IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STATE OF TEXAS,<br><br>　　　　*Plaintiff*,<br><br>　　　　*v.*<br><br>ERIC H. HOLDER, JR., in his official capacity as Attorney General of the United States,<br><br>　　　　*Defendant*. | Civil Action No. 1:12-00128<br>(RMC-DST-RLW)<br>Three-Judge Court |

**UNITED STATES' NOTICE OF FILING SECTION 5 DETERMINATION**

The United States respectfully notifies the Court that on March 12, 2012, the Attorney General made a determination on the State of Texas' administrative submission, pursuant to Section 5 of the Voting Rights Act, 42 U.S.C. § 1973c, of Senate Bill 14, the voting change at issue in this action. In his determination letter, the Attorney General interposed an objection to Sections 9 and 14 of Senate Bill 14, and made no determination regarding related changes in Sections 1-8, 10-13, 15, and 17-22 of Senate Bill 14. A copy of the determination letter is attached hereto as Attachment 1.

Date: March 12, 2012

                                            Respectfully submitted,

RONALD C. MACHEN, JR.         THOMAS E. PEREZ
United States Attorney             Assistant Attorney General
District of Columbia              Civil Rights Division

                                            */s/ Jennifer L. Maranzano*
                                            T. CHRISTIAN HERREN, JR.
                                            MEREDITH BELL-PLATTS
                                            ELIZABETH S. WESTFALL
                                            JENNIFER L. MARANZANO
                                            Voting Section
                                            Civil Rights Division
                                            U.S. Department of Justice
                                            950 Pennsylvania Avenue, N.W.
                                            Washington, D.C. 20530
                                            Telephone:    (800) 253-3931
                                            Facsimile:    (202) 307-3961

                                            *Attorneys for Defendants*

CERTIFICATE OF SERVICE

      I hereby certify that on March 12, 2012, I served a true and correct copy of the foregoing via the Court's ECF system, to the following counsel of record:

Jonathan F. Mitchell
Adam W. Aston
Arthur C. D'Andrea
James P. Sullivan
Office of the Attorney General
209 West 14th Street
7th Floor (MC-059)
Austin, Texas 78701
Telephone: (512) 936-1342

*Counsel for Plaintiff*

Joseph Gerald Hebert
191 Somerville Street
Suite 405
Alexandria, Virginia 22304
Telephone: (703) 628-4673
Facsimile: (202) 736-2222

Chad W. Dunn
Brazil & Dunn
4201 Cypress Creek Pkwy., Suite 530
Houston, TX  77068
Telephone: (281) 580-6310
Facsimile: (281) 580-6362

*Counsel for Movant-Intervenors*

                                            */s/ Jennifer L. Maranzano*
                                            Jennifer Maranzano
                                            Voting Section
                                            Civil Rights Division
                                            U.S. Department of Justice
                                            950 Pennsylvania Avenue, N.W.
                                            Washington, D.C. 20530
                                            Telephone: (800) 253-3931

# ATTACHMENT 1

# ATTACHMENT 1



**U.S. Department of Justice**

Civil Rights Division

---

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

MAR 1 2 2012


Mr. Keith Ingram
Director of Elections
Elections Division
Office of the Texas Secretary of State
P.O. Box 12060
Austin, Texas 78711-2060

Dear Mr. Ingram:

    This refers to Chapter 123 (S.B. 14) (2011), which amends the Texas Transportation Code relating to the issuance of election identification certificates, and which amends the Texas Election Code relating to the procedures for implementing the photographic identification requirements, including registration procedures, provisional-ballot procedures, notice requirements, and education and training requirements, for the State of Texas, submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act of 1965, 42 U.S.C. 1973c. We received your response to our January 9, 2012 follow-up to our September 23, 2011 request for additional information on January 12, 2012; additional information was received through February 17, 2012.

    According to the 2010 Census, the State of Texas had a total population of 25,145,561, of whom 9,460,921 (37.6%) were Hispanic, 2,975,739 (11.8%) were black, 1,027,956 (4.1%) were Asian, and 11,397,345 (45.3%) were Anglo. Texas's total voting-age population was 18,279,737, of whom 6,143,144 (33.6%) were Hispanic, 2,102,474 (11.5%) were black, 758,636 (4.2%) were Asian, and 9,074,684 (49.6%) were Anglo. The five-year aggregate American Community Survey (2006-2010) estimates that Texas had a Hispanic citizen voting-age population of 25.5 percent.

    We have carefully considered the information you have provided, as well as census data, comments and information from other interested parties, and other information, including the state's previous submissions. Under Section 5, the Attorney General must determine whether the submitting authority has met its burden of showing that the proposed changes have neither the purpose nor the effect of denying or abridging the right to vote on account of race or color or membership in a language minority group. *Georgia* v. *United States*, 411 U.S. 526 (1973); *Procedures for the Administration of Section 5 of the Voting Rights Act of 1965*, 28 C.F.R. 51.52(c). With regard to Sections 9 and 14 of S.B. 14, concerning photographic identification

51.52(c). With regard to Sections 9 and 14 of S.B. 14, concerning photographic identification requirements for in-person voting and acceptable forms of photographic identification, I cannot conclude that the state has sustained its burden under Section 5 of the Voting Rights Act. Therefore, on behalf of the Attorney General, I must object to Sections 9 and 14 of S.B. 14.

We start our analysis recognizing the state's legitimate interest in preventing voter fraud and safeguarding voter confidence. *Crawford* v. *Marion County Election Bd.*, 553 U.S. 181 (2008). In that vein, the state's sole justifications for changing the current practice to require photographic identification to vote in person that appear in the legislative proceedings and are presented in its submission are to ensure electoral integrity and deter ineligible voters from voting. At the same time, we note that the state's submission did not include evidence of significant in-person voter impersonation not already addressed by the state's existing laws.

The voting changes at issue must be measured against the benchmark practice to determine whether they would "lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise." *Beer* v. *United States*, 425 U.S. 130, 141 (1976). In support of its position that this proposed requirement will not have such a prohibited effect, the state provided two sets of registered-voter data, which were matched with two different data sources maintained by the state's Department of Public Safety (DPS). One set was current as of September 16, 2011, and the other as of early January 2012. The September data reported that there were 12,780,841 registered voters, of whom 2,785,227 (21.8%) were Hispanic. The January data reported that there were 12,892,280 registered voters, of whom 2,810,869 (21.8%) were Hispanic.

There is, however, a significant difference between the two data sets with regard to the number and characteristics of those registered voters without a driver's license or personal identification card issued by DPS. The September data indicate that 603,892 (4.7%) of the state's registered voters do not have such identification; this population consists of 174,866 voters (29.0% of the 603,892 voters) who are Hispanic and 429,026 voters (71.0%) who are non-Hispanic. The January data indicate that 795,955 (6.2%) of the state's registered voters do not have such identification; this population consists of 304,389 voters (38.2%) who are Hispanic and 491,566 voters (61.8%) who are non-Hispanic. The state has not provided an explanation for the disparate results. More significantly, it declined to offer an opinion on which of the two data sets is more accurate. Accordingly, we have considered both in reviewing your submission.

Starting our analysis with the September data set, 6.3 percent of Hispanic registered voters do not have the forms of identification described above, but only 4.3 percent of non-Hispanic registered voters are similarly situated. Therefore, a Hispanic voter is 46.5 percent more likely than a non-Hispanic voter to lack these forms of identification. In addition, although Hispanic voters represent only 21.8 percent of the registered voters in the state, Hispanic voters represent fully 29.0 percent of the registered voters without such identification.

Our analysis of the January data indicates that 10.8 percent of Hispanic registered voters do not have a driver's license or personal identification card issued by DPS, but only 4.9 percent of non-Hispanic registered voters do not have such identification. So, Hispanic registered voters are more than twice as likely as non-Hispanic registered voters to lack such identification. Under

the data provided in January, Hispanics make up only 21.8 percent of all registered voters, but fully 38.2 percent of the registered voters who lack these forms of identification.

Thus, we conclude that the total number of registered voters who lack a driver's license or personal identification card issued by DPS could range from 603,892 to 795,955. The disparity between the percentages of Hispanics and non-Hispanics who lack these forms of identification ranges from 46.5 to 120.0 percent. That is, according to the state's own data, a Hispanic registered voter is at least 46.5 percent, and potentially 120.0 percent, more likely than a non-Hispanic registered voter to lack this identification. Even using the data most favorable to the state, Hispanics disproportionately lack either a driver's license or a personal identification card issued by DPS, and that disparity is statistically significant.

The state has provided no data on whether African American or Asian registered voters are also disproportionately affected by S.B. 14.

Sections 9 and 14 of S.B. 14 would also permit a voter to vote in person using military photographic identification, a United States citizenship certificate that contains the person's photograph, a United States passport, or a license to carry a concealed handgun. The state has produced no data showing what percent of registered voters lack a driver's license or personal identification card issued by DPS, but do possess another allowable form of photographic identification. Nor has the state provided any data on the demographic makeup of such voters. In addition, when the Texas Legislature was considering S.B. 14, there were a number of legislative proposals to expand the forms of identification that could be used by voters to meet this new requirement – including proposals to allow any state-issued or tribal identification with a photograph to be used for regular voting – but those proposals were rejected.

In view of the statistical evidence illustrating the impact of S.B. 14 on Hispanic registered voters, we turn to those steps that the state has identified it will take to mitigate that effect.

You have informed us that the DPS-issued "free" election identification certificate, which is proposed to be implemented by Section 20 of S.B. 14, would protect voters who do not already have another acceptable form of identification. The application process for these certificates will mirror the manner in which a person obtains a driver's license. First-time applicants will be required to furnish various supplemental documents and undergo an application process that includes fingerprinting and traveling to a driver's license office.

An applicant for an election identification certificate will be required to provide two pieces of secondary identification, or one piece of secondary identification and two supporting documents. If a voter does not possess any of these documents, the least expensive option will be to spend $22 on a copy of the voter's birth certificate. There is a statistically significant correlation between the Hispanic population percentage of a county and the percentage of a county's population that lives below the poverty line. The legislature tabled amendments that would have prohibited state agencies from charging for any underlying documents needed to obtain an acceptable form of photographic identification.

As noted above, an applicant for an election identification certificate will have to travel to a driver's license office. This raises three discrete issues. First, according to the most recent American Community Survey three-year estimates, 7.3 percent of Hispanic or Latino households do not have an available vehicle, as compared with only 3.8 percent of non-Hispanic white households that lack an available vehicle. Statistically significant correlations exist between the Hispanic voting-age population percentage of a county, and the percentage of occupied housing units without a vehicle.

Second, in 81 of the state's 254 counties, there are no operational driver's license offices. The disparity in the rates between Hispanics and non-Hispanics with regard to the possession of either a driver's license or personal identification card issued by DPS is particularly stark in counties without driver's license offices. According to the September 2011 data, 10.0 percent of Hispanics in counties without driver's license offices do not have either form of identification, compared to 5.5 percent of non-Hispanics. According to the January 2012 data, that comparison is 14.6 percent of Hispanics in counties without driver's license offices, as compared to 8.8 percent of non-Hispanics. During the legislative hearings, one senator stated that some voters in his district could have to travel up to 176 miles roundtrip in order to reach a driver's license office. The legislature tabled amendments that would have, for example, provided reimbursement to voters who live below the poverty line for travel expenses incurred in applying for the requisite identification.

The third and final point is the limited hours that such offices are open. Only 49 of the 221 currently open driver's license offices across the state have extended hours. Even Senator Troy Fraser, the primary author of this legislation in the Senate, acknowledged during the legislative hearing that, "You gotta work to make sure that [DPS offices] are open." Despite the apparent recognition of the situation, the legislature tabled an amendment that would have required driver's license offices to be open until 7:00 p.m. or later on at least one weekday and during four or more hours on at least two Saturdays each month.

The legislation mandates a statewide voter-education effort concerning the new identification requirement, but does not provide specific standards for the program. The state, however, has yet to approve a final version of the materials designed to accomplish that goal, either for voters or for election officials. The state has indicated that it will implement a new educational program; but as of this date, our information indicates that the currently proposed plan will incorporate the new identification requirement into a general voter-education program.

The legislation requires that poll-worker training materials reflect the new identification requirements. This is particularly vital because a poll-worker can permit a voter to cast a ballot if the name as listed on the documentation is "substantially similar to but does not match exactly" the name on the voter registration list, and if the voter also submits an affidavit stating that he or she is the person on the list of registered voters. Though the Secretary of State's office has adopted an administrative rule to guide poll-workers in determining when names are substantially similar, the rule gives poll-workers a great deal of discretion. The state has provided no enforcement guidelines to prevent the vagueness of this standard from leading to inconsistency or bias in its application.

Even after submitting data that show over 600,000 registered voters do not have either a driver's license or personal identification card issued by DPS – and that a disproportionate share of those registered voters are Hispanic – the state has failed to propose, much less adopt, any program for individuals who have to travel a significant distance to a DPS office, who have limited access to transportation, or who are unable to get to a DPS office during their hours of operation. This failure is particularly noteworthy given Texas's geography and demographics, which arguably make the necessity for mitigating measures greater than in other states. The state also has not developed any specific proposals to educate either voters about how to comply with the new identification requirement or poll officials about how to enforce the proposed change.

In conclusion, the state has not met its burden of proving that, when compared to the benchmark, the proposed requirement will not have a retrogressive effect, or that any specific features of the proposed law will prevent or mitigate that retrogression. Additionally, the state has failed to demonstrate why it could not meet its stated goals of ensuring electoral integrity and deterring ineligible voters from voting in a manner that would have avoided this retrogressive effect. Because we conclude that the state has failed to meet its burden of demonstrating that the proposed law will not have a retrogressive effect, we do not make any determination as to whether the state has established that the proposed changes were adopted with no discriminatory purpose.

Under Section 5 of the Voting Rights Act, the submitting authority has the burden of showing that a submitted change has neither a discriminatory purpose nor a discriminatory effect. *Georgia* v. *United States*, 411 U.S. 526 (1973); 28 C.F.R. 51.52. In light of the considerations discussed above, I cannot conclude that your burden has been sustained in this instance. Therefore, on behalf of the Attorney General, I must object to the changes affecting voting that are occasioned by Sections 9 and 14 of Chapter 123 (S.B. 14) (2011). Sections 1 through 8, 10 through 13, 15, and 17 through 22 of S.B. 14 are directly related to the procedures for implementing the photographic identification requirements, including registration procedures, provisional-ballot procedures, notice requirements, and education and training requirements. Accordingly, no determination by the Attorney General is required or appropriate under Section 5. 28 C.F.R. 51.22 and 51.35.

We note that under Section 5 you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that these proposed changes neither have the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group. 28 C.F.R. 51.44. In addition, you may request that the Attorney General reconsider the objection. 28 C.F.R. 51.45. However, until the objection is withdrawn or a judgment from the United States District Court for the District of Columbia is obtained, the submitted changes continue to be legally unenforceable. *Clark* v. *Roemer*, 500 U.S. 646 (1991); 28 C.F.R. 51.10. To enable us to meet our responsibility to enforce the Voting Rights Act, please inform us of the action that the State of Texas plans to take concerning this matter. If you have any questions, you should contact Robert S. Berman (202/514-8690), a deputy chief in the Voting Section.

6

      Because the Section 5 status of this legislation is presently before the United States District Court for the District of Columbia in *State of Texas* v. *Holder,* No. 1:12-cv-00128 (D.D.C.), we are providing the Court and counsel of record with a copy of this letter.

                                        Sincerely,

                                        Thomas E. Perez
                                        Assistant Attorney General