## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS

     *Plaintiff,*

vs.

ERIC H. HOLDER, JR.,
ATTORNEY GENERAL OF THE
UNITED STATES

     *Defendant.*

Case No. 1:12-cv-00128
RMC-DST-RLW

## FIRST AMENDED EXPEDITED COMPLAINT
## FOR DECLARATORY JUDGMENT

1.    The State of Texas brings this suit under section 5 of the Voting Rights Act of 1965, 42 U.S.C. § 1973c ("section 5"), and under 28 U.S.C. § 1331, and seeks a declaratory judgment that its recently enacted Voter-ID Law, also known as Senate Bill 14, neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race or color, nor will it deny or abridge the right of any citizen of the United States to vote because he is a member of a language minority group.

2.    In the alternative, the State of Texas seeks a declaration that section 5, as most recently amended and reauthorized by the Voting Rights Act Reauthorization and Amendments Act of 2006, exceeds the enumerated

1

powers of Congress and conflicts with Article IV of the Constitution and the Tenth Amendment.

## I.  THE PARTIES

3.    The plaintiff is the State of Texas.

4.    The defendant, United States Attorney General Eric Holder acting in his official capacity, has his office in the District of Columbia.

## II.  JURISDICTION AND VENUE

5.    The Court has jurisdiction under 28 U.S.C. § 1331 and venue under 42 U.S.C. § 1973c.

## III.  THREE-JUDGE COURT

6.    The State of Texas requests the appointment of a three-judge court under 42 U.S.C. § 1973b and 28 U.S.C. § 2284.

## IV.  FACTS AND BACKGROUND

7.    On May 27, 2011, the Governor of Texas signed into law Senate Bill 14, which requires most voters to present a government-issued photo identification when appearing to vote at the polls.  Voters who suffer from a documented disability as determined by the United States Social Security Administration or the Department of Veteran Affairs are exempt from this requirement.  *See* SB 14 § 1. (Ex. 1).  The Texas Election Code also permits voters over the age of 65, as well as disabled voters, to vote by mail, and those who vote by mail are not required to obtain or present photo identification when voting.  *See* TEX. ELEC. CODE §§ 82.002–82.003.

2

8.     Voters who lack a government-issued photo identification may obtain from the Texas Department of Public Safety (DPS) an "election identification certificate," which is issued free of charge and satisfies the photo-identification requirements of Senate Bill 14.  *See* SB 14 § 20.

9.     Under Senate Bill 14, voters who fail to bring a government-issued photo identification may still cast a provisional ballot at the polls. Those ballots will be accepted if the voter presents a government-issued photo identification to the voter registrar within six days after the election, or if the voter executes an affidavit stating that the voter has a religious objection to being photographed or that he has lost his photo identification in a natural disaster that occurred within 45 days of the election.  *See* SB 14 §§ 17-18.

10.     Senate Bill 14 resembles the Indiana Voter-ID Law that the Supreme Court of the United States upheld as constitutional in *Crawford v. Marion County Election Bd.*, 553 U.S. 181 (2008).  Indiana's law was allowed to go into effect upon enactment, because Indiana is not a "covered jurisdiction" under the Voting Rights Act.  Other States, such as Wisconsin and Kansas, have enacted photo-identification requirements in 2011 and are permitted to enforce their laws regardless of whether DOJ may object to those laws.

11.     Senate Bill 14 also resembles the Voter-ID Law in Georgia that the Department of Justice precleared in 2005.

12.     Section 5 prohibits a State subject to section 4(b) of the Voting Rights Act, 42 U.S.C. § 1973b(b), from enforcing "any voting qualification or prerequisite to voting . . . different from that in force and effect on November 1, 1964" unless the State either obtains a declaratory judgment from the United States District Court for the District of Columbia that its election law "neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race or color," or because of membership in a language minority group, or else obtains approval for its law from the Attorney General of the United States.  *Id.* § 1973c(a).

13.     Because Texas is a "covered jurisdiction" under section 5 of the Voting Rights Act, it is not permitted to implement Senate Bill 14 unless the State obtains preclearance from either the Department of Justice or a three-judge panel of this Court.  On July 25, 2011, the State of Texas submitted Senate Bill 14 to the Department of Justice for preclearance.  Submission Letter, A. McGeehan to T. Herren (July 25, 2011) (Ex. 2).

14.     On September 23, 2011, exactly 60 days after Texas had submitted Senate Bill 14 for administrative preclearance, and on the last possible day for DOJ to respond, the Department of Justice sent a letter to the Texas Director of Elections, stating that the information provided in the State's preclearance submission was "insufficient to enable us to determine that the proposed changes have neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or

membership in a language minority group."   Letter, T. Herren to A. McGeehan (Sept. 23, 2011) (Ex. 3).   DOJ's response to the State requested, among other things, that Texas provide:

> "a.   The number of registered voters in Texas, by race and Spanish surname within county of residence, who currently possess a Texas driver's license or other form of photo identification issued by DPS that is current or has expired within sixty days.   Please include a description of the manner in which you calculated these numbers;
>
> "b.   For the 605,576 registered voters who the State has advised do not have a Texas driver's license or personal identification card, please provide the number of such persons by Spanish surname, as well as an estimated number by race, within county of residence; and
>
> "c.   Describe any and all efforts, other than the requirements outlined in Section 5 of Chapter 123, to provide notice to these individuals of the requirements of S.B. 14 and the availability of a free DPS-issued identification."

*Id.* at 2-3.

15.   On October 4, 2011, Texas responded to DOJ in a letter that answered DOJ's questions and attached the data that Texas was capable of providing.   Because Texas does not record the race of voters when they register to vote, the State explained that it was unable to determine the racial makeup of registered voters who lack DPS-issued identification. Indeed, the very reason Texas refuses to maintain racial and ethnic data on its list of registered voters is to facilitate a colorblind electoral process, and Texas adopted this race-blind voter-registration policy shortly after the enactment of the 1965 Voting Rights Act.   In addition, until 2009, the DPS

did not maintain a separate Hispanic category for driver's license holders to check when providing their racial or ethnic background—which further crimped the State's ability to calculate racial or ethnic breakdown of those who have (or do not have) DPS-issued photo-identification cards.

16.     On November 16, 2011, DOJ responded to Texas's submission of additional information in a letter yet again claiming that the supplemental information provided by the State was "incomplete" and "does not enable us to determine that the proposed changes have neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color or membership in a language minority group."  Letter, T. Herren to A. McGeehan (Nov. 16, 2011) (Ex. 4).  This time, DOJ demanded that the State provide a racial breakdown of each *county* of voters that possess DPS-issued identification, which would then be used to extrapolate the racial makeup of that group as compared to the general population.

17.     On January 12, 2012, Texas provided the data that DOJ requested along with a letter explaining the State's concerns about the relevance of that data to the law's impact on minority voters.  Letter, K. Ingram to T. Herren (Jan. 12, 2012) (Ex. 5).

18.     On December 23, 2011, the Department of Justice announced that it denied preclearance to South Carolina's recently enacted Voter-ID Law—notwithstanding the Department of Justice's earlier decision to preclear a similar Voter-ID law in Georgia.  In a letter explaining its decision,

the Department of Justice cited data showing that 8.4% of white registered voters in South Carolina did not possess a photo identification issued by the State's Department of Motor Vehicles, while 10.0% of "non-white" registered voters in South Carolina did not possess this type of DMV-issued photo identification.  *See* Letter, T. Perez to C. Jones (Dec. 23, 2011), at 2 (Ex. 6).

19.   The Department of Justice concluded this 1.6% "racial disparit[y]" compelled it to deny preclearance on the ground that South Carolina had "failed to meet its burden of demonstrating that [its Voter-ID law] will not have a retrogressive effect."  *See* DOJ Letter to S.C. at 4-5.  The Department of Justice rejected South Carolina's Voter-ID law notwithstanding the fact that South Carolina's law, like Texas's, provides free photo-identification to voters who lack the identification needed to vote, and permits voters who do not possess government-issued photo identification to cast provisional ballots on Election Day, which will be counted if the voter brings a valid and current photo identification to the county board of registration and elections before certification of the election.

18.   On March 12, 2012, exactly 60 days after Texas had answered DOJ's latest request for additional data, and on the last possible day for DOJ to respond, the Department of Justice announced its decision denying preclearance to Senate Bill 14.  In a letter explaining its decision, the Assistant Attorney General for Civil Rights stated that he "cannot conclude

that the state has sustained its burden under Section 5 of the Voting Rights Act." *See* Letter, T. Perez to K. Ingram (March 12, 2012), at 2 (Ex. 7).

18.     The Department of Justice's letter to Texas expressly recognized the State's interests in preventing voter fraud and safeguarding voter confidence.   Further, it did not deny the existence of in-person voter impersonation that Senate Bill 14 was enacted to detect and deter.   The Department of Justice asserted, however, that the State's submission "did not include evidence of *significant* in-person voter impersonation not already addressed by the state's existing laws."   *See* Letter, T. Perez to K. Ingram (March 12, 2012), at 2 (Ex. 7) (emphasis added).   The Department of Justice apparently believes that section 5 prevents a State from deterring and detecting election fraud—which undermines all citizens' voting rights—if the State's generally applicable voter-fraud-prevention laws happen to impact various types of voters in different ways.   The Department also seems to believe that it has the authority to unilaterally determine what constitutes "significant" fraud, despite the fact that local elections, in particular, can turn on a handful of votes.   And despite the Department's repeated requests for information from the State, it never asked the State to submit evidence of election fraud.   Nonetheless, the Department now attempts to support its decision by noting that the State did not include evidence of "significant" voter impersonation.

19.   The Department of Justice's letter to Texas claims that the State must prove that the percentage of Hispanic registered voters who currently possess a photo identification equals or exceeds the percentage of non-Hispanic registered voters who currently possess photo identification.   But Texas does not record the race of voters when they register to vote, and until 2009 DPS did not maintain a separate Hispanic category on driver's licenses. The Department of Justice purports to derive the number of "Hispanic" and "non-Hispanic" registered voters and holders of driver's licenses from the State's data by using Spanish surname as a proxy for Hispanic ethnicity. This approach fails to account for the large number of Hispanics who lack Spanish surnames, and discriminates between Hispanic men and women who choose to marry someone of a different race or ethnicity.   *See Rodriguez v. Bexar County*, 385 F.3d 853, 866 n.18 (5th Cir. 2004) (criticizing Spanish-surname data as a "highly problematic" and "disfavored" method of measuring Hispanic ethnicity).

20.   The Department of Justice's letter to Texas cites data showing that registered voters with Spanish surnames are more likely to currently lack a driver's license than voters without Spanish surnames.   *See* Letter, T. Perez to K. Ingram (March 12, 2012), at 2-3 (Ex. 7).   The Department of Justice concluded this "disparit[y]" compelled it to deny preclearance on the ground of retrogressive effect.   *See* Letter, T. Perez to K. Ingram (March 12, 2012), at 3 (Ex. 7).   The Department of Justice rejected Texas's Voter-ID law

notwithstanding the fact that Texas's law offers photo-identification *free of charge* to voters who lack the identification needed to vote, and permits voters who do not possess government-issued photo identification to cast provisional ballots on Election Day, which will be counted if the voter brings a valid and current photo identification to the county board of registration and elections within six days of the election.

19.    The Department of Justice's letter rejecting Texas's preclearance submission does not make a serious effort to reconcile its administrative-preclearance decision with the Supreme Court's ruling in *Crawford*—which not only upheld Indiana's Voter-ID law as constitutional, but also made clear that photo-identification requirements are "nondiscriminatory" election regulations.    *See Crawford*, 553 U.S. at 203 (opinion of Stevens, J.) (upholding Indiana's photo-identification requirement as "a neutral, *nondiscriminatory* regulation of voting procedure.") (emphasis added); *id.* at 205 (Scalia, J., concurring in the judgment) (The Indiana photo-identification law is a "generally applicable, *nondiscriminatory* voting regulation.") (emphasis added).

20.    Similarly, the Department of Justice's letter to Texas does not acknowledge the serious constitutional questions that arise from DOJ's decision to interpret section 5 in a manner that would preclude covered jurisdictions from enforcing the same type of election-fraud prevention measures that the Supreme Court has upheld as constitutional—and that fall

within the States' reserved powers under the Tenth Amendment to the Constitution.  *See generally Northwest Austin Mun. Utility Dist. No. One v. Holder*, 557 U.S. 193 (2009).

21.    The Department of Justice's letter to Texas also fails to acknowledge its own previous decision to preclear the Voter-ID law in Georgia, and does not attempt to reconcile the Department's refusal to preclear Texas's Voter-ID law with its earlier preclearance rulings.

## V.  CLAIMS FOR RELIEF

**CLAIM ONE**:

**The State of Texas is entitled to a declaratory judgment granting preclearance to Senate Bill 14 under section 5 of the Voting Rights Act because Senate Bill 14 has neither the purpose nor the effect of denying or abridging the right to vote on account of race or color, or because of membership in a language minority, and otherwise fully complies with section 5 of the Voting Rights Act.**

24.    The allegations in paragraphs 7 – 23 are reincorporated herein.

A.    Senate Bill 14 does not "deny or abridge" the right to vote.

25.    The State of Texas respectfully requests a declaration from this Court that Senate Bill 14 does not "deny or abridge" the right to vote within the meaning of section 5, nor was it enacted with this purpose.  Section 5 does not preclude covered jurisdictions from enacting generally applicable fraud-prevention laws, such as Senate Bill 14, that entail minor inconveniences on exercising the right to vote—especially when the covered jurisdiction mitigates those inconveniences through the mechanisms of free photo-ID cards and provisional ballots.  For example, laws requiring that

citizens register to vote prior to election day impose inconveniences that are similar to the one required by Senate Bill 14.  But neither of these laws "denies" or "abridges" the right to vote.

26.    Laws requiring voters to present proper identification at polling places are common.  At the time of this complaint, no fewer than 31 States require voters to present some type of identification when voting at the polls. *See*    http://www.ncsl.org/legislatures-elections/elections-campaigns/voter-id-state-requirements.aspx.  Further, 15 States have enacted laws that require voters to present a photo identification.  *Id.*

27.    These laws do not "deny" or "abridge" anyone's right to vote—a voter needs only to bring identification to the polls, and, in Texas, if a voter fails to bring the required government-issued photo identification to the polls then he can cast a provisional ballot that will be counted if the voter presents the required identification to the voter registrar within six days of the election.  In addition, voters can obtain photo identification *free of charge* at any time, at their convenience, before the election—or after casting a provisional ballot—if they lack an acceptable form of government-issued identification.

28.    DOJ's letter to Texas reflects a belief that *any* law that imposes even the *slightest* inconvenience on one's ability to vote represents a "denial" or "abridgement" of the right to vote—even when the State accommodates those who do not possess a photo identification by offering photo

identification free of charge and by allowing voters without photo identification to cast provisional ballots. That is not a tenable construction of the Voting Rights Act, and it cannot be reconciled with the Supreme Court's ruling in *Crawford*. *See* 553 U.S. at 198 (opinion of Stevens, J.) ("[T]he inconvenience of making a trip to the DMV, gathering the required documents, and posing for a photograph *surely does not qualify as a substantial burden on the right to vote, or even represent a significant increase over the usual burdens of voting*.") (emphasis added); *id.* at 209 (Scalia, J. concurring in the judgment) ("The universally applicable requirements of Indiana's voter-identification law are eminently reasonable. The burden of acquiring, possessing, and showing a free photo identification is simply not severe, because it does not 'even represent a significant increase over the usual burdens of voting.'" And the State's interests are sufficient to sustain that minimal burden.") (internal citations omitted).

29. The Supreme Court's ruling in *Crawford* also recognizes that allowing voters to cast provisional ballots mitigates any "burdens" that photo-identification requirements might otherwise impose on the right to vote. *See Crawford*, 553 U.S. at 199 ("The severity of that burden is, of course, mitigated by the fact that, if eligible, voters without photo identification may cast provisional ballots that will ultimately be counted."). Sections 17 and 18 of Senate Bill 14 allow voters who appear at the polls without the required identification to cast provisional ballots, an allowance that defeats any claim

that the photo-identification requirement "denies" or "abridges" anyone's right to vote.  Unlike many other voting changes that may actually prevent someone from participating in an election, Senate Bill 14's requirements will affect only the ballots of those who *choose* not to obtain the required identification that the State offers free of charge—either before the election or (for those who cast provisional ballots) in the six-day window following the election.

B.   <u>Senate Bill 14 does not deny or abridge the right to vote "on account of race or color," or "because" of one's membership in a "language minority group."</u>

30.   The State of Texas respectfully requests a declaration from this Court that Senate Bill 14 does not deny or abridge the right to vote "on account of race or color," or "because" of one's membership in a "language minority group," and that it was not enacted with those purposes.  As the Supreme Court recognized in *Crawford*, photo-identification laws are "nondiscriminatory"; they apply to all voters regardless of race and language abilities, and they affect only those voters who choose not to obtain a photo identification (which the State offers free of charge) and present it either at the polls or to the voting registrar after casting a provisional ballot.

31.   Even if racial or language minorities may be statistically less likely than others to currently possess a government-issued photo identification (as DOJ asserts in its letter), that does not establish a section 5

violation.  Section 5 precludes covered jurisdictions from enforcing those laws that have the "purpose" or "effect" of "denying or abridging the right to vote *on account of race or color*," or "deny[ing] or abridg[ing] the right of any citizen of the United States to vote *because he is a member of a language minority group*."  *See* § 1973c(a) (emphasis added); § 1973b(f)(2) (emphasis added).  Even if DOJ contends that Senate Bill 14 has the unintended effect of "denying" or "abridging" the voting rights of those who do not possess a government-issued photo identification, it does not do so *on account of* their race or color, or *because of* their membership in a language minority group.  It would do so on account of their decision not to obtain the identification that the State offers free of charge.

32.  The Department of Justice's letter to Texas asserts that section 5 jurisdictions are forbidden to enforce any Voter-ID law that will "lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise."  *See* DOJ Letter at 2 (quoting *Beer v. United States*, 425 U.S. 130, 141 (1976)).  This approach is irreconcilable with the language of section 5, which protects persons of *all* races from new voting laws that have the effect of denying or abridging the right to vote *on account of race or color*.  Nothing in section 5 authorizes the Department of Justice or this Court to withhold preclearance from a neutral, nondiscriminatory voter-identification law simply because DOJ believes the law may have a disparate impact on minority voters—or white voters.  The existing patterns of photo-

ID possession will always vary somewhat by race, so these laws will *always* have a temporary differential effect on *some* racial group.

33.    Section 5 *does* allow DOJ or this Court to withhold preclearance from voting qualifications that were enacted with the purpose of denying or abridging the voting rights of a particular race, or facially neutral voting qualifications that may have been enacted with benign motivations but that are *administered* by racially biased election officials who selectively enforce these laws to deny minorities the right to vote *on account of their race.  See, e.g., South Carolina v. Katzenbach*, 383 U.S. 301, 312-13 (1966). But Texas's Voter-ID law was not enacted with the purpose of disenfranchising minority voters, and there is not even a suggestion that the State would administer those laws in a racially biased manner.  Nor is there any evidence that Texas would administer this law in a manner that would abridge the voting rights of language minorities *because of* their membership in a language minority group.

34.    *Beer*'s "nonretrogression" construction of section 5 arose from a case involving legislative reapportionment and must be limited to that context.  *See Beer*, 425 U.S. at 141 ("It is thus apparent that *a legislative reapportionment that* enhances the position of racial minorities with respect to their effective exercise of the electoral franchise can hardly have the 'effect' of diluting or abridging the right to vote on account of race within the meaning of § 5."); *see also Reno v. Bossier Parish School Bd.*, 528 U.S. 320,

329 (2000) ("In *Beer v. United States*, 425 U.S. 130 (1976), this Court addressed the meaning of the no-effect requirement *in the context of an allegation of vote dilution.*") (emphasis added). The inherently unique nature of the reapportionment process is such that redistricting is fundamentally distinct from laws that govern the administration of elections or ballot-box integrity.

35.    Extending "retrogressive effects" analysis to Voter-ID laws, by denying preclearance to any voter requirement that has an unintended disparate impact on racial or language minorities, would present serious constitutional questions. The Fifteenth Amendment prohibits only voting restrictions that are *motivated by* racial discrimination. *See City of Mobile v. Bolden*, 446 U.S. 55, 62 (1980) ("[R]acially discriminatory motivation is a necessary ingredient of a Fifteenth Amendment violation."). If the Department of Justice's apparent construction of section 5 operated to block Texas's Voter-ID law solely because it *may* have a *disparate impact* on racial minorities (or "language minorities"), then this Court will have to confront whether this interpretation of section 5 represents a permissible exercise of Congress's enforcement power under the Fifteenth Amendment. *See generally City of Boerne v. Flores*, 521 U.S. 507 (1997); *Nw. Austin Mun. Util. Dist. No. One v. Holder,* 129 S. Ct. 2504 (2009). Courts must adopt any reasonably permissible construction of section 5 that will avoid these constitutional concerns. *See Nw. Austin*, 129 S. Ct. at 2511-14. To do that,

this Court must cabin the "nonretrogressive effects" test to the context of legislative redistricting.

36.   Even if non-retrogression extends beyond redistricting, it still should not extend to a law that imposes a temporary inconvenience no greater than the inherent inconvenience of voting.   Whatever the initial disproportionate impact based on a snapshot of current patterns of photo-ID possession, those patterns are easily changed and cannot be the basis for a finding of disproportionate or retrogressive impact.

C.   <u>The Court must interpret section 5 of the Voting Rights Act to permit preclearance of Senate Bill 14 in order to avoid the grave constitutional question whether section 5 exceeds Congress's enforcement power under section 2 of the Fifteenth Amendment.</u>

37.   Any construction of section 5 that precludes Texas from implementing its Voter-ID Law will exceed Congress's enforcement power under section 2 of the Fifteenth Amendment, or will at the very least present grave constitutional questions that this Court must avoid.   A finding that covered jurisdictions cannot adopt a commonsense voting change already found to be non-discriminatory by the Supreme Court would highlight the constitutional difficulties with section 5.   Accordingly, this Court must interpret section 5 in a manner that authorizes preclearance in this case.   *See Nw. Austin*, 129 S. Ct. at 2511-14.

38.    Section 2 of the Fifteenth Amendment empowers Congress to "enforce" the Fifteenth Amendment with "appropriate" legislation.   This enforcement prerogative might permit Congress to enact laws that empower DOJ or this Court to deny preclearance to state laws *that actually violate* the Fifteenth Amendment.  *See South Carolina v. Katzenbach*, 383 U.S. 301, 334 (1966) ("The Act suspends new voting regulations pending scrutiny by federal authorities *to determine whether their use would violate the Fifteenth Amendment.*") (emphasis added).  But, as the Supreme Court recognized in *South Carolina*, placing the States under this form of administrative receivership pushes the constitutional boundaries of Congress's enforcement power under the Fifteenth Amendment.  *Id.*

39.    The Texas Voter-ID law does not violate the Fifteenth Amendment because it was not enacted with a racially discriminatory purpose.  *See City of Mobile v. Bolden*, 446 U.S. 55, 62 (1980).  In addition, the Supreme Court has explicitly upheld photo-identification laws against constitutional challenges, declaring that these laws represent "nondiscriminatory" regulations of elections.  *See Crawford*, 553 U.S. at 203 (opinion of Stevens, J.); *id.* at 205 (Scalia, J., concurring in the judgment).  It is tenuous enough for a federal court or the Department of Justice to deny preclearance to a voting qualification that does not violate the Fifteenth Amendment; these constitutional concerns are further aggravated when

preclearance is withheld from a law that the Supreme Court of the United States has explicitly upheld as constitutional.

40.     Even if the Constitution is properly construed to empower Congress to enact prophylactic legislation that extends beyond the self-executing right established in section 1 of the Fifteenth Amendment, any attempt by Congress to invoke its powers in this prophylactic manner will raise serious constitutional questions.  That is nowhere more obvious than in the case of section 5 of the Voting Rights Act, which represents an enormous intrusion into state sovereignty by reversing the bedrock assumption that duly enacted (and constitutional) state laws may take immediate effect. Accordingly, Congress is required to state its extra-constitutional prohibitions in clear and explicit language and justify this prophylaxis with legislative findings.  *See, e.g.*, *Katzenbach v. Morgan*, 384 U.S. 641 (1966) (upholding a congressional prohibition on literacy tests only after noting "evidence suggesting that prejudice played a prominent role in the enactment of the [literacy-test] requirement"); *Oregon v. Mitchell*, 400 U.S. 112 (1970) (opinion of Black, J) (upholding a federal ban on literacy tests that was based on a congressional finding that "literacy tests have been used to discriminate against voters on account of their color.").  *See also Bd. of Trustees of the Univ. of Alabama v. Garrett*, 531 U.S. 356 (2001); *Kimel v. Florida Board of Regents*, 528 U.S. 62 (2000); *City of Boerne v. Flores*, 521 U.S. 507 (1997). The language of section 5 falls far short of the clear statement needed for this

Court to even consider denying preclearance to the perfectly constitutional Voter-ID law that Texas has enacted.

41.     The interpretation of section 5 that the Department of Justice adopted in its letter to Texas will establish a preclearance obstacle that sweeps far beyond what is necessary to enforce the Fifteenth Amendment. Both the Fourteenth and Fifteenth Amendments prohibit only those voting restrictions that are *motivated by* racial discrimination.  *See City of Mobile v. Bolden*, 446 U.S. 55 (1980).  To the extent that section 5 blocks laws that are free from racially discriminatory motives, it can survive only if its prophylactic scope satisfies the "congruent" and "proportional" test of *City of Boerne v. Flores*, 521 U.S. 507 (1997).  Congress enacted the VRA "to make the guarantees of the Fifteenth Amendment finally a reality for all citizens," *Allen v. State Bd. of Elections*, 393 U.S. 544, 556 (1969), not to empower the Department of Justice to block States from enacting laws that do not violate the Fifteenth Amendment and that the Supreme Court has expressly upheld as constitutional.

42.     There is no conceivable justification for construing section 5 in a manner that would enable DOJ or the federal courts to deny administrative preclearance to a law that the Supreme Court has already determined is non-discriminatory.  Nor is there any justification for requiring Texas to wait for permission from DOJ (or a federal district court) before implementing its photo-identification laws.   *Crawford* shows that litigants can bring

immediate challenges to new voting requirements that are believed to disproportionately affect minorities by invoking the Fourteenth and Fifteenth Amendments and section 2 of the VRA.  And a district court can promptly issue a temporary restraining order or a preliminary injunction if the plaintiffs demonstrate a likelihood of success on the merits.

     D.    <u>The Court must interpret section 5 of the Voting Rights Act to permit preclearance of Senate Bill 14 in order to avoid the grave constitutional question whether section 5 violates the Tenth Amendment.</u>

     43.    Any construction of section 5 that precludes Texas from implementing its Voter-ID Law will violate the Tenth Amendment by denying covered jurisdictions the powers reserved to them under that amendment, or will at the very least present grave constitutional questions that this Court must avoid by interpreting section 5 to allow for preclearance in this case.

     44.    Although the Supreme Court in *Crawford* did not directly address the Tenth Amendment, by upholding Indiana's Voter-ID law the Court effectively recognized that the States enjoy a reserved power under the Tenth Amendment to require voters to present photo identification at the polls—at least when appearing to vote for state and local officials.  Congress therefore has no power to enact legislation to nullify Indiana's Voter-ID law for state and local elections.  *See, e.g., Oregon v. Mitchell*, 400 U.S. 112, 125 (1970) (opinion of Black, J.) ("No function is more essential to the separate

and independent existence of the States and their governments than the power to determine within the limits of the Constitution the qualifications of their own voters for state, county, and municipal offices and the nature of their own machinery for filling local public offices.").  It follows that Congress cannot empower the Department of Justice or the federal courts to block Texas from requiring photo identification when conducting elections for state and local officials.

E.    The Court must interpret section 5 of the Voting Rights Act to permit preclearance of Senate Bill 14 in order to avoid the grave constitutional question that section 5 violates the Republican Form of Government Clause.

45.    Any construction of section 5 that precludes Texas from implementing its Voter-ID Law will violate the Constitution's Republican Form of Government Clause by giving federal officials an arbitrary veto power over a democratically enacted, constitutional state law, or will at the very least present grave constitutional questions that this Court must avoid by interpreting section 5 to allow for preclearance in this case.

46.    Senate Bill 14 was modeled on the Voter-ID legislation that the Supreme Court approved in *Crawford* and that the Department of Justice precleared in 2005.  It passed with overwhelming majorities in both Houses of the Texas Legislature.  To deny preclearance will allow the Attorney General or a panel of federal judges to thwart the will of Texas's elected

representatives and block state officials from implementing a democratically enacted, constitutional state law.  Federal courts may of course enjoin state officials from implementing unconstitutional statutes, and Congress may pass legislation to preempt state law consistent with its enumerated constitutional powers.  But Congress cannot establish a regime that permits unelected officials at the Department of Justice to arbitrarily deny preclearance to a constitutional Voter-ID law enacted by a State's democratically enacted legislature—especially when preclearance has already been granted to a materially similar Voter-ID law in Georgia.

47.  Section 5, if interpreted to preclude preclearance of Senate Bill 14, further violates the Republican Form of Government Clause by disabling the State of Texas from implementing a constitutionally legitimate election fraud-prevention device.  *See Crawford v. Marion County Election Board*, 553 U.S. 181, 196-197 (2008) (opinion of Stevens, J.).

F.   <u>The Court should interpret section 5 of the Voting Rights Act in a manner that permits preclearance of Senate Bill 14 in order to avoid the grave constitutional question whether section 5 violates Texas's right to "equal sovereignty."</u>

48.  Section 5, if interpreted to forbid Texas to enforce its Voter-ID law, violates constitutional principles of federalism and state sovereignty by depriving Texas of equal sovereignty with other States.

49.    Other States, such as Indiana, Kansas, and Wisconsin, have been able to enact and enforce similar laws without interference from DOJ. Yet Texas is denied that ability to implement election-fraud prevention laws. This creates a two-tracked system of sovereignty, in which States such as Indiana, Kansas, and Wisconsin can enforce their photo-identification requirements, but Texas and South Carolina cannot, even though all of these state laws comply with the Constitution.   As Justice Kennedy has aptly noted, "Texas is at a tremendous disadvantage" as result of the fact that "section 5 applies only to some States and not others."   Oral Argument Transcript, *Perry v. Perez*, No. 11-713, at 38 Tr. 5-11 (Jan. 9, 2012).  Worse, under DOJ's interpretation of section 5, Georgia can enforce its photo-identification requirements simply because it was fortuitous enough to seek administrative preclearance during a previous Administration.

50.  Section 5, if interpreted to preclude preclearance of Senate Bill 14, relegates Texas to a diminished tier of sovereignty by disabling Texas from implementing a legitimate election fraud-prevention device.  *See Crawford v. Marion County Election Board*, 553 U.S. 181, 196 (2008) (opinion of Stevens, J.) ("There is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters. Moreover, the interest in orderly administration and accurate recordkeeping provides a sufficient justification for carefully identifying all voters participating in the election process."); *id.* at 196-197 ("[T]he fact of inflated voter rolls does provide a

neutral and nondiscriminatory reason supporting the State's decision to require photo identification."). "Non-retrogression" cannot be invoked to prohibit covered jurisdictions (such as Texas and South Carolina) from enacting *constitutional* fraud-prevention devices that non-covered jurisdictions (such as Indiana, Kansas, and Wisconsin) may implement.

**CLAIM TWO**:

> **The State of Texas is entitled to a declaratory judgment authorizing the immediate implementation of Senate Bill 14 because section 5 of the Voting Rights Act violates the Constitution.**

51.   The allegations in paragraphs 7 – 50 are reincorporated herein.

52.   The 2006 reauthorization of section 5 is unconstitutional on its face for the reasons provided in *Northwest Austin*, 129 S. Ct. at 2511-14.

# VI.  DEMAND FOR JUDGMENT

The State of Texas respectfully requests the following relief from the Court:

A.   A declaratory judgment that Senate Bill 14 may take effect immediately because it neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race or color, nor will it deny or abridge the right of any citizen of the United States to vote because he is a member of a language minority group.

B.   A declaratory judgment that section 5, as most recently amended and reauthorized by the Voting Rights Act

Reauthorization and Amendments Act of 2006, exceeds the enumerated powers of Congress and conflicts with Article IV of the Constitution as well as the Tenth Amendment.

C.    All other relief to which the State of Texas may show itself to be entitled.

Respectfully submitted.

GREG ABBOTT
Attorney General of Texas

DANIEL T. HODGE
First Assistant Attorney General


/s/ Jonathan F. Mitchell
JONATHAN F. MITCHELL
Solicitor General

ADAM W. ASTON
ARTHUR C. D'ANDREA
JAMES P. SULLIVAN
Assistant Solicitors General

209 West 14th Street
P.O. Box 12548
Austin, Texas 70711-2548
(512) 936-1695


Dated:  March 12, 2012