**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

STATE OF TEXAS,

                 Plaintiff,

      v.

ERIC H. HOLDER, JR.,
ATTORNEY GENERAL OF THE
UNITED STATES, *et. al.*

                 Defendant,

Case No. 1:12-cv-00128
RMC-DST-RLW

**DEFENDANT-INTERVENORS'[1] MOTION TO COMPEL PRODUCTION OF DOCUMENTS AND DEPOSITION TESTIMONY[2]**

---

[1]  This brief is submitted on behalf of all Defendant-Intervenors, specifically, the Texas State Conference of NAACP Branches and the Mexican American Legislative Caucus of the Texas House of Representatives; the Texas League of Young Voters Education Fund, Imani Clark, KiEssence Culbreath, Demariano Hill, Felicia Johnson, Dominique Monday, and Brianna Williams; Eric Kennie, Anna Burns, Michael Montez, Penny Pope, Marc Veasey, Jane Hamilton, David De La Fuente, Lorraine Birabil, Daniel Clayton, and Sergio Deleon; the Texas Legislative Black Caucus, the League of Women Voters of Texas,  the Justice Seekers, Peter Johnson, Ronald Wright, and Donald Wright; Southwest Workers Union, La Union Del Pueblo Entero; Victoria Rodriguez, Nicole Rodriguez, Southwest Voter Registration Education Project, Mi Familia Vota Education Fund.

[2] We note that Texas League of Young Voters Education Fund Defendant-Intervenors served a Request for Production on the State on May 17, 2012, seeking information on students attending public institutions of higher learning in Texas.  This Request was made because the documents produced by Texas in this litigation fail to answer the fundamental question of why student IDs were excluded as an acceptable form of identification for voting under SB 14.  In addition, the requested information will help the Court to understand the impact of that exclusion. Texas served objections to this Request for Production less than three hours prior to the midnight deadline for the filing of this brief.  Thus, the parties have not had the opportunity to meet and confer regarding Texas's objections. Should Texas ultimately refuse to produce the requested documents, the Court's intervention on this issue may be required.  However, the issue is not yet ripe as of the deadline for filing this brief.

1

On April 20, 2012, this Court deferred decision on the "contours" of any applicable qualified legislative privilege asserted by Texas, until the Court had concrete examples of whether and how Texas asserted it. 4/20/2012 Order, at 1-2. That time has come. Specifically, in an 823-page privilege log and four depositions of key legislators and their top aides, Texas has sought to shield from discovery every conceivable non-public communication to or from a legislator or his/her staff concerning Senate Bill ("SB 14"), no matter how relevant to rebutting Texas's putative proofs of lack of discriminatory purpose in the legislature's passage of SB 14. In 28 hours of depositions (roughly split about one-third questions, one-third answers, and one-third privilege objections), Texas asserted privilege and instructed witnesses to refuse to answer questions approximately 700 times. Purportedly protected from disclosure are the identities of constituents with whom the legislators or their aides communicated on SB 14 and similar statutes;[3] communications between legislators and executive agencies;[4] and the purpose of legislation, unless as stated in the public record.[5] Four days of deposition produced virtually no substantive testimony from the witnesses, other than a parroting of the public record.

Specifically, Texas's witnesses were instructed not to disclose:

- any explanation for statements on the public legislative record, unless specifically set forth on the public record;

---

[3] This was the position taken by Texas for the first three depositions, until this Court directed Texas to the contrary.

[4] The issue of the applicability of any legislative privilege to communications with executive agencies is currently pending before this Court, and Defendant-Intervenors rely on the argument made by the Department of Justice in connection with that motion.

[5] This was the position taken by Texas for the first three depositions, until this Court directed Texas to the contrary. After that, some testimony as to "general" purpose was permitted.

- any explanation for statements made publicly, outside the public legislative record, such as in op-ed pieces or press releases, unless specifically set forth on the public record;

- any explanation for the use of several procedural maneuvers, expressly acknowledged to be unique, used to bring SB 14 to the Senate floor, unless specifically set forth on the public record; and

- whether Texas has information that it failed to disclose to the public, which may be contrary to the statements made by supporters of SB 14 on the public record.

In short, in Texas's view, if a group of Texas legislators privately agreed that SB 14 was needed in order to suppress minority votes, that discussion would be privileged.   But the case law recognizes that seldom, if ever, will legislators publicly proclaim ulterior and nefarious purposes behind a law.[6]   In appropriate Section 5 cases, therefore, discovery of non-public record legislative documents and the taking of legislator's testimony is necessary in order to ensure that the unstated purposes of legislation are revealed.

Defendant-Intervenors recognize that this Court has already ruled that not every litigated Section 5 case presents the sort of "extraordinary instances" where abrogation of an otherwise applicable qualified legislative privilege is appropriate. *See* 4/20/2012 Order at 1.  However, even if abrogation of legislative privilege were limited to only such cases, this case easily meets

---

[6] As the Supreme Court observed in *Village of Arlington Heights v. Metropolitan Housing Corp.*, 429 U.S. 252, 265 (1977) "[r]arely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern, or even that a particular purpose was the 'dominant' or 'primary' one.  In fact, it is because legislators and administrators are properly concerned with balancing numerous competing considerations that courts refrain from reviewing the merits of their decisions, absent a showing of arbitrariness or irrationality. But racial discrimination is not just another competing consideration. When there is a proof that a discriminatory purpose has been a motivating factor in the decision, this judicial deference is no longer justified." *Arlington Heights*, 429 U.S. 265-66 (footnotes omitted).

3

that standard.  First, as has been detailed by the Department of Justice in a previous submission (Doc. 69), there is substantial direct and circumstantial evidence of discriminatory purpose.  Further, as has been confirmed in last week's depositions, SB 14 was anything but a routine legislative enactment.  A series of indisputably irregular procedures was used to bring SB 14 up for a vote.  The Supreme Court specifically recognized the relevance of procedural irregularities to an inference of racially discriminatory purpose in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266 (1977) ("*Arlington Heights*"), and the numerous and substantial irregularities here provide more than enough "red flags" to require Texas's assertions of privilege to yield.

Texas's obstructionist position has immediate impacts: it prejudices the ability of Defendant-Intervenors to gain access to facts about one of the main issues in this case (racial purpose), and it harms the ability of Defendants-Intervenors' experts to undertake their analysis of racial purpose.  Ultimately, it hampers the overall ability of Defendant-Intervenors to prepare for trial.  For these reasons, Defendant-Intervenors respectfully request that this Court order that Texas produce the documents withheld on the basis of legislative privilege and that the witnesses noticed by the Department of Justice and Defendant-Intervenors testify without hiding behind the broad legislative privilege asserted by Texas.[7]

---

[7]  There are other reasons to compel the discovery sought here.  First, the privilege log produced by Texas (filed by the Department of Justice with its papers today) provides little guidance as to the nature of the information withheld, with hundreds of entries simply seeking protection for otherwise unidentified "materials from the personal files" [of a witness] reflecting the legislator's thoughts, opinions, or mental impressions on Voter ID." E.g., Texas Privilege Log at p. 61-64.  Others seek to withhold discovery of "confidential constituent communications," without identifying the constituent.  E.g. Texas Privilege Log at p. 82. In accordance with this Court's order of May 21, dkt. no. 128, the State should be ordered to produce an adequate privilege log.  Furthermore, no privilege should be allowed for any document where no specific legislator is identified in the privilege log.  Finally, as will be demonstrated *infra*, Senator Fraser, the sponsor

<u>Argument</u>

## I.   THE MOTION TO COMPEL SHOULD BE GRANTED

In its Order of May 17, this Court ruled that, "to the extent such a [legislative] privilege exists, that privilege does not protect testimony with respect to the general purpose or the purpose of a legislature as a whole in enacting S.B. 14 (as opposed to the subjective intent of the legislator)."  Order at 2.   Two questions are left open by this Court:  (1) whether a privilege applies in the first instance, and (2) if it does, what, other than the general purpose of the legislation, does it <u>not</u> shield.

### A.  <u>Any Legislative Privilege Is Inapplicable To This Case</u>

In its April 20 Order denying, without prejudice, Texas's Motion for a Protective Order, this Court rejected the notion that a legislative privilege is always inapplicable in any litigated Section 5 proceeding.[8] The Court's Order of April 20 provides a starting point for the discussion of applicability of any privilege:  at a minimum, any privilege may be abrogated in "extraordinary instances." [9] This Section 5 case presents such an extraordinary instance.

---

of SB 14, was uncooperative and obstructionist during his deposition, requiring his re-deposition for that reason alone.

[8]  We rely on and incorporate herein our argument previously made in opposition to Texas's Motion for a Protective Order, D.N. 55, specifically the argument that Section 5 cases, by definition, present the sort of cases where "important federal interests are at stake," and the privilege is therefore inapplicable.  *United States v. Gillock*, 445 U.S. 360, 373 (1980).

[9]  In *Arlington Heights*, 429 U.S. at 270, the Court opined that "extraordinary" instances would call for testimony from legislators over and above the legislative record.  *Arlington Heights*, 429 U.S. at 270.  The Court has held that in cases brought under Section 5 of the Voting Rights Act of 1965, courts "should look to our decision in *Arlington Heights* for guidance."  *Reno v. Bossier Parish Sch. Bd.,* 520 U.S. 471, 488 (1997).  Guidance from *Arlington Heights* on the specific issues before this Court is limited, because the case did not discuss pre-trial discovery issues at all, and did not discuss the applicability of legislative privilege in the context of Section 5 litigation, where it is the State that has placed the intent of its legislators into issue.

As indicated in *Arlington Heights*, 429 U.S. at 266, whether the legislative enactment departed procedurally or substantively from normal practice is an important indicia of discriminatory intent.  Here, multiple witnesses have provided sworn testimony that there were significant departures from established, regular legislative procedures leading to the passage of SB 14. For example:

- In 2007, a prior photo identification bill, HB 218 failed to pass in the Senate, when proponents of the bill were unable to muster the required two-thirds vote to bring the bill to the floor (despite an initial, unusual maneuvers that had led to a successful first vote).  Declaration of Sen. Uresti, previously submitted as Exh. 8 to Dkt. No. 69; McCoy Tr. 70:5-9; 74:7-15. [10]

- In January, 2011, the Senate amended Rule 5.11(d) so as to carve out from the two thirds rule "voter identification" legislation.  (McCoy Tr. 119:19-28).

- No witness could identify any category of legislation carved out from the two-thirds rule, other than "voter identification" legislation.  (McCoy Tr. 121:8-17; Fraser Tr. 184:1-8; 299:23 to 300:23 (stating that he believes there were others, but cannot name any)) [11].

- In January, 2011, SB 14 was declared to be an "emergency item" by Governor Perry, an unusual occurrence which led to its passage within 60 days of the declaration.  (Harless Tr. 35:10-11; [12] McCoy Tr. 145:4-13).

---

[10] The Transcript of the Deposition of Janice McCoy is attached hereto as Exh. A

[11] The Transcript of the Deposition of Sen. Troy Fraser is attached hereto as Exh. B.

[12] The Transcript of the Deposition of Rep. Patricia Harless is attached hereto as Exh. C.

- SB 14 was assigned to the Select Committee on Voter Identification and Voter Fraud, which was designated a "fast-track" committee. Rep. Harless could not testify as to whether there were any other "fast-track" committees in the 82nd Session of the Texas Legislature. (Harless Tr. 35:6 to 36:13).

- The Select Committee on Voter Identification and Voter Fraud considered only one bill, SB 14, and Rep. Harless was not aware of any other Select Committee that had considered only one bill. (Harless Tr. 36:17 to 37:6).

- Colby Beuck, Representative Harless's Chief-of-Staff, could not recall another bill being passed as quickly as SB 14 in his eight years of experience in the Senate. (Beuck, Tr. 198:22 to 199:2).[13]

- Representative Harless could not dispute that it took under two hours for SB 14 to be voted out of the Calendars Committee. (Harless Tr. 284:6-15).

Even without the substantial direct and circumstantial evidence of discriminatory purpose previously detailed by the Department of Justice in Doc. 69, these facts, taken singularly and together, constitute the sort of "extraordinary instances" where abrogation of any otherwise applicable legislative privilege is appropriate and necessary. Where, as here, procedural irregularities in reaching a legislative decision have been acknowledged, it strongly suggests an invidious purpose may be at work because legislative action is often characterized by routine, ordinary processes. As the Supreme Court noted in its *Arlington Heights* decision, "[w]hen there is a proof that a discriminatory purpose has been a motivating factor in the decision, . . . judicial deference is no longer justified." *Arlington Heights*, 429 U.S. at 265-266. Defendant Intervenors respectfully submit that this Court owes no deference to Texas's overly broad

---

[13] The Transcript of the Deposition of Colby Beuck is attached hereto as Exh. D

7

assertion of privilege and that given the procedural irregularities identified thus far, legislators and their staffs should be required to produce documents and testimony that allow the issue of racial purpose to be fully probed and aired.

This Court's April 20 Order also recognized that, unlike the federal legislative privilege embodied in the Speech and Debate Clause, the "contours of the privilege remain somewhat uncertain."  4/20/2012 Order at 1-2.  Thus, unlike the law surrounding the federal legislative privilege discussed in *Fields v. Office of Eddie Bernice Johnson*, 459 F.3d 1, 16 (D.C. Cir. 2006), this case presents more of a "blank slate" when it comes to the reach of a state privilege.  *See id.*, 459 at 20 (Tatel, J., concurring: "To be sure, I might prefer a more limited view of the Speech or Debate Clause's reach were I writing on a blank slate. . . .")

In writing on this relatively blank slate, we respectfully submit that the Court focus on the unique aspects of Section 5 litigation, particularly the requirement that the State prove lack of discriminatory purpose. [14]  Common sense dictates that those harboring such invidious intent would be wary of letting it be known.  *Cf. Brooks v. Miller,* 158 F.3d 1230, 1236 (11th Cir. 1998) (Section 2 case); *Smith v. Clarkton* 682 F.2d 1055, 1064 (4th Cir. 1982) (Fair Housing Act case: "Municipal officials acting in their official capacity seldom, if ever, announce on the record that they are pursuing a particular course of action because of a desire to discriminate against a racial minority.  Even individuals acting from invidious motivations realize the unattractiveness of their prejudices when faced with the public record.").   Accordingly, evidence of the privately stated, as well as the publicly stated, purposes of legislation has been accepted as critical evidence in both Section 2 and Section 5 cases.  *See, e.g., Texas v. United States of America, et*

---

[14]   The State bears the burden of proving that SB 14 "neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race or color [or membership in a language group]."  42 U.S.C. § 1973c(a).

*al.,* 2012 U.S. Dist LEXIS 5, at **29-30 (D.D.C. Jan 2, 2012)*, partially vacated on unrelated grounds* (Jan. 6, 2012, Order; Dkt. No. 136) *("Texas Redistricting")*, (allowing depositions of legislators and production of documents outside the legislative record to proceed in Section 5 litigation); *Busbee v. Smith*, 549 F. Supp. 494, 500 (D.D.C. 1982), *aff'd mem.,* 459 U.S. 1166 (1983) (finding Section 5 violation of redistricting plan based on deposition and trial testimony of numerous legislators, including reports of statements not part of legislative record); *Arizona v. Reno*, 887 F. Supp. 318, 323 (D.D.C. 1995) (denying a motion for summary judgment on the issue of purpose because the Defendant had not yet had an opportunity to identify and depose the officials, including legislators, who had supported the disputed change); *Port Arthur v. United States*, 517 F. Supp. 987, 1021-23 (D.D.C. 1981) (considering testimony of elected officials in determining whether stated reasons for legislation were pretextual); *Georgia v. Ashcroft*, 539 U.S. 461, 471-75, 483 (2003) (finding testimony of legislators "significant" to Court's consideration of discriminatory effect of voting change in Section 5 action); *Baldus v. Members of the Wisconsin Government Accountability Board*, No. 11-cv-562, 2011 U.S. Dist LEXIS 142338, at *6 (E.D. Wis. Dec. 8, 2011) (Section 2 case: "any documents or testimony relating to how the Legislature reached its decision on the 2011 redistricting maps are relevant to the plaintiff's claims as proof of discriminatory intent" and allowing a legislative aide to testify).

Against this backdrop, Texas posits its unprecedentedly broad assertion of legislative privilege.[15]  Throughout all depositions, Texas's witnesses were instructed – and agreed – to assert privilege and therefore limit their testimony to matters of public record and only the public record.  No testimony was allowed as to the substance of a single conversation had between the

---

[15] It is worth noting that the State of Texas did not assert legislative privilege in this Court in the recent redistricting litigation, and in fact called legislators and legislative staff to testify at trial in that case.  This undermines the State's most recent claim that there exists a strong state policy underlying the State's assertion of privilege.

witness and any other legislator, executive agency, constituent, or other person concerning SB 14 or other voter identification bills.[16]  No testimony, unless based expressly on the public record, was permitted as to the reasons for or facts surrounding the Governor's declaration of emergency status for SB 14,[17] the reasons for or facts surrounding the change in Senate rules that allowed SB 14 to get to the Senate floor,[18] the reasons for or facts surrounding the differences between SB 14 and prior voter identification bills,[19] or the reasons for or facts surrounding the rejection of proposed amendments to SB 14.[20]  No testimony, unless based expressly on the public record,

---

[16]  See, e.g. Beuck Tr. 66:13 to 67:16, 72:11 to 72:23 (communications regarding HB 112), 100:6 to 101:21, 105:17 to 105:22, 109:23 to 110:15, 112:14 to 113:1, 124:21 to 125:17, 165:24 to 166:13, 175:1 to 176:25, 178:16 to 180:16, 260:21 to 261:7 (communications regarding SB 14); Harless Tr. 47:2 to 48:6, 185:10 to 187:8, 189:11 to 192:4, 233:15 to 234:5, 289:24 to 291:1 (communications regarding SB 14), 192:5 to 192:9 (communications with executive agencies regarding HB 112); McCoy Tr. 48:11 to 49:24, 50:6 to 50:18 (communications regarding HB 218), 86:16 to 87:8, 87:12-88:11, 110:22 to 111:6 (communications regarding SB 362), 146:19 to 146:25, 159:1 to 159:25, 160:22 to 161:10, 176:5 to 178:3 (communications regarding SB 14); Fraser Tr. 85:25-88:6, 89:8-21 (communications regarding HB 218), 133:13 to 137:11, 148:4 to 148:16, 172:22 to 173:24, 210:20 to 215:18 (communications regarding HB 362).

[17]  See, e.g. Beuck Tr. 204:23 to 205:11, 262:25 to 264:16; Harless Tr. 216:18 to 217:82; McCoy Tr. 146:8-25; Fraser Tr. 229:7 to 233:7.

[18]  McCoy Tr. 120:6 to 120:12, 121:22 to 122:13, 122:23 to 123:5, 125:6 – 125:13 (suspension of two-thirds rule for voter ID legislation), 125:22 to 126:6 (consideration of changing rules generally); Fraser Tr. 174:16 to 178:11, 179:23 to 180:25, 181:6 to 182:22, 188:22 to 189:24, 192:4 to 193:11 (discussing 2009 change to two-thirds rule for voter ID legislation).

[19]  See, e.g. Beuck Tr. 120:2 to 120:7, 135:6 to 137:11, 138:9 to 139:4, 140:22 to 141:18 (changes from HB 112 to SB 14); Harless Tr. 207:22 to 208:9, 215:9 to 215:17 (changes from HB 112 to SB 14); McCoy Tr. 178:17-179:17 (changes from SB 362 to SB 14), 374:3 to 374:13 (changes in legislation from 2009 legislative session to SB 14); Fraser Tr. 254:2 to 254:6, 256:13 to 257:6, 274:20 to 275:18 (facts supporting differences in 2009 and 2011 legislation), 303:24 – 304:20 (differences between SB 362 and SB 14).

[20]  See, e.g., Beuck Tr. 215:8 to 216:17 (Amendment 15), 217:12 to 218:12 (Amendment 23), 224:3 to 224:25 (Amendment 50), 225:18 to 226:24 (Amendment 54), 227:22 to 228:21 (Amendment 55), 229:5 to 231:1 (Amendment 58); Harless Tr. 246:5 to 246:17 (Amendment 15), 256:13 to 258:25 (Amendment 34), 259:1-261:6 (Amendment 35), 262:4 to 262:15 (Amendment 54), 263:15 to 264:5 (Amendment 55), 266:8 to 266:18 (Amendment 58); Fraser

was allowed as to whether the legislature had done any analyses or studies of the potential impact of SB 14 on minority voters.[21]  Indeed, Texas went so far as to instruct the witnesses – and the witnesses agreed – to assert privilege in response to the question of whether the witness had access to information contrary to the position taken on the floor concerning the impact of SB 14 on minorities that he had failed to disclose.  Harless Tr. 291:2-9.

United States v. Gillock, 445 U.S. 360, 373 (1980), and the cases cited above instruct that determining whether a qualified privilege, such as that asserted by Texas, is to be applied, requires a careful balancing of interests.  Here, there is substantial evidence of discriminatory purpose and irregular legislative procedure used to pass SB 14.  In addition, because the Voting Rights Act mandates inquiry into the legislative purpose behind the relevant statute – not just the purpose stated on the record – and the only means of obtaining that information is from the documents and testimony of the legislators and their staff, the privilege should not be given the breadth that Texas seeks.  This Court can best make the requisite determination of discriminatory intent under Section 5 if inquiry into the legislative purpose behind the statute is permitted.

**B.**      **The Court Should Compel Full Discovery As To the Procedural Irregularities In Bringing SB 14 To The Floor**

---

Tr. 286:3 to 286:21 (Amendment 12), 287:9 to 287:24 (Amendment 40), 288:8 to 289:1 (Amendment 29)

[21]  See, e.g., Beuck Tr. 124:21 to 125:17 (Concealed Handgun License holders analyses), 181:19 to 185:12, 232:20 to 233:12 (impact on minority voters), 218:22 to 219:11 (Student IDs), 235:22 to 236:12 (cost to obtain election certificate), 247:4 to 247:12 (Drivers's License holders analyses); Harless Tr. 139:13 to 141:19 (academic studies),150:24 to 155:21 (Drivers's License holders analyses), 193:1-4 (impact on minority voters), 251:21 to 252:2 (Military IDs), 280:13 to 282:21 (analyses of holders of photo IDs) ; McCoy Tr. 171:10 to 174:13 (general analyses and reports), 180:22 to 181:14, 189:14 to 189:23 (impact on minority voters), 186:12 to 186:19, 187:4 to 187:18 (cost to obtain election certificate), 206:9 to 16 (Drivers's License holders analyses), 272:10 to 275:16 (Sec. of State analyses on voter turnout); Fraser Tr. 236:25 to 237:14, 243:14 to 244:20 (analyses of other state voter ID laws), 249:16 to 250:25 (impact on minority voters).

In light of the importance of procedural irregularities in the passage of SB 14, as discussed above, Texas should be compelled to respond to requests for testimony and documentary discovery on these issues.

During depositions, Texas's counsel instructed the witnesses not to testify, and the witnesses asserted privilege, numerous times on issues of procedural irregularity, *e.g.*, the change in the two-thirds rule  (McCoy Tr. 120:6-12; 121:22 to 122:13: 125:6-13) and the Governor's emergency declaration (Beuck Tr. 262:25 to 264:16; Fraser Tr. 227:7 to 233:7).  The extent to which Texas and its witnesses used evasive and obstructionist answers combined with broad privilege assertions to block legitimate discovery is illustrated by the following excerpts from the deposition of Senator Fraser, the primary sponsor of SB 14.  We note that all of these colloquies occurred <u>after</u> the parties had the benefit of this Court's Order of May 17.

First, Senator Fraser refused to provide any substantive information as to the purpose behind the two-thirds rule, while stating just seconds later that there was no purpose:

> Q.  (By Ms. Westfall) Did House Bill 218, was there a failure to suspend regular order of business with two-thirds of the vote?
>
> A. Yes.
>
> Q. What -- and could you tell me the purpose of the two-thirds rule that you testified about earlier, as a general matter, and, of course, procedurally?
>
> A.  Well, that's privilege. There's, you know, everyone has a different opinion.
>
> MR. SWEETEN: Privilege.
>
> Q.  (By Ms. Westfall) Well, I'm -- Mr. Sweeten, I don't think it -- I'm not asking about a particular legislative act, I'm asking about Senator Fraser's deep knowledge of Senate procedures given his long history in the Senate.
>
> MR. SWEETEN: Okay. I -- we're going to let you answer as to the general purpose of the rule.
>
> A.  There is no purpose for the two-thirds rule.

Fraser Tr. 121:6-24.

Later in the deposition, Senator Fraser refused to acknowledge the existence of the two-

thirds rule altogether:

Q. Most years. Okay. Are you familiar with the two-thirds rule? You testified about that earlier today, did you not?

A. There's no such thing as a two-thirds rule.

Q. Is there a two-thirds tradition?

A. No.

Q. Is there a two-thirds procedure?

A. Yes.

Fraser Tr. 184:1-8.

Senator Fraser continued to turn the deposition into a tooth-pulling, not truth-pulling,

exercise:

Q.  But to, ordinarily, to get a bill to be brought out of the calendar and onto the Floor for consideration on the merits of the bill, you need to have a two-thirds vote –

A. No.

Q. As a procedural matter?

A. No.

Q. And there's a tradition, is there not?

A. No.

Q. How would you describe it?

A. Incorrect that you -- you're describing it incorrectly.

Q. Could you describe what -- what is the procedure that ordinarily requires two-thirds votes of senators? What is that vote?

13

A. A bill that is filed in the legislature to be brought up in the regular order of business requires majority vote.

Q. What are the circumstances under which it requires two-thirds?

A. Clarify.

Q. I believe you testified earlier that there is ordinarily a blocker bill put in place and you need two-thirds of a vote to get around the blocker bill; is that right?

A. To bring up the blocker bill is a majority. If you follow the regular order of business, it is a majority vote.

Q. Once a blocker bill is in place, you need two-thirds to overcome that; is that correct? And to go out of order; is that correct?

MR. SWEETEN: Objection, compound.

A. You asked two questions.

Q. (By Ms. Westfall) Why don't you take the first one first, and then we'll do the second one? Does it require two-thirds vote to overcome a blocker bill and go out of order?

A. There's no such thing as overcoming the blocker bill.

Q. I'm using the wrong terms, because I am not familiar with the Texas Senate rules, but I would like you to interpret my terms as broadly as you are able to understand them to answer the question.

A. If you ask that question correctly, I'll be glad to answer it.

Q. Okay. Well, Ms. McCoy testified yesterday she was unaware of any other bills, except voter ID, that have been accepted under Rule 5.11D. Are you surprised by her testimony?

MR. SWEETEN: Objection, assumes facts not in evidence. You can go ahead and answer.

A. Am I surprised by her answer?

Q. (By Ms. Westfall) Correct. Yes.

A. That's her recollection. I'm a member. She's a staffer.

Fraser Tr., 186:4 to 188:8.

14

Then, Senator Fraser refused to provide any substantive information about the Senate's

removing voter identification legislation from the operation of the two-thirds rule:

> Q. And turning your attention to Rule 5.11 on Page 24 of this document, Exhibit 32, could you direct your attention to that?
> \* \* \* \*
> Q. Could you describe the provision in Section A of Rule 11, 5.11?
>
> A. It says "Any bill, resolution, or other measure may be on any day be made a special order for future time of the session by affirmative vote of two-thirds of the members present."
>
> Q. Turning your attention to Subsection D of Rule 5.11, what does that subsection provide for?
>
> A. "Notwithstanding Subsection A of this bill, a bill or resolution relating to voter identification requirements reported favorably from the Committee of the Whole may be set as a special order for a time at least 24 hours after the motion is adopted by a majority of the members of the Senate."
>
> Q. Could you explain the effect of Rule 5.11D?
>
> A. I think it's self-explanatory as I just read it.
>
> Q. So you have no further testimony in answer to my question about the effect?
>
> A. The effect is as it reads, that would be the effect.
>
> Q. What is the purpose of Rule 5.11D as it pertains to voter ID requirements?
>
> A. The purpose is to not –
>
> MR. SWEETEN: Hold on. Hold on. I think as it pertains to voter ID requirements, I'm going to object. I think that that calls for him to reveal matters of legislative privilege. He's also already answered in previous questioning questions about this rule.
>
> MS. WESTFALL: Are you preventing me from examining the witness about this exhibit, the rules in 2009 pertaining to voter ID?
>
> MR. SWEETEN: I'm not prohibiting you from examining about the exhibit. You can do that. And you have done that.
>
> MS. WESTFALL: I would direct you also to the Court's Order of today concerning purpose. And the purpose of a rule governing consideration of voter ID in 2009, are you prohibiting me from examining the witness?

15

MR. SWEETEN: Counsel, you've already asked him very specifically earlier about this rule and what he felt the purpose of it was and what Janice McCoy thought the purpose of it was. You've already asked this question.

MS. WESTFALL: I can ask a different question. But I'm going to keep my question on the record. I'm not withdrawing it.

Q. (By Ms. Westfall) What was purpose in Rule 5.11D of specifying voter ID requirements?

MR. SWEETEN: Okay. I'm going to let him answer as to your previous question, what is the purpose of that rule. He can answer that.

A. The purpose of number -- of Subsection C (sic) is to establish a special order, that notwithstanding the section's rule, a bill or resolution relating to the voter identification requirements reported favorably by the committee can be set as a special order.

Q. (By Ms. Westfall) And are you reading from Subsection D of Rule 5.11?

A.  D, yes, I am.

Q. What -- I'm going to ask the question I asked previously, which is what was the purpose of specifying voter ID requirements by name in Rule 5.11D and setting specific procedures for those requirements?

A. It was to specify a special order relating to what is mentioned in Subsection D.

Q. And what was the purpose of that special order?

A. To establish a special order.

Q. Okay. So what I'm hearing is roundy, roundy circle. Do you have any further testimony on the subject –

MR. SWEETEN: Objection to the sidebar. Objection to the sidebar.

A.  No.

Q.  (By Ms. Westfall) Were there any conversations about establishing Rule 5.11D that you're aware of?

A. Yes.

Q. When did that conversation occur?

A.  In the Committee of the Whole meeting with all 31 senators.

Q.  When was that meeting?

A.  Prior to the passage of this. It was likely the first week of the session.

Q. Is there a Senate rules committee that adopts rules at the beginning of every session?

A. Not a specified rules committee, no.

Q. Does the Committee of the Whole Senate establish its own rules?

A. Yes.

Q. Who is the chair of that committee in 2009?

A.  It would have to be John Whitmire, because he's the Dean of the Senate, and he runs the meeting that establishes -- that calls for the vote on the rules.

Q. Did you have any conversations with Senator Williams concerning Rule 5.11D or the concept embodied therein?

MR. SWEETEN: You can answer as to whether a conversation occurred, otherwise it's legislatively privileged.

A.  Yes. There was a conversation.

Q. When did that conversation occur?

A. Immediately prior to this meeting.

Q. I believe you testified this meeting would have been the first week of session in January; is that correct, of 2009?

A.  It looks like it was January 14, and the session I think probably started on the 10th, so the first week of the session.

Q. What was your conversation with Senator Williams about?

MR. SWEETEN: Do not reveal, based on legislative privilege.

A. Privilege.

Fraser Tr. 175:15 to 180:17.

17

Finally, Senator Fraser blocked substantive discussion concerning the declaration of

emergency status for voter identification legislation in 2011:

> Q.  [by MS.WESTFALL] Was Senate Bill 14 designated by the Governor to be
> emergency legislation?
>
> A. Yes.
>
> Q. What are the -- what happens? Describe what happens when the Governor designates
> a bill as emergency legislation.
>
> A. The Governor declares it an emergency legislation.
>
> Q. What's the consequences for its consideration in the Texas State Senate?
>
> A.  No consequences.
>
> Q.  Is it automatically considered within the first 60 days of session?
>
> A.  No.
>
> Q.  There are no consequences to this designation?  Is it purposeless; is that your
> testimony?
>
> A.  No.
>
> Q.  What is the purpose of designation by the Governor of emergency legislation?
>
> A.  You would have to ask the Governor that.
>
> Q.  I'm asking as a general -- I'm asking as a general matter, when -- strike that. As a
> result of the designation of SB 14 as emergency legislation, was it considered within the
> first 60 days of the Senate session in 2011?
>
> A.  She asked me two questions.
>
> Q.  Well, you know what –
>
> MR. SWEETEN: Hold on.
>
> Q.  -- I'm asking the questions. If you don't like the questions and you need clarification,
> you can ask me, as I instructed you at the beginning of this deposition.
>
> MR. SWEETEN: Okay. Okay. Let's -- let me – I want to hear the question read back,
> please. (Question read back.)

MR. SWEETEN: Objection, legislative privilege.

MS. WESTFALL: Can you further explain your assertion of privilege? This is a procedural matter and a timing matter and a matter of public record.

MR. SWEETEN: He can answer -- the legislative privilege objection relates to matters of nonpublic record. He is free to answer based upon the public record, if it is as you claim it is. So he can answer if there are matters of the public record that addresses this, but -- I mean, I'm asserting privilege as to matters not of the public record.

Q.  (By Ms. Westfall) Can you answer the question?

A.  Privilege.

Q.  When a governor designates legislation as emergency legislation, is it always considered within the first 60 days of the session?

MR. SWEETEN: You can answer as a general matter.

A.  No.

Q.  (By Ms. Westfall) Is it sometimes considered within the first 60 days of a session?

A.  Yes.

Q.  And this designation is done by the Governor; is that right?

A.  Yes.

Q.  How did Senate Bill 14 come to receive this emergency designation?

MR. SWEETEN: Objection, calls for legislative privilege. Also calls for speculation.

Q.  (By Ms. Westfall) Were there any conversations about the designation of Senate Bill 14 as emergency legislation, that you're aware of?

MR. SWEETEN: The question –

A.  No.

MR. SWEETEN: -- is were there any conversations?

A.      No.

MR. SWEETEN: Okay. You answered it. Okay.

Q.  (By Ms. Westfall) There were no conversations you're aware of?

A.  No.

Q.  Did you request this designation of the Governor's Office?

A.  No.

Q.  When did you first learn that Senate Bill 14 had been designated as emergency legislation?

MR. SWEETEN: You can answer.

A.  Read about it in the paper.

Q.  (By Ms. Westfall) Do you know why Senate Bill 14 had to be considered within the first 60 days of the legislature in 2011?

A.  Privilege.

MR. SWEETEN: Yeah, objection, privilege. Calls for speculation.

Q.  (By Ms. Westfall) Are you aware of any conversations regarding the timing of consideration of Senate Bill 14 in the Senate?

MR. SWEETEN: Objection, that requires him to reveal his mental impressions, opinions about the legislation.

A.      Privilege.

MR. SWEETEN: It's legislative privilege.

(Fraser Tr. 227:7 to 232:8).

Any otherwise applicable legislative privilege on these issues cannot stand in the face of admittedly irregular legislative procedures.  Further, Senator Fraser's answers were non-responsive and downright evasive, obstructionist, and in some respects even contrary to other State witnesses.  Even more troubling, Senator Fraser's answers and counsel for the State's assertion of privilege-based objections on the subject matters identified above are at odds with this Court's May 17th Order that, "to the extent such a [legislative] privilege exists, that privilege

20

does not protect testimony with respect to the general purpose or the purpose of a legislature as a whole in enacting S.B. 14 (as opposed to the subjective intent of the legislator)." 5/17/2012 Order at 2.  Texas should be compelled to respond to requests for full testimonial and documentary[22] discovery on all of these issues.

## C.     The Scope Of Any Applicable Privilege Does Not Extend To Documents Or Testimony Related To Legislative Purpose

As this Court indicated in its May 17 Order, at a minimum, any legislative privilege is inapplicable in a Section 5 case to the extent the information sought to be discovered goes directly to the issue of legislative purpose.   For starters, that Order requires the re-deposition of Colby Beuck, Rep. Patricia Harless, Janice McCoy, and Sen. Troy Fraser, all of whom were instructed to, and did, assert legislative privilege repeatedly on questions of legislative purpose, so as to avoid discussion of <u>any</u> information not in the public record.[23]

Left open by this Court is the issue of whether non-public record statements by legislators are also subject to discovery.  In approaching that issue here, we emphasize just how broadly Texas has asserted the privilege here.  Texas has refused to allow its witnesses to testify as to the

---

[22] In this regard, we note that Texas's privilege log provides no guidance as to whether any of the documents withheld from production deal with the procedural irregularities such as the change in Rule 5.11, the applicability of the two-thirds rule, "chubbing" (another change in procedure dealing with the House calendar), or the Governor's emergency declaration.  Accordingly, it is not possible for defendants to identify specific documents that should be reviewed *in camera*. Texas should be required to submit a revised log providing appropriate identifying information.

[23] In addition to the excerpts of Fraser's testimony above, see, e.g., Beuck Tr. 44:15 to 45:19 (Sanctuary Bill purpose); 60:10 to 61:16, 79:2-12 (HB 112 purpose); 94:18-20 (Governor's emergency declaration); 121:19 to 123:13, 144:6 to 145:1, 145:10-19; 149:4 to 151:12; 149:4 to 151:12 (SB 14 purpose); Harless Tr. 94:23 to 101:2, 148:25 to 150:23 (SB 14 purpose), 181:24-184:14 (Sanctuary Cities Bill purpose); McCoy Tr. 44:11 to 44:22, 45:3 to 45:9, 60:15 to 62:9 (HB 218 purpose), 96:12 to 96:25, 97:4 to 97:20 (SB 362 purpose), 139:23 to 140:6 (SB 363 purpose), 193:11 to 194:22, 223:11 to 224:5 (SB 14 purpose); Fraser Tr. 67:23 to 68:16, 71:24 to 73:8, 74:9 to 77:4 (HB 218 purpose); Fraser 148:24 to 152:9, 153:5 to 158:18 (SB 362 purpose), 266:24-271:15, 274:7-19, 275:19-277:11 (SB 14 purpose).

unstated purposes of the legislation, as to whether there are analyses and studies concerning the legislation that have not been made public, and as to whether there were discussions as to the impact of the legislation on minority voting.

What if a major legislative player in the passage of SB 14 had told someone in private that SB 14 would have the effect of suppressing minority voting?  What if an interest group had told legislators that it wanted SB 14 passed in order to reduce minority voting?  What if supporters of SB 14 had asked for and received information showing that minority voting would be reduced by SB 14, but had not disclosed that information to the public?  Can there be any doubt that any of this information would not heavily instruct on the issue of discriminatory purpose?  Yet, Texas's witnesses were repeatedly instructed to assert privilege in response to questions seeking this precise information.

To be sure, there is a fine line between "a legislator's subjective motivation" and the unstated purpose of legislation, but just as certainly, this Court is not confined only to the "purpose" as stated in public. "[D]etermining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available."  *Arizona v. Reno*, 887 F. Supp. 318, 322 (D.D.C. 1995), quoting *Arlington Heights*, 429 U.S. at 266.   The best available evidence here is that contained in the documents – broadly and vaguely described by Texas as "materials from the personal files" [of a witness] reflecting the legislator's thoughts, opinions, or mental impressions on Voter ID," "confidential constituent communications," and a myriad of similarly vaguely described communications with executive agencies and other legislators, in addition to the testimony of the key players in the drafting and passage of SB 14.  Indeed, communications with constituents, email communications from legislative staff, and communications with other branches of state

22

government (*e.g.*, Governor's office) go directly to "the purpose of a legislature as a whole in enacting S.B. 14" – the very topic on which this Court has overruled Texas's overly broad assertion of privilege. 5/17/2012 Order at 2

    In assessing whether a qualified legislative privilege should be overcome, some courts have applied a five factor test that analyzes:  (1) the relevance of the evidence sought to be protected; (2) the availability of other evidence; (3) the seriousness of the litigation and the issues involved; (4) the role of the government in the litigation; and (5) the possibility of future timidity by government employees who will be forced to recognize that their secrets are voidable.  *Comm. for a Fair & Balanced Map v. Ill. State Bd. of Elections*, No. 11-c-5065, 2011 U.S. Dist. LEXIS 117656, at **24-25 (N.D. Ill. Oct. 12, 2011), citing *Rodriguez v. Pataki*, 280 F. Supp. 2d 89, 101 (S.D.N.Y. 2003); *In re Franklin Nat'l Bank Secs. Litig.*, 478 F. Supp. 577, 583 (E.D.N.Y. 1979).  These factors argue strongly in favor of permitting the Defendant and the Defendant Intervenors to discover documents and elicit testimony from key witnesses, not only about "the purpose of a legislature as a whole in enacting S.B. 14," 5/17/2012 Order at 2, but also about specific conversations between and among legislators, their staffs, executive agencies, constituents and lobbyists that instruct upon the unstated purposes of SB 14.[24]   There is no other

---

[24] At least partial foundation has been laid so as to allow discovery as to the substance of the following communications:

Communications with constituents and lobbyists:  Communications between Beuck and King Street Patriots and between Beuck and Catherine Englebrecht (Beuck Tr. 244:64 to 246:10); communications between Beuck and Advocacy, Inc. (Beuck Tr. 247:17-24); communications between McCoy and/or Fraser and King Street Patriots (Tr. 159:14-159:25); conversation between Sen. Fraser and Skipper Wallace about HB 218 (McCoy Tr. 48:11- 50:5; Fraser Tr. 135:18 -137); conversations between Sen. Fraser and unidentified constituents regarding voter ID (McCoy Tr. 110:22-111:12); conversations with constituents in 2010 relating to photographic voter ID (Harless Tr. 185:20-186:9); conversations with Catherine Engelbrecht prior to and following passage of SB 14 (Harless Tr. 186:19-187:16, 289:24 to 291:1).

vehicle to obtain this potentially crucial information, in this tremendously significant case than through the documents requested by defendants and testimony sought from these witnesses.

## D.   Texas Should Be Ordered To Provide Foundational Information

In its May 17 Order, the Court required Texas to provide foundational information. By the time the parties had the benefit of this Order, Texas's counsel had instructed three witnesses not to answer questions asking whether discussions had occurred on several significant and

Communications between legislators/aides and local officials:  Communications between Beuck and/or Harless and George Hammerlein, Harris County Clerk's Office in January or February 2011 (Beuck Tr. 265:6 to 267:11, Harless Tr. 289:24 to 291:1); communications between Beuck and Ed Johnson of Harris County Clerk's Office (Beuck Tr. 268:8 to 269:5); conversations between Fraser and local officials in Houston regarding SB 362 (Fraser Tr. 151:22 to 152:22).

Communications between legislators/aides and executive agencies: several conversations between McCoy and Ann McGeehan of Secretary of State's Office about HB 218 (McCoy Tr. 50:6 – 51:5); conversation between Harless and B. Hebert prior to floor debate on SB 14 (Harless Tr. 240:13 to 241:25).

Communications between legislators/aides and miscellaneous parties:  communications between Beuck and persons in Georgia and Indiana's Secretary of State office (Beuck Tr. 273:23 to 275:20); communications between Sen. Fraser and McCoy concerning contacting individuals from other states to testify (McCoy Tr. 89:19 – 90:1).

Communications between and among legislators/aides:  conversation between McCoy and Sen. Williams about allowing non-photo ID in SB 362 (Fraser Tr. 145:23 to 146:23); conversation between Fraser and Sen. Williams regarding Rule 5.11(d) (Fraser Tr. 179:23 to 180:24); conversation between Fraser and Sens. Van de Putte and Whitmire concerning differences between SB 362 and SB 14 (Fraser Tr. 302:14 to 303:24); conversation between Harless and Speaker Straus prior to committee assignments regarding SB 14 (Harless Tr. 224:4-23)

Communications between legislators/aides and Lt. Gov./aides:  Communications between Beuck and Bryan Hebert of Lt. Governor's office (Tr. 100:6 to 101:4); conversations between McCoy and Lt. Gov. staff, including Julia Rathgeber and Blaine Brunson, regarding HB 218 (McCoy Tr. 53:10 – 55:18; Fraser Tr. 124:8 to 126:7); conversations between McCoy and Lt. Governor at his office regarding "the legislative process" (McCoy Tr. 87:22 – 88:15); conversations between McCoy and Rathgeber regarding SB 362 (Fraser Tr. 134:4 to 135:6); conversation between Fraser and Lt. Gov. Dewhurst about including non-photo ID in SB 362 (Fraser Tr. 146:24 to 147:13)

relevant topics. Even after having the benefit of this Court's Order, Senator Fraser refused to give basic information in response to questions as to whether conversations occurred, citing privilege.  In most cases, the instruction given by Texas's counsel to the witness not to testify as to anything other than matters of the public record was so broad and all-encompassing that it was not possible to tell whether the witness even had knowledge of any non-public information concerning the subject matter of the question.  These witnesses should be re-deposed and required to provide the requested testimony.[25]

---

[25] These are:

<u>Colby Beuck's deposition</u>:  Whether discussion occurred as to forms of ID in connection with SB 14 (Tr. 105:17-22); whether discussions occurred re decision to include License To Carry and effect of requirement on non-whites (Tr.124:21 to 125:127); whether Beuck had a discussion with Rep. Harless as to non-photo IDs. (Tr. 134:7-18); whether discussions occurred as to decisions made as to which IDs to include in SB 14 (Tr. 115:12-18, 116:24 to 117:25, 118:13 to 119:13, 120:9-20), whether Beuck had discussions with Rep. Harless as to impact of SB 14 on minorities (Tr. 175:19 to 176:4); whether discussions occurred as to further steps to obtain information (Tr. 184:24 to 185:13); whether discussions occurred as to compliance with Voting Rights Act (Tr. 178:2-15); whether discussions occurred as to racial composition of populace with allowable IDs (Tr. 186:11 to 187:17); whether discussions occurred as to relationship of illegal aliens issues to SB 14 (Tr. 238:2 to 241:1).

<u>Janice McCoy's deposition</u>:  Whether Sen. Fraser had conversations concerning whether HB 218 should be brought to the floor (Tr. 68:3-11); whether McCoy was ever instructed not to look at who among registered voters possessed one of the forms of identification included on SB 362 (Tr. 95:16 – 23); whether Sen. Fraser made "any promises to anyone concerning alternative legislative measures that would have accomplished the goal of deterring in-person voter impersonation" (Tr. 106:17 to 108:5); whether McCoy's office had communications about the purpose of SB 362 (Tr. 110:6 to 110:14); whether anyone asked Senator Fraser to bring SB 14 to the Floor (Tr. 144:20 to 144:24); nature of communications between Fraser and the Lt. Governor's office regarding SB14 (Tr. 156:19-157:13); nature of communications between McCoy and the Mr. Bettencourt regarding SB14 (Tr. 158:13-159:4); identity of any constituent who had asked Fraser to pass "some sort of voter ID law" (Tr. 192:2-192:9); whether any discussions occurred between with McCoy that certain legislators, working with the DOJ, were trying to kill SB 14 (Tr. 224:16-225:10); information concerning conversations between McCoy and Anne McGeehan and others in Secretary of State's Office (Tr. 272:10 to 273:7).

<u>Rep. Harless's deposition</u>: whether Harless discussed committee assignments before they were made (Tr. 42:17-43:23); whether Harless had conversations with constituents regarding importance of voter identification to district (Tr. 47:10-48); whether constituent conversations

## Conclusion

For the reasons set forth above, Defendant-Intervenors respectfully request that the Court compel Texas to (1) re-submit a privilege log with adequate descriptions of the materials withheld, (2) produce all documents and provide testimony relating to the legislative procedures used to enact SB 14, (3) produce all documents and provide testimony relating to unstated purposes of SB 14, and (4) produce Sen. Fraser, Rep. Harless, Colby Beuck, and Janice McCoy for re-deposition.

Dated:  May 21, 2012

/s/ Ezra D. Rosenberg_____
Ezra D. Rosenberg (D.C. Bar No. 360927)
Michelle Hart Yeary (*Pro Hac Vice*)
Dechert LLP
902 Carnegie Center, Suite 500
Princeton, NJ 08540-6531
(609) 955 3222 (phone)
Ezra.rosenberg@dechert.com

---

regarding mail-in ballot fraud (Tr. 120:9-121:7); whether Harless had conversations with constituents, staff, or executive agencies regarding illegal immigrants voting (Tr. 126:24-127:21); whether Harless had conversations with voters as to whether they did not vote due to concerns of voter fraud (Tr. 131:23-133:6); whether Harless had conversation with DPS regarding SB 14 (Tr. 192:5-9);  (refusing to identify); whether Harless had conversations with Senator Fraser about sponsorship of SB 14 (Tr. 222:15-222:25; whether Harless had communications from constituents regarding opposition to SB 14 (Tr. 233:15-234:5); whether Harless had conversations with other legislators as to impact of SB 14 on minorities's voting (Tr. 270:18 to 273:5).

Sen. Fraser's deposition:  whether Fraser had had any "conversations about conducting any analyses" prior to carrying House Bill 218 in the Senate (Tr. 92:11-93:12); whether Fraser was aware of any conversations regarding the non-inclusion of photo ID in SB 14 (Tr. 253:11 – 253:21); whether any conversations had occurred regarding SB 14 having a purpose of decreasing the amount of Hispanic voters (Tr. 270:3 – 272:9).

Michelle.yeary@dechert.com

Jon Greenbaum (D.C. Bar No. 489887)
Mark A. Posner (D.C. Bar No. 457833)
Robert A. Kengle
Lawyers' Committee for Civil Rights Under Law
1401 New York Ave., NW, Suite 400
Washington, D.C. 20005
(202) 662-8389 (phone)
bkengle@lawyerscommittee.org
mposner@lawyerscommittee.org

Wendy Weiser (*Pro Hac Vice*)
Myrna Perez (*Pro Hac Vice*)
Ian Vandewalker (*Pro Hac Vice*)
The Brennan Center for Justice at NYU Law School
161 Avenue of the Americas, Floor 12
New York, NY 10013-1205
Wendy.weiser@nyu.edu
Myrna.perez@nyu.edu
Ian.vandewalker@nyu.edu

Gary Bledsoe
Law Office of Gary L. Bledsoe & Associates
316 West 12th St., Suite 307
Austin, TX 78701
(512) 322-992 (phone)
garybledsoe@sbcglobal.net

Victor L. Goode
NAACP National Headquarters
4805 Mt. Hope Dr.
Baltimore, MD 21215-3297
(410) 580-5120 (phone)
vgoode@naacpnet.org

Robert S. Notzon (D.C. Bar No. TX0020)
The Law Office of Robert Notzon
1507 Nueces St.
Austin, TX 78701
(512) 474 7563 (phone)
Robert@notzonlaw.com

Jose Garza
Law Office of Jose Garza
7414 Robin Rest Dr.

San Antonio, TX 98209
(210) 392-2856 (phone)
garzapalm@aol.com

*Counsel for Defendant-Intervenors*
*Texas State Conference of NAACP Branches and*
*the Mexican American Legislative Caucus of*
*Texas House Representatives*

Ryan Haygood
Natasha M. Korgaonkar
Leah C. Aden
Dale E. Ho
Debo P. Adegbile
Elise C. Boddie
NAACP Legal Defense and Educational Fund, Inc.
99 Hudson Street, Suite 1600
New York, NY 10013
(212) 965-2200/Fax: (212) 226-7592
rhaygood@naacpldf.org
nkorgaonkar@naacpldf.org
laden@naacpldf.org
dadegbile@naacpldf.org
dho@naacpldf.org
eboddie@naacpldf.org

FRIED, FRANK, HARRIS
SHRIVER & JACOBSON LLP
Douglas H. Flaum
Michael B. de Leeuw
Adam Harris
One New York Plaza
New York, NY 10004-1980
(212) 859-8000
Douglas.flaum@friedfrank.com
Michael.deleeuw@friedfrank.com
Adam.harris@friedfrank.com

*Counsel for Texas League of Young Voters*
*Education Fund, Imani Clark, KiEssence*
*Culbreath, Demariano Hill, Felicia Johnson,*
*Dominique Monday, and Brianna Williams*

J. Gerald Hebert
D.C. Bar No. 447676
Attorney at Law

191 Somerville Street, #405
Alexandria, VA 22304
Telephone: 703-628-4673
hebert@voterlaw.com

Chad W. Dunn
D.C. Bar No. 987454
Texas Bar No. 24036507
Brazil & Dunn LLP
4201 Cypress Creek Pkwy., Suite 530
Houston, Texas 77068
Telephone: (281) 580-6310
Facsimile: (281) 580-6362
chad@brazilanddunn.com

*Counsel for Kennie Defendant-Intervenors*

John Kent Tanner
3743 Military Road, N.W.
Washington, DC 20015
(202) 503-7696
Email: john.k.tanner@gmail.com


Nancy Abudu
Katie O'Connor
Moffatt Laughlin McDonald
American Civil Liberties Union Foundation Inc.
230 Peachtree Street NW, Suite 1440
Atlanta, GA 30303
(404) 523-2721/Fax: (404) 653-0331
Email: nabudu@aclu.org
Email: koconnor@aclu.org
Email: lmcdonald@aclu.org

Lisa Graybill
Rebecca Robertson
American Civil Liberties Union Foundation of
Texas
1500 McGowan Street
Houston, Texas 77004
(713) 942-8146
Email: lgraybill@aclutx.org
Email: rrobertson@aclutx.org


Kumiki Gibson

Advancement Project
1220 L Street, NW, Suite 850
Washington, DC 20005
(202) 728-9557
Email: kgibson@advancementproject.org

*Counsel for Justice Seekers, League of Women
Voters of Texas, Texas Legislature Black Caucus,
Donald Wright, Peter Johnson, Ronald Wright,
Southwest Workers Union and La Union Del
Pueblo Entero*


Nina Perales
Mexican American Legal Defense & Educational
Fund, Inc.
110 Broadway, Suite 300
San Antonio, TX 78205
(210) 224-5476/Fax: 210-224-5382
Email: nperales@maldef.org

*Counsel for Mi Familia Vota Education Fund,
Southwest Voter Registration Education Project,
Nicole Rodriguez, Victoria Rodriguez*


## <u>CERTIFICATE OF CONFERENCE</u>

I hereby certify that Defendant-Intervenors have conferred with Texas about the issues

raised in this motion, or have participated in conversations where the Department of Justice and

Texas have conferred about the issues raised in this motion, including throughout the depositions

May 14 through 18, 2012, and in prior submissions to this Court. Texas opposes the motion.


<u>/s/ Ezra D. Rosenberg</u>
Ezra D. Rosenberg

30

## <u>CERTIFICATE OF SERVICE</u>

I certify that on May 21, 2012, the foregoing Motion to Compel Production of Documents and Deposition Testimony was filed with the Clerk of the Court using the CM/ECF system which will electronically serve all counsel of record.


<u>/s/ Ezra D. Rosenberg</u>
Ezra D. Rosenberg