IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STATE OF TEXAS, )<br><br>Plaintiff, )<br><br>v. )<br><br>ERIC H. HOLDER, JR., in his official capacity as )<br>Attorney General of the United States, )<br><br>Defendant. )<br><br>ERIC KENNIE, *et al.*, )<br><br>Defendant-Intervenors, )<br><br>TEXAS STATE CONFERENCE OF NAACP )<br>BRANCHES, *et al.*, )<br><br>Defendant-Intervenors, )<br><br>TEXAS LEAGUE OF YOUNG VOTERS )<br>EDUCATION FUND, *et al.*, )<br><br>Defendant-Intervenors. )<br><br>TEXAS LEGISLATIVE BLACK CAUCUS, *et al.*, )<br><br>Defendant-Intervenors, )<br><br>VICTORIA RODRIGUEZ, *et al.*, )<br><br>Defendant-Intervenors. )| CASE NO. 1:12-CV-00128<br>(RMC-DST-RLW)<br>Three-Judge Court |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE ATTORNEY GENERAL'S MOTION TO COMPEL

## Table of Contents

I.  FACTUAL AND PROCEDURAL BACKGROUND .......................................................... 2

  A.  Discovery Motions Related to Privilege ................................................................ 2

  B.  Depositions ............................................................................................................. 4

    1.  Depositions Taken During the Week of May 14, 2012 ................................... 4

    2.  Depositions Noticed for the Week of May 29 and June 4, 2012 .................... 7

  C.  Document Discovery ............................................................................................... 7

II.  ARGUMENT .............................................................................................................. 9

  A.  Texas's Assertion of State Legislative Privilege Must Yield to the Crucial Federal

  Interest in Enforcing the Voting Rights Act. ............................................................ 10

    1.  The Critical Need for Legislator Testimony and Documents Supports Overriding

    Texas's Assertion of Legislative Privilege. ........................................................ 13

      a.  The Fraser, Harless, McCoy and Beuck Depositions Establish that Texas is

      Asserting Legislative Privilege Over Vital Evidence Necessary to Assess Legislative

      Purpose. .............................................................................................................. 17

      b.  Documents Withheld Based on State Legislative Privilege Constitute Critical

      Evidence of the Purpose of SB 14. ..................................................................... 23

    2.  The Remaining *Rodriguez* and *Irvin* Factors Weigh Heavily in Favor of Abrogating

    the Privilege. ......................................................................................................... 25

  B.  Even If a State Legislative Privilege Applies, Texas's Assertions Extend Well Beyond

  the Scope of any Such Privilege. .............................................................................. 26

1. Texas Has Improperly Withheld Documents from State Legislators Who Have Not Asserted Legislative Privilege. ............................................................................ 28

2. Any State Legislative Privilege Does Not Apply to Political Communications with Constituents, Lobbyists, or Interest Groups........................................................... 29

3. Any State Legislative Privilege Does Not Apply to Public Statements and Public Materials. ............................................................................................................... 30

4. Any State Legislative Privilege Does Not Apply to Communications within Executive Agencies................................................................................................. 32

5. Any State Legislative Privilege Does Not Apply to Post-Enactment Communications. ..................................................................................................... 34

6. Any State Legislative Privilege Does Not Apply to Foundational Questions that Would Demonstrate the Basis for the Privilege.................................................... 36

C. The State of Texas Has Asserted Attorney-Client Privilege Over Documents and Testimony Beyond the Scope of the Privilege.......................................................... 36

1. The Attorney-Client Privilege Does Not Apply to Communications with the Texas Legislative Council. ............................................................................................. 38

2. The Attorney-Client Privilege Does Not Apply to Communications Disclosed to Parties Outside the Attorney-Client Relationship................................................ 39

3. The Attorney-Client Privilege Does Not Apply to Communications that Are Not Based on Confidential Client Information............................................................ 40

4. The Attorney-Client Privilege Does Not Extend to Policy Advice........................... 42

D.    The State of Texas Has Improperly Asserted the Deliberative Process Privilege

Without Establishing Necessary Elements. ................................................................ 44

E.    Deponents Must Be Compelled to Provide Responsive Answers to Questions that

Do Not Raise Privilege Issues............................................................................................... 46

F.    The Same Considerations Weigh Heavily in Favor of Abrogating these Privileges for

Future Deponents and Documents Produced Late Today........................................................ 47

III.    CONCLUSION............................................................................................................. 52

The Attorney General seeks discovery concerning the State of Texas's ("Texas" or "the State") claim that Texas's photographic voter identification law, Senate Bill 14 (2011) ("S.B. 14"), "neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race, color," or language minority status in violation of Section 5 of the Voting Rights Act, 42 U.S.C. § 1973c.  The State of Texas's rolling production of documents and serial invocation of numerous evidentiary privileges, as well as the State's refusal to withdraw overbroad assertions of privilege in the face of indisputable case-law, again require the Attorney General to seek an order compelling discovery from this Court.

The instant motion principally addresses Texas's unwarranted reliance on state legislative privilege, the attorney-client privilege, and the deliberative process privilege to improperly withhold numerous categories of documents that are directly relevant to the State's claim for judicial preclearance of S.B. 14 and sharply restrict deposition testimony from four central witnesses:  Texas Senator Troy Fraser, S.B. 14's original author; Janice McCoy, Senator Fraser's chief of staff; Representative Patricia Harless, the Texas House sponsor of S.B. 14; and Colby Beuck, Representative Harless's chief of staff.[1]  These four witnesses, who are uniquely positioned to provide evidence concerning the purpose of S.B. 14, were instructed to limit or not answer a wide array of questions at the very core of the purpose inquiry, including whether any part of the purpose in passing S.B. 14 was to reduce the number of minorities able to vote, *see,*

---

[1] The Attorney General submits this motion to compel pursuant to the Court's May 7, 2012 Order directing the parties to file motions to compel by May 21, 2012. *See* Order at 6 (May 7, 2012) (Doc. 107). Discovery closes on June 15, 2012. Due to the compressed discovery schedule in this case, however, depositions noticed by all parties will be on-going over the next few weeks. Additionally, Texas produced emails responsive to the Attorney General's discovery requests today. Should Texas withhold emails or instruct deponents not to answer questions on grounds of unwarranted assertions of privilege, or otherwise, the Attorney General respectfully requests that the Court permit him to supplement this motion to seek appropriate relief.

1

*e.g.* Harless Dep. 95:20-96:5 (instruction to only consider the public record in answering whether the purpose of S.B. 14 was in part to decrease the number of Hispanic voters) and whether the legislature analyzed S.B. 14's impact on minority voters prior to its passage, *see, e.g.,* Fraser Dep. 249:16-250:2 (instructed not to answer question, "Did you conduct any analysis to determine if minority voters would be disproportionately less likely to possess the forms of ID required by Senate Bill 14?").  The State's persistent invocation of legislative privilege throughout these depositions in response to a wide range of questions related to the purpose and effect of S.B. 14 will likely be repeated during more than a dozen depositions noticed for the weeks of May 29, 2012 and June 4, 2012.  For the reasons that follow, the Court should enter the attached order compelling Texas to produce the documents and deposition testimony withheld and ordering prospective relief to compel deposition testimony with regard to witnesses whose depositions the Attorney General has not yet taken.[2]

## I.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  Discovery Motions Related to Privilege

On March 14, 2012, during a telephonic status conference, the State indicated its intention to assert legislative privilege over documents and testimony concerning S.B. 14.  Dep. 7:16-8:13 (Mar. 14, 2012).  On March 15, 2012, the Court ordered Texas to file a motion for

---

[2] To the extent that the Court finds that supplemental witness testimony is appropriate from the four witnesses deposed the week of May 14, 2012, the Attorney General also requests an enlargement of time in which to take these witnesses' testimony, as Texas's lengthy speaking objections expended significant time.  For instance, Texas's counsel routinely interposed the following objection:  "To the extent that you're asking questions that reveal thoughts and opinions about legislation or in furtherance of the legislative process, we'll be objecting to and not be providing answers with respect to communications between legislators and staff members; communications between legislators and other legislators, as well as legislative staffers; communications between constituents and legislators or staff; communications between legislators and staff and state agencies, including the Lieutenant Governor's Office or the Office of the Governor, and communications between legislators and staff of the Legislative Council." *E.g.*, Beuck Dep. 9:5-22, May 14, 2012 (Ex. 1).

protective order regarding legislative privilege as to members of the Texas legislature.  Order re

Expedited Discovery (Doc. 17).  Texas filed that motion on March 22, 2012.  *See* Plaintiff's

Motion for Protective Order Regarding Legislative Privilege (Doc. 34).  On April 20, the Court

denied the motion without prejudice.  *See* Order (Doc. 84).  The Court's Order noted that if any

Texas legislators asserted privilege in response to specific requests for depositions or to justify

withholding the production of specific communications, the Attorney General or defendant-

intervenors could at that time move to compel.  *See id.*  On April 25, 2012, the Attorney General

moved to compel production of documents withheld on the basis of legislative privilege,

deliberative process privilege, and attorney-client privilege.  *See* Attorney General's Motion to

Compel the Production of Documents and Privilege Logs (Doc. 93).  Earlier today, the Court

granted in part and denied in part the Attorney General's Motion.  *See* Order (Doc. 128).

The Attorney General deposed four key witnesses during the week of May 14, 2012: S.B.

14's sponsors—Senator Troy Fraser and Representative Patricia Harless—and their respective

chiefs of staff—Janice McCoy and Colby Beuck.  Following the first two of these depositions,

on May 16, 2012, the Attorney General made an oral motion to compel deposition responses to

questions concerning (1) the purpose of S.B. 14 and (2) foundational information necessary to

assess the claim of privilege over communications between constituents and legislators.[3]  On

May 17, the Court ordered that Texas must allow its witnesses to testify to the purposes of S.B.

14—regardless of whether the witness is called upon to answer questions outside the public

---

[3] The Attorney General reserved the right to seek additional relief concerning these depositions.

3

record of S.B. 14—but allowed Texas to continue to invoke privilege over legislative communications that Texas claims to be privileged.  *See* Order (Doc. 122).

**B.      Depositions**

**1.      Depositions Taken During the Week of May 14, 2012**

Throughout the depositions of S.B. 14's sponsors and their respective chiefs of staff, as discussed below, Texas repeatedly invoked legislative privilege and instructed the deponents not to answer questions related to the core of the State's statutory claim, including the history of S.B. 14 and the legislature's consideration of predecessor voter identification bills,[4] the purpose of S.B. 14[5] and the prior photographic voter identification bills,[6] the procedures employed to

---

[4] Fraser Dep. 86:4-10, 89:7-8, May 17, 2012 (refusing to answer questions about his sponsorship of HB 218 on basis of privilege) (Ex. 2); Fraser Dep. 131:4-132:6, 132:15-23, 133:13-17, 137:15-20, 142:1-7 (refusing to answer questions about development of S.B. 362 on basis of privilege); Fraser Dep. 236:25 – 237:14 (instruction on and assertion of privilege regarding development of S.B. 14); Fraser Dep. 252:21 - 254:6 (instruction on and assertion of privilege over the inclusion of non-photographic identification as forms of allowable identification in S.B. 362 and not in S.B. 14); Fraser Dep.  258:7 (instruction on and assertion of privilege over the inclusion of state and federal issued photographic identification as forms of allowable identification in S.B. 362 and not in S.B. 14).

[5] Harless Dep. 94:23-100:9, May 15, 2012 (in response to question about purpose of S.B. 14, counsel for Texas instructed witness to answer solely based on the public record) (Ex. 3); Harless Dep. 252:13-19 (refusing to answer question, "Why does S.B. 14 allow military identification and not college identification as a permissible form of ID?" on basis of privilege); McCoy Dep. 192:17-193:14, May 16, 2012 (limiting testimony about the purpose of S.B. 14) (Ex. 4); raser Dep. 266: 24 – 267: 25 (instruction on and assertion of privilege over questions about the purported purpose of S.B. 14); Fraser Dep. 274: 11-19 (instruction on and assertion of privilege over witness' bases for stating the purpose of S.B. 14); Fraser Dep. 274: 20-275: 18 (instruction on and assertion of privilege over whether the purpose of photo identification bills evolved over time.

[6] Harless Dep. 201:21-202:3, 202:25-203:6 (instructions not to answer questions related to inclusion of allowable forms of identification under a predecessor photo identification bill, H.B. 112); Harless Dep. 207:25-208:9 (instruction not to answer question as to why Ms. Harless introduced a voter identification bill that permitted the use of non-photo identifications and four months later, sponsored a bill that did not permit the use of non-photo identification); Harless Dep. 215:7-215:17 (instruction not to answer question about the purpose of the change from H.B. 112 to S.B. 14 as to the use of non-photo identification); McCoy Dep. 96:12-23 (limiting testimony about the purpose of S.B. 362 to the public record); McCoy 60:15-61:3; 61:24-29 (limiting testimony about  the purpose of H.B. 218); Fraser Dep. 68:4-16, 73:4-17, 75:10-13 (refusing to answer questions about purpose of H.B. 218); Fraser Dep. 142:1-12, 143:18-23, 153:10-14 (refusing to answer questions about purpose of provisions in S.B. 362).

4

consider and pass voter identification legislation,[7] the statements made—both on and off the

record—about the legislation and the effect of the bills on minority voters,[8] whether any part of

the purpose of S.B. 14 was to discriminate against Hispanic voters,[9] and the bill's ultimate effect

on minority voters.[10]   Instead, the witnesses were permitted to testify—in a circular manner—

---

[7] Harless Dep. 42:5-42:9 (refusing to testify, based on privilege objection, in response to question about why House Select Committee on Voter Identification and Voter Fraud was convened); McCoy Dep. 120:6-12: (not answering whether Sen. Fraser asked Sen. Williams to introduce a resolution suspending the two-thirds rule for voter identification requirements); McCoy Dep. 121:22- 122:13 (not answering whether Fraser had concerns about exempting S.B. 362 from two-thirds rule); Fraser Dep. 246: 15-247: 24 (instruction on and assertion of privilege regarding whether witness looked at how .B. 14 would impact voters and whether additional forms of identification were considered); Fraser Dep. 249: 16- 250: 9 (instruction on and assertion of privilege over whether minority voters would be disproportionately less likely to possess the forms of identification required by S.B. 14 and whether studies conducted on who has the requisite forms of identification pursuant to S.B. 14); Fraser Dep. 258: 4 -259: 10, 264:13-20 (instruction on and assertion of privilege over whether any analysis was conducted about the process of obtaining an election identification certificate); Fraser Dep. 260: 11-261: 4 (instruction on and assertion of privilege over why S.B. 14 accounts for some constituencies' concerns but not for others); Fraser Dep. 264: 6-11 (instruction on and assertion of privilege over whether the legislature modified S.B. 14 in response to racial and ethnic minorities' concerns);  Fraser Dep. 279:19-24 (instruction on and assertion of privilege over questions about voters having confidence in electoral process).

[8] Harless Dep. 157:5-158:8 (asserting legislative privilege in response to question about Rep. Harless's statement in the press dismissing assertions that her voter identification bill would disenfranchise minority voters); Harless Dep. 238:14-238:23 (refusal to answer question, "Did you ever discuss whether S.B. 14 might impact minority voters more than it impacted Anglo voters with anyone?" on the basis of privilege); *see also* Harless Dep. 193:5-193:10 (in response to question, "Did you conduct or did you instruct anyone to conduct an analysis of the impact that [previous photo identification bill] would have on minority voters?" counsel for Texas instructed witness not to answer); McCoy 206:9-13 (not answering whether any analysis was conducted to determine which registered voters lacked driver license and social security numbers); McCoy Dep. 171:10-17 (limiting testimony on reports reviewed in conjunction with S.B. 14 to the public record); McCoy Dep. 137:7-10 (not answering whether any analysis was conducted to determine the impact of S.B. 362 on minority voters); McCoy Dep. 192:17-193:17 (limiting testimony about the purpose  of S.B. 14 to the public record and not answering whether there were unstated purposes in enacting S.B. 14).

[9] Harless Dep. 95:20-96:5 (in response to question as to whether purpose of S.B. 14 was in part to decrease the number of Hispanic voters, counsel for Texas instructed witness to answer solely based on the public record); McCoy Dep. 193:18- 194:9 (not answering whether any part of the purpose of S.B. 14 was to decrease participation by minority voters).

[10] Harless Dep. 238:14-238:23 (refusal to answer question, "Did you ever discuss whether S.B. 14 might impact minority voters more than it impacted Anglo voters with anyone?" on the basis of privilege); *see also* Harless Dep. 193:5-193:10 (in response to question, "Did you conduct or did you instruct anyone to

solely about public statements concerning these bills.[11]   Even then, Texas instructed the

witnesses not to answer any questions about the bases for statements made on the public record

concerning these bills—including the witnesses' own on-the-record statements and statements to

the media—on the ground that such testimony would reveal the witnesses' privileged mental

impressions.   As a result, these witnesses' testimony merely parrots the public record and

withholds basic evidence concerning legislative purpose, evidence that is crucial to resolving

---

conduct an analysis of the impact that [previous photo identification bill] would have on minority voters?" counsel for Texas instructed witness not to answer); McCoy Dep. 95: 16-23 (instruction and assertion of privilege over whether witness was ever instructed not to look at who among registered voters possessed one of the forms of identification under S.B. 362); McCoy Dep. 115:6-25 (instruction and assertion of privilege over witness's assessment of whether S.B. 362 would disenfranchise voters); McCoy Dep. 116:3-117:2 (instruction and assertion of privilege over why S.B. 362 was not changed to respond to opponents' concerns); McCoy Dep. 117:17-24 (instruction and assertion of privilege over whether she took steps to determine whether S.B. 362 would disenfranchise voters); McCoy Dep. 137:7-10 (not answering whether any analysis conducted to determine the impact of S.B. 362 on minority voters); McCoy Dep. 171:10-17 (limiting testimony on reports reviewed in conjunction with S.B. 14 to the public record); McCoy Dep. 189:14- 23 (instruction and assertion of privilege over whether witness looked into whether any racial or ethnic group would be more likely to not possess the underlying documentation needed for an election identification certificate); McCoy Dep. 195: 21-196:1 (instruction and assertion of privilege over whether Senator considered any alternative legislative measures to deter voter fraud); McCoy 206:9-13(not answering whether any analysis was conducted to determine which registered voters lacked driver license and social security numbers); McCoy Dep. 224:16-225:10 (instruction and assertion of privilege over why the witness believed that the opposition on the Senate floor was for the purposes of the Department of Justice).

[11] Harless Dep. At 103:10-103:20 (in response to question about the acts sought to be prevented by S.B. 14, counsel for Texas instructed witness that "[t]o the extent that you can refer to public debate about the issue or public statements, you can answer."); Fraser Dep. 151:4-17 (repeatedly responding to several questions about the purpose of S.B. 362 with the response that its purpose was "to preserve the integrity of the ballot box" before asserting privilege over any further answer); Fraser 283: 20-284: 9 (instruction on and assertion of privilege over why witness moved to table an amendment to include expired identification in S.B. 14); Fraser Dep. 284: 22 – 285: 23 (instruction on and assertion of privilege over why witness moved to table an amendment to require the Secretary of State to study the impact of S.B. 14 on minorities); Fraser 286: 3- 21 (instruction on and assertion of privilege over why witness moved to table an amendment to prohibit state agencies from charging for the underlying documents required to obtain the required identification pursuant to S.B. 14); Fraser Dep. 286: 25 – 288: 7 (instruction on and assertion of privilege over why witness moved to table an amendment that would have allowed for the provisional ballots of indigent voters to be counted); Fraser Dep. 288: 8- 289:8 (instruction on and assertion of privilege over why witness moved to table an amendment to require extended hours at driver license offices); Fraser Dep. 289: 18 – 291 : 20 (instruction on and assertion of privilege over questions about witness' citing to a public opinion poll on photo identification requirements in the press).

Texas's statutory claim under *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266-68 (1977).[12]

### 2.      Depositions Noticed for the Week of May 29 and June 4, 2012

The Attorney General anticipates that Texas will assert privilege during the remaining depositions noticed by the Attorney General to further preclude the development of critical evidence.  At present, the Attorney General has noticed for deposition during the weeks of May 29, 2012 and June 4, 2012:  Lieutenant Governor David Dewhurst; Senators Robert Duncan, Dan Patrick and Tommy Williams; Representatives Jose Aliseda, Leo Berman, Larry Gonzales, Aaron Peña, Todd Smith, and Joe Straus; staff for Lieutenant Governor Dewhurst, including Chief of Staff Blaine Brunson, Deputy Chief of Staff Julia Rathgeber, and Deputy General Counsel Bryan Hebert; staff for Governor Perry, including Legislative Director Senator Kenneth Armbrister and former policy director Michael Schofield; and the former director of Texas's Division of Elections, Ann McGeehan.  Much like the four individuals who have been deposed, these individuals have particularized knowledge of factors directly at issue under *Arlington Heights* that makes their complete testimony central to a full inquiry of the purpose of enacting S.B. 14.  Accordingly, the Attorney General now seeks prospective relief requiring these witnesses to answer questions concerning the purpose of S.B. 14, the bases for public statements, the information available to legislators and officials prior to decisions concerning SB 14, and other critical areas not protected by any state legislative privilege.[13]

### C.      Document Discovery

---

[12] Specific instances in these depositions of Texas's repeated assertion of privilege over these crucial areas are discussed in detail in Section II.A.1.a, *infra*.

[13] The specific need for testimony is discussed in detail in Section II.A.1, *infra*.

The Attorney General propounded his First Set of Requests for Production of Documents (Ex. 5) on March 20, 2012.  Ten days later, the State of Texas responded with a set of objections, wherein the State asserted attorney-client privilege, legislative privilege, deliberative process privilege, and protection from disclosure pursuant to Texas Government Code § 323.017.  *See* Plaintiff's Objections and Responses to Defendant's First Set of Requests for Production (Mar. 30, 2012) (Ex. 6).  The State produced only formal legislative history on March 31 and began producing responsive documents in the possession of state agencies on April 13.  The State likewise produced several, and in some instances deficient, privilege logs on a rolling basis.  On May 11, the State produced an omnibus privilege log 832 pages in length that lists thousands of relevant documents withheld on the basis of legislative privilege, deliberative process privilege, attorney client privilege, and the attorney work-product doctrine.  *See* May 11 Privilege Log (Ex. 7).  This log included documents that—on their face—cannot be shielded from disclosure by any of the asserted privileges.  *See* Sections II.B.1, II.B.3, II.B.4, II.B.5, II.C.1, II.C.2, II.C.3 *infra*. Because the State of Texas asserts that the scope of the state legislative privilege dovetails almost perfectly with the scope of relevant evidence that legislators have not previously chosen to disclose, the vast majority of materials that have been disclosed are either public documents or irrelevant to the inquiry before this Court.[14]

---

[14] For example, the State of Texas produced only four documents from the Office of Representative Patricia Harless, the House Sponsor of S.B. 14.  *See* May 11 Privilege Log at 33-45 (claiming privilege over all other documents).  Two documents are chapters of the Texas Transportation Code, one is a letter from a reporter requesting documents under the Texas Public Information Act, and one is an email discussing a disability exemption.  *See* Harless Documents (Ex. 8) (TX_00006824-6830, 7066-7067, and 7207-7208).  Similarly, the State of Texas produced only nine documents from the Office of the Lieutenant Governor.  *See* May 11 Privilege Log at 434-442.  Five are copies of public statements, one is a blank email without the noted attachment, one is the public fiscal note for S.B. 14, and three are documents from the Texas League of Women Voters unrelated to photographic voter ID.  *See* Dewhurst

## II.   **ARGUMENT**

The Attorney General is entitled to an order compelling the production of testimony and documents over which the State has improperly asserted the state legislative privilege, attorney-client privilege, and the deliberative process privilege.[15]  "A party seeking discovery may move for an order compelling . . . production[] or inspection . . . if a party fails to respond that inspection will be permitted—or fails to permit inspection—as requested under Rule 34."  Fed. R. Civ. P. 37(a)(3)(B)(iv).  A party may also seek to compel witness testimony in a deposition. Fed. R. Civ. P. 47(a)(3)(C).  While a party moving to compel discovery bears the initial burden to prove that the materials sought are relevant, the burden of demonstrating facts sufficient to establish a privilege's applicability rests on the proponent of a privilege.  *See In re Subpoena Duces Tecum*, 439 F.3d 740, 750 (D.C. Cir. 2006); *Alexander v. FBI*, 192 F.R.D. 32, 33-34 (D.D.C. 2000).  The "basis of privilege" must be "adequately established in the record," *Liberty Lobby, Inc. v. Dow Jones & Co., Inc.*, 838 F.2d 1287, 1303 (D.C. Cir. 1988), through evidence sufficient to establish the privilege "with reasonable certainty," *FTC v. TRW, Inc.*, 628 F.2d 207, 213 (D.C. Cir. 1980).

Here, Texas can make no such showing for the documents and testimony over which it asserts these privileges.  As explained below, to the extent that the Court has recognized a state

---

Documents (Ex. 9) (TX_00034443-34446, 34448, 34461-34463, 34517-34518, 34523, 34528-34531, 34548-34549).

[15] The Attorney General incorporates by reference all of the arguments against Texas's assertions of privilege that were presented in opposition to the State's motion for a protective order, *see* Defendant's Response in Opposition to Plaintiff's Motion for a Protective Order (Doc. 57); United States' Statement in Support of Its Request to Depose and Seek Documents from State Legislators and Staff (Doc. 69), and in support of the Attorney General's prior motion to compel, *see* Memorandum of Points and Authorities in Support of the Attorney General's Motion to Compel (Doc. 93-1); Reply Memorandum in Support of the Attorney General's Motion to Compel (Doc. 104).

legislative privilege,[16] Texas's assertion of such privilege must yield to the vital federal interest in enforcing the Voting Rights Act's guarantee to Texas citizens that no Texas law shall deny or abridge the right to vote on account of race, color, or language minority status.  Further, to the extent that any of the privileges Texas asserts may apply here, Texas has invoked these privileges to block discovery in a wholly overbroad manner.  Consequently, the Attorney General has been denied crucial discovery necessary to defend against Texas's claim that S.B. 14 lacks any discriminatory purpose and will not have a discriminatory effect.

>    **A.**    **Texas's Assertion of State Legislative Privilege Must Yield to the Crucial Federal Interest in Enforcing the Voting Rights Act.**

The state legislative evidentiary privilege is—at most—a qualified privilege.  *See Comm. for a Fair & Balanced Map v. Ill. State Bd. of Elections*, No. 11 C 5065, 2011 WL 4837508, at *7 (N.D. Ill. Oct. 12, 2011); *Rodriguez v. Pataki*, 280 F. Supp. 2d 89, 100-01 (S.D.N.Y. 2003), *aff'd*, 293 F. Supp. 2d 302 (S.D.N.Y. 2003); *United States v. Irvin*, 127 F.R.D. 169, 173 (C.D. Cal. 1989); *Baldus v. Members of the Wis. Gov't Accountability Bd.*, No. 11-cv-562, 2011 WL 6122542, at *2 (E.D. Wis. Dec. 8, 2011) (three-judge court).  Unlike the federal legislative privilege, which rests on the Speech or Debate clause of the U.S. Constitution, any state legislative privilege rests on federal common law.  *See In re Grand Jury Subpoena*, 438 F.3d 1141, 1166 (D.C. Cir. 2006); *see also* Fed. R. Evid. 501; *United States v. Gillock*, 445 U.S. 360, 368 (1980).  This distinction flows not only from the text of the Speech or Debate clause—which is limited to federal legislators—but also from the limited relevance of the two concerns that underlie the clause to state legislators:  "the need to avoid intrusion by the Executive or Judiciary

---

[16] *See* Order at 2 (Apr. 20, 2012) (Doc. 84) (concluding that "the [Supreme] Court's case law assumes that at least some of the privileges and immunities afforded to federal legislators by the Speech or Debate Clause are also afforded to state legislators").

into the affairs of a coequal branch" and "the desire to protect legislative independence." *Gillock*, 445 U.S. at 369.  The first of these rationales, which "rest[s] solely on the separation of powers doctrine," does not apply to state legislators.  *Id.*; *see also Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 502 (1975).  With regard to the second rationale, a state official's interest in legislative independence must yield "where important federal interests are at stake," including the enforcement of federal statutes.  *Gillock*, 445 U.S. at 361 (finding that a state legislative privilege "would impair the legitimate interest of the Federal Government [in the enforcement of federal criminal law] . . . with only speculative benefit to the state legislative process").  Instead, the Supreme Court has "drawn the line" by limiting any absolute protections that state legislators may have to official immunity from civil actions.  *See id.* at 372-73; *see also Tenney v. Branhove*, 341 U.S. 367, 376-77 (1951) (holding state legislators immune from civil suit for legislative acts).  Any state legislative privilege is simply not co-extensive with the scope of the federal Speech or Debate clause.  *See Gillock*, 445 U.S. at 372-73.

Given this history, courts that have recognized a state legislative privilege have routinely determined that the privilege must yield in the face of significant federal interests, including claims under the Voting Rights Act.  *See Comm. for a Fair & Balanced Map*, 2011 WL 4837508, at *6 (concluding that "recognition of an evidentiary privilege for state legislators for their legislative acts would impair the legitimate interest of the Federal government" in "vindicat[ing] public rights" under the Voting Rights Act (citing *Gillock*, 445 U.S. at 373)); *Rodriguez v. Pataki*, 280 F. Supp. 2d at 100-01; *United States v. Irvin*, 127 F.R.D. 169, 173 (C.D. Cal. 1989); *Baldus*, 2011 WL 6122542, at *2  (three-judge court).  *Rodriguez v. Pataki* identified five factors to be weighed to determine whether and to what extent a claim of state legislative privilege must yield:

11

> (i) the relevance of the evidence sought to be protected, (ii) the availability of other evidence, (iii) the seriousness of the litigation and the issues involved, (iv) the role of the government in the litigation, and (v) the possibility of future timidity by government employees who will be forced to recognize that their secrets are violable.

280 F. Supp. 2d at 100-01 (internal quotation marks and citations omitted). *United States v. Irvin* added three additional factors: "the interest of the litigants, and ultimately of society, in accurate judicial fact finding," "the presence of issues concerning alleged governmental misconduct," and "the federal interest in the enforcement of federal law." *Irvin*, 127 F.R.D. at 173 (internal citations and quotation marks omitted). *See generally In re Grand Jury* (*Granite Purchases*), 821 F.2d 946, 957 (3d Cir. 1987) ("Even while granting government officials a qualified, confidentiality privilege, however, the courts have taken pains to insure that the privilege applies only 'to the very limited extent' that the 'public good' in confidentiality transcends the value of 'utilizing all rational means for ascertaining truth.'" (quoting *Trammell v. United States*, 445 U.S. 40, 50 (1980))).

These factors weigh strongly in favor of abrogating the privilege with regard to the documents Texas has withheld and the four deponents for whom Texas has asserted state legislative privilege. As explained below, this Court will be denied critical evidence of legislative purpose without the documents and testimony over which Texas asserts legislative privilege, weighing the critical first *Rodriguez* factor in favor of disclosure. There is also no question that this evidence is solely in the possession of the State of Texas and the legislators that the State has advised and instructed to assert privileges. The remaining *Rodriguez* factors similarly align in favor of disclosure. Accordingly, the Court should grant the Attorney General's motion to compel.

1.      **The Critical Need for Legislator Testimony and Documents Supports Overriding Texas's Assertion of Legislative Privilege.**

Section 5 of the Voting Rights Act prohibits covered jurisdictions from implementing voting changes that either have a retrogressive effect or were motivated by a discriminatory purpose. *See* 42 U.S.C. § 1973c(a); *Beer v. United States*, 425 U.S. 130 (1976). In a judicial preclearance action, this Court must make findings under both the effect prong and purpose prong of Section 5. *See generally Shelby Cnty. v. Holder*, 811 F. Supp. 2d 424, 436-39 (D.D.C. 2011) (discussing the preclearance standards under both prongs, as modified by the 2006 Amendments to the Voting Rights Act), *aff'd*, No. 11-5256, 2012 WL 1759997 (D.C. Cir. May 18, 2012). Although Texas bears the burden of establishing that S.B. 14 has neither a discriminatory effect nor a discriminatory purpose, *see* 42 U.S.C. § 1973c(b); *see also Georgia v. United States*, 411 U.S. 526, 538 (1976), if Texas presents a *prima facie* case as to the absence of a discriminatory motivation in its case-in-chief, the burden of production shifts to the Attorney General to introduce evidence that the State has not met its statutory burden. *See Bossier Parish Sch. Bd. v. Reno*, 907 F. Supp. 434, 446 (D.D.C. 1995) (three-judge court), *vacated on other grounds*, 520 U.S. 471 (1997).

The discovery at issue here directly relates to the purpose prong of Section 5. Evidence of a prohibited purpose may be direct or circumstantial, and a discriminatory purpose need only be a motivating factor—not a primary motivation of the legislation—in order for preclearance to be denied. *See Reno v. Bossier Parish Sch. Bd.* (*Bossier Parish I*), 520 U.S. 471, 488 (1997); 28 C.F.R. § 51.54(a). The Supreme Court has held that "in cases brought under § 5 of the Voting Rights Act of 1965, the *Arlington Heights* framework should guide a court's inquiry into whether a jurisdiction had a discriminatory purpose in enacting a voting change." *Hunt v. Cromartie*, 526

13

U.S. 541, 546 n.2 (1999) (citing *Bossier Parish 1*, 520 U.S. at 488)); *see also Arlington Heights*, 429 U.S. 266-68 (framework).  Congress endorsed this approach to Section 5's purpose inquiry during the reauthorization of the Voting Rights Act in 2006.  *See* H.R. Rep. No. 109-478, at 42 (2006).[17]

"[A]ssessing a jurisdiction's motivation in enacting voting changes is a complex task requiring a 'sensitive inquiry into such circumstantial and direct evidence as may be available.'" *Bossier Parish I*, 520 U.S. at 488 (quoting *Arlington Heights*, 429 U.S. at 266).  Under the *Arlington Heights* rubric, the "important starting point" for assessing whether the State can establish that the proposed change was adopted free of a discriminatory purpose is "the impact of the official action whether it 'bears more heavily on one race than another.'"  *Id*. at 489 (quoting *Arlington Heights*, 429 U.S. at 266).  Beyond evidence of the effect of the change on the ability of minority voters to participate in the political process, a court must assess the historical background of the decision, particularly if it reveals a series of decisions undertaken with discriminatory purpose; the sequence of events leading up to the decision; whether the challenged decision departs, either procedurally or substantively, from the normal practice; and contemporaneous statements and viewpoints held by the decision-makers.  *See id.* (quoting *Arlington Heights*, 429 U.S. at 266-268).

Given the nature of the discriminatory purpose inquiry required by *Arlington Heights*, extensive formal or informal discovery—including testimony from elected decision-makers—is

---

[17] *See generally Blanchard v. Begeron*, 489 U.S. 87, 91-92 (1989) (relying on committee reports as establishing relevant factors for statutory analysis, over Justice Scalia's dissent); *Wisconsin Public Intervenor v. Mortier*, 501 U.S. 597, 610 n.4 (1991) (rejecting the position that legislative history is irrelevant to proper statutory interpretation); William N. Eskridge, Jr., *Legislative History Values*, 66 Chi.-Kent L. Rev. 365, 372 (1990).

14

generally required in judicial preclearance cases.  *See, e.g.*, *New York v. United States*, 874 F.

Supp. 394,402 (D.D.C. 1994) (three-judge court); *Georgia v. Ashcroft*, 195 F. Supp. 2d 25, 32

(D.D.C. 2002) (three-judge court), *vacated on other grounds*, 539 U.S. 461 (2003); *Busbee v.

Smith*, 549 F. Supp. 494 (D.D.C. 1982) (three-judge court), *aff'd*, 459 U.S. 1166 (1983).  Purpose

discovery is particularly well-founded where—as in this case—there is substantial evidence that

the law at issue has a disparate impact on minority voters.  *See Bossier Parish I*, 520 U.S. at 488-

89; *see also* Letter from Thomas E. Perez, Ass't Att'y Gen., U.S. Dep't of Justice, to Keith

Ingram, Director of Elections, State of Texas (Mar. 12, 2002) (Ex. 10); Def.'s Response in Opp.

To Pl.'s Mot. for  Protective Order (Mar. 29, 2012) (Doc. 57).   Previous panels of this Court

have used legislative testimony as a uniquely probative means of assessing purpose.  *See, e.g.*,

*Arizona v. Reno*, 887 F. Supp. 318, 323 (D.D.C. 1995) (three-judge court) (denying state's

motions for summary judgment and to limit discovery because the United States had "not yet

been able to identify and depose many of the officials—state court judges, legislators, and

executive officials—who participated in the decision," whose testimony was necessary for a

complete evidentiary record on discriminatory purpose); *Busbee v. Smith*, 549 F. Supp. at 516-17

(relying on testimony from legislators that included "overt racial statements" in finding a

discriminatory purpose and denying preclearance); *Port Arthur v. United States*, 517 F. Supp.

987, 1021-23 (D.D.C. 1981) (three-judge court) (considering elected officials' testimony to

assess purpose and pretext); *see also Georgia v. Ashcroft*, 539 U.S. 461, 471-75, 483 (2003)

(finding testimony of elected officials "significant" to assessing discriminatory purpose and

effect).[18]

---

[18] Notably, in *Busbee* the testimony of several state legislators, elected executive officials, and individuals

Documents and testimony from the legislators and legislative staff members who drafted S.B. 14 and guided it through the legislative process also directly pertain to the core question of purpose under *Arlington Heights*.  Indeed, because the Section 5 inquiry requires considering these witnesses' decision-making process, a complete evidentiary record on purpose cannot be complied without this evidence, which is entirely within the control of the State.  *See Arizona v. Reno*, 887 F. Supp. at 323; *see also Jones v. City of College Park*, 237 F.R.D. 517, 521 (N.D. Ga. 2006) (deposition testimony of officeholders is appropriate where "government intent is at the heart of the issue in this case"); *Irvin*, 127 F.R.D. at 173; *cf. United States v. Bd. of Educ.*, 610 F. Supp. 695, 700 (N.D. Ill. 1985) ("Here, the decisionmaking process is not 'swept up into' the case, it *is* the case.").[19]  Any evidence concerning pretext is uniquely in the hands of these legislators, whose legislative purpose is at issue and who are unlikely to have spoken about such issues or shared relevant documents with legislators cooperating with the Attorney General.  *Cf. Fields*, 459 F.3d at 15.  Texas's consistent and improper assertions of legislative privilege have not only hindered the Attorney General's ability to obtain this critical evidence but also delayed the progress of discovery.  Given the vital need for purpose discovery to resolve Texas's statutory claim, Texas's assertion of legislative privilege must yield.

---

assisting legislators in the redistricting process was obtained after the court denied the State of Georgia's motion for a protective order.  *See Docket, Busbee v. Smith*, No. 82-665, at 4, 6 (Docs. 52 and 82) (Ex. 11); Order, *Busbee v. Smith*, No. 82-665 (D.D.C. Apr. 22, 1982) (Ex. 12) (denying Georgia's motion for a protective order and permitting depositions of legislators).

[19] Courts considering intentional discrimination claims under Section 2 of the Voting Rights Act, 42 U.S.C. § 1973, have also relied on the testimony of elected decision-makers when considering allegations of discriminatory purpose.  *See, e.g.*, *Brooks v. Miller*, 158 F.3d 1230, 1236 (11th Cir. 1998); *Garza v. County of Los Angeles*, 756 F. Supp. 1298, 1314-18 (C.D. Cal. 1990), *aff'd*, 918 F.2d 763, 768 (9th Cir. 1990).

        **a.**      **The Fraser, Harless, McCoy and Beuck Depositions Establish that Texas is Asserting Legislative Privilege Over Vital Evidence Necessary to Assess Legislative Purpose.**

Throughout these depositions, Texas repeatedly invoked legislative privilege to cut off questioning that targeted issues at the core of the State's statutory claim, including the purpose and effect of S.B. 14 and prior photo identification legislation, less discriminatory alternatives to S.B. 14, the legislature's shifting views on acceptable voter photo identification, the unusual procedures used to guide S.B. 14 through the legislative process, the passage of S.B. 14, and any communications among legislators and staff concerning S.B. 14 and other photo identification bills.  As a result, the Attorney General was left unable to develop evidence in any of these areas, all of which are crucial to a complete Section 5 analysis under *Arlington Heights*.

As to purpose, the State refused to let the Attorney General fully examine witnesses about the purpose of S.B. 14 and prior photo identification legislation—discovery at the core of Section 5.[20]  Instead, the witnesses were permitted to testify, in a circular manner, solely about

---

[20] Harless Dep. 94:23-100:9 (instructing the witness to answer a question about the purpose of S.B. 14 solely based on the public record); Harless Dep. 252:13-19 (refusing to answer "Why does S.B. 14 allow military identification and not college identification as a permissible form of ID?"); Harless Dep. 201:21-202:3, 202:25-203:6 (instructing the witness not to answer questions related to inclusion of allowable forms of identification under a predecessor photo identification bill); Harless Dep. 207:25-208:9 (instructing the witness not to answer question as to why Rep. Harless introduced a voter identification bill that permitted the use of non-photo identifications and—four months later—sponsored a bill that did not permit the use of non-photo identification); Harless Dep. 215:7-215:17 (instructing the witness not to answer question about the purpose of the change from H.B. 112 to S.B. 14 as to the use of non-photo identification); Fraser Dep. 131:4-132:6, 132:15-23, 133-13-17, 137:15-20, 142:6-12 (refusing to answer questions about HB 218 and S.B. 362 beyond public record); Fraser Dep. 236:25 – 237:14 (instruction on and assertion of privilege regarding development of S.B. 14); Fraser Dep. 252:21 -254:6 (instruction on and assertion of privilege over the inclusion of non-photographic identification as forms of allowable identification in S.B. 362 and not in S.B. 14); Fraser Dep.  258:7 (instruction on and assertion of privilege over the inclusion of state and federal issued photographic identification as forms of allowable identification in S.B. 362 and not in S.B. 14; Fraser Dep. 266:14-265:17 (refusal to answer questions probing at the assertion of S.B. 14's purpose); Fraser Dep. 274: 20-275:18 (refusal to answer question about the shifting justification for photo identification over time).  *See generally* Harless Dep. at 97:2-8

the public record concerning the purpose of the bills. [21]  Even then, Texas refused to allow the

Attorney General to examine the witnesses about the bases for their own public statements

concerning the purpose of the bill. [22]  Likewise, Texas directed witnesses not to answer ultimate

questions about whether any part of the purpose of S.B. 14 was to discriminate against minority

voters, decrease the number of Hispanic voters, or decrease the number of other groups of

minority voters. [23]  Texas also prohibited examination of witnesses about the purpose of

including various forms of photo and non-photo identification in S.B.14 and prior, similar

legislation. [24]  Texas's broad assertion of legislative privilege fully prevented the Attorney

---

(noting that counsel for the State of Texas was repeatedly grabbing the witness's arm to prevent her from testifying prior to repeated objections).

[21] Harless Dep. 95:20-96:5 (in response to question as to whether purpose of S.B. 14 was in part to decrease the number of Hispanic voters, counsel for Texas instructed witness to answer solely based on the public record); Harless Dep. At 103:10-103:20 (in response to question about the acts sought to be prevented by S.B. 14, counsel for Texas instructed witness that "[t]o the extent that you can refer to public debate about the issue or public statements, you can answer."); McCoy Dep. 60:15-61:3, 61:24-61:9 (limiting testimony about the  purpose of H.B. 218 to the public record); McCoy Dep. 96: 12-97:11 (limiting testimony about the purpose of S.B. 362 to the public record); McCoy Dep. 192:17- 193:17 (limiting testimony about the purpose  of S.B. 14 to the public record and not answering whether there were unstated purposes in enacting S.B. 14); McCoy Dep. 84:18-85:5 (instruction not to answer whether any polls or reports were relied on when developing S.B. 362 that were not cited in the public record); Fraser Dep. 151:4-17 (repeatedly responding to several questions about the purpose of S.B. 362 with the response that its purpose was "to preserve the integrity of the ballot box" before asserting privilege over any further answer).

[22] McCoy Dep. 136:10-137:10, 200:17- 201:17, 204:13-205:13 (not answering questions about Sen. Fraser's statements on the public record); Fraser Dep., 203:6-17 (refusing to answer questions about the witness's statement on the Senate floor).

[23] Harless Dep. 95:20-97:10 (in response to series of questions about whether the purpose of S.B. 14 was in part to decrease the number of Hispanic voters, decrease the number of African-American voters, or decrease the number of any group of minority voters, counsel for Texas invoked legislative privilege and witness testified about testimony on House floor and refused to answer questions); McCoy Dep. 193:18-194:9 (not answering whether the purpose of S.B. 14 was to decrease the participation of minority voters).

[24] Harless Dep. 252:13-19 (refusing to answer "Why does S.B. 14 allow military identification and not college identification as a permissible form of ID?"); Harless Dep. 201:21-202:3, 202:25-203:6 (instructing the witness not to answer questions related to inclusion of allowable forms of identification under a predecessor photo identification bill, H.B. 112); Harless Dep. 207:25-208:9 (instructing the witness not to answer question as to why Ms. Harless introduced a voter identification bill that permitted

General from developing any evidence concerning purpose in these areas despite its significance

to the *Arlington Heights* analysis.  429 U.S. at 267-68.

Texas also invoked legislative privilege to block discovery on the effect of S.B. 14 and

prior photo identification legislation on minority voters.  In particular, the State invoked

privilege as to any analysis conducted on the impact that S.B. 14 will have on minority voters,

including analyses to determine the number of registered voters who lacked S.B. 14-compliant

identification, the racial and ethnic composition of these voters, and the burden on such voters to

obtain the election identification certificate provided for in S.B. 14. [25]  This evidence directly

---

the use of non-photo identifications and four months later, sponsored a bill that did not permit the use of non-photo identification); Harless Dep. 215:7-215:17 (instructing the witness not to answer question about the purpose of the change from H.B. 112 to S.B.14 as to the use of non-photo identification); Beuck Dep. 115:12-115:18 (instructing the witness not to answer question about how decision was made on the forms of identification to include in S.B. 14); Beuck Dep. 120:9-121:10 (instructing the witness not to answer questions about the inclusion of license to carry identifications in S.B. 14); McCoy Dep. 45:3-24 (limiting testimony about forms of identification allowed by H.B. 218 to the public record); McCoy Dep. 93:6-94:18 (not answering why S.B. 362 did not include student identifications as an allowable form of identification); McCoy Dep. 173:23- 174:13 (limiting response on why S.B. did not allow for two forms of non-photo identification to the public record); McCoy Dep. 178:16- 178:25 (not answering why S.B. 14 did not include a state or federally issued form of identification as allowable identification): McCoy Dep. 179:1-179:5 (not answering why S.B. 14 did not include a valid employee identification as a form of allowable identification ); McCoy Dep. 183:12-25 (limiting response regarding the exception for certain individuals with disabilities under S.B. 14 to the public record); 185:15- 186:11 (not answering how the exception for individuals with religious objections to being photographed came to be included in S.B. 14 because there was no information available on the public record); McCoy 218:14- 20 (not answering why the conference committee removed tribal identification as an allowable form of identification under S.B. 14); 218:21-219:2 (not answering why the conference committee removed a provision to target the voter education at low-income and minority communities); 219:3-10 (not answering why the conference committee  removed a provision exempting certain individuals whose identification had been stolen from the photo identification requirements of S.B. 14); Fraser Dep., 137:15-20, 140:22-143:23 (refusing to answer questions about identification requirements in S.B. 362); Fraser Dep. 257:13-257:12 (not answering why S.B. 14 does not include federally issued identification as an acceptable form of identification); 260:14-24 (not answering questions about how the exception for some individuals with disabilities and individuals with religious objections to being photographed came to be included in S.B. 14).

[25] Harless Dep. 280:13-280:21 (instructing the witness to answer whether there had been "any analysis or study done to see how many individuals did not have the requisite photo ID during consideration of S.B. 14" based solely on the public record); see also Harless Dep. 193:5- 193:11 (instructing the witness not to

addresses discriminatory purpose because the legislature's failure to conduct this research is

circumstantial evidence that the legislature disregarded any known discriminatory effects of the

law, the concerns of minority legislators and voters, and the State's legal obligations under

Section 5.  Moreover, these analyses would be highly relevant to the effect inquiry required

under *Arlington Heights*.  Texas also refused to allow witnesses to testify about concerns raised

by minority legislators or voters about S.B. 14 and any responses taken to address those

concerns; indeed, Texas refused to allow the witnesses to even identify such concerns.[26]  Again,

answers to these questions would provide significant insight into the integrity of the public

---

answer whether the she had conducted or instructed anyone to conduct an analysis of the impact that a previous photographic voter identification bill would have on minority voters); McCoy Dep. 189:14-190:16 (not answering why she did not look into who among registered voters would be less likely to possess the required forms of identification under S.B. 14); McCoy Dep. 205:8-13 (not answering if Sen. Fraser researched whether S.B. 14 was the least restrictive way to accomplish his goals); McCoy Dep. 187:4-8 (not answering whether she looked into the costs of obtaining the underlying documents necessary to obtain an election identification certificate); McCoy Dep. 189:14-23 (not answering whether minority voters would be more likely to not possess the underlying documentation necessary for obtaining an election identification certificate); *see* Fraser Dep. 92:6-93:12, 06:5-10, 140:22-141:13, 160:1-4, 212:12-19, 213:21-214:1, 215:15-18 (refusing to answer questions about any such analysis conducted for predecessor legislation).

[26] Harless Dep. 234:18-235:5 (in response to question, "Can you identify today any changes that were made to S.B. 14 in response to concerns articulated by minority groups during the hearings held by the Select Committee on Voter Identification and Voter Fraud?" instruction to answer based on public record, followed by witness's invocation of privilege);McCoy Dep. 204:6-11 (not answering whether any actions were taken in response to minorities' concerns); *see also* McCoy Dep. 133:23- 134:21 (not answering question about the Senator's reaction to opposition by all the racial and ethnic minority senators to S.B. 362); Fraser Dep. 166:21-24, 168:5-8, 206:9-207:10 (refusing to answer questions about the substance of concerns raised by minority opponents to predecessor legislation or any steps taken in response to those concerns); Fraser Dep. 249:16-250:2 (instructed not to answer question, "Did you conduct any analysis to determine if minority voters would be disproportionately less likely to possess the forms of ID required by Senate Bill 14?"); Fraser Dep. 246:9-246:20 (refusing to answer question about studies or reports while drafting S.B. 14); Fraser Dep. 264: 6-11 (refusing to answer whether S.B. 14 was changed in response to minority concerns); Fraser Dep. 264:13-20 (instruction to limit answer to the public record regarding whether analysis of costs or steps necessary to obtain an election identification certificate); Beuck Dep. 161:22-162:21 (in response to question about factual basis of problems with voter confidence discussed in the bill's debate, instructed witness to confine response to matters of public record).

record and the presence of a discriminatory purpose.  As a result, the Attorney General was unable to develop substantive evidence in this crucial area.

Similarly, Texas instructed witnesses not to answer questions about less discriminatory alternatives to S.B. 14.  In particular, the State instructed witnesses not to answer questions about drafts and provisions that were considered but not adopted, as well as the circumstances of the tabling of amendments to S.B. 14 that would have mitigated the effect of S.B. 14 on minority voters or required the assessment of the bill's effect on minority voters. [27]  These questions directly relate to discriminatory purpose, as such a purpose may be inferred if legislators rejected mitigating provisions or amendments without a reasonable basis for doing so.

In addition, the State uniformly blocked all testimony the Attorney General sought to obtain about why the Texas legislature narrowed the forms of acceptable voter identification in bills introduced over the course of several legislative sessions.[28]

---

[27] Harless Dep. 215:7-215:17 (instructing the witness not to answer a question about purpose of S.B. 14's failure to allow the use of non photo identification); Harless Dep. 266:5-266:18 (objecting to a question concerning witness's vote to table Amendment 58, which would have required a study by county and ethnicity of access to photo identification); McCoy Dep. 213:3-8 (not answering why Sen. Fraser tabled Sen. Ellis' amendment to require the Secretary of State to conduct a study on the impact of S.B. 14 on minority voters); McCoy Dep. 214:14-215:2 (not answering how Sen. Gallegos' amendment that would have  required driver license offices remain open until 7 p.m. one day per week and for at least four hours on a Saturday two times per month would interfere with Sen. Fraser's goals for S.B. 14); Fraser Dep. 288:14-289:8 (refusing to answer questions about why he tabled an amendment to extend hours of driver license offices); Fraser Dep. 287:2-288:7 (refusing to answer questions about why he voted to table an amendment to count provisional ballots for indigent individuals) Fraser Dep. 284:22- 285:23 (refusal to answer why he did not support an amendment requiring a study that would track the effect of S.B. 14 on minority voters); Fraser Dep. 283:21-9 (refusing to answer why he moved to table an amendment to allow for voters to use expired identifications); Fraser Dep. 246: 21- 247:8 (refusing to answer whether additional forms of identification were considered to include in S.B. 14).

[28] Harless Dep. 207:25-208:9 (instruction not to answer question as to why Ms. Harless introduced a voter identification bill that permitted the use of non-photo identifications and four months later, sponsored a bill that did not permit the use of non-photo identification); McCoy Dep. 45:3-24 (limiting testimony about forms of identification allowed by H.B. 218 to the public record) ; McCoy Dep. 93:6-94:18 (not answering why S.B. 362 did not include student identifications as an allowable form of identification);

21

As to legislative procedure, the State refused to allow witnesses to answer questions related to unusual procedures employed during S.B. 14's consideration, including elimination of the Senate's two-thirds majority vote rule, the Senate's quick consideration of S.B. 14 only by the Committee of the Whole and no other Senate Committees, and the creation of a select House committee designed solely to consider and move S.B. 14 through the House. [29] Because substantive changes as well as any deviation from ordinary legislative procedures are significant factors under *Arlington Heights*, this testimony is necessary to conduct a complete analysis of S.B. 14. *See* 429 U.S. at 267.

Finally, Texas consistently instructed deponents not to answer questions related to communications about S.B. 14 and other photo identification bills, including conversations about the substance of certain provisions, means of ensuring passage, procedures that were employed, and plans for implementation of S.B. 14.[30] Texas's assertion of privilege in this area even

---

McCoy Dep. 173:23-174:13 (limiting response on why S.B. did not allow for two forms of non-photo identification to the public record); McCoy Dep. 178:16-178:25 (not answering why S.B. 14 did not include a state or federally issued form of identification as allowable identification): McCoy Dep. 179:1-179:5 (not answering why S.B. 14 did not include a valid employee identification as a form of allowable identification); Fraser Dep. 137:15-20, 141:25-142:12 (refusing to explain why certain types of photo identification were included in S.B. 362); Fraser Dep.252:14-253:10 (instruction not to answer why S.B. 14 did not permit a voter to show two forms of non-photo identification, although his proposed bill two years earlier had allowed that).

[29] Harless Dep. 42:5-42:9 (refusing to testify, based on privilege objection, in response to question about why House Select Committee on Voter Identification and Voter Fraud was convened); McCoy Dep. 120:6-12: (not answering whether Sen. Fraser asked Sen. Williams to introduce a resolution suspending the two-thirds rule for voter identification requirements)**;** McCoy Dep. 121:22- 122:13 (not answering whether Sen. Fraser had concerns about exempting S.B. 362 from two-thirds rule); *see* Fraser Dep. 168:20-23 (refusing to answer questions about procedures used to ensure S.B. 362's passage in the senate); Fraser Dep. 229:21-24 (refusing to answer why S.B. 14 would need to be heard in the first sixty days of the legislative session).

[30] Harless Dep. 215:7-215:17 (claiming "It was clearly privileged communications" in response to a question concerning allowable forms of identification ); McCoy Dep. 49:15-24 (not answering questions about the nature of multiple conversations with a party operative); McCoy Dep. 56: 19-157:13 (not answering questions about the nature of her communications with a gubernatorial staffer); McCoy Dep.

blocked questions about the witnesses' public statements, statements in the press, and statements in the legislative record,[31] seemingly on grounds that such facts would reveal the legislator's "mental impression" derived from privileged communications. This evidence is central to uncovering the unstated, non-public purposes of S.B. 14 and to identify facts—if any— indicating discriminatory purpose. *See Arlington Heights*, 429 U.S. at 252.

### b. Documents Withheld Based on State Legislative Privilege Constitute Critical Evidence of the Purpose of SB 14.

Additionally, many of the documents withheld by Texas on legislative privilege grounds are central to the purpose and effect inquiries in this case and should be ordered disclosed by the Court. Documents "related to the sources, drafting, development, or analysis of S.B. 14" and documents "relied upon" during the "drafting, proposing, and development" of the bill, Def. 1st RFPs ¶¶ 2-3, describe both key actors' contemporaneous understanding of the bill's purpose and the sequence of events leading to the bill's passage. *See Reno v. Bossier Parish Sch. Bd.* (*Bossier Parish I*), 520 U.S. 471, 489 (1997) (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,

---

192:2-9 (not answering whether constituents asked Senator Fraser to pass a voter ID law); McCoy Dep. 177:24-178: 3 (not answering questions about the nature of her conversations with the Secretary of State's office); McCoy Dep. 53:10- 55:8 (only testifying as to general nature of conversations with Lieutenant Governor's office); Fraser Dep. 133:13-17, 148:10-15, 173:9-19 (refusing to answer questions about conversations with other states' officials and other Texas legislators concerning the development and movement of S.B. 362 through the senate); Fraser Dep. 225:10-18 (instructed not to answer whether he had been directed to introduce S.B. 14).

[31] Fraser Dep. 256:13-257:12 (refusing to answer question about the changes between the 2009 and 2011 photo identification bills); Fraser Dep. 287:2-288:7 (refusing to answer questions about why he voted to table an amendment to count provisional ballots for indigent individuals); Fraser Dep. 284:22- 285:23 (refusal to answer why he did not support an amendment requiring a study that would track the effect of S.B. 14 on minority voters); Fraser Dep. 283:21-9 (refusing to answer why he moved to table an amendment to allow for voters to use expired identifications); Fraser Dep. 246: 21- 247:8 (refusing to answer whether additional forms of identification were considered to include in S.B. 14); McCoy Dep. 201:19-24 (instruction and assertion of privilege over whether anyone instructed Sen. Fraser to not answer questions about S.B. 14 while it was considered by the Committee of the Whole); Harless Dep. 157:5-158:8 (asserting legislative privilege in response to question about Rep. Harless's statement in the press dismissing assertions that her voter identification bill would disenfranchise minority voters).

429 U.S. 252, 268 (1977)).  While many of the subject matter descriptions provided by the State in

its May 11 privilege log are insufficient to ascertain the nature of the document, the few

substantive descriptions illustrate the vital importance of these documents.  For example, the

State has withheld investigatory files held by Speaker of the House Joe Straus and Senator

Tommy Williams concerning the effects of S.B. 14; a letter from Senator Troy Fraser, regarding

procedures related to S.B. 362, the first bill introduced under the subject-specific elimination of

the Senate's two-thirds voting rule for Voter ID legislation; and Senator Fraser's talking points

concerning S.B. 14's provisional ballot provisions.  *See* May 11 Privilege Log at 98, 105, 169,

326.[32]

More fundamentally, the production of documents constitutes a lesser burden on

legislators and the legislative process, which must tip the balance in favor of disclosure.  Texas

has already collected the set of documents it deems relevant and has loaded them into a

Summation database.  Thus the act of production will place no further burden on the resources or

activities of the Texas Legislature.  *See Corporacion Insular de Seguros v. Garcia*, 709 F. Supp.

288, 296-97 (D.P.R. 1989) (ordering the disclosure of all disputed legislative documents after

applying concerns related to distractions or threats to legislative independence only to live

testimony).  Moreover, the Supreme Court's suggestion in *Arlington Heights* that a state

legislative privilege may apply to legislator testimony made no note of an accompanying

---

[32] Withheld documents may be divided into several tiers based on their centrality to this litigation.  Should
the Court determine that the qualified privilege shields some documents from discovery, the greater
importance of documents concerning sponsors, legislative leadership, committee chairs, and committee
staff all warrant disclosure.  *See* Contested Document Privilege Claim Index at 5-8 (Ex. 13).  Moreover,
documents concerning S.B. 14 and prior photographic voter identification proposals are of greater
importance than documents concerning other legislation that is of ancillary relevance to the instant
litigation.  *See id.* at 8-9.

limitation on the use of legislative documents to prove discriminatory purpose. *See* 429 U.S. at

268. The vital importance of these documents to a complete *Arlington Heights* analysis strongly

favors abrogating any state legislative privilege Texas may have.

>    **2.    The Remaining *Rodriguez* and *Irvin* Factors Weigh Heavily in Favor
>           of Abrogating the Privilege.**

The remaining factors identified by the courts in *Rodriguez* and *Irvin* further weigh in

favor of overriding any state legislative privilege here. Incontrovertibly, this litigation raises

serious questions of federal law under the Voting Rights Act and implicates the Act's core

guarantee that citizens' fundamental right to vote shall not be denied or abridged on account of

race, color, or language minority status. *See* 42 U.S.C. 1973c(a); *see also Shelby County v.*

*Holder*, No. 11-5256, 2012 WL 1759997, at *20-21 (D.C. Cir. May 18, 2012) (deferring to

Congress's determination "that serious and widespread intentional discrimination persisted in

covered jurisdictions" and warranted the preemptive enforcement mechanism of Section 5).

Given this important interest, society has a substantial interest in accurate judicial fact finding in

this matter. *See Irvin*, 127 F.R.D. at 174 (concluding that "profound questions" concerning the

possibility of intentional discrimination required that legislative privilege yield to the "the federal

interest in enforcement of the Voting Rights Act"); *Rodriguez*, 280 F. Supp. 2d at 102-03

(granting motion to compel discovery of redistricting documents); *Baldus*, 2011 WL 6122542, at

*1-2 (overriding legislative privilege asserted over documents because of the "highly relevant

and potentially unique nature of the evidence"). At the same time, the possibility of "future

timidity" on the part of Texas legislators and staff as a result of the requested discovery seems

quite unlikely, given the frequent testimony of Texas legislators in voting cases, both recently

and in past decades. *See Gillock*, 445 U.S. at 373; *see also*, *e.g.*, Gary Martin, *Texas Officials*

*Testify that Redistricting Process Was "Bipartisan,"* Houston Chron., Jan. 18, 2012, *at*

http://blog.chron.com/txpotomac/2012/01/texas-officials-testify-that-redistricting-process-was-

bipartisan; *Session v. Perry*, 298 F. Supp. 2d 451, 471-72 & nn.61-62 (E.D. Tex. 2004) (noting

legislator's testimony), *rev'd sub nom. LULAC v. Perry*, 548 U.S. 399 (2006).  The testimony of

state and local legislators from other jurisdictions in Voting Rights Act cases further supports

this conclusion.  *See, e.g.*, *Arizona v. Reno*, 887 F. Supp. at 323; *Busbee v. Smith*, 549 F. Supp. at

516-17; *Port Arthur v. United States*, 517 F. Supp. at 1021-23.  Finally, the Attorney General, as

the statutory defendant in this action, has a strong interest in the proper enforcement of federal

law.  Taking all of these factors into consideration, the potential for S.B. 14 to effectively

disenfranchise hundreds of thousands of Texas voters—and the possibility that this law was

intended to thwart the electoral participation of growing numbers of minority voters in Texas—

means that any state legislative privilege claimed over documents in the possession of executive

agencies must yield.  *See Purcell*, 549 U.S. at 4.

> **B.    Even If a State Legislative Privilege Applies, Texas's Assertions Extend Well Beyond the Scope of any Such Privilege.**

Alternatively, to the extent that this Court finds that Texas may assert state legislative

privilege over these documents and witnesses' testimony, Texas's assertion of the privilege over

certain categories of communications, which stretches far beyond even the outer boundaries

covered by the federal privilege, is overbroad and should be narrowed considerably.  "In no case

has [the Supreme Court] ever treated the Clause as protecting all conduct relating to the

legislative process."  *United States v. Brewster*, 408 U.S. 501, 515 (1972).  Rather, "[c]onduct

must be 'part of,' not merely 'related to,' the due functioning of the legislative process" to be

protected by the Speech or Debate Clause."  *Fields v. Office of Eddie Bernice Johnson*, 459 F.3d

1, 12 (D.C. Cir. 2006) (en banc) (quotation marks omitted).  Since the boundaries of state legislative privilege are narrower than any evidentiary privilege available to federal legislators under the Speech or Debate Clause of the U.S. Constitution, Texas's overbroad assertions of privilege have improperly withheld vital evidence sought by the Attorney General.  *See Gillock*, 445 U.S. at 370; *see also* Order at 2 (Apr. 20, 2012) (Doc. 84) (recognizing that "the contours of the privilege remain somewhat uncertain").  Thus, at a minimum, the Court should order Texas to supplement its discovery and witness testimony in the areas described below.

Moreover, in numerous cases, the State has not provided an adequate description of the materials to assess whether the document falls within the scope of any cognizable legislative privilege.  *See* Contested Document Privilege Claim Index at 1 (Ex. 13).  For example, the State has described 128 documents as "Materials from the personal files of Senator Fraser reflecting the legislator's thoughts, opinions, or mental impressions on Voter ID" and an additional 16 documents as "Materials from the personal files of Senator Fraser reflecting his thoughts, opinions, or mental impressions on Voter ID."  *See* May 11 Privilege Log at 61-68, 83-98.  Most of these entries are also undated and lack a sender or recipient.  In at least one case, the entry lacks a subject entirely.  *See id.* at 181.  In addition, in some cases the privilege log describes multiple documents in a single entry, preventing a reasonable assessment of the privilege claim.  *See* Contested Document Privilege Claim Index at 1.  In one particularly egregious example, the State describes 65 pages encompassing at least seven different documents in a single entry.  *See* May 11 Privilege Log at 31.  As this Court ordered the State to produce "privilege logs fully compliant with the requirements of Federal Rule of Civil Procedure 26(b)(5) no later than Friday, May 11, 2012," Order at 4 (May 7, 2012) (Doc. 107), the failure to provide a useful description of these documents constitutes a failure to establish the privilege and should trigger

27

disclosure, especially as the pace of this litigation cannot allow Texas yet another opportunity to justify withholding documents. *See, e.g.*, *Tuite v. Henry*, 98 F.3d 1411, 1417 (D.C. Cir. 1996) (requiring "a detailed specification of the information for which the privilege is claimed with an explanation why it properly falls within the scope of the privilege" to sustain a privilege claim).

>    1.    **Texas Has Improperly Withheld Documents from State Legislators Who Have Not Asserted Legislative Privilege.**

On May 21, 2012, the Court ordered Texas to produce all documents from state legislators that have waived state legislative privilege. Order at 4 (Doc. 128) (identifying Senators Davis, Gallegos, Van de Putte, Farias, Giddings, and Representative Vaught as having waived privilege). In the time since the Attorney General's April 25, 2012 motion to compel, however, additional state legislators have waived legislative privilege, but Texas has withheld documents on the basis of those individuals' legislative privilege. *See* Privilege Waivers from Texas State Legislators (Ex. 14); Contested Document Privilege Claim Index at 4. Accordingly, the Attorney General seeks documents from the following legislators: Richard Raymond, Eddie Rodriguez, Roberto Alonzo, Carol Alvarado, Rafael Anchia, Lon Burnam, Garnet Coleman, Dawnna Dukes, Joe Farias, Jessica Farrar, Pete Gallego, Veronica Gonzales, Roland Gutierrez, Ana Hernandez, Eddie Lucio III, Armando Martinez, Trey Martinez-Fischer, Elliott Naishtat, Mike Villarreal, Armando Walle, Chente Quintanilla, Scott Hochberg, Rodney Ellis, and Royce West.

Moreover, the right to assert a legislative privilege belongs solely to legislators. *See Gravel*, 408 U.S. at 621-22 & n.13; *Miller v. Transamerican Press, Inc.*, 709 F.2d 524, 530 (9th Cir. 1983) (citing *Gravel*, 408 U.S. at 616-19). Indeed, as this Court recognized in its April 20 Order, legislators must affirmatively "assert a legislative privilege," for any legislative privilege

protection to apply in this case.  Order at 3 (Doc. 84).  To date, only 30 legislators have done so.

*See* Notice of Legislative Privilege Assertion (Doc. 89); Amended Notice of Legislative

Privilege Assertion (Doc. 90).  Because of this, Texas's assertion of legislative privilege in its

privilege log for communications concerning legislators who have not affirmatively invoked the

privilege is also improper, and disclosure of these documents should be required.

> ## 2.        Any State Legislative Privilege Does Not Apply to Political Communications with Constituents, Lobbyists, or Interest Groups.

Texas has also improperly withheld documents and instructed witnesses not to answer

any questions concerning communications with constituents, lobbyists, or interests groups, even

in instances where the contact was of a purely political nature.  Legislative privilege covers only

"conduct that is integral to the legislative *process*, not a Member's legislative *goals*."  *Fields*,

459 F.3d at 12; *see also Gravel*, 408 U.S. at 625 ("That Senators generally perform certain acts

in their official capacity as Senators does not necessarily make all such acts legislative in

nature.").  Political activities that are not legislative in nature—such as voluntary advocacy

communications initiated by constituents, activists, lobbyists, or interest groups—are not

privileged.  *See United States v. Brewster*, 408 U.S. 501, 512 (1972); *see also Jewish War*

*Veterans of the U.S.A., Inc. v. Gates*, 506 F. Supp. 2d 30, 59 (D.D.C. 2007) (holding that "the

focus should remain on whether a Member's activities are legislative in nature" in assessing

whether legislative privilege applies).  Similarly, a legislator's promises to perform an act in the

future, including promises to introduce, sponsor, vote for, or solicit other votes for a bill, are not

privileged.  *See Helstoski*, 442 U.S. at 489.  Nevertheless, during depositions the week of May

14, witnesses refused to answer questions related to each of these topics.[33]  Texas should

therefore be ordered to supplement its discovery responses and witness testimony to provide this

information.

Similarly, Texas has withheld from production hundreds of documents that it has

described as "confidential email communications with [a] constituent," to which the State often

appends a boilerplate assertion that the email reflects "the legislator's thoughts, opinions, or

mental impressions on Voter ID."  *See, e.g.*, May 11 Privilege Log at 69-82.  Because the State

claims that any resident of Texas is a constituent of each and every legislator, *see* Harless Dep. at

94:4-7 (Mr. Sweeten: . . . [W]e have defined con[stituents] as those who live in the State of

Texas."), this formulation includes political communications with individuals ranging from

voters in a legislator's district to political consultants, interest groups, and party officials.  Thus

the State has failed to carry its burden to establish the existence of the privilege with regard to a

broad range of documents and should therefore be compelled to produce them to the Attorney

General.  *See* Contested Document Privilege Claim Index at 3.

### 3.    Any State Legislative Privilege Does Not Apply to Public Statements and Public Materials.

---

[33] *E.g.*, Fraser Dep. 226:23-227:1 (not answering whether he promised anyone to introduce S.B. 14); Fraser Dep. 149:24-150:14 (refusing to answer whether he promised anyone to introduce S.B. 362); Harless Dep. 271:3-272:8 (refusing to answer questions concerning voter ID advocates who visited her office); Beuck Dep. 47:12-47:22, 80:4-82:7 (colloquy in which counsel for State defined legislative privilege to extend over all communications with constituents, regardless of who initiated the communication); McCoy Dep. 48:17-23 (not answering why a constituent was particularly interested in photo identification legislation); McCoy Dep. 49: 15-25 (not answering question about nature of conversation with constituent); McCoy Dep. 192:2-9 (not answering whether constituents asked Fraser to pass a voter ID law); Harless Dep. 132:12-23 (instruction and refusal to answer whether any registered voter ever told the Representative that they did not vote because they were concerned about voter fraud canceling out their vote).

Texas's assertion of state legislative privilege to protect documents and witness testimony concerning legislators' public statements to the press and other public materials stretches far beyond applicable case law.  It is well-settled that federal legislative privilege does not extend beyond legislative activities.  *See Hutchinson v. Proxmire*, 443 U.S. 111, 125 (1979). ("The gloss going beyond a strictly literal reading of the Clause has not, however, departed from the objective of protecting only legislative activities.").  Since a legislator's dissemination of information to the press or other members of the public is "in no way essential" to the legislative function, the privilege does not apply to such statements.  *Gravel*, 408 U.S. at 625; *see also Hutchinson*, 443 U.S. at 130-31; *McSurely v. McClellan*, 553 F.2d 1277, 1285-86 (D.C. Cir. 1976) (en banc) (excluding from legislative acts the dissemination of materials "outside the Halls of Congress.").  Analogously, once legislative information is released to the public— such as through publication in the press—even legislative *immunity* no longer applies.  *See Doe v. McMillan*, 412 U.S. 306, 315-16 (1973).

Here, Texas repeatedly asserted legislative privilege to block witnesses from testifying about their own public statements to the press or even an editorial published under a legislator's name.[34]  In fact, the witnesses often refused to answer questions about even the content of their public statements, except to repeat the public statement, sometimes verbatim.[35]  Because of this, the Attorney General was unable to develop any substantive evidence concerning these legislators' views on S.B. 14 even when they chose to publicly discuss them outside the halls of

_____

[34] McCoy Dep. 136:10-137:10, 200:17- 201:17, 204:13-205:13 (not answering questions about Sen. Fraser's statements on the public record; Fraser Dep. 157:20-159:25 (refusing to answer questions about Sen. Fraser's statements in a press release).

[35] Harless Dep. 128:10-131:20 (based on privilege instruction, providing nonresponsive answers to questions related to the witness's public statement concerning the need to restore public confidence in the election system).

31

the legislature.  Once again, Texas's broad assertion of legislative privilege fully hampered the

Attorney General's efforts to develop highly relevant evidence under *Arlington Heights*.  429

U.S. at 268 (citing legislators' contemporaneous statements as "highly relevant" evidence).

The scope of public documents over which the State has claimed privilege establishes the

insupportably broad nature of the State's privilege claims.  *See* Contested Document Privilege

Claim Index at 2-3.  Although the State did produce numerous press releases from individual

legislators, it chose to withhold several others.  *See, e.g.*, May 11 Privilege Log at 100, 183, 224,

255.  Texas also appears to take the position that once a public document enters the possession of

a legislator, it becomes privileged.  *See, e.g.*, May 11 Privilege Log at 23 (claiming that an

unannotated copy of a Georgia statute reflects a Texas "legislator's thoughts, opinions, and

mental impressions"); *id.* at 19 (claiming that a copy of a newspaper article in a legislator's

"personal files" reflects "the legislator's thoughts, opinions, and mental impressions").  Needless

to say, the factual documents a legislator collects do not reflect his or her "thoughts, opinions,

and mental impressions," and there is no state interest in protecting against their production to

the Attorney General.

### 4. Any State Legislative Privilege Does Not Apply to Communications within Executive Agencies.

Texas has improperly asserted state legislative privilege to justify withholding documents

concerning communications within Texas state executive agencies.  The mere fact that an

executive agency discusses legislative issues internally does not draw the coverage of a

legislator's personal privilege.  *Cf. Evans v. Atwood*, 177 F.R.D. 1, 4 (D.D.C. 1997) (rejecting

the application of the attorney-client privilege on the mere basis that "one can deduce from the

lawyer's opinion that the client must have inquired of the lawyer").  *See generally Mead Data*

*Central, Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 254 n.27 (D.C. Cir. 1977) (setting out

distinctions between a privilege meant to shield underlying facts and one intended to shield

advice, opinions, and evaluations).  Such documents have plainly been disseminated "outside the

Halls of" the Texas Legislature.  *See McSurely*, 553 F.2d at 1285-86.  Therefore, this Court

should direct Texas to produce those responsive documents in the possession of State agencies

over which the State has asserted a legislative privilege.

　　While a legislator covered by a state legislative privilege may arguably decline to

produce legislative documents in their possession or to testify about privileged communications,

even the federal legislative privilege does not extend to identical documents held by third parties.

*See Brown & Williamson Tobacco Corp. v. Williams*, 62 F.3d 408, 423 n.14 (D.C. Cir. 1995)

(explaining that Brown & Williamson could subpoena press agencies that received identical

copies of documents that cannot be subpoenaed from legislators).  Indeed, applying the federal

when executive officials possess the documents sought would make little sense because the

separation of powers concern underlying the Speech or Debate clause is no longer implicated.

*See, e.g.*, *Eastland*, 421 U.S. at 502.  And, of course, it is well-settled that this separation of

powers concern does not support a state legislative privilege in federal court.  *See Gillock*, 445

U.S. at 369; *Eastland*, 421 U.S. at 502; *see also* Section II.A., *supra*.  Given these defined

boundaries for even federal legislative privilege, internal documents and communications in the

possession of the Texas Office of the Secretary of State and the Texas Department of Public

Safety are wholly unprotected by state legislative privilege.  *See, e.g.*, *Hutchinson*, 443 U.S. at

127.

　　Moreover, a legislator may not invoke legislative privilege on behalf of an executive

official.  Questioning of an executive branch official lies too far afield from core legislative

functions to be protected by the legislative privilege.  *Cf. Consumers Union of U.S., Inc. v. Periodical Correspondents' Ass'n*, 515 F.2d 1341, 1351 (D.C. Cir. 1975) (rejecting a suit challenging internal rules because the "execution of internal rules is so identified with the legislative process as to lend additional force to the historic legislative treatment of the rule" under the Speech or Debate Clause).  The Attorney General is unaware of any cases in which the Speech or Debate privilege or a state legislative privilege has been invoked to protect documents outside the possession of a legislative official, let alone upheld.

Even if this Court were to conclude that a state legislative privilege may apply to documents in the possession of state executive agencies, documents wholly internal to the state executive agencies are plainly beyond the scope of a legislative privilege.  *See* Contested Document Privilege Claim Index at 3.  Nevertheless, the State has claimed a legislative privilege over "Confidential e-mail among [Department of Public Safety] staff" on the basis that the communications concerned legislative requests for information.  *See* May 11 Privilege Log at 3.  As set out above, a state legislative privilege cannot encompass all communications on the subject of legislation, regardless of the identities of the communicating parties.  The production of such materials will in no way interfere with legislative processes or inhibit the candor with which an agency will provide information regarding the anticipated effects of proposed legislation.  Additionally, these documents and related testimony are central to the Attorney General's ability to probe factors related to legislative purpose during the depositions of the Governor's staff members and the former director of elections, currently noticed for the week of May 29th.

### 5.    Any State Legislative Privilege Does Not Apply to Post-Enactment Communications.

Texas has repeatedly asserted state legislative privilege to withhold evidence of post-enactment communications between legislators and staff about S.B. 14.[36]  Federal case law clearly limits assertions of privilege to legislative acts that are "part of, *not merely related to*, the due functioning of the legislative process."  *Fields v. Office of Eddie Bernice Johnson*, 459 F.2d 1, 11 (D.C. Cir. 2006) (en banc) (emphasis added).  Since the communications over which Texas has asserted privilege took place after S.B. 14's final enactment, they cannot be "part of" the legislative process, and legislative privilege does not cover them.  While this evidence may not be as relevant to purpose, evidence of post-enactment concerns raised about the bill could provide important evidence about the effect of S.B. 14 as more of the public became aware of it, and as other State agencies began to consider how to implement it.  Accordingly, as this constitutes relevant evidence to which legislative privilege simply does not extend, Texas must be compelled to supplement its document productions and witness testimony in this area.[37]

The State of Texas has withheld numerous documents that post-date the enactment of S.B. 14.  *See* Contested Document Privilege Claim Index at 4.  For example, the State withheld hundreds of pages of documents in the possession of Speaker of the House Joe Straus that are dated between May 31, 2011—four days after the signing of S.B. 14—and November 10, 2011.

---

[36] The Attorney General brought this improper assertion of legislative privilege to Texas's attention in a letter on May 15, 2012, the day after Colby Beuck's deposition and the day of Patricia Harless's deposition.  Following a meet and confer on this issue, Texas agreed that it would not assert legislative privilege over questions concerning post-enactment communications, but Texas limited this agreement only to the remaining deponents noticed for the week of May 14, 2012—Senator Fraser and Janice McCoy.  Email from Patrick Sweeten, Assistant Texas Attorney General, to Duston Barton, Law Clerk to Hon. Rosemary Collyer & Risa Berkower, Attorney, Voting Section, May 16, 2012 (Ex. 15) [hereinafter "Sweeten Email"].  Since any objection to this line of questioning falls far outside even the broadest reading of federal legislative privilege case law, the Attorney General now seeks to compel Texas to permit witness testimony on post-enactment statements for all future witnesses and to supplement the testimony of Colby Beuck and Patricia Harless to respond to the questions asked of them in this area.

[37] *See, e.g.,* Beuck Dep. 129:2-132:21 (witness instructed not to answer questions about post-enactment conversations concerning the definition of military identification under S.B. 14).

*See* May 11 Privilege Log at 140-151.  As each of these communications post-dates the enactment of S.B. 14, their disclosure could not logically interfere with the State's legislative process.  A retrospective reflection on the substance of the bill may disclose a legislator's understanding of an existing law's purpose, but withholding such materials will not provide a "benefit to the state legislative process."  *Gillock*, 445 U.S. at 373.

> **6.    Any State Legislative Privilege Does Not Apply to Foundational Questions that Would Demonstrate the Basis for the Privilege.**

Texas has consistently withheld basic foundational information in privilege logs and instructed witness not to answer questions that would establish the basis for its assertions of legislative privilege.  It is well-settled that the party asserting a privilege bears the burden of establishing that the burden applies.  *Alexander v. FBI*, 102 F.R.D. 32, 34 (D.D.C. 2000).  Despite this, Texas repeatedly instructed Colby Beuck and Patricia Harless not to answer basic foundational questions that would have established the type of basic information routinely provided in privilege logs in accordance with Fed. R. Civ. P. 26(b)(5).[38]

> **C.    The State of Texas Has Asserted Attorney-Client Privilege Over Documents and Testimony Beyond the Scope of the Privilege.**

A party asserting the attorney-client privilege "must conclusively prove each element of the privilege."  *In re Lindsey*, 148 F.3d 1100, 1106 (D.C. Cir. 1998); *see also Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 863 (D.C. Cir. 1980).

---

[38] The Attorney General brought this improper assertion of legislative privilege to Texas's attention in a letter on May 15, 2012, the day after Colby Beuck's deposition and the day of Patricia Harless's deposition.  Following a meet and confer on this issue, Texas agreed that it would not assert legislative privilege over foundational privilege-log questions, but Texas limited this agreement only to the remaining deponents noticed for the week of May 14, 2012—Senator Fraser and Janice McCoy.  *See* Sweeten Email (Ex. 15).  Since any objection to this line of questioning falls far outside even the broadest reading of federal legislative privilege case law, the Attorney General now seeks to compel Texas to permit witness testimony on these foundational questions for all future witnesses and to supplement the testimony of Colby Beuck and Patricia Harless to respond to the questions asked of them in this area.

> The privilege applies only if (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

*In re Sealed Case*, 737 F.2d 94, 98-99 (D.C. Cir. 1984) (quoting *United States v. United Shoe Machinery Corp.*, 89 F. Supp. 357, 358-59 (D. Mass. 1950)).  In addition, communications from an attorney to a client are shielded only if "they rest on confidential information obtained from the client."  *Id.* at 99 (citing *Mead Data Central, Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 254 (D.C. Cir. 1977).  Finally, "when an attorney conveys to his client facts acquired from other persons or sources, those facts are not privileged."  *Id.* (citing *Brinton v. Dep't of State*, 636 F.2d 600, 604 (D.C. Cir. 1980)).  *See generally In re Lindsey*, 158 F.3dd 1263, 1272 (D.C. Cir. 1998) ("[T]he attorney-client privilege must be strictly confined within the narrowest possible limits consistent with the logic of its principle." (internal citations and quotation marks omitted)).

As a fundamental matter, the State continues to claim an attorney-client privilege over numerous documents without disclosing the parties to the relevant communications.  *See* Contested Document Privilege Claim Index at 9.  For example, the State has withheld a document authored by "Don Clemmer" without providing the document's source or a list of recipients.  *See* May 11 Privilege Log at 735.  As a practical matter, it is simply not possible for the Attorney General to assess the validity of this claim of attorney-client privilege, as the privilege log does not establish whether Mr. Clemmer is the purported attorney or the client, along with whether confidential information has been relayed and whether the communication

has been disclosed to individuals outside of an attorney-client relationship.  As noted above, this

Court has given the State of Texas its last chance to establish the bases on which it is

withholding documents, *see* Order (May 7, 2012) (Doc. 107), and so the State's failure to carry

its burden to establish privilege must lead to immediate disclose of the withheld documents.

> 1.      **The Attorney-Client Privilege Does Not Apply to Communications with the Texas Legislative Council.**

Texas has continued to withhold hundreds of pages of documents on the basis of an

attorney-client privilege regarding legislator communications to the Texas Legislative Council.

*See* Contested Document Privilege Claim Index at 10-11.  However, the State has not and cannot

explain why the Texas Legislative Council has an attorney-client relationship with every one of

the individual members of the Texas legislature.  *See Texas v. United States*, 279 F.R.D. 24, *9

(D.D.C. 2012) (finding no such relationship) [hereinafter "*Texas II*"], *vacated in part*, 2012 WL

1578390 (D.D.C. Jan. 6, 2012).  The Texas Legislative Council's statutory mandate sets out in

detail eight functions that its staff may perform, none of which authorize the provision of legal

advice or the formation of an individual attorney-client relationship.  *See* Tex. Gov. Code

§ 323.006 (listing functions); *see also Texas II*, 279 F.R.D. at 34 ("The Texas Government Code

expresses no such relationship or expectation.").  Notably, the Policy Issue Research Section and

Bill Analysis Section of the Texas Legislative Council are components of the Research Division,

rather than the Legal Division.  *See Research*, Texas Legislative Council, *at*

http://www.tlc.state.tx.us/research.htm.  While Section 323.017 of the Texas Government Code

does establish that "information, advice, or opinions from an assistant or employee of the council

are confidential," state confidentiality law does not create a federal evidentiary privilege.  *See*

*United States v. Gillock*, 445 U.S. 360, 368 (1980); *see also Texas II*, 279 F.R.D. at 34 n.13

("[T]he habits of the years do not transform 'confidentiality' to avoid public inquiry into 'attorney-client privilege' when demanded as part of litigation.").[39]

Even if an attorney-client relationship were to exist between each attorney and non-attorney employee of the Texas Legislative Council and the State's 181 legislators, much of the advice provided to individual legislators is likely not protected by privilege.  A government official's request for "neutral, objective analysis" and the analysis provided in return are not protected by attorney-client privilege.  *Tax Analysts v. IRS*, 117 F.3d 607, 619 (D.C. Cir. 1997); *see also Coastal States Gas*, 617 F.2d at 863 (distinguishing governmental inquiries into legal principles or the legality of potential state action from a "private party seeking advice to protect personal interests").  Further, to the extent that the information provided to the Legislative Council has been shared with third parties, any attorney-client privilege has been waived.  *United States v. Deloitte LLP*, 610 F.3d 129, 139 (D.C. Cir. 2010).  Accordingly, the withheld TLC communications with legislators must be produced.

> **2.     The Attorney-Client Privilege Does Not Apply to Communications Disclosed to Parties Outside the Attorney-Client Relationship.**

It is well settled that the attorney-client privilege covers only those communications between parties to the attorney-client relationship.  The voluntary disclosure of privileged communications to a third party waives the privilege, even if the disclosure is inadvertent.  *See Deloitte*, 610 F.3d at 139; *In re Sealed Case*, 877 F.2d 976, 980 (D.C. Cir. 1989).  This is

---

[39] This confidentiality provision exempts communications between legislators and the Texas Legislative Council from production under the Texas Public Information Act.  *See* Tex. Gov. Code § 552.021 (providing general right of access); *id.* § 552.101 (exempting "information considered to be confidential by law").  Even Texas law is clear that exceptions from disclosure under the Public Information Act "do not create new privileges from discovery."  *Id.* § 552.005.

because the privilege "protects the attorney-client relationship by safeguarding confidential communications" and voluntary disclosure "is inconsistent with the confidential attorney-client relationship." *Deloitte*, 610 F.3d at 139.  Moreover, "[o]nce a communication is disclosed, the attorney-client privilege is waived for all documents and communications relating to the subject matter o the disclosure." *Elkins v. District of Columbia*, 250 F.R.D. 20, 24 (D.D.C. 2008) (Collyer, J.); *see also Williams & Connolly v. S.E.C.*, 662 F.3d 1240, 1244 (D.C. Cir. 2011); *In re Sealed Case*, 121 F.3d 729, 741 (D.C. Cir. 1997) (quoting *In re Sealed Case*, 676 F.2d 793, 809 (D.C. Cir. 1982)).

Here, Texas improperly claims attorney-client privilege over numerous categories of documents that have been disclosed to parties outside any conceivable attorney-client relationship.  *See* Contested Document Privilege Claim Index at 9.  For example, the State has withheld a document that it describes as "[c]onfidential e-mail from DPS General Counsel to Secretary of State General Counsel, SOS Attorneys, OAG Attorneys, and DPS Staff."  May 11 Privilege Log at 3.  While the Department of Safety General Counsel represents DPS staff, and the Office of the Attorney General may constitute the agency's outside counsel, no attorney-client relationship exists between the DPS General Council and attorneys in the Office of the Secretary of State.  Similarly, the State has withheld a document containing communications between counsel for Speaker Joe Straus and for Lieutenant Governor Dewhurst.  *See* May 11 Privilege Log at 154.  The inclusion of any client confidences in such an email unquestionably waives the attorney-client privilege—and likely constitutes subject-matter waiver for these critical officials.

      **3.**      **The Attorney-Client Privilege Does Not Apply to Communications that Are Not Based on Confidential Client Information.**

Further, the attorney-client privilege only covers communications that implicate confidential client information. *In re Rail Freight Fuel Surcharge Antitrust Litig*., 268 F.R.D. 114, 116 (D.D.C. 2010). "[W]hen an attorney conveys to his client facts acquired from other persons or sources, those facts are not privileged." *In re Sealed Case*, 737 F.2d 94, 99 (D.C. Cir. 1984). Rather, an attorney's communication to a client is protected "only if it is based on confidential information provided by the client." *Amobi v. District of Columbia Dept. of Corrections*, 262 F.R.D. 45, 51 (D.D.C. 2009) (noting the D.C. Circuit's "strict construction" of the privilege in this area); *see also Tax Analysts*, 117 F.3d at 618-19 ("The privilege also protects communications from attorneys to their clients if the communications "rest on confidential information obtained from the client." (quotation marks omitted)). Attorney-client communications—including attorney advice— that are not based on confidential information concerning the client are not privileged. *Tax Analysts*, 117 F.3d at 619 (citing *Schlefer v. United States*, 702 F.2d 233 (D.C. Cir. 1983)); *Evans*, 177 F.R.D. at 3 ("The privilege protects the communications made by the attorney to the client only insofar as the attorney's communications disclose the confidential communication from the client."). In this context, confidential communications are defined to include only those communications where "'at the time and in the circumstances of the communication, the communicating person reasonably believes that no one will learn the contents of the communication.'" *Evans*, 177 F.R.D. at 5 n.2 (quoting Restatement (Third) of the Law Governing Lawyers § 71).

Here, Texas has asserted the attorney-client privilege over numerous categories of documents that do not meet this standard. *See* Contested Document Privilege Claim Index at 9. An analysis of a public bill proposal conducted by an attorney for a state legislator is not protected by the attorney-client privilege, as this document contains no client confidences.

41

However Texas has sought to withhold precisely such documents from disclosure. *See* May 11 Privilege Log at 127 (claiming privilege over analysis post-dating passage of S.B. 14 in the Texas Senate). Similarly, the State of Texas has asserted attorney-client privilege over email from the Office of the Texas Attorney General to individual legislators soon after the Attorney General denied preclearance to S.B. 14. *See, e.g.*, May 11 Privilege Log at 30. As neither legislators nor the Office of the Attorney General has noted the existence of communications from the legislator preceding this email, it appears that there is no client confidence over which privilege may be properly asserted.

### 4. The Attorney-Client Privilege Does Not Extend to Policy Advice.

Texas may not properly assert attorney-client privilege over attorney communications that address non-legal concerns, including policy or strategy matters relating to S.B. 14's development and passage. As noted above, a prerequisite to coverage of the attorney-client privilege is that the relevant communication was for the "purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding." *In re Sealed Case*, 737 F.2d at 98-99. As a result, a government attorneys' advice on "political, strategic, or policy issues . . . would not be shielded from disclosure by the attorney-client privilege." *In re Lindsey,* 148 F.3d 1100 (D.C. Cir. 1998) (per curiam). This limitation on the privilege applies even when the attorney is employed by the client in the dual roles of political advisor and lawyer; no privilege applies when such an attorney counsels his client on primarily political, rather than legal, matters. *Id*. at 1113 (finding attorney-privilege did not apply to advice given by attorney serving as "a political advisor, albeit one with legal expertise"). The mere fact that an individual is an attorney does not establish that all communications with that individual are for the purpose of obtaining legal advice, particularly in the context of general counsel. *See, e.g.*,

*Radiant Burners, Inc. v. Am. Gas Ass'n*, 320 F.2d 314, 324 (7th Cir. 1963) ("Certainly the privilege would never be available to allow a corporation to funnel its papers and documents into the hands of its lawyers for custodial purposes and thereby avoid disclosure").

Texas has improperly asserted attorney-client privilege over both documents and testimony that concern such policy matters that fall outside the privilege's boundaries.  For instance, during the deposition of Colby Beuck, chief of staff to Representative Harless, Texas instructed Mr. Beuck not to answer questions concerning conversations that he had with Rep. Harless concerning her assertion of legislative privilege in this litigation.  Beuck Dep. 250:15-252:4.  The following day, however, during the deposition of Rep. Harless, she testified that she was uncertain whether she had established with Mr. Beuck the circumstances under which he provides legal as opposed to policy advice to her.  Harless Dep. 51:8-52:17.  To the extent that Mr. Beuck's conversation with Rep. Harless's about her assertion of legislative privilege constituted strategic policy advice rather than legal advice, testimony was improperly withheld.

Similarly, Texas has asserted an attorney-client privilege over dozens of documents that appear to confer political advice.  *See* Contested Document Privilege Claim Index at 10.  For example, the State has withheld multiple "Confidential legislative policy advisor memorand[a]" on the basis that legal counsel for Speaker Joe Straus drafted the memorandum.  *See* May 11 Privilege Log at 126-127.  The addition of a boilerplate assertion that the memorandum contains legal advice cannot suffice to establish both the presence of client confidences and the provision of legal—rather than political—advice.  *See id.*; *see also, e.g.*, May 11 Privilege Log at 107 (claiming that communications were offered "for the purpose of giving or receiving legal advice).  In addition, the State has asserted an attorney-client privilege over a majority of documents over which it has also claimed a deliberative process privilege.  *See id.* at 738-790.

The Governor's role in declaring a legislative emergency and signing legislation is primarily

political, and the broad invocation of attorney-client privilege over documents related to SB 14

renders suspicious the breadth of the State's privilege claims.[40]

> **D.** **The State of Texas Has Improperly Asserted the Deliberative Process
> Privilege Without Establishing Necessary Elements.**

Texas continues to improperly assert the deliberative process privilege over executive

branch materials without having established necessary elements of the privilege.  As this Court

noted in its Order earlier today, a party whose document request draws an objection based on the

deliberative process privilege "must be able to determine, from the privilege log, that the

documents withheld are (1) pre-decisional; (2) deliberative; (3) do not 'memorialize or evidence'

the agency's final policy; (4) were not shared with the public; and (5) cannot be produced in

redacted form."  *NLRB v. Jackson Hosp. Corp.*, 257 F.R.D. 302, 309 (D.D.C. 2009).  Since the

United States moved to compel the initial set of withheld documents, the State has expanded its

assertion of the deliberative process privilege to encompass dozens of additional documents.  *See*

May 11 Privilege Log at 738-790.  While the State has provided additional information in its

latest privilege log, the log nevertheless does not satisfy these requirements.  Critically, the State

has consistently failed to establish that documents are pre-decisional and deliberative, as the

decisions at issue are described in only the vaguest of terms.  *See, e.g.*, May 11 Privilege Index at

773-774 (describing 12 consecutive documents as "Confidential communications between

Governor Staff containing advice, opinions, and deliberations that precede a final decision

relating to voter ID and other policies.").  Simply repeating the elements of a privilege cannot be

---

[40] The Attorney General recognizes that *in camera* review is not a feasible option under the Court's
current schedule.  *See* Order at 6-8 (Doc. 107).  However, should the Court continue to pending trial to a
later date, *in camera* review would be appropriate.

sufficient to satisfy those elements. *Cf. Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)

(granting a motion to dismiss for failure to state a claim and holding that "formulaic recitation of

the elements of a cause of action will not do."). Although "declarations from agency officials

explaining what the documents are and how they relate to the decisions" are not strictly required

in order to sustain the privilege, they are often necessary in order to establish its complex

elements. *See Jackson Hosp. Corp.*, 257 F.R.D. at 309 (citing *Landry v. FDIC*, 204 F.3d 1125,

1134 (D.C. Cir. 2000)). Here the absence of an explanation of the documents and decisions at

issue, in combination with the State's superficial privilege log, is fatal to the deliberative process

claim.[41]

    In sum, the Office of the Governor has asserted the deliberative process privilege over

hundreds of pages of documents. *See* Contested Document Privilege Claim Index at 11. Even if

the Court were to determine the State had met its burden to establish the application of the

privilege, the qualified privilege should nevertheless fall in the face of the Attorney General's

compelling need. "Each time the deliberative process privilege is asserted the district court must

---

[41] The Attorney General respectfully disagrees with the conclusion that Section 5 is not "directed at . . . the purpose or motivation of individual actors." Order at 3 (Doc. 128). While the ultimate inquiry in a Section 5 preclearance case is of course the purpose of the legislation at issue, under *Arlington Heights*, contemporaneous statements constitute a critical category of relevant circumstantial evidence. *See* 429 U.S. at 268. Thus the court's inquiry in *Busbee v. Smith* hinged on the racially charged statements of Georgia House Redistricting Chairman Joe Mack Wilson. *See* 549 F. Supp. at 500. In the broader context of discrimination law, "courts often must inquire into the motives of legislators and other government actors." *Grossbaum v. Indianapolis-Marion County Bldg. Auth.*, 100 F.3d 1287, 1292 (7th Cir. 1996); *see also id.* at 1292 n.3 (noting "the inquiry that courts *occasionally* make into the subjective 'intent,' 'motive,' or 'actual purpose' of government actors" and the analytical distinction from the broader purpose inquiry). In the analogous Establishment Clause context, the Court has inferred purpose from the detailed public comments of a statute's sponsor. *See Edwards v. Aguillard*, 482 U.S. 578, 586-88 (1987); *see also McCreary County v. ACLU of Kentucky*, 545 U.S. 844, 861-63 (2005) (describing the contours of a practical purpose inquiry). To the extent that the Court determines that the State has satisfied the requirements of the deliberative process privilege with regard to any document in the possession of the Office of the Governor, the Attorney General requests that the Court reconsider its order in light of these precedents.

undertake a fresh balancing of the competing interests, taking into account factors such as the

relevance of the evidence, the availability of other evidence, the seriousness of the litigation, the

role of the government, and the possibility of future timidity by government employees." *In re*

*Sealed Case*, 121 F.3d 729, 737-38 (D.C. Cir. 1997) (internal modifications and quotation marks

omitted).  Numerous documents were provided to Brandy Marty, Michael Schofield, and Ray

Sullivan, officials in the Office of the Governor who the State has identified as persons involved

in the drafting, proposing, development or analysis of SB 14.  *See* Plaintiff's Supplemental

Objections and Responses to Defendant's First Set of Interrogatories at 5-6 (Ex. 16); May 11

Privilege Log at 742, 745-746, 757-760, 770, 781, 786.  Moreover, the fact that the documents

produced by the Office of the Governor consist primarily of thousands of useless form letters

establishes other evidence is not available to establish the Governor's understanding of

legislative purpose and the purpose of particular steps taken to ensure the passage of S.B. 14.

There is no serious question concerning the extreme importance of the instant litigation or the

role of the government.  Finally, there is no evidence that disclosure of the relevant materials

would be likely to trigger future timidity among Governor Perry's advisors.  Therefore, even if

the Court were to determine that the deliberative process privilege applies, it should nonetheless

compel the production of the disputed documents.

> **E.      Deponents Must Be Compelled to Provide Responsive Answers to Questions that Do Not Raise Privilege Issues.**

Even where counsel for the Attorney General has posed questions that have not triggered

a privilege objection, in numerous circumstances deponents have refused to provide a responsive

answer.  For purposes of a motion to compel, "an evasive or incomplete disclosure, answer, or

response must be treated as a failure to disclose, answer, or respond."  Fed. R. Civ. P. 37(a)(4);

*see also Alexander v. FBI*, 186 F.R.D. 78, 93 (D.D.C. 1998) ("[A] witness can be compelled to answer the question posed by a party if the witness's answer is nonresponsive.").  During the deposition of Rep. Harless, when the Representative was asked whether she believed that S.B. 14 would still be worth enacting if minority voters lacked required ID at a greater rate than Anglos, the Representative responded, "My debate on the floor and my testimony was that I think it will increase participation for all Texans."  Harless Dep. at 150:6-16; *see also id.* at 114:2-117:6, 156:18-157:7, 194:19-195:24, 216:15-217:12, 246:3-248:1 (additional objections).

Senator Troy Fraser similarly refused to provide a responsive answer when repeatedly asked whether S.B. 362, a prior photographic voter ID bill, had a partisan purpose.  Instead, he consistently recited that the purpose of the bill was "to protect the integrity of the ballot box." Fraser Dep. at 189:19-191:21. Fraser Dep. 157:12-161:22.   Further, when Senator Fraser was examined about the purpose and effect of Senate Rule 5.11, a rule applying solely to bills pertaining to voter identification, he responded by reading verbatim from the rule itself.  Fraser Dep. 173:25-178:14 (including testimony in response to a question about the effect of the rule that "[t]he effect is as it reads, that would be the effect.").  Likewise, in response to repeated questions about what the witness meant by "responsibility" in his press release stating "voting is one of most important rights as Americans but it's also a responsibility," Senator Fraser twice answered, in a circular manner, "I meant that voting is one of our most important right as Americans but it is also a responsibility."  Given these non-responsive answers, supplemental responses to these lines of questioning should be required.

**F.      The Same Considerations Weigh Heavily in Favor of Abrogating these Privileges for Future Deponents and Documents Produced Late Today.**

47

The Attorney General seeks prospective relief concerning Texas's privilege assertions for all future deponents in this case.  As explained below, these witnesses all possess vital evidence necessary to conduct a complete analysis of S.B. 14 under *Arlington Heights*.  Just as Texas's privilege assertions hampered the development of a proper evidentiary record for the witnesses deposed during the week of May 14, 2012, the Attorney General anticipates similar objections in the remaining depositions.  Accordingly, the Court should prospectively order Texas to allow complete testimony from all of these witnesses.

Lieutenant Governor David Dewhurst presides over the Senate and makes key decisions about the procedure by which legislation is passed.  Fraser Dep. 25: 10-24; McCoy Dep. 63:16-64:18.   The Lieutenant Governor is permitted to cast a vote on any legislation and expressly wields the tie-breaking vote.  *See* Fraser Dep. at 25:18-24.  Ms. McCoy testified that during the Senate's consideration of S.B. 14, she talked to the Lieutenant Governor's office "once or twice a day."  McCoy Dep. at 147:12-15; *see also* McCoy Dep. at 53:10-18 (communicated with Lieutenant Governor's office a dozen or two dozen times about Senate consideration of H.B. 218); McCoy Dep. at 87: 13-88:11 (communicated with Lieutenant Governor's office daily during Senate consideration of S.B. 362).  Given the Lieutenant Governor's leadership role in the Senate and his public statements about voter identification legislation, *see* David Dewhurst, *A Letter from Lt. Governor David Dewhurst on Voter I.D. Bill*, May 16, 2007, *reprinted in The Week in the Rearview Mirror*, Tex. Weekly (May 21, 2007) (Ex. 17), the Attorney General posits that probing the reasons, considerations, and discussions related to his decisions about voter identification legislation is critical to an inquiry of the legislature's purpose in passing S.B. 14.

Senators Duncan, Patrick, and Williams will likewise have vital knowledge, held by no other individuals, regarding the development and passage of S.B. 14. Senator Duncan chaired the

48

Committee of the Whole during its consideration of S.B. 14 and S.B. 362.  As such, he made procedural decisions that impacted the consideration of these bills.  Senator Patrick was one of the authors of S.B. 14 and sponsored an amendment, which passed the Senate, to exempt certain individuals with disabilities from the identification requirements of S.B. 14.  McCoy Dep. 183: 17-184:12.  Finally, Senator Williams introduced the resolution to exclude voter identification legislation from the two-thirds rule of the Senate, a key procedural move that allowed for S.B. 362 and S.B. 14 to pass the Senate.  McCoy Dep. 120:4-5.

Texas has also listed Representatives Aliseda, Gonzales, and Peña as witnesses with knowledge of the facts of this case and as having been involved in the drafting, proposing, developing, or analysis of S.B. 14.  *See* Plaintiff's Supplemental Objections and Responses to Defendant's First Set of Interrogatories at 3-4.  Representative Berman, a cosponsor of S.B. 14, chaired the Elections Committee in the 80th legislature, a session in which the House passed a voter identification bill.  Representative Smith, also a sponsor of S.B. 14, carried a previous voter identification bill in the House, and chaired the Elections Committee in the 81st legislative session.  Representative Straus served as Speaker of the House in the 81st and 82nd legislatures and made key decisions related to the House's consideration of voter identification bills.  *See, e.g.*, Harless Dep. 223:4- 8; Beuck Dep. 102:23 -103: 8.

Ms. McCoy testified that she discussed S.B. 14 and past voter identification bills with Ms. Rathgeber, Mr. Brunson, and Mr. Hebert.  McCoy Dep. 53:10 -20; 88:16-24; 146:16-147:9; 176:20-177:9; *see also* Fraser Dep. 124: 8-125:21.  Additionally, she testified that she discussed S.B. 14 with Michael Schofield from Governor Perry's office.  McCoy Dep. 156: 19-157:9.  The Attorney General also believes that Kenneth Armbrister, the legislative director for Governor Perry, would have knowledge of the Governor's emergency designation of S.B. 14 and any

additional involvement in voter identification bills by the Governor.   *See* Plaintiff's
Supplemental Objections and Responses to Defendant's First Set of Interrogatories at 6-8.

     Ann McGeehan served as the Director of Elections during the legislature's consideration
of S.B. 14, as well as past voter identification bills.  The Attorney General believes she will have
knowledge of any communications between her office and legislators about voter identification,
and its effect.  Additionally, the Attorney General believes that Ms. McGeehan will have
knowledge about the development of the Secretary of State's regulations for implementing S.B.
14.  *See* Plaintiff's Supplemental Objections and Responses to Defendant's First Set of
Interrogatories at 9.

     Based on the deposition testimony thus far, as well as Texas's discovery responses to
date, the Attorney General contends that full and complete testimony from each of these
individuals is vital to analyze the stated purposes of S.B. 14 and accurately assess the State's
purpose in enacting S.B. 14.  The Attorney General also notes that as discovery is ongoing, he
may still identify additional witnesses who have specialized knowledge central to the purpose
inquiry whose testimony should not be shielded by an assertion of privilege.  The Attorney
General respectfully requests the opportunity to submit further briefs should he identify such
witnesses in the remainder of the discovery period.

     Finally, the State of Texas did not produce any email responsive to an automated search
until today.[42]  As a result, the Attorney General has not had the opportunity to review the

---

[42] The Court ordered the Attorney General to provide terms by which the State of Texas could refine its
email searches by May 9, 2012, and ordered the State of Texas to produce its responsive email by today's
date.  *See* Order at 4-5 (Doc. 107).  However, the refining searches were needed only for email from the
Department of Public Safety and the Office of the Secretary of State.  Thus the State of Texas has
unnecessarily withheld the full set of relevant email from vital actors in this suit—legislators, the
Lieutenant Governor, and the Governor—until the last day to file discovery-related motions.

50

production and accompanying privilege logs in order to determine whether any email has been improperly withheld on the basis of privilege claims.  To the extent that the Court grants the instant motion, the Attorney General requests that relief be extended to withheld email as well. Moreover, as a result of this eleventh hour production, the Attorney General requests that he be permitted to move to compel the production of withheld email after the date that the Court has set as the final date for such motions.

III.     <u>**CONCLUSION**</u>

For the reasons set out above, this Court should grant the Attorney General's motion to compel the production of documents and responsive testimony and enter the proposed order attached to the instant motion.

Date:  May 21, 2012

                                                                Respectfully submitted,

RONALD C. MACHEN, JR.                    THOMAS E. PEREZ
United States Attorney                          Assistant Attorney General
District of Columbia                               Civil Rights Division


                                                                */s/ Risa Berkower*
                                                                T. CHRISTIAN HERREN, JR.
                                                                MEREDITH BELL-PLATTS
                                                                ELIZABETH S. WESTFALL
                                                                BRUCE I. GEAR
                                                                JENNIFER L. MARANZANO
                                                                RISA BERKOWER
                                                                DANIEL J. FREEMAN
                                                                Attorneys
                                                                Voting Section, Civil Rights Division
                                                                U.S. Department of Justice
                                                                950 Pennsylvania Avenue, N.W.
                                                                Washington, D.C. 20530