# EXHIBIT 1

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS,                )
                               )
          Plaintiff,           )
                               )
VS.                            )
                               )
ERIC H. HOLDER, JR. in his     )
official capacity as Attorney  )
General of the United States,  )
                               )
          Defendant,           )
                               )
ERIC KENNIE, et al             )
                               )
    Defendant-Intervenors,     )
                               )
TEXAS STATE CONFERENCE OF      )  CASE NO. 1:12-CV-00128
NAACP BRANCHES,                )  (RMC-DST-RLW)
                               )  Three-Judge Court
    Defendant-Intervenors,     )
                               )
TEXAS LEAGUE OF YOUNG VOTERS    )
EDUCATION FUND, et al,         )
                               )
    Defendant-Intervenors,     )
                               )
TEXAS LEGISLATIVE BALCK        )
CAUCUS, et al,                 )
                               )
    Defendant-Intervenors,     )
                               )
VICTORIA RODRIGUEZ, et al.,    )
                               )
    Defendant-Intervenors.     )

************************************************
ORAL DEPOSITION OF
COLBY BEUCK
MAY 14, 2012
************************************************



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

COLBY BEUCK                                                    MAY 14, 2012

2

1          ORAL DEPOSITION OF COLBY BEUCK, produced as a

2     witness at the instance of the Defendant, was duly

3     sworn, was taken in the above-styled and numbered cause

4     on the MAY 14, 2012, from 9:50 a.m. to 6:08 p.m., before

5     Chris Carpenter, CSR, in and for the State of Texas,

6     reported by machine shorthand, at the offices of The

7     United States Attorney, 816 Congress Avenue, Suite 1000,

8     Austin, Texas 78701, pursuant to the Federal Rules of

9     Civil Procedure and the provisions stated on the record

10    or attached hereto.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

3

```
 1                    A P P E A R A N C E S

 2      FOR THE PLAINTIFF, STATE OF TEXAS:

 3            Patrick K. Sweeten
              Matthew Frederick
 4            Jonathan F. Mitchell
              OFFICE OF THE ATTORNEY GENERAL OF TEXAS
 5            P.O. Box 12548
              Austin, TX  78711-2548
 6
              209 West 8th Street
 7            8th Floor
              Austin, TX  78701
 8
              (512) 936-1307
 9            patrick.sweeten@aog.state.tx.us

10      FOR THE DEFENDANT, HOLDER, ET AL:

11            Elizabeth S. Westfall
              Daniel Freeman
12            Risa Berkower
              Jennifer Maranzano
13            Bruce Gear
              U.S. DEPARTMENT OF JUSTICE
14            950 Pennsylvania Avenue, NW
              NWB - Room 7202
15            Washington, DC  20530
              (202) 305-7766
16            elizabeth.westfall@usdoj.gov

17      FOR THE DEFENDANT-INTERVENOR TEXAS STATE CONFERENCE OF
        NAACP BRANCHES AND THE MEXICAN AMERICAN LEGISLATIVE
18      CAUCUS:

19            Ezra D. Rosenberg
              DECHERT, LLP
20            Suite 500
              902 Carnegie Center
21            Princeton, NJ  08540-6531
              (609) 955-3200
22            ezra.rosenberg@dechert.com

23

24

25
```



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

4

1        FOR THE KENNIE INTERVENORS:

2                Chad W. Dunn
                 BRAZIL & DUNN, LLP
3                4201 Cypress Creek Parkway
                 Suite 530
4                Houston, TX  77068
                 (281) 580-6310
5                chad@brazilanddunn.com

6        FOR THE RODRIGUEZ INTERVENORS:

7                Amy Pederson (by telephone)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

5

1                            INDEX

2     Appearances.......................................3

3     COLBY BEUCK

4          Examination by Ms. Westfall...............7
           Examination by Mr. Rosenberg.............249
5
      Signature and Changes.........................278
6
      Reporter's Certificate........................280
7
                            EXHIBITS
8
      NO. DESCRIPTION                        PAGE MARKED
9
         2    Notice of Deposition                 19
10
         3    Letter From Lt. Governor Dewhurst on Voter   32
11            I.D. Bill

12       4    House Bill 112                       56

13       5    Senate Bill 14                      111

14       6    Georgia Statute on Photo Indentification  142

15       7    Printout From the Website of Rep.    157
              Patricia Harless
16
         8    Bill History of SB 14               190
17
         9    House Journal, March 23, 2011       214
18
        10    Bloomberg Article:  Texas Voter      220
19            Identification Law Blocked by Justice
              Department as Biased
20

21

22

23

24

25



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

6

1                (Witness sworn)

2                THE REPORTER:  Would all counsel present

3        state their names and affiliations.

4                MS. WESTFALL:  I'm Elizabeth Westfall.

5        I'm with the U.S. Department of Justice.  I represent

6        the Attorney General in this matter.

7                MR. FREEMAN:  Dan Freeman, also with the

8        Department of Justice representing the Attorney General.

9                MS. BERKOWER:  Risa Berkower, also with

10       the Justice Department.

11               MS. MARANZANO:  Jennifer Maranzano, also

12       with the Justice Department.

13               MR. GEAR:  Bruce Gear, also with the

14       Justice Department.

15               MR. ROSENBERG:  Ezra Rosenberg from

16       Dechert, LLP, representing the Texas State Conference of

17       NAACP Branches and the Mexican-American Legislative

18       Caucus.

19               MR. DUNN:  Chad Dunn for the Defendant

20       Kennie Intervenors.

21               MR. MITCHELL:  Jonathan Mitchell for the

22       State of Texas.

23               MR. FREDERICK:  Matthew Frederick for the

24       State of Texas.

25               MR. SWEETEN:  Patrick Sweeten with the



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

7

1       Texas Attorney General's Office on behalf of the State

2       of Texas and on behalf of the witness.

3                    THE REPORTER:   And on the phone?

4                    MS. PEDERSON:   Amy Pederson for the

5       Rodriguez Intervenors.

6                    MS. WESTFALL:   Thank you.

7                         COLBY BEUCK,

8       having been first duly sworn to testify the truth, the

9       whole truth, and nothing but the truth, testified as

10      follows:

11                       EXAMINATION

12      BY MS. WESTFALL:

13          Q.   Good morning, Mr. Beuck.  Could you state and

14      spell your name for the record, please.

15          A.   Yes.  My name is Colby, C-o-l-b-y, and my last

16      name is Beuck, and it's spelled B-e-u-c-k.

17          Q.   Have you ever been deposed?

18          A.   No.  This is my first time.

19          Q.   Great.  I'm going to go over some ground rules

20      so you'll understand how today will go, will operate.

21                   Today you will be -- you're under oath.

22      You have been sworn in, and you'll be testifying

23      truthfully, accurately, and completely.  Do you agree

24      with that?

25          A.   Yes.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

COLBY BEUCK                                              MAY 14, 2012

8

1        Q.   The court reporter will prepare a transcript of
2   everything that's said today, so you must respond to
3   questions orally without shaking your head or nodding.
4   Okay?
5        A.   Okay.
6        Q.   You must wait for me to finish my question
7   before you answer; otherwise, we'll be talking over each
8   other.  Do you understand?
9        A.   Yes.
10       Q.   I will try to ask you clear questions, but if
11   you don't understand a question, will you let me know?
12       A.   Yes.
13       Q.   If you would like to take a break, you may do
14   so, but please tell me, and I'll try to accommodate you,
15   but if there is a question pending, I would ask that you
16   answer that question first.  Do you agree?
17       A.   Yes.
18       Q.   And you understand that you're under oath
19   today; is that right?
20       A.   Yes.
21       Q.   And you may be subject to penalty of perjury
22   for giving false or misleading testimony; is that
23   correct?
24       A.   Yes.
25       Q.   Do you understand these instructions?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

9

1          A.    Yes, I do.

2          Q.    Do you have any questions about these

3     instructions?

4          A.    No, I do not.

5               MR. SWEETEN:  Elizabeth, I think it's

6     appropriate here for me to go ahead and tell you that as

7     you know, we will be asserting the legislative privilege

8     with respect to this deposition.

9               To the extent that you're asking questions

10    that reveal thoughts and opinions about legislation or

11    in furtherance of the legislative process, we'll be

12    objecting to and not be providing answers with respect

13    to communications between legislators and staff members;

14    communications between legislators and other

15    legislators, as well as legislative staffers;

16    communications between constituents and legislators or

17    staff; communications between legislators and staff and

18    state agencies, including the Lieutenant Governor's

19    Office or the Office of the Governor, and communications

20    between legislators and staff of the Legislative

21    Council.  And with that, we'll go ahead and let you

22    proceed.

23               MS. WESTFALL:  One clarifying question,

24    Mr. Sweeten:  Is that with regard to communications in

25    both directions?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1          MR. SWEETEN:  That's correct, it is.

2          And also, I also want to just make sure

3    it's clear on the record, this does not include, we will

4    not be asserting legislative privilege as to matters of

5    public record.  That would include committee hearings,

6    House floor proceedings or debates or public speeches.

7          MS. WESTFALL:  Thank you.

8    Q.   (By Ms. Westfall)  Mr. Beuck, are you on any

9    medication today that would affect your ability to

10   testify?

11   A.   No, I'm not.

12   Q.   Is there any reason why you can't testify

13   truthfully today?

14   A.   No.

15   Q.   Just in terms of ground rules, I will use the

16   terms "voter ID" and "photo ID" interchangeably during

17   this deposition.  And I want you to interpret those

18   terms broadly to mean a requirement that a voter present

19   a form of identification, whether it has a photo or not,

20   when voting in person at the polls before being able to

21   vote a regular ballot.  Do you understand?

22   A.   Yes.

23   Q.   If I refer to Representative Harless, I'm

24   referring to the representative, her office and staff.

25   Do you understand?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

11

1      A.    Yes.

2      Q.    And when I refer to the term "minority voters,"

3   I mean voters who are not white, who are not Anglo.  Do

4   you understand?

5      A.    Yes.

6      Q.    Thank you.

7            Are you represented by counsel here today?

8      A.    Yes, I am.

9      Q.    Who is your lawyer?

10     A.    Patrick, Matt, and Jonathan.

11     Q.    Have you been deposed before?

12     A.    No.  This is my first time.

13     Q.    Have you ever testified in court?

14     A.    No, I have not.

15     Q.    Have you ever been involved in a case where the

16   State of Texas was a plaintiff or a defendant?

17            MR. SWEETEN:  Objection to the term

18   "involved."

19     Q.    (By Ms. Westfall)  You may answer.

20     A.    Involved as a?

21     Q.    Did you have any participation in any

22   litigation in which the State of Texas was a party?

23     A.    Yes.

24     Q.    Tell me about that litigation.  Describe the

25   nature of the litigation, please.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

12

1       A.   I was an attorney for the Lieutenant Governor's

2   Office, and there was a case that I was a participant in

3   as an attorney.

4             MR. SWEETEN:   Elizabeth, Mr. Beuck is an

5   attorney.  I don't know the specific issue that you're

6   going to be asking him about, but obviously, to the

7   extent that it would -- that it would implicate any sort

8   of attorney-client privilege, I'm going to instruct him

9   that he should not answer that question.

10            I'm not sure we're there yet, but with

11  respect to -- you know, I'm not sure what you're getting

12  at or whether that's public record.  We may need to take

13  a short visit and sort this out as to what this is.  But

14  you can continue asking based on that.

15      Q.   (By Ms. Westfall)  I'm not asking you to reveal

16  any attorney-client communications you may have had in

17  representing the Lieutenant Governor in the

18  participation of the litigation you just described, but

19  could you tell me the name of the litigation?

20      A.   I'm trying to remember the parties' names.  It

21  was an -- I can't remember the parties' names.  I

22  apologize.

23      Q.   What was the nature of the dispute?

24      A.   The dispute was a -- it was a taxpayer dispute.

25      Q.   What year was this?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

13

1       A.    This was in 2000 -- 2009, I believe.

2       Q.    What court --

3       A.    2010.

4       Q.    Okay.  Sorry.  What court was this in?

5       A.    Here in Austin.

6       Q.    Is this ongoing?

7       A.    No.

8       Q.    How was it resolved?

9       A.    I do not know the final result.

10      Q.    What was your involvement in that litigation?

11      A.    I was involved with the discovery, preparation

12   of materials.  Preparation of materials.

13              I'm sorry, I'll project.

14              MR. ROSENBERG:  Please speak up.

15              THE WITNESS:  Okay.

16      Q.    (By Ms. Westfall)  Were you employed with the

17   Lieutenant Governor at that time?

18      A.    Yes, I was.

19      Q.    Did you work in his personal office, his

20   legislative office?

21      A.    I worked in his capitol office, yes.

22      Q.    What did you do to prepare for today's

23   deposition?

24      A.    I read through the House transcript for the

25   debate on voter ID.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

14

```
 1        Q.   Do you do anything else?

 2        A.   No.

 3        Q.   Did you read any other materials?

 4        A.   In preparation for today's, no.

 5        Q.   Did you meet with your attorneys?

 6        A.   Yes.

 7        Q.   For how long?

 8        A.   I would say two to four hours.

 9        Q.   And who here did you meet with at this table?

10        A.   Patrick and Matt.

11        Q.   Other than your attorneys, did you speak to

12   anyone else about this deposition?

13        A.   That would include my boss?

14        Q.   Outside of your family.

15        A.   Outside of my family.  Okay.  No.

16        Q.   Did you talk to Representative Harless?

17             MR. SWEETEN:  Objection to the extent that

18   this reveals any thoughts, opinions about legislature or

19   the furtherance of the legislative process, don't reveal

20   communications between yourself and Representative

21   Harless.

22             MS. WESTFALL:  Mr. Sweeten, I'm going to

23   be asking questions today.  I understand that you're

24   asserting legislative privilege, but I will be ask --

25   the fact that a conversation occurred is not privileged.
```



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

15

1      We will be asking you questions throughout the day to

2      establish, essentially, a privilege log so that we may

3      move to compel as the court has ordered us.  Is that --

4      are you agreeable to that?

5                  MR. SWEETEN:  Obviously, you can ask the

6      questions that you want to ask.  When you ask him what

7      the conversation was about, which was the preface of

8      your question, then I think we're getting into the

9      substance of the communication, which is not something

10     that he can -- he's going testify to.

11         Q.    (By Ms. Westfall)  Did you have any

12     conversation with Representative Harless over the

13     weekend in advance of this deposition?

14         A.    No.

15         Q.    Did you have a conversation with Representative

16     Harless in the last two weeks?

17         A.    Yes.

18         Q.    Was it about this deposition?

19                 MR. SWEETEN:  Objection.  I'm going to

20     instruct you not to answer communications that you've

21     had with -- with Representative Harless.

22                 MS. WESTFALL:  Mr. Sweeten, in terms of

23     the temporal scope of the privilege, we are going to

24     argue -- and I'm wondering if you will agree -- that the

25     privilege ends when the law is signed, which was May



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

16

1     2011, was it not?

2               MR. SWEETEN:  I think that's when it was

3     signed, yes.

4               MS. WESTFALL:  Therefore, what

5     privilege -- what privilege are you asserting?  What

6     legislation does this pertain to?

7               MR. SWEETEN:  Well, I think to the extent

8     that it reveals any thoughts or opinions about

9     legislation of any kind, that those communications are

10    privileged.  I've let you ask about when he met with

11    Representative Harless, but I don't think that it's

12    appropriate for him to go into the substance of those

13    communications.

14               MR. ROSENBERG:  If I could --

15               MS. WESTFALL:  Are you taking a position

16    that legislative privilege extends past the signing of

17    Senate Bill 14?

18               (Mr. Sweeten conferring with co-counsel.)

19               MS. WESTFALL:  Could we go off the record

20    while there's a break?

21               MR. SWEETEN:  Sure, that's fine

22               (Off the record at 10:03 a.m. to

23    10:08 a.m.)

24               MS. WESTFALL:  We're back on the record.

25               Mr. Sweeten, did you have an answer to the



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

COLBY BEUCK                                              MAY 14, 2012

17

1    question that was left pending with you?

2              MR. SWEETEN:  I do.  I think, as you said,

3    that the bill was passed in May of 2011.  Our position

4    would be that he can discuss -- he could reveal

5    discussions with Representative Harless that occurred

6    after passage, except to the extent that those

7    conversations relate to matters that occurred before the

8    passage of the bill.  So if he's discussing --

9              Any discussions that you've had with

10   Patricia Harless or other members who have claimed the

11   privilege or their staffs that related to the passage of

12   Senate Bill 14, that legislation, do not reveal

13   those.  However, if any discussions that you've had, you

14   can reveal -- after passage of May 2011, you can reveal

15   information or discussions that you've had, as long as

16   they don't relate to the prepassage matters.  Does that

17   make sense?  We can talk about that if you --

18             THE WITNESS:  Can we talk about it?

19             MR. SWEETEN:  Okay.  Let me talk with the

20   witness about it.

21             MS. WESTFALL:  Let's go off the record

22   again.

23             (Recess at 10:09 a.m to 10:10 a.m.)

24             MS. WESTFALL:  We're going back on the

25   record.  Thank you.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

18

1      Q.   (By Ms. Westfall)  Mr. Beuck, how many

2   conversations did you have with Representative Harless

3   in advance of this deposition about this deposition?

4      A.   Several.

5      Q.   Fewer than ten?

6      A.   Yes.

7      Q.   More than five?

8      A.   I would say between five and ten.

9      Q.   What was the general subject matter of the

10   topics that you discussed?

11      A.   The majority of the conversations were

12   regarding scheduling, the fact of when I was going to be

13   deposed, when she was going to be deposed.  That was the

14   majority of the conversations.

15      Q.   Did you discuss Senate Bill 14 at all?

16           MR. SWEETEN:  I'm going to, again, caution

17   the witness that based upon the legislative privilege,

18   do not reveal discussions that you've had with

19   Representative Harless at any time that relate to the

20   passage of Senate Bill 14.  You can discuss matters that

21   don't relate to legislation that occurred after the

22   passage of Senate Bill 14.

23           THE WITNESS:  Okay.

24      Q.   (By Ms. Westfall)  Did you bring any notes or

25   documents with you today?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1        A.    No.

2              (Exhibit 2 marked for identification.)

3        Q.    (By Ms. Westfall)  I'm going to hand you a

4   document that's been marked U.S. Exhibit 2.  Have you

5   seen this document before?

6        A.    Yes.

7        Q.    What is it?

8        A.    This is my Notice of Deposition, I believe.

9        Q.    When did you first receive this?

10       A.    A week ago, I believe, or several weeks ago.

11       Q.    What did you do when you received this?

12       A.    I went back through our documents and made sure

13   I -- we had produced all the documents requested.

14       Q.    How did you conduct that search?

15       A.    The search for e-mails, there were a keyword

16   search through our e-mail system, a document search

17   through our files.

18       Q.    And when you talk about files, these are paper

19   files?

20       A.    Paper files, yes.

21       Q.    Where are they located?

22       A.    In the Capitol office.

23       Q.    Are they located in Representative Harless's

24   office itself?

25       A.    No.  They would be located in our -- our file



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

 1      system, which is not located in her office.

 2           Q.    And where is that file system located?

 3           A.    In the front room.

 4           Q.    What is --

 5           A.    File cabinets.

 6           Q.    What is the front room?

 7           A.    I'm sorry?

 8           Q.    What is the front room?

 9           A.    The -- the common area of the office.

10           Q.    And by "office," do you mean the Capitol

11      office?

12           A.    Capitol office, yes.

13           Q.    Who maintains those documents?

14           A.    Myself, and I would say I would be the

15      custodian of those records.

16           Q.    And you're the custodian of the records for

17      Senate Bill 14 or a broader category of documents?

18           A.    Could you be -- a broader category of

19      documents.

20           Q.    For all documents in the front office or only

21      certain bills?

22           A.    Not all documents.  We have other employees in

23      the office who -- who maintain the files as

24      well.  Senate Bill 14 was -- I was the primary staff

25      person responsible for that legislation, so those files



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

21

1       were under my supervision.

2            Q.    So you searched hard copy files.  You searched

3       e-mail.  What other records and documents did you search

4       in response to Exhibit 2?

5            A.    Electronic files as well.  Not just

6       e-mails. Our saved files.

7            Q.    Did you look on a shared drive?

8            A.    Yes.

9            Q.    Where did you look on the shared drive?  What

10      particular drive on the --

11           A.    Looking for the -- the X drive is our shared

12      file -- our shared drive for the office.

13           Q.    How did you conduct that search of the X drive?

14           A.    With keywords, and as well as manually going

15      through and looking through the documents.

16           Q.    How many documents did you discover through

17      that search on the X drive?

18           A.    The electronic files on the X drive, I would

19      say more than -- more than 50.

20           Q.    What did you do with those documents?

21           A.    I turned them over to my attorneys.

22           Q.    And which of your attorneys here today did you

23      turn them over to?

24           A.    Stacey Napier -- Schiff -- I'm sorry.  She

25      changed her last name.  But it was an attorney with the



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

22

1    Attorney General's Office.

2         Q.   When did you turn those documents over to

3    Ms. Napier?

4         A.   I believe it was -- the majority of the

5    documents I turned over several weeks ago.  There was

6    additional documents in here that were not -- we

7    received several, and I believe there was another

8    request for documents.  This covered the majority of

9    that.  What this did not cover, we produced recently.  I

10   believe it was last week.

11        Q.   Turning your attention now to Exhibit -- U.S.

12   Exhibit 2, do you see the list of documents in that

13   document, a numbered list after Attachment A?

14        A.   Okay.  This is Number 2, "All documents and

15   communications not limited to --"

16        Q.   I was just turning your attention to the list

17   of documents.  And you now see that list of documents --

18        A.   Yes.

19        Q.   -- correct?

20        A.   Yes.  Yes.

21        Q.   Turning your attention to Number 7, do you see

22   that request?

23        A.   Yes.

24        Q.   Did you search for those documents?

25        A.   Yes.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

23

1        Q.   Where did you search for those documents?

2        A.   I have a file for the documents that are --

3   that would be under that, that request.

4        Q.   Did you produce any documents to your attorney?

5        A.   Yes.

6        Q.   How many?

7        A.   I don't know the number of files.

8             MR. SWEETEN:  He's asked you to speak up

9   just a little bit, if you would.

10            THE WITNESS:  I'm sorry.

11            MR. SWEETEN:  No, you're doing fine.

12       Q.   (By Ms. Westfall)  Turning to your attention to

13  Number 8 in U.S. Exhibit 2, do you see that number?

14       A.   Yes.

15       Q.   And what is it?

16       A.   All public statements you or others in your

17  office, including the Legislature, have made about voter

18  ID.

19       Q.   Did you conduct a search for these documents?

20       A.   Yes, I did.

21       Q.   How many documents did you find?

22       A.   I would say five to ten.

23       Q.   Representative Harless didn't make more public

24  statements on SB 14?

25       A.   That we had in our possession, I would say five



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

24

1    to ten.

2         Q.   Did she make other -- more than five to ten

3    public statements about SB 14?

4         A.   I would believe so.

5         Q.   And who would know where those are maintained?

6         A.   I can't answer.  I don't know.

7              MR. SWEETEN:  Objection, assumes facts not

8    in evidence.

9         Q.   (By Ms. Westfall)  Did you provide those public

10   statements to Ms. Napier?

11        A.   That was -- that was part of the documents that

12   I turned over, yes.

13        Q.   Turning your attention to Number 11, what is

14   that request?

15        A.   All documents and communications concerning

16   civil and criminal allegations, investigations,

17   warnings, enforcement actions.

18        Q.   Did you conduct a search for those documents?

19        A.   Yes.

20        Q.   Did you find any documents?

21        A.   Yes.

22        Q.   What were those documents?

23        A.   We had -- there was --

24              MS. WESTFALL:  I would note for the record

25   that the witness is reviewing the document.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

25

1        A.    Yes.  I did turn over information regarding

2    that.  There were statistics on the Attorney General's

3    investigations into voter fraud.

4        Q.    (By Ms. Westfall)  Was that the sum total of

5    the documents that you turned over in response to Number

6    11?

7        A.    I believe there was also some newspaper

8    articles on fraud investigations.

9        Q.    Were those fraud investigations in the state of

10   Texas?

11       A.    Yes.  And there could have been some that were

12   nationwide.  The majority of them were for Texas.

13       Q.    Thank you, Mr. Beuck.

14             Could you tell me where you went to

15   college?

16       A.    The University of Georgia.

17       Q.    What year did you graduate?

18       A.    1999.

19       Q.    Did you go to law school?

20       A.    Yes.

21       Q.    Where did you go to law school?

22       A.    The University of Texas.

23       Q.    What year did you graduate?

24       A.    2002.

25       Q.    As a general matter, do you vote in elections



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

26

```
 1    in Texas?
 2         A.   Yes.
 3         Q.   Do you vote in person or absentee?
 4         A.   I vote in person.
 5         Q.   How far is your polling place from your
 6    residence?
 7         A.   I would say it's close.  Several blocks.  I'm
 8    not very good with distance, but I would say it's close,
 9    walkable.
10         Q.   Do you have a driver's license?
11         A.   Yes, I do.
12         Q.   How far is the nearest driver license office
13    from your residence?
14         A.   I believe it's on North Lamar.  I can't tell
15    you the distance, but it is -- I'm not very good
16    distance.  So I know where it is.  It's driveable.
17    About a 15-minute drive, perhaps.
18         Q.   Do you know its hours of operation?
19         A.   No, I do not.
20         Q.   When was the last time you visited that driver
21    license office?
22         A.   I don't know.  I don't know.
23         Q.   When did you last renew your driver's license?
24         A.   I do not know.  I'd have to look at my -- I
25    cannot remember when I renewed my license.
```



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

COLBY BEUCK                                                    MAY 14, 2012

27

1          Q.    Do you have a Texas driver's license?

2          A.    Yes, I do.

3          Q.    Do you recall ever waiting in line at the

4     driver license office?

5          A.    I believe I did.  Yes, I have waited in a

6     driver's license office.

7          Q.    Do you recall how long you waited in line?

8          A.    That was several years ago.  No, I do not

9     remember.

10         Q.    Were you born in Texas?

11         A.    Yes, I was.

12         Q.    Do you have a certified copy of your birth

13    certificate?

14         A.    Yes.

15         Q.    Do you have any experience related to election

16    law?

17         A.    Could you be -- elaborate on that?

18         Q.    Outside of your work on voter ID in the

19    Legislature, do you have any experience in election law?

20         A.    No, I do not.

21         Q.    Have you ever worked as a poll worker?

22         A.    No, I have not.

23         Q.    Have you ever worked as a poll watcher?

24         A.    No, I have not.

25         Q.    Have you ever witnessed any problems in the



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

28

1        polls while you were voting?

2              A.    No.

3              Q.    Have you ever witnessed any voter trying to

4        impersonate another voter?

5              A.    No, I have not.

6              Q.    What was your first job out of law school?

7              A.    I was employed with the County Attorney's

8        Office, Travis County Attorney's Office.

9              Q.    What year was that?

10             A.    That was immediately after graduation, 2002.

11             Q.    How long were you employed in that office?

12             A.    That job was, I believe, for several months

13       while I was studying for the bar exam.

14             Q.    Was it a clerkship, in essence?

15             A.    Yes.

16             Q.    And what was your next legal job after that?

17             A.    That would be with the Office of the Lieutenant

18       Governor beginning in 2003.

19             Q.    Did you ever work for a law firm named Chapel

20       Hill and Lawrence?

21             A.    Yes, I did.

22             Q.    When did you work there?

23             A.    That was a summer internship, and I can't

24       remember.

25             Q.    Was it during law school?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

COLBY BEUCK                                          MAY 14, 2012

29

1          A.   It was during law school.  I'm trying to
2     remember which year.  I believe it was my -- I guess it
3     would have been in 2000.
4          Q.   What year did --
5          A.   Or thereabouts.
6          Q.   I'm sorry.  I'm doing something I wasn't
7     supposed to, which was to talk over you.
8               What year did you start working for
9     Lieutenant Governor Dewhurst?
10         A.   That was in 2003.
11         Q.   In what capacity were you hired?
12         A.   I was hired as a policy analyst.
13         Q.   How did you come about getting this job?
14         A.   I interviewed for the position.
15         Q.   Why did you decide you wanted to work for the
16    Lieutenant Governor for Dewhurst?
17         A.   I've always been interested in state
18    government, and I thought I would be very good for the
19    position.
20         Q.   Could you describe the policy analyst position?
21         A.   Yes.  My duties?  I was to track legislation
22    and monitor the issues that I was responsible for, for
23    the Lieutenant Governor and senior staff.
24         Q.   Did you have any connection with the Lieutenant
25    Governor before interviewing for his office -- with his



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

30

1      office?

2          A.    No.

3          Q.    What issues did you handle for him?

4          A.    Initially, jurisprudence issues.  The

5      Jurisprudence Committee was my committee that I was

6      tasked with following.  Then criminal justice issues and

7      -- criminal justice was mainly my policy area.

8          Q.    What did the Jurisprudence Committee handle as

9      a general matter?

10         A.    A variety of legal issues.  I would say

11     anything from family law matters to other civil -- civil

12     legal matters.

13         Q.    Did you handle election issues for Governor --

14     Lieutenant Governor Dewhurst?

15         A.    No, I did not.

16         Q.    Did you handle voter ID?

17         A.    No, I did not.

18         Q.    How long were you employed with Lieutenant

19     Governor Dewhurst?

20         A.    Seven years.

21         Q.    So you didn't handle voter ID at all?

22         A.    I was not in -- Voter ID was not my -- it was

23     not my area.

24         Q.    Did you remain a policy analyst for the

25     duration of your employment with Mr. Dewhurst?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

COLBY BEUCK                                              MAY 14, 2012

31

1        A.    Yes.  I believe my title was Counsel For Public

2    Policy.

3        Q.    Who handled voter ID issues for Mr. Dewhurst

4    when you were working for him?

5        A.    Bryan Hebert.

6        Q.    Would you spell list last name?

7        A.    I believe it's H-e-b-e-r-t.

8        Q.    What was his title?

9        A.    I do not know.

10       Q.    Was he -- did he handle all aspects of voter ID

11   for the Lieutenant Governor or certain aspects?

12       A.    I can't speak to that.  I don't know.  He was

13   the policy analyst in charge of that issue.  I don't

14   know his scope.

15       Q.    How big is the office?

16       A.    25 to 35 people.

17       Q.    How many policy analysts?

18       A.    Ten.

19       Q.    And you were employed there --

20       A.    Plus or minus ten.

21       Q.    You were employed there until 2009; is that

22   correct?

23       A.    2009, yes.

24       Q.    Would you say that voter ID was one of the

25   Lieutenant Governor's signature issues?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

32

1              MR. SWEETEN:  Objection, calls for
2    speculation.
3         Q.   (By Ms. Westfall)  You may answer.
4         A.   I know it was an issue he was very interested
5    in.  I can't speculate on his priorities, but I know it
6    was an important issue.
7         Q.   Did he have a press person handle voter IDs
8    issues?
9         A.   Yes.
10        Q.   Who was that person?
11        A.   While I was employed?
12        Q.   Yes.
13        A.   Mike Wintemute.
14        Q.   Are you aware of whether he drafted a letter
15   that Lieutenant Governor Dewhurst wrote in 2007
16   regarding voter ID?
17        A.   No, I don't have any knowledge of that.
18             MS. WESTFALL:  Could you please mark this
19   U.S. 3 and hand it to the witness?
20             (Exhibit 3 marked for identification.)
21        Q.   (By Ms. Westfall)  You've been handed U.S. 3.
22   Do you recognize this document?
23             MR. SWEETEN:  Caution the witness to
24   review the document before answering a question about
25   it.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

 1        A.   (Viewing documents.) It appears this is a

 2   letter from the Lieutenant Governor or a -- printed in

 3   the Texas Weekly.

 4        Q.   (By Ms. Westfall)  Have you ever seen this

 5   letter before?

 6        A.   I do not remember it.

 7        Q.   Do you know who wrote this for Mr. Dewhurst?

 8        A.   No, I do not.

 9        Q.   Why did you stop working for Mr. Dewhurst?

10        A.   I was looking to grow as my -- in my -- my

11   position, I was looking to just grow professionally, and

12   I felt that a change was good.

13        Q.   So when did you stop working for him?

14        A.   November of 2009.

15        Q.   Did you come to be employed elsewhere at that

16   time?

17        A.   Yes.

18        Q.   Where did you become employed?

19        A.   With Representative Patricia Harless.

20        Q.   How did you obtain that position?

21        A.   Interviewed.

22        Q.   Did you have any connection with Representative

23   Harless prior to November 2009?

24        A.   No.

25        Q.   So it was a cold interview?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

34

1          A.    I was informed of the position through a

2     friend.

3          Q.    Who was the friend?

4          A.    Lisa Kaufman.

5          Q.    Is Lisa Kaufman employed by Ms. Harless?

6          A.    No.

7          Q.    Who is Lisa Kaufman?

8          A.    She works -- she is a former employee of the

9     Speaker.

10          Q.    Speaker Straus?

11          A.    Yes.

12          Q.    Did you she tell you about the availability of

13     a chief of staff position with Ms. Harless?

14          A.    Yes.

15          Q.    When did you interview with her?

16          A.    Fall 2009.

17          Q.    How long have you -- have you held that

18     position continuously up to the present?

19          A.    Yes.

20          Q.    What are your responsibilities as chief of

21     staff for Representative Harless?

22          A.    It varies during the time of year.  During

23     session, my responsibilities are different than during

24     the interim.  Primarily during session, I'm responsible

25     for the Representative's legislation.  As chief of



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1    staff, also responsible for operating the office,

2    employees, and also constituent communications.

3         Q.    Do you also engage in communications with the

4    executive branch on behalf of Representative Harless?

5         A.    Meaning the Governor's Office?

6         Q.    Well, we'll start with the Governor's Office.

7    Do you engage in those communications on her behalf or

8    with her?

9         A.    If the Governor's Office calls, I'm usually the

10   one to answer the phone.

11        Q.    And would the same be true for the Lieutenant

12   Governor's Office?

13        A.    Currently, I'm the only employee, so yes, I'm

14   the one answering the phone.

15        Q.    So the office is you, currently, for

16   Representative Harless?

17        A.    Full-time employee, yes.

18        Q.    Do you have any legislative areas that you

19   focus on?

20        A.    With my current employee?  I'm sorry.  In my

21   current employment?

22        Q.    Yes.

23        A.    My areas -- Representative Harless is on the

24   State Affairs Committee.  Those were the issues that she

25   had asked me to -- to monitor specifically.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

36

1      Q.   State Affairs handles voter ID issues; does it

2   not?

3      A.   No, it does not.

4      Q.   What does it handle?

5      A.   It handles a wide variety of issues related to

6   electric, dereg -- electric.  Some social issues.  It's

7   a fairly large committee that receives a lot of

8   different legislation.  Electric power,

9   telecommunications are the major issues that come from

10  through that committee, as well as social issues.

11     Q.   Is she running for reelection this year?

12     A.   Yes.

13     Q.   Are you involved in the campaign in any way?

14     A.   No.

15     Q.   When Representative Harless is considering how

16  to vote on a bill, do you advise her on that?

17          MR. SWEETEN:  I'm going to caution the

18  witness to the extent that your answer may reveal

19  thoughts or opinions about legislation or in furtherance

20  of the legislative process, don't answer that.  You can

21  answer as a general matter.

22          MS. WESTFALL:  Mr. Sweeten, I understand

23  your -- I understand your concerns about privilege, but

24  I would ask that you not -- that you refrain from

25  speaking objections as general matter, and that the



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

COLBY BEUCK                                         MAY 14, 2012

37

1    witness be able to answer questions about the fact of a

2    communication having occurred.

3             MR. SWEETEN:   Okay.  And thus far, I have

4    let him answer questions about the fact of the

5    communication.  However, it's my duty to assert the

6    privilege that is appropriate here, and that is the

7    legislative privilege with respect to these issues.  And

8    so I will caution him, as we proceed, to avoid providing

9    information related to the communications that we've

10   outlined.  With that, you can go ahead.

11        A.    As -- as part of my job duties, I -- I do --

12   I'm asked to make recommendations on legislation.

13        Q.    (By Ms. Westfall)  Do you generally do that for

14   Representative Harless?

15        A.    Yes.

16        Q.    And how do those recommendations -- how are

17   those recommendations conveyed?

18        A.    A variety of ways.

19        Q.    In-person meetings?

20        A.    Yes.

21        Q.    Telephone meetings?

22        A.    Yes.

23        Q.    E-mail?

24        A.    Yes.

25        Q.    Texting?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

COLBY BEUCK                                                    MAY 14, 2012

                                                                          38

1        A.   Yes.

2        Q.   Do you e-mail her on a work e-mail, or her

3   personal e-mail, or all the above?

4        A.   All of the above.

5        Q.   What do you generally -- what e-mail do you

6   generally use with Representative Harless?

7        A.   It depends.  Typically, it is her -- her -- a

8   personal account.

9        Q.   Under Texas FOIA, public information law, are

10  citizens able to obtain e-mails through the government

11  account?

12       A.   I'm not an expert --

13       Q.   To the extent you know.

14       A.   -- on the public information law, so I can't --

15  I know state e-mails are subject to the open records

16  law.

17       Q.   Do you know whether legislators sometimes use

18  personal e-mail to avoid FOIA?

19            MR. SWEETEN:  Objection, calls for

20  speculation.

21       Q.   (By Ms. Westfall)  You may answer.

22       A.   I can't speak to that.  I don't know.  I can't

23  speak for other legislators.

24       Q.   Do you know whether Representative Harless has

25  a Gmail account?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

39

1      A.    I don't believe she does.

2      Q.    She uses Yahoo?

3      A.    No.

4      Q.    What is your role, generally, when

5   Representative Harless sponsors a bill?

6      A.    Sponsoring a bill is, the legislation comes

7   over from the Senate.  As other legislation, I prepare

8   the legislation to make its way through the process, the

9   legislative process.

10      Q.    So is it your testimony that bills all

11   originate in the Senate, or do some originate in the

12   House?

13      A.    No.  No.  Bills do originate in the House.  You

14   said sponsor a bill.  That would be -- sponsoring

15   legislation is -- for Representative Harless would be a

16   Senate bill.  An author, she would be the author of the

17   bill if it was House bill.

18      Q.    I see.  Thank you for clarifying that for me.

19           Have your responsibilities changed during

20   the course of your employment with Representative

21   Harless?

22      A.    No.

23      Q.    Do you represent Representative Harless in an

24   attorney-client capacity?

25      A.    Yes, I have.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1       Q.   On what occasion?  Just -- and I'm not asking
2    you to talk about privileged communications.  Just
3    generally, when have you represented her as her
4    attorney?
5       A.   When she requests legal advice.
6       Q.   And is that in your capacity as chief of
7    staff?  You're providing her with legal advice?  Is that
8    your testimony?
9       A.   When -- when there is a question on legal
10   issues, I provide my legal advice.
11      Q.   So I believe you testified that you're the sole
12   staff person right now; is that right?
13      A.   Full time.  We do have part-time staff.
14      Q.   Is there anyone else in the office who has ever
15   handled voter ID issues while you've been employed with
16   Representative Harless?
17      A.   No.
18      Q.   You're the person who does everything on that
19   issue for her right now?
20      A.   Yes.
21      Q.   How many election-related bills has
22   Representative Harless sponsored?
23      A.   Besides voter ID, we -- we had two bills last
24   session.  I don't know other sessions.  I can speak to
25   the past session.  But I'm not qualified to speak on the



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

COLBY BEUCK                                          MAY 14, 2012

41

1     other sessions when I was not there.

2         Q.   Could you tell me the bill number for the first

3     one?

4         A.   The bill number for?

5         Q.   You said there were two bills, election-related

6     bills?

7         A.   No.  I don't know the bill numbers.

8         Q.   Could you describe the bills for me?

9         A.   There was one bill regarding school board --

10    school board elections, there in Harris County, to help

11    our local school district with the costs associated with

12    running an election.

13        Q.   Would you describe the other bill?

14        A.   The other bill had to do with translating the

15    election materials, the costs associated with Harris

16    County translating the election materials.  Harris

17    County had asked to -- for our office to help with that,

18    to see if the Secretary of State would translate those

19    materials so that there's uniformity across the state.

20    That's what the legislation did.

21        Q.   And so the purpose of the bill was to provide

22    funding for the printing of those materials; is that

23    right?

24        A.   The actual translation of the election

25    materials.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

42

1          Q.    Why did Representative Harless sponsor that

2     legislation?

3               MR. SWEETEN:   I'm going to object to the

4     extent that the question may ask him to reveal thoughts

5     or opinions about legislation in furtherance of the

6     legislative process, and you're asking about a specific

7     communication between Ms. Harless and Mr. Beuck.

8               MS. WESTFALL:   Let me strike that

9     question.

10         Q.    (By Ms. Westfall)   What was the purpose of that

11    legislation?

12         A.    The purpose was to -- Harris County had

13    concerns regarding the translation of those election

14    materials.   They felt that because there were several

15    other counties that were now going be required to

16    translate into these other languages, that there should

17    be a uniform translation across -- across the state.

18         Q.    What is your understanding of why Harris County

19    decided that Representative Harless was the person to

20    carry that bill?

21               MR. SWEETEN:   Objection, calls for

22    speculation.

23         Q.    (By Ms. Westfall)   You may answer.

24         A.    I can't speak to that.

25               MS. WESTFALL:   Mr. Sweeten, I would ask



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

43

1          that you make your objections in a shorter fashion so

2          that there is not coaching of the witness.

3                    MR. SWEETEN:  Counsel, I just said,

4          "Objection, calls for speculation."  How would you like

5          me to rephrase that?

6                    MS. WESTFALL:  "Objection, speculation."

7                    MR. SWEETEN:  Okay.  I will shorten it to

8          that.

9          Q.   (By Ms. Westfall)  I believe you testified

10         earlier, and this was of interest to me the, the

11         difference between sponsoring and authoring a bill.

12                   So when a bill comes from the Senate and

13         it comes to the House and it's being sponsored in the

14         House?  Is that right?  That's a correct term?

15         A.   Yes.  House -- we House sponsor the

16         legislation.

17         Q.   How is it decided which member will be

18         sponsoring the Senate Bill?

19         A.   From my experience, it is the committee, and

20         leadership will make that determination.

21         Q.   Is it leadership in both the House and the

22         Senate decide who will carry that bill in House?

23         A.   Typically, I would say it would just be the

24         House leadership makes that determination.

25         Q.   And in the House, when you refer to leadership,



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

COLBY BEUCK                                                    MAY 14, 2012

                                                                        44

1      who, other than the Speaker, is involved in that

2      decision?

3           A.    I can't say.  I don't know.

4           Q.    Is it chiefly the decision of the Speaker?

5                 MR. SWEETEN:  Objection, calls for

6      speculation.

7           A.    I don't know.

8           Q.    (By Ms. Westfall)  How many immigration-related

9      bills has Representative Harless sponsored, authored, or

10     co-sponsored during your employment with her office?

11          A.    We had a -- one bill.

12          Q.    Could you tell me about that bill?

13          A.    Yes.  It was a bill -- I believe it was called

14     a Sanctuary City Bill.

15          Q.    What did Sanctuary City Bill do?

16          A.    This was legislation she had filed in previous

17     sessions.  It was -- it was not my focus this session,

18     so I'm not the expert on it.  So I really -- the details

19     of the legislation, I know it's to -- I really don't

20     know the details on it, to be honest.

21          Q.    Could you describe the basic purpose of the

22     bill?

23          A.    The purpose of the bill was to --

24                MR. SWEETEN:  I'm going to make sure

25     that -- with respect to this question, I'm going to



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

COLBY BEUCK                                                    MAY 14, 2012

45

1     object to it to the extent it calls for you to provide

2     information that's covered by the legislative privilege

3     which could be communications with Representative

4     Harless.  With that, you can go ahead and answer.

5              MS. WESTFALL:  Mr. Sweeten, are you taking

6     the position that questions related to the purpose of

7     legislation are covered by legislative privilege, so I

8     understand this for the record?

9              MR. SWEETEN:  Just so it's clear, I'm

10    saying that any communications that he's had with

11    Representative Harless about the purpose of the bill

12    would be covered by legislative privilege.  If you're

13    asking him based on the text of the bill or his general

14    understanding, I think that would be -- that's fair

15    game.

16       Q.   (By Ms. Westfall)  My question stands.  What

17    was the purpose of the Sanctuary Cities Bill?  You may

18    answer.

19              MR. SWEETEN:  My instruction stands.

20       A.   The purpose of the legislation was to prohibit

21    cities from providing a sanctuary regarding immigration

22    laws, federal immigration laws.

23       Q.   (By Ms. Westfall)  Could you explain that a

24    little bit further?  It's not clear to me.  Could you

25    describe it a little further?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

46

1          MS. WESTFALL:  I want to note for the
2     record that the witness is pausing and thinking about
3     his answer.
4          A.   The legislation was in response to cities that
5     were not enforcing immigration laws, and the legislation
6     was intended to -- to prohibit that.
7          Q.   (By Ms. Westfall)  And she sponsored this bill
8     in 2009; is that correct?
9          A.   Yes.
10         Q.   Had this bill been introduced prior to 2009 in
11    some way, shape, or form?
12         A.   Yes.
13         Q.   Who introduced it previously?
14         A.   I -- I don't know.
15         Q.   Do you know why Representative Harless
16    introduced the bill in 2009?
17         MR. SWEETEN:  Objection, speculation.
18         Q.   (By Ms. Westfall)  You may answer.
19         A.   Her constituents had requested it.
20         Q.   What area does she represent?
21         A.   Spring, Texas.
22         Q.   Where is that?
23         A.   Northwest Harris County.
24         Q.   Northwest Harris County.  Which of her
25    constituents asked her to sponsor the bill?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

47

1            MR. SWEETEN:  Objection.  I'm going to
2    instruct the witness not to answer to the extent that
3    that information reveals thoughts and opinions about
4    legislation or furtherance of the legislative process,
5    and it relates to communications between you and
6    Representative Harless, communications between
7    constituents and legislative staff or Representative
8    Harless, communications between legislators or
9    legislative staff.
10            With that cautionary instruction, you can
11    go ahead and answer to the extent you have an answer.
12            MS. WESTFALL:  Mr. Sweeten, I want to
13    clarify whether you are including within the privilege a
14    promise that a legislature makes for a constituent to
15    sponsor a bill.  Would you say that that is privileged?
16            MR. SWEETEN:  I am saying that any
17    communications between constituents and a legislator
18    would be covered by the legislative privilege.
19            MS. WESTFALL:  And that is about
20    legislation, generally, in either direction?
21            MR. SWEETEN:  In either direction
22    regarding legislation, that's correct.
23            MS. WESTFALL:  Court reporter, could you
24    read back the question?
25            (The requested portion was read by the



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1    reporter.)

2        A.   I can't speak to an individual constituent who

3    asked.  I know several have been in contact.

4        Q.   (By Ms. Westfall)  Could you tell me the

5    identity of the constituents?

6            MS. WESTFALL:  And that's outside the

7    privilege, Mr. Sweeten.

8        A.   The identity?

9        Q.   (By Ms. Westfall)  Who were these constituents?

10       A.   Constituents.  That's about -- I don't know the

11   individual identities of these -- these people.

12       Q.   Were there any lobbyists who requested her to

13   sponsor the bill?

14       A.   I don't know.

15       Q.   Were there any interest groups that asked her

16   to sponsor the bill?

17       A.   I don't know.

18       Q.   Are you familiar with a group ALEC?

19       A.   Yes.

20       Q.   Did ALEC ask her to sponsor the bill?

21       A.   I cannot speculate.  I don't know.

22       Q.   How many bills did she sponsor in 2009?

23       A.   I think we sponsored around -- more than five

24   Senate bills, five to ten Senate bills.  We authored

25   approximately ten House bills, 10 to 15.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1        Q.    And could you remind me:  Did she sponsor or
2    author the Sanctuary Cities Bill in the House in 2009?
3        A.    She was an author.  We had filed legislation on
4    that.
5        Q.    Do you know why she was selected to carry the
6    bill rather than Representative Solomons?
7        A.    Which bill?
8        Q.    Sanctuary Cities.
9        A.    There were several Sanctuary City bills last
10   session.  Representative Solomons, I believe, had one as
11   well.
12       Q.    What happened to Representative Harless's
13   Sanctuary Cities bill?
14       A.    It did not move.
15       Q.    Did not move out of committee?
16       A.    Correct.
17       Q.    What committee was it considered by?
18       A.    State Affairs.
19       Q.    Why did it not move out of committee?
20       A.    I can't speculate.  I don't know.
21       Q.    Who was Chair of State Affairs at that time,
22   committee?
23       A.    Byron Cook.  Representative Byron Cook.
24       Q.    Is it generally the Chair who decides which
25   bills move out of committee?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

50

1          A.    Typically.

2          Q.    Do you believe that compliance with the Texas

3    Constitution is an important consideration in the

4    law-making process?

5          A.    Yes.

6          Q.    How do you ensure that there is compliance with

7    the Texas Constitution in drafting a bill?

8          A.    Reading the Constitution helps.

9          Q.    Take any other steps?

10         A.    Consulting with Texas Legislative Council.

11         Q.    Could you describe generally for me your role

12   in drafting a bill between you and the Council?

13         A.    Generally speaking, there is an idea for

14   legislation, and I take that legislation, the ideas, the

15   general ideas, and request counsel to assist in drafting

16   the legislation.

17         Q.    So the Texas Legislative Council does the

18   actual -- provides the technical support in drafting the

19   bill; is that correct?

20         A.    As well as legal.

21         Q.    And you provide the concept and get it to

22   them?  Is that how it works?

23         A.    Yes.

24         Q.    Do you believe that the compliance with federal

25   law is an important consideration in the law-making



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

COLBY BEUCK                                              MAY 14, 2012

                                                                    51

1    process?

2         A.   Yes.

3         Q.   How do you ensure compliance with federal law

4    in drafting legislation?

5         A.   The same as with Texas constitutional law.  You

6    study the federal law, as best you can, and consult with

7    Texas Legislative Council.

8         Q.   Are you familiar with Section 5 of the Voting

9    Rights Act?

10        A.   Yes.

11        Q.   When did you first learn about Section 5?

12        A.   Quite sometime ago.  I can't say.  Probably

13   high school.

14        Q.   How does the Legislature ensure compliance with

15   Section 5 of the Voting Rights Act?

16             MR. SWEETEN:  Objection, speculation.

17        Q.   (By Ms. Westfall)  You may answer.

18        A.   Could you repeat the question?

19        Q.   How does the Legislature ensure compliance with

20   Section 5?

21             MR. SWEETEN:  Same objection.

22        A.   By taking the same steps of studying the law

23   and consulting with counsel.

24        Q.   (By Ms. Westfall)  Do you believe that

25   compliance with the Federal Voting Rights Act is an



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

52

1       important consideration in the law-making process?

2                    MR. SWEETEN:  Objection, vague.  Go ahead,

3       you can answer.

4            A.   I believe following all laws is important, all

5       federal law is important.

6            Q.   (By Ms. Westfall)  Are there any particular

7       steps that you take with regard to ensuring that

8       election laws comply with Section 5, that you haven't

9       already testified to?

10           A.   No.

11           Q.   What is Texas's current system for determining

12      how to verify the identity of a voter at the polls?

13           A.   The current voting system.

14           Q.   Before SB 14 --

15           A.   Yes.

16           Q.   -- since that's not being implemented?

17           A.   A -- for regular voting, not early voting?

18           Q.   Let me withdraw the question.  Strike the

19      question.  I will rephrase.

20                    What is the current system, under Texas

21      law, for determining how to verify the identity of a

22      voter who is voting in person on either early voting or

23      on election day?

24           A.   I believe with early voting, there is a -- I

25      show my driver's license when I early vote.  That's



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

COLBY BEUCK                                          MAY 14, 2012

53

1    typically what I do.  When you are voting on election
2    day, you have the option of showing your registration
3    card, your voter registration card, or there are a
4    couple of other documents that you are able to show to
5    verify your identity.
6        Q.    What are those documents?
7        A.    It's a pretty long list.  I don't know.  I've
8    never used that.  So I know there is a -- there's
9    personal records of some sort.
10       Q.    So when you're answering these questions, are
11   you testifying based on your personal experience as a
12   voter?
13       A.    My personal experience?  No.  As well as what I
14   know from the issue.
15       Q.    Are there any problems with the current system
16   you just described for verifying a voter's identity when
17   he shows up at the polls on election day?
18       A.    Yes, I think there are concerns.
19       Q.    What are those concerns?
20       A.    That an individual would be able to -- to vote
21   and use someone else's identity.
22       Q.    Are you aware of any times that that's occurred
23   in Texas?
24       A.    Yes, I believe there are examples.
25       Q.    Could you tell me about what those examples



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

54

1      are?

2          A.   The specific cases, I can't say.  I can't speak

3      to.

4          Q.   Do you know how many cases there have been?

5          A.   No, I do not.

6          Q.   Do you know how many allegations of in-person

7      voting fraud there have been in Texas?

8          A.   No, I do not.

9          Q.   Do you know how many convictions of in-person

10     voting fraud in Texas?

11         A.   No, I don't have those numbers.

12         Q.   Are there any other concerns with the current

13     system for verifying a voter's identity that you haven't

14     already testified about today?

15              MR. SWEETEN:  Are you asking if he has

16     concerns?  Just to clarify the question.  Any concerns?

17         A.   My personal concerns?

18         Q.   (By Ms. Westfall)  Is the question -- you had

19     testified that there were concerns with the system.  I

20     asked you whether there were concerns.  Is the question

21     not clear to you?

22         A.   No.  If you could --

23         Q.   You said earlier that there were problems with

24     the current system for verifying a voter's identity.  Do

25     you remember testifying about that?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

COLBY BEUCK                                                    MAY 14, 2012

55

1        A.    Yes.

2        Q.    And then you just testified about in-person

3   voter fraud, and we had some discussion about that,

4   right?

5        A.    Yes.

6        Q.    Are there any other problems or concerns that

7   the current system, in your view, fails to address?

8        A.    Beyond somebody voting for somebody else?

9        Q.    Correct.

10        A.    I think that's the major concern.

11        Q.    Okay.

12        A.    That I'm aware of.

13        Q.    That's the sum total of the problem, as you see

14   it, with the current system; is that correct?

15        A.    Well, I can't speak to the sum total.  I know

16   that's the -- the major -- the major issue.

17        Q.    As you sit here today testifying, I want to

18   know every single concern and problem with the current

19   system, and that's my question.  Does that clarify the

20   question for you?

21        A.    I believe I've answered it.

22        Q.    Okay.  You testified earlier that you started

23   to work for Representative Harless in November of 2009,

24   correct?

25        A.    Correct.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

56

1       Q.   Was there a time after you were hired by

2    Representative Harless that you started to work on photo

3    ID issues?

4       A.   When did I begin working on photo ID issues?

5       Q.   For Representative Harless.

6       A.   For Representative Harless?  We prefiled

7    legislation, in the fall of 2010, so there about,

8    around.

9            MS. WESTFALL:  Could you mark this as U.S.

10   Exhibit 4.

11           (Exhibit 4 marked for identification.)

12           MS. WESTFALL:  Thank you.

13      Q.   (By Ms. Westfall)  You've been handed what's

14   been marked U.S. 4.  Take a look at it.  Let me know

15   when you've had a chance to review it.

16      A.   (Viewing documents.)

17      Q.   Have you had a chance to take a look?

18      A.   Yes.  This is the House Bill 112, the

19   legislation we -- Representative Harless prefiled.

20      Q.   Were you involved in developing this bill?

21      A.   Yes.

22      Q.   Were you involved in drafting this bill?

23      A.   In the drafting process?

24      Q.   Yes.

25      A.   Yes.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

COLBY BEUCK                                              MAY 14, 2012

57

1      Q.   Could you describe that process for me?

2      A.   The process is as with other bills, as I

3  described earlier, the idea for the legislation was

4  brought up, and I researched the issue, and I contacted

5  Texas Legislative Council for assistance in drafting.

6      Q.   Did you do anything else, in the drafting or

7  development process, for HB 112?

8      A.   Beyond researching the issue and that's -- no.

9      Q.   Thank you for your testimony.

10          Could you describe the basic provisions of

11  HB 112?

12     A.   (Viewing documents.)

13          MS. WESTFALL:   Please note for the record

14  that the witness is reviewing Exhibit 4.

15     A.   Could you repeat -- you're asking the basic --

16     Q.   (By Ms. Westfall)  Could you describe the basic

17  provisions of HB 112?

18     A.   Yes.  There is -- this is the voter

19  identification legislation.  There is a -- a voter must

20  present to an election officer one form of

21  identification.  And then that lists -- those are, I

22  guess, what you would consider to be photo ID, or two

23  different forms of identification.  Then that lists

24  several -- I believe that's -- that's the -- the list of

25  other documents that you would be able to show.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

58

1          Q.    How long did it take to draft this bill?

2          A.    I don't recall.

3          Q.    Did it take more than three months?

4          A.    I don't believe so.  I don't think it took

5     longer than three months.

6          Q.    How many meetings did you have with

7     Representative Harless about this bill?

8          A.    Several.

9          Q.    Less than ten?

10         A.    I'd say five to ten.

11         Q.    Did you have meetings about HB 112 in 2010,

12    prior to the filing in November of 2010?

13         A.    It would be in the fall of 2010, early -- I'm

14    sorry, excuse me.  Later summer, early fall.

15         Q.    How long did it take to draft the bill with the

16    Texas Legislative Council?

17         A.    I do not remember.

18         Q.    A matter of weeks?

19         A.    I think it was several weeks.

20         Q.    How many communications did you have with the

21    Texas Legislative Council about HB 112?

22         A.    No more than five.

23         Q.    Did you consider any other -- turning your

24    attention to U.S. 4, did you consider any other,

25    including any other kinds of ID in this bill, as



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

59

1      allowable by voters?

2          A.   Additional forms of photo identification?  No.

3          Q.   Did you consider any other forms of nonphoto

4      identification?

5          A.   No.

6          Q.   So HB 112 allowed for two forms of nonphoto ID;

7      is that correct?

8          A.   Yes.

9          Q.   Does that establish a person's identity?

10         A.   Would two forms of identification establish a

11     person's identity?

12         Q.   That's the question, yes.

13         A.   I believe it's -- I believe there's a greater

14     likelihood of identifying the person -- correctly

15     identifying the person more than current law under this

16     bill, yes.

17         Q.   So the use of two forms of nonphoto ID would

18     increase the likelihood that you could confirm a voter's

19     identity; is that correct?

20         A.   Yes, I believe it would.

21         Q.   And that's why Representative Harless included

22     it in this bill; is that right?

23              MR. SWEETEN:  Objection to the form.  Also

24     objection to the fact that you're asking him to

25     speculate as to what Representative Harless believes and



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

COLBY BEUCK                                        MAY 14, 2012

60

```
1      you're asking -- it implicates communications that he

2      may have had with Representative Harless.  So to the

3      extent -- and so I'm going to object to privilege.

4           Do not answer that if your answer reveals

5      communications you've had with Representative Harless.

6           MS. WESTFALL:  I'm gonna strike that

7      question.  Actually, I'm not going to strike.  I'm going

8      to leave it pending, because I'm going to move on that

9      question to compel.

10     Q.   (By Ms. Westfall)  I'm gonna ask you another

11     question.  What was the purpose of allowing the use of

12     two nonphoto forms of ID in HB 112?

13          MR. SWEETEN:  Again, do not reveal

14     communications that you've with Representative Harless

15     in answering that question.

16          MS. WESTFALL:  Mr. Sweeten, I'm not asking

17     him to talk about communications.  I'm asking him what

18     was the purpose of a particular provision in a

19     particular bill.

20          MR. SWEETEN:  You're asking him what the

21     purpose of this bill is, is that the question?

22          MS. WESTFALL:  Are you taking the position

23     that asking questions about the purpose of provisions in

24     legislation is protected by legislative privilege?  Is

25     that your position?
```



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

61

1           MR. SWEETEN:  What I'm saying is, that if

2    there's a discussion that he's had with Representative

3    Harless, that he does not have to reveal that, and that

4    is privileged.  So to the extent that he can answer

5    based upon his own testimony, I'm gonna let him -- on

6    his own perception, I'm going to let him do that.  But I

7    will not let him reveal communications that he's had

8    with Representative Harless.

9           MS. WESTFALL:  That's abundantly clear,

10   and I'm not -- that's not the question.  So thank you

11   for your testimony, Mr. Sweeten.

12       Q.   (By Ms. Westfall)  You may answer.

13           MR. SWEETEN:  I'm not testifying.  I'm

14   trying to make sure that the record is clear, and I'm

15   trying to make sure that the witness is clear on my

16   instruction as to privilege.  With that, go ahead.

17           MS. WESTFALL:  Thank you.

18       Q.   (By Ms. Westfall)  You may answer.

19       A.   Could you repeat the question?

20       Q.   I certainly could.

21           What was the purpose of allowing the use

22   of two forms of nonphoto ID in HB 112?

23       A.   To improve the likelihood that the person

24   voting is who they say they are.

25       Q.   Turning your attention to Section 63.0101 on



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

62

1      Page 5.  Do you see that?

2          A.    Uh-huh.

3          Q.    And continuing on to Page 6, do you see that it

4      allowed the use of driver's licenses that had not

5      expired earlier than two years before the date of

6      presentation?

7          A.    Under Subsection 1?

8          Q.    Correct.

9          A.    Yes.

10         Q.    Why was the two-year number selected?

11         A.    I don't know.

12         Q.    Do you see under Subsection 2 of that same

13     section a reference to United States military

14     identification cards?

15         A.    Yes.

16         Q.    Could you describe the form of identification

17     cards that is described or referenced by that statement?

18         A.    A United States military identification card?

19         Q.    Yes.  What kind of cards does that include?

20         A.    I think that would be identification from the

21     United States military.  I can't say beyond that --

22         Q.    Do you know --

23         A.    -- what that would include.

24         Q.    Do you know where this particular provision

25     came from?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

COLBY BEUCK                                              MAY 14, 2012

63

1        A.   I believe this language was from the

2   legislation as from the 2009 legislation.

3        Q.   And what was that bill?

4        A.   I do not remember the bill number.

5        Q.   Was much of this list of acceptable forms of ID

6   from the 2009 bill?

7        A.   Yes.

8        Q.   I believe you testified that you were involved

9   in development of HB 112?

10       A.   Yes.

11       Q.   Could you describe that process, to the extent

12   you haven't already testified about it?

13       A.   I believe I answered as my -- my involvement, I

14   believe I already answered.

15       Q.   So it's simply communications with

16   Representative Harless on five occasions in -- or ten

17   occasions in the fall of 2010; is that correct?

18            MR. SWEETEN:   Objection, misstates his

19   testimony.

20       Q.   (By Ms. Westfall)  You may answer.

21       A.   My -- my involvement with House Bill 112, yes,

22   conversations with Representative Harless, five to ten,

23   approximately, researching the issue and communications

24   with counsel.

25       Q.   Were there any activities related to the



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

64

1    development of the bill before the fall of 2010?

2         A.   Activities?  Could you be --

3         Q.   Were you involved in developing the bill prior

4    to the fall of 2010?

5         A.   House Bill 112?

6         Q.   Yes.

7         A.   No.

8         Q.   I believe you testified that you looked to the

9    bill in 2009 as a model, in part or in whole, for

10   HB 112; is that correct?

11        A.   That's correct.

12        Q.   Did you look at any other previous bills in

13   drafting HB 112?

14        A.   When I was researching the issue, I looked at

15   previous legislation, so I believe 2007, 2009.

16        Q.   Do you remember what parts of those previous

17   bills you drew from in drafting HB 112?

18        A.   No, I don't.  The specifics on which parts, I

19   don't remember.

20        Q.   Did you look at any other states' photo ID laws

21   in drafting HB 112?

22        A.   In my research, yes, I did.

23        Q.   Which states?

24        A.   Specifically, the Indiana legislation on voter

25   identification, the Georgia, were states that I looked



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

65

1    to.

2         Q.    Did anyone direct you to look at those states?

3              MR. SWEETEN:   Objection to the extent that

4    it attempts to reveal communications between he and

5    other legislative staff and/or Representative Harless.

6    He can answer it if it does not implicate those

7    communications or other communications I've articulated

8    today.

9         A.    Did anybody direct me to look at those states

10   specifically?

11        Q.    (By Ms. Westfall)   Yes.

12        A.    I came to that conclusion on my own, after

13   researching the issue, that those were two states I

14   needed to look at.

15        Q.    Do you remember any provisions that you drew

16   from the Georgia photo ID law to include in HB 112?

17        A.    No, I don't remember specifically.

18        Q.    Do you recall anything in the Georgia photo ID

19   law that you rejected and did not include in HB 112?

20        A.    No.

21        Q.    Do you recall any aspect of the Indiana photo

22   ID law that you included in HB 112?

23        A.    No, I don't know the specific provisions from

24   the individual states.

25        Q.    Did you take any steps in the drafting process


ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

66

1       or development of HB 112 as a result of looking to any

2       states' other photo ID laws?

3            A.    Can you restate?  I'm sorry.

4            Q.    Did you make any changes to HB 112 as a result

5       of reviewing other states' photo ID laws?

6            A.    My primary model for this bill was the

7       legislation from 2009.  I know the -- those were taken

8       into consideration when that was drafted in 2009.  As

9       far as my -- I can't -- I don't know.

10           Q.    Did you look to any models from any interest

11      group or lobbyist in drafting HB 112?

12           A.    No.

13           Q.    Did you have any communications with other

14      legislators other than Representative Harless, about

15      HB 112?

16                 MR. SWEETEN:  Can you read the question

17      back.

18                 (The requested portion was read by the

19      court reporter.)

20                 MR. SWEETEN:  I'm going to instruct him

21      not to reveal any communications that you've had.  The

22      fact of the communication, I will allow you to answer

23      that.

24                 MS. WESTFALL:  Thank you, Mr. Sweeten.

25                 MR. SWEETEN:  You're welcome.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

67

1          A.    No, I have not.

2          Q.    (By Ms. Westfall)  So you solely talked to

3    Representative Harless, is that correct, as to

4    legislators, about 112?

5          A.    That's correct.

6          Q.    Did you talk to any legislative staff in

7    developing HB 112?

8          A.    Yes.

9          Q.    Who were those staff people?

10              MR. SWEETEN:  Same instruction.  You can

11   reveal who you talked to or the facts about the

12   communication, but not the substance of the

13   communication.

14         Q.    (By Ms. Westfall)  You may answer.

15         A.    Okay.  Senator Fraser's office and the

16   Lieutenant Governor's Office.

17         Q.    Could you identify the particular staff person

18   in Senator Fraser's office with whom you had

19   communications about HB 112?

20         A.    Janice McCoy.

21              MR. ROSENBERG:  Would you speak up,

22   please?

23              THE WITNESS:  I'm sorry.

24         A.    Janice McCoy.

25         Q.    (By Ms. Westfall)  Was there anyone else in the



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

68

```
 1      office you had communications with?  I'm sorry, in

 2      Senator Fraser's office?

 3           A.   No.

 4           Q.   How many communications did you have with

 5      Ms. McCoy?

 6           A.   Less than five.

 7           Q.   Were these communications in the fall of 2010?

 8           A.   I don't remember.

 9           Q.   Were any of these conversations in 2009?

10           A.   In 2009?  No.

11           Q.   Were any of these conversations in the first

12      half of 2010?

13           A.   With --

14           Q.   With Ms. McCoy?

15           A.   With Ms. -- no, no.  The first half of -- no,

16      2010, no.

17           Q.   Were the two of you the sole parties to these

18      conversations?

19           A.   Yes.

20           Q.   Were these conversations conducted in person?

21           A.   No.

22           Q.   Were these conversation on the telephone?

23           A.   Yes.

24           Q.   Were any of these conversations on e-mail?

25           A.   Not that I remember.
```



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1       Q.    Were any of these conversations on text?

2       A.    No.

3       Q.    And you just testified that you also had

4    communications with a staff person from Mr. Dewhurst's

5    office.  Is that correct?

6       A.    Yes.

7       Q.    Who was that staff person?

8       A.    Bryan.  Bryan Hebert.

9       Q.    H-e-b-e-r-t?

10      A.    Yes.

11      Q.    What is his title?

12      A.    I don't know his exact title.

13      Q.    Were these conversations in the fall of 2010?

14      A.    Yes.

15      Q.    How many conversations did you have with

16   Mr. Hebert?

17      A.    Less than five.

18      Q.    Were the two of you the sole parties to those

19   communications?

20      A.    Yes.

21      Q.    Were those communications in person?

22      A.    Yes.

23      Q.    Where was the location of those communications?

24      A.    In Mr. Hebert's office.

25      Q.    How long were the meetings?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1           A.    Less than 30 minutes.

2           Q.    Did you have any e-mail communication between

3     the two of you after those meetings?

4           A.    Yes.

5           Q.    Have you produced those e-mails to your

6     attorneys?

7           A.    I did not have those documents.

8           Q.    They no longer existed in your e-mail system?

9           A.    That's correct.

10          Q.    What happened to them?

11          A.    They were -- I don't know what happened to

12    them.  I do not have them.  They were deleted.

13          Q.    Who would know what happened to those e-mails?

14          A.    I don't know.

15          Q.    Now that you remember you had e-mail --

16                MR. SWEETEN:  Can we work towards a break

17    maybe in about five minutes?  Just pretty soon we'd like

18    to take a break.

19                MS. WESTFALL:  Certainly.

20          Q.    (By Ms. Westfall)  Now that you remember you

21    had e-mail with Mr. Hebert, did you have any e-mail

22    communication with Ms. McCoy?

23          A.    In 2000 --

24          Q.    In 2010?

25          A.    No, not that I remember.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

71

1        Q.   Do you remember whether you had any other
2    meetings with any other legislative staff or staff in
3    the Governor's Office in 2010 regarding HB 112?
4        A.   No.  That's all.
5        Q.   Did you have any other communications regarding
6    HB 112 in which Representative Harless was present?
7        A.   I'm sorry.  Can you repeat the question?
8        Q.   Any other communications -- any communications
9    regarding HB 112 at which Representative Harless was
10   present?
11       A.   Communications with myself and Representative
12   Harless?
13       Q.   And a third party.
14       A.   No, I don't remember.
15       Q.   Did you have any communications with officials
16   or legislators in other states in the fall of 2010
17   regarding the development of HB 112?
18       A.   No.
19       Q.   Did you have any communications with anyone in
20   Georgia regarding their photo ID law?
21       A.   No.
22       Q.   Did you have any communications with --
23       A.   I'm sorry.  Regarding House Bill 112?
24       Q.   Correct.
25       A.   No, no communications.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1          Q.    Did you have any communications with anyone

2    anybody in Indiana regarding their law?

3          A.    No.

4          Q.    Did you have any communications with any

5    interest groups or lobbyists concerning HB 112?

6          A.    No.

7          Q.    Did you have any communications with any

8    interest group representing minority voters regarding

9    the development of HB 112?

10         A.    No.

11         Q.    Did you have -- other than what you just

12   testified about, did you have any discussions with

13   anybody about the forms of ID to include in HB 112?

14              MR. SWEETEN:   Objection to the extent that

15   you're asking to him to reveal communications that are

16   specifically covered by the legislative privilege.   I

17   can go through those if you need to me to familiarize.

18   But otherwise, are you familiar with what we're talking

19   about?

20              THE WITNESS:   Yes.

21              MR. SWEETEN:   Okay.   Then with that

22   instruction, you can go ahead and answer Ms. Westfall's

23   question.

24         A.    Okay.   Could you repeat it?

25         Q.    (By Ms. Westfall)   Sure.   Did you have any



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

73

1      discussions with anyone about the forms of ID to include
2      in HB 112?
3            A.    Besides who I --
4            Q.    Besides the people you already testified about?
5            A.    No.
6            Q.    Conversations.   Thank you.
7                  Mr. Sweeten, if you don't mind, I have
8      about five more minutes just to get through the section.
9                  MR. SWEETEN:   That's fine.   Go ahead.
10                 MS. WESTFALL:   And it will be a logical
11     break.
12           Q.    (By Ms. Westfall)  Did you analyze which
13     registered voters did not possess any or all of the
14     forms of ID identified in HB 112?
15           A.    No, I did not.
16           Q.    Did you read any research or analysis of voter
17     ID to assist you in drafting HB 112, that you haven't
18     already testified to?
19           A.    Yes, I did research the issue.
20           Q.    I believe you testified earlier that you had
21     researched other states' laws?
22           A.    Yes.
23           Q.    Was there anything else, any other research
24     that you conducted to assist you in new drafting HB 112?
25           A.    Yes, I -- yes.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1          Q.    Tell me what that research consisted of.

2          A.    My research on voter ID generally consisted of

3     law review articles; basically what I could get my hands

4     on, as far as research goes.

5          Q.    Which law review articles did you review?

6          A.    I can't remember.

7          Q.    Do you remember the authors of the law review

8     articles?

9          A.    No.

10         Q.    Do you remember the publications in which they

11    were published?

12         A.    No.

13         Q.    Did you conduct or instruct anyone to conduct

14    an analysis of the impact of HB 112 on minority voters?

15         A.    No.

16         Q.    Why didn't you?

17              MS. WESTFALL:  Please note for the record

18    that the witness is thinking about a response.

19         A.    Can you repeat it?

20         Q.    (By Ms. Westfall)  Certainly.  Did you conduct

21    or --

22              MS. WESTFALL:  Actually, court reporter,

23    could you read back that question?

24              (The requested portion was read by the

25    court reporter.)



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

75

```
 1        Q.   (By Ms. Westfall)  The question before that
 2   was:  Did you conduct or instruct anyone to conduct an
 3   analysis of the impact of HB 112 on minority voters?
 4        A.   Okay.
 5        Q.   "Why didn't you?" was the question.
 6        A.   And why didn't I?  Okay.
 7        Q.   Yes, thank you.
 8        A.   For House Bill 112, I was not -- I was not
 9   asked.
10        Q.   You testified earlier that you understood this
11   change would be subject to Section 5 of the Voting
12   Rights Act, correct?
13        A.   I'm sorry.  I don't remember that.  Could
14   you --
15        Q.   Is it your understanding or was -- I'm sorry,
16   strike that.
17             Was it your understanding, at the time of
18   the drafting of HB 112, that it would be subject to
19   preclearance for Section 5 of the Voting Rights Act?
20        A.   The voter ID legislation would be subject to
21   preclearance, yes.  Yes, that was my understanding.
22        Q.   Did you take any steps in response to your
23   understanding of that?
24        A.   With House Bill 112?
25        Q.   Yes.
```



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

76

1      A.   With my research and my conversations and

2   consulting with Legislative Council.

3      Q.   Were you directed not to analyze the impact of

4   HB 112 on minority voters?

5            MR. SWEETEN:   Objection.   Don't reveal any

6   communications between legislators, staff, and you, or

7   any of the other areas that we've discussed.

8            THE WITNESS:   Okay.

9      Q.   (By Ms. Westfall)   To the extent you can

10  answer, can you answer?

11     A.   Was I directed to not --

12     Q.   Analyze the impact of HB 112 on minority

13  voters?

14     A.   I think --

15            MR. SWEETEN:   Again, if the answer to the

16  question involves you revealing communications between a

17  legislator, staff members, staff state agencies,

18  including the Governor or Lieutenant Governor's Office

19  or communications between the Texas Legislative Council,

20  if that's the basis of your answer, do not reveal that.

21     A.   No, I was not directed.

22     Q.   (By Ms. Westfall)   Is your answer you weren't

23  directed or you're not answering because your counsel

24  has instructed you not to answer?

25     A.   I'm sorry?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1       Q.   Are you not answering the question?

2       A.   No.

3       Q.   You are not able to answer the question?

4       A.   I am answering the question:  That was not a

5    directive.

6       Q.   Are you familiar with the concept of Spanish

7    surname voter registration?

8       A.   I am now.

9       Q.   Were you at the time of the drafting of HB 112?

10      A.   No.

11      Q.   And just to go back to the -- to the testimony

12   that you just provided about not having been instructed

13   not to analyze the impact, that is your answer with

14   regard to outside of any communications that your

15   counsel is asserting is privileged; is that correct?

16      A.   I'm sorry.  Could you --

17      Q.   I'm just trying to understand the answer that

18   you just gave, the testimony that you just gave when I

19   asked you:  Were you directed not to analyze the impact

20   of HB 112 on minority voters, and you said, "I was not

21   instructed that."  Is that correct?

22      A.   Yes.

23      Q.   But you were at --

24      A.   I'm sorry.  I'm getting twisted.

25      Q.   That's okay.  We're going to take a break



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

78

1    shortly.

2              Your counsel had just instructed you that

3    you should not answer that question if it meant

4    revealing any communications that you had --

5         A.   Right.

6         Q.   -- with Representative Harless, other

7    legislators, or staff; is that correct?

8         A.   Yes.

9         Q.   So that question you did not answer with regard

10   to any directives you had made -- you may have received

11   from those individuals; is that correct?

12        A.   Okay.

13             MR. SWEETEN:  Do you need a take a minute

14   and we can discuss the privilege assertion, if you --

15             MS. WESTFALL:  Mr. Sweeten, I have a

16   question pending and you've instructed him, and I'm

17   trying to clarify his testimony for the record.

18             MR. SWEETEN:  I understand.  But I'm also

19   -- I'm allowed, per the rules, to discuss with him the

20   assertion of privilege when appropriate.  This is

21   certainly a time -- the entire premise of your question

22   is based upon privilege.  I can talk with him about that

23   assertion.

24             MS. WESTFALL:  Why don't we move on and

25   finish these questions, and we can take a break in five



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

79

```
 1    minutes?  How about that?
 2         Q.   (By Ms. Westfall)  What was the purpose of
 3    HB 112?
 4              MR. SWEETEN:  Objection to the extent that
 5    that question calls for you to provide information about
 6    communications between legislators, legislative staff,
 7    or any of other enumerated areas.  Do not provide an
 8    answer to that question if it does implicate those
 9    communications.
10         A.   Okay.  I believe the purpose of House Bill 112
11    is to improve the elections process by strengthening the
12    identity requirements for voters.
13         Q.   (By Ms. Westfall)  Did Representative Harless
14    make any public statements concerning HB 112?
15         A.   I can't remember.
16         Q.   Was there a press release concerning HB 112?
17         A.   I can't remember.
18         Q.   Did HB 112 generate any support?
19         A.   Support?
20         Q.   For the bill from any source?
21              MR. SWEETEN:  You can answer it to the
22    extent that it doesn't implicate the areas of
23    communication that we previously discussed.
24              THE WITNESS:  Okay.
25              MR. SWEETEN:  If it does implicate those,
```



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

80

1    do not provide an answer to that question.

2         A.    The question again.  Did we receive positive

3    supportive --

4         Q.    (By Ms. Westfall)  Did it generate any support

5    from any source?

6         A.    Positive comments.

7         Q.    Yeah.  Support would be positive, not negative.

8         A.    Yes.  Yes.

9         Q.    And from what sources?

10        A.    Constituents.

11        Q.    Who were those constituents?

12              MR. SWEETEN:  I'm going to instruct you

13   not to answer communications because I think it would

14   reveal communications between you, your office, and

15   constituents.

16              MS. WESTFALL:  Are you not -- are you

17   instructing him not to identify constituents?  Because

18   that a privilege log issue, and I need to have that

19   answered today, Mr. Sweeten.

20              MR. SWEETEN:  What I'm telling you is that

21   the way you've come into this question, which is "what

22   did you talk about," and now you're asking that.

23              I mean, I -- as far as -- as I've told

24   you, he can provide information about the fact that the

25   conversation occurred or that he received -- or with



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

81

1    whom he spoke.  But he's not going to reveal

2    communications and the substance of those communication

3    with constituents as --

4              MS. WESTFALL:  A privilege log includes a

5    general generic description of the subject matter of the

6    communication, does it not, Mr. Sweeten?

7              MR. SWEETEN:  I think a general

8    description, yes.  Now, you've asked him, "Did you get

9    supportive constituent comments," and I think we're

10   really beyond the general description of it.

11             MS. WESTFALL:  That's extremely general,

12   in my mind.  I would like to know for the record whether

13   you are refusing to provide a very basic standard entry

14   in a privilege log, which is:  Who made the

15   communication, generally what it was about, and who

16   received it?  And right now, I have an extremely generic

17   description of the communication, which was support for

18   a bill, and I have the recipient, who was the sender.

19   Who was the constituent is my question.

20             MR. SWEETEN:  Yeah, I think the way you

21   phrased the question, I think that you're asking him to

22   reveal communications regarding Senate Bill 14, and

23   you're asking him about the substance of those.  I'm

24   going to instruct him not to answer that question.

25             MS. WESTFALL:  And that's with regard to



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

82

1      all supporters, not just constituents?

2                MR. SWEETEN:  It's with respect to all

3      constituents.  It's not -- that's part of what we've

4      asserted in the court documents, as well as today, is

5      privileged.  It's communications between constituents

6      and Representative Harless's office, which would include

7      Mr. Beuck.

8          Q.   (By Ms. Westfall)  Was there any support from

9      any interest groups for HB 112?

10         A.   Could you be more specific on interest group?

11         Q.   A group, an organization of people.  Were there

12     any organizations of people, nonprofit, for profit,

13     lobbyists, other groups that expressed support for

14     HB 112?

15         A.   I can't remember.

16         Q.   And the bill was introduced in 2010, correct?

17         A.   Yes.

18         Q.   It's years ago, right?  By my math.  Am I

19     right?

20         A.   Correct.

21         Q.   After it was filed -- after HB 112 was filed in

22     November 2010, what happened to the bill?

23         A.   The bill did not move forward.

24         Q.   Was it referred to a committee?

25         A.   I believe it was referred to a committee.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

83

1        Q.    Was it the Select Committee on Voter ID?

2        A.    I believe so.

3        Q.    What happened to it after that?

4        A.    It did not move forward.

5        Q.    Okay.

6              MR. SWEETEN:  Let's go ahead and take a

7    break.

8              MS. WESTFALL:  Oh, let me ask one

9    question.

10       Q.    (By Ms. Westfall)  Did --

11             MS. WESTFALL:  Actually, let's take a

12   break.

13             (Recess 11:43 a.m. to 12:01 p.m.)

14       Q.    (By Ms. Westfall)  Could you describe the

15   record retention policy in Representative Harless's

16   office?

17       A.    There is a -- e-mails -- the Texas Legislative

18   Council runs the -- the e-mail system -- are typically

19   delete every 30 days.  We -- I archive materials.  You

20   have to archive materials in order for them to not be

21   deleted.

22       Q.    Did you take any steps to archive materials

23   related to voter ID?

24       A.    Yes.

25       Q.    When did you take those steps?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1          A.    The -- I saved the initial archive, I believe,
2     was a communication from the Attorney General's Office.
3          Q.    So that was this year, in 2012?
4          A.    Yes.
5          Q.    Did you archive any photo ID-related materials
6     prior to 2012?
7          A.    Yes, I did have some.
8          Q.    What were those materials?
9          A.    My documents and e-mails and electronic files.
10         Q.    Where did you save those files?
11         A.    They were located -- the electronic files were
12    on the X drive, the e-mails were in my e-mail archive,
13    and the documents were located in the file.
14         Q.    What was the approximate date on which you
15    started to archive those materials?
16         A.    Really, from the beginning of the Senate Bill
17    14, the important documents, the documents that I
18    believed needed to be saved, they were, beginning with
19    the committee hearing on Senate Bill 14.
20         Q.    Did you start to archive bills related to the
21    development of Senate Bill 14 at the end of 2010,
22    beginning of 2011?
23         A.    I don't -- could you repeat it?  The documents
24    in preparation for Senate Bill 14 --
25         Q.    That is correct.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

COLBY BEUCK                                                    MAY 14, 2012

85

```
 1        A.   -- prior to --
 2        Q.   In 2010, 2011.
 3        A.   I don't know.
 4        Q.   You just remember that you started to archive
 5   as of the time of the committee hearing; is that
 6   correct?
 7        A.   No, that's -- that's I believe where at least
 8   my -- I know we have documents.  That's where my
 9   e-mails, I believe.
10        Q.   So in the archived part of your computer
11   system, you have e-mails, you have documents that were
12   formerly on the shared drive.  Are there any other
13   electronic communications that you archived?
14        A.   You said e-mails and -- yes, we have e-mails
15   and our saved electronic documents, Word files, and that
16   type of thing.
17        Q.   What was the -- what is the volume, the number
18   of those documents?
19        A.   The electronic documents, I think anywhere from
20   50 to a hundred e-mails.  50 to a hundred, they're a
21   good number.
22        Q.   Have you provided each and every electronic
23   document on SB 14 to your counsel?
24        A.   Yes.
25        Q.   When did you do that?
```



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

86

1        A.    I believe about a month ago.

2        Q.    Could you tell me the domain on which

3   Representative Harless maintains a personal e-mail

4   account?

5        A.    By domain you mean?

6        Q.    Who was her provider for personal e-mail?  I'm

7   not asking you her e-mail address.

8        A.    Okay.

9        Q.    Just the provider.

10       A.    AOL.

11       Q.    Did you search for e-mail in response to -- her

12   personal AOL e-mail in response to -- either the

13   deposition notice that she received or the document

14   request that the Attorney General propounded in March?

15       A.    No, I don't have access.

16       Q.    Has anyone, to your knowledge, searched her AOL

17   account?

18       A.    She did.

19       Q.    How do you know that?

20       A.    She told me.

21       Q.    And I believe you testified earlier that you

22   found e-mails had been deleted.  Was that related to

23   communications that you had had with Senator Fraser's

24   staff person or Lieutenant Governor Dewhurst's staff

25   person?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

COLBY BEUCK                                                    MAY 14, 2012

87

1          A.    I believe it was with -- with the Lieutenant

2     Governor's Office.  That was in reference to House Bill

3     112 in late summer, early fall 2010.

4          Q.    Did you delete those e-mails?

5          A.    No.  I believe they were automatically deleted.

6          Q.    That was pursuant to an e-mail deletion policy

7     that exists in the Governor's Office or in your office?

8          A.    Yes.

9          Q.    What is that policy?

10         A.    The one I described earlier.  After 30 days,

11    e-mails are deleted.

12         Q.    Was there a reason you didn't save those

13    e-mails?

14         A.    I didn't believe they needed to be saved.  They

15    were transitory in nature, in my opinion.

16         Q.    Did Representative Harless hold any events in

17    her district related to HB 112?

18         A.    Can you be more specific on events?  Are you

19    are referring to --

20         Q.    Were there any town meetings, any meetings with

21    constituents, any meetings with legislators, any

22    meetings whatsoever in her district regarding to HB 112?

23         A.    I think she'd have to speak to that.  I don't

24    know.

25         Q.    Aren't you her chief of staff?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

88

1      A.   Yes.

2           MR. SWEETEN:   Objection, argumentative.

3      Q.   (By MS. WESTFALL)   Did Representative Harless

4  send any constituent mail regarding HB 112?

5      A.   Yes, I believe we did.

6      Q.   When was that mail sent?

7      A.   Anywhere from when the bill was filed to

8  January, February of 2011.

9      Q.   Was this a newsletter sent to constituents,

10  either electronically or in paper?

11      A.   Yes.

12      Q.   Have you produced that communication to your

13  counsel?

14      A.   Yes.

15      Q.   Was there more than one?

16      A.   I don't know.

17      Q.   Was that sent to all constituents?

18      A.   The e-mail newsletter is sent to an e-mail

19  database that we have, which includes people who ask to

20  be on the newsletter or constituents who e-mail in.

21  We've compiled it over the years, so it's a pretty large

22  group.

23      Q.   Have you had any other communications with

24  constituents, except for that newsletter, regarding

25  HB 112?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

89

1        A.   It's possible there could be some other --
2   other constituent communication letters and that type of
3   thing.  I can't say specifically.
4        Q.   Was there any communication with Mr. Paul
5   Bettencourt and Representative Harless or your office
6   concerning HB 112?
7        A.   Not to my knowledge.
8        Q.   Was there any communication between any member
9   of the King Street Patriots and Representative Harless
10  or anyone in her office concerning HB 112?
11       A.   Not to my knowledge.
12       Q.   Was there any communication between Catherine
13  Engelbrecht and Representative Harless or anyone in her
14  office concerning HB 112?
15       A.   Not to my knowledge.
16       Q.   Who would know whether these communications
17  were made in your office besides you?
18       A.   Who would be the best judge of who has
19  communicated with Representative Harless?  I believe
20  Representative Harless.
21       Q.   Would anyone else besides her know?
22       A.   I believe that's probably the most appropriate
23  person.
24       Q.   Were there any communications between anyone at
25  the American Legislative Exchange Council, otherwise


ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1    known as ALEC, and Representative Harless or anyone at

2    her office concerning HB 112?

3        A.   I don't know.  Not to my knowledge.

4        Q.   Would Representative Harless be the only one

5    who would be able to answer that question?

6        A.   I'm answering these questions based on my

7    knowledge of who is -- I did not have a conversation

8    with them, and I can't speak for Representative Harless.

9        Q.   Thank you.

10            What does the term Legislative Emergency

11   mean within the Texas Legislature?

12       A.   An emergency item as declared, as issued by

13   Governor?

14       Q.   (Nods head yes.)

15       A.   Typically, an emergency item is not subject to

16   the rules, the calendar rules associated with

17   nonemergency item legislation.

18       Q.   What types of bills, typically, are emergency

19   legislation?

20       A.   It varies.  Since I've been at the Capitol,

21   there's local bills that -- it's entirely up to the

22   Governor.  It varies.

23       Q.   What is your understanding of the criteria for

24   becoming emergency legislation?

25            MR. SWEETEN:  Objection, speculation.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1         A.   My thought is that it's an item that needs

2     immediate attention.

3         Q.   (By MS. WESTFALL)   Turning back to the

4     newsletters that were sent to the constituents regarding

5     HB 112 that you just testified about, could you describe

6     the substance of that communication?

7              MR. SWEETEN:   I'm going to instruct you

8     not to provide and reveal information regarding the

9     substance of correspondence between Representative

10    Harless's office and constituents.

11             MS. WESTFALL:   Just to clarify, you are

12    taking the position that communications sent in to a

13    large number of constituents, a mass form mailing, to

14    lots and lots of people, falls within legislative

15    privilege?  Is that right, Mr. Sweeten?

16             MR. SWEETEN:   Well, I mean, I think I've

17    been clear on the fact that if it's a public record,

18    including committee hearings, House Floor proceedings,

19    debates, public speeches, that sort of thing.  We're

20    talking about -- if you're asking about mass mailings, I

21    mean, there would probably be -- we'd have to have a

22    discussion.  Okay.  I think at this point, since -- if

23    you're talking about a mass mailing, we're going to

24    allow him to answer questions about that, because I

25    think that falls within, sort of, more of the public



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

92

1      record.

2               MS. WESTFALL:  And I believe he testified

3      it was a newsletter.  Have you produced those

4      newsletters in this litigation to us?  Are they on your

5      privilege log?

6               MR. SWEETEN:  We can check that.

7               MS. WESTFALL:  To extent that they haven't

8      been produced, since you're agreeing that they're not

9      privileged, I ask they be produced immediately.

10              MR. SWEETEN:  Okay.

11     Q.   (By Ms. Westfall)  And what was the substance

12     of communication regarding HB 112 in the newsletter you

13     just testified about?

14     A.   Okay.  The -- as I remember it, there was a --

15     I believe there was a newsletter which contained the

16     bills that we prefiled.

17     Q.   Did it describe HB '12?

18     A.   Briefly, yes, I think it did.

19     Q.   What did it say?

20     A.   I can't remember without -- I can't remember.

21     It briefly described that it was a -- I'm not going to

22     speculate.  I can't remember.

23     Q.   Did it talk about the purposes of HB '12?

24     A.   The basic purpose, yes, I think it did.

25     Q.   Do you recall what it said?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

93

1          A.    No, I don't.

2          Q.    Would it refresh your recollection to have that

3    document in front of you?

4          A.    You know, it might.  I can -- I believe it said

5    it was a photo identification bill.  It was a fairly

6    short newsletter briefly describing the bills that we

7    prefiled.

8          Q.    Was photo ID declared to be a legislative

9    emergency for the 82nd Legislature?

10         A.    Yes, it was.

11         Q.    Do you know how that decision was made?

12         A.    No, I do not.

13         Q.    Were you at all involved in that decision?

14         A.    No, I was not.

15         Q.    Did you attend any meetings regarding that

16   decision?

17         A.    No.

18         Q.    Did you see any written materials about that

19   decision?

20         A.    Other than the Governor's proclamation, no.

21         Q.    Did you receive any e-mail on that subject?

22         A.    News reports.

23         Q.    Are you aware of any communications in which

24   you were involved regarding declaring photo ID

25   legislative emergency in the 82nd Congress at which



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

94

1    Representative Harless was not present?

2        A.   Go back.  I'm sorry.

3        Q.   Sorry.  I'm going to strike that question,

4    because it was very long.

5             Are you aware of any communications

6    regarding declaring photo ID to be a legislative

7    emergency in which Representative Harless did not

8    participate?

9             MR. SWEETEN:  Objection, vague.  Go ahead.

10       A.   Okay.  Meetings where she did not -- meetings

11   that went on where she did not participate.  No, I'm not

12   may.

13       Q.   (By MS. WESTFALL) Why was voter ID a

14   legislative emergency?

15            MR. SWEETEN:  Objection, speculation.

16       A.   That would be speculating.  The Governor's

17   decision.

18       Q.   (By MS. WESTFALL)  What was the purpose of

19   declaring a legislative emergency?

20            MR. SWEETEN:  Same objection.

21       A.   I can't speak for to purpose.  I can tell you

22   what that effect is, but I can't speak to the purpose.

23       Q.   (By MS. WESTFALL)  Was any election set to

24   occur within the first 60 days of 2011?

25       A.   I'm sorry?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

95

1       Q.   Were there any elections scheduled to be held

2   in the first 60 days of the legislative session in 2011?

3       A.   I don't remember.

4       Q.   Are you aware of anything that made SB 14

5   urgent for the legislators' consideration in 2011?

6       A.   The concerns -- I mentioned it earlier when we

7   were talking about the intent of House Bill 112, the

8   concerns of -- regarding the integrity of the elections

9   process.

10      Q.   Is there any other reason why photo ID was such

11  a high priority for the Governor, that you're aware of?

12      A.   Not that I'm aware of.

13      Q.   Was Representative Harless the House sponsor of

14  SB 14?

15      A.   Yes.

16      Q.   And when did you learn that Representative

17  Harless would be the sponsor of the SB 14?

18           MR. SWEETEN:   Caution the witness not to

19  reveal communications between -- in the areas that I've

20  already described.   You can rely upon information

21  contained within the public record, as we have already

22  outlined as well.   Go ahead.

23      A.   I first learned she was going to be the House

24  sponsor in a press release from Chairman Bonnen,

25  B-o-n-n-e-n.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

COLBY BEUCK                                          MAY 14, 2012

96

 1         Q.   (By MS. WESTFALL)  When was that press release?

 2         A.   February, I believe.  I don't remember the

 3    date.  Some point in February.

 4         Q.   That was -- your testimony is, you had no idea

 5    she was sponsoring the bill until you saw a press

 6    release?

 7         A.   That was my first knowledge of it, yes.

 8         Q.   Did you have any communications at all

 9    regarding Representative Harless's sponsorship of SB

10    14?

11              MR. SWEETEN:  Can you read the question

12    back, please.

13              (The requested portion was read by the

14    court reporter.)

15              MR. SWEETEN:  Okay.  I'm going to instruct

16    the witness that to the extent -- and I'm going to

17    object to the question.  But to an extent that your

18    answer would reveal thoughts and opinions about

19    legislation or in furtherance of the legislative

20    process, do not reveal communications between

21    legislators and staff members, communications between

22    legislators and other legislators and their staff,

23    communication between constituents and legislative

24    staff, communications between legislative staff and

25    state agencies, including the Governor and Lieutenant



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

97

1      Governor's Office, and communications between

2      legislators' staff and the Texas Legislative Council.

3               To the extent you can answer it without

4      revealing those communications, you are free to do so.

5               MS. WESTFALL:  And Mr. Sweeten, to

6      clarify, you are not objecting to him testifying about

7      the fact that a communication occurred, because that is

8      not privileged, correct?

9               MR. SWEETEN:  Counsel, as this deposition

10     has proceeded, I have allowed you to establish the fact

11     of the communication, and I will continue to do so.

12               MS. WESTFALL:  Thank you.  Thank you.

13      Q.   (By MS. WESTFALL Can you answer my question?

14      A.   Yes.  Yes.  I did have communications.

15      Q.   How many?

16      A.   Less than ten.

17      Q.   When were those communications held?

18      A.   January, February of 2011.

19      Q.   Who was a party to those communications?

20      A.   Representative Harless.

21      Q.   Anybody else?

22      A.   Senator Fraser's office.

23      Q.   Are you referring to the staff person you

24     testified?

25      A.   Yes.  Yes.  Janice McCoy.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

98

1          Q.   Janice --

2          A.   Janice McCoy.

3          Q.   Were all ten of these discussions with --

4          A.   It wasn't exactly ten.

5          Q.   I'm sorry.  Were these discussions about

6     Representative Harless sponsoring SB 14 with

7     Representative Harless, you, and Ms. McCoy?  All of

8     them?

9          A.   No.  No.  No, that's not what I --

10         Q.   Maybe -- why don't we start with the first

11    communication about --

12         A.   Okay.

13         Q.   -- that you were involved in.

14         A.   My communications with Representative Harless.

15         Q.   And was that in January 2011?

16         A.   I would say January and February.

17         Q.   Were those communications in person?

18         A.   Yes.

19         Q.   Were those meetings in her office?

20         A.   Yes.

21         Q.   Were they all in her office?

22         A.   Yes, we did have -- I believe we had a phone

23    conversation as well.

24         Q.   Did you have any e-mail communication with

25    Representative Harless about her sponsorship of SB 14?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1          A.    Not that I remember.

2          Q.    Did you have any meetings with Representative

3     Harless and Ms. McCoy?

4          A.    Not that I remember.

5          Q.    Did you have any meetings just with Ms. McCoy?

6          A.    I had a phone conversation.

7          Q.    Did you only have one?

8          A.    At the most, two.  I can remember one.  I would

9     say at the most two.

10         Q.    When were these phone conversations?

11         A.    January and February.

12         Q.    How long were the phone conversations?

13         A.    Brief.

14         Q.    And just to make the record, Mr. Sweeten, what

15    were the conversations about?

16              MR. SWEETEN:   Objection.  Do not reveal

17    the content of those communications, to the extent it

18    would -- if it would implicate legislative privilege.

19    I'm going to instruct you not to answer that question.

20         Q.    (By MS. WESTFALL And what were the

21    conversations you had with Representative Harless about

22    regarding her sponsorship of SB 14?

23              MR. SWEETEN:   The same objection.  It

24    calls for him to reveal legislative privileged

25    information.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

COLBY BEUCK                                          MAY 14, 2012

                                                          100

1          Q.   (By Ms. Westfall)  Is it your testimony there

2     were no e-mail whatsoever regarding -- that you were

3     aware of or party to involving Representative Harless's

4     sponsorship of SB 14?

5          A.   Not that I remember.

6          Q.   Did you have any communications with the

7     Governor's Office, the Lieutenant Governor's Office,

8     regarding Representative Harless's sponsorship of SB 14?

9               MR. SWEETEN:  Again, don't reveal the

10    content of the conversation, but you can discuss if you

11    had such conversations with those offices.

12         A.   The Lieutenant Governor's Office.

13         Q.   (By MS. WESTFALL) Was it a staff person in that

14    office that you had the communication with?

15         A.   Yes.

16         Q.   Who was the staff person?

17         A.   Bryan, Bryan Hebert.

18         Q.   How many communications did you have with him?

19         A.   One.

20         Q.   When were these communications -- that

21    communication?  I'm sorry.

22         A.   February, January of 2011.

23         Q.   Was that a phone call?

24         A.   Yes.

25         Q.   What was it about?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1        A.    I can't speak to that without revealing --

2    without the privilege.

3               MR. SWEETEN:   Objection, it calls for him

4    to reveal matters that are legislative privileged.

5        Q.    (By MS. WESTFALL) Did you have any

6    communications with the Department of Public Safety

7    regarding SB 14 and Representative Harless's sponsorship

8    of that bill?

9               MR. SWEETEN:   Can you read that back?  I'm

10   sorry, I didn't get that whole question.

11              (The requested portion read back by the

12   reporter.)

13              MR. SWEETEN:   Don't reveal

14   communications.  You can reveal whether or not such a

15   conversation -- if a conversation at that time occurred.

16       A.    No.

17       Q.    (By Ms. Westfall)  Did you have any such

18   conversations with anyone from the Secretary of State's

19   Office?

20              MR. SWEETEN:   The same instruction.

21       A.    No.

22       Q.    (By Ms. Westfall)  Were you involved in the

23   development of drafting of SB 14?

24       A.    Yes.

25       Q.    Can you describe your role in development of


ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

COLBY BEUCK                                              MAY 14, 2012

102

1    SB 14?

2         A.   I was -- my responsibility was to research the

3    issue, review past legislation, and to work with the

4    Texas Legislative Council on of drafting the

5    legislation.

6         Q.   When did you start undertaking those

7    activities?

8         A.   With regard to Senate Bill 14?

9         Q.   Yes.

10        A.   I think that would have been late -- late

11   February.  When it was determined that Representative

12   Harless would be the sponsor, that's when I actually

13   started working on Senate Bill 14.

14        Q.   How did you come to have that responsibility

15   for developing SB 14?

16             MR. SWEETEN:  Don't reveal any

17   communications, but if you can do so without revealing

18   those, you can go ahead and answer the question.

19        A.   As her chief of staff, my responsibilities

20   include legislation.  That's my primary responsibility

21   during the legislative sessions, to help with her

22   legislative package.

23        Q.   (By MS. WESTFALL) Did you work with other staff

24   people or members in developing SB 14?

25        A.   Yes.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

COLBY BEUCK                                        MAY 14, 2012

                                                                    103

1       Q.   Who were those members or staff?

2       A.   The two previous staff I've mentioned with

3  Senator Fraser's office and the Lieutenant Governor's

4  Office.  I also had conversations with the Speaker's

5  office, Meredith Fowler.

6       Q.   What's her title with Speaker Straus?

7       A.   She's a policy analyst.  I don't know her

8  title.

9       Q.   Anybody else?

10      A.   Steven Schar is the committee clerk for the --

11 the Select Committee on Voter Identification.  I had

12 communications with him as well.

13      Q.   So how did the development work amongst this

14 group you just identified?

15           MR. SWEETEN:  Don't reveal the

16 communications that occurred between you and anyone in

17 those offices that you've mentioned, but to the extent

18 you can answer it without doing so, you can answer.

19           THE WITNESS:  Okay.

20      A.    The process, when it came over and the Senate

21 Bill 14 came over from the Senate, Representative

22 Harless was asked to be the House sponsor.  I then went

23 about my job of seeing the legislation, helping her with

24 moving the legislation through the process.

25      Q.   (By Ms. Westfall) Did you have any involvement



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

104

1    with SB 14 before it arrived in the House?

2         A.   No, I did not.

3         Q.   Did Representative Harless?

4         A.   Not to my knowledge.  I can't speak for her.

5         Q.   Are you aware of any discussions about how to

6    structure or draft the ID requirements or the allowable

7    forms of ID under SB 14?

8              MR. SWEETEN:  Don't reveal any

9    communications between the legislators or their staff in

10   answering this question.  If you -- go ahead.

11        A.   The -- I'm sorry.  Could you repeat it?

12        Q.   Certainly.

13        A.   It's the forms of identification, the

14   discussions behind which ones to --

15        Q.   (Nods head yes.)

16        A.   No, I'm not aware of it, not to my knowledge.

17        Q.   So you just got the bill from the Senate, and

18   you didn't talk about the forms of ID that were

19   required; is that right?

20             MR. SWEETEN:  Objection.  You're asking

21   him to reveal the communications.  You're asking him,

22   did he discuss the forms of ID, which is a

23   particularized conversation about Senate Bill 14;

24   therefore, I'm going to instruct him not to answer that

25   question.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

COLBY BEUCK                                          MAY 14, 2012

105

1      Q.   (By Ms. Westfall)  Who were the people who know

2  who could tell us about the ID -- strike that.

3           Other than the staff that you've just

4  listed, are there any other people who could -- with

5  information about the types of allowable forms of ID

6  that were considered to be included in SB 14 when it

7  arrived in the House?

8      A.   You're asking before it arrived in the House

9  who was involved in --

10     Q.   No, when it arrived in the House.

11     A.   Okay.  When it arrived in the House, who had --

12  the staff?

13     Q.   (Nods head yes.)

14     A.   Okay.  And you asked if there was anybody else?

15     Q.   (Nods head yes.)

16     A.   No.

17     Q.   Did you have discussions about the form of ID

18  to include in SB 14?

19           MR. SWEETEN:  I'm going to instruct him

20  not to answer that.  I think that you're asking him

21  about the specific communication which is legislatively

22  privileged.

23     Q.   (By Ms. Westfall) Are you aware of whether

24  Representative Harless had any discussions about the

25  forms of ID to include in SB 14?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

 1        A.   I can't -- I can't say that.  I can't speak for

 2    her.  I don't know.

 3        Q.   Are you aware of any written communications

 4    about the forms of ID that were included in SB 14?

 5        A.   Other than what was in the bill, no.

 6        Q.   There was no e-mail on this topic at all?

 7        A.   On the --

 8        Q.   Forms of ID to include in SB 14?

 9        A.   Not that I remember.

10        Q.   Who would know the answer to that question?

11        A.   I can't speak for other people.  I don't know.

12        Q.   Can you describe the drafting process for

13    SB 14?

14        A.   The bill, as it came over from the Senate,

15    there were several amendments that were added on in the

16    Senate.  The bill that we had in committee was -- was

17    the product of the Senate and their amendments on the

18    floor, and that -- that was the -- that was the drafting

19    process, was rolling those -- those amendments in.

20        Q.   So that was kind of like technical in nature?

21        A.   Technical, yes.  And there were also changes

22    that we had made.

23        Q.   Did you have communications with the

24    Legislative Council back and forth with drafts of SB 14

25    when it arrived in the House?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

COLBY BEUCK                                                    MAY 14, 2012

                                                                        107

1       A.   Yes.

2       Q.   How many drafts did you exchange?

3       A.   Two to three.

4       Q.   When were those drafts exchanged?

5       A.   February.

6       Q.   Who was the person at the Legislative Council

7    with whom you communicated?

8       A.   Jennifer is her first name, I believe.

9       Q.   Jennifer Jackson?

10      A.   Yes.  Thank you.

11      Q.   She was the sole person you had communications

12   with at the Council?

13      A.   Yes.

14      Q.   Were the other staff people you just listed

15   earlier involved in those communications as well; i.e.,

16   Ms. McCoy, staff from the Lieutenant Governor's Office,

17   staff from Speaker Straus's office?

18      A.   Were they involved in my communications with --

19   no.  It was my communicating with Jennifer.

20      Q.   So the two of you were the sole parties to

21   those drafts; is that correct?

22      A.   Yes.

23      Q.   Did Representative Harless look at these

24   drafts?

25      A.   Yes.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

COLBY BEUCK                                              MAY 14, 2012

108

1      Q.   Was she part of communications with

2   Ms. Jackson?

3      A.   No.  I was the -- I was the point of contact

4   with Council.

5      Q.   What were the changes that were made through

6   the drafting process with the Council?

7      A.   The changes that Council made in the various

8   drafts?  Is that you're asking?

9      Q.   Yes.

10     A.   I don't remember the specific changes that were

11  made.  I know there were at least two drafts.

12     Q.   Did you play any role before -- you may have

13  testified about this earlier, but please remind me.  Did

14  you have any role in the development of SB 14 before it

15  arrived in the House?

16     A.   No.

17     Q.   So you not do any research to figure out how to

18  craft that bill as it originated in the Senate; is that

19  correct?

20     A.   No.  That was for the Senators and -- no.

21     Q.   Did you conduct any research when it arrived in

22  the House, in terms of looking to other states' models?

23  Doing any other research?

24     A.   Yes.

25     Q.   Could you tell me about that research.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

109

1       A.   The research fell in line with my research on

2   House Bill 112.   It involved looking to other states,

3   Georgia, Indiana, researching legal opinions.

4       Q.   What sort of legal opinions?

5       A.   Specifically the Indiana case.

6       Q.   Did you read Crawford, the Crawford decision?

7       A.   Yes.  Yes.

8       Q.   Did it cause you to change any of the drafting

9   of the bill, SB 14?

10          MR. SWEETEN:   I'm going to object to that.

11  I think that calls for his thought process in how he

12  reacted to the Crawford decision, et cetera.  I think

13  that's out -- I think that is legislatively privileged,

14  so I'm going to instruct him not to answer that

15  question.

16      Q.   (By Ms. Westfall)  Did you have any

17  communications with any interest group about SB 14 as

18  you were developing it?

19      A.   No.

20      Q.   Did you have any communications with any

21  lobbyist?

22      A.   No.

23      Q.   Did you have any communications with other

24  legislators or staff, who you haven't already testified

25  about, in developing SB 14?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

110

1              MR. SWEETEN:  Don't reveal any

2      communications in that category.  You can reveal whether

3      or not you've had discussions with individuals and other

4      staff.

5          A.   It was -- could you repeat the question?  I'm

6      sorry.

7          Q.   (By Ms. Westfall)Did you have any

8      communications with any interest groups or constituents

9      regarding the development of SB 14?

10             MR. SWEETEN:  The same instruction.

11             THE WITNESS:  Is that a different --

12         Q.   (By Ms. Westfall)  Answer that question,

13     please.

14         A.   Okay.  Constituents regarding the development

15     of SB 14?  No.

16         Q.   Did you have any communication with the

17     American Legislative Exchange Council?

18         A.   No.

19         Q.   Did you have communications with any experts on

20     the topic of voter ID in developing SB 14?

21         A.   And experts?

22         Q.   Any people from outside the state who write or

23     think about voter ID.

24         A.   No, I didn't have any discussions.

25             MS. WESTFALL:  Could you mark this is



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

111

1    Exhibit 5.

2              (Exhibit 5 marked for identification.)

3        Q.   (By Ms. Westfall) I'm handing you what's been

4    marked as U.S. Exhibit 5.  Do you recognize this?

5        A.   It appears to be Senate Bill 14.  I'm not --

6    Senate Bill 14 as it was signed by the Governor.

7        Q.   Was this a different form of the bill from what

8    was received in the House?

9        A.   Yes.

10       Q.   What were the differences?

11       A.   Would you like me to go through the bill?

12       Q.   Well, the major differences.

13       A.   The major differences.  Okay.

14       Q.   The major differences.

15       A.   The Section 1 has to do with the disability

16   exemption.  As that came over from the Senate, the

17   standard was different.  I believe it was based on a

18   physician's note.  And in the version as it was signed

19   by the Governor, there is a written documentation from

20   the Social Security Administration or Department of

21   Veterans Affairs.

22              The -- I believe in the Senate bill, the

23   concealed handgun license, there was no language

24   regarding the expired -- the House added the language

25   regarding the -- that it's not expired 60 days before



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

112

1      the date of presentation.

2              The exemption for the religion objection

3      was worded -- I believe was worded differently in the

4      Senate's version of the bill.

5              The natural -- excuse me -- the natural

6      diaster language contained -- the final version of the

7      bill was added in the House, so that was not contained

8      in the Senate's version of the bill.

9              The language on the election

10     identification certificate was not in the Senate's

11     version of the bill.  I might have missed some, but from

12     my reading through the bill, those are the ones I

13     remember right now.

14        Q.   Thank you.

15              Going back to your development of SB 14,

16     did you have any communications with any groups

17     representing minority voters in developing SB 14?

18        A.   Can you repeat that?

19              MS. WESTFALL:  Could you read back the

20     question please, sir.

21              (The requested portion was read by the

22     court reporter.)

23              MR. SWEETEN:  Don't reveal the substance

24     of any communication.  You can answer, identify the fact

25     of the communication.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

113

1          A.    Yes.

2          Q.    (By Ms. Westfall) What were those groups?

3          A.    I believe we received communications from -- it

4    was either LULAC or MALC, and as well as the -- those

5    are the ones I remember.

6          Q.    Are you talking about MALDEF?

7          A.    I'm sorry.  MALDEF.

8          Q.    And were any steps taken in response -- in

9    drafting SB 14, in response to those communications?

10         A.    I don't remember the nature of the

11   communications, so I can't say.

12         Q.    So you're --

13         A.    But I do remember we were -- we were contacted

14   by them.

15         Q.    Did you receive written communications?

16         A.    I don't remember.  I know there was

17   communication.  I believe there was an office visit from

18   an individual.

19         Q.    Do you recall one visit from someone from

20   MALDEF?

21         A.    Yes.

22         Q.    Do you recall who that person was?

23         A.    No, I don't.

24         Q.    Do you recall when that meeting took place?

25         A.    No, I don't.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

COLBY BEUCK                                                    MAY 14, 2012

114

1       Q.   Do you recall whether it was Luis Figueroa?

2       A.   I can't remember.

3       Q.   Were you at that meeting?

4       A.   The office visit, I don't remember.

5       Q.   Who was at that meeting, besides the

6    representative from MALDEF and the representative?

7       A.   I don't remember.

8       Q.   And sitting here today, you can't recall

9    whether any steps were taken in response to that meeting

10   with regard to the development of SB 14; is that right?

11      A.   I don't.

12      Q.   You don't recall?

13      A.   I don't recall.

14      Q.   You can't identify any steps, in other words,

15   that were taken in response to that?

16              MR. SWEETEN:  Objection, argumentative.

17      Q.   (By Ms. Westfall)  You may answer.

18      A.   I don't recall the specifics of the

19   communication; therefore, I can't speak to what was

20   changed.

21      Q.   And Representative Harless is the only person

22   who would be able to speak to that; is that right?

23              MR. SWEETEN:  Objection as to -- you don't

24   have to answer that question.

25              MS. WESTFALL:  What's your basis?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

115

1          MR. SWEETEN:  The basis is, you're asking

2     him to say, will Representative Harless answer that

3     question, and how would he possibly --

4          MS. WESTFALL:  I said, is she the only

5     person who would know, and that goes to the motion to

6     compel which we will file.

7          MR. SWEETEN:  Okay.  I'm going to go

8     ahead, and I'll let you answer the question, but I'm

9     going to object to the question for speculation.  Go

10    ahead.

11    A.   I don't know.  I can't --

12    Q.   (By Ms. Westfall)  Turning back to Exhibit 5,

13    SB 14, how was the decision reached on the forms of ID

14    to include in SB 14 on the House side?

15         MR. SWEETEN:  Objection.  Don't answer the

16    question.  That calls for him to provide thoughts and

17    opinions about legislation in furtherance of the

18    legislative process and is legislatively privileged.

19    Q.   (By Ms. Westfall)  Did you conduct or

20    Representative Harless conduct any analysis to determine

21    what forms of ID to include in SB 14 when it came to the

22    House?

23         MR. SWEETEN:  Objection, compound.

24    Q.   (By Ms. Westfall)  You may answer.

25    A.   I can answer for myself, and yes, I did look at



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

116

1       forms of identification.

2           Q.    What analysis did you conduct?

3           A.    In my research on voter identification issues,

4       there were different forms of identification out there,

5       and they were considered.

6           Q.    So you looked at -- as you testified earlier,

7       you looked at Georgia and Indiana; is that correct?

8           A.    Correct.

9           Q.    Did you look to previous iterations of voter ID

10      in the House or Senate?

11          A.    Correct.

12          Q.    Which previous iterations did you look to?

13          A.    In my research on the issue, I looked at -- I

14      believe I looked at 2007, 2009.

15          Q.    Could you describe the forms of ID that are

16      acceptable under Senate Bill 14?

17          A.    Acceptable forms of identification would be a

18      driver's license, an election identification

19      certificate, a personal identification card issued by

20      DPS.  Those are DPS issued identification.  Next would

21      be a military identification card.  A United States

22      citizens certificate, a United States passport, and a

23      license -- concealed carry license.

24          Q.    Were any other forms of ID considered during

25      the drafting and development of SB 14 on the House side?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1          MR. SWEETEN:  Objection to the question.

2     You're asking him to reveal thoughts and opinions about

3     what was considered in formulating this legislation.  It

4     also calls for speculation.

5          So I'm going to instruct you, if you can

6     answer based upon your own personal knowledge, but I

7     don't want you to reveal any communications between any

8     of the categories that we've been discussing today.

9     A.   In the committee and on the House floor, there

10    were, I believe, a few other forms of identification

11    that were discussed and brought up as a --

12         MR. SWEETEN:  Let me be clear also.  To

13    the extent -- and I want to be consistent that this --

14    I'm not including in this instruction matters of public

15    record, including committee hearings or House Floor

16    debates, so that is not included in that instruction.

17    Q.   (By Ms. Westfall)  My question is limited to

18    the time when the House received SB 14, to the time the

19    committee considered it.

20    A.   Okay.

21    Q.   Were any other forms of ID considered in the

22    development to be added to SB 14?

23         MR. SWEETEN:  Same objection.

24    A.   I think if I answer that, that's going to be

25    privileged.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

COLBY BEUCK                                    MAY 14, 2012

                                                             118

1            MR. SWEETEN:  Elizabeth, I'm sorry, I've

2       got to go to take a break.

3            MS. WESTFALL:  Absolutely.  By all means.

4       Let's take a break.  Do you want to do lunch?

5            (Lunch recess from 12:53 to 1:51 p.m.)

6       BY MS. WESTFALL:

7       Q.   I believe we were talking about U.S. Exhibit

8       Number 5, SB 14.

9       A.   Yes.

10      Q.   During consideration and development of SB 14,

11      did you consider allowing the use of expired forms of

12      ID?

13      A.   During the development, after it came over from

14      the Senate, did I consider other -- expired forms of

15      identification?

16      Q.   Yes.

17      A.   The --

18           MR. SWEETEN:  Hold on a second.  I'm going

19      to object.  I think to the extent that this requires him

20      to reveal thoughts and opinions about legislation or in

21      furtherance of the legislative process, I think that

22      this is potentially legislatively privileged.

23           If you're asking him in the drafting

24      stage, as he's drafting this, was that considered his --

25      as he looking at it?  I can let him answer as to that,


ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

COLBY BEUCK                                    MAY 14, 2012

119

1    but don't reveal any -- you're not to reveal your
2    thought process or any communications surrounding that
3    issue.  Go ahead.
4              MS. WESTFALL:  So just to be clear, you're
5    directing him not to answer as to communications he had
6    with Representative Harless, other staff, other
7    legislators regarding expired forms of ID?
8              MR. SWEETEN:  Yeah.  I'm absolutely
9    instructing him not to answer with respect to the
10   conversations that he's had with any of those
11   individuals or any of them that I've named.  And so I
12   guess to the extent that you can answer her question
13   without revealing that information, you can do so.
14        A.   The -- the issue of expired licenses, that --
15   yes, that was something that was -- I thought of.
16        Q.   (By Ms. Westfall)  And it wasn't included in SB
17   14 as enacted by the House; is that right?
18        A.   That's correct.
19        Q.   Turning your attention to Exhibit 5 --
20        A.   Well, some expired are, I mean, past 60 days.
21   Sorry to interrupt.
22        Q.   Right.  And you testified earlier that HB 112
23   allowed for forms of I.D. that had expired two years
24   earlier; is that correct?
25        A.   I believe -- yes, I believe that's what's in



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

COLBY BEUCK                                                    MAY 14, 2012

120

1     112.

2         Q.    So why the change in Representative Harless's

3     position from HB 112 to SB 14?

4              MR. SWEETEN:   Don't answer as to Harless's

5     position.  We're not here to answer on what Harless's

6     position is.  That's legislatively privileged.  So don't

7     answer that question.

8              THE WITNESS:   Okay.

9         Q.   (By Ms. Westfall)  Turning your attention back

10    to SB 14, can you tell me how the -- how it came to be

11    included, the license to carry a concealed handgun, why

12    was that a form of acceptable ID?

13             MR. SWEETEN:   Hold on.  You're asking

14    about the thought process of the development of this

15    legislation.  This witness cannot provide that

16    information.  It's legislatively privileged for him to

17    talk about any conversations he's had or the thought

18    process or opinions about the legislation.  So I think

19    your -- your question invades the legislative privilege

20    as phrased.

21        Q.   (By Ms. Westfall)  Who were the persons who

22    would know about the development and inclusion of that

23    form of ID in SB 14?

24        A.    The concealed handgun license?

25        Q.    Yes.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

COLBY BEUCK                                                    MAY 14, 2012

121

1        A.    That was a Senate floor amendment.  I believe

2    Senator Hinojosa offered that amendment.

3        Q.    To the Senate bill?

4        A.    Correct.

5        Q.    Why was it included on the Senate, do you know?

6              MR. SWEETEN:  Objection.  I think that

7    that asks for him to speculate as to what -- why the

8    Senate included it.  It also invades the legislative

9    privilege protections, and he doesn't have to provide

10   that information.

11       Q.    (By Ms. Westfall)  Do you know anything else

12   about the -- that was in the public record about why

13   license to carry licenses were included as allowable ID?

14             MR. SWEETEN:  You can answer.  It's of

15   public record.

16       A.    Okay.  I don't remember the debate, just -- the

17   specific part of that debate.  It was a lengthy debate,

18   but beyond that, it was Senator Hinojosa.

19       Q.    (By Ms. Westfall)  What was the purpose of

20   including the license to carry ID as an allowable form

21   of ID in SB 14?

22             MR. SWEETEN:  I'm going to object to

23   that.  You're asking for matters that are legislatively

24   privileged.  You're also asking him to speculate as to

25   the intent of individuals who passed Senate Bill 14.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

122

1      That's outside of what he's able to testify about, and

2      it's privileged.

3                  MS. WESTFALL:  Just to be clear,

4      Mr. Sweeten, the purpose of -- questions about the

5      purpose of particular provisions of SB 14 are privileged

6      according to your client?

7                  MR. SWEETEN:  What I'm saying is that you

8      asked him to speculate as to what the purpose was when

9      Senate Bill 14 came over to the House.  You're asking

10     him to go into the mindset of what those senators --

11     what their thought process was.  So on two points, one,

12     it's asking for speculation.  You're calling for

13     speculation for him to do so.

14                 MS. WESTFALL:  But you're not instructing

15     the witness --

16                 MR. SWEETEN:  Secondly --

17                 MS. WESTFALL:  -- not to answer on that

18     basis.

19                 MR. SWEETEN:  Secondly, I do believe that

20     it invades -- it asks him to reveal thoughts and

21     opinions about legislation or in furtherance of the

22     legislative process.  I think it does that.  So I --

23     with respect to that issue, I'm going to instruct him

24     not to answer that question.

25                 MS. WESTFALL:  Okay.  Just to be clear, I



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

COLBY BEUCK                                              MAY 14, 2012

123

1      believe earlier in this deposition, you've allowed him

2      to answer questions regarding purpose, have you not?

3               MR. SWEETEN:   You asked him specifically

4      about what -- I don't know that you said the word

5      "purpose," so we'll have to look at the transcript.   But

6      I think you asked him about what he did when he was

7      drafting the bill and other matters that were within his

8      purview when he was looking at the bill.

9                      That's a different thing than asking

10     him with a final -- with a Senate Bill 14 coming over

11     from the Senate, it's a completely different thing for

12     you to ask him to glean what the purpose of that bill

13     was.

14          Q.   (By Ms. Westfall)   Do you know the racial

15     composition of Texans who have license to carry

16     licenses?

17          A.   No, I do not.

18          Q.   Do you know whether anyone in the legislature

19     or their staff looked into that issue in considering SB

20     14?

21          A.   No, I do not.

22          Q.   Do you know whether holders of these licenses

23     are disproportionately White relative to Texas

24     registered voters?

25          A.   I don't have -- I don't know.   I don't have



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

124

1    information on that.

2         Q.   Do you know whether anyone in the legislature

3    or their staff looked into that issue when considering

4    whether to include license to carry as a form of

5    allowable ID in SB 14?

6              MR. SWEETEN:  I'm going to let you answer

7    that, but do not reveal conversations you've had with

8    other legislators, legislative staff, or any

9    conversations you've had with Representative Harless or

10   any state agencies, including those that I've enumerated

11   before.

12        A.   I can't speak for other offices and their

13   research that they did when this amendment was offered

14   in the Senate.

15        Q.   (By Ms. Westfall)  But answering my question,

16   do you know whether anyone looked into that issue of

17   racial composition of those licensed holders?

18        A.   No, I can't --

19        Q.   You don't know?

20        A.   I don't know.

21        Q.   Are you aware of any discussions with

22   legislators or staff expressing concern or opinions that

23   including this form of ID might disproportionately favor

24   White voters?

25             MR. SWEETEN:  Don't reveal any



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

125

1      conversations you've had as enumerated previously.  I

2      can list those if you're not familiar with what I'm

3      telling you, but don't list the -- do not discuss

4      communications you've had with staff members,

5      legislators or the other entities.

6            A.    Conversations regarding CHL license and the --

7      I'm sorry?

8                  MS. WESTFALL:  Could you read back the

9      question, please?

10                 (Requested portion read back by the court

11     reporter.)

12                 MR. SWEETEN:  I'm going to instruct you

13     not to answer the question based upon the legislative

14     privilege.  I will allow you to discuss matters of

15     public record in answering this question.

16           A.    Okay.  And no, I don't remember any

17     conversations.

18           Q.    (By Ms. Westfall)  Was there anything on the

19     public record about the discussion of the racial

20     composition of people who hold license to carry licenses

21     in Texas?

22           A.    I don't remember from the Senate debate.

23           Q.    Was there anything in the House debate?

24           A.    I don't remember that issue coming up.

25           Q.    Turning your attention back to SB 14, how did



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

126

1        the disability exception that you testified about

2        earlier arose -- arise?

3                MR. SWEETEN:  Don't reveal communications

4        that you've had with any of the legislative staff,

5        legislators, state agencies, constituents.

6            A.   How did the initial language, the initial --

7        this was also an amendment placed on the Senate -- an

8        amendment from the Senate, a floor amendment, and in our

9        committee substitute, we -- we -- we made some

10       modifications to the disability exemption.

11           Q.   (By Ms. Westfall)  Do you know whether the

12       disability exemption was included in SB 14 in response

13       to any concerns that were raised about the bill?

14               MR. SWEETEN:  Don't reveal any

15       conversations you've had.  You can testify as to the

16       public record.

17           A.   I -- I can't say.  Senator Patrick offered that

18       amendment, and I can't speak for his office.

19           Q.   (By Ms. Westfall)  With regard to SB 14, how

20       did the exception regarding religious objections to

21       photo IDs arise?

22               MR. SWEETEN:  Don't testify as to any

23       conversations that you've had with respect to this.  You

24       can testify as to matters revealed in the public record.

25           A.   I believe that exemption came from another



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

COLBY BEUCK                                                    MAY 14, 2012

127

1    Senate floor amendment.  I can't remember the author of

2    that amendment.

3         Q.   (By Ms. Westfall)  Was that exemption not put

4    in, in the conference committee of SB 14?

5         A.   The religious exemption?

6         Q.   Yes.

7         A.   I believe it's in the -- yes, it's in the

8    final.

9         Q.   But was it inserted during conference?

10        A.   The language was -- I believe there were a few

11   changes to that language, but as a whole, it was kept

12   throughout the process after it was put on in the

13   Senate.

14        Q.   Do you know whether putting in that exemption

15   was in response to any concerns that were raised?

16             MR. SWEETEN:  Don't reveal the thought

17   process revealed within conversations.  You can testify

18   as to matters within the public record.

19        A.   Concerns, when you mentioned -- when you say

20   "concerns," are you -- can you elaborate on that, or is

21   that just concerns from --

22        Q.   (By Ms. Westfall)  Was the religious

23   exemption or -- that was included in SB 14, included

24   because there were concerns expressed by any outside

25   group, constituent, et cetera, that you're aware of?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

128

```
 1              MR. SWEETEN:  You can testify as to
 2     matters of the public record.  Don't reveal
 3     conversations.
 4          A.   Okay.  I don't remember the Senate debate when
 5     that amendment came up.  Senator -- I think it was
 6     Senator Duncan, I'm not a hundred percent sure on that,
 7     offered that amendment, but I do not remember the
 8     justification for placing it in there.
 9          Q.   (By Ms. Westfall)  SB 14 includes military ID
10     as a form of appropriate identification, does it not?
11          A.   Yes.
12          Q.   What does that mean?
13              MR. SWEETEN:  Objection, asked and
14     answered.
15          Q.   (By Ms. Westfall)  You may answer.
16          A.   I'm sorry.  I missed that.
17              MR. SWEETEN:  Just asked and answered.
18     You can go ahead and answer her question.
19          A.   Okay.  The -- that shows up in Section 36.0101
20     and the United States military identification
21     card.  You're asking what does that include?  I think
22     that's the language speaks for itself.
23          Q.   (By Ms. Westfall)  Actually, it really
24     doesn't.  Do you have any specific information about
25     what types of cards or the providence of such cards?
```



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

COLBY BEUCK                                                MAY 14, 2012

                                                                    129

1          A.   Beyond the text of the bill, no.

2          Q.   Did you have any discussion with Representative

3    Harless or any other staff or legislators concerning how

4    to define military ID under SB 14?

5               MR. SWEETEN:  Don't reveal the substance

6    of discussions.

7          A.   Yes.

8          Q.   (By Ms. Westfall)  When were those

9    discussions?  When did they take place?

10         A.   The summer of 2011.

11         Q.   That was after the bill was passed?

12         A.   Correct.

13         Q.   Who was involved in those discussions?

14         A.   Representative Harless and myself.

15         Q.   Just the two of you?

16         A.   In that instance, yes, Representative Harless

17   and myself.

18         Q.   Was there more than one conversation?

19         A.   Yes.

20         Q.   And how many other conversations?

21         A.   I'm going to say less than five.

22         Q.   Was this related to any legislative act?

23              MR. SWEETEN:  Objection to the question as

24   vague.  I also am going to tell you, don't reveal the

25   substance of any discussions that you've had with



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

130

1      Representative Harless, any other legislator or any
2      other staff member.
3          Q.   (By Ms. Westfall)  This was after the bill was
4      signed into law, was it not?
5          A.   Correct.
6          Q.   So you had more than -- you had a handful of
7      conversations with Representative Harless about military
8      IDs, correct?
9          A.   Yes.
10         Q.   And it was you and Representative Harless for
11     at least one of those conversations; is that right?
12         A.   For those conversations, yes.
13         Q.   Was this an in-person conversation?
14         A.   A telephone conversation.
15         Q.   Who were the parties to the other conversations
16     about military ID in the summer of 2011?
17         A.   I had a conversation with the Secretary of
18     State's Office.
19         Q.   Was that just between you and the Secretary of
20     State --
21         A.   Yes.
22         Q.   -- office?  Who in that office did you talk to?
23         A.   At that time, John Sepehri, I believe, that's
24     who was working with.
25              THE REPORTER:  Sorry.  What was that last



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1     name?

2              THE WITNESS:  Sepehri is how you pronounce

3     it.  I'm not sure on the spelling.

4              MR. FREDERICK:  S-e-p-e-h-r-i.

5        Q.   (By Ms. Westfall)  When you -- what prompted

6     your conversation with Representative Harless about

7     military IDs?

8              MR. SWEETEN:  Don't reveal it if it

9     relates to any conversations you've had with any of the

10    enumerated people.  You can answer it if it does not do

11    that.  Okay?

12       A.   Okay.  I think that's part of the privilege.

13       Q.   (By Ms. Westfall)  So you can't answer?

14       A.   What prompted me to look into this issue, that

15    would be.

16       Q.   Does that answer apply to questions that I have

17    about the other conversations that you've had with

18    Secretary of State's office about military ID?

19       A.   What prompted me to contact the Secretary --

20    yes.

21       Q.   Yes.

22       A.   Yes.

23       Q.   When you were drafting SB 14 and developing it

24    in the House side, did you assess the number of forms of

25    military ID that would be included in the bill?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

132

1      A.   No.

2      Q.   Did you believe that the forms of military ID

3 would be easily recognizable by poll workers?

4      A.   I believe that was the testimony or the

5 thought.

6           MS. WESTFALL:  Mr. Sweeten, could you

7 explain why you have directed the witness not to testify

8 about conversations related to SB 14 that occurred after

9 its enactment?

10          MR. SWEETEN:  Yeah.  Conversations that

11 occurred after the enactment of Senate Bill 14 that

12 discuss the Senate Bill 14 process, as well as the

13 legislative process in enacting it, are just as I said

14 earlier today, we're asserting that those are

15 privileged.

16          As to conversations that don't relate

17 to the passage development of Senate Bill 14, you know,

18 he can answer those questions.  I haven't stopped you

19 from doing that.  But as they relate back to the process

20 by which Senate Bill 14 was passed, I'm instructing him

21 not to answer those questions.

22      Q.   (By Ms. Westfall)  Now that you've heard from

23 your counsel, Mr. Sweeten, on his position on the

24 privilege, do you want to amend or clarify any of the

25 responses that you've given today in answer to any of my



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

133

1     questions?

2          A.    I'm sorry.   The --

3          Q.    Mr. Sweeten has explained a distinction about

4     conversations concerning the development of SB 14 that

5     occurred after --

6          A.    Post passage, if it involves Senate Bill 14, is

7     that --

8          Q.    Correct.   Do you want to amend any of the

9     answers to any of the questions that I've asked?

10         A.    Not that -- no.

11         Q.    Okay.   Why does Senate Bill 14 include military

12    ID and not student ID?

13              MR. SWEETEN:   Objection.   I think that

14    calls for matters that are legislatively privileged.

15    They also impact conversations that occurred regarding

16    the bill that are not a public matter.

17              He can testify as to the public

18    hearing, the public aspects of this case, including

19    committee, et cetera, but not to the matters that are

20    nonpublic.

21         A.    The -- the debate in committee and on the

22    floor, these forms of identification were chosen because

23    they were readily identifiable and secure.

24         Q.    (By Ms. Westfall)   Aren't there many, many

25    forms of military IDs?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

COLBY BEUCK                                                    MAY 14, 2012

134

1          A.   I -- I'm not advised.  I don't --

2          Q.   Do you know or do you not know?

3               MR. SWEETEN:  Objection, asked and

4     answered.

5          Q.   (By Ms. Westfall)  You may answer.

6          A.   I don't know.

7          Q.   Why is it that Senate Bill 14 that

8     Representative Harless carried does not include nonphoto

9     ID as acceptable ID?

10              MR. SWEETEN:  Objection.  I think that

11    you're asking him to reveal conversations that relate --

12    that would be legislatively privileged, conversations

13    that we've enumerated before.

14                   And to the -- so I'm going to object

15    to the extent that those conversations reveal thoughts

16    and opinions about legislation or in furtherance of the

17    legislative process, that I'm instructing him not to

18    answer those questions.

19         Q.   (By Ms. Westfall)  Do you have any -- any

20    response to that question that is not -- that is outside

21    the privilege that your counsel is asserting?

22         A.   Why photo identification, is that --

23         Q.   Why SB 14 did not include nonphoto ID as

24    acceptable ID?

25              MR. SWEETEN:  Again, you can testify as to



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

135

1    the public record.  Don't reveal conversations,

2    communications, that we've enumerated.

3         A.   Photo identification is -- is -- further

4    strengthens the -- the ability of the poll workers to

5    verify these people are who they say they are.

6         Q.   (By Ms. Westfall)  So you testified earlier

7    that Representative Harless filed the bill in November

8    2010 that included nonphoto ID as acceptable ID, did she

9    not?

10        A.   That's correct.

11        Q.   Why did she change her position in the

12   intervening months between when she filed HB 112 in

13   November 2010 and when she started carrying SB 14 at the

14   beginning of 2011?

15             MR. SWEETEN:  Objection, speculation.

16   Objection.  It calls for him to provide matters that are

17   legislatively privileged, reveal -- potentially reveal

18   conversations with Representative Harless.

19             To the extent that you can answer that

20   based upon the public record, you can do so.

21        Q.   (By Ms. Westfall)  Can you provide any

22   testimony in response to my question given your

23   counsel's instruction?

24        A.   No.  I think that would be within the

25   privilege.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

COLBY BEUCK                                                    MAY 14, 2012

136

1        Q.   Did you have any discussions with anyone other

2   than Representative Harless about why there was such a

3   shift between HB 112 and SB 14 in terms of allowable

4   forms of identification?

5             MR. SWEETEN:   Court reporter, could you

6   please read that question back?

7             (Requested portion read back by the court

8   reporter.)

9             MR. SWEETEN:   I'm going to instruct you

10  not to reveal discussions with legislators, with staff

11  members, with any members of state agencies, with the

12  Texas Legislative Council, other staffers.  Those are

13  legislatively privileged.  Do not reveal those.

14  However, if you can answer her question based upon the

15  public record, I will allow you to do so.

16       Q.   (By Ms. Westfall)  Do you have any response

17  in -- in response -- any testimony in response to my

18  question given your counsel's instruction?

19       A.   No.  I did not have any -- I did not have

20  conversations.

21       Q.   You did not have conversations with

22  Representative Harless about why she changed your

23  position, is that your testimony?

24       A.   No, that's not my testimony.  You -- this -- my

25  understanding was that your question was about people



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

COLBY BEUCK                                          MAY 14, 2012

137

 1    outside of Representative Harless.

 2         Q.   Okay.  So to the extent that it was public, did

 3    not involve staff, did not involve legislators, you did

 4    not have conversations about why there was a shift in

 5    allowable forms of ID from HB 112 to SB 14; is that

 6    right?

 7         A.   Correct.

 8              MR. SWEETEN:  Don't reveal any

 9    conversations you've had with Representative Harless

10    regarding that issue.

11              THE WITNESS:  Okay.

12         Q.   (By Ms. Westfall)  Did you have any discussions

13    outside of the legislature with anyone about the change

14    in the form of the bill from HB 112 to SB 14?

15         A.   No.

16         Q.   Did you have any conversations with any

17    constituents about the change in the bill -- bills?

18         A.   No.

19         Q.   Any groups?

20         A.   No.

21         Q.   Did you have any discussion with anyone in the

22    -- actually, strike that.

23              Did anyone in the media or the press ask

24    you or Representative Harless, any other staff or any

25    legislators, why -- why the bill changed from HB -- why


ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

138

 1    the forms of allowable ID changed from HB 112 to SB 14?

 2              MR. SWEETEN:  Objection, compound.

 3        Q.   (By Ms. Westfall)  You may answer.

 4        A.   Not that I remember.

 5        Q.   There was no scrutiny of that issue at all?

 6              MR. SWEETEN:  Objection to form, vague.

 7        Q.   (By Ms. Westfall)  You may answer.

 8        A.   Not that I remember.

 9        Q.   Is it your testimony here today that you don't

10    recall a single question about why the use of nonphoto

11    ID was included in HB 112 and not included in SB 14?  Is

12    that your testimony?

13              MR. SWEETEN:  Are you saying "media

14    question," because your last question --

15              MS. WESTFALL:  I'm saying any question.

16              MR. SWEETEN:  Any question from anyone?

17              MS. WESTFALL:  Correct.

18              MR. SWEETEN:  Don't reveal any constituent

19    questions or any questions between legislators,

20    legislative staff, TLC or state agencies in answering

21    that question.

22        A.   I -- I don't remember it.  If it happened, I

23    don't remember.

24        Q.   (By Ms. Westfall)  Why in your mind did the --

25    did SB 14 not include nonphoto ID?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1              MR. SWEETEN:  Don't reveal any

2     communications in answering that.  You can rely on the

3     public record, or if you can provide your personal

4     opinion, in your mind, as to that question.

5          A.   I mentioned it earlier.  I think it provides,

6     it strengthens the election workers' ability to prove

7     they are who they say they are when they come to vote.

8          Q.   (By Ms. Westfall)  Was there anything that

9     happened in the beginning of 2011 or end of 2010 that

10    prompted the legislature to feel there was a need for

11    stricter ID?

12             MR. SWEETEN:  Objection.  I think that

13    calls for legislatively privileged information.  And

14    don't reveal any sort of communication that was

15    discussed.  Don't reveal the -- don't reveal the

16    thoughts and opinions about legislation or furtherance

17    of the legislative process that you've learned through

18    communications.

19         A.   Anything that happened as far as -- that's

20    pretty broad.  Can you be more specific?

21         Q.   (By Ms. Westfall)  Was there -- were there any

22    changes in circumstance, any changes with regard to

23    election administration, any in-person voter fraud, any

24    decrease in public confidence at elections that you can

25    point to, that would cause the legislature to conclude



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

140

1      that it needed to introduce a legislation about nonphoto

2      forms of ID?

3                  MR. SWEETEN:  Same instruction.  Don't

4      reveal legislatively privileged information.

5           A.   Without revealing privileged communications, I

6      would say no.

7           Q.   (By Ms. Westfall)  So you testified earlier

8      that you drafted HB 112, correct?

9           A.   The --

10          Q.   At the request of Representative Harless; is

11     that right?

12                 MR. SWEETEN:  Objection, misstates prior

13     testimony.  And don't reveal conversations that you had

14     with Representative Harless.

15          A.   Okay.  The bill came over from the Senate.  Did

16     I have it drafted to -- I did have it drafted to

17     incorporate the Senate amendments, technical, and then

18     the changes that we made in the committee substitute.

19          Q.   (By Ms. Westfall)  Are you referring to HB 112

20     or SB 14?

21          A.   SB 14.

22          Q.   Okay.  Turning your attention to HB 112, you

23     drafted that --

24          A.   I'm sorry.  Was that -- yes.  Yes, I did.

25          Q.   -- at Representative Harless's request; is that




Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

141

1      correct?

2           A.    Yes.  Yes.

3           Q.    And it informs -- forms -- it included forms of

4      nonphoto ID, correct?

5           A.    That's correct.

6           Q.    Why was it included in HB 112 and not in SB

7      14?

8                 MR. SWEETEN:  Don't reveal legislatively

9      privileged information.  That includes all the

10     communications that we've talked about.  To the extent

11     you can answer based on your own personal knowledge,

12     I'll let you do that.

13                THE WITNESS:  Okay.

14                MR. SWEETEN:  Or matters of the public

15     record, okay?

16          Q.    (By Ms. Westfall)  Do you have any testimony in

17     response to my question?

18          A.    No.

19          Q.    Did you review the Georgia photo ID bill in

20     crafting, drafting or developing SB 14?

21          A.    Yes, I did in my research.

22          Q.    Are you familiar with the law?

23          A.    I am familiar with it.  I'm by no means an

24     expert.

25                MS. WESTFALL:  Would you mark this as U.S.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

COLBY BEUCK                                                    MAY 14, 2012

142

1       6?

2               (Exhibit 6 marked for identification.)

3           Q.   (By Ms. Westfall)  You've been handed U.S. 6.

4       Would you look at the document and tell me if you

5       recognize it?

6           A.   This appears to be a Georgia statute on photo

7       identification -- I'm sorry, on voter identification.

8           Q.   Have you seen this before?

9           A.   Yes.

10          Q.   When did you last review it?

11          A.   I'd say early 2011.

12          Q.   Given the list of IDs in the Georgia statute,

13      is it fair to say that SB 14 allows for a narrower range

14      of IDs that are allowable than does the Georgia statute?

15          A.    I would say it allows for a different, looks

16      like two different forms that the Senate bill does not.

17          Q.   What are those forms?

18          A.   A valid employee identification card, and then

19      a valid tribal identification card.

20          Q.   Do you know why SB 14 does not allow for

21      employee identification cards?

22              MR. SWEETEN:  I'm going to object.  I'm

23      going to instruct you not to answer to the extent that

24      it reveals any communications that you've had with

25      respect to any of the categories that we've previously



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1    talked about.  Do not reveal the thoughts and opinions

2    on legislation in furtherance of the legislative

3    process.  Okay?  If you can answer it based on matters

4    of public record, you can go ahead and do so.

5         A.   That issue was discussed on the House floor.  I

6    remember the debate.  And the concerns with employee

7    identification cards were standardization of the form

8    and security of the form, of the form of identification.

9         Q.   (By Ms. Westfall)  And do you know why tribal

10   IDs were not included?

11              MR. SWEETEN:  In Senate Bill 14, is that

12   the question?

13              MS. WESTFALL:  In Senate Bill 14.

14              MR. SWEETEN:  Okay.  I'm going to instruct

15   you not to answer unless based upon the public record.

16        A.   Similar concerns with readily identifiable and

17   a standardized readily identifiable form, from my

18   recollection of the debate.

19        Q.   (By Ms. Westfall)  Is it fair to say that there

20   are differences between the Georgia law and the Texas

21   law, Senate Bill 14?

22        A.   You can say there are differences.

23        Q.   Are you familiar with the Indiana photo ID law?

24        A.   Yes.

25        Q.   Are there any differences between SB 14 and the



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

144

1      Indiana law?

2           A.    I believe there are.

3           Q.    Do you know what they are?

4           A.    Without a copy of the Indiana law, I can't say

5      specifically.

6           Q.    Could you list each and every purpose for the

7      enactment of SB 14?

8                 MR. SWEETEN:  Don't answer that question,

9      other than unless you can do so based upon matters of

10     public record.

11                MS. WESTFALL:  Mr. Sweeten.

12                MR. SWEETEN:  Uh-huh.

13                MS. WESTFALL:  You have allowed repeatedly

14     him -- you've allowed this witness to answer that

15     question repeatedly on other topics during this

16     deposition.  Are you changing -- is this --

17                MR. SWEETEN:  I'm saying --

18                MS. WESTFALL:  Is your position on this

19     topic changing because we're now talking about SB 14?

20                MR. SWEETEN:  You're talking about a piece

21     of legislation.  You're asking him to glean and provide

22     information as to the legislative -- all the legislative

23     intent behind the passage of that.  He cannot do that.

24     It's legislatively privileged.

25                So I'm going to instruct him not to



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

145

1      answer that question because -- except for to the extent

2      it implicates matters of public record.

3           Q.   (By Ms. Westfall)  As to matters of public

4      record, tell me every single purpose you're aware of for

5      SB 14.

6           A.   To deter and detect voter fraud, to increase

7      voter confidence.

8           Q.   Anything else?

9           A.   Those are the ones I'm aware of.

10          Q.   Was any part of the purpose of SB 14 to

11     decrease the number of Hispanic voters?

12               MR. SWEETEN:  I'm going to instruct you

13     not to answer that question based on any conversations

14     you've had with legislators, with staff, with state

15     agencies, with anyone else in those enumerated

16     categories related to the legislative process.  I will

17     allow you to answer based upon matters of public record.

18          A.   No.  That was not a stated purpose for the

19     bill.

20          Q.   (By Ms. Westfall)  And are you asserting that

21     you can't answer that question based on advice of

22     counsel that that's privileged?

23               MR. SWEETEN:  I think you misstate his

24     answer.  I've allowed him to answer based only upon the

25     public record, and he's done so.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1          Q.    (By Ms. Westfall)  Are you aware of any -- the

2     existence of any conversations about decreasing the

3     number of Hispanic voters in SB 14?

4                MR. SWEETEN:  Other than matters of public

5     record, do not reveal any conversations you've had with

6     any legislator, legislative staff, state agency, Texas

7     Legislative Council or anyone else.  Okay?  You can

8     testify about matters of public record.

9                MS. WESTFALL:  Mr. Sweeten, are you

10    instructing him not to answer about the existence of

11    conversations, because that is depriving me of the right

12    to make my record on a privilege log basis.

13                MR. SWEETEN:  You are asking him --

14                MS. WESTFALL:  -- so we can move to

15    compel.

16                MR. SWEETEN:  -- the -- the preface of

17    your question is as to substance.

18                MS. WESTFALL:  Existence.

19                MR. SWEETEN:  You're asking him substance

20    of -- you're asking about him a topic, a specific

21    topic:  Are you aware of conversations regarding X

22    topic?  He can talk to you about individuals.  I've let

23    him today talk about individuals he's had discussions

24    with, dates of those, approximately.  Whether they were

25    by e-mail or in person.  I've let him do that.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

COLBY BEUCK                                           MAY 14, 2012

147

1              But you're now asking about him

2      substance of conversations, and he's not going to

3      provide substance of conversations.  That is

4      legislatively privileged.

5                   MS. WESTFALL:  You're instructing him not

6      to answer?

7                   MR. SWEETEN:  That's correct.

8         Q.   (By Ms. Westfall)  Are you aware of any

9      discussions or communications about the racial impact of

10     SB 14?

11                  MR. SWEETEN:  You can answer that question

12     to the extent it appears on the public record.  You

13     cannot -- I'm instructing you not to answer with respect

14     to matters that are conversations that we've enumerated

15     before that are legislatively privileged.

16        Q.   (By Ms. Westfall)  Do you have any testimony in

17     response to my question?

18        A.   The -- could you --

19        Q.   Are you aware of any communications regarding

20     the racial impact of SB 14?

21        A.    It was an issue that was discussed on the House

22     floor.

23        Q.   Those are the only discussions you're aware of;

24     is that correct, that you can testify about based on the

25     instructions of your counsel?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

COLBY BEUCK                                          MAY 14, 2012

148

1        A.    Yes.  And in the committee.

2        Q.    Are you aware of any discussions of SB 14 and

3    Hispanic voters?

4              MR. SWEETEN:  Confine your answer to

5    matters of the public record and committee hearing

6    testimony.  I'm going to instruct you not to answer

7    based upon the conversations that we've enumerated

8    because they're legislatively privileged.

9              Go ahead.

10       A.    Any discussions involving SB 14 and Hispanic

11   voters?  I believe that it was discussed in committee

12   and on the House floor.

13       Q.    (By Ms. Westfall)  Other than that, you're not

14   going to answer my question based on privilege?

15       A.    Correct.

16       Q.    Are you aware of anyone else who knows about

17   any communications regarding SB 14 and Hispanic voters?

18             MR. SWEETEN:  Don't reveal matters that

19   are legislatively privileged or implicate the

20   conversation or the categories of conversations that

21   we've discussed earlier.  You can discuss matters of the

22   public record.

23       A.    Based on that, no, based on the public record.

24       Q.    (By Ms. Westfall)  You mean based on the public

25   record, no?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

COLBY BEUCK                                        MAY 14, 2012

149

1          A.    No.

2          Q.    Is that your answer?

3          A.    Yeah.

4          Q.    Was any part of the purpose of SB 14 to

5     decrease the number of any minority voter group --

6                MR. SWEETEN:  You can answer --

7                MS. WESTFALL:  -- in participating in

8     elections?

9                MR. SWEETEN:  You can answer based upon

10    the public record.  Don't reveal any communications

11    between you and other legislators or legislative staff.

12         A.    To my knowledge of the debate, no, that was

13    not -- it was discussed, but that was not a stated

14    purpose.

15         Q.    (By Ms. Westfall)  So that's based on the

16    public record; is that correct?

17         A.    (Witness nodding.)

18         Q.    That would be --

19         A.    That's correct.

20         Q.    That would be the House floor and Senate

21    floor --

22         A.    That's correct.

23         Q.    -- committee testimony; is that correct?

24         A.    Correct.

25         Q.    Was any part of the purpose of SB 14 to



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1    discriminate in any way against any group of voters on

2    the basis of race or ethnicity?

3              MR. SWEETEN:  Same objection.  I'm going

4    to instruct you not to answer based upon conversations

5    you've had with legislators, state agencies, staffers.

6    You can answer the question with respect to matters of

7    the public record.

8    A.   No.  That was not a stated purpose of -- public

9    stated purpose of -- to my knowledge, no, that was not.

10   Q.   (By Ms. Westfall)  Was any part of the purpose

11   of SB 14 for partisan purposes?

12             MR. SWEETEN:  Same instruction.

13   A.   It was discussed.  It was not a purpose, as I

14   remember from the debate, from the bill offered.

15   Q.   (By Ms. Westfall)  Was any part of the purpose

16   of SB 14 to depress Democrat -- participation of

17   Democrats in elections to further the partisan interest

18   of Republican candidates?

19             MR. SWEETEN:  Same instruction.

20   A.   No.  That was not a stated purpose of the

21   authors for Senate Bill 14.

22   Q.   (By Ms. Westfall)  Did the purpose of photo ID

23   in Texas evolve over time and between legislative

24   sessions?

25             MR. SWEETEN:  Again, I'm going to instruct



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

151

1    you not to answer to the extent that that would reveal

2    communications that we've previously enumerated that

3    would be legislatively privileged.  To the extent that

4    you have knowledge responsive to this question based

5    upon the public record, I will allow you to provide that

6    answer.

7         A.   There have been changes over the sessions in

8    the voter ID bills, yes.

9         Q.   (By Ms. Westfall)  In the purpose of the voter

10   ID bills?

11        A.   I'm sorry.  The purpose, no, I don't believe

12   there's been a --

13        Q.   Isn't it true that at one time the proponents

14   of voter ID in Texas asserted that it would prevent

15   noncitizens from voting in elections?

16             MR. SWEETEN:  Same objection and

17   instruction.

18        A.   I don't recall that.  I can really only speak

19   to my involvement in this most recent legislative

20   session, 2011.  I can't speak for other.

21        Q.   (By Ms. Westfall)  Can I turn your attention

22   back to US Exhibit Number 3?

23        A.   (Witness complies.)

24        Q.   Turning your attention to US Number 3.

25        A.   Okay.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

152

1      Q.   Doesn't this indicate that your former

2  employer, Lieutenant Governor Dewhurst, indicated that

3  the purpose of photo ID was to prevent noncitizens from

4  voting?  Isn't that right?

5      A.   I believe I mentioned this earlier.  I don't

6  remember this letter, and as far as what the letter

7  says, (reading) --

8      Q.   But I believe you just testified today that the

9  reasons you're aware of for SB 14 are voter fraud and

10  voter confidence; is that correct?

11      A.   Those --

12           MR. SWEETEN:  I'm going to object to you

13  providing any -- and I'm going to instruct you not to

14  answer based upon the legislative privilege as to any of

15  the categories enumerated.  To the extent you have

16  information related to the public record, you can

17  provide that.

18           THE WITNESS:  Okay.

19           MS. WESTFALL:  Mr. Sweeten, I was just

20  asking him about his previous testimony on the purposes,

21  which I believe were -- the purposes are currently, as

22  you're testifying and sitting here today, the purposes

23  of SB 14 are to prevent voter fraud and to increase

24  voter confidence.  Am I correctly stating your

25  testimony?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

153

1          MR. SWEETEN:  Are you talking about his

2     personal thoughts on the matter?

3          MS. WESTFALL:  The purpose of the

4     legislation.

5          MR. SWEETEN:  And what I'm telling you,

6     and I've tried to be consistent with respect to this, is

7     that he's not going to testify about the purpose of

8     Senate Bill 14 as to every conversation that every

9     legislator had.  He's not going to reveal that

10    information.  I'm going to instruct him not to.

11         If you're going to ask him as to his

12    personal understanding of this legislation, you know,

13    I've let you do that to some degree.  So he can provide

14    that, but don't reveal any sort of legislatively

15    privileged information.

16    Q.    (By Ms. Westfall)  As to the issue of voter

17    fraud, isn't it true that voter ID only would prevent

18    in-person voter impersonation; is that correct?

19    A.    That -- that is my understanding.

20    Q.    It's not the universe of voter fraud, it's that

21    category of voter fraud; is that correct?

22         MR. SWEETEN:  Objection, that calls for

23    speculation.  Are you asking him specifically about this

24    letter?

25         MS. WESTFALL:  I am not.


ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

154

1          MR. SWEETEN:  Okay.  All right.  Can you

2     restate the question, or we can have him read it back if

3     you prefer?

4          Q.   (By Ms. Westfall)  Can you answer my question?

5          MR. SWEETEN:  No, no, no, no.  I don't

6     know the question.  I'm going to ask the court reporter

7     to read it back first.

8          (Requested portion read back by the court

9     reporter.)

10          MR. SWEETEN:  I'm going to let you answer

11     that.  I don't want you to reveal anything that's the

12     subject of legislative privilege in the areas that I've

13     enumerated.  Go ahead and answer based upon your

14     personal understanding of the public record.

15          A.   And I was speaking from my -- this most recent

16     session.  I can't speak for the Lieutenant Governor back

17     in two thousand and -- I believe this was in 2009.

18          Q.   (By Ms. Westfall)  Okay.  You were working for

19     the Lieutenant Governor at that point though, correct?

20          A.   Correct.

21          Q.   Okay.  So in answer to my question, the two

22     things you testified about in terms of the purposes of

23     SB 14 were voter fraud and voter confidence, correct?

24          MR. SWEETEN:  Don't reveal matters of

25     legislative privilege.  You can testify as to the public



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1      record or your personal understanding.

2          A.    Yes.  I believe that's right.

3          Q.    (By Ms. Westfall)  And voter fraud is limited

4      to in-person voter impersonation; is that correct?

5          A.    Yes.

6          Q.    SB 14?

7          A.    In SB 14, yes.

8          Q.    SB 14 would not prevent the whole range of

9      voter fraud set forth in the Texas election code; is

10     that correct?

11         A.    Yes.  There is -- yes.

12         Q.    Are you aware of incidents of mail-in ballot

13     fraud that have occurred in Texas?

14         A.    Yes.

15         Q.    Tell me what you know about that.

16         A.    I understand it is -- there are concerns about

17     the mail-in ballot process and fraud within the mail-in

18     ballot process.

19         Q.    What do you know about any convictions that

20     have occurred over that conduct?

21              MR. SWEETEN:  Objection, vague.

22         A.    I don't know the specifics, specific number of

23     convictions.  I understand it's a concern.

24         Q.    (By Ms. Westfall)  Has the Texas legislature

25     taken any steps to address that concern?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

156

1            MR. SWEETEN:  Don't reveal matters of the

2      legislative privilege.  You can testify based upon the

3      public record and information you've gleaned from that.

4            A.    Yes.  I believe there were several bills filed

5      of legislation to address those issues.

6            Q.    (By Ms. Westfall)  When were those bills filed?

7            A.    I can speak to the 2011 session.  I know there

8      were bills filed in the 2011 session.  I'm not sure

9      about other sessions.  I can't say.

10           Q.    And who sponsored those bills?

11           A.    Representative Aliseda had a mail-in ballot --

12     Aliseda, Jose Aliseda.

13           Q.    What happened with that bill?

14           A.    I believe he -- he had several.  I think there

15     were other bills regarding mail-in.  His was not the

16     only one.  I don't know the -- I do not believe -- I

17     don't believe that his bill passed.

18           Q.    Were these put on the emergency calendar by the

19     governor?

20           MR. SWEETEN:  Just keep your testimony to

21     the matters of public record with respect to this.

22           A.    The governor --

23           MS. WESTFALL:  Mr. Sweeten, isn't the

24     emergency calendar a matter of public record?

25           MR. SWEETEN:  If the emergency calendar is



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1    a matter of public record, then he is going to be able

2    to testify about that, and I will allow --

3              MS. WESTFALL:   That was my question was

4    about the emergency calendar.  It was a question that

5    was within the scope of public matters.  I don't think

6    it warranted an objection, and I'd ask you to withdraw

7    that.

8              MR. SWEETEN:   Okay.  As I've already -- as

9    I've been saying in a constant loop, I will let him

10   testify as to matters of public record.

11             Okay.  You can do so.

12        A.   I believe the governor's emergency item had to

13   do with in-person.  I don't believe it had to -- excuse

14   me -- the governor's proclamation had to do with

15   in-person voter fraud.

16        Q.   (By Ms. Westfall)  Did not include any of this

17   mail-in ballot bills that were filed by Representative

18   Aliseda and others; is that correct?

19        A.   That's my understanding.

20             (Exhibit 7 marked for identification.)

21        Q.   (By Ms. Westfall)  I'm handing you what's been

22   marked as US-7.  Do you recognize it?

23        A.   That is Representative Patricia Harless.

24        Q.   And is this from her website, or what is this

25   exactly?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

COLBY BEUCK                                              MAY 14, 2012

158

1      A.   This appears to be her campaign website.

2      Q.   Have you seen this before?

3      A.   Yes.

4      Q.   Did you draft it?

5      A.   No.

6      Q.   Do you know who did?

7      A.   No.

8      Q.   Do you see under "Immigration Reform" it lists

9    "Require Texas photo ID to vote"?

10     A.   Yes, I do.

11     Q.   Do you know what requiring Texas photo ID to

12   vote has any -- has to do with immigration reform?

13          MR. SWEETEN:   Don't reveal conversations

14   you've had with anyone in answering this question.

15     A.   I didn't draft this document so I don't know.

16     Q.   (By Ms. Westfall)  Are you personally aware of

17   any connection between immigration reform and requiring

18   Texas photo ID to vote?

19     A.   Not to my knowledge.

20     Q.   What -- what does SB 14 have to do with

21   increasing public confidence in voting?

22          MR. SWEETEN:   I'm going to instruct you to

23   answer only based upon matters in the public record.

24   Don't reveal conversations that we've previously

25   enumerated, including legislators, legislative staff,



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

COLBY BEUCK                                                    MAY 14, 2012

159

1    et cetera.

2        A.    My knowledge, increasing voter confidence by

3    giving election workers a tool to verify people are who

4    they say they are when they go to vote.

5        Q.    (By Ms. Westfall)  Do you have any -- can you

6    point me to any research studies or analysis that would

7    show there's an increase in public confidence when photo

8    ID laws are enacted?

9        A.    In committee there was testimony from the

10   Secretary of State, Georgia Secretary of State, who

11   testified that voter turnout increased after their voter

12   identification laws were implemented.  Indiana, also,

13   there was a representative from the state of Indiana who

14   testified to the same, that when Indiana's voter

15   identification laws were implemented, voter turnout

16   increased.

17       Q.    And was there any exploration during the

18   hearing of whether any other factors increased voter

19   turnout in Georgia or Indiana other than photo ID laws?

20       A.    Yes.  I remember a discussion regarding the

21   2008 election.

22       Q.    And it was possible that was the presidential

23   election and there was significant turnout and interest

24   in that election?

25       A.    Correct.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

COLBY BEUCK                                                          MAY 14, 2012

160

1      Q.    Is that correct?

2      A.    Correct.

3      Q.    And it's true that the increase in turnout

4   might not have had anything to do with the photo ID law

5   in place; is that correct?

6            MR. SWEETEN:  Objection, argumentative.

7      A.    The --

8            MS. WESTFALL:  You can answer.

9            MR. SWEETEN:  Keep your matters -- keep

10  what your testimony is to matters of public record.  I

11  think she is asking about the hearing so you're free to

12  do that.

13     A.    The information showed that even after the

14  presidential election, I believe in 2010, that there was

15  also an increase in turnout.  I know from the Secretary

16  of State's office, Georgia Secretary of State, provided

17  us with that information, the committee.

18     Q.    (By Ms. Westfall)  And it had been specifically

19  attributed to photo ID through an analysis that you're

20  aware of?

21     A.    That was his testimony.  He attributed it.

22     Q.    Are there any other studies or research that

23  you're aware of related to increases in public

24  confidence as a result of photo ID?

25     A.    I believe I have seen some studies that show



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

161

1    that.

2         Q.   Did you take into account as you were drafting

3    SB 14 or considering SB 14 any studies about public

4    confidence?

5              MR. SWEETEN:   Don't reveal any

6    legislatively privileged matters.   You can testify about

7    matters of public record, but any discussions,

8    conversations that you've had, don't reveal those.

9         A.   Did I -- did I consider any?

10        Q.   (By Ms. Westfall)   Studies or research on

11   increases in public confidence?

12        A.   Did I -- yes, they were considered.

13        Q.   What were those?

14        A.   The studies, I can't say specifically.   I

15   remember reading -- reading studies on that issue --

16        Q.   Is this --

17        A.   -- which point -- the studies pointed to

18   Indiana and Georgia as positive.   There was a positive

19   result after the voter -- voter -- voter identification

20   laws had been passed, there was a positive result in

21   turnout.

22        Q.   Did the Texas legislature find any -- that

23   there was a problem with public confidence in voting?

24              MR. SWEETEN:   Don't reveal any matters

25   that are legislatively privileged, including all the



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

162

1    conversations that we've enumerated previously.  You can

2    go ahead and testimony based on matters of the public

3    record on that issue.

4        A.   Yes.  I think there was discussion about there

5    being a problem of -- the problem with voter confidence

6    in elections, I remember that being discussed during the

7    debate.

8        Q.   (By Ms. Westfall)  What was the basis of that

9    concern factually?

10                MR. SWEETEN:  Confine to matters of the

11   public record.  Don't reveal legislatively privileged

12   information.

13       A.   I remember from the testimony there were

14   accounts of -- from constituents of incidences, some

15   personal accounts of witnessing incidences of voter --

16   voter fraud.

17       Q.   (By Ms. Westfall)  Are you talking about

18   in-person voter impersonation or other forms of voter

19   fraud?

20                MR. SWEETEN:  Same instruction.

21       A.   All forms.

22       Q.   (By Ms. Westfall)  I believe you testified

23   earlier you were unaware of any specific allegations of

24   in-person voter impersonation or convictions based on

25   that crime; is that correct?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

163

1          MR. SWEETEN:   Objection.  I think that

2     misstates his testimony, but go ahead.  You can answer.

3          A.   My understanding was that that was my personal

4     -- there are -- there was testimony.  There was

5     discussion about that.  Other people might -- I'd have

6     to go back and look, but I thought that was regarding

7     myself.

8          Q.   (By Ms. Westfall)  What -- what hearing are you

9     talking about at which individuals testified about

10    concerns about public confidence in voting?

11         A.   I believe it was discussed on the floor as well

12    as in committee.  I'm not --

13         Q.   Does --

14         A.   There were lengthy committees and they -- it

15    was also discussed in the Senate, so it might have been

16    brought up in the Senate as well.  I can't identify

17    which committee hearing that came from, but I know it

18    was an issue that was discussed.

19         Q.   There was testimony before the House or Senate

20    committees from a particular witness on voter

21    confidence, public confidence?

22         A.   Yes, I believe so.

23         Q.   Do you know the name or identity of the

24    witness?

25         A.   No, I do not.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

COLBY BEUCK                                                    MAY 14, 2012

164

1      Q.   Do you know the year in which this testimony

2    occurred?

3      A.   This most recent session, 2011.

4      Q.   Who are the main opponents of Senate Bill 14?

5           MR. SWEETEN:  Confine your answer to

6    matters of the public record.  Don't reveal

7    conversations with other legislators, other staff.

8      A.   I believe the vote was along party lines, so I

9    would say the Democratic members of the House and

10   Senate.

11     Q.   (By Ms. Westfall)  And were there any outside

12   groups that opposed the bill?

13     A.   Yes.

14     Q.   What were those groups?

15          MR. SWEETEN:  Don't reveal legislatively

16   privileged matters, including constituent

17   correspondence, discussions with legislators, as well as

18   other staffers.  You can confine your answer to the

19   matters of the public record.

20     A.   The minority interest groups, the League of

21   Women Voters, I believe.

22     Q.   (By Ms. Westfall)  How did you learn about

23   their opposition?

24     A.   Through my research.  They were -- weren't shy

25   about it.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1          Q.    Was there any opposition to SB 14 amongst

2    election officials in Texas?

3          A.    Election officials meaning?

4          Q.    Secretary of State or county officials?

5          A.    Was there any opposition, yes.

6                MR. SWEETEN:  Just confine your answers to

7    matters of the public record.  Don't reveal any

8    categories of information we've gone over many times.

9          Q.    (By Ms. Westfall)  Your answer was "yes"?

10         A.    I believe there was concern from local

11   officials.

12         Q.    And which local officials?

13         A.    I can't remember who exactly.

14         Q.    What were those concerns?

15         A.    I remember one local official account of

16   concerns regarding the costs associated with

17   implementation of the bill.

18         Q.    Who was that county official?

19         A.    I don't remember.

20         Q.    What county was it?

21         A.    I don't remember.

22         Q.    How did you learn about this concern?

23         A.    Through the media.

24         Q.    Were there any constituents who had any

25   concerns about SB 14 other than the minority voting



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

COLBY BEUCK                                              MAY 14, 2012

166

```
 1     rights groups that you just testified about?

 2               MR. SWEETEN:  Don't reveal matters or

 3     discussions between constituents and you or

 4     Representative Harless or in any other areas of

 5     conversation that we discussed earlier, including

 6     legislators, legislative staff, state agencies,

 7     regarding that.

 8        A.   Yes.  There were constituents who had concerns

 9     as well.

10        Q.   (By Ms. Westfall)  What were their concerns?

11               MR. SWEETEN:  Same instruction.

12        A.   I think expressing their concerns would take me

13     into the privileged area of communications.

14        Q.   (By Ms. Westfall)  So you have no answer to

15     that question?

16        A.   Correct.

17        Q.   Did Representative Harless take any steps to

18     address any of the concerns raised by bill opponents.

19               MR. SWEETEN:  Don't reveal communications

20     that are legislatively privileged.  If you cannot do so

21     without -- if you cannot answer the question without

22     doing so, then do not answer the question.

23        A.   I think my answer would get into that so I

24     would say no.  It would -- my answer would get into that

25     privilege so no.
```



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

167

1      Q.   (By Ms. Westfall)  Can you point to anything in

2    SB 14 that was added in the House in response to

3    concerns by groups or individuals representing minority

4    voters?

5             MR. SWEETEN:  You can confine your answers

6    to the public record.  Do not reveal legislatively

7    privileged information.

8             MS. WESTFALL:  Mr. Sweeten, I'm asking

9    about a publicly signed law, and I'm asking him about

10   provisions in the law.  I'm not asking him about

11   privileged communications.  Would you please withdraw?

12            MR. SWEETEN:  What was your question

13   again?

14            MS. WESTFALL:  I said -- my question was:

15   Is there any provision in SB 14 that was added in

16   response to concerns raised by people, groups

17   representing minority voters or minority voters

18   themselves?  Anything in the law?

19            MR. SWEETEN:  You can confine your answers

20   to matters of the public record.  Do not reveal

21   communications as we've outlined before between

22   legislators, legislative staff, state agencies, Texas

23   legislative council, constituents.

24      A.   Okay.  I know from the debate there were

25   several amendments offered by opponents to the bill that



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

168

1    were to address concerns.

2         Q.   (By Ms. Westfall)  And were any of them

3    adopted?

4         A.   Yes.

5         Q.   Which ones?

6              MR. SWEETEN:  Same instruction.

7         A.   Specifically, I can't remember which amendments

8    were the total number of amendments which were added in

9    the Senate.

10        Q.   (By Ms. Westfall)  Could you confine your

11   answer to the House?

12        A.   Well, I can -- I can -- I remember from some of

13   the debate, so I was going to -- just was clarifying

14   that this is not the sum total of all the changes that

15   were made by opponents to the bill.

16              And Senator Davis had a -- Senator Davis

17   had an amendment to allow for there to be substantially

18   similar -- when an election worker is reviewing the

19   identification, the names can be substantially similar.

20   That was -- that was added in the Senate and kept in the

21   bill through the House.  And that was to address

22   concerns from that there would be -- that was to address

23   some of the opponents' concerns.

24        Q.   Can you think of any other changes to the bill,

25   or that is the sum total?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

169

1            MR. SWEETEN:  Same instruction.

2       A.   This is by no means the sum total, so I'm going

3    to qualify that.

4       Q.   (By Ms. Westfall)  As you're sitting here

5    today, can you think of any other, or should we move on

6    to another question?

7       A.   I believe there was increased notice

8    requirements placed in the Senate.

9       Q.   By "increased notice," do you mean public

10   notification or notice to voters?

11      A.   Yes.

12      Q.   Can you think of any other changes?

13           MR. SWEETEN:  Same instruction.

14      A.   I apologize.  I was looking at the -- the

15   language regarding the election identification

16   certificate, I believe that was an issue.

17      Q.   (By Ms. Westfall)  Was that certificate put in

18   the bill in response to the concerns of minority groups?

19           MR. SWEETEN:  Same objection and

20   instruction.

21      A.   It was a concern first brought up by

22   Representative Anchia during the House debate, and that

23   language is -- was in response.

24      Q.   Anything else?

25           MR. SWEETEN:  Same instruction.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

COLBY BEUCK                                              MAY 14, 2012

170

1        A.   The disability exemption was something we heard

2     from that was, I believe, a concern and --

3        Q.   (By Ms. Westfall)  Was that a concern of

4     minority voters?

5        A.   I'm sorry.  Okay.  (Reading document.)

6             I'll leave it there.  That's my -- that's,

7     from reviewing it, that's not the sum total of the

8     changes that were done on behalf of --

9        Q.   But that's, sitting here today, you're here to

10    testify.  I gave you plenty of opportunity to testify

11    about all changes that were made to the bill in response

12    to minority concerns, and you've testified, and that's

13    your testimony today; is that correct?

14       A.   That's correct.

15       Q.   And to clarify in terms of the concerns about

16    the bill from minority voting groups and minority

17    voters, did Representative Harless seek those opinions

18    out from those groups, or were those -- was that

19    opposition in the public sphere, and you became aware of

20    them that way?

21            MR. SWEETEN:  Don't reveal any matters

22    that are legislatively privileged.  Don't reveal

23    conversations that I've enumerated previously.  You can

24    testimony based upon matters that are public record.

25       A.   I can't speak for Representative Harless, but



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

COLBY BEUCK                                                    MAY 14, 2012

171

1     these groups, the information was -- their opposition
2     was -- was out there in the public sphere.
3          Q.   (By Ms. Westfall)  So you're saying the way you
4     learned about it was -- was from it being in the public
5     sphere; is that correct?
6          A.   Their concerns?
7          Q.   Yes.
8          A.   Through the debate and my research on the
9     issue, yes.
10         Q.   Were you concerned that failing to address the
11    concerns of minority voters might have an impact on
12    preclearance of SB 14 under Section 5 of the Voting
13    Rights Act?
14              MR. SWEETEN:  Was he personally
15    concerned?  Is that the question?
16              MS. WESTFALL:  Yes.
17              MR. SWEETEN:  Okay.  I'm going to let you
18    answer that question, but I want you to confine any sort
19    of information you learned about this from any of the
20    sources we've enumerated to the matters of the public
21    record.  Otherwise, don't answer it and reveal its
22    communication.
23         A.   Okay.  My concerns were that the legislation
24    would comply with federal law and in so much as those
25    minority concerns meshed with that.  It was something



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

172

1      that I did, I did think about, of course.

2                   MR. SWEETEN:  I also object to the last

3      question, based on it assumes facts not in evidence, but

4      go ahead.

5          Q.  (By Ms. Westfall)  Did you take any steps to

6      address your concerns that not responding to the

7      concerns of minority voters could have an adverse impact

8      on Session 5 consideration of SB 14?

9                   MR. SWEETEN:  Don't reveal any

10     communications you've had with legislators, staff

11     members, state agencies, et cetera.

12                  THE WITNESS:  Oh, okay.

13                  MR. SWEETEN:  As I've previously

14     instructed.

15         A.   I thought the bill as it was drafted would --

16     would comply.

17         Q.  (By Ms. Westfall)  So you took no steps,

18     because you thought the bill was satisfactory; is that

19     correct?

20         A.   I took no steps to address --

21         Q.   The concerns of minority voters, because you

22     thought they were adequately addressed; is that correct?

23         A.   I don't know if feel comfortable saying that

24     the concerns of minority -- that's pretty broad.  That's

25     a large -- that's a large number, so unless it's a



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

173

1    specific one, I can't answer that.

2         Q.   Does Representative Harless have any minority

3    groups as recipients of her newsletter distribution or

4    her e-mail blasts?

5         A.   I don't know.

6              MS. WESTFALL:  Okay.  Why don't we take a

7    break for a few minutes?

8              (Recess 3:10 p.m. to 3:25 p.m.)

9              MS. WESTFALL:  We're back on the record.

10        Q.   (By MS. WESTFALL) You testified earlier about

11   studies and research that you had done in advance of

12   drafting SB 14.  Did you share any of those studies with

13   Representative Harless?

14             MR. SWEETEN:  Don't reveal any

15   communications you've had with Representative

16   Harless.  I instruct you not to answer.

17             MS. WESTFALL:  As to whether he shared any

18   studies with Representative Harless?

19             MR. SWEETEN:  He's not going to reveal any

20   communications that he's had with Representative

21   Harless.  I'm going to instruct him not to answer based

22   on that question.

23        Q.   (By MS. WESTFALL) Did Representative Harless

24   make any public statements about the opposition to

25   SB 14?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

COLBY BEUCK                                        MAY 14, 2012

174

1        A.    I don't remember.

2        Q.    Did you handle her public statements on SB 14?

3        A.    I believe her public statements are her own.

4        Q.    Did you draft press releases for her?

5        A.    I was the contact person for press releases.

6        Q.    Did you draft the press releases?

7        A.    Yes.

8        Q.    Did you draft all the press releases on SB 14?

9        A.    I believe so.

10       Q.    How many were there?

11       A.    Two or three.

12       Q.    What was the first one that you issue about?

13       A.    We did a press release when it was determined

14   that we would be lead House sponsor of Senate Bill

15   14.  We did a press release on passage, House passage of

16   Senate Bill 14.  There was another one, I believe,

17   another press release on Senate Bill 14 regarding the

18   Department of Justice rejection of -- the Department of

19   Justice denying preclearance, and we did a press release

20   for that as well.

21       Q.    Did you draft all three of those?

22       A.    Yes.

23       Q.    Do you recall what the first press release

24   said?

25       A.    No.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

175

1      Q.    Did Representative Harless ever discuss whether
2  SB 14 might disproportionately impact minority voters?
3             MR. SWEETEN:  Don't reveal communications
4  you've had with Representative Harless.  To the extent
5  that public statements made that can help you answer
6  that question, you can rely on the public record.
7      A.    Did Representative Harless make any statements
8  regarding whether --
9      Q.    (By MS. WESTFALL) Whether SB 14 might
10  disproportionately impact minority voters?
11     A.    I don't recall.
12     Q.    Is it possible she might have?
13             MR. SWEETEN:  Are you asking about public
14  statements or are you talking about -- obviously, he
15  can't --
16             MS. WESTFALL:  I'm asking about --
17             MR. SWEETEN:  -- discuss the statements
18  that he's made.
19     Q.    (By MS. WESTFALL) I'm asking about any
20  statements that Representative Harless has ever made or
21  discussions she's had about possible impact of SB 14 on
22  minority voters.
23     A.    Okay.
24             MR. SWEETEN:  Don't reveal information
25  that's legislatively privileged or that -- don't reveal



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

176

1      communications between Representative Harless and you,

2      Representative Harless and other legislators.  You can

3      confine your answer to matters of public record.

4          A.   I don't know.  It's possible.  I don't know.

5          Q.   (By MS. WESTFALL) So as to the public record,

6      you don't know; is that your testimony?

7          A.   Correct.

8          Q.   Have you ever had any discussion with

9      Representative Harless about whether SB 14 might

10     disproportionately impact minority voters?

11              MR. SWEETEN:  Don't answer that question.

12     It's legislatively privileged.

13         Q.   (By MS. WESTFALL) Are you aware of whether

14     Representative Harless has ever discussed whether SB 14

15     might disproportionately impact minority voter with

16     persons other than yourself?

17              MR. SWEETEN:  Don't reveal communications

18     that you had or that you're aware of that she had with

19     legislators, legislator staff, state agencies.  You can

20     confine your answer to matters of the public record.

21         A.   I don't recall.  I can't speak for

22     Representative Harless, so I don't recall.

23         Q.   (By MS. WESTFALL) And so your answer is to

24     public information; is that correct?

25         A.   Correct.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

COLBY BEUCK                                              MAY 14, 2012

177

1      Q.   And you're not testifying about any other

2  conversations that Representative Harless might have had

3  based on the advice of counsel?

4      A.   Correct.  I don't know of those conversations,

5  so...

6      Q.   Was Representative Harless concerned that SB 14

7  might disproportionately impact minority voters?

8                MR. SWEETEN:  Don't reveal communications

9  that you've had with Representative Harless.  You can

10  testify as to matters of the public record as to that

11  issue.

12                THE WITNESS:  Okay.

13                MR. SWEETEN:  Objection, calls for

14  speculation.  Go ahead.

15      A.   I would -- based upon the privilege, I would

16  say I don't know.

17      Q.   (By MS. WESTFALL) You do know the public

18  record?

19      A.   I can't -- I can't speculate to her -- her

20  thoughts.

21      Q.   Right.  But your testimony is just about the

22  public record.  Are you aware of any indication in the

23  public record where Representative Harless indicated any

24  concern about the impact of SB 14 on minority voters?

25                MR. SWEETEN:  You can answer.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

178

1          A.    No, I'm not aware of any.

2          Q.    (By MS. WESTFALL) Did Representative Harless

3     seek any advice from anyone on whether SB 14 complied

4     with Section 5 of the Voting Rights Act?

5                MR. SWEETEN:   Again, don't reveal

6     conversations that Representative Harless had with any

7     legislators or with any staff members with TLC or state

8     agencies' constituents.   To the extent you can answer it

9     without revealing those, you can go ahead and do so.

10         A.    Based on the public record, I'm not aware of.

11         Q.    (By MS. WESTFALL) And you're acting on the

12    advice of counsel not to testify about any private

13    conversations that Representative Harless might have had

14    about SB 14 and the Voting Rights Act; is that correct?

15         A.    That's correct.

16         Q.    Did you, outside of Representative Harless's

17    presence, have any discussions yourself about opposition

18    to SB 14?

19               MR. SWEETEN:   Don't reveal communications

20    that you've had with other legislators, their staff,

21    state agencies, TLC, or Representative Harless herself.

22    To the extent that you can answer that question without

23    revealing those, you can go ahead and do so, including

24    matters of the public record.

25         A.    Did I -- did I have conversations?  Yes.


ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

179

1        Q.    (By MS. WESTFALL) With whom?

2        A.    Regarding?

3        Q.    Regarding the opposition to SB 14.

4              MR. SWEETEN:   Same objection and

5        instruction.

6              THE WITNESS:   Okay.

7        A.    Conversations with staff regarding opposition

8        of Senate Bill 14.

9        Q.    (By MS. WESTFALL) You had conversations with

10       staff?

11       A.    No.   That's your question.   I'm sorry.   I'm

12       repeating your question.

13       Q.    My question is:   Did you, outside of

14       Representative Harless's presence, have any discussions

15       about the opposition to SB 14?

16       A.    Okay.

17             MR. SWEETEN:   And, again, the same

18       instruction.

19             THE WITNESS:   Okay.

20       A.    Yes.   And then you asked with who, correct?

21       Okay.   The individuals, the staff I have mentioned.   I

22       believe I had conversations regarding the opposition

23       with the staff I've mentioned previously, as well as

24       other legislators' staff.

25       Q.    (By MS. WESTFALL) And you're talking about



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

180

1    staff from Senator Fraser's office, the Lieutenant

2    Governor's Office, Speaker Straus's Office; is that

3    correct?

4        A.   Correct.

5        Q.   And as a result of those conversations, were

6    any changes made to SB 14?

7        A.   I think --

8             MR. SWEETEN:  Don't reveal any sort of

9    privileged information.

10            THE WITNESS:  Okay.

11            MR. SWEETEN:  Okay?  Don't reveal the

12   conversations that you've had with anyone that are

13   legislatively privileged.  I've enumerated what those

14   are.  So don't reveal that information.

15       A.   I think my conversations with those staff

16   members would be within the privilege.

17       Q.   (By MS. WESTFALL) When did you have those

18   conversations with the staff members about opposition to

19   SB 14?

20       A.   From January until passage of the bill.

21       Q.   Did you have many, many conversations about the

22   opposition to SB 14?

23            MR. SWEETEN:  Objection, vague.

24       Q.   (By MS. WESTFALL) Did you have them on a

25   periodic basis?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

181

1          A.    Representative Harless was the House sponsor of

2     the legislation.  I think staff knew that I was -- yes,

3     there were many conversations with staff.

4          Q.    And what were the nature of your discussions

5     about the opposition of SB 14 with staff and Senator

6     Fraser's office?

7                MR. SWEETEN:  Don't answer the question.

8     It would reveal legislatively-privileged information.

9          Q.    (By MS. WESTFALL) What was the nature of the

10    conversations that you had with staff in the Lieutenant

11    Governor's Office?

12               MR. SWEETEN:  Same objection.  Same

13    instruction.

14         Q.    (By MS. WESTFALL) What was the nature of the

15    conversations that you had with staff in Speaker

16    Straus's office?

17               MR. SWEETEN:  Same objection.  Same

18    instruction.

19         Q.    (By MS. WESTFALL) During the drafting or the

20    Legislature's consideration of SB 14, was there efforts

21    to determine the number of registered voters in Texas

22    who lack a driver's license?

23               MR. SWEETEN:  Don't reveal any

24    legislatively-privileged discussions, conversations.

25    That includes discussions with other staff members,



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1      other legislators.  That includes the state agencies.

2      That includes constituents.  That includes the TLC.

3                 THE WITNESS:  Okay.

4                 MR. SWEETEN:  If you can confine your

5      answer to the matters of public record, you are free to

6      do so.

7          A.   The committee.  There was testimony that the

8      information was sought from the Secretary of State's

9      Office regarding those who do not have a social security

10     number or a driver's license number associated with

11     their voter registration.

12         Q.   (By MS. WESTFALL) How did that issue come to

13     the attention of the committee?

14                MR. SWEETEN:  Again, don't reveal any

15     legislatively-privileged discussions that I've

16     enumerated previously.

17         A.   There was testimony from the Secretary of

18     State's Office, and the issue came up.  I believe

19     Representative Anchia asked the questions regarding

20     that.

21         Q.   (By MS. WESTFALL) Was this during the House

22     Select Committee's consideration of SB 14?

23         A.   Yes.

24         Q.   Representative Anchia asked questions about

25     which registered voters did not have allowable forms of



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

183

1    ID under SB 14; is that correct?

2        A.   The issue came up.  I don't know if it was

3    Representative Anchia.  The issue did come up regarding

4    registration cards, voter registrations, and those being

5    associated with a social security number or a driver's

6    license number.  The issue did come up, yes.

7        Q.   And was there a response from the Secretary of

8    State's Office.

9             MR. SWEETEN:  Are you asking him in the

10   hearing?

11       Q.   (By MS. WESTFALL) Yes, in the hearing.

12       A.   Yes.  Yes.

13       Q.   There was a response?  And what was the

14   response?

15       A.   I believe the number was in the range of

16   600,000 Texans have a voter registration card without an

17   associated social security number or driver's license

18   number.  I can't remember the exact number.  But it was

19   in that range.

20       Q.   Was there any analysis of the racial

21   composition of those voters?

22             MR. SWEETEN:  Are you asking about is this

23   public record again?

24       A.   (By MS. WESTFALL) I'm asking public record,

25   private record, every record.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

184

1          MR. SWEETEN:  To the extent that the

2     question asks you to reveal conversations between

3     legislative staff, the legislators, state agencies, the

4     TLC, or constituents, do not reveal that information.

5     To the extent that you can answer it without revealing

6     those conversations or matters of the public record, you

7     can do so.

8          A.   Based on the public record, I know the issue

9     came up.  I cannot remember at which point the Secretary

10    of State's office does not have their voter -- racial

11    data is not kept in -- racial data is not collected with

12    voter registration cards, so the Secretary of State's

13    Office, my understanding is, did not have that

14    information.

15         Q.   (By MS. WESTFALL) So the answer my question,

16    there was no racial analysis -- there was no analysis by

17    race of persons who are registered voters who do not

18    have allowable forms of ID under SB 14; is that right?

19         MR. SWEETEN:  Same instruction.  Same

20    objection.

21         A.   The Secretary of State's Office did not have

22    the racial data associated with the voter registration

23    data.

24         Q.   (By MS. WESTFALL) Did Representative Harless or

25    you take any further steps to try to obtain that



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

COLBY BEUCK                                                MAY 14, 2012

185

1    information during consideration of SB 14?

2                  MR. SWEETEN:  Don't reveal any

3    communications you've had with Representative Harless,

4    that you've had with legislative staff, the state

5    agencies, with TLC, or constituents.

6         Q.   (By MS. WESTFALL) Do you have no answer to that

7    question?

8         A.   No answer to that question.

9         Q.   Because --

10        A.   Correct.

11        Q.   -- based on the advice of counsel that --

12        A.   Correct.

13        Q.   -- it's privileged?

14                  It was a pretty important issue, huh,

15   figuring out the racial impact of people who did not

16   have ID; isn't that right?  A pretty important, central

17   issue in the debate?

18                  MR. SWEETEN:  Objection.  Can you just

19   keep it to one question at a time?  Also, objection,

20   argumentative.

21                  MS. WESTFALL:  I will withdraw that

22   question.

23        Q.   (By MS. WESTFALL) Was it not an important

24   issue, during consideration of SB 14, as to the racial

25   composition of people who did not have an allowable form



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1    of ID?

2              MR. SWEETEN:  I'm going to instruct you

3    not to reveal discussions or communications between you,

4    state agencies, legislators, legislative staff,

5    constituents, or the TLC.  To the extent you have

6    information where you can answer her question, you can

7    go ahead and do so.

8         A.   The information was not available from the

9    Secretary of State's Office, because they do not collect

10   racial data.

11        Q.   (By MS. WESTFALL) Other than making an inquiry

12   of the Secretary of State about registered voters with

13   forms of ID, were there any other efforts to determine

14   the racial composition of people without allowable IDs?

15             MR. SWEETEN:  Same objection.  Same

16   instruction.

17        A.   They are the record keepers for voter

18   registration in Texas.  I think they would be the

19   appropriate agency for that.  That was -- they are the

20   -- they did not have that information available at the

21   committee hearing.

22        Q.   (By MS. WESTFALL) So is it your testimony there

23   weren't further efforts other than to make that inquiry

24   to the Secretary of State; is that correct?

25             MR. SWEETEN:  Do you understand my



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

COLBY BEUCK                                        MAY 14, 2012

187

1      instruction?

2                  THE WITNESS:  Uh-huh.

3                  MR. SWEETEN:  Okay.  With that

4      instruction, you can go ahead and answer, to the extent

5      you have any information.

6           A.   My answer is not based on.

7           Q.   (By MS. WESTFALL) Because you have nothing that

8      was in the public record that indicates an answer to my

9      question; is that correct?

10          A.   Correct.

11          Q.   There may be something in the private record

12     that indicates an answer to my question; is that

13     correct?

14                 MR. SWEETEN:  Don't answer that question.

15     She is asking you about the content of communications.

16     You don't have to answer that question.  There were

17     legislatively-privileged discussion that occurred.

18          Q.   (By MS. WESTFALL) Did the Secretary of State

19     testify about any analysis of Spanish surname registered

20     voters and their access to forms of allowable ID under

21     SB 14?

22          A.   I don't recall that information being presented

23     at the committee hearing.

24          Q.   Did Representative Harless or anyone on the

25     committee ask for that information from the Secretary of



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

188

1   State?

2                MR. SWEETEN:  Do not reveal communications

3   between you, state agencies, or any of the other

4   enumerated areas.  Okay?  Don't reveal those.  You can

5   answer to the extent that you can based on public record

6   or to the extent it doesn't implicate communications

7   that we've outlined.  Okay.  Go ahead.

8        A.   No, based on --

9        Q.   (By MS. WESTFALL) There's nothing in the public

10   record on that issue; is that correct?

11        A.   That's correct.

12        Q.   Are you aware of any efforts, at any point

13   during the development of SB 14, to attempt to craft a

14   bill that would accomplish the bill's objectives without

15   disproportionately harming minority voters?

16                MS. WESTFALL:  Colby, don't reveal any

17   communications that you've had with legislators, with

18   legislative staff, with state agencies, the TLC, their

19   constituents.  To the extent that there's information

20   that you have that is outside of those areas, you can go

21   ahead and answer Ms. Westfall's question, to the extent

22   can.

23        A.   Am I aware of any other efforts -- I'm sorry.

24   I've got to repeat it.  Am I aware of any other efforts

25   outside of Senate Bill 14?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1        Q.   (By MS. WESTFALL) During the development of

2   SB 14, to attempt to craft a bill that would accomplish

3   the bill's objectives without disproportionately falling

4   upon minority voters?

5              MR. SWEETEN:  Objection.  Argumentative as

6   well.  Repeat my previous objection and instruction.

7        Q.   (By MS. WESTFALL) You may answer.

8        A.   It's my opinion that the bill addresses that as

9   it is.

10        Q.   And how does the bill address that issue?

11        A.   By providing free ID, a provisional ballot

12   period.

13        Q.   Okay.  We'll talk about that a little about it

14   later.

15              Can you tell me each and every effort that

16   is made to ensure that the forms of ID included in SB 14

17   were equally accessible to all registered voters

18   regardless of race or ethnicity?

19              MR. SWEETEN:  Don't reveal any

20   communications you've had with a legislative staff or

21   legislators, with members of the TLC, state agencies, or

22   constituents.  To the extent you can answer without

23   revealing those, you can go ahead and try to do so.

24        A.   Accessibility of other IDs.

25        Q.   (By MS. WESTFALL) To ensure that the forms of



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1    ID included in SB 14 were equally accessible to all

2    voters, all registered voters regardless of race or

3    ethnicity?

4         A.   Not to my knowledge.

5         Q.   There is nothing in the public record; is that

6    correct?

7         A.   Not to my knowledge.  I'm -- there might be.

8         Q.   But as you sit here today, you can't think of

9    any; is that correct?

10        A.   Correct.

11        Q.   Thank you.

12             When was SB 14 filed in the Senate?

13        A.   I'm not sure if I understand.  When was the

14   bill filed?  The bill was filed --

15        Q.   In the Senate?

16        A.   I not sure when it was filed in the Senate.

17        Q.   Was the sometime in January 2011?

18        A.   The bill has a low bill number, so I imagine it

19   was -- it's one of the bill numbers reserved.

20             MS. WESTFALL:  Could you mark this as

21   Exhibit 8, please.

22             (Exhibit 8 marked for identification.)

23        A.   I imagine it was early on.

24        Q.   (By MS. WESTFALL) That's a good tip about low

25   bill numbers.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

COLBY BEUCK                                                    MAY 14, 2012

191

1      A.   It's not always the case.  Not always the case.

2      Q.   That is very sensible.

3           MS. WESTFALL:  Could you hand this to the

4      witness?

5      Q.   (By MS. WESTFALL) You've been handed U.S.

6      Exhibit 8.  Do you recognize this document?

7      A.   This is a printout of the bill history of

8      Senate Bill 14 from, it looks like, the Texas

9      Legislature online.

10     Q.   Have you seen this document before?

11     A.   I've seen a similar document.  Yes, I've seen a

12     similar document.

13     Q.   Could you -- referring to Exhibit U.S. 8, could

14     you tell me when Senate Bill 14 was filed in the Senate?

15     A.   The 12th of January 2011.

16     Q.   And what is a House Select Committee?  And you

17     can turn your attention away from that, but hold on to

18     that, because we may look at it again.

19     A.   Okay.

20     Q.   What is a House Select Committee?

21     A.   A Select Committee is -- it's outside of the

22     standard -- sorry, not standard.  The standing

23     committees that the House has.  It's a separate

24     committee outside of the standing committees.

25     Q.   Are you familiar with the House Select



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

COLBY BEUCK                                    MAY 14, 2012

192

1      Committee on voter identification and voter fraud?

2          A.   I am.

3          Q.   Could you describe the committee for me?

4          A.   The -- describe the committee?  The makeup of

5      the committee?

6          Q.   Or the purpose of the committee.

7          A.   Oh, okay.

8          Q.   Tell me about the committee.

9          A.   The committee was tasked with legislation

10     regarding voter identification and voter fraud, and it

11     was created for that purpose.

12         Q.   Was it convened for one legislative session

13     only?

14         A.   I can't speak to future, future sessions.  It

15     was created in the 82nd Legislative Session.

16         Q.   Can you describe the circumstances of the

17     committee's creation?

18              MR. SWEETEN:  Don't reveal any

19     communications that are legislatively privileged that

20     we've previously outlined.  But go ahead, you can answer

21     the question to the extent you can do so without

22     revealing those.

23         A.   To my knowledge, from news reports and the

24     public record, is that it was created for the specific

25     purpose of the voter identification legislation.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

193

1        Q.   (By MS. WESTFALL) Was Speaker Straus behind its

2    creation?

3             MR. SWEETEN:  Don't reveal any

4    legislatively-privileged communications.  To the extent

5    that you -- and also objection, speculation.  But to the

6    extent you can answer that question based on -- without

7    revealing those, go ahead.

8        A.   Typically, the Speaker's office is responsible

9    for creating -- creating committees.

10       Q.   (By MS. WESTFALL) Including special committees?

11       A.   Yes.

12       Q.   Or -- I'm sorry, Select Committees?

13       A.   Yes.

14       Q.   And was it your understanding that Speaker

15   Straus and his office was involved in creating the House

16   select Committee on voter identification and voter fraud

17   in 2011?

18            MR. SWEETEN:  Objection, calls for

19   speculation.

20       A.   I can't speculate, but typically, the Speaker's

21   Office has the ability to create committees.

22       Q.   (By MS. WESTFALL) Would anyone else in

23   leadership have been involved in the creation of the

24   committee?

25            MR. SWEETEN:  Objection, speculation.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

194

1      Also, don't reveal legislatively-privileged

2      communications.  But go ahead.

3          A.   I don't know if anybody else was involved.

4          Q.   (By MS. WESTFALL) How many bills did the Select

5      Committee on -- and I'm just going the refer to this as

6      the Select Committee, if that's okay, for purposes of

7      this discussion.  How many bills did the Select

8      Committee consider?

9          A.   There were several bills that were referred to

10     the committee.  I believe the -- Senate Bill 14 was the

11     single bill heard by the committee.

12         Q.   Did it hear any bills on mail-in ballot fraud

13     that were filed in 2011?

14         A.   No.  I believe those were referred to the

15     Committee on Elections.

16         Q.   Why did they go to the Committee on Elections?

17              MR. SWEETEN:  Objection, calls for

18     speculation.  You can answer to the extent you're not

19     revealing legislatively-privileged communications.  Go

20     ahead.

21         A.   I can't speculate as to why they went where

22     they did.

23         Q.   (By MS. WESTFALL) Did Representative Harless

24     serve on the Select Committee?

25         A.   Yes.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1    Q.   Can you tell me about the circumstances under

2    which she was appointed to that committee?

3              MR. SWEETEN:  Don't reveal any

4    communications that I've previously outlined that are

5    legislatively privileged.  To the extent you can answer

6    without revealing those, you can go ahead.

7    A.   I don't know the circumstances behind her

8    appointment.

9    Q.   (By MS. WESTFALL) How did you first learn about

10   her appointment?

11             MR. SWEETEN:  Don't reveal any

12   legislatively-privileged communications.  You can answer

13   to the extent you have information outside of that.

14   A.   I believe it was a press release from the

15   Speaker's Office.

16   Q.   (By MS. WESTFALL) Is that ordinarily how you

17   learn about Representative Harless's appointments to

18   committees, is via a press release?

19   A.   Typically, that's how it's done.  A press

20   release to all the members so they all find out at the

21   same time.  That's how I learned of it.

22   Q.   When was the first time that the committee met?

23   A.   Early March.

24   Q.   How many times did the committee meet?

25   A.   Less than five times.  I believe it was four,



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

196

1    but I cannot be sure on that.  I think it was four

2    times.  Less than five.

3        Q.   Do members of the House generally submit their

4    preferences for serving on committees to the Speaker's

5    office?

6        A.   Yes.

7        Q.   Do you know whether Representative Harless

8    indicated to the Speaker's Office that she wanted to

9    serve on the Select Committee?

10            MR. SWEETEN:  If that's a matter of public

11   record, you can feel free to answer that.  If it's

12   something that falls within what we've outlined as being

13   legislatively privileged, do not.

14            THE WITNESS:  Okay.

15       Q.   (By MS. WESTFALL) Can you not answer that

16   question?

17       A.   I can't answer that question.

18       Q.   On the basis of it being privileged, on the

19   basis of counsel's advice?

20       A.   Correct.

21       Q.   When did Senate Bill 14 pass the Senate?  And

22   if you want to take a look at Exhibit 8, feel free to do

23   so.

24       A.   Senate Bill 14 was reported engrossed on

25   January 26th, 2011.  It was received by the House on the



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

197

1    27th of January.

2        Q.   How usual is it for a bill of this substantive

3    nature to be enacted in one chamber in two weeks on

4    January?

5                MR. SWEETEN:  Objection, assumes facts not

6    in evidence.  Objection, calls for speculation.  You can

7    answer if you have information responsive to that

8    question.  So don't reveal any legislatively-privileged

9    information.

10               MS. WESTFALL:  Mr. Sweeten, I think the

11   timing of bills being passed is a matter of public

12   record, and you have no basis for making a privilege

13   objection.

14               MR. SWEETEN:  Well, I mean, first of all,

15   with respect to my objections, you loaded that question

16   chock full of conclusory statements.

17               MS. WESTFALL:  Those are different

18   objections.

19               MR. SWEETEN:  So those are my objections.

20               MS. WESTFALL:  That's not basis for

21   instructing the witness not to answer.

22               MR. SWEETEN:  Okay.  And I'm not

23   instructing him not to answer.  I'm instructing him not

24   to reveal privileged information, if he needs to do so

25   in order to answer that question.  I'm not saying he



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

COLBY BEUCK                                           MAY 14, 2012

198

1     does.  I've already instructed him, he can testify as to

2     the public record.  So if it truly is public record,

3     he's free to answer that question.

4                MS. WESTFALL:  I'm not sure how it could

5     possibly be privileged.

6                MR. SWEETEN:  Okay.  Well, and the

7     instruction don't apply, then, if it's publicly

8     available.

9                MS. WESTFALL:  Then I'm not sure why you

10    made the objection.

11        Q.   (By MS. WESTFALL) Can you think of any other

12    bills that are substantive that got passed in two weeks

13    in the Senate?

14        A.   I'm not a Senate historian, so I can't speak to

15    that.

16        Q.   You've worked in the Senate since 2003, have

17    you not?

18        A.   I have worked in the Senate since 2003, so I

19    can speak to that.  Past 2003, I'm no expert.  The

20    emergency legislation, I guess it's possible.  That is

21    in the beginning of the session, so it is...

22        Q.   Can you recall, based on your experience

23    working in the Senate from 2003 to the present, whether

24    any other substantive bills have been enacted in the

25    Senate in two weeks in January, that are substantive in



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

199

```
 1    nature, such as Senate Bill 14?

 2         A.   Not that I recall.

 3         Q.   Did you or Representative Harless have any

 4    involvement in the Senate's consideration of SB 14 from

 5    the time it was filed on January 12th until it was

 6    referred to the Select Committee?

 7              MR. SWEETEN:  Don't reveal any

 8    legislatively-privileged communications.  I've outlined

 9    before.

10         A.   Do we have any involvement in the sense -- no.

11         Q.   (By MS. WESTFALL) So you simply watched what

12    happened in the Senate?  Is that your testimony?

13         A.   That's correct.  And I'm speaking of behalf of

14    myself, not Representative Harless.  I had no

15    involvement in it.  I was a spectator.

16         Q.   Do you know whether she had any involvement in

17    SB 14, from the time it was filed in the Senate to the

18    time it was referred to the House Committee?

19              MR. SWEETEN:  Same instruction.

20         A.   Not to my knowledge.

21         Q.   (By MS. WESTFALL) Not to your knowledge based

22    on the public record?  Is that your testimony?

23         A.   That's, I think -- I don't want to -- I don't

24    know if she did.

25         Q.   Have any private conversations?
```



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

200

1      A.   I can't speak for her, so I don't know her

2   involvement.

3      Q.   Did you have any conversations or

4   communications with the media or the public when SB 14

5   was filed in January?

6           MR. SWEETEN:  If they're public

7   communications, if there's discussions with the media,

8   I'm going to let you answer that.  If it's says to

9   constituent communications, I think that that would be

10  privileged, so I don't want you to provide that

11  information.

12     A.   I don't recall having any conversations with

13  the media on the filing of Senate Bill 14.

14     Q.   (By MS. WESTFALL) Did Representative Harless?

15     A.   Not to my knowledge.

16     Q.   Can you describe the Select Committee's

17  consideration of SB 14?

18          MR. SWEETEN:  You're asking about matters

19  of the public record, is that correct, the

20  consideration?

21          MS. WESTFALL:  No.  I'm asking about

22  public and private consideration by the Select Committee

23  of SB 14.

24          MR. SWEETEN:  Well, I don't want you to

25  are reveal any communications that we have already



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1    outlined or that are legislatively-privileged, but to

2    the extent that you have information that is not

3    legislatively-privileged.

4        A.    Can I get, because -- I was -- what was the

5    question again?

6        Q.    (By MS. WESTFALL) Can you describe the

7    committee's consideration of SB 14?

8        A.    Okay.

9             MR. SWEETEN:  You can testify about

10   matters of the public record, okay?  Don't reveal

11   communications that have -- that you're aware of that

12   occurred between legislators, legislative staff, TLC,

13   state agencies, or constituents.

14            THE WITNESS:  Okay.

15       A.    The committee process, there was a full day

16   hearing in early March on the issue.  I believe it began

17   early in the morning and continued.  There was a break

18   during the legislative session.  Then the committee

19   readjourned after session and continued to hear

20   testimony from the -- and invited testimony as well as

21   public testimony.  There was a considerable.

22       Q.    (By MS. WESTFALL) And were any substantive

23   changes made to SB 14 during the committee's

24   consideration of it?

25       A.    There were not -- no, there were not any



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1    committee -- committee amendments.  It was the committee

2    substitute as it went through.

3         Q.   During the first few months of 2011, did you

4    gather any information to assist Representative Harless

5    in her work on SB 14?

6              MR. SWEETEN:  To the extent that this

7    question is asking you to reveal communications that you

8    had with Representative Harless, or any other staff

9    members, I don't want you to provide that information.

10   That's legislatively-privileged.  If you can provide

11   that answer without revealing those communications that

12   we've outlined previously, I'm going to let you do so.

13        Q.   (By MS. WESTFALL) Did you contact the

14   Department of Public Safety during the first few months

15   of 2011?

16             MR. SWEETEN:  You're just asking the

17   contact?

18             MS. WESTFALL:  Yeah.

19             MR. SWEETEN:  Okay.  I'm going to let you

20   answer whether or not you had contact, including,

21   as this is along the lines of a privilege log

22   questions.  You can talk about the contact and the date

23   of.  Do not reveal the substance of any sort.

24        A.   Yes.

25        Q.   (By MS. WESTFALL) What prompted you to contact



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

 1      DPS?

 2              MR. SWEETEN:  Unless matter is a matter of

 3      public record, you do not have to reveal that

 4      information.  That is legislatively-privileged.

 5          Q.  (By MS. WESTFALL) Do you have any answer based

 6      on public record?

 7          A.   There was an expert witness in committee from

 8      DPS.

 9          Q.   Which prompted you to contact DPS?

10          A.   Yes.

11          Q.   Do you have any further explanation of why you

12      contacted DPS, based on this expert testimony?

13              MR. SWEETEN:  And based on the public

14      record.  Don't reveal legislatively-privileged

15      communications.

16          A.   No.

17          Q.   (By MS. WESTFALL) What did you learn from DPS?

18              MR. SWEETEN:  I'm going to advise you not

19      reveal that conversation.

20              MS. WESTFALL:  Is this based on

21      legislative privilege, Mr. Sweeten.

22              MR. SWEETEN:  It is.  Legislative fact

23      gathering is within the privilege.  We've asserted

24      that.  He is not going to reveal information or

25      communications between state agencies and him.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

204

1              MS. WESTFALL:  Is that the sole privilege

2       you're asserting over those conversations?

3              MR. SWEETEN:  I believe we've also

4       asserted the deliberative process privilege over the

5       state agency considerations.

6         Q.   (By MS. WESTFALL) What steps did you take, if

7       any, upon receiving information from the Department of

8       Public Safety.

9         A.   I'm sorry.  Could you repeat the question?

10        Q.   Certainly.  What steps did you take, if any,

11      upon receipt of information from the Department of

12      Public Safety?

13             MR. SWEETEN:  Don't reveal communications

14      that relate -- don't reveal it if revealing so reveals

15      communications you've had with any state agents.

16        A.   What actions were taken upon any conversations

17      with DPS?

18        Q.   (By MS. WESTFALL) Correct.

19        A.   Okay.  None that I can recall.

20        Q.   Is this based on recollection or based on

21      privilege and the instructions of counsel or both?

22        A.   On my recollection.

23        Q.   Of after the committee voted -- actually, the

24      committee voted SB 14 out of committee; is that correct?

25        A.   Correct.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

COLBY BEUCK                                                          MAY 14, 2012

                                                                            205

1        Q.   And was it placed on the House's emergency

2   calendar?

3        A.   Yes.

4        Q.   Do you know why that happened?

5             MR. SWEETEN:  Don't reveal any

6   communications related to that, that would be

7   legislatively privileged.  To the extent it's a matter

8   of public record, you can freely answer that.

9        A.   I believe the emergency calendar, there are

10  certain items that are eligible for it.  I don't know

11  beyond why that decision was made, but if...

12       Q.   (By MS. WESTFALL) Who was responsible for

13  making the decisions about what gets on the emergency

14  calendar in the House?

15       A.   The chair of the Calendars Committee typically

16  has jurisdiction over the House Floor calendar.

17       Q.   And who is that person?

18       A.   That would be Representative Hunter.

19       Q.   Was he the person who decided to put SB 14 on

20  the emergency calendar in the House?

21            MR. SWEETEN:  Objection to the extent it

22  calls for speculation.  Go ahead.

23       A.   I can't speculate, but he is the Chair, and

24  typically Calendars Committee does have jurisdiction

25  over the House Floor calendars.  I can't speculate if he



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

206

1    was the person who made the final decision or not.

2         Q.   (By MS. WESTFALL) And going back to the Select

3    Committee's consideration of SB 14, did a representative

4    from DPS testify at that hearing?

5         A.   Yes.

6         Q.   Who was the person that testified?

7         A.   I believe her name was Rebecca.  Rebecca Davio.

8         Q.   And what was the testimony concerning?

9         A.   The DPS's involvement as it -- as it --

10   identification -- their involvement in the

11   identification parts of the legislation.

12        Q.   Are you referring to the election

13   identification certificate, or are you referring to

14   drivers' licenses?

15        A.   I believe at that time, it was not the election

16   identification certificate.  I think it was just the

17   personal identification used for voting purposes and the

18   free ID.  That's the part of her testimony that I

19   remember.  There might have been other parts of the

20   testimony, but that's the specific part I remember.

21        Q.   Turning to Floor consideration, House Floor

22   consideration of SB 14, did Representative Harless have

23   a strategy to ensure that SB 14 was passed on the House

24   Floor?

25             MR. SWEETEN:  Don't reveal any



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

207

1    communications you've had with Representative Harless or

2    any other communications that we've discussed and

3    enumerated today multiple times.  To the extent that you

4    can answer that question without revealing those

5    communications, you can do so.

6                 THE WITNESS:  Okay.

7          Q.    (By MS. WESTFALL) Can you answer the question

8    based on advice of counsel?

9          A.    Correct.

10         Q.    What was your role during the House

11   consideration, the Floor consideration of SB 14?

12         A.    I was monitoring the debate.  It was a full --

13   full day's debate, and I was monitoring it.

14         Q.    Did you prepare talking points for her?

15                MR. SWEETEN:  Objection.  I think you're

16   asking for communications that he's had with

17   Representative Harless.  I don't believe that those are

18   -- I think those are subject to legislative privileged.

19   I'm going to instruct him not to answer that question.

20                MS. WESTFALL:  I'm asking about the

21   existence of documents, not the substance of the

22   documents, Mr. Sweeten.

23                MR. SWEETEN:  What you asked was:  Did you

24   prepare talking points for Representative Harless?

25                MS. WESTFALL:  Right.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

208

1            MR. SWEETEN:  And if you're asking if

2      there is an existing document, that is a very different

3      question.

4            MS. WESTFALL:  It's a privilege log

5      question.

6            MR. SWEETEN:  Okay.

7            MS. WESTFALL:  But you can stick with your

8      objection if that's the story you're sticking to.

9            MR. SWEETEN:  I'm sticking with the facts,

10     which are, you asked two separate questions there now.

11     So if you're asking if there's an existing document with

12     talking points?  Is that your question?

13            MS. WESTFALL:  It is.

14            MR. SWEETEN:  Okay.

15            MS. WESTFALL:  Think about a privilege

16     log, Mr. Sweeten.

17            MR. SWEETEN:  Well, and I have let you,

18     during today's questioning, establish facts that you

19     would establish in a privilege log.  So if you're

20     asking:  Is there a document in existence that is

21     talking points, then I think we can let him answer that.

22      A.   Is there a document that exists that contains

23     talking points?

24      Q.   (By MS. WESTFALL) That you prepared or someone

25     in your office prepared for Representative Harless for



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

209

1    Floor consideration.

2              MR. SWEETEN:   The problem is that you're

3    asking him now what he prepared, and that would

4    implicate communications between he and Representative

5    Harless.

6              MS. WESTFALL:   The fact of the

7    communication is not privileged, correct?  You have a

8    privilege log that indicates he authored communications

9    to DPS.  They were received by DPS.  You have a subject

10   matter line.  You have a date line.  That's called the

11   privilege log.  I'm asking him similar questions with

12   regard to communications during this deposition.

13             MR. FREDERICK:   If I may, this is Matt

14   Frederick for the record.  Let me just point out that

15   counsel for the United States representation of the

16   privilege log is not totally consistent with the

17   privilege log that the United States has produced, as

18   far as the level of detail.  I believe that the

19   questions go for more detail than has been provided on

20   any party's privilege log in this litigation.

21             MS. WESTFALL:   Well, I think that's a non

22   sequitur, to the point at hand, Mr. Frederick.

23             Mr. Sweeten, are you going to let him

24   answer the question about the existence of the document,

25   or no?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

COLBY BEUCK                                                          MAY 14, 2012

210

1              MR. SWEETEN:  I'm going to let him answer

2      whether or not there is a document in existence.  We

3      won't describe it.  I'm not going to let him provide any

4      detail, but if -- does -- do you want to ask your

5      question again with that?

6          Q.   (By MS. WESTFALL) My stands to the extent you

7      remember what I asked.  Could you please answer the

8      question so I don't have to repeat it, please,

9      Mr. Beuck?

10         A.    There is a document in existence.

11         Q.    Are you the author of such document?

12         A.    I am the author.

13             MS. WESTFALL:  And for the record,

14     Mr. Sweeten, what did the talking points say?

15             MR. SWEETEN:  No.  We're not going to

16     answer that question.  That would reveal communications

17     between Mr. Beuck and Representative Harless.

18         Q.   (By MS. WESTFALL) Did you prepare

19     Representative Harless for questions she might receive

20     on the Floor during consideration of SB 14?

21             MR. SWEETEN:  Objection.  You're asking

22     him for communications he had with Representative

23     Harless.  Do not provide an answer to that.

24         Q.   (By MS. WESTFALL) Getting back to the talking

25     points, did you have anyone else review the talking



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1    points, outside of your office, in advance of providing

2    them to Representative Harless?

3                MR. SWEETEN:  Objection.  It assumes facts

4    not in evidence, and I'm going to object to the extent

5    that it would implicate any sort of communications

6    you've had with any legislative staff or any other

7    enumerated areas.

8         Q.   (By MS. WESTFALL) So can you not testify --

9         A.   No.

10        Q.   -- in response to my question based on advice

11   of counsel?

12        A.   I cannot testify based on advice from counsel.

13        Q.   Besides the talking points we've discussed, did

14   you have meetings with Representative Harless to prepare

15   her for Floor consideration of SB 14?

16                MR. SWEETEN:  Don't reveal -- in answering

17   that question, you would be revealing the substance of

18   communications; therefore, I don't want you to do that.

19   If she wants to ask whether you've had meetings with

20   Representative Harless prior to a Floor appearance,

21   that's a different question.  But don't reveal the

22   substance of the communication.  It is legislatively

23   privileged.

24        Q.   (By MS. WESTFALL) Did you have any meetings

25   with Representative Harless before the Floor



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

212

1    consideration of SB 14?

2         A.    Yes.

3         Q.    How long were those meetings?

4         A.    30 minutes to an hour.

5         Q.    Was anyone else at that meeting besides the two

6    of you?

7         A.    No.

8         Q.    Did you have this meeting in person?

9         A.    Yes.

10        Q.    Did you have this meeting in her office?

11        A.    Yes.

12        Q.    Did Representative Harless review any

13   documents, besides the talking points we talked about,

14   before she engaged in the Floor consideration of SB 14?

15              MR. SWEETEN:  Yeah.  The question is a

16   yes-or-no question.  I'm going to let you answer that,

17   but as to what those documents are, if that's the next

18   question, we're not going to -- I'm going to assert the

19   legislative privilege as to that.  You can yes or no to

20   her question.

21        A.    I believe she did review other documents.

22        Q.    (By MS. WESTFALL) How many?

23        A.    I don't know.

24        Q.    Who were the documents authored by?

25              MR. SWEETEN:  Don't -- you don't have to



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

213

1    answer that question.  That's legislatively privileged.

2         Q.   (By MS. WESTFALL) Did they come from a

3    lobbyist?

4              MR. SWEETEN:   The same objection and the

5    same instruction.  Don't answer the question.  It's

6    legislatively privileged.

7         Q.   (By MS. WESTFALL) Did they come from the

8    Lieutenant Governor's Office?

9              MR. SWEETEN:   Same objection.

10        Q.   (By MS. WESTFALL) Did they come from the

11   Governor's office, interest groups, or constituents?

12             MR. SWEETEN:   Same objection.

13        Q.   (By MS. WESTFALL) Are you not answering based

14   on advice of counsel?

15        A.   Yes.

16        Q.   What did the documents say?

17             MR. SWEETEN:   Same objection.

18        Q.   (By MS. WESTFALL) Do you recall that during the

19   Floor debate, Representative Harless stated she was not

20   advised concerning the number of voters that lacked the

21   required identification and what percentage of these

22   voters are African American or Hispanic?

23        A.   It was a fairly lengthy debate.  I don't recall

24   that specific statement by her.

25        Q.   We'll get an exhibit on that in a minute.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

214

1          Are you familiar with the amendments

2     offered to SB 14 on the House Floor?

3          A.   Some of them, yes.  There were several.  There

4     were many amendments offered.

5               MS. WESTFALL:  Would you mark this as

6     Exhibit U.S. 9.

7               (Exhibit 9 marked for identification.)

8          Q.   (By MS. WESTFALL) You have been handed U.S.

9     Exhibit 9.  Do you recognize this exhibit?

10              MR. SWEETEN:  Do we get one of those?

11              MS. WESTFALL:  Certainly.  I'm eager not

12    to carry this home.

13         Q.   (By MS. WESTFALL) Do you recognize this

14    document?

15         A.   This appears to be a copy the House Journal

16    from March 23rd.

17         Q.   By the way, were you on the Floor with

18    Representative Harless during the Floor consideration,

19    or were you elsewhere?

20         A.   I was not on the Floor.

21         Q.   Where were you?

22         A.   I was in an office.

23         Q.   What office?

24         A.   It would be considered the -- it's a conference

25    room within the Speaker's Office.


ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

215

1      Q.   Who were you with?

2      A.   Myself.

3      Q.   Turning your attention to Amendment 15, which

4   is on Page 969 of Exhibit 8.

5           MR. ROSENBERG:   What page was that,

6   Ms. Westfall?

7           MS. WESTFALL:   969.

8      Q.   (By MS. WESTFALL) Amendment 15, could you take

9   a look at that and let me know when you're ready?

10     A.   (Viewing documents.)

11     Q.   Have you had a chance the to review that?

12     A.   Yes.

13     Q.   What is this amendment designed to accomplish?

14     A.   The amendment appears to prohibit fees for the

15  issuance of any document under Senate Bill 14.

16     Q.   And how did Representative Harless respond to

17  this amendment?

18          MR. SWEETEN:   Are you asking a matter of

19  public record?

20          MS. WESTFALL:   Yes.  I'm asking a matter

21  of public record.  It's right here, Mr. Sweeten?

22     A.   Representative Harless moved to table Amendment

23  Number 15.

24     Q.   (By MS. WESTFALL) Why did she do that?

25          MR. SWEETEN:   Objection, calls for



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

COLBY BEUCK                                                    MAY 14, 2012

216

1    speculation.  Also, don't reveal any communications

2    you've had with Representative Harless as to the issue.

3         A.   I can't speculate to her motives on that

4    amendment.

5         Q.   (By MS. WESTFALL) Did you advise her to table

6    that amendment?

7              MR. SWEETEN:  Objection.  It would reveal

8    communications between Mr. Beuck and Representative

9    Harless, and it would be legislatively-privileged.

10             Instruct you not to answer.

11        Q.   (By MS. WESTFALL) Did you have any

12   conversations with Representative Harless about this

13   amendment?

14             MR. SWEETEN:  The subject matter is

15   contained within the question; therefore, I'm going to

16   instruct not to answer, as it would reveal matters of

17   the legislative privilege.

18        Q.   (By MS. WESTFALL) Was Representative Harless

19   holding a cell phone during the House Floor

20   consideration of Senate Bill 14?

21        A.   I don't recall.

22        Q.   Did you receive any texts from her during House

23   Floor consideration of SB 14?

24             MR. SWEETEN:  You can testify as to

25   whether or not you received a text.  Don't testify as to



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

217

1    what those communications were or the substance of

2    those.

3         A.   I believe I did.

4         Q.   (By MS. WESTFALL) More than one?

5         A.   More than one.  Probably less than five.

6         Q.   Do you know whether she was texting persons

7    other than you during House Floor consideration of

8    SB 14?

9              MR. SWEETEN:  Objection, calls for

10   speculation.

11        A.   I don't know.

12        Q.   (By MS. WESTFALL) Turning your attention to

13   Amendment 23 at House Journal 979.  Could you describe

14   this amendment?

15        A.   This is an amendment from Representative Dutton

16   adding a student identification card to the list of

17   acceptable forms of photo identification.

18        Q.   How did Representative Harless vote on this

19   amendment?

20        A.   She voted for the motion to table.

21        Q.   Did you advise her to do that?

22             MR. SWEETEN:  Objection.  Don't reveal any

23   conversation you had with Representative Harless.  I

24   instruct you not to answer that.

25        Q.   (By MS. WESTFALL) So the answer is no, you're



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1       not going to respond based on privilege?

2                    MR. SWEETEN:  You've asked him to reveal

3       the substance of communication between he and

4       Representative Harless.  That is clearly within the

5       lines of legislatively privilege that I'm very

6       consistently drawing today.

7                    MS. WESTFALL:  I just want to make sure

8       the witness is indicating on the basis of privilege for

9       the record.  Okay?

10                    MR. SWEETEN:  Fair enough.  I am

11       instructing you not to answer that question.  It would

12       reveal legislatively-privileged information.

13       Q.   (By MS. WESTFALL) Why do you think she voted

14       against this amendment?

15       A.   I can't speculate.

16       Q.   Weren't student IDs included in previous

17       iterations of the bills?

18                    MR. SWEETEN:  Objection, vague.

19       Q.   (By MS. WESTFALL) You can answer.

20       A.   I'd have to go back and look at the previous

21       versions of voter ID through the last sessions.

22       Q.   Did you do any analysis, or did Representative

23       Harless do any analysis, as to whether student IDs would

24       be more frequently possessed by minorities than the

25       general population?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1           MR. SWEETEN:  I'm going to object to the

2    question.  It think it calls for matters that are

3    legislatively privileged.  Don't reveal any

4    communications you've had with Representative Harless.

5    And legislative fact-gathering is well contained within

6    the privilege, so I'm going to instruct you

7    accordingly.  To the extent you can provide information,

8    matters of public record or that are not part of the

9    legislative privilege, you can provide an answer to that

10   question.

11        A.   No, based upon the advice from my counsel.

12        Q.   (By MS. WESTFALL) I believe you testified

13   earlier that there are lots of different forms of ID

14   that would be considered allowable; U.S. Military IDs;

15   is that correct?

16        A.   I don't remember phrasing my answer that way.

17        Q.   There's more than a handful of military IDs, is

18   there not?

19        A.   Not to my knowledge.  I don't know.

20        Q.   Or do you not know the number of U.S. military

21   IDs?

22        A.   I don't know.

23        Q.   Okay.  And turning back to House Bill 112,

24   Representative Harless had filed a bill, in November

25   2010, that provided for the use of photo IDs issued by



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

220

```
 1    the state, its agencies, and subdivisions; isn't that
 2    right?
 3         A.   I'm looking at House Bill 112, identification
 4    card issued to person by government entity, correct.
 5         Q.   And that would be quite a few IDs, would it
 6    not?
 7         A.   Correct.
 8         Q.   Representative Harless indicated publicly that
 9    her concern with student IDs was the number of student
10    IDs; isn't that right?
11              MR. SWEETEN:  You can answer to the extent
12    she's asking about matters of public record.
13         A.   I remember the student ID issue coming up
14    during the debate.  I don't remember her specific
15    testimony on...
16              MR. SWEETEN:  Hold one second.
17              MS. WESTFALL:  Would you mark this as
18    Exhibit 10, please.
19              (Exhibit 10 marked for identification).
20         Q.   (By MS. WESTFALL) You've been handed U.S.
21    Exhibit Number 10.  Have you seen this document before?
22         A.   (Viewing documents.)
23         Q.   If I could turn your attention to the top of
24    the third page.  I'm sorry, the third page, double
25    sided.  There is some quotations from Representative
```



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

221

1    Harless.  If you could just take a look at those and let

2    me know when you've had a chance review it.

3        A.    Okay.

4        Q.    By the way, have you seen this article before?

5        A.    I do remember this.  I remember when it was --

6        Q.    Okay.

7        A.    I do remember the article.  I don't remember

8    the specifics of it.  (Viewing documents.) Just this top

9    portion.  Yes.  Okay.

10       Q.    So it indicates, does it not, that

11   Representative Harless excludes student IDs because,

12   quote, "We wanted a form of identification that was

13   easily recognized by the poll workers at the election

14   site."  Is that correct?

15       A.    That's what --

16            MR. SWEETEN:  You're asking him is that

17   what -- if that's correct, that's what that says?

18            MS. WESTFALL:  That's correct.  Correct.

19       Q.    (By MS. WESTFALL) Does Exhibit 10 indicate

20   that?

21       A.    The exhibit does indicate that.

22       Q.    Did Representative Harless consider whether

23   those same concerns would apply to the number of

24   military IDs for example, which could be varied?

25            MR. SWEETEN:  I'm going to object to the



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

222

1      extent that she's asking you to reveal conversations

2      that you've had with Representative Harless.  And I'm

3      going to instruct you not to answer based upon that.  If

4      you can answer based upon public record or matters that

5      don't implicate this communications of legislative

6      privilege, but I'm going to instruct you not to answer.

7          A.   I don't recall in the public record, if that

8      was something.  I don't recall.

9          Q.   (By MS. WESTFALL) Did you have any

10     conversations with Representative Harless about this

11     amendment, Amendment 23?

12         A.   Regarding student IDs?

13              MR. SWEETEN:  Don't reveal the substance

14     of any conversations.

15         Q.   (By MS. WESTFALL) Did you have any

16     conversations with about her this amendment?

17         A.   Not that I recall.

18         Q.   Turning your attention to Amendment 35 at House

19     Journal 991, are you familiar with this amendment?

20         A.   Yes, I remember.  I remember this from the

21     debate.

22         Q.   Could you describe the amendment?

23         A.   It's applying the Voting Rights Act to certain

24     sections of Senate Bill 14.

25         Q.   And how did Representative Harless vote on this



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

COLBY BEUCK                                          MAY 14, 2012

223

1    amendment?

2         A.    She voted for the motion to table.

3         Q.    Did you advise her to vote that way?

4              MR. SWEETEN:   Objection.   Don't reveal

5    communications you had with Representative Harless.

6    Those are legislatively privileged.

7         Q.    (By MS. WESTFALL) Did you have any other

8    testimony in response to that question, or no?

9              MR. SWEETEN:   Objection.   The question is

10   vague.

11        A.    No.

12        Q.    (By MS. WESTFALL) Does Representative Harless

13   believe that materials printed under SB 14 should only

14   be in English?

15             MR. SWEETEN:   I'm going to object.   Do not

16   reveal any communications that you've had with

17   Representative Harless.   To the extent that the public

18   record reveals answers to this question, you can refer

19   counsel to that.

20        A.    Not that -- not that I know of.

21        Q.    (By MS. WESTFALL) Do you know what Section 203

22   does of the Voting Rights Act?   Sorry.

23        A.    I know I have expert here to answer that in

24   case I don't.   I'm not going to assume to know.   I

25   remember the debate.   I remember it had to do with



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

COLBY BEUCK                                          MAY 14, 2012

224

```
 1    Section -- I can't remember if that's Section 2 or
 2    Section 5.
 3        Q.   Turning to your attention now to Amendment
 4    Number 50 at House Journal 1009 and 1010.
 5        A.   Okay.
 6        Q.   Are you familiar with this amendment?
 7        A.   Okay.
 8        Q.   What would this amendment have done?
 9        A.   This provides a travel reimbursement, provides
10    travel reimbursement for individuals under a certain --
11    under certain -- certain poverty guidelines.  They may
12    recover expenses for traveling to a DPS office for
13    obtaining photo identification.
14        Q.   How did Representative Harless vote on this
15    amendment?
16        A.   She voted for the motion to table.
17        Q.   Why did she vote that way?
18            MR. SWEETEN:  Objection to the extent that
19    that would reveal communications you had with
20    Representative Harless.
21            Don't provide an answer to that question.
22    If there are matters on the public record that you can
23    refer counsel to, you can answer that question.
24        Q.   (By MS. WESTFALL) Do you have an answer?
25        A.   No, I do not.
```



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1      Q.   Isn't it the case that the majority of

2    individuals who live below the federal poverty line in

3    Texas are members of racial minorities?

4           MR. SWEETEN:   Objection, assumes facts not

5    in evidence.   Objection, argumentative.   If you have

6    personal knowledge of what she's asking you, I'll let

7    you answer.

8      A.   No, I don't have any personal knowledge on

9    that.

10     Q.   (By MS. WESTFALL) Did you have any

11   conversations with Representative Harless about

12   Amendment 50?

13          MR. SWEETEN:   Objection.   The question

14   asks about the subject matter.   Therefore, I'm going to

15   instruct you not to reveal communications you had with

16   Representative Harless and the other communications that

17   I've outlined previously.

18     Q.   (By MS. WESTFALL) Turning your attention to

19   Amendment 54 at Page 1015 of the House Journal, are you

20   familiar with this amendment?

21     A.   This is an amendment directed to the Secretary

22   of State to require certain records be kept regarding

23   Senate Bill 14.

24     Q.   How did Representative Harless vote on this

25   amendment?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

226

1        A.    She voted for the motion to table.

2        Q.    Why did she vote that way?

3              MR. SWEETEN:  Objection.  Don't reveal

4    communications between you and Representative Harless.

5    To the extent there's public information about that

6    issue, you can answer based upon the public record.

7        Q.    (By MS. WESTFALL) Why did Representative

8    Harless not want this information to be gathered?

9              MR. SWEETEN:  Same objection.  Your

10   question asks for matters that are privileged by the

11   legislative privilege, that are covered under that.  It

12   also asks for communications between Mr. Beuck and

13   Representative Harless, and I'm going to instruct him

14   not to answer that question.  It also calls for

15   speculation.

16       Q.    (By MS. WESTFALL) Did Representative Harless or

17   you have any concerns that this information would be

18   harmful because it would show a disparate effect on

19   SB 14 on minority voters?

20             MR. SWEETEN:  I'm going to instruct you

21   not to answer that question in that question asks for

22   you to reveal matters that are subject to the

23   legislative privilege and impact communications you may

24   have had with Representative Harless.

25       Q.    (By MS. WESTFALL) How far in advance were --



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1    was there a requirement that these amendments be filed

2    within a certain time period before Floor consideration

3    of SB 14?

4        A.    No, there was not a -- I think what's referred

5    to as a prefiling rule.  These amendments, many of them,

6    from my observation, were being drafted, and a good

7    number of them were being drafted and submitted during

8    the debate.  And I understand a lot of them were

9    prepared beforehand.  But, no, there was no prefiling.

10       Q.    Did you have any awareness or knowledge of

11   Amendment Number 54 in advance of the Floor debate?

12       A.    Not that I recall.

13       Q.    Did you consult with the Secretary of State's

14   Office about her position on this amendment before it

15   was considered?

16             MR. SWEETEN:  I'm going to instruct you

17   not to answer.  That is a matter subject to the

18   legislative privilege.  It's communication between your

19   -- potentially, communication between your office, you,

20   or Representative Harless with a state agency, which is

21   covered by the legislative privilege.

22       Q.    (By MS. WESTFALL) Turning to your attention to

23   Amendment Number 55 on the following page, Page 1016,

24   are you familiar with this amendment?

25       A.    This is an amendment which is requesting the


ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

228

1    Secretary of State -- or it's requiring the Secretary of

2    State to make a determination on the racial or ethnic

3    identity of -- of those that are required to cast a

4    provisional ballot under Senate Bill 14.

5         Q.   How did Representative Harless vote on this

6    amendment?

7         A.   She voted for the motion to table.

8         Q.   Why did she vote that way?

9              MR. SWEETEN:   Objection.  It calls for

10   matters in communications between Mr. Beuck and

11   Representative Harless.  It implicates those

12   communications, and therefore, it's legislatively

13   privileged.  I instruct you not to answer that question.

14        Q.   (By MS. WESTFALL) Did Representative Harless

15   have any concern that the burden of SB 14 might be felt

16   disproportionately by minority voters?

17             MR. SWEETEN:   Objection, calls for

18   speculation.  Objection, also to the extent that it

19   implicates legislative privilege and communications that

20   Mr. Beuck had with Representative Harless, I instruct

21   you not to answer on that basis.

22        Q.   (By MS. WESTFALL) Did you have any

23   communications with Representative Harless about this

24   amendment?

25             MR. SWEETEN:   I'm going to let you answer



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1    as to the fact of a communication.  Otherwise, I will

2    not -- I'm not going to let you discuss the specific

3    communications involved.

4         A.    Not that I recall.

5         Q.    (By MS. WESTFALL) Turning your attention to

6    Amendment 58 on Page 1021.

7         A.    Yes.

8         Q.    Can you describe this amendment?

9         A.    This is an amendment which requires the

10   Secretary of State to conduct a study on the ethnicity,

11   the potential impact on voter turnout, turn-out data.

12   It's requiring the Secretary of State to conduct a

13   study, and it makes that study conditional on the

14   implementation of Senate Bill 14.

15        Q.    How did Representative Harless vote on this

16   amendment?

17        A.    She voted for the motion to table.

18        Q.    Why did she vote that way?

19             MR. SWEETEN:   Objection, it calls for

20   matters that are covered under the legislative privilege

21   and communications between Mr. Beuck and Representative

22   Harless.  I'm going to instruct you not to answer on

23   that basis.  To the extent that there are matters of

24   public record that you can testify that provide you the

25   ability to answer that question, you can do so.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

COLBY BEUCK                                                    MAY 14, 2012

                                                                        230

1        Q.   (By MS. WESTFALL) Is there anything in the

2   public record that would enable you to answer that

3   question?

4        A.   No.

5        Q.   Why did Representative Harless not want this

6   information gathered?

7             MR. SWEETEN:  I'm going to make the same

8   objection.  You're asking for matters that are contained

9   within the legislative privilege.  You're asking to

10  reveal communications between Mr. Beuck and

11  Representative Harless.  Also, communications with

12  others, potentially.  I'm going to instruct you not to

13  answer on that basis.

14            THE WITNESS:  Okay.

15       Q.   (By MS. WESTFALL) Isn't it true that

16  Representative Anchia raised the issue with

17  Representative Harless as to why this information wasn't

18  gathered prior to the bill being drafted?

19            MR. SWEETEN:  Don't reveal communications

20  between Representative Harless and Representative Anchia

21  unless those are matters of public record.  These are

22  covered by the legislative privilege.

23       Q.   (By MS. WESTFALL) Do you have an answer to my

24  question, based on the public record?

25       A.   I believe that was a conversation they had in



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1    committee.

2         Q.   What was Representative Harless's reaction to

3    Representative Anchia's statement in that regard?

4              MR. SWEETEN:   You can testify as to the

5    public record, if that's what this is, and if you

6    recall.

7         A.   I don't recall.

8         Q.   (By MS. WESTFALL) How would you respond to

9    someone who would say that not studying the impact of

10   allowable forms of ID on minority voters shows a callous

11   disregard for their voting rights?

12             MR. SWEETEN:   I'm going to object to the

13   question as argumentative.  I don't know if you're

14   attempting to find out Representative Harless's

15   position.  If so, it reveals those communications.  If

16   you're asking him his personal opinion, then I will let

17   him answer with respect to his personal opinion on that

18   issue.

19        Q.   (By MS. WESTFALL) What is your opinion as a

20   legislative staffer on that issue, Mr. Beuck?

21        A.   The disregard for the impact?

22        Q.   By not investigating, that it would appear to

23   show disregard for the interests of minority voters?

24             MR. SWEETEN:   Same instruction.

25        A.   I think that statement assumes there was not an



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

232

1    investigation into the impact.

2        Q.   (By MS. WESTFALL) Was there an investigation

3    into the impact?

4              MR. SWEETEN:  Don't reveal information

5    that is subject to the legislative privilege, including

6    communications with any state agencies, with

7    constituents, or the Legislative Council, with

8    Representative Harless, other legislators or staffers.

9        A.   Well, with the testimony and the committee, the

10   turnout shows that voter participation increased in the

11   states that have implemented voter identification.

12       Q.   (By MS. WESTFALL) How is that responsive to the

13   concern that there was no investigation as to the impact

14   of the allowable forms of ID in Senate Bill 14 on

15   minority voters?

16             MR. SWEETEN:  Objection, argumentative.

17       Q.   (By MS. WESTFALL) You may answer.

18       A.   I think that illustrates the impact in the

19   other states, and it would carry over to Texas.

20       Q.   Was there any study conducted or investigation

21   of the impact of the allowable forms of ID under Senate

22   Bill 14 on minority voters that was not disclosed to the

23   public?

24             MR. SWEETEN:  I'm going to object to the

25   extent that your question asks for research conducted



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

233

1      prior to the bill that is potentially impacted by the

2      legislative privilege, including communications with all

3      of the various state agencies, the representatives,

4      representatives' staffs, the Texas Legislative

5      Council.  And I'm going to instruct him not to answer on

6      that basis, except to the extent that you can do so

7      based upon the matters of public record.

8          Q.   (By MS. WESTFALL) Is there any publicly-

9      available information on that topic?

10         A.   On the -- specific to Senate Bill 14?

11         Q.   Yes.

12         A.   Not to my knowledge.

13         Q.   Is there any publicly-available information of

14     any research or studies conducted as to impact of

15     allowable forms of ID under prior photo ID bills

16     introduced in the Texas House or Senate that you're

17     aware of?

18         A.   Not that I'm aware of.

19         Q.   Did Representative Harless serve on the

20     Conference Committee of the bill?

21         A.   Yes.

22         Q.   Did she chair it?

23         A.   As the House sponsor of the legislation, I

24     think it's -- yes, she did chair it.  She was the chair

25     of the House conferees.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

234

1     Q.   Were there any changes that were put in during

2     the conference consideration of the bill that had not

3     been in either version passed in the House or Senate?

4              MR. SWEETEN:  I assume those are matters

5     of public record, if so, you can go ahead and answer.

6     A.   Yes.  There was the -- election identification

7     certificate that was not contained in either the Senate

8     version or the House version.

9     Q.   (By MS. WESTFALL) Could you describe the

10    circumstances of the insertion of that provision into

11    the conference bill?

12             MR. SWEETEN:  You can discuss matters of

13    public record.  Don't discuss conversations that you had

14    with any of the areas with we've been discussing.

15    A.   I know it was a concern brought up by

16    Representative Anchia during the House Floor debate.

17    Q.   (By MS. WESTFALL) What did he ask for?

18    A.   His concerns were that -- having to do with the

19    personal identification and DPS, DPS revenues.

20    Q.   I'm not sure I understand.  Can you clarify?

21    A.   He had -- I remember him discussing the issue,

22    the details of which I don't know.  It had to do with

23    receipt -- the revenue received by DPS and their

24    identification.  The revenue received from DPS from

25    identifications.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

ESQUIRE
DEPOSITION SOLUTIONS

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1      Q.    Could you describe the election identification
2      certificate provision in SB 14?
3      A.    The election identification certificate, I
4      remember during the debate that it was modeled after the
5      provisions in current law for a personal identification,
6      for a DPS personal identification.  It's modeled after
7      that language.
8      Q.    Were you involved in the drafting of that
9      particular provision that went in, in the conference
10     committee?
11     A.    No.
12     Q.    Who drafted it?
13           MR. SWEETEN:   I caution the witness not to
14     reveal any communications between other legislative
15     staffers, Representative Harless, or any of the other
16     enumerated areas.
17     Q.    (By MS. WESTFALL) On the basis of that
18     instruction, are you not answering the question?
19     A.    Correct.  I'm sorry.
20     Q.    But it wasn't -- it wasn't you?
21     A.    That's correct.
22     Q.    During the drafting or the legislators'
23     consideration of SB 14, was there any analysis of cost
24     or steps that a voter would need to take to obtain an
25     election identification certificate?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

236

1              MR. SWEETEN:  Again, as to matters and

2      communications that relate that are covered by the

3      legislative privilege with the enumerated groups that

4      I've provided today, don't reveal those communications.

5      If you can answer based upon the public record or with

6      information that does not implicate those

7      communications, you can go ahead and try to do so.

8          A.   The cost associated with obtaining a -- the

9      personal identification, election identification

10     certificate.  Are you referring to the documents

11     necessary for an identification?  The election

12     identification certificate is a free ID.

13         Q.   (By MS. WESTFALL)  DPS is prohibited from

14     charging --

15         A.   Correct.

16         Q.   -- for an election identification certificate;

17     is that correct?

18         A.   That's my understanding.

19         Q.   What documents are necessary to obtain an

20     election identification certificate under SB 14?

21         A.   They have to be a registered voter.  It

22     references a Section 52. -- 521.142, that DPS may

23     require from the applicant identification.  It doesn't

24     list out the necessary identification.

25         Q.   Are you familiar with any regulations or



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1    proposals for implementing the election identification

2    certificate that have been developed by either DPS or

3    the Secretary of State?

4        A.   It's my understanding that it is to be

5    implemented in a manner similar -- as the bill says, in

6    a manner similar to the driver's license and personal

7    identification certificate.

8        Q.   Do you have any knowledge or information about

9    the plans to implement the election identification

10   certificate?

11            MR. SWEETEN:  Don't reveal any

12   communications that you've had or Representative Harless

13   has had with state agencies with respect to this matter

14   and in addition to the other enumerated areas, but to

15   the extent that you can answer based upon public

16   information, you can feel free to do so.

17            THE WITNESS:  Okay.

18       Q.   (By MS. WESTFALL) Do you have any knowledge --

19       A.   No.

20       Q.   -- based on public information?  Did you have

21   any conversations with Representative Harless about how

22   this certificate would be implemented?

23            MR. SWEETEN:  Don't answer that, because

24   it would reveal communications that you've had with

25   Representative Harless which are covered by the



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1    legislative privilege.

2        Q.   (By MS. WESTFALL) Are you aware at any time

3    during consideration of SB 46 of any legislators or

4    their staff making any statements about illegal aliens

5    voting?

6              MR. SWEETEN:  I'm going to object to the

7    extent that the question calls for you to reveal

8    communications between legislators, legislative staff,

9    state agencies, the TLC or constituents.  Don't reveal

10   any of those communications.  To the extent that you can

11   do so based upon the public record, on matters not

12   implicated by that, then you can go ahead and try to

13   answer that.

14       A.   Any statements, public statements of staff or

15   members regarding the illegal immigration, not that I

16   recall.

17       Q.   (By Ms. Westfall) Not based on the public

18   record because your counsel has instructed you not to

19   talk about the private record; is that correct?

20       A.   That's correct.

21       Q.   Are you aware of the claims that SB 14

22   attempted to exploit fears of illegal immigrants voting?

23             MR. SWEETEN:  Again, don't reveal

24   legislatively-privileged information, which are the

25   categories that we've discussed.  To the extent that you



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

239

1    have information from the public record, from those

2    sources, if you can answer the question, go ahead and do

3    so.

4        A.   Senate -- my understanding is and I've said it

5    earlier is that Senate Bill 14 was about the elections

6    process and improving that.  How other people feel about

7    it, I can't speculate.

8        Q.   I know it's the end of the day, but you need to

9    listen carefully to the question and answer the question

10   so we can move on to the next question.

11             So I'm going to ask the question again:

12   Are you aware of claims that Senate Bill 14 attempted to

13   exploit fears of illegal immigrants voting?

14             MR. SWEETEN:  The same instruction.  You

15   can testify as to matters of the public record.

16       Q.   (By Ms. Westfall) Are you aware of that claim

17   in your own head sitting here today?

18       A.   Okay.  Okay.  I remember the issue coming up

19   during the committee hearing, public testimony.  There

20   were some individuals.  I remember that being discussed,

21   so yes.

22       Q.   And who testified about those concerns?

23       A.   I don't recall.

24       Q.   Outside of the hearings at which concerns about

25   illegal aliens voting was raised, did Representative



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

240

1    Harless or you become aware of those concerns from any

2    other sources communicated to the representative or to

3    you?

4              MR. SWEETEN:  Objection to the question,

5    it calls for speculation.  In addition, I'm going to

6    instruct you as I previously have:  Do not reveal

7    communications that you have had with Representative

8    Harless, staff members, state agencies, constituents or

9    TLC.  Let me also tell you that if you've got

10   information as to that question based upon the public

11   record, you can go ahead and try to answer her question.

12             THE WITNESS:  Okay.

13             MS. WESTFALL:  And to be clear,

14   Mr. Sweeten, I'm asking about communications from

15   members of the public, groups, interest groups that were

16   communications to Representative Harless or Mr. Beuck.

17             MR. SWEETEN:  Again, as to constituent

18   communications, we've held that there is a privilege as

19   to that information, so...

20             THE WITNESS:  Okay.

21             MS. WESTFALL:  Therefore, you're

22   instructing him not to answer if he received those

23   communications; is that correct?

24             MR. SWEETEN:  I'm instructing him not to

25   reveal the substance of the communication that he



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

241

1    received from constituents; that's correct.

2         Q.   Have there been elections held since SB 14 was

3    signed into law in July -- I mean, pardon me -- in May

4    2011?

5         A.   There was a -- yes, a constitutional election

6    -- a constitutional amendment election in November, and

7    we're currently having an election right now.

8         Q.   To your knowledge, has the Secretary of State

9    or any County election officials enforced SB 14?

10        A.   Not to my knowledge.

11        Q.   Are you aware of any in-person voter

12   impersonation having occurred during these elections?

13        A.   Not to my personal knowledge, no.

14                  Could I get a drink of water real fast?

15                  MS. WESTFALL:  Why don't we take a little

16   break, because I think we'll be concluding and passing

17   the baton.

18                  (Recess 5:05 p.m. to 5:16 p.m.)

19        Q.   (By Ms. Westfall)  I believe you testified

20   earlier about provisional ballots in SB 14?

21        A.   Yes.

22        Q.   Could you describe how provisional ballots work

23   in the bill?

24        A.   Okay.  There is a provision in the bill that

25   allows for a voter to cast a provisional ballot if they



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

242

1    do not have the required photo identification.

2         Q.   And could you describe the circumstances under

3    which a provisional ballot is counted?

4         A.   Yes.   They must -- they must state that they do

5    not have any other form of identification that meets the

6    requirements of Senate Bill 14.   Wait.   No.   Excuse

7    me.   Those are the exceptions.

8         Q.   Is it true that a person who casts a

9    provisional ballot under SB 14 must present one of the

10   allowable forms of ID in order for it to be counted

11   except narrow circumstances related to religious

12   objection or natural disaster?

13        A.   They have within six days to return and show

14   the identification.

15        Q.   And if they don't show the identification or

16   fall into one of these exceptions, the religious

17   exception or the natural disaster exception, their

18   provisional ballot will not be counted; is that correct?

19        A.   That is my understanding.

20        Q.   And I think you testified earlier that there

21   may have been nonpublic investigations of the impact of

22   Senate Bill 14; is that correct?

23             MR. SWEETEN:   Objection.   You're asking

24   him to reveal information that's protected by the

25   legislative privilege.   He's not going to answer that



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1    question.  So I'm going to instruct you not to answer

2    the question, unless public information reveals the

3    answer, which I think by its own terms, it could not.

4        Q.   (By Ms. Westfall)  I believe you testified

5    earlier that you answered phone calls for Representative

6    Harless; is that correct?

7        A.   Correct.

8        Q.   Did you ever receive any phone calls from

9    anyone from the King Street Patriots regarding voter ID?

10            MR. SWEETEN:  Objection, asked and

11   answered.  I'm also going to object, because it

12   potentially implicates communications from a

13   constituent.  And so with that, I'm going to go ahead

14   and instruct you not to answer that.  It's already been

15   asked and answered.

16       Q.   (By Ms. Westfall)  Did you already -- did you

17   take any phone calls from Paul Bettencourt related to

18   photo ID on behalf of Representative Harless?

19            MR. SWEETEN:  Objection, asked and

20   answered.

21            MS. WESTFALL:  You may answer.

22            MR. SWEETEN:  Same instruction.

23            MS. WESTFALL:  Are you instructing him not

24   to answer?

25            MR. SWEETEN:  I am.  I think you're asking



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

244

1      for constituent communications.  I think that's within

2      the privilege.  It's one of the categories that we've

3      been asserting.

4                     MS. WESTFALL:  Are you asserting a

5      privilege over the fact that a communication was made?

6                     MR. SWEETEN:  First of all, he's already

7      answered this question.  So if you're just asking the

8      fact, was a communication made, I will let him answer

9      whether he received those.  I think I know the answer,

10     though, but I'm going to let him answer it again.

11                    So you can go ahead and do it, Colby, if

12     you can.

13                    THE WITNESS:  Okay.

14     Q.   (By Ms. Westfall)  Did you receive any phone

15     call from anyone with the King Street Patriots related

16     to photo ID that were made in to Representative Harless?

17     A.   Yes.

18                    MR. SWEETEN:  That were made in to?

19                    MS. WESTFALL:  That were called in to

20     Representative Harless's office.

21                    MR. SWEETEN:  Okay.  All right.  He's --

22     he can answer as to whether contact was made.  He will

23     not answer the substance.

24                    Once again, the prefatory remarks on

25     your question, you're asking about substance, and I'm



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

COLBY BEUCK                                              MAY 14, 2012

                                                                245

1     not going to continue to allow you to do that.  That is

2     improper.  You're asking about substance of

3     conversation.  So I'll let him talk about contact.

4     We'll talk about the privilege log like you said, but

5     I'm not going to let him get into the substance of any

6     conversations.

7              MS. WESTFALL:  I understand that.  The

8     question's not improper.  It's relevant.  It's within

9     Rule 26.  You're asserting a privilege.  You can

10    instruct your witness not to answer.  That's how we've

11    been operating today.

12             MR. SWEETEN:  Okay.  He's answered the

13    question I think you asked.  I'm not going to let him

14    reveal substance of the communication.  I've been very

15    clear about that.

16             MS. WESTFALL:  I'm now going to ask my

17    question to make my record.  I understand your position

18    on privilege.

19        Q.  (By Ms. Westfall)  What was the nature and the

20    substance of the communication and phone call from the

21    King Street Patriots regarding photo ID?

22             MR. SWEETEN:  Do not answer the question

23    proposed.  She's asking about substance of

24    communications.  You don't have to do that.

25        Q.  (By Ms. Westfall)  Did you receive a phone



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

246

1    call --

2               MR. SWEETEN:   Let me just say for the

3    record, it's protected by the legislative privilege.   Go

4    ahead.

5        Q.   (By Ms. Westfall)   Did you receive a phone call

6    from Paul Bettencourt regarding photo ID issues in

7    Representative Harless's office?

8        A.   No.

9        Q.   Did you receive any phone call from Catherine

10   Engelbrecht concerning photo ID issues?

11              MR. SWEETEN:   Objection, asked and

12   answered.

13       Q.   (By Ms. Westfall)   You may answer.

14       A.   Yes.

15       Q.   What was that call regarding or concerning?

16              MR. SWEETEN:   Don't reveal communications

17   between constituents that contacted your office.   It's

18   covered by the legislative privilege.

19       Q.   (By Ms. Westfall)   In Texas, are there as many

20   driver's license offices as polling locations to your

21   knowledge?

22              MR. SWEETEN:   You can answer if you know.

23       A.   I don't know the exact numbers of either of

24   those.

25       Q.   (By Ms. Westfall)   Have there been any driver



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

ESQUIRE
DEPOSITION SOLUTIONS

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1    license offices that have closed due to lack of funding

2    to your knowledge?

3         A.    Not that I'm aware of.

4         Q.    Did you conduct any research or have any

5    knowledge about availability or locations of driver

6    license offices in either the state of Georgia or the

7    state of Indiana?

8              MR. SWEETEN:   I'm going to object.   I

9    think this falls within legislative fact-gathering,

10   which is within the privilege.   He doesn't have to

11   answer what occurred with respect to legislative fact-

12   gathering.

13        Q.    (By Ms. Westfall)   Are there any answers that

14   you want to change at this point in response to any

15   question that I asked you today?

16        A.    Not that I can think offhand.

17        Q.    Is there any information that you didn't recall

18   that you now recall now that we're at the end of the day

19   in answer to any of my questions?

20        A.    You had mentioned, you had asked a -- if groups

21   contacted me in the preparation of Senate Bill 14.   And

22   I -- the groups that had contacted me, and I -- there

23   was a group before while I was drafting it that

24   contacted me, and add -- Advocacy, Inc.

25        Q.    I see.   And what was the concern of that



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

248

1   organization?

2          MR. SWEETEN:  Don't reveal communications

3   from potential constituents that's subject to the

4   legislative privilege.

5      Q.   (By Ms. Westfall)  Is there anything you would

6   like to add so that we can understand your answers more

7   clearly to any of the questions I asked today?

8      A.   Not that I can think of right now.

9      Q.   Is there any further information beyond the

10  phone call that you received from Advocacy, Inc. that

11  you didn't recall earlier today when I asked you a

12  question that you now recall, or is that the sum total?

13     A.   That's what I can think of right now.

14         MS. WESTFALL:  So throughout today, your

15  counsel has instructed you not to answer many questions

16  on the basis of legislative privilege.  The Attorney

17  General intends to move to compel responses to or will

18  consider moving to compel responses to many of the

19  questions that you did not answer.  We therefore leave

20  this deposition open in the event that the Attorney

21  General's motion is granted in whole or in part.  And I

22  will now conclude my questioning for today.  For the

23  time being, we leave the deposition open and turn over

24  questioning to Mr. Rosenberg.

25                     EXAMINATION



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

249

1    BY MR. ROSENBERG:

2        Q.   Good afternoon, Mr. Beuck.  I'm Ezra Rosenberg.

3    I represent the Texas State Conference of NAACP Branches

4    and the Mexican-American Legislative Caucus.

5             You're still under oath, you understand

6    that?

7        A.   Yes.

8        Q.   I'm just going to ask you a few questions.  I

9    know it's late in the day.  I'm not going to go over

10   everything that Ms. Westfall did.  I do want to tie up a

11   few points, so let me just start.

12            Earlier, Ms. Westfall asked you about

13   conversations that you had with Representative Harless

14   in preparation for the -- this deposition, and I believe

15   your answer was that the majority of the conversations

16   had to do with scheduling; is that correct?

17       A.   Regarding the depositions?

18       Q.   Yes.

19       A.   Yes.

20       Q.   What did the minority of the conversations have

21   to deal with other than scheduling?

22            MR. SWEETEN:  Okay.  I'm going to go ahead

23   and assert our objection that we made earlier that

24   conversations that occurred that relate to Senate Bill

25   14, even if they're after the time of passage, we're



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

250

1   asserting legislative privilege as to those.  And as to

2   legislative matters.  But to the extent that

3   Mr. Rosenberg's questions do not implicate those, I'm

4   going to go ahead and let you answer that question.

5        A.   I think the -- what I said previously is the

6   extent that I can answer.

7        Q.   (By Ms. Westfall)  It's your testimony then

8   that every one of those conversations have to deal only

9   with scheduling?

10       A.   No.

11       Q.   Is what -- well, then, again, just so it's

12  clear, what did the rest of the conversations deal with?

13       A.   I think I cannot answer that without stepping

14  into the privilege.

15       Q.   Did you discuss with Representative Harless

16  whether or not she or you would assert privilege in this

17  deposition?

18       A.   It's my understanding that she has asserted the

19  privilege.  She has communicated that with me, and

20  that's my understanding.

21       Q.   When did she communicate that with you?

22       A.   I don't know the exact date.  It was a week or

23  two ago.

24       Q.   And can you tell me about that conversation?

25       A.   Regarding the?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1          Q.   Assertion of privilege.

2          A.   The assertion of privilege, she told me she was

3     going to assert the privilege.

4          Q.   Did she tell you how extensive her assertion of

5     the privilege was?

6               MR. SWEETEN:   I'm going to object to the

7     extent that it calls for attorney-client privileged

8     information.  Ms. Harless is represented by our

9     office.  Mr. Beuck is as well.  Also, Mr. Beuck is an

10    attorney with Ms. Harless's office.  So to the extent

11    that there were discussions about the deposition, I

12    think that those matters would be privileged.

13              MR. ROSENBERG:   Are you directing him not

14    to answer?

15              MR. SWEETEN:   I'll let him answer that the

16    privilege that she's advised him that she was asserting

17    the privilege.  As to the additional questions about

18    those conversations, to the extent that they implicate

19    the attorney-client privilege, then I would assert that

20    -- I would assert that privilege.

21              MR. ROSENBERG:   And just so it's clear,

22    the attorney-client privilege, vis-a-vis, Mr. Beuck as

23    attorney for Representative Harless?

24              MR. SWEETEN:   Well, I mean, first of all,

25    you haven't established the specifics of the



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

252

1      question.  Mr. Beuck is an attorney.  If he reasonably

2      believes that he was providing legal advice, then I

3      think that would be covered under the attorney-client

4      privilege.

5              MR. ROSENBERG:  Well, let's inquire into

6      that a bit.

7          Q.   (By Mr. Rosenberg)  Was it your understanding

8      that you were operating as Representative Harless's

9      attorney in that conversation?

10         A.   Regarding the deposition and the privilege?

11         Q.   Yes.

12         A.   Yes.

13         Q.   Did she actually come to you and ask you to

14     give her legal advice concerning the privilege?

15         A.   She did ask me my opinion.

16         Q.   Your job is chief of staff for Representative

17     Harless?

18         A.   Correct.

19         Q.   When you were hired, were you also told that

20     you were going to be operating as her lawyer?

21         A.   It was my being an attorney and was a fact she

22     was well aware of, and I think that was a

23     positive.  You'll have to ask her if --

24         Q.   Well, I mean, there are lots of attorneys in

25     this country who not everything they do is --



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

253

1          A.    I understand.

2          Q.    -- in an attorney-client context.  Is it your

3     testimony that you actually operate as Representative

4     Harless's attorney?

5          A.    In matters where she is asking my -- my opinion

6     on a legal issue, that is my understanding.

7          Q.    Just because it calls for your knowledge of the

8     law, you think you're operating as her attorney?

9          A.    That's my understanding.

10         Q.    Have documents been withheld from production in

11    this case on the basis of attorney-client privilege

12    focusing on your relationship with Representative

13    Harless as her attorney?

14         A.    I'm not aware.  I don't know.

15         Q.    Did you review the privilege log in this matter

16    relating to documents from Representative Harless?

17         A.    No.

18         Q.    Did you advise your attorneys here as to any

19    documents that you believed were privileged under

20    attorney-client privilege because of your relationship

21    as Representative Harless's attorney?

22         A.    Any documents that we produced?

23         Q.    Yeah.

24         A.    No.

25         Q.    Does Representative Harless maintain any



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1   documents in her own office?  And when I say "her own

2   office," I don't mean her office complex, I mean her own

3   office.

4       A.   Capitol office?

5       Q.   Yeah.  Well, does she have more than one

6   office?

7       A.   We have a district office.

8       Q.   Okay.  Well, that's good.  Let's talk about

9   that, too, but let's start with the Capitol office.

10      A.   Okay.

11      Q.   Does Representative Harless maintain any

12  documents in the room that's her office in the Capitol

13  office?

14      A.   Yes.

15      Q.   And you searched those files in connection with

16  the production of documents in this case?

17      A.   Yes.

18      Q.   And documents were produced from those files?

19      A.   I don't recall where the documents -- if

20  documents came from specifically those files.  I

21  produced all documents in the office that were

22  responsive, so, but I can't recall which file folder it

23  actually came from.

24      Q.   Sure.  Was a search also made of her district

25  office for responsive documents?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

255

1        A.    Yes.

2        Q.    And documents were produced from that office

3   also?

4        A.    There were not responsive documents there.

5        Q.    I think in response to a question from

6   Ms. Westfall, you testified that you received text

7   messages from Representative Harless during the floor

8   debates; is that correct?

9        A.    A few, yes.

10        Q.    Was any search made of text messages on

11   Representative Harless's telephone to the extent that

12   they're kept?

13        A.    I believe she did search that.  I searched mine

14   as well.  I did not have any responsive documents.

15        Q.    And --

16        A.    Texts.  Excuse me.

17        Q.    And during the floor debates, were you able to

18   view the floor debates through a closed-circuit

19   television?

20        A.    I had the debate pulled up on the Internet.

21        Q.    So you were able to watch it as it was going?

22        A.    Correct.

23        Q.    And were you also able to speak with

24   Representative Harless by telephone during the floor

25   debates?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

256

1       A.    I believe we did have a phone conversation.

2       Q.    Do you recall what the phone conversation was

3    about?

4             MR. SWEETEN:   Don't reveal the substance

5    of any conversations you've had.   If the question is, do

6    you recall what it's about, you can go ahead and answer

7    "yes" or "no," but do not reveal the substance of those

8    communications.

9       A.    Okay.   I don't recall the specifics of the

10   phone conversation.   It was -- I don't recall the

11   specifics.

12      Q.    (By Mr. Rosenberg)   Do you recall anything

13   about the phone conversation?

14            MR. SWEETEN:   Don't reveal the substance

15   of it.   It's legislatively privileged.   But you can

16   answer that question.

17      A.    Based on that, I can't.

18      Q.    (By Mr. Rosenberg)   Well, the question was

19   whether you recalled anything.   You can give me a "yes"

20   or a "no" answer.

21      A.    Okay.   Okay.   Yeah.   I thought you were asking

22   -- yes, I do recall.

23      Q.    What do you recall about it?

24            MR. SWEETEN:   Same objection.

25            THE WITNESS:   Okay.   Sorry.   Jumped ahead.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1         Q.   (By Mr. Rosenberg)  By the way, how do you
2    define "constituents"?
3         A.   It's a broad term.
4         Q.   How broad is it?
5         A.   Well, I guess it's got multiple -- constituents
6    can -- residents of Texas.  Sometimes with -- actual
7    people who live in District 126.
8         Q.   Well, how about for purposes of the assertion
9    of the legislative privilege, how do you define
10   "constituents"?
11        A.   I have defined it broadly.
12        Q.   Okay.  So let's talk about how broad.  How
13   broad?
14        A.   A resident of Texas.
15        Q.   Okay.  So a resident of Texas is a constituent,
16   and therefore, are you asserting privilege over any
17   communication between you or Representative Harless with
18   a constituent dealing with SB 14 with any resident of
19   Texas?
20        A.   Okay.  I might need you to repeat that.
21        Q.   Sure.  Are you asserting privilege as to any
22   communication between either you or Representative
23   Harless and any resident of Texas concerning SB 14?
24             MR. SWEETEN:  I've instructed him to
25   include that, so I think that that answer may be better



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

COLBY BEUCK                                                    MAY 14, 2012

                                                                      258

1      for me, but the answer is that that is part of what a
2      constituent is.
3          Q.    (By Mr. Rosenberg)  So let's see.  We have
4      residents of Texas.  Are you asserting privilege --
5                Well, let me ask the question this way:
6      Is a lobbyist a constituent for your purposes of
7      asserting privilege today?
8          A.    If they are a resident of the state.
9          Q.    And is an interest group a constituent for
10     purposes of your asserting privilege in this case today?
11         A.    Yes.
12         Q.    Whether or not they're a resident of the state?
13         A.    That -- that has been my -- so if that's -- if
14     they're a resident, that's --
15         Q.    So let's just start with people whom I guess we
16     can agree are not constituents.
17         A.    Okay.
18         Q.    Did you or Representative Harless have any
19     communication with any lobbyist who is not a resident of
20     Texas concerning SB 14?
21         A.    I can -- I can't speak for Representative
22     Harless.  I can speak for myself.  No.
23         Q.    And when you say you can't speak for
24     Representative Harless, did you receive any telephone
25     calls for Representative Harless from any lobbyist who



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

```
 1     is not a resident of the State of Texas?

 2         A.    Not that I recall.

 3         Q.    Does Representative Harless log appointments

 4     and telephone calls with lobbyists?

 5         A.    She does keep a schedule of appointments, a

 6     calendar.

 7         Q.    And do you know how long that schedule is

 8     maintained?

 9         A.    I believe it's a year.  I'm not -- I'm not a

10     hundred percent sure on that.

11         Q.    Did you or Representative Harless have any

12     communications with any interest groups who are not

13     residents of Texas concerning SB 14?

14              MR. SWEETEN:  Objection, asked and

15     answered.

16              MR. ROSENBERG:  It was lobbyist before,

17     but go ahead.

18         A.    Okay.  I would say no.

19         Q.    (By Mr. Rosenberg)  Which lobbyist whom you

20     consider constituents did you or Representative Harless

21     have communications with concerning SB 14?

22              MR. SWEETEN:  As of right now, you're just

23     establishing --

24              MR. ROSENBERG:  Which ones.

25              MR. SWEETEN:  -- the fact of the
```



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

COLBY BEUCK                                                          MAY 14, 2012

                                                                         260

1     communication --

2                    MR. ROSENBERG:  Exactly.

3                    MR. SWEETEN:  -- much like counsel was

4     earlier?

5                    MR. ROSENBERG:  Yeah.

6                    MR. SWEETEN:  You can answer to the extent

7     about the contact.

8          A.    Okay.  Regarding Senate Bill 14?

9          Q.    Yeah.

10         A.    I believe I added Advocacy, Inc. as one.

11         Q.    Anyone else other than Advocacy, Inc.?

12         A.    Not that I can recall right now.

13         Q.    King Street Patriots?

14         A.    Yes.  Yes.  King Street Patriots.

15         Q.    How about Texans for Lawsuit Reform?

16         A.    Not that I recall.

17         Q.    Did you or Representative Harless have

18    communications with this state Republican party

19    concerning SB 14?

20         A.    Not that I recall.

21         Q.    And by the way, just to make sure we have the

22    objection on the record, what was the substance of the

23    communication that you had with Advocacy, Inc.

24    concerning SB 14?

25                   MR. SWEETEN:  Object to the extent it


ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

COLBY BEUCK                                          MAY 14, 2012

261

1      calls for matters that are legislatively privileged,

2      don't answer the question.

3          Q.   (By Mr. Rosenberg)  And what was the substance

4      of the conversation that you had with King Street

5      concerning SB 14?

6               MR. SWEETEN:  Same objection and

7      instruction.

8          Q.   (By Mr. Rosenberg)  Did you review any

9      documents from the Heritage Foundation in connection

10     with SB 14?

11         A.   I don't recall.

12         Q.   Have you ever heard of the Heritage Foundation?

13         A.   Yes.

14         Q.   What is the Heritage Foundation?

15         A.   I believe they are -- well, I'm not going to --

16     I don't want to speculate.  They're an advocacy group, a

17     public policy advocacy group.

18         Q.   Do you know if Representative Harless reviewed

19     any information from the Heritage Foundation concerning

20     SB 14?

21         A.   I do not know.

22         Q.   Did you review any information from McAllen

23     Monitor concerning SB 14?

24         A.   I believe there was a news article.

25         Q.   What is McAllen Monitor?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

262

1      A.   It's my understanding that's the local

2  newspaper for the McAllen area in the Valley.

3      Q.   I'm sorry?

4      A.   For the McAllen area, the Valley newspaper.

5      Q.   Do you recall the nature of the article that

6  you reviewed?

7      A.   No, I don't.

8      Q.   Did you review anything from the Fair Elections

9  Legal Network concerning SB 14?

10          MR. SWEETEN:   Are you asking if he's been

11  contacted with respect to this advocacy --

12          MR. ROSENBERG:   The question was, did you

13  review.

14          MR. SWEETEN:   Okay.  Well, I've asserted

15  that with respect to legislative fact-gathering matters

16  reviewed in connection with Senate Bill 14, that those

17  are matters that are legislatively privileged.

18      Q.   (By Mr. Rosenberg)  So, well, let me change the

19  question first.  Did you have any contact with any

20  entity called the "Fair Elections Legal Network"

21  concerning SB 14?

22      A.   Not that I remember.

23      Q.   Do you know if Representative Harless did?

24      A.   No, I don't know.

25      Q.   What is your understanding as to the factual



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

COLBY BEUCK                                    MAY 14, 2012

263

1     basis for the declaration of emergency status or the

2     emergency proclamation for SB 14 by the governor?

3               MR. SWEETEN:  I'm going to object.  It's

4     been asked and answered.  Speculation.  I'm also going

5     to instruct you not to answer to the extent it reveals

6     information, communications between legislators, staff

7     members, state agencies, TLC, constituents.  With that

8     instruction, you can answer to the extent that it does

9     not reveal those communications.

10         A.   I'm sorry.  Regarding the governor's?

11         Q.   Proclamation.

12         A.   Proclamation --

13         Q.   Yes.

14         A.   -- of an emergency item.

15         Q.   Yes.

16         A.   The fact pattern behind?

17         Q.   Yes.

18         A.   Could you repeat the question?

19         Q.   Sure.  What's your understanding of the factual

20    basis for the governor's proclamation of emergency

21    status for SB 14?

22              MR. SWEETEN:  The same objection and

23    instruction.  Go ahead.

24         A.   I can't speculate to what the governor was

25    thinking when he issued that proclamation.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

264

1      Q.   (By Mr. Rosenberg)  Did you discuss that issue
2    with Representative Harless?
3              MR. SWEETEN:  Objection.  You're asking
4    him to reveal communication he's had with --
5              MR. ROSENBERG:  "Yes" or "no" answer.
6              MR. SWEETEN:  Did you discuss -- what
7    matter?
8              MR. ROSENBERG:  The factual basis for the
9    governor's proclamation of emergency status for SB 14.
10             MR. SWEETEN:  Yeah.  I think you're doing
11   more than asking a question about a broad matter that
12   would be covered by the privileged log.  You're asking a
13   very specific fact.  So I'm going to instruct you not to
14   answer that question based on the legislative privilege
15   that you reveal communications between you and
16   Representative Harless.
17     Q.   (By Mr. Rosenberg)  Did you do any analysis of
18   the factual basis for a -- did you do any analysis or
19   investigation of the amount of in-person fraud, voter
20   impersonation in person, in connection with SB 14?
21             MR. SWEETEN:  You're asking him questions
22   about legislative fact-gathering.  I've repeatedly made
23   that objection that for him to reveal information that
24   went into the considerations behind Senate Bill 14 is a
25   matter that's covered by the scope of the legislative



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

ESQUIRE
DEPOSITION SOLUTIONS

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

COLBY BEUCK                                              MAY 14, 2012

265

1     privilege.  I'm going to instruct him that that is

2     privileged.

3          Q.   (By Mr. Rosenberg)  Did you have any -- so

4     you're not going to answer that question?

5          A.   Correct.

6          Q.   Did you have any discussions with local

7     officials as to voter fraud in connection with SB 14?

8               MR. SWEETEN:  Same objection.  Same

9     instruction.

10         A.   I'm going to -- the answer is no based on --

11         Q.   (By Mr. Rosenberg)  Did you have any

12    discussions with local election officials in connection

13    with SB 14?

14              MR. SWEETEN:  Same objection.  Same

15    instruction.

16              MR. ROSENBERG:  Whether he had any

17    discussions with local election officials?

18              MR. SWEETEN:  You can ask if he has had

19    contact with local election officials.  I'll allow that

20    question.  I think the other is I think you're treading

21    into the substance of conversations and legislative

22    fact-gathering that I think is privileged.  But go

23    ahead, you can answer if you've had contact with local

24    election officials.

25         A.   Yes.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

266

1        Q.   (By Mr. Rosenberg)  With whom did you have

2   contact?

3        A.   The Harris County clerk's office.

4        Q.   Who at the Harris County clerk's office?

5             MR. SWEETEN:  You can answer if you know.

6        A.   I'm trying to remember.  George is his first

7   name.  George Hammerline.

8        Q.   (By Mr. Rosenberg)  Hammerline?

9        A.   Yes.

10       Q.   Anyone else?

11       A.   He's -- George.  George is the contact.

12       Q.   And when did you have a conversation with

13  George Hammerline?

14       A.   Late February.

15       Q.   Of 2011?

16       A.   2011.  Yes.

17       Q.   And what was your -- the purpose of your having

18  a conversation with Mr. Hammerline?

19             MR. SWEETEN:  Once again, I think the

20  question implicates legislative fact-gathering.  We

21  believe that that's part of the legislative privilege.

22  I've made that assertion and continue to do so.

23             You can answer to the extent that it

24  implicates matters of public record, however.

25       Q.   (By Mr. Rosenberg)  Can you answer the



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

                                                              267

1     question?

2          A.   No, I cannot.

3          Q.   Was it related to SB 14?

4          A.   Yes.

5          Q.   And what was the substance of your conversation

6     with Mr. Hammerline?

7               MR. SWEETEN:   Same objection.   Same

8     instruction.

9          Q.   (By Mr. Rosenberg)  And you're not going to

10    answer the question?

11         A.   Correct.

12         Q.   Other than Mr. Hammerline, did you have

13    discussions with any other local election officials

14    concerning SB 14?

15         A.   Not that I remember.

16         Q.   Do you know if Representative Harless had any

17    discussions with any local election officials concerning

18    SB 14?

19         A.   I can't speculate.   Not that I know of.

20         Q.   Do you know if there is any investigation or

21    analysis of voter impersonation that has not been made

22    public?

23              MR. SWEETEN:   I object.   You're asking for

24    information related to the legislative fact-gathering

25    process.   It also could implicate communications that



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1    he's had with these various parties that I believe are

2    subject to the legislative privilege.  So I think that

3    is within the legislative privilege.  I think that is

4    not a proper question.  I'm going to instruct you not to

5    answer.

6         Q.   (By Mr. Rosenberg)  Are you going to answer?

7         A.   No.

8         Q.   Do you know a guy named Ed Johnson?

9         A.   Yes.

10        Q.   Who is he?

11        A.   He works for the Harris County clerk's office.

12        Q.   Okay.  Clerk's office or the tax office?

13        A.   Oh.  He works for Harris County.  I don't know

14   which division he works in.

15        Q.   Have you ever spoken to him about SB 14?

16        A.   Yes.

17        Q.   When did you speak to him?

18        A.   It was in 2011.  I don't know the exact date.

19   It was during the session in 2011.

20        Q.   What was your purpose in speaking with

21   Mr. Johnson?

22             MR. SWEETEN:  Objection to the extent that

23   it reveals legislative fact-gathering with respect to

24   Senate Bill 14.  I believe that's within the legislative

25   privilege and instruct you not to answer that question.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

269

1      Q.    (By Mr. Rosenberg)   Are you going to answer the

2   question?

3      A.    No.

4      Q.    On that basis?

5      A.    Yes.

6      Q.    Did any legislators contact you in order to get

7   preapproval for any amendments to SB 14?

8            MR. SWEETEN:   I'm going to object to the

9   extent that that implicates communications between a

10  legislator and you subject to the legislative privilege

11  and communications.

12     A.    Were there any communications?  Can I -- can

13  you repeat the question?

14     Q.    (By Mr. Rosenberg)   Sure.  Did any legislators

15  contact you in connection with preapproval of any

16  amendments that were going to be offered to SB 14?

17           MR. SWEETEN:   Don't answer to the extent

18  that that implicates any communications that you've had

19  with legislators, which it plainly does, unless this is

20  a matter of public record, for example, a colloquy on

21  the floor, discussions that are public.

22     A.    Got you.  Okay.  I'm going to not answer the

23  question.

24     Q.    (By Mr. Rosenberg)   On that basis?

25     A.    Correct.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

COLBY BEUCK                                              MAY 14, 2012

270

1        Q.   In connection with the production of e-mails, I

2    think you said that they were deleted after 30 days; is

3    that correct?

4        A.   Correct.

5        Q.   Are you aware of any backup system or archiving

6    of e-mails?

7        A.   There is an archive within our e-mail

8    system.  We have to manually move the e-mail over to

9    that, to that archive.  I'm not aware of any automatic

10   archiving system.

11       Q.   And were your archives and Representative

12   Harless's archives searched in connection with the

13   e-mail production in this case?

14       A.   Yes.

15       Q.   Have you spoken with anyone from your IT

16   department as to whether or not there is any kind of

17   backup system over and above the archiving?

18       A.   No, I have not.

19       Q.   Do you know if there is one?

20       A.   I do not know.

21            MR. ROSENBERG:  Why don't we take a

22   couple-minute break.  I might be just about done.

23       A.   Okay.

24            (Recess at 5:57 p.m. to 6:01)

25       Q.   (By Mr. Rosenberg)  Just a couple of more



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

271

1    questions, Mr. Beuck.  Getting back to Mr. Hammerline,

2    do you know whether he testified as a witness at any of

3    the hearings in connection with the photo ID

4    legislation?

5              MR. SWEETEN:  I'm sorry.  Can you repeat

6    the question?  I apologize.  My fault.

7              MR. ROSENBERG:  I just asked whether

8    Mr. Hammerline testified as a witness at any of the

9    hearings.

10             MR. SWEETEN:  Go ahead and answer.

11        A.   I don't believe he was a witness.  He -- he --

12   my memory is that he was not a witness in the House.  I

13   can't speak to the -- I don't believe he was in the

14   Senate.  I'm not a hundred percent sure.  It's possible

15   he was in previous sessions.  I'm not sure.

16        Q.   (By Mr. Rosenberg)  Is there such a thing

17   called "interim hearings" in Texas legislature?

18        A.   Yes.

19        Q.   What are interim hearings?

20        A.   Committees, there are -- during the interim,

21   the speaker will issue an interim charge for committees

22   to study issues.  The committees typically will hold

23   hearings, one, maybe two hearings on the

24   issue.  Sometimes public testimony is taken.  Sometimes

25   it's not.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

272

```
 1        Q.   Were there interim hearings on photo ID
 2   legislation?
 3        A.   Yes.  I believe there was.
 4        Q.   Were you involved in those interim hearings?
 5        A.   No, I was not.
 6        Q.   Were you aware of the interim hearings?
 7        A.   Yes.  I was aware of the interim hearings.
 8        Q.   Do you know if Mr. Hammerline testified at any
 9   of the interim hearings?
10        A.   I don't know.
11        Q.   Were you involved in organizing witnesses for
12   any of the hearings in connection with SB 14?
13        A.   Yes.
14        Q.   Were you involved in gathering witnesses in
15   connection with -- organizing witnesses in connection
16   with any of the hearings on HB 112?
17        A.   No.
18        Q.   Which witnesses were you involved with in
19   connection with SB 14?
20             MR. SWEETEN:  Which witnesses did he
21   contact?  I just want to make sure I'm clear on the
22   question.
23        Q.   (By Mr. Rosenberg)  Well, let's start with
24   contacting them.  We'll go from there.
25        A.   The Georgia Secretary of State.  The gentleman
```



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

273

1    from Indiana.  Wheeler was his last name.  Thomas
2    Wheeler.
3        Q.   Anyone else?
4        A.   There was another individual from -- from
5    Austin.  I cannot remember his name.  I contacted him as
6    well.
7        Q.   Do you remember what issue that witness from
8    Austin spoke on or testified on?
9        A.   His experience with the -- I remember his
10   committee testimony was with his experience on the -- he
11   was -- he's an attorney from Austin and his experience
12   with the Voting Rights Act cases.
13       Q.   Anyone else?
14       A.   The expert witnesses.
15       Q.   Which expert witnesses?
16       A.   DPS, I mentioned earlier, Rebecca Davio.
17   Davio.  I'm not sure how it's pronounced.
18       Q.   Anyone else?
19       A.   The Attorney General -- Attorney General's
20   office have a representative there.
21       Q.   Do you recall who that was?
22       A.   No, I do not.
23       Q.   Ever hear of a guy named Mike Hull?  H-U-L-L.
24       A.   Yes.  Yes.  I am familiar with his name.
25       Q.   Who is he?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

COLBY BEUCK                                          MAY 14, 2012

274

```
 1        A.   I know his name.  I don't really know what he
 2   does or who he is.  I am familiar with his name.
 3        Q.   You ever have any contact with him?
 4        A.   Regarding?
 5        Q.   SB 14?
 6        A.   No.
 7        Q.   Do you know if Representative Harless did?
 8        A.   I don't know.
 9        Q.   You were contacted with the Georgia Secretary
10   of State's office.  Were those telephone, mail or both?
11        A.   Telephone, e-mails.
12        Q.   And what was the nature of your conversation
13   with them?
14             MR. SWEETEN:  Don't reveal your
15   communications which relate to legislative fact-
16   gathering for Senate Bill 14.  To the extent you can
17   answer based upon the public record, you can feel free
18   to do so.  Otherwise, it's legislatively privileged.  Go
19   ahead.
20             MR. ROSENBERG:  Just so I'm clear.  A
21   communication that Mr. Beuck had with a third party
22   who's not a constituent, and I'm assuming that Georgia
23   Secretary of State is not within your broad definition
24   of constituency, is you're asserting privilege over that
25   communication?
```



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

COLBY BEUCK                                        MAY 14, 2012

275

1              MR. SWEETEN:  I'm saying that when there's

2     legislative fact-gathering occurring with respect to

3     this bill, Senate Bill 14, that that is squarely within

4     the privileges that we've asserted in our briefing, that

5     that information he does not have to reveal the

6     information related to that fact-gathering.  I've let

7     him answer as to the contacts.  I will let him answer as

8     to the public record with respect to these individual

9     witnesses.  However, as far as the fact-gathering,

10    that's squarely on all fours with how we've been

11    asserting legislative privilege.

12        Q.   (By Mr. Rosenberg)  Can you answer my question?

13        A.   What was the nature of the conversation?

14             MR. SWEETEN:  Yeah.  Same objection and

15    instruction with respect to legislative fact-gathering.

16        Q.   (By Mr. Rosenberg)  Can you answer?

17        A.   I cannot.  Sorry.

18        Q.   Same question as to your communication with

19    Mr. Wheeler from Indiana.  Can you tell me the substance

20    of your conversation or correspondence with Mr. Wheeler?

21             MR. SWEETEN:  Same objection and

22    instruction.  To the extent that you can reveal

23    information from a public record, you can feel free to

24    do so.

25        A.   Okay.  No, I cannot.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

276

1      Q.   (By Mr. Rosenberg)  And the gentleman or

2    gentlewoman from Austin, I think you said was a lawyer

3    experienced with the Voting Rights Act.  Do you recall

4    that person's name?

5      A.   No, I do not.  He also testified in the Senate.

6      Q.   And can you tell me the substance of your

7    conversations or other communications with that person?

8              MR. SWEETEN:  Same objection and

9    instruction.

10     A.   No, I cannot.

11     Q.   (By Mr. Rosenberg)  Was that person's name Eric

12   Opiela?

13     A.   That does not sound familiar.

14     Q.   The name Eric Opiela doesn't sound --

15     A.   Not -- not in this case.  I have heard that

16   name before, but not -- he was not --

17     Q.   Where have you heard that name?

18     A.   I can't say.

19     Q.   You can't say because you don't want to say?

20     A.   No.  I don't know where I've heard that name

21   before.

22              MR. ROSENBERG:  I have no further

23   questions.  Thank you.

24              MR. SWEETEN:  Thank you.  Reserve

25   questions for time of trial.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

277

1          MR. ROSENBERG:  And we -- just for the

2      record, as -- we're in the same position as is DOJ, and

3      we will leave this record open and we will undoubtedly

4      join with DOJ in a motion to compel.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

COLBY BEUCK                                                    MAY 14, 2012

278

1                    CHANGES AND SIGNATURE

2                    RE: TEXAS VS. HOLDER, ET AL

3        PAGE   LINE   CHANGE            REASON

4        _____

5        _____

6        _____

7        _____

8        _____

9        _____

10       _____

11       _____

12       _____

13       _____

14       _____

15       _____

16       _____

17       _____

18       _____

19       _____

20            I, COLBY BEUCK, have read the foregoing deposition

21       and hereby affix my signature that same is true and

22       correct, except as noted above.

23

24                    _____

25                         COLBY BEUCK



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

COLBY BEUCK                                                    MAY 14, 2012

279

```
 1        THE STATE OF _____)

 2        COUNTY OF_____)

 3

 4             Before me,_____, on this day

 5        personally appeared COLBY BEUCK, known to me (or proved

 6        to me under oath or through_____

 7        (description of identity card or other document) to be

 8        the person whose name is subscribed to the foregoing

 9        instrument and acknowledged to me that they executed the

10        same for the purposes and consideration therein

11        expressed.

12             Given under my hand and seal of office

13        this_____day of _____, 2012.

14

15

16             _____

17             NOTARY PUBLIC IN AND FOR
               THE STATE OF _____

18

19

20

21

22

23

24

25
```



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

COLBY BEUCK                                          MAY 14, 2012

                                                                    280

1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLUMBIA
2

3    STATE OF TEXAS,               )
                                   )
4              Plaintiff,          )
                                   )
     VS.                           )
5                                  )
     ERIC H. HOLDER, JR. in his    )
6    official capacity as Attorney )
     General of the United States, )
7                                  )
               Defendant,          )
8                                  )
     ERIC KENNIE, et al,           )
9                                  )
          Defendant-Intervenors,   )
10                                 )
     TEXAS STATE CONFERENCE OF     )  CASE NO. 1:12-CV-00128
11   NAACP BRANCHES,               )  (RMC-DST-RLW)
                                   )  Three-Judge Court
12        Defendant-Intervenors,   )
                                   )
13   TEXAS LEAGUE OF YOUNG VOTERS   )
     EDUCATION FUND, et al,        )
14                                 )
          Defendant-Intervenors,   )
15                                 )
     TEXAS LEGISLATIVE BALCK        )
16   CAUCUS, et al,                )
                                   )
17        Defendant-Intervenors,   )
                                   )
18   VICTORIA RODRIGUEZ, et al.,    )
                                   )
19        Defendant-Intervenors.   )

20              REPORTER'S CERTIFICATION
               DEPOSITION OF COLBY BEUCK
21                  MAY 14, 2012

22        I, Chris Carpenter, Certified Shorthand Reporter in

23   and for the State of Texas, hereby certify to the

24   following:

25        That the witness, COLBY BEUCK, was duly sworn by the



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

COLBY BEUCK                                    MAY 14, 2012

281

1   officer and that the transcript of the oral deposition

2   is a true record of the testimony given by the witness;

3        That the deposition transcript was submitted on the

4   _____day of _____, 2012, to the witness or to the

5   attorney for the witness for examination, signature and

6   return to_____, by

7   _____, 2012; and if returned, the original

8   transcript will forwarded to Elizabeth Westfall, the

9   custodial attorney;

10        That the amount of time used by each party at the

11   deposition is as follows:

12        Ms. Westfall: 5 hours, 56 minutes

13        Mr. Rosenberg:  38 minutes

14        I further certify that I am neither counsel for,

15   related to, nor employed by any of the parties or

16   attorneys in the action in which this proceeding was

17   taken, and further that I am not financially or

18   otherwise interested in the outcome of the action.

19        Certified to by me this 16th day of May, 2012.

20

21                              _____

22   Chris Carpenter, Texas CSR 1151
     Expiration Date:  12/31/2012

23   100 Congress Avenue, Suite 2000
     Austin, TX  78701

24   (512)328-5557

25   Firm Registration No. 283



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS