# EXHIBIT

# 3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STATE OF TEXAS,                    ) | |
|       Plaintiff,              ) | |
|                        ) | |
| V.                                 ) | |
|                        ) | |
| ERIC H. HOLDER, JR.,               ) | |
| in his official capacity          ) | |
| as Attorney General of            ) | |
| the United States,                ) | |
|       Defendant.              ) | |
|                        ) | |
| ERIC KENNIE, et al.,               ) | |
|     Defendant-Intervenors,       ) | |
|                        ) | |
| TEXAS STATE CONFERENCE             ) | CASE NO. 1:12-CV-00128 |
| OF NAACP BRANCHES, et al.,         ) | (RMC-DST-RLW) |
|     Defendant-intervenors,       ) | Three-Judge Court |
|                        ) | |
| TEXAS LEAGUE OF YOUNG              ) | |
| VOTERS EDUCATION FUND, et al.,     ) | |
|     Defendant-Intervenors,       ) | |
|                        ) | |
| TEXAS LEGISLATIVE BLACK            ) | |
| CAUCUS, et al.,                    ) | |
|     Defendant-Intervenors,       ) | |
|                        ) | |
| VICTORIA RODRIGUEZ, et al.,        ) | |
|     Defendant-Intervenors.       ) | |

_____

ORAL DEPOSITION OF
REPRESENTATIVE PATRICIA HARLESS
May 15, 2012

_____

      ORAL DEPOSITION OF REPRESENTATIVE PATRICIA HARLESS,
produced as a witness at the instance of the Defendant, and duly
sworn, was taken in the above-styled and numbered cause on the
15th day May, 2012, from 9:42 a.m. to 7:11 p.m., before Amy C.
Kofron, CSR in and for the State of Texas, reported by machine
shorthand, at the offices of the United States Attorney, 816
Congress Avenue, Austin, Texas, pursuant to the Federal Rules of
Civil Procedure and the provisions stated on the record or
attached hereto.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

```
 1                    A P P E A R A N C E S
 2         FOR THE PLAINTIFF:
           Mr. Patrick Sweeten
 3         Mr. Matthew H. Frederick
           OFFICE OF THE ATTORNEY GENERAL OF TEXAS
 4         P.O. Box 12548
           Austin, Texas 78711-2548
 5
 6         FOR THE DEFENDANT:
           Mr. Daniel J. Freeman
 7         Ms. Elizabeth S. Westfall
           Ms. Risa Berkower
 8         Ms. Jennifer Maranzano
           Mr. Bruce Gear
 9         U.S. DEPARTMENT OF JUSTICE
           950 Pennsylvania Avenue NW
10         NWB Room 7203
           Washington, DC 20530
11
12         FOR THE DEFENDANT-INTERVENORS, TEXAS
           STATE CONFERENCE OF NAACP BRANCHES AND
13         MEXICAN AMERICAN LEGAL CAUCUS:
           Mr. Ezra Rosenberg
14         DECHERT, L.L.P.
           902 Carnegie Center
15         Suite 500
           Princeton, New Jersey 08540-6531
16
17         FOR THE DEFENDANT-INTERVENOR, KENNIE:
           Mr. Chad Dunn
18         BRAZIL & DUNN, L.L.P.
           4201 Cypress Creek Parkway
19         Suite 530
           Houston, Texas  77068
20
21
22
23
24
25
```



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1                            INDEX

2

3     Appearances. . . . . . . . .                              2

4     REPRESENTATIVE PATRICIA HARLESS

5           Examination by Mr. Freeman. . .                     5

6           Examination by Mr. Rosenberg. . .                 274

7     Signature and Changes. . . .                            292

8     Reporter's Certificate. . .                             294

9

10                          EXHIBITS

11    NO.  DESCRIPTION                                       PAGE

12    (Exhibits 1-10 referred to were marked in previous depositions)

13    11   Deposition Notice                                   13

14    12   Press Release                                       35

15    13   Texas Legislature Bills by Committee                37

16    14   Population and Voter Data                           82

17    15   Population and Voter Data                           89

18    16   Press Release                                      102

19    17   House Journal                                      115

20    18   House Debate Transcript Vol. I                     116

21    19   "Making the Case for Photo IDs at the polls"       133

22    20   Houston Chronicle NewsRoom                         142

23    21   May 9, 2012 letter                                 155

24    22   Caucus Members Pledge Press Release                177

25    23   Plaintiff's Interrogatory Responses                218



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1       24   House Debate Transcript Vol. II          246

2       25   Recognized Tribes List                   255

3       26   House Committee Transcript Vol. III       267

4       27   Texas Response to Motion to Compel        268

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

```
 1                REPRESENTATIVE PATRICIA HARLESS,

 2      having been first duly sworn, testified as follows:

 3                         EXAMINATION

 4      BY MR. FREEMAN:

 5          Q.   This is the deposition of Representative Patricia

 6      Harless in the matter of Texas V. Holder, U.S. District Court

 7      for the District of Columbia, Docket No. 1:11-CV-128.

 8                My name is Dan Freeman, and I'm here on behalf of

 9      Attorney General Eric Holder.  And with me are my colleagues,

10      Elizabeth Westfall, Risa Berkower, Jennifer Maranzano and Bruce

11      Gear, who you've already met, as well as attorneys for the

12      defendant intervenors, who you've also met, so I won't introduce

13      them again.

14                Could you spell your name for the record.

15          A.   It's Patricia, P-a-t-r-i-c-i-a, Harless,

16      H-a-r-l-e-s-s.

17          Q.   Thank you.  Have you ever been deposed before,

18      Representative?

19          A.   I have.

20          Q.   And when was that?

21          A.   I can't remember.  20 years ago maybe, 10 years ago.

22          Q.   Okay.  So let me just give you a few ground rules.

23      I'm sure that your attorneys have spoken to you already.  But a

24      deposition functions in the form of questions and answers.  So

25      it's necessary for you to speak rather than gesture in order to
```



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1    answer so that the court reporter can get everything down.  Do

2    you understand?

3         A.   Yes.

4         Q.   And the purpose of the deposition is to secure your

5    testimony and your complete version of the facts relevant to

6    this case.  And so I will need your full and complete answers to

7    the questions that I ask.  Do you understand?

8         A.   Yes.

9         Q.   I may not always be clear when I ask my questions.

10   And so if you don't understand, please ask me to restate the

11   question so that you're able to answer completely.  Do you

12   understand?

13        A.   Yes.

14        Q.   And I think we just had someone come onto to the

15   phone, so --

16             MR. ROSENBERG: Well, we'll enter our appearances --

17             MR. FREEMAN:  Okay.

18             MR. ROSENBERG:  -- formally, I guess, at some point.

19             MR. FREEMAN:  All right.

20        Q.   If you need a break, please let me know, and we'll

21   finish the question that's pending, and then we'll see about a

22   break.  Is that acceptable?

23        A.   Yes.

24        Q.   And if you need to get up for additional water or

25   coffee or something, we should do that between questions, not



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

```
 1        while a question is pending.  Is that all right?

 2             A.   Yes.

 3             Q.   Okay.  If you want to talk to your attorney, that's

 4        fine.  But if there's a question pending or if you're in the

 5        middle of an answer, if you could finish that up first, that

 6        would be great.  Is that okay?

 7             A.   Yes.

 8             Q.   Okay.  At various points your attorney may object to a

 9        question that I ask.  Many of these objections will be resolved

10        by the Court at a later time.  We have some disagreements

11        regarding the law that is applicable to this case, and so none

12        of us will be offended.  But unless your attorney specifically

13        directs you not to answer, you need to please respond to my

14        question.  Is that all right?

15             A.   Yes.

16             Q.   Sometimes your attorney may instruct you not to rely

17        on certain information when you're answering a question.  If you

18        follow that instruction, please answer by preceding your answer

19        by saying, "based on the instruction" or "in reliance on my

20        attorney's instruction."  This will help it be clear for the

21        record that you are relying on that instruction and possibly

22        providing a partial answer.  If you follow that instruction and

23        as a result cannot answer at all, please do say, "I cannot

24        answer based on my attorney's instruction."  Is that all right?

25             A.   Yes.
```



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Patricia Harless

May 15, 2012

8

```
1              MR. ROSENBERG:  And, Dan, before you begin then --

2              MR. FREEMAN:  Sure.

3              MR. ROSENBERG:  -- we did not put our appearances on

4       the record.

5              Ezra Rosenberg from Dechert on behalf of the Texas

6       State Conference of NAACP Branches and the Mexican American

7       Legislative Caucus.

8              MR. DUNN:  Chad Dunn on behalf of the defendant,

9       Kennie Intervenors.

10              MR. ROSENBERG:  And we have someone on the line.  Amy?

11              MS. PEDERSON:  Amy Pederson for the Rodriguez

12      intervenors.

13              MR. ROSENBERG:  Okay.  Thanks.

14              MR. FREEMAN:  And that's P-e-d-e-r-s-o-n.

15              THE REPORTER:  Thank you.

16      Q.    Now, I believe that your attorney agrees that you hold

17      any legislative privilege personally.  Therefore, with regard to

18      your own statements or actions or those of your staff, you may

19      choose to waive that privilege in order to share the truth with

20      the Court, with the public, and with your constituents.  For

21      example, during the redistricting litigation, numerous

22      legislators chose to provide full testimony.  Sometimes is --

23      does -- do you understand that?

24      A.    Yes.

25      Q.    Sometimes you may remember things later in the day.
```



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1     If that happens, let me know while it's on your mind, and we'll

2     add it to the record.  Will you do that?

3          A.   Yes.

4          Q.   I'll give you regular chances to do that as well.

5               Sometimes after we've been talking for a period, you

6     may realize that a prior answer was not entirely accurate.  If

7     you realize that, will you let me know?

8          A.   Yes.

9          Q.   Thank you.  And sometimes while you're answering, you

10    may think of a document that would help you remember or help you

11    answer more accurately.  If you do, please let me know.  We may

12    have that document here.  I brought a small library.  And if

13    not, we may be able to get it in order to help you.  Is that

14    okay?

15         A.   Yes.

16         Q.   I have a few just routine questions to make sure that

17    you're in fine shape to participate in the deposition.  Please

18    don't take offense.  They're standard procedure.

19              Are you on any medication or drugs of any kind that

20    would make it difficult for you to understand and answer

21    questions?

22         A.   No.

23         Q.   Have you had anything alcoholic to drink in the last

24    eight hours?

25         A.   No.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Patricia Harless                                          May 15, 2012

```
 1              Q.    Are you at all sick today?

 2              A.    No.

 3              Q.    Are you currently under a doctor's care for any

 4         illness?

 5              A.    No.

 6              Q.    Is there any reason you can think of why you would not

 7         be able to answer my questions fully and accurately?

 8              A.    No.

 9              Q.    And last thing, I want to remind you that you're under

10         oath and subject to federal penalties for giving false or

11         misleading testimony.  So it's important that you answer my

12         questions truthfully, accurately and completely.  Do you

13         understand?

14              A.    Yes.

15              Q.    Do you have any questions so far?

16              A.    No.

17              Q.    Great.

18                    MR. SWEETEN:  Dan, at this point, I think it's

19         appropriate for me to go ahead, as we talked about yesterday,

20         is -- is to tell you that -- that Representative Harless will be

21         asserting the legislative privilege with respect to questions

22         that we anticipate you will be asking today.  To the extent that

23         Representative Harless is asked questions that reveal her

24         thoughts, mental impressions or opinions about legislation or

25         communications with legislators, legislative staff, state
```



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

```
1        agencies, Texas Legislative Council or constituents that relate
2        to pending litigation, we'll be objecting to those questions on
3        the basis of legislative privilege.
4                     MR. FREEMAN:  That's fine.  I understand.  I will
5        ask that the representative state for the record, "I am
6        asserting legislative privilege" in those cases.
7             Q.   So first off --
8                     MR. SWEETEN:  Oh, let me also -- I forgot.
9                     MR. FREEMAN:  Sure.
10                    MR. SWEETEN:  This does not -- the scope of
11       legislative privilege, we are not including matters of public
12       record, including committee hearings, House floor proceedings,
13       debates or public speeches.  That is not -- we're not asserting
14       the legislative privilege as to those issues.
15                    MR. FREEMAN:  And just, if we're laying out the
16       ground rules, does that also include you will not be asserting
17       with regard to statements to the press?
18                    MR. SWEETEN:  I think that -- obviously, you can
19       ask her a question about a statement to the -- that she made to
20       the press.  That also is part of, I think, the public record.
21       So long way to say yes.
22                    MR. FREEMAN:  Okay.  Good.  Thank you.
23            Q.   So you said you've been deposed once before about 20
24       years ago, correct?
25            A.   Once, maybe twice.  I'm not sure.  I own my own
```



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

```
 1    business.

 2         Q.   Okay.  It was related to your business?

 3         A.   Yes.

 4         Q.   Okay.  And you don't remember the nature of the

 5    proceedings?

 6         A.   You mean the deposition?

 7         Q.   The type of the case.

 8         A.   It was a suit.

 9         Q.   Okay.  Related to?

10         A.   My business.

11         Q.   Okay.  Do you remember what court it was in?

12         A.   No.

13         Q.   Okay.  Have you ever testified in court before?

14         A.   Yes.

15         Q.   And what was that related to?

16         A.   On that same case.

17         Q.   Same case.  Were you a defendant in that case?

18         A.   Yes.

19         Q.   Did you win?

20         A.   One, I did.  One, I didn't.

21         Q.   Okay.  Have you ever been involved in a case where the

22    State of Texas was a party?

23         A.   No.

24         Q.   Okay.

25         A.   Not that I know of.  Not that I went to court on.
```



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

```
 1              Q.    Okay.

 2                    MR. FREEMAN:  If the court reporter can please

 3       mark this as U.S. 11.

 4                        (Exhibit No. 11 marked)

 5              Q.    Have you seen this document before?

 6              A.    Yes.

 7              Q.    Could you tell me what it is?

 8              A.    It is the notice of the deposition.

 9              Q.    What did you do to prepare for this deposition?

10                    MR. SWEETEN:  Don't reveal any communications -- the

11       substance of any communications you've had with your attorneys

12       in this matter.

13              A.    I read through this request, and that's pretty much

14       it.

15              Q.    Did you review any documents?

16              A.    Reviewed the documents that -- that I had in my file,

17       the bill.

18              Q.    And anything besides the bill?

19              A.    Part of the testimony, the record testimony on the

20       floor.

21              Q.    The floor testimony from both the 38th day and the

22       40th day of the session, both floor days?

23              A.    No.

24              Q.    Which day?

25              A.    The day that was the 11 hours.
```



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

```
 1            Q.    Okay.  The 40th day?

 2            A.    I guess.

 3            Q.    Okay.

 4            A.    I don't remember which day.

 5            Q.    Anything besides the text of the bill and the

 6       transcript of the floor debate?

 7            A.    Conference committee report.

 8            Q.    Okay.  Anything besides those three documents?

 9            A.    That's it.

10            Q.    Okay.  And when did you review those?

11            A.    Last night.

12            Q.    Okay.  Did any of those documents refresh your memory

13       concerning S.B. 14?

14            A.    Yes.

15            Q.    Okay.  Did you meet with counsel?

16            A.    Yes.

17            Q.    And when was that?

18            A.    About a month ago.

19            Q.    Okay.  And where did that occur?

20            A.    In my office, and then again last night.

21            Q.    And who was present?  First, the meeting in your

22       office.

23            A.    Patrick and Matt, myself and my chief of staff at the

24       one in my office.

25            Q.    Okay.
```



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

```
 1              A.    And was Stacey -- maybe one other person.  I don't
 2      know.
 3              Q.    Would that will be Stacey Napier?
 4              A.    I can't tell you for sure if she was there.
 5              Q.    Okay.  From the attorney general's office?
 6              A.    Uh-huh.
 7              Q.    Okay.  And last night, who did you meet with?
 8              A.    Matt, Brooke, Jay with the attorney general's office,
 9      and Patrick came in later.
10              Q.    And who is Brooke?
11              A.    With the AG's office.  I don't know.
12              Q.    You don't know her last name?
13              A.    No, sir.
14              Q.    And would Jay be Jay Dyer?
15              A.    Yes.
16              Q.    Okay.  If you could turn to Attachment A, which is the
17      third page of the document.  Did you undertake a search for
18      these documents?
19              A.    I instructed my staff to.
20              Q.    And when was that?
21              A.    I can't tell you for sure.  Maybe a week to two weeks
22      ago.
23              Q.    Okay.  And did you -- other than instructing your
24      staff, did you take any other actions personally?
25              A.    No.
```



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

```
 1          Q.   Did you search your personal e-mail?

 2          A.   My staff did.

 3          Q.   Your staff have access to your personal e-mail?

 4          A.   Uh-huh.

 5          Q.   Okay.  Did you search the text messages on your phone?

 6          A.   No.

 7          Q.   Do you retain text messages on your phone?

 8          A.   No.

 9          Q.   What type of phone do you use when you are using your

10     phone for text messaging in the context of legislative activity?

11          A.   Currently now an iPhone.

12          Q.   And what were you using in 2011?

13          A.   Part, a BlackBerry --

14          Q.   Uh-huh.

15          A.   -- and then I converted to an iPhone.

16          Q.   And is it your belief that those phones do not store

17     the text messages that you send and receive?

18          A.   I have no idea about the technology.  I know that I

19     delete them --

20          Q.   Oh, you --

21          A.   -- every day.

22          Q.   -- you go back and delete at the end of the day?

23          A.   Every day.

24          Q.   Okay.  Okay.  Representative Harless, where were you

25     born?
```



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Patricia Harless                                           May 15, 2012

17

```
 1          A.    Houston, Texas.

 2          Q.    And did you grow up in Houston?

 3          A.    Yes, sir.

 4          Q.    Okay.  Where did you go to school?

 5          A.    I went to Spring ISD and graduated from Candlestick

 6     Christian Academy --

 7          Q.    Okay.

 8          A.    -- in Spring.

 9          Q.    Okay.  Did you go to college?

10          A.    I did.

11          Q.    And --

12          A.    LeTourneau, Longview.

13          Q.    Pardon me?

14          A.    LeTourneau University --

15          Q.    Okay.

16          A.    -- in Longview, Texas.

17          Q.    Where is Longview?

18          A.    It's Northeast Texas.

19          Q.    Okay.  And what was your degree in?

20          A.    Business Administration, BS in BA.

21          Q.    Okay.  And when did you first start working?

22          A.    Start working?

23          Q.    Uh-huh.

24          A.    When I was nine years old.

25          Q.    Okay.
```



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

```
 1              A.    Full-time -- full-time?

 2              Q.    Full-time.

 3              A.    1983.

 4              Q.    Okay.  And who were you working for?

 5              A.    My father, second generation --

 6              Q.    Okay.

 7              A.    -- car dealer.

 8              Q.    And what's his business?

 9              A.    He's deceased, but it's a used car dealership.

10              Q.    Is that Fincher Automotive?

11              A.    Fred Fincher Motors.

12              Q.    Okay.

13              A.    There's a lot of Finchers in Houston.

14              Q.    My apologies.

15              A.    I'm Fred Fincher Motors.

16              Q.    Okay.  Are there other Fincher car dealerships?

17              A.    Yes.  I have six brothers, two sisters, and several of

18      them are in the business.

19              Q.    Okay.

20              A.    We are competitors.

21              Q.    Oh, that sounds rough.

22              A.    It's fun.

23              Q.    Okay.  Okay.  And you're still -- you're still at Fred

24      Fincher Motors?

25              A.    Yes, sir.
```



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

1      Q.    Okay.  Have you participated in government at all

2      outside of elected office?

3      A.    Yes.

4      Q.    And what is your history of participation in

5      government outside of elected office?

6      A.    I was a member of the Texas Independent Auto Dealers

7      Association --

8      Q.    Uh-huh.

9      A.    -- past president, and I would participate in the

10     committee hearing process as an industry volunteer.

11     Q.    Did you testify at hearings?

12     A.    I did.

13     Q.    And how else did you participate?

14     A.    That was it.

15     Q.    And were these on issues in -- which particular

16     committee?

17     A.    Transportation, licensing, on issues pertaining to the

18     automobile industry.

19     Q.    Okay.  And outside of your own campaigns, have you

20     worked on any political campaigns or in any political sphere?

21     A.    Yes.

22     Q.    And what is your history of political participation

23     outside of your own campaigns?

24     A.    Working on campaigns.

25     Q.    Which campaigns?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Patricia Harless                                          May 15, 2012

20

1          A.   I started in '80 -- '89 -- '79-'80 on Reagan's first

2     campaign.

3          Q.   Okay.

4          A.   Worked for President Bush, both senior and President

5     George W.

6          Q.   Okay.

7          A.   Sheriff race, state rep race, state senate race,

8     county commissioner, JP, constable --

9          Q.   Okay.  And --

10         A.   -- judges.

11         Q.   What was the scope of your participation in those

12    races?

13         A.   I just was a volunteer.

14         Q.   Okay.

15         A.   I like electing good people.

16         Q.   Okay.  Did you ever -- were you ever involved in any

17    fundraising?

18         A.   You mean as far as organizing it --

19         Q.   Yes.

20         A.   -- or participating?

21         Q.   First -- first one, then the other.  First,

22    organizing.

23         A.   I never organized a fundraiser.  I participated.  I

24    may have sponsored one, held one at my home.

25         Q.   Okay.  Were you ever involved -- strike that.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Patricia Harless                                                    May 15, 2012

21

1               During your involvement on policy matters as a

2       business owner, did you ever make any requests for materials

3       under the Texas Open Records Act?

4          A.   Not that I recall.

5          Q.   Did you have to interact with government regulation

6       and regulators as a small business owner?

7          A.   Yes.

8          Q.   And did you expect those government agencies to

9       communicate with you fully, openly and honestly?

10         A.   Yes.

11         Q.   When did you last renew your driver's license?

12         A.   Well, about six years ago, I think.  I think it's up

13      for renewal this year, so we renew every six years.

14         Q.   Okay.  And where did you have to go for that?

15         A.   I did it by mail.

16         Q.   And when was the last time you had to do it in person?

17         A.   I can't recall.

18         Q.   When are you allowed to renew a Texas driver's license

19      by mail?

20         A.   You can renew your Texas driver's license, if I

21      remember correctly, for the first renewal after six years.

22      They're good for six years.  The first renewal, if you haven't

23      had any citations or speeding tickets or issues on your driver's

24      license, you can renew by mail.  After 12 -- after the second

25      renewal, you have to go in, in person.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1      Q.    Do you have to submit a new photograph when you renew

2      by mail?

3      A.    No.

4      Q.    Okay.  Do you know where the closest driver's license

5      office is to your house?

6      A.    I do.

7      Q.    And how far is that from your house?

8      A.    It's probably about 7 to 10 miles.

9      Q.    And do you know what hours it's open?

10     A.    No, I don't.

11     Q.    And how long would it take you to get there?

12     A.    Depending on traffic, maybe 15 to 20 to 30 minutes.

13     Q.    And do you remember last time you went how long you

14     had to wait in line?

15     A.    When my son turned 16, about 45 minutes.

16     Q.    Okay.  And when your son turned 16, do you know what

17     time of day you went with him?

18     A.    We went two different times, one to take a test and

19     then one to get his temporary -- his temporary then to take the

20     test.  Maybe an hour to do the driving test.

21     Q.    Do you know what time of day you went, though?

22     A.    After school.

23     Q.    So --

24     A.    After 2:30 or 3:00.

25     Q.    If you hadn't been going with him, would you have



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1    normally been at work?

2         A.   Yes.

3         Q.   If you didn't have a car, would you be able to get to

4    that driver's license office from your House?

5         A.   I don't know if the bus runs there.  I can't tell you

6    for sure.

7         Q.   Okay.  If there weren't a bus, how long would it take

8    you to get there?

9         A.   In my car?

10        Q.   Without a car.

11        A.   I can't even speculate.

12        Q.   Okay.  If you had to walk, do you know how long it

13   would take?

14        A.   No.

15        Q.   Do you know how much it would cost to take a cab from

16   your House to the driver's license office?

17        A.   No.

18        Q.   Okay.  Do you know what documents you brought with you

19   when you went with your son to help him get his driver's

20   license?

21        A.   I can't remember.

22        Q.   Do you know if some driver's license offices are

23   currently closed because of funding issues?

24        A.   I think the record testimony in committee is that

25   there are some.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1          Q.    Are some currently using reduced hours?

2          A.    There may have been testimony on that.  I can't recall

3     specifically.

4          Q.    Okay.  Do you know -- is there a driver's license

5     office in every county in Texas?

6          A.    I think the testimony was that there is not.

7          Q.    Okay.  Do you have a copy of your birth certificate?

8          A.    I do.

9          Q.    And does the name on the birth certificate match your

10    current name on your driver's license?

11         A.    No.

12         Q.    Do you know where you'd get a copy if you lost your

13    birth certificate?

14         A.    I do what my constituents do and call my office.

15         Q.    Okay.  How much would it cost to get a new copy of

16    your birth certificate?

17         A.    I couldn't tell you.  I've got -- I've got a certified

18    copy I've had since I was a kid.

19         Q.    Okay.  Do you know how long it takes to get a new copy

20    of a birth certificate?

21         A.    I don't.

22         Q.    Do you have a copy of the order that legally changed

23    your name?

24         A.    I don't know if I do.

25         Q.    Do you know where you would get a copy?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

ESQUIRE
DEPOSITION SOLUTIONS

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1          A.    The order that -- no, I don't.

2          Q.    I guess after you got married?

3          A.    Yeah.

4          Q.    Do you know how much a copy would cost?

5          A.    I don't.

6          Q.    Do you know how long it would take to get a copy?

7          A.    I don't.

8          Q.    How would you go about finding out where to get a copy

9     of that document?

10         A.    I'd call my office.

11         Q.    Okay.  You probably get a lot of phone calls, don't

12     you?

13         A.    We do, a lot.

14         Q.    And the next question is going to kind of sound a

15     little silly, but I don't drive a car.

16               How much is gas going for in Harris County right now?

17         A.    I filled up yesterday.  I think I paid 3.79 a gallon.

18         Q.    When is the last time you voted?

19         A.    I voted last week.

20         Q.    And how far is your polling place from your home?

21         A.    I had to go to two different polling places.  I voted

22     in a MUD election and in an EDS election.

23         Q.    And just for the record, a MUD is a municipal utility

24     district?

25         A.    Yes.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

    1        Q.    And an EDS is?

    2        A.    Is emergency -- or ESD, emergency service district.

    3        Q.    Okay.  And those had different polling places?

    4        A.    Yes.

    5        Q.    And how far was the MUD polling place?

    6        A.    The MUD is our subdivision MUD, so it was probably a

    7    quarter of a mile.  The EDS was at the fire department, so it

    8    was probably five or six miles, but they had -- they had a

    9    number of locations open.

   10        Q.    Okay.  And so those are much closer than the driver's

   11    license office; is that correct?

   12        A.    Yes.

   13        Q.    And where do you vote for presidential elections?  How

   14    far is that from your house?

   15        A.    Well, in Harris County, we have early voting.

   16        Q.    Okay.

   17        A.    And I typically vote early voting, and that is at a

   18    church --

   19        Q.    Uh-huh.

   20        A.    -- and it's probably 7 to 10 miles from my house.

   21        Q.    Okay.  If you were to vote on election day --

   22        A.    It's in --

   23        Q.    -- do you know where you would vote?

   24        A.    It's in my subdivision at an elementary school that's

   25    probably a mile or two away.



                                        Toll Free: 800.211.DEPO
                                        Facsimile: 512.328.8139

                                               Suite 220
                                         3101 Bee Caves Road
ESQUIRE                                     Austin, TX 78746
DEPOSITION SOLUTIONS                     www.esquiresolutions.com

1     Q.   Okay.  So that's much closer than the driver's license

2  office as well, correct?

3     A.   Well, not early voting.

4     Q.   But the election day precinct is much closer, correct?

5     A.   If I voted on election day.  I don't.

6     Q.   Okay.

7     A.   I'm scared I might be sick and miss it.

8     Q.   I understand.  We're often very busy on election day

9  as well.  Although in DC, our vote doesn't count quite as much.

10          Okay.  What ID are you carrying on you today?

11     A.   I have my driver's license, my concealed handgun

12  license, my voter registration card.

13     Q.   And which ones of those have your photo on them?

14     A.   My driver's license and my concealed handgun license.

15     Q.   Okay.  And which of those establish your citizenship?

16     A.   I would say my driver's license.

17     Q.   Does it indicate on your driver's license that you're

18  a United States citizen?

19     A.   No.

20     Q.   And so how does that document establish your

21  citizenship?

22     A.   I think you have to answer a question that you're a

23  citizen or provide some type of citizenship paper to get a

24  driver's license.

25     Q.   So if someone is a Green Card holder who is a legal



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1     resident of Texas and in line to become a citizen, can they not

2     get a Texas driver's license?

3          A.   I'm not sure.

4          Q.   Okay.  And if someone's here on a work visa, can they

5     not get a Texas driver's license?

6          A.   I'm not sure.  I don't know the procedures.

7          Q.   Okay.  Do you have a passport on you?

8          A.   No.

9          Q.   Do you have a military ID?

10         A.   No.  Now --

11         Q.   Is --

12         A.   -- I need to clarify that.  You mean on me?

13         Q.   Yes.

14         A.   Okay.

15         Q.   Those are coming.

16         A.   Okay.  I just --

17         Q.   And do you have a passport?

18         A.   I do.

19         Q.   Do you have a military ID?

20         A.   I don't.

21         Q.   Does anyone in your family have a military ID?

22         A.   Oh, my goodness, I have no clue.

23         Q.   Immediate family.

24         A.   I have six brothers, two sisters, 37 nieces and

25     nephews and 42 great nieces and nephews all in Harris County.  I



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Patricia Harless                                      May 15, 2012

29

1        have no clue.

2              Q.    You must have amazing picnics.

3                    What other types of ID are produced by the State of

4        Texas?

5              A.    Identification card, a driver's license --

6              Q.    Uh-huh.

7              A.    -- concealed handgun are all provided by DPS.

8              Q.    Anything else by the state or its agencies?

9              A.    I don't know that.

10             Q.    Do state colleges produce identification cards?

11             A.    I'd assume some do.  The one my son went to had -- he

12       had an ID, student ID card.

13             Q.    And do employers -- when the state is an employer,

14       does it produce identification cards?

15             A.    I don't know what their procedures are.

16             Q.    Do you have any kind of legislator ID?

17             A.    I do.

18             Q.    Does it have your photo on it?

19             A.    It does.

20             Q.    Does that legislator identification card establish

21       your identity?

22             A.    I guess it could.

23             Q.    Okay.

24             A.    It hadn't got me out of tickets.

25             Q.    I hope not.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

```
 1          A.    Yeah, I know.

 2          Q.    Where do you get your information about elections?

 3          A.    What do you mean?

 4          Q.    In terms of news, information about issues.

 5          A.    You mean on polling places or the date?

 6          Q.    I mean in terms of the candidates, the issues, the

 7   polling.

 8                    MR. SWEETEN:  You're asking as a general matter?

 9                    MR. FREEMAN:  As a general matter, yes.

10                    MR. SWEETEN:  Okay.  All right.

11          A.    We get massive amounts of mail during the election

12   season.  I typically try to look at a sample ballot and do some

13   research on the candidates --

14          Q.    Okay.

15          A.    -- just for my own information to see who I'm going to

16   vote for.

17          Q.    And how do you do that research?

18          A.    I go to their web site if they have one, look at their

19   web sites and read what their values are, what they say their

20   values are.

21          Q.    And what newspapers or web sites do you read other

22   than candidates' web sites?

23          A.    Just the Houston Chronicle.

24          Q.    Okay.  What news channels do you watch?

25          A.    None.
```



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1          Q.    And do you listen to any talk radio?

2          A.    No.

3          Q.    And do you receive any e-mail newsletters or repeated

4    e-mails from any organization or individual?

5          A.    Our republican clubs that I'm members of send out

6    massive amounts of information.  I typically delete most of

7    them.

8          Q.    And what republican clubs are you a member of?

9          A.    Northwest Forest Republican Women in Harris County and

10   Texas Tea Republican Women, Cy-Fair Republican Women.

11         Q.    What was the last one?

12         A.    Cy-Fair Republican Women.

13         Q.    What is Cy-Fair?

14         A.    Cy-Fair is northwest area in Harris County.

15         Q.    Oh, okay.  Thank you.

16               Representative Harless, what committees do you

17   currently sit on?

18         A.    I sit on State Affairs, on Licensing and -- LAP,

19   Licensing and Administrative Procedures, Redistricting.  I

20   sit -- I sit on the Select Committee For Human Trafficking, and

21   I served on the Select Committee For Voter -- I don't -- I don't

22   know the technical name.

23         Q.    Was it the Select Committee on Voter Identification

24   and Voter Fraud?

25         A.    Yes.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1    Q.   Okay.  What is a select committee?

2    A.   A select committee is a committee issued to study a

3    specific item.

4    Q.   And who decides to establish a select committee within

5    the legislature?

6    A.   Our information comes from the speaker's office.

7    Q.   So can the speaker decide to establish a select

8    committee on any issue?

9    A.   I would assume he could.

10   Q.   Does anyone else participate in that decision-making

11   process, to your knowledge?

12   A.   I wouldn't know.

13   Q.   Okay.  Who picked the name of the Select Committee on

14   Voter Identification and Voter Fraud?

15   A.   I don't know.

16   Q.   Are you aware of any other select committees related

17   to voting or elections, first in the current legislature?

18   A.   Not other than this committee.

19   Q.   Any in past legislatures?

20   A.   I don't know.  I've only been there three sessions.

21   Q.   Okay.  But you said that you were involved, to some

22   extent, as a small business owner; is that correct?

23   A.   Yes.

24   Q.   But were you not following issues related to election

25   law?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1          A.   As a small business person, prior to being elected,

2     no.

3          Q.   Okay.  Are you aware of any other select committees

4     that relate directly to a standing committee in the way that the

5     Select Committee on Voter Identification and Voter Fraud relates

6     to elections?

7          A.   I think we've had committees, yes.

8          Q.   Could you provide any examples?

9          A.   We had a select committee on emergency appropriation.

10    We had a select committee on state sovereignty.  I think there

11    was a select committee on government efficiency, which are all

12    under other jurisdictions of other committees.

13         Q.   And what is the purpose of establishing a select

14    committee in those circumstances?

15         A.   In my opinion, it's to bring more attention and a

16    larger venue to an issue.

17         Q.   Is the Select Committee on Voter Identification and

18    Voter Fraud larger than the election committee?

19         A.   You mean as far as members?

20         Q.   As far as the number of members, yes.

21         A.   I don't know that.

22         Q.   What did you mean by a larger venue?

23         A.   It's a select issue --

24         Q.   Uh-huh.

25         A.   -- so you don't have to share the stage with other



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1     issues, and it brings in more participation, in my -- my view, a

2     larger group to participate.  It's a single issue, so it's open

3     more to the public, and testimony is not limited.

4          Q.   Okay.  By saying that testimony is not limited, do you

5     mean that there are not limitations on the amount of time that

6     individuals can testify under the House rules?

7          A.   No.

8          Q.   What do you mean by that?

9          A.   I mean that in the regular committee process on agenda

10    when we have legislation that's there for a hearing --

11         Q.   Uh-huh.

12         A.   -- there may be five, ten, twenty pieces of

13    legislation.  So the committee kind of establishes a time frame

14    in how long they'll give each of these issues in order to get

15    through the agenda.  And on the select committee, it is the sole

16    purpose to hear that information as broad and as wide with as

17    much participation as possible.

18         Q.   Do select committees overlap in the time that they

19    meet with other committees that members of the committee may be

20    on?

21         A.   It's possible.  I can't tell you for sure if we did or

22    if they do, but it's possible.

23         Q.   Okay.  Was the Select Committee on Voter

24    Identification and Voter Fraud a "fast-track" committee?

25         A.   I can't answer that.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1          MR. FREEMAN:  If I can mark this as U.S. Exhibit 12.

2                    (Exhibit No. 12 marked)

3          Q.   I guess that copy is for you.  Could you take a look

4     at this document? Have you seen this document before?

5          A.   Not that I recall.

6          Q.   Do you see on the second-to-last line of the first

7     page where it says "fast track"?

8          A.   I see that.

9          Q.   Do you have any idea what that means?

10         A.   I know that the voter ID legislation was an emergency

11    item for the governor's office.

12         Q.   Were there other emergency items for the governor's

13    office?

14         A.   Yes.

15         Q.   Were those assigned to fast-track select committees?

16         A.   I don't recall.

17         Q.   Were there any other fast-track select committees in

18    the 82nd legislature in 2011?

19         A.   I can't answer 100 percent sure, but I think that the

20    state sovereignty committee was a select committee.  The

21    government reform committee was a select committee for

22    government for the governor's emergency items.  I think there

23    were more than just this that were the governor's emergency

24    items that had select committees.

25         Q.   But if you look on this document below "Fast Track



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1    Select Committee on Voter Identification and Voter Fraud," do

2    you see "Select Committee on State Sovereignty"?

3        A.   I do.

4        Q.   Is that designated a fast-track committee?

5        A.   It doesn't -- it doesn't say that in this document.

6        Q.   Are you aware of any other fast-track committees

7    having been established in the sessions of the legislature in

8    which you served?

9        A.   I can't answer that.  I didn't write this, so I can't

10   answer that.

11       Q.   But are you aware of any other committees being

12   designated as fast-track committees?

13       A.   I don't know for sure.

14       Q.   Okay.  So you're not aware?

15       A.   I'm not aware.

16       Q.   Thank you.

17       A.   No.  I can't say I'm not -- I don't recall.

18       Q.   Okay.  How many bills did the Select Committee on

19   Voter Identification and Voter Fraud consider?

20       A.   We had a hearing on just the one.

21       Q.   Okay.  Are there any other examples of committees of

22   which you are aware that heard only one bill?

23       A.   I don't know.

24       Q.   So you're not aware of any other examples of a

25   committee that has heard only one bill?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1          A.   I don't know if there were any other committees that

2     only heard one bill.  There's like 30-plus committees, and I

3     have my hands full with my committee.

4          Q.   No.  I understand.  I'm just asking:  To your

5     knowledge, you don't --

6          A.   Not to my knowledge.

7          Q.   -- you're not aware of any other?

8          A.   I don't remember.

9          Q.   Okay.  Thank you.

10          Were there any bills submitted in the 82nd legislature

11     to address mail-in voter fraud?

12          A.   Any committees?

13          Q.   Any bills submitted?

14          A.   Yes, I think there were.

15          Q.   Were those referred to the Select Committee on Voter

16     Identification and Voter Fraud?

17          A.   If they were, we did not hear them.

18          Q.   Okay.

19          A.   I'm not sure where they referred them, but we did not

20     have a hearing on them.

21          Q.   If I can just -- we can just clean this up real

22     quickly, if I can have this marked U.S. Exhibit 13.

23                    (Exhibit No. 13 marked)

24               MR. SWEETEN:  That last one was 12?

25               MR. FREEMAN:  Yes.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Patricia Harless

```
 1              Q.   Have you seen this document before?

 2              A.   No, I haven't seen it in this form.

 3              Q.   Do you recognize it, though?

 4              A.   Yes.

 5              Q.   And does this document indicate the number of bills

 6      that were heard by the Select Committee on Voter Identification

 7      and Voter Fraud?

 8              A.   Bills by committee.  Seems to be.

 9              Q.   And how many bills were heard by the select committee?

10              A.   One.

11              Q.   Okay.  So is it the case that any of the bills that

12      were submitted related to mail-in voter fraud were not submitted

13      to the select committee; is that correct?

14              A.   You know, I'm not familiar with how the system

15      searches that.  If you are and you're saying that, then I

16      understand, but I don't know.  Is this a search on all the bills

17      that were referred to that committee, or --

18              Q.   Well --

19              A.   -- is it just a search on the bills that were heard in

20      that committee?

21              Q.   If you can see, the report indicates that it is the

22      82nd legislature regular session.

23              A.   Right.

24              Q.   And the number of bills by committee.  Do you see

25      where it indicates one?
```



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Patricia Harless                                              May 15, 2012

1          A.   It says, "Number of bills: 1."

2               And it says, "Bills Out of Committee: (1)."

3          Q.   But if you look at the top of the page, it states,

4     "Texas Legislature" --

5          A.   Right.

6          Q.   -- "Bills By Committee."

7          A.   Right.

8          Q.   Does -- do you understand what that would mean?

9          A.   I guess this document is saying there was only one

10    bill referred, from what --

11         Q.   Okay.

12         A.   -- what you're saying.

13         Q.   And you don't have any recollection of hearing or

14    addressing any other bill in the select committee?

15         A.   No, we did not.

16         Q.   Okay.  Why would a bill related to the -- to mail-in

17    voter fraud not be referred to the select committee?

18               MR. SWEETEN:  Hold on one second.  I just want to

19    provide you a admonitory instruction you're going to hear

20    several times today.  I don't want you to reveal in answering

21    questions for Mr. Freeman any thoughts, mental impressions or

22    opinions about legislation, including S.B. 14.  I don't want you

23    to reveal any communications with legislators, legislative

24    staff, state agencies, including the governor's office or

25    lieutenant governor, any communications with Texas Legislative



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1      Council or constituents.  You are free to include matters of the

2      public record, including committee hearings, House floor

3      proceedings, debates or those proceedings.

4                   MR. FREEMAN:  And I will just -- just note for

5      the record that you are, in fact, free to reveal your own

6      communications and mental impressions.  It is your privilege to

7      assert or to waive.

8                   MR. SWEETEN:  Counsel, first of all, I'm going

9      to -- I'm her attorney.

10                  MR. FREEMAN:  I recognize that.

11                  MR. SWEETEN:  I will do the instructing as to

12     what -- and I'm communicating with my client, and she is

13     asserting the privilege.  This is the second time now that

14     you've told her that.  I'll give her the legal advice, and she

15     has indicated that she will assert the privilege.  So my

16     marching orders is I will provide her with the framework for how

17     to assert that privilege.

18                  MR. FREEMAN:  Okay.

19                  MR. SWEETEN:  So I would ask you to not continue

20     with that line.

21                  MR. FREEMAN:  Okay.  Well, Counsel, at this

22     point, she has not verbally asserted the privilege in this

23     deposition, although she is, of course, free to if she chooses

24     to.

25                  MR. SWEETEN:  We have done so in a court filing,



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

1     and she is asserting that privilege.

2                    MR. FREEMAN:  I believe there was a question

3     pending.  Is it possible to get it read back?

4                    THE REPORTER:  Yeah.  Sure.  Yeah, I can read it

5     back.

6                    Question:  "Okay.  Why would a bill related to

7     the -- to mail-in voter fraud not be referred to the select

8     committee?"

9                    MR. SWEETEN:  With that instruction, go ahead and

10    answer.

11         A.    I don't know.

12         Q.    Who makes the decisions concerning to which committee

13    each bill is referred?

14         A.    I'm -- I don't know that.

15         Q.    How many bills did you submit in the 82nd legislature?

16         A.    I can't answer.

17         Q.    Do you have a rough number?

18         A.    I think it was less than 35.

19         Q.    Okay.  And were you ever concerned regarding what

20    committee each of those bills would be referred to?

21         A.    On advice from my counsel, I can't answer that.

22         Q.    And does the name -- does the particular committee to

23    which a bill is referred affect its likelihood of being passed

24    out of committee and out of the House and becoming law?

25         A.    I don't know that.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1          Q.   So if a particular committee is busy with one issue,

2     is it more or less likely that it would address other bills that

3     may be referred to it?

4          A.   I don't know that.

5          Q.   Why was the Select Committee on Voter Identification

6     and Voter Fraud convened?

7               MR. SWEETEN:   Don't reveal thoughts, mental

8     impressions or opinions about the legislation, including

9     communications that we've outlined.

10         A.   I can't answer that.

11         Q.   Thank you.   Why are you asserting legislative

12    privilege here today?

13         A.   On advice from my counsel, protected conversations.

14         Q.   Did you ask to be included on the Select Committee on

15    Voter Identification and Voter Fraud?

16         A.   I can't remember.

17         Q.   Did you discuss your assignments before they were

18    formally made?

19              MR. SWEETEN:   Don't reveal any communications that

20    you've had with other legislators, legislative staff, state

21    agencies, Texas Legislative Council or constituents.   Those are

22    legislative privileges.

23         A.   That would be a conversation that I had with another

24    member.

25         Q.   When did that conversation occur?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

1          A.    I can't -- I can't remember.

2          Q.    Do you recall, did it occur in person?

3          A.    I don't know.

4          Q.    Did you ever send an e-mail regarding the assignment

5     to that committee?

6          A.    Not that I recall.

7          Q.    Did you submit preferences for committees prior to the

8     committee assignments being made?

9          A.    I think that's privileged communication.

10         Q.    What legislation would that relate directly to?

11               MR. SWEETEN:   I'm sorry.   The question again?

12     Can you -- can you say it again?

13         Q.    Did you submit preferences regarding your choices for

14     committees?

15               MR. SWEETEN:   I think you're asking her to reveal

16     communications she's had with other legislators, legislative

17     staff, state agencies, Texas Legislative Council or constituents

18     as to pending legislation.

19         Q.    At the time that the -- strike that.

20               Did you ever discuss committee assignments with

21     Speaker Straus?

22               MR. SWEETEN:   Don't reveal any communications

23     that you've had regarding pending legislation.

24         A.    I can't answer that for a privileged conversation.

25         Q.    Did you ever have communications regarding committee



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1    assignments with Chairman Bonnen?

2              MR. SWEETEN:  You can say -- you can reveal

3    whether or not you've had a conversation with Representative

4    Bonnen.  You cannot -- I'm instructing you not to reveal the

5    substance of that conversation.

6         A.   Not that I recall.

7         Q.   Did you have any conversation concerning committee

8    assignments with Senator Fraser?

9         A.   Not that I recall.

10        Q.   What committees did you serve on in your past

11   sessions?

12        A.   2009, I served on State Affairs, Workforce and

13   Technology.  I can't remember the other committee.  There was

14   another one.  And 2007, I served on Transportation, County

15   Affairs, and Rules and Resolutions.

16        Q.   Okay.

17        A.   Redistricting was the other one in 2009.

18        Q.   Okay.  Did you ever -- so you never served on the

19   Elections committee?

20        A.   No.

21        Q.   Did you ever assert that you wished to serve on the

22   Elections committee?

23              MR. SWEETEN:  Don't reveal any communications

24   that you've had with other legislators, legislative staff, state

25   agencies, Texas Legislative Council or constituents.  If it's a



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1       matter of public record, you can answer the question.

2            A.   Not that I recall.

3            Q.   Okay.  Have you ever sponsored or cosponsored

4       legislation related to open government?

5            A.   I think I probably have.

6            Q.   Okay.  And what was that?

7            A.   Whew.  I filed a bill on the Systems Benefit Fund to

8       stop state agencies from diversions of funds, and I can't

9       remember the specifics of the others.

10           Q.   And why did you submit a bill related to open

11      government?

12           A.   Well, this one was specifically diversions of the

13      funds.

14           Q.   Okay.  And why was that issue important to you?

15           A.   Because the money that is taxed should go to that

16      specific purpose.

17           Q.   Okay.  Before this last term, did you ever sponsor any

18      election-related bills?

19           A.   I filed a bill pertaining to election costs in my

20      school district in 2009.

21           Q.   Okay.  Anything in 2007?

22           A.   I may have filed that same bill in 2007.

23           Q.   And in 2011, did you file that same bill?

24           A.   I possibly could have.  I can't recall for sure.

25           Q.   Did you file anything related to elections in 2011



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1    other than the school election funding bill and bills related to

2    photographic voter ID?

3        A.    Not that I recall.

4        Q.    Okay.  Why were you more interested in

5    election-related matters in the 82nd legislature?

6              MR. SWEETEN:  I'm going to caution the witness to

7    not reveal thoughts, mental impressions or opinions about

8    legislation, including Senate Bill 14, or communications

9    surrounding that.  You're free to include matters of public

10   record.

11       A.    I think testimony on the floor was that it was a bill

12   that was important to my district.

13       Q.    Okay.  How do you usually communicate with your

14   legislative colleagues?

15       A.    One-on-one.

16       Q.    Okay.  So in person on the floor?

17       A.    Yes.

18       Q.    Do you ever send e-mails between legislators?

19       A.    I think that's privileged.

20             MR. SWEETEN:  I'm going to let you testify as to

21   the means of communication, in other words, if you've talked to

22   them, if you've sent e-mails.  But as far as the substance of

23   that, you're right, that is privileged.  So you can just say if

24   you've e-mailed.  You can answer that question.

25       A.    I would bet I probably have e-mailed, but I could not



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1    guarantee that I do.  I know it's usually face-to-face.

2         Q.   And if I can -- if I can jump back real quickly.  Can

3    I ask you -- you earlier testified that you were -- that you had

4    an increased interest in matters related to elections because

5    photographic voter ID was important to your district.  Is that

6    correct?

7         A.   That was my testimony on the floor --

8         Q.   Okay.

9         A.   -- and in the committee.

10        Q.   Why was it important to your district?

11             MR. SWEETEN:  You can provide an answer to the

12   extent that you're relying upon matters of public record,

13   including committee hearings, floor debates, but do not reveal

14   thoughts, mental impressions or opinions about the legislation

15   relating to Senate Bill 14.

16             THE WITNESS:  As in --

17             MR. SWEETEN:  Tell him --

18             MR. FREEMAN: There's a question pending.

19        A.   As in -- as in my points that I spoke about in

20   committee and on the floor, it was important to protect the

21   integrity of the election process.

22        Q.   Did any constituents ever volunteer information to you

23   related to this issue and the importance of it?

24             MR. SWEETEN:  I think you're asking at this point

25   about a communication between a constituent and Representative



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

1    Harless.  I believe that that's within the scope of the

2    legislative privilege.

3           So my instruction to you will be not to answer that

4    question.

5        A.    On advice from my counsel, I can't answer that

6    question because it's privileged conversation.

7        Q.    Thank you.  So back to communications with legislative

8    colleagues.  Sorry to be back and forth it like that. Do you

9    ever communicate with your legislative colleagues via text

10   messaging?

11       A.    Yes.

12       Q.    Do you do that from your office, between offices?

13   When you're in your office, would you use your phone to

14   text-message other colleagues?

15       A.    Possibly to see if they're in their office.

16       Q.    And do you use your phone for texting on the floor?

17       A.    Yes.

18       Q.    And when you e-mail with your legislative colleagues,

19   do you use your official House account?

20       A.    Yes --

21       Q.    Do you --

22       A.    -- both.

23       Q.    You use your personal account as well?

24       A.    Could possibly.

25       Q.    Is your personal account subject to disclosure under



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1      the Texas Open Government Act?

2           A.    If it --

3                 MR. SWEETEN:   If you know.

4           A.    If it pertains to legislative issues, I would say yes.

5           Q.    Okay.  Why would you use your personal account rather

6      than your official account?

7           A.    I would only use my personal account if they sent me

8      an e-mail and I'm responding.

9           Q.    Okay.  Are you particularly close with any of your

10     colleagues in the Harris County delegation?

11          A.    Yes.

12          Q.    Who?

13          A.    Carol Alvarado.

14          Q.    Are you particularly close with Beverly Woolley?

15          A.    I'm closer to Carol.

16          Q.    Okay.  Who are your staff?

17          A.    Colby Beuck is my chief of staff.  Julie Scott is

18     scheduler.

19          Q.    How do you spell Ms. Scott's name?

20          A.    S-c-o-t-t.

21          Q.    Oh, Scott.  Okay.

22          A.    Sorry.

23          Q.    It's different parts of the country, different

24     accents.  Thank you. Did you have any part-time staff during the

25     session?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

```
 1              A.    I have interns that work.

 2              Q.    Okay.  Any other paid staff?

 3              A.    Our interns get nominal pay, $100 a month or enough

 4       for gas.

 5              Q.    Okay.  Any other staff receiving a living wage?

 6              A.    No.

 7              Q.    Okay.

 8              A.    Not in my district -- not in my Austin office.

 9              Q.    Did you have any other -- do you have any other staff

10       in your district office?

11              A.    I do.

12              Q.    And who is that?

13              A.    Ella Edmiston, E-d-m-i-s-t-o-n.

14              Q.    And what is her role?

15              A.    She's a district director.

16              Q.    And what is the role of a district director?

17              A.    To attend meetings in my stead and handle the

18       constituent inquiries that come into the office.

19              Q.    The questions about how to get a new birth

20       certificate?

21              A.    Uh-huh.

22              Q.    Got it.  And what is your scheduler's role?

23              A.    To -- and I'm not sure that's her official title.  I

24       know she's got a title on her card, but she's to look through

25       the e-mail invitations and the mail invitations and update my
```



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

 1       calendar and schedule any type of speaking or arrange those

 2       schedules.

 3              Q.   Okay.  And what are the interns' roles?

 4              A.   To smile at the people as they walk through the door

 5       and ask them to take a bag.

 6              Q.   What's in the bag?

 7              A.   We provide constituents with maps and promoting Texas.

 8              Q.   Okay.  And what is Mr. Beuck's role as chief of staff?

 9              A.   He's in charge of everything.

10              Q.   Such as?

11              A.   Taking out the trash if it needs to be taken out,

12       ordering the office supplies, working on the legislation,

13       meeting with the different parties that come to the office,

14       handling constituent inquiries that Julie or Ella can't handle.

15              Q.   Anything else?

16              A.   Oh, my goodness.  I'm sure there is, but I'm not in

17       the office day-to-day, so --

18              Q.   Do you spend more of your time in Harris County or in

19       Austin during the session?

20              A.   During session, more in Austin.

21              Q.   And outside of session?

22              A.   More in my district.

23              Q.   And is Mr. Beuck in Austin full-time?

24              A.   Yes, sir.

25              Q.   Okay.  Do any staff serve as your attorney for the



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1      purpose of providing you with legal advice?

2          A.    Colby.

3          Q.    And how do you distinguish between when he's providing

4      you with legal advice versus policy advice or nonlegal advice?

5          A.    I don't know that we've established that.

6          Q.    Well, at a practical level, when -- when is he

7      providing you with legal advice?

8          A.    I don't know how to answer that.

9          Q.    Do you ever provide him with confidential information

10     for the purpose of obtaining a legal opinion?

11         A.    I could have.

12         Q.    Are there any past incidents when you could -- that

13     you can name?

14         A.    Not that I --

15         Q.    And I'm not going to ask you to disclose the contents

16     because they are confidential.

17         A.    Not that I recall.

18         Q.    Okay.  How do you usually communicate with your staff?

19         A.    On the phone.

20         Q.    Okay.  Do you e-mail with them?

21         A.    Occasionally.

22         Q.    And do you text with them?

23         A.    Not as often, but, yes, occasionally.

24         Q.    Okay.  How are documents maintained in your office?

25         A.    What do you mean maintained?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Patricia Harless                                              May 15, 2012

53

```
 1          Q.    How are they kept?

 2          A.    The computer documents?

 3          Q.    We can start with that.

 4          A.    I think House administration has a policy that

 5    documents are saved and purged after 30 days.  I'm not sure of

 6    the procedures in the office on paper documents.

 7          Q.    Are e-mails purged after 30 days, or is -- is that all

 8    electronic documents?

 9          A.    House administration has a policy.  I'm not specific

10    of it.  I just know that there's a 30-day window.

11          Q.    Okay.  And do you save files on your X drive?

12          A.    I don't know what their procedures are.

13          Q.    But when you're saving a file, if you were working in

14    a -- in a Word document, where would you save it?

15          A.    If I hit the save button, and I don't know where it

16    puts it.

17          Q.    Okay.  Is that -- does Mr. Beuck find the documents

18    for you?

19          A.    Yes, he does.

20          Q.    Okay.  Are you familiar with the term "X drive"?

21          A.    I've heard them say that before.

22          Q.    Are you familiar with the term "Y drive"?

23          A.    I've heard them say that before as well.

24          Q.    Are you familiar with the distinction?

25          A.    No.
```



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Patricia Harless

May 15, 2012

54

1      Q.   Okay.  If you had a personal document that you were

2   working on, on your office computer because you're there for the

3   whole session, where would you save it; do you know?

4      A.   I'd have hit the save button, and wherever it puts it.

5   I'm sorry.

6      Q.   That's fine.  That's fine.

7      A.   I would love to give you more information, but I gripe

8   about the computer, so --

9      Q.   Okay.  So do you know -- just to be certain, do you

10   know if files, electronic files, are saved separately for

11   different pieces of legislation?

12      A.   I don't know what their procedure is.

13      Q.   But you don't move them around?

14      A.   I don't.

15      Q.   Okay.  Do you have -- related to paper documents,

16   where are those kept in your office?

17      A.   I don't set up the procedures of how they organize the

18   office, but I know we have several lateral files.

19      Q.   Okay.  And do you have any kind of procedure related

20   to how long those files are kept?

21      A.   I don't.

22      Q.   Do you have any procedure for how they are -- how they

23   are arranged?

24      A.   I don't.

25      Q.   Okay.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1          A.    I'm a delegator.   Sorry.

2          Q.    That's fine.   Do you ever archive your e-mail?

3          A.    I don't.

4          Q.    Does anyone else archive your e-mail for you?

5          A.    I think there has been -- I think they may have in the

6     past.   I don't know for sure.

7          Q.    Okay.   Do you believe that compliance with the Texas

8     Constitution is an important consideration in the law-making

9     process?

10         A.    Compliance with the Texas Constitution is an important

11    process --

12         Q.    Important consideration in the law-making process?

13         A.    Yes.

14         Q.    How do you ensure, when you're submitting a bill or

15    voting on a bill, that the bill complies with the Texas

16    Constitution?

17         A.    I --

18         MR. SWEETEN:   Hold on a second.   I want you to make

19    sure that you're not revealing thoughts, mental impressions or

20    opinions about specific legislation.   If he's asking you as a

21    general matter or if it's something that relates to something

22    that you've said publicly, you can answer that, but not as to

23    specific legislation.   Okay?

24         A.    As a general matter, I rely on Leg Council.

25         Q.    Okay.   Anyone else?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1          A.   No.

2          Q.   And so does Leg Council submit a determination as to

3    whether a given bill -- an opinion as to whether it complies

4    with the Texas Constitution?

5          A.   I'm not aware of their procedures.

6          Q.   Do you know if anyone else provides a formal opinion

7    as to whether a bill complies with the Texas Constitution?

8          A.   I'm not aware of if there are any.

9          Q.   So would it be fair to say that your process is to

10   rely solely on Leg Council with regard to the question of

11   whether a given bill relies -- or complies with the Texas

12   Constitution?

13         A.   That would be my impression, yes.

14         Q.   Okay.  Do you believe that compliance with federal law

15   is an important consideration in the law-making process?

16              MR. SWEETEN:   Same instruction.

17         A.   I assume that the agencies do that.

18         Q.   But in term --

19         A.   Leg Council.

20         Q.   Okay.  And how do you ensure that -- that there is

21   compliance with federal law when you're drafting a bill?

22         A.   I rely on Leg Council.

23         Q.   And how do you ensure that you're complying

24   with -- with federal law when you're voting on a bill?

25         A.   I rely on Leg Council's draft.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

1        Q.    Okay.  Leg Council's draft, what do you mean by that?

2        A.    The -- drafting the legislation.

3        Q.    Okay.  Do you believe with -- that compliance with the

4   federal Voting Rights Act is an important consideration in the

5   law-making process?

6        A.    Yes.

7        Q.    Prior to passage, did you understand that S.B. 14

8   would be subject to preclearance under Section 5 of the Voting

9   Rights Act?

10       A.    The record on the floor was that I did.

11       Q.    I'm asking about your personal understanding, not

12   the record on the floor.

13            MR. SWEETEN:  And don't reveal your thoughts,

14   mental impressions or opinions about legislation, including

15   specifically Senate Bill 14.  You can rely on matters of the

16   public record as you have.  Go ahead.

17       A.    On the floor, I stated that.

18       Q.    Okay.  How did you act on this consideration, this

19   issue, when you were drafting S.B. 14?

20       A.    How did I act?

21       Q.    Yeah.

22            MR. SWEETEN:  He's -- the question is -- and I

23   want to make sure that you are not revealing any mental

24   impressions or opinions about legislation.  Okay?  That also

25   includes all these -- all the communications that we've



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1    outlined, constituents, state agencies, legislators, legislative

2    staff or the Texas Legislative Council.

3        Q.   Do you need me to rephrase?

4        A.   Please.

5        Q.   Okay.  What actions did you take or changes did you

6    make in consideration of the fact that S.B. 14 would have to be

7    submitted for preclearance under Section 5 of the Voting Rights

8    Act?

9            MR. SWEETEN:  Don't answer that question except

10   to the extent that it's a matter of public record.  It's

11   legislatively privileged.

12       A.   On advice from my attorney, I'm not answering that

13   question.

14       Q.   Thank you.  And what -- when you were voting on S.B.

15   14, how did you take into account the Voting Rights Act

16   compliance of the bill?

17           MR. SWEETEN:  Same instruction.

18       A.   Can you explain what you're asking?

19       Q.   When you were voting on the bill, in what way did you

20   consider whether the bill complied with the federal Voting

21   Rights Act?

22           MR. SWEETEN:  Same instruction.  Don't reveal

23   mental impressions, opinions about legislation.

24       A.   On advice from my counsel, I can't answer that.

25       Q.   Okay.  Thank you. Now, you've said that you relied on



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1          Leg Council with regard to whether S.B. 14 relied -- complied

2          with the federal Voting Rights Act.  Is there a written document

3          setting out Leg Council's opinion with regard to Voting Rights

4          Act compliance?

5               A.   I'm not aware.

6               Q.   And so was it solely Leg Council's drafting of the

7          bill that you were relying on?

8                    MR. SWEETEN:  Objection, assumes facts not in

9          evidence.  Also assumes -- also, you're asking her to reveal

10         mental impressions, opinions about legislation, including Senate

11         Bill 14.

12              A.   On advice from my counsel, I can't answer that.

13              Q.   Okay.  Was there any other formal opinion that you

14         received or read or reviewed as to whether S.B. 14 complied with

15         the Federal Voting Rights Act?

16                   MR. SWEETEN:  Don't reveal your mental

17         impressions, opinions about legislation or your thoughts about

18         the legislation.  Okay?  You can answer to the extent that --

19         that you can refer to the public record on this issue.

20         Otherwise, don't answer.

21                   MR. FREEMAN:  Mr. Sweeten, this is a privileged

22         log type of question.  I'm asking you about the existence of the

23         document.

24                   MR. SWEETEN:  Okay.  And let me explain that to

25         her.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1           MR. FREEMAN:  Sure.

2           MR. SWEETEN:  During the course of today's

3    deposition, there may be moments where he's attempting to

4    establish if it -- the existence of a specific type of document.

5    There's a line there, however.  We're not going to disclose;

6    we're going to just --

7           THE WITNESS:  An existence of the --

8           MR. SWEETEN:  Yeah.  Just let me tell you.  There

9    is a line there that we're not going to disclose the substance

10   of what's in that document, but he can ask questions about, for

11   example, if a document exists or the date of a document.

12   However, do not reveal what's contained in the document.  So

13   with that instruction, if you can answer that, then go ahead and

14   do so.

15     A.   Can you ask your question again.

16     Q.   Sure.

17          MR. FREEMAN:  If we could have the court reporter read

18   it back.

19          THE REPORTER:  Sure. Question: "Okay.  Was there any

20   other formal opinion that you received or read or reviewed as to

21   whether S.B. 14 complied with the federal Voting Rights Act?"

22     A.   My testimony on the floor was that we looked at the

23   legislation drafted from Georgia and Indiana and drafted and

24   filed our legislation along those lines.

25     Q.   I'll repeat my question.Was there any formal opinion



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1     with regard to S.B. 14 that you read or reviewed in drafting or

2     voting on the bill with regard to its compliance with the

3     federal Voting Rights Act?

4          A.   I can't answer that.

5          Q.   So are you not aware of any such opinion issued by TLC

6     or anyone else?

7          A.   TLC is?

8          Q.   The Legislative Council.

9          A.   I can't recall.  I don't remember.

10         Q.   Now, the Legislative Council, their job is to draft

11    bills based on the substantive suggestions of legislators or

12    legislative staff; is that correct?

13         A.   That is my understanding.

14         Q.   And so if a legislator asks for a substantive change

15    to be in a bill, TLC will include it in that bill; is that

16    correct?

17         A.   That's privileged, and our discussion is privileged

18    with Leg Council.

19         Q.   So I think in terms of objections about privilege, I'm

20    going to ask that your counsel make those objections.  Because

21    unless you are submitting -- even assuming that there is an

22    attorney/client privilege with Legislative Council, which the

23    United States does not -- or the attorney general does not

24    believe there is, the only privileged communications are going

25    to be confidential communications.  I'm asking about the



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

1      function of the -- the legislative agency.

2                  So I'm asking if Legislative Council were to

3      receive an instruction from a legislator to include a particular

4      substantive provision in a bill, would it be within the role of

5      Legislative Council to reject that request?

6          A.   I don't know how other members do their relationship

7      with Leg Council.

8          Q.   Okay.  In your experience as a legislator, has Leg

9      Council ever rejected a substantive request that you've asked

10     for legislation that you've submitted to them for drafting?

11         A.   I can't recall that they -- that we've asked a

12     substantive change.

13         Q.   Well, for example, if you submitted something to Leg

14     Council saying I would like you to draft legislation that will

15     decrease the gasoline tax in Texas by a penny per gallon, would

16     they draft that legislation for you, or would they -- would

17     they, in some cases, say, no, we can't do that?

18         A.   They would draft the legislation.  I don't know if

19     they would say no.

20         Q.   Have they ever said no?

21         A.   Not that I recall, but I don't have the one-on-one

22     communications with Leg Council.

23         Q.   So how does the fact that Leg Council drafted a bill

24     based on these substantive requests of legislators or staff

25     indicate that the bill complies with the Texas Constitution?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1              MR. SWEETEN:  As a general matter, you're asking?

2              MR. FREEMAN:  As a general matter.

3         A.   I'm not sure what their procedures are.  I know the

4    legislature relies on their legal interpretation and following

5    all federal and state statutes prior to drafting.

6         Q.   How is their legal interpretation a part of the draft

7    bill that you received from them after submitting a substantive

8    request?

9         A.   I don't know what their procedures are.  I know that

10   we request legislation based on accomplishing a goal, and I

11   don't know what their procedures are after that.

12        Q.   And if a legislator were to submit a request to Leg

13   Council for a bill that would raise the voting age in Texas to

14   25, is it your understanding that Leg Council would say to that

15   legislator, no, I will not do that?

16        A.   You're asking me to speculate on what their

17   conversation is with another member.  I can't do that.  I don't

18   know.

19        Q.   I'm just trying to understand how the agency works.

20        A.   Yeah.

21        Q.   I don't want you to speculate.  So if you don't know

22   how the agency works --

23        A.   I don't.

24        Q.   Okay.  So what is the basis for your reliance on the

25   fact that Leg Council drafted a bill for the fact that it would



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

1     comply with the Texas Constitution?

2              MR. SWEETEN:  As a general matter?

3              MR. FREEMAN:  As a general matter.

4     A.   As a general matter, they're the agency that has the

5     sole responsibility of making sure the legislation is drafted

6     properly, correctly and meets all the standards.

7     Q.   Okay.

8     A.   That's my opinion of what their role.

9     Q.   Okay.  And if I could just shift that over.  What is

10    the basis for your reliance on the fact that Leg Council drafted

11    a bill for the fact that it complies with Section 5 of the

12    Voting Rights Act?

13    A.   It's my reliance that they draft all legislation that

14    comply with federal and state rules and laws.

15    Q.   Has Leg Council ever drafted a bill that did not

16    comply with the Voting Rights Act?

17    A.   I don't know.

18    Q.   Has the United States Supreme Court ever found that a

19    Texas redistricting violated Section 5 of the Voting Rights Act?

20              MR. SWEETEN:  If you know.

21    Q.   If you know.

22    A.   I don't know.

23    Q.   Are you aware of whether any Texas redistricting has

24    ever been struck down by the Texas -- by the United States

25    Supreme Court?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Patricia Harless                                          May 15, 2012

65

1              A.   I don't know that.

2              Q.   Are you aware of whether part of the Texas

3    congressional redistricting from the last decade was struck down

4    by the U.S. Supreme Court?

5              A.   I'm not aware.

6              Q.   Why don't we take a break for a minute.

7              A.   Okay.

8                   (Recess from 10:58 a.m. to 11:14 a.m.)

9              Q.   Have you had any communications with legislators or

10   staff outside the presence of attorneys from the attorney

11   general's office concerning the assertion of legislative

12   privilege in this case?

13             A.   No.

14                  MR. SWEETEN:  Wait.  Hold on a minute.  Can you read

15   that back, that question?

16                  THE REPORTER:  Sure, uh-huh.

17                  Question: "Have you had any communications with

18   legislators or staff outside the presence of attorneys from the

19   attorney general's office concerning the assertion of

20   legislative privilege in this case?"

21             A.   I answered that too quickly.

22                  MR. SWEETEN:  Okay.  Let me say that with respect to

23   conversations that relate to Senate Bill 14, I'm instructing her

24   not to answer related to communications she's had with those

25   individuals.  The fact of communications and the date of, to the



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1    extent she can provide you that, I'll let her answer that

2    question, but I'm not going to allow her to reveal the

3    communications that you're asking about.

4              MR. FREEMAN:  How is this related to a

5    legislative act, Mr. Sweeten?

6              MR. SWEETEN:  Well, I mean, first of all, the

7    substance of the conversation is not known to you or to me at

8    this point.  So with respect to if she's had communications

9    regarding Senate Bill 14 --

10             MR. FREEMAN:  Okay.

11             MR. SWEETEN:  -- it is my view that that would

12   absolutely be related to a legislative act.  So she would not be

13   able to reveal that information or other mental impressions

14   regarding legislation.

15             MR. FREEMAN:  Well, my question was about the

16   insertion of privilege in litigation.  And so I would ask that

17   you limit your instruction to your client to communications

18   regarding legislative acts and not regarding this litigation or

19   testimony in this case.  It is not related to the substance of

20   the legislative process.

21             MR. SWEETEN:  If your question is not related to

22   legislation at all -- is that what I'm understanding?

23             MR. FREEMAN:  It's not related --

24             MR. SWEETEN:  But rather the litigation itself.

25             MR. FREEMAN:  It is not related to legislative



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1    process.  The subject of this litigation is, of course,

2    legislation, and so I'm trying to get at --

3                 MR. SWEETEN:  But --

4                 MR. FREEMAN:  -- I'm trying to get at --

5                 MR. SWEETEN:  -- I want to make sure that I'm

6    dividing this correctly.

7                 MR. FREEMAN:  Okay.

8                 MR. SWEETEN:  Okay.  I will not allow her to

9    testify, because it's covered by the legislative privilege,

10   about information regarding legislation.  If your question is

11   has she talked with another legislator --

12                MR. FREEMAN:  Uh-huh.

13                MR. SWEETEN:  -- about the assertion of

14   legislative privilege, just about that matter, outside the

15   presence of counsel, then I think I would let her answer that

16   specific question, and I think that's what you're asking.

17                MR. FREEMAN: Let me rephrase my question and

18   hopefully I can avoid an objection by your attorney.

19        Q.   Have you discussed outside of the presence of

20   attorneys from the attorney general's office whether or not you

21   would assert privilege in this case, legislative privilege?

22        A.   With?

23        Q.   With anyone outside the presence of attorneys from the

24   attorney general's office.

25        A.   I have not had those conversations with any



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1    legislator.

2         Q.   Have you had those conversations with any of your

3    staff?

4         A.   With my chief of staff and --

5              MR. SWEETEN:  Don't reveal communications that

6    you've had with Mr. Beuck that -- where attorneys were present.

7              THE WITNESS: May I ask my counsel a question?

8              MR. SWEETEN:  Yeah, sure.

9              MR. FREEMAN: There's a question pending, so let

10   me perhaps rephrase if that can clarify.

11        Q.   Have you had any conversations outside the presence of

12   attorneys from the attorney general's office concerning the

13   assertion of legislative privilege with your staff?

14             MR. SWEETEN:  Mr. Beuck yesterday indicated he's

15   an attorney and he's at times provided her information.  So I

16   need to speak with her -- before she's going to answer that

17   question, I need to speak with her about that assertion of

18   privilege.  And we may be able to provide you an answer to that

19   question, but I have a right to -- you know, otherwise, I'm

20   going to have to instruct her not to answer, but I think we can

21   maybe --

22             MR. FREEMAN:  Okay.

23             MR. SWEETEN:  -- get past this if we -- if you

24   give me one minute to speak with her.

25             MR. FREEMAN:  That's fine.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

```
 1                    (Recess from 11:18 a.m. to 11:20 a.m.)

 2               MR. SWEETEN:  Yesterday there -- at the tail end,

 3      Mr. Rosenberg's question was about -- was to Mr. Beuck, and at

 4      that time, as an -- as an attorney and someone who has spoken

 5      with Representative Harless, he asserted the attorney/client

 6      privilege.  Obviously, that is hers as a potential client to

 7      waive.  So with respect to -- at this point, we're going to

 8      allow her to answer that question, and we're not -- we obviously

 9      are still maintaining our assertion of legislative privilege.

10               MR. FREEMAN:  Uh-huh.

11               MR. SWEETEN:  But as to the questioning regarding

12      attorney/client privilege, Representative Harless is not going

13      to stand by that privilege.  So she will --

14               MR. FREEMAN:  Okay.

15               MR. SWEETEN:  -- answer your question.

16               MR. FREEMAN:  Okay.

17      A.   I've had a conversation with my chief of staff on

18      privilege.

19      Q.   Okay.  And what was the substance of that

20      conversation?

21      A.   The affidavit that we submitted in the privilege.

22      Q.   And did you discuss whether you would agree to that

23      affidavit?

24      A.   Yes.

25      Q.   And did you ever discuss considerations against
```



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1    agreeing to assert legislative privilege in this case?

2        A.   No.  Can you ask that again so that I understand

3    completely what you're asking?

4        Q.   Sure.  Did you ever discuss reasons why you might not

5    want to discuss -- or might not want to agree to assert the

6    legislative privilege in this case?

7             MR. SWEETEN:  Okay.  Let me also say that

8    obviously any conversation that you had, if Mr. Beuck was

9    present with me or with any of the members the attorney

10   general's office, is a privileged conversation.  Do not reveal

11   any matters discussed within those conversations.

12       A.   The only conversation Colby and I had was about

13   signing the affidavit on privileged motions.

14       Q.   And was the idea to assert legislative privilege in

15   this case, did that originate in your office?

16       A.   I --

17            MR. SWEETEN:  Do not reveal any conversations

18   that you've had with attorneys for the attorney general's

19   office.  If answering that question would do so, do not answer

20   the question.

21       A.   I can't answer that question because it would reveal

22   private conversations.

23       Q.   I understand.  Have you ever asserted legislative

24   privilege in any other matter?

25       A.   Not that I recall.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1          Q.   Do you have copies of the affidavit?  Sorry.  Strike

2     that.

3               Did you -- sorry.  Strike that as well.

4               Did you ever have discussions with other legislators

5     concerning their decision not to assert legislative privilege in

6     the redistricting litigation?

7          A.   No.

8          Q.   Did you ever have conversations with other legislators

9     concerning their decision to testify in the redistricting

10    litigation?

11         A.   Not that I know of.

12         Q.   Did you ever have discussions with other legislators

13    concerning their testimony in the redistricting litigation?

14         A.   Not that I remember.

15         Q.   Are you aware of any other instances where legislators

16    have asserted the legislative privilege in litigation with the

17    federal government?

18         A.   I wouldn't have a way of knowing that.

19         Q.   So you're not aware of any other instances?

20         A.   Not -- I would have no way of knowing that.

21         Q.   Okay.  Let's turn to a different subject.

22              When were you first elected?

23         A.   2006, sworn in 2007.

24         Q.   Did you have a primary?

25         A.   I did.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Patricia Harless                                        May 15, 2012

72

```
 1              Q.    Was it an open seat?

 2              A.    Yes.

 3              Q.    And who was your opponent in the primary?

 4              A.    Judge John Devine.

 5              Q.    Is he still a sitting judge?

 6              A.    No.

 7              Q.    Was he a sitting judge at the time?

 8              A.    No.

 9              Q.    He was a former judge?

10              A.    Yes.

11              Q.    And how did you distinguish yourself from your

12      opponent in that election?

13              A.    As the community activist and a long-time resident of

14      the district.

15              Q.    Did you campaign on any particular issues?

16              A.    I'm sure we did --

17              Q.    Do you --

18              A.    -- the same ones.

19              Q.    Do you recall what those issues were?

20              A.    Not exactly, but my stance has always been

21      probusiness, limited government, personal responsibility.

22              Q.    Okay.  Do you consider Devine to be conservative?

23              A.    He considers himself to be conservative.  He's running

24      for U.S. Supreme Court judge against David Medina, so --

25              Q.    You mean Texas Supreme Court?
```



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

```
1              A.   Yeah.  I'm sorry.

2              Q.   Okay.

3              A.   Texas.

4              Q.   And did you campaign on issues related to elections at

5         all?

6              A.   I can't remember exactly what -- what all of our

7         talking points were.

8              Q.   But you don't recall having campaigned on issues

9         related to elections, do you?

10             A.   I can't remember exactly.  I may have -- there may

11        have been discussion about integrity of elections.

12             Q.   Okay.  But you don't recall any specific?

13             A.   No.

14             Q.   Okay.  Did you have a general election opponent?

15             A.   I did.

16             Q.   And who was that?

17             A.   The first one, Chad Khan.

18             Q.   And what were the issues in that campaign?

19             A.   Same thing:  Probusiness, limited government, personal

20        responsibility, increasing quality of life in the district.

21             Q.   And what did Mr. Khan campaign on?

22             A.   What a bad person I was.

23             Q.   I'm sorry to hear that.  You seem like a very nice

24        person.

25             A.   It's just part of it.
```



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

    1          Q.   Has a -- when is the last time that a democrat won in

    2     District 126?

    3          A.   My predecessor was Peggy Hamric, and I know she was

    4     elected in 1991, so -- she was a republican.

    5          Q.   So at least back to 1991 no democrat has won in

    6     District 126?

    7          A.   That I remember, yes.

    8          Q.   Okay.  Why did you decide to run?

    9          A.   Because I had been involved in the legislature as a

   10     business person and realized that there are laws that are made

   11     without any input of the impact on businesses.

   12          Q.   And who encouraged you to run?

   13          A.   Peggy Hamric, my predecessor.

   14          Q.   Okay.  Did Representative Hamric take into account the

   15     interest of small businesses when she was a legislator?

   16          A.   Yes.

   17          Q.   Okay.  Did anyone else besides the former

   18     representative encourage you?

   19          A.   My mom.

   20          Q.   Anyone else?

   21          A.   You know, people in the community.  It was an open

   22     seat.  She was running for senate, for SD 7, and so community

   23     leaders.

   24          Q.   And who currently holds the seat in SD 7?

   25          A.   Dan Patrick.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

1          Q.    Did the Independent Automobile Dealers Association

2     encourage you to run?

3          A.    I think they were supportive.  I don't think they

4     necessary encouraged me.

5          Q.    Okay.  Who are your campaign staff?

6                MR. SWEETEN:  Is this the original campaign --

7                MR. FREEMAN:  Yes.

8                MR. SWEETEN:  -- for representative?

9          Q.    In 2007 -- '6.

10         A.    Spencer Newman, Kendra Hefner.

11         Q.    And do either of them work for you in a legislative

12    capacity?

13         A.    No.

14         Q.    Have they also worked on your later campaigns?

15         A.    Yes, Spencer Newman has.

16         Q.    Okay.  Did you have any consultants?

17         A.    Kendra was my consultant my first --

18         Q.    Okay.

19         A.    -- election.

20         Q.    And who does she work with?

21         A.    She's independent.

22         Q.    Okay.  As a general matter, who are your donors?

23         A.    I have huge support in my district.  Mainly my

24    district.  I mean, after elected in -- in my race, I had support

25    from Texans lawsuit -- Texans for Lawsuit Reform, the



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1      Independent Auto Dealers, Texas Automobile Dealers, small

2      business groups.

3          Q.   Okay.  And who endorsed you in that first primary

4      race?

5          A.   You mean business groups?

6          Q.   Any groups at all.

7          A.   The Texas Realtors, AAA rated with Texas Rifle

8      Association.  Really not -- not many folks.  It was an open

9      seat, and my opponent got all the conservative endorsements from

10     all the groups du jour.

11         Q.   Okay.  And in the general, who endorsed you?

12         A.   I can't recall specifically, but a lot of the business

13     groups and the realtors, the restaurant association, the car

14     dealer association.

15         Q.   Okay.  In 2008, did you have a primary?

16         A.   Yes.

17         Q.   And who was your primary opponent?

18         A.   So I ran in 2006.  2008, it was Chad Khan.

19         Q.   Was that the general or the primary?

20         A.   The general.

21         Q.   Did you have a primary?

22         A.   No.

23         Q.   Okay.  So in the general, it was Chad Khan?

24         A.   Again.

25         Q.   Again?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1    A.   Uh-huh.

2    Q.   And was it a close race?

3    A.   No.

4    Q.   Do you know how many points you won by?

5    A.   No.

6    Q.   Do you know how many points you won by in 2006?

7    A.   2006, in my primary, it was really close in the

8    general.  It was 60, in the 60s.

9    Q.   Okay.

10   A.   In 2008, I think it was in the 60s again.

11   Q.   Congratulations.

12   A.   I got eight points above McCain, which meant that I

13   reached out to my district.

14   Q.   And sorry.  Just to jump back to 2006 real quickly.

15        Do you know what the turnout was in the general

16   election?

17   A.   In the general, I can't say exactly.  I think it was

18   anywhere from 7 to 12,000.

19   Q.   And do you know in 2008 what the turnout was?

20   A.   I -- it was more --

21   Q.   Okay.

22   A.   -- but I don't know how much more.

23   Q.   And do you remember what issues you campaigned on in

24   2008?

25   A.   The same issues in 2006.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

1          Q.    So you don't recall specifically whether you

2     campaigned on election issues or voter ID?

3          A.    No, not specifically, but it's possible on integrity

4     of the election.

5          Q.    Okay.  And in 2010, did you have a primary?

6          A.    No.

7          Q.    And did you have a general election opponent?

8          A.    Yes.

9          Q.    And who was that?

10         A.    Casey McKinney.

11         Q.    And do you remember what issues you campaigned on in

12    2010?

13         A.    Education, business, limited government, some

14    immigration issues and community issues.

15         Q.    And what immigrations issues did you campaign on?

16         A.    From the literature, providing -- I'm trying to

17    remember how to phrase it -- providing verification when

18    employers hire employees.

19         Q.    Okay.  Different from the I-9 process?

20         A.    Yes, through the E-Verify.

21         Q.    Okay.  But that's also a federal program, correct?

22         A.    Right.

23         Q.    Okay.  Did -- and do you recall if you campaigned on

24    voter ID as an issue?

25         A.    I think -- I think we did.  I think we talked about



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1        the integrity of the election process in photo voter ID.

2        Q.   Okay.  And do you remember what the turnout was like

3    in 2010?

4        A.   I don't.

5        Q.   Do you know if it was different at all from 2008?

6        A.   I think it was about the same.

7        Q.   As 2008?

8        A.   Yeah.  Maybe a little less.  I can't remember.

9        Q.   So it was higher than 2006; is that correct?

10       A.   I would be guessing.

11       Q.   Okay.

12       A.   I could have checked that if I'd have known, but --

13       Q.   It's all right.

14       A.   I have it in a file on my desk.

15       Q.   It's all right.

16            I'm going to actually ask and see if we can find --

17   this might be one of those circumstances where documents can

18   refresh your recollection, and I'm going to try and remember it,

19   and we'll come back to it -- it will be a little bit out of

20   order.

21       A.   Okay.

22       Q.   Do you remember, did you vote in favor of S.B. 1

23   budget measure?

24       A.   This session?

25       Q.   I believe it was this session, yes.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

 1          A.   I think I did.  I can't remember.

 2          Q.   You don't recall?

 3          A.   I don't.

 4          Q.   Okay.

 5          A.   I may have voted against it.  There was one bill I

 6     voted against most of the members on, and I don't remember if

 7     that was it.

 8          Q.   Do you recall why you voted against a bill that most

 9     of the -- do you mean most of the republican members or most of

10     the members of the House as a whole?

11          A.   Most --

12               MR. SWEETEN:  And I don't want you to reveal your

13     thoughts, mental impression or opinions about legislation or why

14     you specifically voted for something.  I don't want you to

15     reveal that unless it's a matter of public record, something

16     expressed publicly.

17          A.   I think I publicly went to the microphone and said I

18     was disappointed in the funding cuts in education.

19          Q.   Okay.  And so that was a -- so that was the -- that

20     was a republican sponsored bill, correct?

21          A.   Yes, I think so.

22          Q.   Where do you fall in the political spectrum within the

23     republican delegation to the Texas House?

24          A.   You mean as number?

25          Q.   Well, if -- to the far, far right or towards the



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1     middle?

2          A.    I consider myself an independent.

3          Q.    Okay.

4          A.    And my record reflects that.

5          Q.    Okay.  Do you have a primary coming up?

6          A.    No.

7          Q.    Glad we didn't keep you away from that.  That might

8     have been hard.  So I'm glad this wasn't a problem.

9     Congratulations on that.

10         A.    Thank you.  Thank you.

11         Q.    How would you describe your current district, the one

12    from which you were elected in -- in 2010?

13         A.    What do you mean by describe it, the -- the

14    boundaries?

15         Q.    The constituents.  So in terms of the work they do,

16    socioeconomic class, ethnicity.

17         A.    My boundaries are very diverse.  I live in

18    unincorporated Harris County --

19         Q.    Okay.

20         A.    -- which has no city rules or regulation.  The area is

21    1.5 million people, and if it were a city, it would be the fifth

22    largest city in the United States without any type of city

23    government, which is the reason I have a lot of constituent

24    inquiries, because I'm their first level.

25         Q.    Is there no county government?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1          A.   There's county commissioners, but typically the

2    constituents come to me to get response from county government.

3          Q.   Okay.

4          A.   It's very economically diverse.  One of my school

5    districts, I represent Spring, is at close to 70 percent free

6    and reduced lunches.  Cy-Fair is becoming more economically

7    diversed and probably approaching 50 percent free or reduced

8    lunches.  I have a broad mix of people from bus riders that

9    don't buy cars to people that have several cars.

10         Q.   And are you aware of the -- the racial make-up of your

11   district?

12         A.   Not specifically.  I would say it's probably over

13   50 percent Caucasian.

14              MR. FREEMAN:  We can mark this as U.S. 14.

15                   (Exhibit No. 14 marked)

16         Q.   Have you ever seen this document before or a document

17   similar to it?

18         A.   Similar to it, yes, sir.

19         Q.   And if you can go to District 126.  And if you can

20   look at the percent BH column under population and the total.

21         A.   Uh-huh.

22         Q.   Do you see what percentage population for your

23   district?

24         A.   Am I reading it in the right column of 51.2?

25         Q.   Yes.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1          A.    Okay.

2          Q.    So does that indicate that this is combined

3     majority --

4          A.    Black and Hispanic.

5          Q.    -- minority?

6                So that's in your current district, correct?

7          A.    When you say current, this is --

8          Q.    The district from which you were elected in the -- in

9     2010.

10         A.    Well, this is the 2010 census numbers --

11         Q.    Yes.

12         A.    -- so I was elected in a district that reflected

13    different numbers.

14         Q.    But in 2010, that was the district from which you were

15    elected, correct?

16         A.    I disagree with that because of the fact that these

17    are 2010 census numbers, which we didn't get until January of

18    2011.  And so the district I was elected in and voted for,

19    though these were certified after 2010, this was not the numbers

20    I was relying on.

21         Q.    Are you -- not in terms of reliance, but are you aware

22    of what date the census reflects the population on?

23         A.    They started, I want to say, in May.

24         Q.    Are you aware that the census reflects April 1st,

25    2010?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

```
 1          A.   No.

 2          Q.   Okay.  But it's the 2010 census, correct?

 3          A.   Yes.  I know we got the information in 2011.

 4          Q.   Okay.  So as of the 2010 election, is it your

 5    understanding, after seeing this document, that the district

 6    from which you were elected is -- the population is majority

 7    either black or Hispanic?

 8          A.   Yes.

 9          Q.   Okay.

10          A.   From this document.

11          Q.   Yes.

12               And do you see on the top right-hand corner where the

13    document is produced from?

14          A.   Top right-hand, Texas Legislative Council.

15          Q.   Okay.  Thank you. Were the demographics of your

16    district trending over the last decade?

17          A.   Yes.

18          Q.   And in what way were they trending?

19          A.   I think more minority population.

20          Q.   Okay.  Now, you said before that you were on

21    Redistricting; is that correct?

22          A.   Yes.

23          Q.   And what was your involvement in the map that was

24    passed by the legislature last spring?

25               MR. SWEETEN:  Hold on a second.  I think the
```



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1    question you're asking her is -- requires her to reveal

2    potentially communications that we've outlined are protected

3    under the legislative privilege.  And also, I don't know that

4    this question specifically does so, but she's -- I'm going to

5    instruct her not to reveal mental impressions, opinions about

6    legislation, including redistricting legislation.  I believe

7    that's legislatively privileged.

8              So you can go ahead and answer.

9         Q.   What was your public role in the redistricting

10   process?

11        A.   To sit through the committee process and make a vote

12   when it was called for vote on the plan.

13        Q.   And just so I can be clear, despite the fact that all

14   other legislators who were asked questions about this during the

15   redistricting litigation waived legislative privilege, are you

16   asserting legislative privilege with regard to the redistricting

17   legislative process?

18              MR. SWEETEN:  I think my instruction has been

19   clear, and she is asserting legislative privilege here today.

20   If you want to ask her that, that's fine, but she said that.

21   She's not going to reveal mental impressions, opinions about

22   legislation despite whatever anybody else did.  We're talking

23   about Representative Harless, and she is asserting that

24   privilege.

25              MR. FREEMAN:  Mr. Sweeten, with all due respect,



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

```
 1      you've informed me that she is, but I'm just asking --

 2                  MR. SWEETEN:  Okay.

 3                  MR. FREEMAN:  -- her to state for the record that

 4      she is asserting legislative privilege with regard to the

 5      redistricting bill.

 6          A.   On advice from my counsel, I am asserting legislative

 7      privilege.

 8          Q.   Okay.  And so I'm going to ask a series of questions

 9      that are probably going to trigger objections.  No one will be

10      offended.

11               Did you provide any input to Representative Beverly

12      Woolley concerning the Harris County delegation map?

13                  MR. SWEETEN:  Objection.  I'm going to instruct

14      you not to reveal any mental impressions, opinions about

15      legislation, including Senate Bill 14, including any

16      communications with legislators, legislative staff, state

17      agencies, Texas Legislative Council or constituents.  With that

18      instruction, you can answer his question.

19          A.   By answering that question, I would reveal private,

20      privileged conversations.

21          Q.   Just in terms of asking the privilege log related

22      questions, did you have any conversations with Representative

23      Woolley concerning redistricting as a broad subject?

24          A.   Not that I recall.

25          Q.   Okay.  Did you attend any meetings of the republican
```



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

1      delegation from Harris County concerning redistricting?

2                    MR. SWEETEN:  Her attendance at meetings, I

3      think -- I think you're wading into the areas that we think are

4      legislatively privileged.  Based on the preface of the question,

5      you said the meeting involved what?

6                    MR. FREEMAN:  Redistricting and the Harris County

7      republican delegation.

8           A.   They had several meetings.  I was only able to attend

9      one.

10          Q.   Okay.

11                   MR. SWEETEN:  I'll let -- and she has.  I will

12     let her establish -- again, these are privilege log questions.

13     You're asking were communications made.  If she attended a

14     meeting, I'm going to let her answer that question.

15                   MR. FREEMAN:  Okay.

16                   MR. SWEETEN:  But any substance, I'm not going to

17     let her.

18                   MR. FREEMAN:  Okay.

19          Q.   Did you ask for any specific areas to be included in

20     your new district?

21                   MR. SWEETEN:  Objection.  That asked for

22     communications.

23               So I'm going to instruct you not to answer based on

24     the legislative privilege.

25          Q.   How would you describe the district that you voted in



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1      favor of in H283, the House redistricting plan that was passed

2      out of Texas legislature?  I'm just asking a description of the

3      district as passed.

4                   MR. SWEETEN:  That would ask her to reveal her

5      thoughts, mental impressions or opinions about legislation that

6      has passed; and therefore, I'm going to instruct her not to

7      answer that question.  Also, I mean -- there -- there -- an

8      overlay to all of this is I'm not sure what the relevance of

9      redistricting litigation is to this litigation.  So --

10                  MR. FREEMAN:  We'll get there.

11                  MR. SWEETEN:  -- objection.

12      Q.   I guess, just so I can clarify my question and make

13     sure that you're asserting an objection here, I just want to

14     know how you would describe the area contained within your

15     district in terms of demographics, socioeconomics, industry, the

16     same types of questions we discussed before, but in your -- the

17     new district that was passed by the Texas legislature last time

18     around.  And I --

19                  MR. SWEETEN:  Hold on.

20                  MR. FREEMAN:  They're caucusing.

21                  MR. SWEETEN:  To the extent you can answer that,

22     I'm going to let you answer the question as to after passage

23     what the district -- whatever his question is about, the

24     description of the current existing district.  I don't want you

25     to reveal any mental impressions, opinions or thoughts about



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1      that legislation that was passed.  Do you understand that

2      distinction?

3                        THE WITNESS:  Yes.

4                        MR. SWEETEN:  Okay.  And with that, you can go

5      ahead and answer his question.

6          A.   The district passed during session, the San Antonio

7      district and my previous district and now the court ordered

8      district were all fine with me.

9          Q.   But how would you describe the new district in terms

10     of --

11         A.   It --

12         Q.   -- differences from the old district?

13         A.   It has different boundaries.  It goes further north.

14     I think that there -- it's probably more -- more houses, more

15     developments, less industry.

16         Q.   Okay.  Is there any difference in the demographics in

17     terms of the racial communities?

18         A.   To be honest, to be absolutely honest, I have never

19     looked at that.

20         Q.   Okay.  Let's take a look.

21                        MR. FREEMAN:  If we can mark this as U.S. 15.

22                        (Exhibit No. 15 marked)

23         Q.   And can you tell me, for District 126, is it still a

24     majority minority district?

25         A.   From the Leg Council sheet that you have given me --



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Patricia Harless                                            May 15, 2012

1          Q.   Uh-huh.

2          A.   -- on the House Plan 283, it shows that the percentage

3      BH is 45.1, and my district that I ran in, in 2010 was 51.2.  So

4      that would make me 6.1 percent less minority than in the

5      previous district I ran in.

6          Q.   Did you ask to eliminate the majority minority status

7      of your district?

8          A.   No.

9               MR. SWEETEN:  Objection.  Don't reveal any -- any

10     mental impressions or communications that you had regarding any

11     sort of bill.

12              THE WITNESS:  Okay.

13              MR. SWEETEN:  And give me time to make my

14     objections.

15              THE WITNESS:  I'm sorry.

16         Q.   And would eliminating the majority minority status of

17     your district make it easier for you to run for reelection?

18              MR. SWEETEN:  You're asking about the bill that

19     was passed, and so I'm going to instruct her not to answer the

20     question based on because it would reveal thoughts, mental

21     impressions, opinions about legislation.

22              MR. FREEMAN:  Mr. Sweeten, I would say that's

23     outside the scope of the bill and reflects the general issue of

24     whether it would be easier for Representative Harless to run for

25     reelection in a majority Anglo district or a majority minority



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

```
 1    district.
 2                    MR. SWEETEN:  Is your question following passage?
 3                    MR. FREEMAN:  My question is related to the
 4    demographics of greater than 50 percent or lesser than
 5    50 percent.
 6                    MR. SWEETEN:  I'm going to object, calls for
 7    speculation.  I'm going to let her answer that question about
 8    after passage of the bill because I don't think that you're
 9    asking her to reveal mental impressions about the passage of the
10    bill; you're asking her as it stands now --
11                    MR. FREEMAN:  Yes.
12                    MR. SWEETEN:  -- how she would view that issue.
13         Q.   Based on your political knowledge of Harris County,
14    your own election.
15                    MR. SWEETEN:  Objection, calls for speculation.
16         Go ahead.
17         A.   I was happy with my old district.  I'm happy with my
18    new district.  I didn't care.
19         Q.   Okay.  Are you a member of a group called the Texas
20    Tea Republicans?
21         A.   Texas Tea Republican Womens Club.
22         Q.   Oh, okay.  I don't think we need to show the exhibit.
23    What is your involvement with that group?
24         A.   I pay dues to them annually.
25         Q.   Are you involved in leadership at all?
```



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

```
 1          A.    No.

 2          Q.    Do you attend meetings?

 3          A.    Rarely.  Maybe --

 4          Q.    Do --

 5          A.    -- once a year.

 6          Q.    Do they send materials to you?

 7          A.    They send e-mails out as a distribution, and I'm on

 8     that list as a member.

 9          Q.    Do they discuss particular issues?

10                MR. SWEETEN:  Don't reveal communications you've

11     had with -- with constituents.  If it's a mass mailing and is of

12     a public nature, I'll let you discuss that.

13          A.    They send out e-mails.

14          Q.    Okay.  At the meetings you've attended, does this --

15     has this group had a substantial number of minority individuals

16     attending, black or Hispanic?

17          A.    I -- I don't -- I can't recall.  I would say probably

18     no.

19          Q.    Okay.

20          A.    I've attended maybe one meeting in a year.

21          Q.    Okay.  And have they sent out any communications

22     regarding voter ID?

23          A.    They send out communications every day that I usually

24     delete.

25          Q.    Okay.
```



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1          A.    They don't like me, and I don't like them.

2          Q.    Sorry to hear that.

3          A.    Sorry.

4                MR. SWEETEN:  Just answer the question.

5          Q.    Are you a member of the American Legislative Exchange

6     Council?

7          A.    I am.

8          Q.    And what is your participation in the American

9     Legislative Exchange Council?

10         A.    I've attended a couple of their conventions.  I think

11    the speaker appointed me to a task force on cable ready, but I

12    can't --

13         Q.    Does the speaker -- you mean Speaker Straus?

14         A.    Yes.

15         Q.    Okay.  And so Speaker Straus is also involved in the

16    American Legislative Exchange Council?

17         A.    I don't know if he is or isn't.

18         Q.    Okay.  Have you ever introduced bill language that was

19    provided by the American Legislative Exchange Council?

20         A.    No.

21                THE WITNESS:  Sorry.

22         Q.    That's fine.

23                MR. SWEETEN:  That's okay.  Don't reveal

24    communications you've had with constituents.  Okay?  Don't

25    reveal the substance of communications.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1          MR. FREEMAN:  And, Mr. Sweeten, are you

2     considering the American Legislative Exchange Council to be a

3     constituent?

4          MR. SWEETEN:  To be honest with you, Mr. Freeman,

5     I am not familiar with the American Legislative Exchange, but as

6     you know, we -- we've defined constituents as those who live in

7     the State of Texas, so --

8          MR. FREEMAN:  It's an organization also known as

9     ALEC that is based outside of the State of Texas.

10          MR. SWEETEN:  I don't -- I think under our

11     interpretation of what a constituent is, if you're asking if it

12     originated -- information originated outside of the State of

13     Texas, not from a Texas citizen, then -- then that's -- I don't

14     think that that's covered under where we're asserting our

15     privilege.

16          MR. FREEMAN:  Okay.  But I'm asking about -- the

17     representative's already answered no, so this is --

18          MR. SWEETEN:  Okay.  All right.

19          MR. FREEMAN:  -- largely a moot point.

20          MR. SWEETEN:  Well, I'm glad we had that debate.

21          MR. FREEMAN:  Yes.  Good.  But we're setting

22     ground rules for things in the future.  That's important.

23     Q.   Okay.  If we can move on -- we're going to move on to

24     S.B. 14 itself.  What were the purposes of S.B. 14?

25          MR. SWEETEN:  Okay.  I'm going to -- I'm going to



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1        instruct you at this time not to answer based upon the fact that

2        that would invade legislative privilege, including

3        communications with legislators, legislative staff, state

4        agencies, Texas Legislative Council, constituents, as well as it

5        would reveal your mental impressions regarding Senate Bill 14.

6        That's my instruction.  You can answer based upon the public

7        record.

8            A.   If I recall in testimony on the floor, I stated the

9        purpose was to protect the integrity of the election process and

10       to deter and detect fraud.

11           Q.   Were there any other purposes?

12               MR. SWEETEN:  Same instruction.  Same objection.

13           A.   Those are the ones that I recall that I mentioned on

14       the floor.

15           Q.   And so any other purposes -- am I correct that you

16       would not be stating any other purposes based on the instruction

17       received from counsel?

18           A.   I can't recall anything else.  I can't remember what

19       all I discussed on the House floor.

20           Q.   Okay.  Was the purpose of S.B. 14, in part, to

21       decrease the number of Hispanic voters?

22               MR. SWEETEN:  I'm going to object to the

23       question.  The matter invades the legislative privilege, and --

24       and I'm going to instruct Representative Harless not to answer

25       that question because it reveals thoughts, mental impressions



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1    and opinions about legislation.  Also reveals communications

2    that she may have had with the parties that I've already listed.

3         A.   And my testimony on the House floor that I believe

4    that the legislation would increase participation for all

5    Texans.

6         Q.   Was the purpose, in part, to decrease the number of

7    African-American voters?

8         A.   My --

9              MR. SWEETEN:  Object -- hold on.  I'm going to object

10   to the question based upon the legislative privilege.  I'm going

11   to instruct Representative Harless not to answer because it

12   would invade her mental impressions, thoughts about pending

13   legislation, about past legislation and would implicate

14   communications that she's had with other legislators and other

15   legislative staff as well as the other groups that I've

16   previously mentioned.

17             You can answer based upon the public record.

18        A.   My testimony on the House floor was that I felt the

19   bill would increase participation with -- for all Texans.

20        Q.   And I guess if I can clarify my question beyond your

21   personal belief but the purpose of the legislation as a whole as

22   understood by any other legislators, was the purpose of the

23   bill, in part, to decrease the number of any group of minority

24   voters?

25             MR. SWEETEN:  I'm going to instruct



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1      Representative Harless not to answer that question.  You're

2      asking her to reveal thoughts, mental impressions about

3      legislation.  You're also asking her to reveal communications

4      between state agencies, legislators, legislative staff, Texas

5      Legislative Council and constituents.

6              And so I'm going to instruct you not to answer that

7      question based on that.  You can refer to public matters such as

8      the public floor debates as to the issue.

9      A.   My testimony on the floor was that this legislation

10     was to protect the integrity of the election process.

11     Q.   And are you asserting legislative privilege with

12     regard to any other purpose maintained by yourself or any other

13     individual for this legislation?

14             MR. SWEETEN:  My instruction to you is to do so

15     unless it -- you can refer to matters of the public -- from

16     public debate, public hearings or committee hearings.

17             MR. FREEMAN:  Mr. Sweeten, this is her privilege

18     to hold or waive, and so I would ask that you instruct her that

19     she can but not that she must withhold this information.

20             MR. SWEETEN:  She's already asserted the

21     legislative privilege.  We're asserting it throughout this

22     deposition.  This is an area that implicates legislative

23     privilege.  This is a protected privilege that this court has

24     recognized and we are going to -- and I'm instructing her as to

25     the boundaries of that privilege.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1              MR. FREEMAN:  Okay.

2         A.   I agree with my counsel that I will invoke privilege,

3    but I'm happy to discuss from my memory what my conversations

4    were on the floor that I recall.

5         Q.   On the floor.

6         A.   And in committee.

7         Q.   Okay.

8         A.   When I say on the floor, I mean from -- from

9    the -- from the front and back mike, public record.

10        Q.   Was the purpose of S.B. 14, in part, to discriminate

11   in any way against any group or groups of minority voters?

12             MR. SWEETEN:  I'm going to instruct you about the

13   legislative privilege and that specifically legislative

14   privilege covers mental impressions, opinions about legislation.

15   It also allows you not to reveal communications between

16   legislators, legislative staffers, state agencies, constituents

17   or the Legislative Council.  That privilege is recognized by

18   this court, and you -- and I'm instructing you accordingly.  You

19   can answer based upon matters of public record.

20        A.   Can I hear the question one more time?

21             MR. SWEETEN:  Yeah, she can read it.

22        Q.   The court reporter can read it back.

23             THE REPORTER: Question: "Was the purpose of S.B.

24   14, in part, to discriminate in any way against any group or

25   groups of minority voters?"



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

1          A.    The purpose of the --

2                MR. SWEETEN:  Same objection.

3          A.    The purpose of --

4                MR. SWEETEN:  Same instruction.

5          A.    The purpose of the legislation, as I stated on the

6     floor during the debate, was to protect the integrity of the

7     election process.

8          Q.    And if you can confirm that you are refusing to answer

9     questions about nonpublic purposes of S.B. 14 on the basis of

10    your assertion of the state legislative privilege --

11         A.    I confirm that.

12         Q.    -- and that it is your assertion and not the assertion

13    of the Office of the Texas Attorney General?

14         A.    It is my assertion.

15         Q.    Okay.  How do you know that the purpose of S.B. 14 is

16    limited to nondiscriminatory reasons?

17                MR. SWEETEN:  I'm going to again instruct you not to

18    answer that question based upon the fact that it would reveal

19    mental impressions about legislation.  It also would reveal

20    communications you've had with the various categories that I've

21    enumerated:  Legislators, legislative staff, state agencies,

22    constituents or Texas Legislative Council.  All of those are

23    covered by the legislative privilege.  This court has found that

24    there is -- that a legislative -- that legislative privilege

25    does exist, and I'm instructing you as to the boundaries of that



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Patricia Harless                                              May 15, 2012

1          privilege.  So you can go ahead and answer with that -- you can

2          answer with respect to matters of the public record.

3                          THE WITNESS: Could you repeat the question,

4          please.

5                          THE REPORTER: Question: "Okay.  How do you know that

6          the purpose of S.B. 14 is limited to nondiscriminatory reasons?"

7          A.    I --

8                          MR. SWEETEN:  Same instruction.

9          A.    I don't recall the debate on that specific question.

10         Q.    Is it your testimony that you do not recall the debate

11         with regard to potential discriminatory purposes or

12         discriminatory effects of S.B. 14?

13                         MR. SWEETEN:  You can confine your answer to

14         matters of the public record.

15         A.    I stated on the floor that I felt that S.B. 14 would

16         increase participation for all Texans.

17         Q.    And what was the basis for your understanding that it

18         would increase the participation for all Texans?

19                         MR. SWEETEN:  Don't reveal your thoughts, mental

20         impressions or opinions about legislation.  You can answer to

21         the extent that you've made a public statement with respect to

22         that.  Otherwise, the legislative privilege would cover

23         this -- this information that he's seeking.

24         A.    From public testimony in committee that I repeated on

25         the House floor, I believe that it would increase participation



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Patricia Harless                                                May 15, 2012

101

1    because people will be -- would be more confident that their

2    vote is counted and --

3        Q.   We'll turn to that later.  But if we can first -- if I

4    can first ask, what is Texas' current system for determining how

5    to verify the identity of a voter?

6        A.   The current system --

7        Q.   Uh-huh.

8        A.   -- for --

9        Q.   With -- S.B. 14 is currently not being implemented

10   because of this litigation.  So without S.B. 14 in place, what

11   is the current system to identify -- to verify the identity of a

12   voter when they show up to vote at the polls?

13       A.   If I remember correctly, testimony during committee

14   was voters show up with a voter registration certificate --

15       Q.   Uh-huh.

16       A.   -- or a driver's license, and they're checked against

17   the current data voter registration -- the voter registration

18   database.

19       Q.   Okay.  On the day that Governor Perry signed S.B. 14,

20   which I believe was May 27th, 2011, correct?

21       A.   (Laughter.)

22       Q.   Okay.  On the day that Governor Perry signed S.B. 14,

23   did you state, quote, "We must do all we can to guarantee our

24   elections are conducted fairly and without fraud.  This bill

25   takes a significant step to ensure the integrity of the ballot



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

```
 1      box by providing a means to detect and deter in-person voter
 2      fraud"?
 3           A.   If you have a statement that I said that.
 4                MR. FREEMAN:  If we could mark this U.S. 16.
 5                     (Exhibit No. 16 marked)
 6           Q.   Do you recognize this press release?
 7                MR. SWEETEN:  I caution the witness to take your
 8      time to review it before answering the question.
 9           Q.   Please do.
10           A.   Well, it's kind of printed over.  Is this a press
11      release from me or from Governor Perry's office?
12           Q.   If you look at the top left.
13           A.   Oh, okay.
14           Q.   And your quote begins at the bottom of Page 1.
15                MR. SWEETEN:  So just so I'm clear, this is a
16      press release from Governor Perry's office, Dan?
17                MR. FREEMAN:  That's correct.
18           A.   It shows that that is a quote from me.
19           Q.   And what did you mean in that statement by "in-person
20      voter fraud"?
21                MR. SWEETEN:  You can testify about the -- the
22      statement that you made, if you indeed made that statement, but
23      I don't want you to go back and reveal thoughts and mental
24      impressions or opinions about legislation.  You can talk about
25      that specific -- about public statements about that issue.
```



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1          A.   My statement says, "We must do all we can to guarantee

2     our elections are conducted fairly and without fraud.  This bill

3     takes a significant step to ensure the integrity of the ballot

4     box by providing means to deter and detect in-person voter

5     fraud."

6          Q.   What do you mean by the term "in-person voter fraud"?

7          A.   From the testimony on the House floor, the purpose of

8     the photo voter ID is to verify the person showing up to vote is

9     who they say they are.

10         Q.   So what is the act that you are trying to prevent by

11    S.B. 14?

12              MR. SWEETEN:  Okay.  That -- and he's asking you

13    now a question that would require you to reveal thoughts, mental

14    impressions, opinions about legislation, okay, or potentially

15    communications with constituents, legislators, staff, TLC or

16    state agencies.  So to the extent he's asking you to do that, my

17    instruction to you is that that is a matter covered by the

18    legislative privilege.  To the extent that you can refer to

19    public debate about the issue or public statements, you can

20    answer.

21              MR. FREEMAN: Let me see if I can rephrase my

22    question to avoid the objection.

23         Q.   How would you define the term used in this press

24    release, the act that you are detecting and deterring, which is

25    in-person voter fraud?  How would you define the term that you



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Patricia Harless                                          May 15, 2012

1    used?

2         A.   The debate on the floor was the act to deter and

3    detect is by having a person that shows up to vote in person

4    show a photo ID showing that they are who they say they are.

5         Q.   But without S.B. 14, what is the in-person voter

6    fraud?

7         A.   Excuse me?

8         Q.   What is in-person voter fraud?

9              MR. SWEETEN:  I don't want you to reveal

10   thoughts, mental impressions or opinions about the legislation.

11   He can ask you about that specific statement that -- that you

12   made, if you made that.  But don't go into the process of

13   making -- of how the legislation came to be, your thoughts as

14   the legislation proceeded or communications that you've had with

15   the individuals I've outlined earlier.

16        A.   I don't recall public testimony specifically about

17   that question.

18        Q.   About the definition of in-person voter fraud?

19        A.   I don't recall it.  I'm not saying it didn't exist.  I

20   don't remember it.

21        Q.   Do you personally have a working definition, an

22   understanding of what in-person voter fraud is?

23        A.   Say that one more time?

24        Q.   Do you have -- oh, sorry.  We can have the court

25   reporter read it.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

```
 1              THE REPORTER: Question: "Do you personally have a

 2    working definition, an understanding of what in-person voter

 3    fraud is?"

 4              MR. SWEETEN:  Just same instruction.  Don't

 5    reveal any mental impressions, opinions about the legislation,

 6    but you can -- if you want to give him your current

 7    understanding -- I think is what he's asking you -- of what

 8    voter -- in-person voter fraud means, I don't think that

 9    that's -- to the extent you're not doing -- you're not providing

10    that information, you can go ahead and do so.

11         A.    There was testimony in committee --

12         Q.    Uh-huh.

13         A.    -- that people stated someone had used an ID of a

14    person that was deceased and went and voted with that person's

15    ID.  That was the testimony of impersonation of a voter.

16         Q.    Okay.  So if -- allow me to -- I'll provide a working

17    definition so we can use that moving forward that -- can we

18    accept that in-person voter fraud is the act of showing up at a

19    polling place with someone else's ID in order to falsify your

20    identity and vote for that other person?  Does that work?

21         A.    Yes.

22         Q.    Okay.  What would a voter need to do under the

23    existing law, pre-S.B. 14, to commit in-person voter fraud?

24         A.    Show up to vote with someone else's voter registration

25    card.
```



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

```
 1            Q.   How would they obtain someone else's voter

 2     registration card?

 3            A.   I have no idea.

 4            Q.   Would they have to steal it, for example?

 5            A.   I don't know.

 6            Q.   What is the punishment under current law for

 7     committing in-person voter fraud?

 8            A.   Prior to --

 9            Q.   Prior to S.B. 14.

10            A.   I don't know exactly.  It was -- we increased it to a

11     second degree -- I think it was a third degree.  I can't

12     remember exactly.

13            Q.   So it was a felony; is that correct?

14            A.   I -- I think it was.

15            Q.   Okay.  And in-person voter fraud would change one

16     vote; is that correct?

17            A.   Excuse me?

18            Q.   An act of in-person voter fraud would change one vote;

19     is that correct?

20                 MR. SWEETEN:  Under existing statute or --

21                 MR. FREEMAN:  Under the -- under the existing

22     statute, as the term is defined.

23            A.   Yes.

24            Q.   And that would be a felony; is that correct?

25            A.   I think.
```



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Patricia Harless                                          May 15, 2012

1          Q.   Okay.

2          A.   I'm not sure.  I can't remember.  I know we

3     increased it to a second degree and a state jail felony, but I

4     don't remember what it was prior to.

5          Q.   Are you aware of any specific incidents of in-person

6     voter fraud in your district, Texas House District 126, in the

7     last 20 years?

8               MR. SWEETEN:  Hold on a second.  When you're

9     answering this question, I don't want you to reveal thoughts,

10    mental impressions or opinions about legislation.

11              THE WITNESS:  Right.

12              MR. SWEETEN:  I also don't want you to reveal

13    communications you've had with constituents or state agencies,

14    other legislators or staff.

15         A.   I was going to say that's privileged conversation with

16    constituents.

17         Q.   Okay.  But in the public record, is it correct that

18    there are no statements in the public record before the

19    committee or before the floor concerning -- that set out

20    incidents of in-person voter fraud in Texas House District 126?

21         A.   I cannot say that for sure.  There were people that

22    were testifying.  I don't know where they lived.

23         Q.   Okay.  And have you, in any public statements,

24    articulated any incidents of in-person voter fraud that occurred

25    in Texas House District 126 in the last 20 years?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1           A.    I don't think I have made any public statements of

2      that.

3           Q.    Are you aware of any specific incidents of in-person

4      voter fraud in Harris County in the last 20 years?

5           A.    There was testimony that -- in committee that there

6      were cases referred to the Secretary of State and some

7      prosecuted in Harris County.

8           Q.    For in-person voter fraud?

9           A.    If I remember correctly.

10          Q.    Did Paul Bettencourt give that testimony?

11          A.    I don't remember him giving testimony --

12          Q.    Okay.

13          A.    -- during our committee.  I'm not saying he didn't,

14     but I don't remember him.

15          Q.    Are you aware of how many convictions the attorney

16     general has secured for in-person voter fraud in the last 20

17     years in the State of Texas?

18               MR. SWEETEN:  In answering that question, don't

19     reveal thoughts, mental impressions, opinions about legislation,

20     including Senate Bill 14, or communications with legislators,

21     legislative staff, state agencies, Legislative Council or

22     constituents.

23               MR. FREEMAN:  Mr. Sweeten, I believe convictions

24     are a matter of public record.

25               MR. SWEETEN:  You can -- you can confine your



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1       testimony to matters of public record.

2           A.   I remember in committee there were testimony of

3       numbers, but I can't tell you what they were.

4           Q.   Was it less than five?

5           A.   I could not tell you for sure.

6           Q.   Okay.  In the last 20 years, are you aware of any

7       convictions of noncitizens for in-person voter fraud?

8                MR. SWEETEN:  Same instruction.

9           A.   I don't recall that in testimony.

10          Q.   Okay.  Are you aware of whether Attorney General

11      Abbott has dedicated substantial resources over the last decade

12      to investigating allegations of voter fraud, in-person voter

13      fraud?

14               MR. SWEETEN:  In answering that question, don't

15      reveal thoughts, mental impressions, opinions about legislation.

16      Don't reveal communications with legislators, legislative staff,

17      state agencies, Texas Legislative Council, constituents or your

18      lawyers.

19               THE WITNESS: Could you please repeat the

20      question.

21               THE REPORTER: Question: "Okay.  Are you aware of

22      whether Attorney General Abbott has dedicated substantial

23      resources over the last decade to investigating allegations of

24      voter fraud, in-person voter fraud? "

25          A.   I don't --



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Patricia Harless                                    May 15, 2012

```
 1                    MR. SWEETEN:  Same instruction.
 2        A.    I don't recall testimony of that.
 3        Q.    Okay.  What is the drinking age in Texas?
 4        A.    21.
 5                    MR. SWEETEN:  You can answer.
 6                    MR. FREEMAN:  Thanks.
 7                    THE WITNESS: I'm getting better about waiting,
 8        though.  My arm's sore.  I'm teasing.
 9        Q.    Have individuals ever created counterfeit photographic
10        identification cards in Texas?
11        A.    Repeat that, please.
12        Q.    I'm happy to.  Have individuals ever created
13        counterfeit photographic identification cards in Texas?
14        A.    I'm not aware of any public testimony of that.
15        Q.    Are you aware, in your personal experience outside the
16        legislature, in terms of any source of information you may have,
17        of whether individuals in Texas have ever created counterfeit
18        photographic identification cards?
19                    MR. SWEETEN:  Same instruction that I've given.
20        A.    I agree.  That's privileged conversations with
21        constituents and staff.
22        Q.    And you have no information outside the legislative
23        process concerning the production of counterfeit photographic
24        identification cards in Texas?
25                    MR. SWEETEN:  Same instruction.
```



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1          A.    Not that I recall in the legislative sense.

2          Q.    Are you aware of any incidents of minors or

3     individuals who are underneath the age of 21 creating or using

4     false IDs in order to obtain alcohol?

5                MR. SWEETEN:   Same instruction.

6          A.    There was testimony in committee that that is

7     possible.

8          Q.    How many convictions have been obtained in the last 20

9     years concerning the use of false IDs either to -- either to

10    obtain alcohol or for any other purpose?

11               MR. SWEETEN:   Same instruction.

12         A.    I have no clue.

13         Q.    Do you know how many investigated incidents there have

14    been?

15         A.    On alcohol?

16         Q.    Using fake IDs to obtain alcohol, fake photo IDs to

17    obtain alcohol or for any other purpose.

18               MR. SWEETEN:   Same instruction.

19         A.    There may have been testimony.  I don't recall it.

20         Q.    Would it be fair to say that there are more

21    convictions for using fake IDs, photo IDs, to obtain alcohol in

22    the State of Texas than there are for in-person voter fraud?

23               MR. SWEETEN:   Objection, calls for speculation.

24    In addition, I object and instruct her, as I have, regarding the

25    specific privilege.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1          But you can go ahead and answer with that instruction.

2          A.    I have no way of knowing that.  I don't recall any

3    testimony on that.

4          Q.    What are the security features of a Texas driver's

5    license?

6          A.    They have a scan -- a scan bar on the back.  I think

7    they're made with holographic material.  I know there's a number

8    of them, but I don't know them all off the top of my head.

9          Q.    Do they have anything that appears if you shine a

10   black light on them?

11         MR. SWEETEN:  Same -- I'm going to make the same

12   objection just to the extent that this could reveal

13   communications in the legislative process between state

14   agencies.  Don't reveal that.  If it's a matter of public

15   record, then you can -- and not part of the legislative process,

16   you can answer.

17         A.    Well, outside of the legislature, when I travel on a

18   plane, I have noticed them shining something on my driver's

19   license.  I don't know what that is and what purpose that is.

20         Q.    Does S.B. 14 provide funding for polling places to

21   have those similar lights, like they use when you're traveling

22   on a plane, to test the validity of Texas driver's licenses?

23         MR. SWEETEN:  You're asking about Senate Bill 14

24   as passed?

25         MR. FREEMAN:  Yes.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Patricia Harless                                    May 15, 2012

113

```
 1                    MR. SWEETEN:  Does it contain that?

 2                    MR. FREEMAN:  Yes.

 3          A.   There was a fiscal note that was several pages with a

 4    lot of breakdown from departments on what the fiscal expense

 5    they expected the legislation to add up to, and I'm not sure

 6    exactly what all the specifics were that went to drafting that

 7    fiscal note.

 8          Q.   Are you aware of whether S.B. 14 provides financing

 9    for handheld computers to scan the back of the driver's license?

10          A.   I'm -- I don't know.

11          Q.   Do you recall any debate in the House concerning the

12    fiscal note attached to S.B. 14?

13          A.   I do.

14          Q.   And do you recall whether all of the funding for S.B.

15    14 would be provided using federal funds available under the

16    Help America Vote Act?

17          A.   If I recall the testimony correctly, there was

18    discussion that part of the funding could be applied for --

19          Q.   Uh-huh.

20          A.   -- through the Help America Vote Act.

21          Q.   And was -- were there discussions as to whether that

22    funding would be available -- would be used only for voter

23    education?

24                    MR. SWEETEN:  You're talking about public

25    hearing --
```



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Patricia Harless                                    May 15, 2012

1              MR. FREEMAN:  Public hearing testimony, yes.

2              MR. SWEETEN:  You can answer.

3         A.   I'm not sure what the -- I don't remember what the

4    testimony was of what specifically that money would be used for,

5    but that we could apply for half of funding to help offset the

6    cost of the fiscal note part of process.

7         Q.   We're going to probably just jump back to that later

8    when I'll find something to refresh your recollection on that

9    during a break --

10        A.   Okay.

11        Q.   -- rather than stop now.

12        A.   Okay.

13        Q.   When there are a greater number of one crime being

14   committed than another, in your opinion, what crime should be

15   given the greater priority in terms of the legislature's

16   attention?

17             MR. SWEETEN:  Okay.  To the extent that this

18   question is asking you to reveal thoughts, mental impressions,

19   opinions about legislation, do not reveal those.  Do not also --

20   also, do not reveal any communications you've had with state

21   agencies, legislators, staff members, constituents or the Texas

22   Legislative Council.  You can refer to matters of the public

23   record or matters that aren't implicated by that legislative

24   privilege.

25        A.   I don't know that that was ever discussed in the



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1    debate of photo voter ID.  I don't remember.

2        Q.    I'm just asking as a general -- as a general

3    principle, your opinion.

4              MR. SWEETEN:  Same instruction.

5        Q.    Okay.  Are you not able to offer an opinion because of

6    the advice of counsel?

7        A.    Yes.

8        Q.    Okay.

9        A.    Because it relies on my thought process.

10       Q.    Did you ever state in the House that you were not

11   advised as to how often in-person voter fraud occurs?

12       A.    I could have possibly stated that.  It was a 12-hour

13   debate.

14       Q.    I thought you said 11.

15       A.    11, 12.  The second time.

16       Q.    Okay.

17       A.    The first time it was four hours.

18             MR. FREEMAN:  If we could mark this as, I

19   believe, U.S. Exhibit 17.

20                    (Exhibit No. 17 marked)

21       Q.    My apologies for making you re-live all those hours.

22       A.    It's part of it.

23       Q.    If you could turn to Page 910.  And if you could just

24   read beginning with, "And how does -- describe how voter

25   impersonation works," Representative Anchia's statement.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

```
 1                    MR. SWEETEN:  Dan, where are you in the --

 2                    THE WITNESS:  Right here (indicating).

 3                    MR. FREEMAN:  910.

 4                    MR. SWEETEN:  Thank you.

 5          A.   And your question was?

 6          Q.   My question was:  Did you state on the House floor

 7     that you were not advised how often in-person voter fraud or

 8     voter impersonation occurs?

 9          A.   That's what the transcript said, so, yes.

10          Q.   Okay.  And is it correct that you stated on the House

11     floor that you'd heard testimony in committee, quote, suggesting

12     that in-person voter fraud occurred?  It's not in that

13     transcript; it was from a different day.  But do you recall

14     that?

15          A.   I don't recall that.

16                    MR. FREEMAN:  If we could -- I apologize.  This

17     is much larger.  But if we could mark this as U.S. 18.  Sorry.

18                    (Exhibit No. 18 marked)

19                    MR. FREEMAN:  I don't have copies for everyone.

20     This is pretty big.

21          Q.   And this is -- if you could look to Page 96, right in

22     the middle of page, starting with Representative Veasey's

23     question, beginning, "Ms. Harless, why on earth."  Could you

24     read for the record beginning with Representative Veasey's

25     question?
```



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1          A.    What line is that?

2          Q.    It is Line 8.

3          A.    No?  Or 96?  Page 6?

4          Q.    On Page 96.

5          A.    Okay.

6          Q.    Beginning --

7          A.    Line 8.

8          Q.    -- Line 8, Mr. Veasey.

9          A.    "Ms. Harless, why on earth would anyone go into a

10    polling place and lie and say that they are not who they are and

11    sign a form that could put them in jail with a second degree

12    felony to cast one ballot?  Help me understand the process here.

13    Help me understand why that would be."

14               "We heard testimony in committee of people suggesting

15    that that occurred."

16          Q.    Okay.  Are there any other incidents in which you have

17    presented legislation based on the suggestion of a problem

18    rather than evidence of a problem?

19               MR. SWEETEN:  I'm going to instruct you to not

20    reveal thoughts, mental impressions, opinions about legislation.

21    Do not reveal communications you've had with legislators,

22    legislative staff, state agencies, Texas Legislative Council or

23    constituents.  You can reveal matters of public record,

24    including committee meetings, House floor proceeding or debates.

25    You can answer the question.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1          A.    From the transcript --

2          Q.    Uh-huh.

3          A.    -- this is at the end of the debate.

4          Q.    It's the end of Volume I of III.

5          A.    Okay.  So I don't know at what part of the process

6     this is.

7          Q.    Uh-huh.

8          A.    But we heard testimony in committee of people saying

9     that voter impersonation happens.

10         Q.    Did they provide evidence in the form of convictions?

11              MR. SWEETEN:  You're saying in the committee?

12              MR. FREEMAN:  In the committee.

13              MR. SWEETEN:  Yeah.  Go ahead and answer.

14         A.    I know that there was information in the committee

15    presented from the AG's office, the Secretary of State of the

16    number of complaints referred --

17         Q.    Uh-huh.

18         A.    -- and the number of convictions, but I cannot recall

19    the specific number of convictions from the testimony in the

20    committee.

21         Q.    Do you recall if they were numerous?

22         A.    I know they were more than one.

23         Q.    Are you certain that they were more than one?

24         A.    I am -- and make sure we're asking the same thing --

25         Q.    Uh-huh.


Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Patricia Harless                                    May 15, 2012

```
 1            A.    -- I'm answering the same thing.

 2            Q.    Convictions for in-person voter fraud.

 3            A.    I don't know specifically what the convictions were,

 4     but it was -- I can't say specifically it was in-person voter

 5     fraud.  I know they talked about convictions.

 6            Q.    Okay.  And just so you know, could you look at the

 7     date on that transcript?

 8            A.    March 23rd, 2011.

 9            Q.    Was that after the committee hearings had occurred?

10            A.    Yes.

11            Q.    Okay.  So that was after you'd received all the

12     evidence that you had received in public proceedings; is that

13     correct?

14            A.    Yes.

15            Q.    And on that date, on March 23rd, you stated that there

16     was the suggestion that in-person voter fraud had occurred; is

17     that correct?

18            A.    That's what it says here.  I can't recall the exact

19     testimony.

20            Q.    And I'll let you know that that's a  transcript that

21     was provided by your counsel to the United States.

22            A.    Right.  But if you notice, in these transcripts,

23     there's a lot of times that it's difficult to hear or understand

24     because of the microphone issues.

25            Q.    But you were at the front mike; isn't that correct?
```



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

```
 1              A.    I was.

 2              Q.    And the front mike, it's easier to hear;

 3       isn't -- isn't that correct?

 4              A.    You read the transcript.  How many times did they say,

 5       "Could you repeat yourself"?

 6              Q.    But no one asked you to repeat yourself there, did

 7       they?

 8              A.    No, they didn't.

 9              Q.    Representative Harless, how many incidents of mail-in

10       ballot fraud have occurred in the State of Texas in the last 20

11       years?

12                     MR. SWEETEN:  Okay.  In answering this question,

13       I don't want you to reveal thoughts, mental impressions or

14       opinions about the legislation.  Also, do not reveal

15       communications with legislators, legislative staff, state

16       agencies, Texas Legislative Council or constituents, as all of

17       those matters are legislatively privileged.  To the extent you

18       can answer that question based upon the public record, you -- I

19       will allow you to do so.

20              A.    I don't recall testimony on mail-in ballot in

21       committee.

22              Q.    Have you heard outside of the context of committee but

23       outside of the context in which your counsel has instructed you

24       not to answer anything about mail-in ballot fraud?

25                     MR. SWEETEN:  Same instruction.
```



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Patricia Harless                                          May 15, 2012

```
 1          A.   That would be privileged communication between
 2     constituents.
 3          Q.   Okay.  And so are you aware of whether mail-in ballot
 4     fraud has been prosecuted more than in-person ballot fraud?
 5               MR. SWEETEN:  Same instruction.
 6          A.   It was not part of the committee testimony that I
 7     recall.
 8          Q.   Okay.  When you were asked in the House about mail-in
 9     ballot fraud, did you state, "This bill is only interested in
10     one type of potential fraud, in-person voter fraud"?
11          A.   I don't recall the exact words, but --
12          Q.   Let me see if we can refresh your recollection.  It
13     might be easier --
14          A.   Yeah.
15          Q.   -- if you could take a look at Exhibit 17 on Page 914.
16     It's the third line on Page 914.
17          A.   "This bill is only interested in one type of potential
18     fraud, in-person voting fraud."
19          Q.   Why did you -- why did you limit the bill in this way?
20               MR. SWEETEN:  Don't answer to the extent that
21     your answer would reveal thoughts, mental impressions, opinions
22     about legislation.  Don't reveal communications to the -- to the
23     legislators, legislative staff, state agencies, Texas Leg
24     Council or constituents.
25          A.   My testimony on the committee was this bill was
```



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1      specifically about in-person, protecting the integrity of the

2      ballot box by verifying you are who you say you are when you

3      show up to vote in person.

4           Q.   But it wasn't about protecting the integrity of the

5      ballot box from -- from mail-in ballot fraud?

6           A.   My testimony --

7                MR. SWEETEN:  Same instruction.

8           A.   -- was only about in-person.  This bill was about

9      in-person voting.

10          Q.   And why did you limit it that way?

11               MR. SWEETEN:  Same instruction.

12          A.   That is privileged.

13          Q.   Okay.  And why would you focus on a bill that

14     addressed a problem such as in-person ballot fraud that occurs

15     rarely, far more rarely than any issues concerning mail-in

16     ballot fraud?

17               MR. SWEETEN:  I'm going to object based upon the

18     legislative privilege and instruct you not to reveal thoughts,

19     mental impressions, opinions about legislation or reveal

20     communications between you and legislators, legislative staff,

21     state agencies, Texas Legislative Council or constituents.

22          A.   This bill was about in-person voting and only

23     in-person voting.

24          Q.   And any other reason is protected by privilege; is

25     that your -- is that your testimony?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1          A.   Yes.

2                    MR. SWEETEN:   Same instruction.

3                    MR. FREEMAN:   Okay.   I just want to get that on

4     the record without -- okay.

5          Q.   Now, are you familiar with your campaign web site?

6          A.   Vaguely.

7          Q.   And are you aware of whether you -- whether you list

8     important issues facing Texans?

9          A.   I think I have an issue drop box.

10         Q.   And this has already been entered as U.S. Exhibit 7.

11    And do you see where you list immigration reform?

12         A.   I do.

13         Q.   And do you see under immigration reform where you list

14    require Texans -- a Texas photo ID to vote?

15         A.   I see that.

16         Q.   Why is requiring Texas photo ID to vote listed under

17    immigration reform?

18                   MR. SWEETEN:   I'm going to instruct you to not

19    answer based upon -- and reveal thoughts, mental impressions,

20    opinions about legislation.   Don't reveal communications that

21    we've already discussed.   Because this is a -- on a web site,

22    you can answer this specific question, but you cannot -- I

23    instruct you not to reveal the information about the bill or

24    legislation, why it's passed.

25         A.   My consultant does my web site, and I don't know why



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Patricia Harless                                    May 15, 2012

1        he put -- put it under immigration reform.

2             Q.    Who is your consultant?

3             A.    Spencer Newman.

4             Q.    And do you see any connection between requiring Texans

5        to show a photo ID to vote and immigration reform?

6                   MR. SWEETEN:   Same instruction.   Objection.

7             A.    If I would have designed this, I would have probably

8        put it under other.

9             Q.    So you don't see a connection; is that correct?

10            A.    It's on my --

11                  MR. SWEETEN:   Same instruction.

12            A.    -- web site under immigration reform.

13            Q.    Are you aware of any documented cases of noncitizens

14       committing in-person ballot fraud in Texas?

15                  MR. SWEETEN:   Don't reveal thoughts, mental

16       impressions or opinions about legislation.   Don't reveal

17       conversations that you've had with legislators, legislative

18       staff, state agencies, Texas Legislative Council or constituents

19       as those matters are legislatively privileged.   If you can

20       answer the question without doing so, you are free to do so.

21            A.    I don't recall that in testimony in committee.

22            Q.    Okay.   And any further information would be covered by

23       privilege?

24            A.    Yes.

25            Q.    Okay.   Are you aware of any documented cases of



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1     undocumented immigrants --

2               MR. SWEETEN:  Same --

3     Q.    -- voting in Texas elections?

4     A.    I don't --

5               MR. SWEETEN:  Same objection.  Same instruction.

6     A.    I don't recall any testimony of that in committee.

7     Q.    Is it necessary to prove citizenship to obtain a Texas

8     license to carry a concealed handgun?

9               MR. SWEETEN:  Same instruction.  Well, answer if

10    you know.

11    A.    I don't know that I know that.

12    Q.    Okay.

13    A.    I applied for my handgun, but I don't remember the

14    questions.

15    Q.    And we already discussed a driver's license?

16    A.    Right.

17    Q.    Are you aware of whether it's necessary to prove

18    citizenship to obtain a Texas identification card, a

19    non-driver's identification?

20              MR. SWEETEN:  Same instruction.  Same objection.

21    You can answer.

22    A.    I don't know for sure.  It seems like there was

23    testimony in committee on other bills about that, but I don't

24    know specifically what the requirements are.

25    Q.    Okay.  Are you aware of whether it's necessary to



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1      prove citizenship in order to obtain a U.S. military

2      identification card?

3            A.   I'm not aware.

4            Q.   Are you aware of whether it's necessary to prove

5      citizenship to obtain a state or federal ID card related to

6      employment?

7                  MR. SWEETEN:   Same instruction regarding

8      legislative privilege.

9            A.   I'm not aware.

10            Q.   Okay.   What ethic group makes up the majority of

11      immigrants in Texas?

12                  MR. SWEETEN:   Same instruction.   Same objection.

13      You can answer.

14            A.   I couldn't tell you for sure.

15            Q.   Is it possible that it is Hispanics?

16            A.   It's possible.

17            Q.   But you're not certain?

18            A.   I'm not exactly certain.

19            Q.   Okay.   Are you aware of any other legislators or

20      staff, including the lieutenant governor, making any public

21      statements about illegal aliens voting?

22            A.   I'm not aware of their statements, if they've made

23      them or not.

24            Q.   Are you aware of any other legislators or staff,

25      including the lieutenant governor, making any nonpublic



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Patricia Harless

1    statements about noncitizens voting?

2               MR. SWEETEN:  I'm going to -- I'm going to object

3    based upon the legislative privilege.  Don't reveal thoughts,

4    mental impressions or opinions about legislation nor

5    communications between legislators, state agencies, including

6    the lieutenant governor's office or governor's office,

7    legislative staff, Texas Legislative Council or constituents.

8         A.    I don't recall any nonpublic statements.

9         Q.    And is that based on the assertion of privilege?

10        A.    Yes.

11        Q.    Okay.  Are you aware of the claims that S.B. 14

12   attempted to exploit fears of illegal immigrants voting?

13               MR. SWEETEN:  Same instruction.

14        A.    I don't recall that testimony on the floor or in

15   committee.

16        Q.    And if you could be clear that any other statements,

17   you will not be providing them on the basis of privilege?

18        A.    If it's conversations about the legislation with

19   constituents --

20        Q.    Okay.

21        A.    -- staff, Leg Council, then you are correct.

22        Q.    You learned Mr. Sweeten's list.

23        A.    I'm trying.  It's -- it's tough for a blonde female,

24   but I'm working on it.

25        Q.    With all due respect, the blonde females who are



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Patricia Harless                                               May 15, 2012

                                                                      128

```
 1      working with me on this team --
 2           A.    This blonde female.
 3           Q.    -- they are outstanding lawyers and I'm sure that you
 4      are an outstanding legislator.
 5           A.    I'm not an attorney.
 6           Q.    If I can just ask that when you are withholding
 7      testimony on the basis of privilege that you do state it for the
 8      record.  It's just easier moving forward for all parties.
 9           A.    Yes, sir.
10           Q.    Okay.  Now, you've described in public the purpose of
11      S.B. 14 as restoring public confidence in the election system;
12      is that correct?
13           A.    Yes.
14           Q.    And have you used the word "restoring"?
15                 MR. SWEETEN:  You're asking her in public
16      statements?
17                 MR. FREEMAN:  In public statements, yes.
18           A.    I would say yes.
19           Q.    Okay.  Can you tell me why you used the word "restore"
20      in public statements?
21           A.    I can't tell you why.
22           Q.    Was there a time previously when Texans had -- had
23      confidence in the election system and lost that confidence?
24           A.    I think that would be privileged based on
25      conversations with constituents.
```



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1          Q.   Has Texas ever had a photo ID requirement in the past?

2          A.   Not that I'm aware of, not in the public testimony.

3          Q.   Has Texas ever had other restrictions on voting that

4     would coincide with a time when Texans had confidence in their

5     elections?

6          A.   I'm not exactly sure what you're asking.

7          Q.   Well, you testified that there was a time in the past

8     when Texans had confidence in their elections, and in the past

9     they did not have a photo ID requirement.  Was there some other

10    limitation on voting that coincided, was at the same time, as

11    that public confidence in the voting?

12              MR. SWEETEN:  Same instruction on legislative

13    privilege.  Go ahead and answer.

14         A.   I don't know that I can answer that.  I don't know

15    that I understand what you're asking.

16         Q.   Did Texans have more confidence in their elections

17    when elections were limited on the basis of race?

18              MR. SWEETEN:  Same instruction.

19         A.   Testimony on the floor was that in the last election

20    cycle we had a House member that won her recount by three votes

21    and an election with a representative from Houston that won his

22    election by eight votes and that it was important that every

23    person that goes to vote in person knows that their vote is

24    going to count.

25              MR. FREEMAN:  I'll object to that testimony as



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Patricia Harless                                    May 15, 2012

1    nonresponsive.

2         Q.   And just so that it's clear, what is your personal

3    view on the issue of whether there was a time in the past that

4    Texans had more confidence in their elections?

5              MR. SWEETEN:   I'm going to object to the extent

6    the question calls for her to provide matters that are

7    legislatively privileged.  Don't reveal thoughts, mental

8    impressions, opinions about legislation.  Don't reveal

9    communications with legislators, legislative staff, state

10   agencies, Texas Legislative Council or constituents.

11        A.   My testimony on the floor was that asking a person to

12   verify who they say they are increases the confidence that every

13   vote counts.

14        Q.   And my question was with regard to the past time when

15   Texans had confidence without a voter -- photo voter ID

16   requirement, what your personal opinion as to why they had

17   confidence but no longer have it.

18             MR. SWEETEN:   Same objection.  Same instruction.

19        A.   I hate to say the same thing over and over, but the

20   purpose of the bill was to increase participation by allowing

21   people to know that their vote counts when they show up to vote

22   in person by verifying you are who you say you are.  That

23   increases public confidence, in my opinion, from the testimony

24   on the floor by the results of the Georgia increase in

25   participation.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1          Q.   We'll get to those later.  If I can just ask one last

2     time as an attempt --

3          A.   I think that --

4          Q.   Based on the use of the word "restore" -- and I'm not

5     trying to be argumentative.  I just want to know why you said

6     restore, which would imply that at some time in the past there

7     was voter confidence and then that voter confidence was lost.

8     And so I want to know what your opinion is not with regard to

9     your constituents, but what your opinion is with regard to when

10    there was confidence and why that confidence was lost such that

11    you would now need a new photo ID requirement to restore that

12    confidence.

13               MR. SWEETEN:  Objection, asked and answered.

14    Objection, compound.  Also, she's already testified she doesn't

15    know why she used the word "restore."  I think she -- that --

16    that's already been -- but go ahead.  You can answer, I guess,

17    again.

18         A.   I thought I had answered, and I absolutely agree with

19    my counsel that I don't know why I used that, but I think I've

20    answered the question that you've asked.

21               MR. FREEMAN: Mr. Sweeten has offered excellent

22    testimony today.

23         Q.   Have you ever had an individual registered voter tell

24    you that they did not vote because they were concerned about

25    voter fraud cancelling out their vote?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

```
 1          A.    Privilege.

 2                MR. SWEETEN:  Okay.  Don't reveal -- I'm going to

 3    object based on legislative privilege.  Don't reveal matters

 4    that we've already discussed.

 5                THE WITNESS:  I need to go to the bathroom.

 6                MR. SWEETEN:  Okay.  We can take a break.

 7                MR. FREEMAN:  Okay.  Let's take a break.

 8    Actually, you know what, it is -- it's a quarter to 1:00.  Let's

 9    take lunch.

10                MR. SWEETEN:  Okay.

11                (Recess from 12:45 p.m. to 2:12 p.m.)

12          Q.    We are back from the lunch break and a discussion of

13    legislative privilege.  And before the break, we had been

14    discussing public confidence.

15                And I'm not sure if I asked this question before the

16    break, but I wanted to know:  Have you ever had an individual

17    registered voter tell you that they did not vote because they

18    were concerned about voter fraud cancelling out their vote?

19                MR. SWEETEN:  Don't reveal thoughts, mental

20    impressions, opinions about legislation, including Senate Bill

21    14.  Don't reveal discussions you've had with constituents.

22          A.    I believe by answering that I will -- I will reveal

23    personal conversations with constituents.

24          Q.    Okay.  Have you ever had an individual registered

25    voter who is a member of a racial minority group or ethnic
```



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

```
 1        minority group or language minority group tell you that you did

 2        not -- that they did not vote because they were concerned about

 3        voter fraud cancelling out their vote?

 4                     MR. SWEETEN:  Same instruction.

 5            A.   My same answer, that will reveal personal

 6        conversations.

 7            Q.   Okay.  Do you remember writing an op-ed in the Houston

 8        Chronicle back in November?

 9            A.   I do.

10            Q.   And this has already been marked as an exhibit.  Okay.

11        It has not.

12                     MR. FREEMAN:  If we could have this marked as U.S.

13        Exhibit 19.

14                          (Exhibit No. 19 marked)

15            Q.   Do you recognize that document?

16            A.   I do.

17            Q.   Is that your November 11th op-ed -- excuse

18        me -- November 14th?

19            A.   It's the op-ed I wrote.  I don't know what date -- I

20        don't remember the date that the Chronicle published it, but,

21        yes.

22            Q.   Is that the Houston Chronicle?

23            A.   Yes.  Sorry.

24            Q.   And have you ever published any other op-eds?

25            A.   I don't think so.  I was surprised about this one too.
```



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1          Q.    Okay.  And in that op-ed, did you state that,

2    "Statistics from Indiana and Georgia show that ID requirements

3    work well and do not suppress turnout, as opponents claim"?

4          A.    "Statistics from Indiana and Georgia show that ID

5    requirements work well and do not suppress turnout, as opponents

6    often claim."  That's what it said.

7          Q.    Did you then claim that voter ID would, in fact,

8    increase turnout?

9          A.    It says, "All along our goal with photo ID has been to

10   restore integrity in the election process, which will increase

11   turnout."

12         Q.    And did you state during debate that there had been

13   document evidence that in two states that have passed this more

14   restrictive photo ID that voter turnout increases?  Do you

15   recall making that statement in debate, not in the op-ed?

16         A.    In debate, I said that the testimony during committee

17   was that they had increased participation in elections from what

18   I remember.

19         Q.    If you could take a look at Exhibit 17, which was the

20   Day 38 transcript on Page 912.

21         A.    Is that the little one or --

22         Q.    It's the little one, yes.

23               On Page 912 -- oh, I'm sorry.  It's on 913.  It's the

24   first sentence on 913.  Oh, no, it's not.  You know what, let's

25   just stick to your public -- to the statement in the op-ed.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1          Are you aware of what the voter ID requirements are in

2     Georgia?

3          A.    Vaguely.  I mean, I don't know if I can quote exactly

4     from memory, but from carrying the legislation and testimony, I

5     remember some of it.

6          Q.    Could you tell me what you remember?

7          A.    I know they allow tribal IDs, tribal cards.  I know --

8     I think that they don't have a provision for absentee ballot.  I

9     think they don't have a -- or provisional ballot.  I don't think

10    they have a provision that allows exemption for indigent,

11    religious.  I think they have state and federal

12    government-issued ID.  And I can't remember all the specifics,

13    but those are the things off the top of my head.

14         Q.    Okay.  So the things that you were saying they do have

15    or they don't have, those are differences from S.B. 14, correct?

16         A.    Right.

17         Q.    And so the Georgia one is different from S.B. 14 --

18         A.    Right.

19         Q.    -- in several ways?

20               Do you know what the prior ID requirements were in

21    Georgia before they passed their new photo ID requirement?

22         A.    I don't remember.

23         Q.    So do -- same question with Indiana:  Do you know what

24    the requirements are in Indiana?

25         A.    Indiana, I know that they had -- I don't know.  I



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Patricia Harless                                              May 15, 2012

1    think that they had a provisional ballot of a couple days, two

2    days, maybe.  I think that they did allow a religious exemption

3    for being photographed, and I think they allowed an indigent

4    provision.  I think their ID requirements were one of the

5    specific ID requirements, something along those lines.  I don't

6    think they were spelled out the same as in Texas and Georgia.

7         Q.   And so that was also different from S.B. 14?

8         A.   Yes.

9         Q.   And do you know what the ID requirement was in Indiana

10   before the law that you're discussing?

11        A.   I don't remember.

12        Q.   Now, with regard to increased turnout, the statistics

13   from Indiana and Georgia that you've cited in the op-ed, what

14   elections were those?

15        A.   I can't recall exactly, but I know in committee

16   testimony in -- the Secretary of State from Georgia was our

17   expert that we brought in, and he testified that in 2008, they

18   had a significant increase, but in the elections since 2008,

19   they had an increase in participation in election turnout in

20   person, and the increase was more so for the minority vote.

21        Q.   And that's in Georgia?

22        A.   Yes.

23        Q.   And are you aware of who the candidates were for the

24   presidential election in 2008?

25        A.   I do, yes, sir.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1      Q.    And who were they?

2      A.    President Obama and Senator McCain.

3      Q.    And are you aware of whether there were any voter

4  registration efforts in the minority community in Georgia prior

5  to the 2008 election?

6           MR. SWEETEN:  I want to go ahead and just

7  instruct you not to reveal thoughts, mental impressions or

8  opinions about legislation.  To the extent that you have this

9  information based on a public record, you can feel free to

10  provide that.

11      A.    From reading the newspaper, I saw that there were

12  voter drives, but I don't know specifically where they were.

13      Q.    And can you think of any reason why there might be

14  higher turnout in 2008 unrelated to voter ID among minority

15  population in Georgia than in prior elections?

16      A.    I think in --

17           MR. SWEETEN:  Same instruction.

18      A.    I think the testimony in committee was, yes,

19  there -- there was a higher turnout in 2008 and in committee

20  there were testimony from members of the committee and the

21  public that said, well, that was probably attributed to the

22  presidential race.

23      Q.    Uh-huh.

24      A.    But the Secretary of Georgia's testimony followed up

25  saying that, yes, they had had increased participation in other



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

```
 1       election since.  And I can't tell you the number, but Georgia

 2       has a lot of elections.

 3            Q.   Okay.  But there would be newly registered minority

 4       voters because of the presidential race, wouldn't there be?

 5            A.   I don't know.

 6            Q.   And with regard to Indiana, because you also cited

 7       Indiana in your op-ed, do you know what elections you're

 8       referring to there?

 9            A.   The testimony was -- I think it was written, and he

10       referenced -- he referenced a couple of elections, two or three,

11       but I can't tell you which ones.

12            Q.   And so you're not aware of who the candidates were?

13            A.   No.

14            Q.   And you're not aware of general population trends in

15       either Georgia or Indiana that would account for changes in the

16       number of votes?

17            A.   No.

18            Q.   And you're not aware of any changes with regard to

19       registration rates in Indiana?

20            A.   Not that I recall.

21            Q.   And you're not aware of any voter registration efforts

22       in Indiana?

23            A.   Not that I recall.

24            Q.   And you're not aware of any get-out-the-vote efforts

25       in Indiana and the elections at issue?
```



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Patricia Harless                                          May 15, 2012

139

1          A.    Not that I recall in testimony.

2          Q.    And you're not aware of any get-out-the-vote efforts

3    in Georgia in the elections at issue?

4          A.    Not that I recall.

5          Q.    Are you aware of any national trends concerning voter

6    registration in states other than Georgia and Indiana in those

7    same elections?

8          A.    You know, I'm sure I've read articles on it.  I just

9    can't grasp the information right now.

10         Q.    And are you aware of any national trends concerning

11   turnout in those same elections?

12         A.    No.

13         Q.    So you stated that you'd gotten information from the

14   Secretary of State of Indiana and the Secretary of State of

15   Georgia.  Did you get information from any academic studies?

16              MR. SWEETEN:  Hold on a second.  Just make sure

17   you're not revealing mental impressions, opinions about the

18   legislation or discussions you've had with legislators,

19   legislative staff, state agencies, Leg Council or constituents

20   in answering that question.

21         A.    Your statement was that I got information from them.

22   The information we got was through testimony.

23         Q.    Okay.  But in preparing this op-ed that I have here,

24   you stated that the statistics from Indiana and Georgia show

25   that ID requirements work.  And so I'm wondering, with regard to



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Patricia Harless                                        May 15, 2012

140

1    statistics, did you get information in the form of any studies?

2                MR. SWEETEN:  Same instruction on legislative

3    privilege.

4         A.   The testimony in committee, they gave us the specific

5    breakdown of the number of voters in the elections, and that was

6    what I was relying on.

7         Q.   And so you were not relying on any academic studies at

8    all?

9                MR. SWEETEN:  Same instruction.

10        A.   I was relying on the testimony in committee.

11        Q.   Okay.  Was there any testimony given in committee by

12   other individuals who stated that voter ID was likely to

13   decrease turnout?

14        A.   I can't recall specifically, but there was a full

15   range of people testifying on the bill.

16        Q.   Did anyone from the Brennan Center for Justice

17   testify?

18        A.   I can't recall specifically if they testified, but I

19   know there was discussion about the Brennan Justice and the

20   report that they had done.  I don't know if there was someone

21   from that group that actually testified or if it was brought up

22   by a committee member.

23        Q.   And why did you not rely on that report in terms of

24   its projections of turnout or the effect of the bill?

25                MR. SWEETEN:  To the extent that he's asking you



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1    to reveal your thoughts, mental impressions or opinions about

2    the legislation, don't reveal those or any communications.

3         A.   I believe by answering that, that would reveal private

4    conversations.

5         Q.   And why did you not rely on any academic studies

6    concerning the effect of turnout --

7         A.   Again, by answering that, that's private

8    conversations.

9         Q.   Okay.

10        A.   Other than what was discussed publicly.

11        Q.   Now, previously, we discussed how the number of voters

12   who turned out in each of your elections has differed in the

13   three times that you've run.  That's correct, right?

14        A.   I think that's what we kind of said, yeah.  You were

15   going to get the numbers, I thought.

16        Q.   And I neglected to do that during lunch, for which I

17   apologize, and I will try to get it during our next break.  We

18   didn't take a long lunch.

19             And can I ask, what factors do you think were

20   responsible for the different levels of turnout in each of your

21   own elections?

22        A.   Well, I'm not exactly sure that there were that big of

23   differences.  I think there probably was but I'm not sure so

24   until I see what elections they were and what the difference was

25   it would be hard to speculate on that.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

1          Q.    Okay.  We'll try and get those numbers in a moment.

2          A.    Thank you.

3          Q.    Now, you also stated to the Houston Chronicle in a

4     different article do you recall stating we will increase turnout

5     for all voters because it protects our integrity of the election

6     it makes you know that your vote counts?  Do you recall making

7     that statement?

8          A.    I don't recall that, but I do recall a few interviews

9     and being somewhat disappointed in how they paraphrased what I

10    said.  I don't know if that was the specific article.

11         Q.    Well, let's see.  This should be U.S. Exhibit 20.  And

12    let's see if this is one of those instances.  Hopefully it won't

13    be.

14                    (Exhibit No. 20 marked)

15         A.    If it's Gary Scharrer, probably -- yeah.

16         Q.    Do you see right above "Full GOP support" where it has

17    a quote?

18         A.    Yes.

19         Q.    Is that an accurate statement, to your knowledge?

20         A.    Let me finish reading.

21         Q.    Sure.

22              MR. SWEETEN:  Were you asking is that an accurate

23    quote, Dan?

24              MR. FREEMAN:  Yes.

25         A.    Yeah.  I'm -- I don't -- this doesn't sound like



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Patricia Harless                                     May 15, 2012

1    something I would say.

2         Q.   Okay.  Is it your understanding that S.B. 14 will let

3    voters know that their vote counts?

4              MR. SWEETEN:  Don't reveal your mental

5    impressions, thoughts or opinions about the legislation itself.

6    You can --  also don't reveal communications that you've had as

7    outlined before.  But you can go ahead and answer that question.

8         A.   My testimony was that participation will likely

9    increase or -- I think I believe that it will increase because

10   of the increased confidence in the election process.

11        Q.   Do you believe it is necessary to let individuals know

12   that their vote counts?

13             MR. SWEETEN:  Same instruction as to the

14   legislative privilege.  Go ahead.

15        A.   I think my testimony on the floor was that it's

16   important -- it's important for everyone to know that one

17   person, one vote, and that when you show up to cast your vote

18   that your vote matters.

19        Q.   Okay.

20        A.   That it counts.

21        Q.   Is any individual's vote not counted under current law

22   when they show up at the polls with their voter registration

23   certificate?

24        A.   I wouldn't be able to answer that.  I don't work in

25   the registrar's office.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Patricia Harless                                        May 15, 2012

1          Q.   But if an individual shows up -- if S.B. 14 becomes

2     law and an individual shows up at the polls with their voter

3     registration certificate, but they lack a photo ID, isn't it the

4     case that their vote will not be counted if they don't have the

5     other necessary ID?

6          A.   The testimony on the floor was that if they show up

7     and don't have a photo ID, if S.B. 14 is implemented, that they

8     can cast a provisional ballot, have six days to go back to the

9     registrar and provide the documentation needed, and their vote

10    would be counted.

11         Q.   But if they don't have that documentation, they don't

12    own that documentation, their vote will not be counted?  That

13    professional ballot will be thrown away.  Isn't that the case?

14              MR. SWEETEN:  Same instruction on legislative

15    privilege.  Go ahead and answer.

16         A.   I'm not sure of the procedures that happen after they

17    cast their provisional ballot.

18         Q.   But if they have six days to show up and show an ID,

19    if they don't arrive and show an ID, are you aware of what

20    happens to the provisional ballot and whether it is counted?

21         A.   I think the testimony on the floor was if they don't

22    show up within the six days with the proper information that

23    that is considered a provisional ballot as the standards are

24    already in place with the Secretary of State and the registrar's

25    office.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

 1          Q.   Okay.  And I think we have the figures from your

 2     general elections.  If I can represent from the Secretary of

 3     State's office that in 2006 there were 27,962 votes cast in your

 4     general election, 27,962.  In 2008 there were 55,131 votes cast

 5     in your general election.  And in 2010 there were 37,472 votes

 6     cast.  And that's from the Texas Secretary of State's web site.

 7          A.   And that was in District 126?

 8          Q.   In District 126, in your race.  And you had a healthy

 9     percentage each time.

10          A.   Okay.

11          Q.   So can I ask, stepping back, what are the factors that

12     you believe were responsible for the different levels of turnout

13     in each one of those elections?

14               MR. SWEETEN:  Objection, calls for speculation.

15          Q.   To the extent that you have political knowledge of

16     your own district and were able to win that district?

17               MR. SWEETEN:  Same objection.

18          A.   I don't know how to answer that without going into the

19     process of our campaign.

20          Q.   I don't believe that the process of your campaign is

21     privileged in this matter, and your counsel has not asserted a

22     privilege over that.  So I would ask, to the extent necessary to

23     answer the question, but no more than necessary, I would ask

24     what factors you thought were responsible for the number of

25     votes essentially doubling from 2006 to 2008 and then dropping



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1    by approximately 18,000 between 2008 and 2010, but that 2010

2    level being significantly higher than 2006?

3         A.   In my experience in the campaigns --

4              MR. SWEETEN:  Hold on.  Objection, calls for

5    speculation, but go ahead.

6         A.    In my experience in the campaigns, presidential

7    election always has a larger percentage of participation.

8         Q.   Okay.

9         A.   And that was 2008.

10        Q.   What about 2010?

11        A.   That is a governor's race.

12        Q.   Okay.

13        A.   And that also has an increase in participation.

14        Q.   Wasn't there a governor's race in 2006?

15        A.   Yes, possibly, but I don't know who was -- I don't

16   know who was fighting for the governor's race then.

17        Q.   So it's possible that -- well, wasn't Governor Perry

18   elected in 2006?

19        A.   Yes, he was.

20        Q.   But it's possible that if the governor's race were

21   more contested in 2006 -- or excuse me -- in 2010 than it was in

22   2006 that more people would turn out?

23             MR. SWEETEN:  Objection, speculation.

24        Q.   Based on your knowledge of Texas politics, as a member

25   of the Texas House of Representatives.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Patricia Harless                                          May 15, 2012

1        A.    Okay.  Of running a campaign?

2        Q.    Yes, absolutely.

3        A.    2010 I know there were a lot of local races --

4        Q.    Uh-huh.

5        A.    -- that were more contested than in the past.

6        Q.    Uh-huh.

7        A.    And there was a lot of participation in pushing

8   getting out the vote.

9        Q.    Okay.

10        A.    I know my campaign we did several mail pieces to get

11   out the vote and calling our supporters, saying, you need to

12   show up and vote.

13        Q.    Is it possible that those same types of local

14   contested local races and get-out-the-vote efforts occurred in

15   Georgia?

16        A.    I can't speak for Georgia.

17        Q.    But is it possible that those occurred in Indiana as

18   well?

19        A.    I can't speak for Indiana.  I can speak for District

20   126.

21        Q.    Sure.  And in District 126 you saw between

22   non-presidential years a significant increase from 2006 to 2010;

23   is that correct, in terms of turnout?

24        A.    From what you have here, 17,000 out of 20,000.

25        Q.    That's almost doubling; isn't that right?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Patricia Harless                                          May 15, 2012

148

```
 1              A.    How much is the population growth from 2006 to 2010?

 2                    MR. SWEETEN:  Let me make sure the numbers.

 3       27,000 is what I heard him say is the '06.

 4              Q.    So that's another 10,000.  Thank you for the

 5       correction.

 6              A.    Another 10,000.

 7              Q.    Another 10,000 voters?

 8              A.    I can't answer those questions because I don't know

 9       what the population of District 126 was in 2006 and what it was

10       in 2008 and what it was in 2010.

11              Q.    But the number -- the turnout rose by approximately 35

12       percent or so?

13              A.    I don't know.

14              Q.    And there was no change in the voter identification

15       law between 2006 and 2010, correct?

16              A.    Not that I know of.

17              Q.    And so there were other factors that were responsible

18       for that increase in turnout, correct?

19                    MR. SWEETEN:  Objection, calls for speculation.

20       Go ahead and answer, if you can.

21              A.    I don't know.

22              Q.    I mean, as a matter of logic, if it wasn't photo ID,

23       it had to be something else, correct?

24              A.    I don't know how to answer that.

25              Q.    Okay.  Let's move on.  Does S.B. 14 address any other
```



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

1     problems other than what we've discussed?

2             MR. SWEETEN:  I'm going to go ahead and instruct

3     you, based on the legislative privilege, do not reveal thoughts,

4     mental impressions, opinions about Senate Bill 14.  Don't reveal

5     communications you've had with any of the areas that we've

6     already gone over.  If you can, go ahead and answer.

7        Q.   Allow me to rephrase.  Is the purpose of S.B. 14 to

8     address any other problems than the ones we have discussed?

9             MR. SWEETEN:  Hold on one second.  Okay.  Are you

10    asking about the purpose of the bill or are you asking about the

11    individual purpose of the legislators who passed the bill or

12    their thought process or mental impression?

13           MR. FREEMAN:  I am asking about the purpose of

14    the bill.

15           MR. SWEETEN:  The purpose of the bill as written,

16    as passed, Senate Bill 14.

17           MR. FREEMAN:  As written and passed, stated and

18    unstated purpose, in any context.

19           MR. SWEETEN:  I'm going to let you answer, to the

20    extent you know.

21        A.   I've answered this before.  The purpose of the bill

22    was to increase participation by protecting the integrity of the

23    election process.

24        Q.   I will note that your counsel has not objected and has

25    not instructed you to limit your testimony to the public record.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Patricia Harless                                          May 15, 2012

150

 1     And, therefore, I would ask, is the purpose of the bill, as you

 2     understand, from both public and non-public sources, legislators

 3     and all other sources from which legislators derive the purpose

 4     of a bill, limited to only those purposes that we have

 5     previously discussed?

 6          A.   I can only speak to my purpose.

 7          Q.   Okay.

 8          A.   And that was to protect the integrity of the election

 9     process, as I stated a number of times on the floor.

10          Q.   Okay.  Nothing else than we've discussed?

11          A.   There's pages of testimony.

12          Q.   Okay.  I just want to make sure we're closing off.

13          A.   I answer all those questions here.

14          Q.   Do you know of any other purpose held by any other

15     legislator that may be construed as the purpose of the bill?

16               MR. SWEETEN:  Hold on a second.  I'm going to

17     object.  That calls for speculation.  I'm also going to object.

18     You're asking her to reveal thoughts, mental impressions,

19     opinions, discussions with other legislators, legislative staff.

20     Those are covered by the legislative privilege.  I'm going to

21     reassert the objection to that issue.

22          A.   I couldn't answer that anyway.  I don't know what

23     their thought processes are -- is.

24          Q.   Let's move on then.  Do you know how many registered

25     voters in Texas lack a driver's license, state ID card, or



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1    license to carry?

2        A.   I know in committee there was testimony of a number

3    presented by Ann McGeehan but I -- when I asked her more

4    questions on, could that number be accurate, could there be name

5    issues, could that number of people have one of the other forms

6    of identification, she said yes.  So I -- I just know the number

7    that was -- she presented.

8        Q.   Do you recall ever telling the Dallas Morning News

9    that you assumed that the population without a necessary ID

10   would be very, very small?

11       A.   I think, yes.  Could be possible.

12       Q.   Okay.  Did you ever try to find out what that number

13   was beyond your conversation with Ms. McGeehan?

14               MR. SWEETEN:  I'm going to instruct you at this

15   point that, based upon legislative privilege, don't reveal

16   thoughts, impression or opinions or discussion you had with

17   legislators, state agencies, legislative staff, Texas

18   Legislative Council or constituents.

19       A.   The discussion -- we had that discussion in committee

20   and we tried to get to those numbers, and there was never a real

21   good answer from the Secretary of State's office.

22       Q.   Okay.  I'm going to ask a series of privilege log

23   questions, if that's all right.  Did you have a conversation

24   with the Department of Public Safety concerning the number of --

25   or concerning the number of registered voters who lacked a Texas



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Patricia Harless                                              May 15, 2012

```
 1        photo ID?

 2                   MR. SWEETEN:  I'm going to let you answer that

 3        question.  It's a yes or no question.

 4        A.    During committee hearing, yes.

 5        Q.    Did you ever reach out via telephone, e-mail, anything

 6        like that, outside the context of committee hearing, to try and

 7        get an answer to that question, given that you said you did not

 8        receive a definite answer from Ms. McGehan?

 9        A.    I think during the committee we asked specifically for

10        some information from TXDOT, and they were to provide that

11        information in the future.  And I don't know if they did.  I

12        can't recall.

13        Q.    Is TXDOT the Texas Department of Transportation?

14        A.    Yes.  I'm sorry.

15        Q.    Is the Department of Public Safety somehow related to

16        TXDOT?

17        A.    Yes.

18        Q.    What is the relationship between the two?

19        A.    At the time it was a division under TXDOT.

20        Q.    Are they separate now?

21        A.    No.  I think they're still probably -- I think they

22        are.  I don't know TXDOT changes.

23        Q.    So just so I understand, you asked the Department of

24        Public Safety or TXDOT for information concerning the number of

25        registered voters who lacked photo ID, but you're not sure
```



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

 1      whether you received it?

 2          A.   I don't know that we specifically asked the way you

 3      did.

 4          Q.   Okay.

 5          A.   It was during committee, and I don't remember the

 6      specific question that we asked her.  But I know that it was

 7      something that she said she would have to follow up on.

 8          Q.   And did you make sure that she followed up?

 9          A.   I don't know that I did.  I think my staff might have.

10      I am not sure.  It wasn't necessarily a question I was looking

11      for.

12          Q.   Are you -- strike that.

13               Who do you believe will make up the group of

14      individuals whose lack the necessary photo ID, the driver's

15      license, state ID card or license to carry?  What is your

16      understanding based on everything you've learned?

17               MR. SWEETEN:   Okay.  Don't reveal thoughts,

18      mental impressions about legislation.  Don't reveal

19      communications you've had with state agencies, legislative

20      staff, legislators, Texas Leg Council or constituents in

21      answering this question.

22          A.   My testimony in committee and on the floor in the

23      debate was that I think there is a very, very small universe of

24      people that won't have one of the approved forms of ID.  And if

25      there are any, we provided for a free ID card.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1      Q.   Is that the election identification certificate?

2      A.   Right, a free election identification certificate.

3      Q.   We'll discuss more about that later.  Can I just ask,

4    do you think that the individuals who lack the ID will be more

5    likely to be poor?

6           MR. SWEETEN:  Same objection.  Don't reveal any

7    sort of thoughts, mental impressions, opinions about legislation

8    or conversations you've had with state agencies, staff,

9    legislators, Leg Council or constituents.

10     A.   The testimony that I stated on the floor a number of

11   times was that I think that it will be a small universe and they

12   have access to a free election certificate card.

13     Q.   If I can just look back real quickly.  You said a

14   moment ago that following up with DPS on the number of

15   registered voters without acceptable ID was not something you

16   were interested in.  Why not?

17          MR. SWEETEN:  I'm going to object.  I think that

18   asks for her to reveal thoughts, mental impressions, opinions

19   about legislation.

20          You can testify as to whether or not you had

21   follow-up conversation with DPS; however, I don't want you to

22   testify about communications with state agencies such as DPS.

23     A.   I don't know that I had follow-up conversations with

24   them, but a lot of that I rely on my staff to do.

25     Q.   Okay.  Do you believe that the individuals who lack --



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

 1     who are registered voters who lack a Texas driver's license,

 2     state ID card, or license to carry will be more likely to be

 3     members of racial minority groups?

 4               MR. SWEETEN:  Same instruction on legislative

 5     privilege.  Don't reveal your mental impressions or opinions

 6     about legislation or communications that we've discussed.

 7          A.   And my answer is the same as it has been.  I feel like

 8     that the people that do not have one of the approved forms of ID

 9     will be a very small universe and we have provided for a free

10     election certificate card for those.

11          Q.   Are you aware that the State of Texas recently

12     informed the attorney general that there are 795,955 individuals

13     in the State of Texas who are registered voters and lack a Texas

14     driver's license or photo ID?

15               MR. SWEETEN:  Objection.  I think that misstates

16     -- I'm going to object.  I think that assumes facts not in

17     evidence.

18               MR. FREEMAN:  Well, I will get that into

19     evidence.  If we can have this marked U.S. 21.

20               (Exhibit No. 21 marked)

21          Q.   Take a moment to read this letter.  And so just to

22     clarify, do you now understand that the recent comparison

23     conducted by the State of Texas between the registered voter

24     database to its driver's license database indicated that 795,955

25     registered voters lack a Texas driver's license?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

 1           A.    That's what this says.

 2           Q.    Do you consider that number to be very, very small?

 3           A.    I consider that number in relation to we don't know

 4     that they have a citizenship paper with an ID, a CSL, a

 5     passport.  They may have one of the other approved forms of

 6     identification.

 7           Q.    But you don't know whether any of them do either; is

 8     that correct?

 9           A.    I don't know that for a fact.

10           Q.    Do you think it's likely that individuals who don't

11     have a driver's license will have a passport, given what those

12     two documents are needed for?

13                 MR. SWEETEN:  Objection, calls for speculation.

14     You can answer.

15           Q.    Based on your life experience?

16                 MR. SWEETEN:  Don't reveal thoughts, mental

17     impressions, opinions about legislation or any communications

18     that you've had with legislators, legislative staff, state

19     agencies, constituents or Leg Council.

20           A.    I would not be surprised to learn that people without

21     a driver's license may have a passport.

22           Q.    Significant numbers of people?

23           A.    I can't answer that.

24                 MR. SWEETEN:  Objection, calls for speculation.

25     Same instruction.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1     Q.    Have you ever seen a U.S. citizenship certificate?

2     A.    Not that I recall.

3     Q.    Do you know if all of them have photographs on them?

4     A.    Not that I recall.

5     Q.    Could you take another look at Exhibit No. 20, the

6     article from May 17th from the Houston Chronicle.  Do you see in

7     there where you told the Chronicle that you did not believe the

8     bill would disenfranchise minority voters?

9     A.    Where is that at?  I'm trying to skim, but my eyes are

10    getting foggy.

11    Q.    It says, "Representative Patricia Harless, republican

12    of Spring, House author of the voter ID bill dismissed

13    assertions that the bill would disenfranchise minority voters."

14    Do you see that?

15    A.    I think that is the reporter reading into an interview

16    what he wants.

17    Q.    Do you believe that the bill will disenfranchise

18    minority voters?

19          MR. SWEETEN:  I'm going to instruct you as to

20    legislative privilege.  Don't reveal thoughts, mental

21    impressions, opinions about legislation or conversations you had

22    with any of the individuals or entities that we named.  Without

23    revealing that, you can answer that question.

24    A.    I believe that by answering that question it would

25    reveal private conversations with constituents and other



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Patricia Harless
May 15, 2012

158

1    legislators.

2        Q.   So just to be clear, you're asserting legislative

3    privilege with regard to your understanding of whether the

4    effect of S.B. 14 will be to disenfranchise some minority

5    voters; is that correct?

6        A.   I am asserting privilege from answering the question

7    that a reporter is summarizing, without a quote, of what his

8    feelings are about my statement.

9             MR. SWEETEN:  I think he's referring to --

10            THE WITNESS:  I think he's referring to that.

11       Q.   I'm happy to step away from the op-ed and just say --

12            THE WITNESS:  I think that's what he's --

13       Q.   Without with regard to the article there, do you now

14   believe that S.B. 14 will not disenfranchise minority voters?

15            MR. SWEETEN:  Don't reveal the matters of the --

16       A.   I can't answer that without revealing private

17   conversations.

18       Q.   Okay.  So I just wanted to be clear that you are

19   asserting legislative privilege with regard to that question.

20   It is now clear.

21       A.   Yes.

22       Q.   Do you believe that any valid registered voters will

23   show up to vote if S.B. 14 is implemented and will be turned

24   away -- excuse me -- will have to vote a provisional ballot

25   because they lack the necessary ID?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1           A.    I can't speculate on what will happen.

2           Q.    Do you know if there are any minority voters who lack

3     the necessary ID and don't own cars needed to get to a driver's

4     license office?

5           A.    I don't know of any.

6           Q.    Do you know if there are any minority voters who

7     currently lack the necessary ID and work during the hours when

8     driver's license offices are open?

9                 MR. SWEETEN:   Again, I'm instructing you about

10    legislative privilege.  Don't reveal thoughts, mental

11    impressions or opinions about legislation or discussion you've

12    had with individuals that we discussed earlier.

13          A.    I don't know of any.

14          Q.    Now, you described the election identification

15    certificate under S.B. 14 as a free ID, right?

16          A.    Free election voter certificate.

17          Q.    But free?

18          A.    Yes.

19          Q.    Okay.  Do you know what documents are needed in order

20    to get the election identification certificate under S.B. 14?

21                MR. SWEETEN:   Representative Harless, you can

22    answer this question, but don't reveal thoughts, mental

23    impressions or opinions about legislation or conversations that

24    you've had with the individuals or entities we've discussed

25    earlier.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Patricia Harless                                      May 15, 2012

1          A.   I know there was discussion in committee and on the

2     floor, but I can't tell you the specific requirements to get an

3     ID or a driver's license off the top of my head, without going

4     back and refreshing my memory.

5          Q.   Okay.  And we discussed earlier that you didn't know

6     how much it cost to get a new copy of a birth certificate or a

7     name change certificate.  Do you know if those cost money,

8     though?

9          A.   I don't recall.

10         Q.   If an ID requires documents that you have to pay for,

11    then you can't get the ID without paying money, correct?  If I

12    have to buy a document to get the free document, then the free

13    document -- I still have to spend money before I get the free

14    document, correct?

15              MR. SWEETEN:  Objection, argumentative.  Also

16    instruct as to legislative privilege.  But go ahead.  You can

17    answer.

18         A.   I have to say I agree with my attorney.  I can't

19    speculate on any of that.  I know that we provided for people

20    that do not have one of the approved forms of identification to

21    get a free election certificate card.

22         Q.   Okay.  Where can a voter obtain the election

23    identification certificate?

24         A.   I think --

25              MR. SWEETEN:  Same instruction on leg privilege.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Patricia Harless
May 15, 2012

161

1    You can go ahead and answer -- legislative privilege.  Go ahead.

2         A.   I think the debate on the floor was that that would be

3    provided by DPS and they would provide the standards upon what

4    is required to get a free ID card.

5         Q.   But do you know where you get the ID card?

6         A.   From I think the DPS.  If I remember correctly, the

7    DPS office.

8         Q.   And do you know if those offices are -- strike that.

9              Does S.B. 14 require employers to provide paid leave

10   in order for an individual to go get an EIC?

11             MR. SWEETEN:  Same instruction on leg privilege.

12   You can go ahead and answer.

13        A.   I don't remember any -- I don't remember that as being

14   part of the bill.

15        Q.   And is it possible that some individuals in Texas live

16   at least 50 miles from a driver's license office?

17        A.   I think there was --

18             MR. SWEETEN:  Okay.  Hold on.  I'm going to

19   instruct you as to leg privilege.  Don't reveal mental thoughts,

20   impressions, opinions about legislation.  Also don't reveal

21   conversations you've had with any of the individuals or entities

22   we've discussed.

23        A.   I think there was testimony or debate on the floor

24   that that was possible.  I don't know that for a fact.

25        Q.   How much would the gas cost to drive 100 miles



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

 1        roundtrip?

 2        A.   I sell cars for a living.  It could cost as much as $5

 3   or --

 4        Q.   100 miles?

 5        A.   If you have an electric car, it doesn't cost you

 6   anything.

 7        Q.   How much would it cost you, in your car, to drive 100

 8   miles?

 9        A.   I'd have to guess.

10        Q.   Approximately?

11        A.   100 miles?  Probably $20, $25.

12        Q.   Okay.  Now, if you could take another look at your

13   op-ed real quickly from November of 2011.  You stated in that

14   op-ed that S.B. 14 contains a reasonable exception for indigent

15   voters in addition to the election identification certificate;

16   is that correct?

17        A.   Where are you reading that at, just to save me from

18   reading everything again.

19        Q.   It's the bottom of the second full paragraph.  "The

20   bill also provides."  Last sentence.

21        A.   On the first page?

22        Q.   First page, yes.

23        A.   My last paragraph said, "The provisions will ensure."

24        Q.   The second full paragraph, last sentence.

25        A.   Okay.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Patricia Harless                                    May 15, 2012

1           Q.   Beginning with, "The bill also provides."

2           A.   Okay.

3           Q.   Do you agree that you stated that, "The bill also

4     provides reasonable exceptions to the photo ID requirement for

5     indigent voters"?

6           A.   Yes.

7           Q.   And that's in addition to the photo election ID for

8     registered voters who request an ID, correct, as you stated it

9     in your op-ed?

10          A.   It says, "indigent and disabled voters and allows

11    individuals not carrying a photo ID to vote provisionally, as

12    long as they provide verification of their identity within six

13    days of the election."

14          Q.   What is this exception for indigent voters?

15          A.   From the legislation?

16          Q.   Uh-huh.

17          A.   I can't remember exactly.

18          Q.   Did that exception remain in the bill as it was

19    signed, or was that only a part of an earlier version of the

20    bill?

21          A.   I can't remember.

22               MR. SWEETEN:   Same instruction on leg privilege.

23    Go ahead and answer.

24          A.   I can't remember.

25          Q.   Isn't is the case that that exception was removed



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Patricia Harless                                    May 15, 2012

164

 1      during the amendment process?

 2          A.    It could be possible.  I don't remember.

 3          Q.    During the debate, do you recall stating that --

 4      sorry.  Strike that.

 5              Did you consider it to be an important issue whether

 6      minority voters were more likely to lack the necessary ID needed

 7      to vote pursuant to S.B. 14?

 8                  MR. SWEETEN:  Don't reveal thoughts, mental

 9      impressions, opinions about the legislation, discussions you've

10      had with leg staff, legislators, state agencies, Leg Council or

11      constituents.

12          A.    I think my testimony on the floor was that I felt that

13      everyone -- it would increase participation and protect the

14      integrity, and if citizens of Texas did not have the approved

15      forms of ID, they were able and eligible to get a voter

16      certificate card.

17          Q.    But it's certainly harder to go get that voter

18      identification card, even if it's free, than to just go to a

19      polling place and vote, isn't it?

20                  MR. SWEETEN:  Same instruction as to legislative

21      privilege.

22          A.    I don't believe I can answer that.

23          Q.    I mean, it would be more trouble for you to go seven

24      miles from your house to a driver's license office than

25      three-quarters of a mile to a polling place, isn't it?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1          A.    Not for the right to vote.

2          Q.    But it's more trouble?

3          A.    It's a sacrifice I'm willing to make to vote.

4          Q.    Are you aware of what turnout rates are statewide in

5    Texas among registered voters?

6          A.    I can't tell you off the top of my head, no.

7          Q.    Are you aware of whether Texas is a high turnout or

8    low turnout state as percentage, relative to other states in the

9    United States?

10         A.    No, I can't answer that.

11         Q.    Would it surprise you to learn that it is one of the

12   five lowest turnout states in the United States?

13         A.    No reaction to that.

14         Q.    Do you think that it is important to make it as easy

15   as possible for voters to be able to exercise the franchise

16   rather than making it harder for them to do so?

17              MR. SWEETEN:  Same instruction on leg privilege.

18         A.    And I believe by answering that it would reveal

19   private conversations.

20         Q.    Do you believe that if African-American or Hispanic

21   voters lacked the required ID at a greater rate than Anglos, the

22   photo ID bill would still be worth enacting?

23              MR. SWEETEN:  I'm going to object to the

24   question.  It calls for matters that are legislatively

25   privileged, including requiring her to reveal thoughts, mental



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1    impressions or opinions about legislation or communications

2    between she, other legislators, legislative staff, state

3    agencies, Leg Council or constituents.

4              To the extent you can provide information that

5    does not reveal that information, you can go ahead and answer.

6         A.   My debate on the floor and my testimony was that I

7    think it will increase participation for all Texans.

8         Q.   I'm going to object to that as nonresponsive and ask

9    one more time, is it your belief that if African-American or

10   Hispanic voters lacked the needed ID at a greater rate than

11   Anglos, that the photo ID bill will still be worth enacting?

12             MR. SWEETEN:  Same instruction as to legislative

13   privilege.  Also objection, asked and answered.

14        A.   I agree.

15        Q.   Your counsel did not instruct you not to answer.  And

16   so if you're not answering on the basis of privilege, please

17   state that for the record.

18        A.   I'm not answering on the basis of privilege.

19        Q.   Okay.

20        A.   Because I felt like I answered it.

21        Q.   Okay.  Is it your belief that if African-American or

22   Hispanic voters lacked the required voter ID at a rate greater

23   than that of Anglos that this bill would still meet what you

24   described, I believe, as the important criterion of compliance

25   with the Voting Rights Act?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

```
1                     MR. SWEETEN:  I'm going to instruct you again as

2          to the legislative privilege.  Don't reveal thoughts, mental

3          impressions, opinions about the legislation.  Don't reveal

4          communications you've had with legislators, legislative staff,

5          state agencies, Leg Council and constituents.

6               A.   And I'm not going to answer that, based on privilege.

7               Q.   What do you believe is the purpose of the Voting

8          Rights Act?

9               A.   Excuse me?

10              Q.   What do you believe is the purpose of the Voting

11         Rights Act?

12                    MR. SWEETEN:  I'm going to object to the extent

13         that that calls for her to reveal thoughts, mental impressions,

14         opinions about legislation or communications she's had with any

15         of the entities or individuals that we've discussed.

16                    MR. FREEMAN:  Mr. Sweeten.

17                    MR. SWEETEN:  To the extent you can answer that

18         question, I'll let you go ahead and do so.

19                    MR. FREEMAN:  Mr. Sweeten, I'm going to ask what

20         legislative act my question refers to, as I've asked her for

21         general understanding of the purpose of the Federal Voting

22         Rights Act.

23                    MR. SWEETEN:  First, with respect to any

24         considerations that she had with Senate Bill 14, she's had

25         conversations with individuals or state agencies, et cetera,
```



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1    where those could have been revealed, I'm instructing her that

2    if those communications occurred do not reveal that information.

3              Also to the extent that that question asks her to

4    reveal thoughts, mental impressions or opinions about

5    legislation, that would be legislatively privileged.  To the

6    extent she can answer outside of that, the privilege area, then

7    I'm going to let her do so.

8              MR. FREEMAN:  Mr. Sweeten, I'm going to ask you

9    to withdraw your objection on the basis that my question had

10   absolutely nothing to do with S.B. 14 and solely asked

11   Representative Harless' understanding of the purpose of the

12   Federal Voting Rights Act of 1965.

13             MR. SWEETEN:  If it has nothing to do with

14   legislative privilege, i.e., any of those communications that

15   we've discussed, she can answer that.  If she's had discussions

16   with legislators, state agencies, staff, counsel, constituents

17   about this issue, she does not have to reveal that.  She can

18   answer outside of that.  If you believe that your question

19   doesn't invade any of those and she also agrees it doesn't

20   invade those communications, I'm going to let her answer that.

21   That's my instruction.

22             MR. FREEMAN:  Mr. Sweeten, I am going to ask you

23   to withdraw your objection on the basis that Texas did not enact

24   the Federal Voting Rights Act of 1965 and that this question has

25   absolutely nothing to do with this state legislative privilege.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1       Now, you've asserted this privilege over and over and over

2       again, but there has to be a line, and this is that line.

3       Please withdraw your objection.

4                   MR. SWEETEN:  Mr. Freeman, I understand what

5       you're suggesting.  But you nor I have a full understanding of

6       communications that she's had with the specific individuals that

7       would be privileged.  Okay?  If any part of your question

8       invades communications that she's had or reveals thoughts,

9       mental impressions or opinions about legislation, then that

10      would be privileged.  To the extent it does not, I am allowing

11      her to answer that question.  So I will not withdraw my

12      objection.  I will instruct her as I have.

13                  Go ahead.  You can answer.

14                  MR. FREEMAN:  Representative Harless -- why don't

15      we have the court reporter read back the question, just so you

16      have it clear.

17                  THE REPORTER:  Question: "What do you believe is

18      the purpose of the Voting Rights Act?"

19      A.    I learned about the Voting Rights Act in 8th grade.

20      And I know it was done in 1965.  And I know there's Section 2

21      and Section 5.  And we're here on Section 5, part of the Voting

22      Rights Act.  And most of my discussions about the Voting Rights

23      Act and education process came after I started doing work on

24      S.B. 14, which I would assume that that would fall under

25      privilege.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1        Q.   Do you believe that the Voting Rights Act is necessary

2    in 2012?

3        A.   I'm not sure how to answer that.

4        Q.   Do you believe that the Voting Rights Act enforces

5    important principles in 2012?

6        A.   I don't know how to answer that.

7        Q.   I would ask for a yes or no answer as to whether the

8    Voting Rights Act enforces principles to the extent that you

9    understand the principles that the Federal Voting Rights Act of

10   1965 enforces?

11       A.   In 2012?

12       Q.   In 2012.

13            MR. SWEETEN:  You're asking her for her opinion

14   about the Voting Rights Act?  Am I clear on that?

15            MR. FREEMAN:  That's correct.

16            MR. SWEETEN:  I'm going to object to relevance as

17   to that question.  I think also it has been asked and answered.

18   She's attempted to answer that.  And she does not have to answer

19   a yes or no.  She can say she doesn't know.

20       A.   And that's what I've answered.  I don't know what the

21   relevance is in 2012.

22       Q.   Okay.  Did you participate in Texas' submission of

23   S.B. 14 for administrative preclearance, including responses to

24   requests for more information?

25            MR. SWEETEN:  Hold on a minute.  When -- can you



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Patricia Harless                                          May 15, 2012

```
 1        clarify the question by participate, what you're specifically
 2        asking.
 3                    MR. FREEMAN:  Sure.
 4            Q.   First, did you provide any -- well, first off, did you
 5        understand the question?
 6            A.   I am not sure I did.
 7            Q.   Okay.  Did you provide any information to the
 8        Department of Justice during preclearance process?
 9            A.   I did a phone interview.
10            Q.   And did you provide any additional information to the
11        State of Texas as part of the preclearance process?
12            A.   My staff may have.
13            Q.   You did not personally?
14            A.   All my files were in Austin and my staff may have
15        provided.
16            Q.   Okay.  Did you participate in the decision to sue the
17        attorney general and initiate this case?
18            A.   I was never asked.
19            Q.   Okay.  Did you participate in the drafting of the
20        complaint in this case and the allegations that are at issue in
21        this case?
22            A.   Our staff -- my staff --
23                    MR. SWEETEN:  Hold on a minute.  I am going to
24        object as to the attorney/client privilege.  Our office
25        represents Representative Harless.  So any communication that
```



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Patricia Harless                                        May 15, 2012

1      we've had with Representative Harless would be privileged under

2      the attorney/client privilege.

3          Q.   Did you provide any non-confidential information as

4      part of participating in the drafting of the complaint in this

5      matter?

6          A.   I cannot tell you what my office did.

7          Q.   Okay. But you did not personally.

8          A.   No.

9          Q.   And you're not aware of what your office did?

10         A.   No.

11         Q.   Okay.  That solves the question.  Are you familiar

12     with the Federal Help America Vote Act of 2002, or HAVA?

13         A.   From the debate on the floor and in committee.

14         Q.   Are you familiar with the voter identification

15     requirements of HAVA?

16         A.   I can't say off the top of my head I am, no.  I'm sure

17     at some point I knew that, but --

18         Q.   Are you aware of HAVA's requirements allowing the use

19     of non-photographic ID in order to identify a voter who has

20     previously registered to vote via mail?

21         A.   I don't know that I'm aware of that.

22         Q.   Okay.  If the Federal Help America Vote Act provided

23     for non-photographic ID in order to establish the identity of a

24     voter, do you think that that would be sufficient for Texas'

25     purposes as well?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Patricia Harless                                        May 15, 2012

1        A.   I think the testimony on the floor was that a photo ID

2   helps verify you are who you say you are.

3             MR. SWEETEN:  I will object to that as

4   nonresponsive and ask another time.

5        Q.   Do you believe that if the Federal Help America Vote

6   Act allows non-photo ID, two forms of non-photo ID to establish

7   identity, that that should be sufficient for Texas as well?

8             MR. SWEETEN:  Don't reveal your thoughts, mental

9   impressions or opinions about the legislation, Senate Bill 14 or

10  communications you've had with any of the entities we've listed.

11  Go ahead and answer.

12       A.   That's privileged.

13            MR. FREEMAN:  Why don't we take a five minute

14  break so that we don't have any similar problems to last time.

15            (Recess from to 3:17 p.m. to 3:33 p.m.)

16       Q.   If we can turn to before you became a member of the

17  Texas Legislature very quickly.  At any point prior to being

18  sworn in as a member of the Texas legislature, did you hear of

19  any photographic voter identification bill or issue as a

20  political issue in Texas?

21       A.   I can't recall that I did.

22       Q.   Okay.

23       A.   It could be possible, but I can't recall.

24       Q.   Are you aware of a photographic voter identification

25  bill that was introduced during your first term, in 2007?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Patricia Harless                                                   May 15, 2012

```
1              A.   Yes.
2              Q.   Was any particular bill subject to serious
3    consideration?
4              A.   I don't remember.
5              Q.   Was a bill passed out of the House?
6              A.   I don't recall.  It seems like there's been stories
7    that it did, but I don't recall.
8              Q.   So is this an issue that, in 2007, would it be fair to
9    say, that you were not greatly involved in?
10             A.   Yes.
11             Q.   Okay.  And just to make sure, did you make any public
12   statements about that bill in 2007, of which you're aware?
13             A.   Not that I know of.
14             Q.   Do you know if you voted in favor of the bill?
15             A.   I don't even know if it made it to the floor.  I can't
16   remember.
17             Q.   Okay.  That's fine.  In 2009, are you aware of a
18   photographic voter identification bill that was introduced?
19   This was in your second term, 81st Texas Legislature?
20             A.   Right.  I know there was a voter ID bill, but I don't
21   know the specifics of it.
22             Q.   Do you know when the bill was introduced in the House?
23             A.   No.
24             Q.   Do you know who introduced it?
25             A.   I think there were more than one.
```



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Patricia Harless                                    May 15, 2012

1          Q.    Do you know who introduced the bill that had passed

2     from the Senate?

3          A.    Senator Fraser.

4          Q.    But do you know who introduced it in the House?

5          A.    No.

6          Q.    Okay.  What was your involvement with that bill?

7          A.    Just watching it as it proceeded.

8          Q.    Did you offer any amendments?

9               MR. SWEETEN:  You can confine your testimony to

10     matters of the public record.

11         A.    I don't recall if it ever made it to the House floor

12     in 2011 or 2009.

13         Q.    Are you aware of the basic provisions of that bill?

14         A.    I know it was different than the bill that we passed

15     this session.

16         Q.    And are you aware of what any of those differences

17     were?

18               MR. SWEETEN:  Are you asking about the bill

19     introduced in 2009 as to what was passed in 2011 and the

20     differences between those?  Which duration?  I want to make sure

21     that I'm clear.

22         Q.    I think I'll ask if the witness understands.  Do you

23     understand what my question was?

24         A.    Partially.  If I recall correctly, which no

25     guarantees, there were more than one voter ID bill filed in the



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Patricia Harless                                                    May 15, 2012

176

1     2009 session by multiple members of the Texas House.

2          Q.   Do you recall what the differences were between the

3     bill that was passed from the Senate in 2009 and was introduced

4     in the Texas House and the bill that was passed from the Senate

5     in 2011 and what was introduced in the Texas House?

6          A.   That's where I think the confusion is coming from,

7     because I don't think the bill that was passed in the Senate in

8     2009 actually made it to the House floor.  I think it went to

9     committee.  And I don't think it got out of committee.  And I

10    did not serve on that committee.  So I wouldn't have known the

11    provisions of the bill and if it was the same bill and how many

12    bills were filed.

13         Q.   Isn't it the case that S.B. 362 was passed out of

14    committee but was chubbed on the floor?

15         A.   I don't recall that.

16         Q.   Okay.

17              THE REPORTER:  I'm not familiar with that term,

18    chubbed.

19              MR. FREEMAN:  Chubbed, c-h-u-b-b-e-d.

20              THE REPORTER:  Thank you.

21              MR. FREEMAN:  It's a term of art that I only

22    recently learned myself.

23         Q.   Did you make any public statements concerning S.B.

24    362, the photographic voter identification bill that passed the

25    Senate in 2009?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

```
 1              A.    Not that I recall.

 2              Q.    Did you send any e-mails concerning that bill?

 3              A.    Not that I recall.

 4              Q.    During the 81st Legislature, 2009, did you sign a

 5      pledge circulated by the Republican Party of Texas concerning

 6      voter ID?

 7              A.    Probably.  I can't say for sure, but it is possible.

 8              Q.    Do you recall what the principles in that pledge were?

 9                    MR. SWEETEN:  I assume this is a public record?

10                    THE WITNESS:  I don't know.

11                    MR. FREEMAN:  If this could be marked as U.S.

12      Exhibit 22.

13                         (Exhibit No. 22 marked)

14                    MR. SWEETEN:  Dan, is this from a web site of

15      some kind?  Clear Lake GOP it says.

16                    MR. FREEMAN:  That is correct.  It is a copy of a

17      Republican Party of Texas press release.

18                    MR. SWEETEN:  Okay.

19                    THE WITNESS:  I don't see my name on it.  Do you?

20              Q.    If you look at Page 2, in between Hancock and

21      Harper-Brown.  It's double sided.

22              A.    Oh.  Sorry.  Yes.

23              Q.    And what were the principles that were in that pledge

24      concerning voter ID?

25              A.    From this press release posted on Clear Lake GOP, it
```



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Patricia Harless
May 15, 2012

178

1        says, "Ensure a valid photo ID is needed to vote.  Take effect

2        at the next possible uniform election date.  Be free of any

3        registration requirements such as same day voter registration

4        that dilutes the intent of the bill, which is ensuring fair and

5        accurate elections.  Increase criminal penalties for voter fraud

6        and registration."

7            Q.    Okay.  Are you aware of whether Attorney General

8        Abbott has dedicated substantial resources over the last decade

9        to investigating allegations of voter fraud, in-person voter

10       fraud?  And you agreed to those principles, correct?

11           A.    Looks like that.

12           Q.    How would allowing same-day registration dilute the

13       intent of a photographic voter ID bill?

14                 MR. SWEETEN:  Okay.  Don't reveal any thoughts or

15       mental impressions or opinions about legislation or

16       communications that you've had with legislators, legislative

17       staff, state agencies, Legislative Council or constituents.

18                 MR. FREEMAN:  I'm asking the representative to

19       explain a public statement.

20                 MR. SWEETEN:  If that's the question, then you

21       can go ahead and have her explain the public statement.

22           A.    I'm not sure, in the context of this.  Our bill did

23       not address same-day registration, the bill that I was involved

24       in.

25           Q.    Do you believe that including a provision allowing



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1    same-day registration based on possession of the documents

2    needed to vote under S.B. 14 would have diluted the intent of

3    S.B. 14?

4             MR. SWEETEN:  Same objection as to legislative

5    privilege.  Don't reveal your mental impressions or thoughts

6    about that legislation or communications that we've outlined

7    previously.

8             THE WITNESS:  May I have the question repeated.

9             THE REPORTER:  Question: "Do you believe that

10   including a provision allowing same-day registration based on

11   possession of the documents needed to vote under S.B. 14 would

12   have diluted the intent of S.B. 14?"

13            MR. SWEETEN:  Same objection.

14   A.    It was not a provision of the bill, so I can't

15   speculate on that.

16   Q.    What does it mean to dilute the intent of a bill?

17   A.    To dilute?

18   Q.    Dilute the intent.

19   A.    From this?  Are you taking that statement from here?

20   Q.    I am.

21   A.    I have no clue what they meant by that.

22   Q.    Why did you sign this pledge?

23   A.    I can't answer.

24   Q.    You don't recall?

25   A.    I don't.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

1       Q.   Do you recall who urged you to sign the pledge?

2       A.   I don't.

3       Q.   Do you recall whether you spoke with Eric Opiela

4  concerning this pledge?

5       A.   I am pretty positive I did not.

6       Q.   Do you know who Eric Opiela is?

7       A.   I've seen his name.  I don't ever recall having a

8  conversation, whether on the phone or in person, with him.

9       Q.   Was Eric Opiela the chairman of the Republican Party

10  of Texas in 2009?

11       A.   I don't know.

12       Q.   Do you have any documents concerning any

13  communications regarding this pledge?

14       A.   Not that I know of.

15       Q.   Okay.  When was the last time that you were asked to

16  prove your citizenship?

17       A.   When I got a passport, maybe.

18       Q.   Do you remember any time before that?

19       A.   Since I just got a new passport about seven years ago,

20  I don't remember since then.  I don't know.  Maybe when I got my

21  concealed handgun license in '96.

22       Q.   Okay.  So once in the last seven years, maybe twice in

23  the last 16 years or so.  To your knowledge, what documents

24  prove that an individual is a U.S. citizen?

25       A.   For me it would be my birth certificate.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1          Q.    Okay.  Any other documents of which you're aware that

2      prove that an individual is a U.S. citizen?

3          A.    I'm not familiar except for maybe the citizenship

4      paper.

5          Q.    Passport?

6          A.    Could possibly.

7          Q.    Okay.

8          A.    I don't know.  Does the passport have the country of

9      origin where you're from?  I don't know.

10         Q.    At Fred Fincher Motors, how many people do you employ?

11         A.    About 13, 12 or 13.

12         Q.    Have you ever had to verify their citizenship?

13         A.    I do every time I interview someone.

14         Q.    And what proof of citizenship do you accept?

15         A.    I take their driver's license, Social Security card,

16     birth certificate.  I run them through the E-Verify system and

17     have them fill out an I9.

18         Q.    During the 2009 legislature, did you sponsor any bills

19     related to immigration?

20         A.    Probably.

21         Q.    Did you sponsor any bills related to the term

22     Sanctuary Cities?

23         A.    Possibly.  I know I did one in the '11 session.

24         Q.    What was the purpose of that Sanctuary Cities bill?

25              MR. SWEETEN:  I'm going to object to the extent



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Patricia Harless                                    May 15, 2012

1    that -- instruct you not to reveal thoughts, mental impressions

2    or opinions about the legislation.  You can testify about the

3    specific purpose of the bill, but you can't testify about

4    communications you've had with other legislators, legislative

5    staff, state agencies, constituents or Texas Legislative

6    Council.

7              MR. FREEMAN:  Mr. Sweeten, I asked it pretty

8    cleanly, what the purpose of that bill was.  And I think that we

9    discussed earlier that questions solely related to the purpose

10   of the bill should not draw an objection.

11             MR. SWEETEN:  I'm clarifying that you're not

12   asking what one legislator's opinion was or you're not getting

13   into discussions about the bill, you're asking about the purpose

14   of the bill, and I'll let her answer that question.

15             MR. FREEMAN:  Mr. Sweeten, I'll ask you to

16   withdraw the objection as you preceded your statement with, "I

17   object."

18             MR. SWEETEN:  I've already given an instruction.

19   I think it is very clear that she can answer this to the extent

20   she's just going to talk about purpose and not talk about

21   legislative intent or mental impressions as we've laid out.

22             You can go ahead and answer the question as

23   posed.

24             MR. FREEMAN:  Mr. Sweeten, do you withdraw your

25   objection?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1      MR. SWEETEN:  Again, if your question is

2  attempting to discover the information that I've set forth here

3  that would be legislatively privileged, then I do not.  If your

4  question is not intended to discover that, then I will let her

5  answer the question.  I am going to let her answer the question,

6  just with that admonitory instruction.

7      A.   Do you have a copy of my bill?

8      Q.   You know, I do not, but I believe that you've

9  testified you introduced a Sanctuary Cities bill in 2009 and

10  2011.  At a broad level, what was the purpose of that bill?

11      A.   I don't remember the 2009 bill.  I know I did one in

12  2011.  I can't remember specifically.  I think it was used as a

13  tool to give law enforcement an opportunity to do their job, but

14  I can't remember exactly without seeing a copy of it.

15      Q.   Can you explain what you mean by, "an opportunity for

16  law enforcement to do their job"?

17      A.   I'm just remembering that from the caption and

18  legislatively.  I'm sorry.  I'm really not trying to be

19  difficult, but we file a lot of bills.  And as soon as the

20  session is over, I go back to my district and my full-time

21  paying job, and I don't remember all the specifics.  I'm happy

22  to explain it more if I could see what it said in it.  It didn't

23  move.

24      Q.   Okay.  But I guess this is a bill that you sponsored,

25  and so I assume you provided input as to the purpose and



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1    drafting.  And so I guess, if I could ask just, do you at all

2    recall any purpose of this Sanctuary Cities bill that you

3    offered in 2009?

4         A.    The answer would be no.

5         Q.    Okay.  Do you recall if the bill that you advanced in

6    2009 was sported by any Hispanic members of the Texas House?

7              MR. SWEETEN:  Don't reveal thoughts, mental

8    impressions or discussions with other legislators, legislative

9    staff, state agencies, constituents, or TLC.

10        A.    Thank you.  I don't remember my 2009 bill.

11        Q.    Do you remember if any Sanctuary Cities bill in 2009

12   was supported by any Hispanic member of the Texas House?

13             MR. SWEETEN:  Same instruction, but go ahead.

14        A.    I don't know that.

15        Q.    Okay.  Did you submit a photographic voter

16   identification bill in the 82nd Legislature in 2010 as prefiled

17   for 2011?

18        A.    I prefiled a bill that was similar to the bill that

19   was heard in committee in 2009.  And then I filed an additional

20   bill.  I think there were two of them.  But that's just from

21   memory.

22        Q.    Okay.  Let's see if we can refresh your recollection.

23   This is U.S. Exhibit 4.

24        A.    Okay.

25        Q.    Which is House Bill 112.  Was that a bill that you



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Patricia Harless                                                May 15, 2012

185

```
 1        submitted for the 82nd Legislature related to photographic voter
 2        identification?
 3             A.   It was a bill that was prefiled because it's got a low
 4        number.  Is it photographic or is it --
 5                  MR. SWEETEN:  Just take your time.  You can
 6        review it.
 7             A.   I think this was the bill that was similar to the bill
 8        filed in -- yeah, driver's license.  Yeah.  It's a photographic
 9        identification bill, yes.
10             Q.   Why did you take a more prominent position on this
11        issue in the 82nd Legislature?
12                  MR. SWEETEN:  Don't reveal any communications
13        that you've had with other legislators, staff, state agencies,
14        constituents or Texas Legislative Council, and don't reveal
15        thoughts, mental impressions or opinions about legislation.  To
16        the extent you're not doing so, you can answer that question.
17             A.   Well, it's difficult to answer that without revealing
18        communications with constituents, but I will say it's an issue
19        that was important to my district.
20             Q.   Did you have any communications in 2010, prior to
21        filing this bill, concerning photographic voter ID with
22        constituents?
23             A.   That's privileged.
24                  MR. SWEETEN:  I'm going to object to legislative
25        privilege.
```



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1       Q.   I'm going to ask not in favor or opposed, so I'm not

2    going to ask the position, but I want to ask as a matter of

3    subject matter whether you had any such conversations.  And I

4    think that --

5            MR. SWEETEN:  You can answer that question.  You

6    can identify as to the subject matter that he's saying.  You can

7    identify whether you had constituent communications and the form

8    and the approximate date, if you're able to.

9       A.   Yes.

10      Q.   Did you have -- did you speak with anyone from ALEC,

11   the American Legislative Exchange Council?

12      A.   No.

13      Q.   Did you speak with anyone from the King Street

14   Patriots?

15      A.   No.

16      Q.   Did you speak with anyone from any other Tea Party

17   groups?

18      A.   No.

19      Q.   Did you speak with Catherine Engelbrecht?

20      A.   Prior to this legislation?

21      Q.   Yes.

22      A.   No.

23      Q.   Did you speak with her after this legislation?

24      A.   That's privileged.

25      Q.   As a matter -- not as a matter of whether she



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Patricia Harless                                          May 15, 2012

187

```
 1        supported or opposed the legislation, but just about voter ID.
 2                   MR. SWEETEN:  You can testify about whether or
 3        not you had contact and with whom the contact was with.  Don't
 4        go into the subject matter of it.
 5            A.    I had contact with her after the committee hearing
 6        on --
 7            Q.    Do you remember the approximate date?
 8            A.    No.
 9            Q.    But the hearing was -- do you remember which
10        particular committee hearing?
11            A.    The committee hearing where this legislation went
12        through.
13            Q.    Okay.  And this was S.B. 14?
14            A.    Yes.
15            Q.    So March 2011?
16            A.    Yes.
17            Q.    Okay.  Did you have any conversations with Paul
18        Bettencourt?
19            A.    No.
20            Q.    Did you have any conversations with any experts,
21        political scientists, concerning photographic voter ID before
22        filing this bill?
23            A.    I would have to say probably no.
24            Q.    Okay.  Did you have any conversations with any
25        experts, including political scientists, at any time after you
```



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Patricia Harless                                        May 15, 2012

1        filed this bill concerning photographic voter ID?

2             A.   I have concerns that those are privileged.  But we

3        were doing due diligence in the legislation, so I am probably

4        sure there were some conversations with experts.

5             Q.   Just to jump back real quickly to Ms. Engelbrecht, how

6        many times did you speak with her?

7             A.   Maybe once or twice.

8             Q.   Was it on the phone?

9             A.   She came by the office after the committee hearing.

10            Q.   Okay.  And how long was the conversation?

11            A.   Ten minutes.

12            Q.   Okay.  Did you have any conversations -- excuse me.

13       Who are the experts who you had conversations with?

14            A.   I can't recall.  I don't know for sure that I did.

15            Q.   Did you ever speak with an individual named Hans von

16       Spakovsky?

17            A.   No, I didn't.

18            Q.   Are you aware of any conversations that occurred with

19       Mr. Von Spakovsky?

20            A.   I think my chief of staff may have, but I don't know

21       for sure.

22            Q.   Okay.  That's fine.  Did you ever have any

23       conversations with George Hammerline?

24            A.   Yes.

25            Q.   When did that occur?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Patricia Harless

May 15, 2012

1      A.    Probably after -- probably after they announced that I

2 would be carrying the bill in the House.

3      Q.    And who is George Hammerline?

4      A.    He's someone who works for one of the government

5 agencies in Harris County.  I can't tell you which one.  He used

6 to work with Paul Bettencourt before Bettencourt left office.

7      Q.    Okay.  Did you speak with him in person?

8      A.    He came by the office.

9      Q.    About how long was the conversation or conversations?

10      A.    Longer than I wanted.  Maybe five, ten minutes.

11      Q.    Okay.  Did you ever have any conversations with any

12 minority groups concerning photographic voter ID?

13      A.    I can't tell you for sure, but I know that after it

14 was announced that we would carry the legislation, there were a

15 number of groups that came back to visit about --

16      Q.    Do you recall any of the names of those groups?

17      A.    It seems like League of Women Voters was probably one,

18 but I can't recall all of them.  And I didn't meet with them.

19      Q.    Who did?

20      A.    I would -- I don't know if one of the interns did,

21 Julie or Colby.  I'm not sure.

22      Q.    Did you make any changes to either your proposed bill,

23 H.B. 112 or S.B. 14 as a result of concerns expressed by these

24 groups?

25            MR. SWEETEN:  Hold on a minute.  Don't reveal any



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Patricia Harless                                      May 15, 2012

190

```
 1       thoughts, mental impressions or opinions about legislation or

 2       conversations or the substance of conversations with any

 3       legislator, staff, state agency, TLC or constituents.

 4             A.   That is privileged.

 5             Q.   Okay.  Who drafted the bill that you have in front of

 6       you, H.B. 112?

 7             A.   Leg Council.

 8             Q.   What input did you provide?

 9                  MR. SWEETEN:  Don't talk about the specific

10       substance of any input or communications you've had with TLC.

11             A.   None.

12             Q.   Who else provided input concerning the substance of

13       the bill?

14                  MR. SWEETEN:  Again, I think that you're asking

15       her to provide mental impressions, opinions about legislation or

16       conversations that she's had with the individuals or entities

17       named.  So I'm going to instruct you not to answer based on

18       legislative privilege.

19             Q.   If you can indicate if you're not answering on the

20       basis of privilege, that would be great.

21             A.   Not answering based on privilege.

22             Q.   Okay.  Thank you.  Are you aware of whether the

23       speaker provided input concerning the substance of H.B. 112?

24                  MR. SWEETEN:  Same objection, same instruction.

25             A.   Privileged.
```



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

```
 1          Q.   Any of the speaker's staff?

 2                    MR. SWEETEN:  Same instruction, same objection.

 3          A.   Privileged.

 4          Q.   Lt. Governor Dewhurst?

 5                    MR. SWEETEN:  Same instruction, same objection.

 6          A.   Privileged.

 7          Q.   Any of Lt. Governor Dewhurst's staff?

 8                    MR. SWEETEN:  Same objection, same instruction.

 9          A.   Privileged.

10          Q.   Senator Fraser?

11                    MR. SWEETEN:  Same objection, same instruction.

12          A.   Privileged.

13          Q.   Senate Fraser's staff?

14                    MR. SWEETEN:  Same objection.

15          A.   Privileged.

16          Q.   Governor Perry?

17                    MR. SWEETEN:  Same objection and instruction.

18          A.   Privileged.

19          Q.   Governor Perry's staff?

20                    MR. SWEETEN:  Same objection and instruction.

21          Q.   Lobbyists?

22                    MR. SWEETEN:  Same objection and instruction.

23                    THE WITNESS:  May I have a minute?

24                    MR. SWEETEN:  Sure.

25                    THE WITNESS:  Thank you.
```



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Patricia Harless                                    May 15, 2012

 1              (Brief off-record discussion)

 2              MR. FREEMAN:  I believe this is when you say

 3      "privileged".

 4          A.    Privileged.

 5          Q.    Thank you.  While you were drafting H.B. 112, did you

 6      speak with the Department of Public Safety?

 7              MR. SWEETEN:  You can testify about the fact of

 8      communication.  You can't testify about the substance.  It's

 9      legislatively privileged.

10          A.    I didn't draft House Bill 112.

11          Q.    While your staff were drafting House Bill 112, are you

12      aware of whether they spoke with the Department of Public

13      Safety?

14          A.    To clarify that as well, my staff doesn't draft the

15      bill.  We present to Leg Council information, and they draft the

16      bill.

17          Q.    So let me clarify based on that.  Thank you.  While

18      your staff were providing the substance of the bill to Leg

19      Council for drafting purposes, while the drafting process was

20      ongoing --

21          A.    Sorry.

22          Q.    -- did they -- accuracy is what we do.

23          A.    I don't want to get down the road with this and --

24          Q.    While your staff was providing information to Leg

25      Council and Leg Council was drafting H.B. 112, did you or anyone



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Patricia Harless                                                    May 15, 2012

```
 1        in your staff speak with the Secretary of State's office?

 2                    MR. SWEETEN:  You can testify about the fact of

 3        communication.

 4             A.   I did not.  I can't answer whether my staff did.

 5             Q.   Did you conduct or did you instruct anyone to conduct

 6        an analysis of the impact that H.B. 112 would have on minority

 7        voters?

 8                    MR. SWEETEN:  Don't answer that.  That's

 9        privileged.  Reveals thoughts, mental impressions about

10        legislation.

11             A.   Privileged.

12             Q.   Why not?

13                    MR. SWEETEN:  Same objection and instruction.

14             A.   Privileged.

15             Q.   Now, you've testified that your staff provided

16        instructions to Legislative Council concerning the substance of

17        the bill, but who made decisions concerning what components

18        would go into the bill?

19             A.   Into?

20             Q.   Into H.B. 112?

21                    MR. SWEETEN:  That's the same instruction as the

22        legislative privilege and objection based on that.  You can

23        answer to the extent it doesn't reveal legislatively privileged

24        information.

25             A.   I am not sure.  I think it's a companion.  It's
```



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

1      similar to the bill that was filed the previous session.

2           Q.   Did you provide any instructions specifically to your

3      staff concerning what should and should not appear in H.B. 112?

4                MR. SWEETEN:  Don't reveal communications between

5      yourself and legislative staff.  It's legislatively privileged.

6                MR. FREEMAN:  I'm going to try and frame this in

7      a way that we can just have this be a subject matter question,

8      Mr. Sweeten.

9                MR. SWEETEN:  Sure.  I'm fine with that.

10          Q.   Were there any communications between you and your

11     stuff on the subject of what should and should not be included

12     in H.B. 112?

13               MR. SWEETEN:  You can answer that.

14          A.   No.

15          Q.   Okay.  Was H.B. 112 ever referred to the Select

16     Committee on Voter Identification and Voter Fraud?

17          A.   I can't remember.

18          Q.   Isn't it the case that we earlier determined that the

19     only bill referred to --

20          A.   I think that's what you said from that sheet.  I could

21     look up the bill number and see where it went, where it was

22     referred to, but I can't remember where it was referred to.

23          Q.   Are all bills referred to some committee after they're

24     filed?

25          A.   I'm not sure of the procedure, if all bills are.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Patricia Harless                                          May 15, 2012

```
 1        Under typical legislative sessions, bills are referred to

 2   committee.  But close to the end of the session there may be 10

 3   to 20,000 bills filed and there may not be time to refer them to

 4   committee.

 5        Q.   But an early bill, a prefiled bill like H.B. 112, that

 6   would be referred to some committee, right?

 7        A.   It's my understanding it should be.

 8        Q.   And so insofar as only one bill was referred to the

 9   Select Committee on Voter Identification and Voter Fraud, that

10   was the bill that was going to move in terms of any voter ID

11   bill that was filed in the last session, right?

12        A.   I think that it would be easy to make that point.

13        Q.   Okay.

14        A.   I can't guarantee that, but I think that would make

15   sense.

16        Q.   Okay.  What were the basic provisions of H.B. 112?  Do

17   you know?

18        A.   Voter education, acceptable identification outside of

19   a polling place, an election officer at a polling place, either

20   one form of identification listed on section.  So it looks like

21   it's got the approved forms of IDs that we talked about and

22   maybe some additional forms.

23        Q.   Okay.  Can we -- can you take a quick look at Section

24   6(b) and tell me whether this allows an individual to present

25   either one form of ID listed in one list or two forms from
```



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Patricia Harless                                              May 15, 2012

1     another list?

2          A.   It does.

3          Q.   Can you take a look at Section 11.

4          A.   Just one second.  I got to take my contacts out,

5     because I can't look anymore.

6          Q.   Do you want us to go off?

7          A.   No.  It will be fine.  They're disposable, but after

8     awhile they blur.  Section 11?

9          Q.   Yes. And if you can look at Section 11(a).

10         A.   This is the bill?

11         Q.   I'm sorry.  It's actually Section 10.  Its on Page 5,

12    where it says, "Documentation of Proof of Identification"?

13         A.   Yes.  This is the --

14         Q.   What are the forms of photo identification that are

15    acceptable under your bill?

16         A.   Under which section?

17         Q.   It's going to be Section 10, which modifies section

18    63.0101 of the Election Code, begins, "The following

19    documentation is an acceptable form of photo identification."

20    Bottom of Page 5.

21         A.   Expired or expired no earlier than two years before

22    the date of presentation.

23         Q.   And is that a driver's license or a Texas

24    identification card?

25         A.   It says issued to a person by DPS, so, yes.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1         Q.    Okay.

2         A.    United States military ID card that contains the

3    person's photograph.

4         Q.    Uh-huh.

5         A.    United States citizen certificate issued to person

6    that contains the person's photograph.  License to carry

7    concealed handgun issued by the Department of Public Safety.

8         Q.    Does it allow passport?

9         A.    Valid ID card that contains persons issued by federal

10   government.  Agency, institution, political subdivision of the

11   state.

12        Q.    And Representative Harless, did you skip Subsection 4.

13   Do you see where it says United States passport?

14        A.    Yes, but that's not underlined or crossed out so --

15        Q.    But it is in the list, isn't it?

16        A.    Yes.

17        Q.    So those are all forms of photographic identification?

18        A.    Uh-huh.

19        Q.    And the bill also allowed two forms of

20   non-photographic identification, correct?

21        A.    Yes.

22        Q.    And what are the forms of non-photographic

23   identification, if you can just -- well, I'll list them quickly.

24   Did it allow voter registration certificate?

25        A.    Uh-huh.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

1        Q.    Official mail addressed to the person by name from a

2    government entity?

3        A.    Yes.

4        Q.    Certified copy of a birth certificate?

5        A.    Yes.

6        Q.    Citizenship papers without a photograph?

7        A.    Yes.  It doesn't say without.  It says citizenship

8    papers.

9        Q.    Okay.  An original or certified copy of a marriage

10    license or divorce decree?

11        A.    Yes.

12        Q.    Court records of adoption, name change, or sex change?

13        A.    Yes.

14        Q.    An identification card issued by a government entity

15    of the state or the United States for the purpose of obtaining

16    benefits?

17        A.    Yes.

18        Q.    A temporary driving permit?

19        A.    Yes.

20        Q.    Pilot's license?

21        A.    Yes.

22        Q.    A library card?

23        A.    Yes.

24        Q.    A hunting or fishing license?

25        A.    Yes.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1      Q.   Okay.  Did this conform, H.B. 112, to the pledge that

2   you made in 2009?

3      A.   Probably not.

4      Q.   Why the difference?

5      A.   What is the difference --

6           MR. SWEETEN:  Well, hold on.  I want to make sure

7   that you're clear.  Don't reveal thoughts, mental impressions or

8   opinions about legislation.  I don't want you to reveal

9   communications.  You're free to include matters of public

10   record, but I caution you on that privilege issue.

11      A.   The question again.

12      Q.   Why the difference between the bill you introduced

13   that allows non-photo ID and the pledge that you made in 2009

14   concerning an identification bill that would only allow photo

15   ID?

16           MR. SWEETEN:  I can't interpret that question

17   other than to ask for her to reveal her mental impressions or

18   opinions about legislation.  I think that is squarely within the

19   order regarding this privilege.  So I'm going to globally

20   instruct her not to answer that question.

21      A.   Privileged.

22      Q.   Thank you.  Why did you introduce a bill that allowed

23   non-photo ID in terms of a photo ID bill?

24           MR. SWEETEN:  Same objection.  Instruction not to

25   answer.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1        Q.   Are you not answering on the basis of privilege?

2             MR. SWEETEN:  Let me finish.  It would reveal

3    your mental impressions, opinions about legislation.

4        A.   Privileged.

5        Q.   Okay.  Is it your understanding that a driver's

6    license or Texas identification card that is expired provides

7    proof of the identity of the individual who holds it?

8             MR. SWEETEN:  Are you asking her as a factual

9    matter?

10            MR. FREEMAN:  Yes.

11            MR. SWEETEN:  You can answer just as to what you

12   know.

13       A.   An ID or a driver's license issued by the Department

14   that's expired provide ID of that person, who they are.

15       Q.   Okay.

16       A.   I think in our legislation we put a provision --

17            MR. SWEETEN:  Let's go ahead and just answer the

18   question he's asked.  Okay?

19       A.   Yes.

20       Q.   Okay.  Does the identification card cease to prove the

21   identity of the person after six months after it's expired?

22       A.   No.

23       Q.   Does it cease to prove the identity of the person two

24   years after it's expired?

25       A.   No.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1        Q.    Are you aware of how the Department of Public Safety

2    maintains records about driver's license expiration?

3        A.    No.

4        Q.    Are you aware of whether they maintain only a notation

5    that it's less than two years expired or more than two years

6    expired?

7        A.    I'm not aware.

8        Q.    Okay.  Does a valid identification card that contains

9    a person's photograph and is issued by an agency or institution

10   of the federal government establish an individual's identity?

11       A.    It could possibly.

12       Q.    How about a valid identification card that contains

13   the person's photograph and is issued by an agency, institution

14   or political subdivision of the State of Texas?

15       A.    It could.

16       Q.    In what ways could it not?

17       A.    You know, I just have no way of knowing what checks

18   and balances that that political subdivision goes through

19   issuing an ID.  I may can go up and say, "I'm John Smith," and

20   you issue me an ID.

21       Q.    Why did you include valid identification cards issued

22   by political subdivisions of the state in H.B. 112?

23             MR. SWEETEN:  I'm going to object.  I think that

24   asks for legislatively privileged information, asks her to

25   reveal thoughts, mental impressions, opinions about legislation,



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1    why she included something or did not include something, was

2    covered by that.

3         A.   Privileged.

4         Q.   And why did you say that a valid identification card

5    issued by an agency or institution with the federal government

6    could establish an identity but not always establish an

7    individual's identity?

8              MR. SWEETEN:  Same objection.

9         A.   The question one more time?  Are you saying --

10        Q.   I'm not saying why, but I'm asking -- you previously

11   testified that a valid identification card that contains the

12   person's photograph and is issued by an agency or institution of

13   the federal government could establish an individual's identity.

14   And I'm asking why only could.  Why are you qualifying that

15   statement?

16             MR. SWEETEN:  I think she's answered that.

17             MR. FREEMAN: I said that with regard to the

18   state.  I didn't say that with regard -- with state subdivision,

19   not with regard to the fed government.

20             MR. SWEETEN: You can answer as to that.

21        A.   So we're talking specifically about the federal

22   government?

23        Q.   Yes.

24        A.   I'm not sure how they issue their IDs.

25        Q.   Okay.  And just for the record, why did you include



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Patricia Harless                                          May 15, 2012

1    valid identification cards issued by agencies or institutions of

2    the federal government in H.B. 112?

3         A.   Privileged.

4              MR. SWEETEN:  Objection, calls for legislatively

5    privileged information, asks her to reveal thoughts, mental

6    impressions or opinions about legislation.

7              MR. FREEMAN: I would ask that you wait for your

8    counsel to finish just so the record is clean.

9         A.   I should.  I'm just trying to speed it up.  Sorry.

10   I'm old and tired.

11        Q.   Now, you previously testified that you don't know what

12   a citizenship certificate looks like; is that correct?

13        A.   I don't know that I do.

14        Q.   Okay.

15        A.   I may have seen one, but I can't recall.

16        Q.   And can I ask, so you included among the list of photo

17   ID in H.B. 112 the United States citizenship certificate issued

18   to the person that contains the person's photograph.  And on the

19   non-photo list you included just a United States -- or United

20   States citizenship papers issued to the person.  From that, can

21   it be inferred that sometimes citizenship papers have a photo on

22   them and sometimes they do not?

23             MR. SWEETEN:  Don't reveal thoughts, mental

24   impressions or opinions about legislation.  Okay.

25        A.   Privileged.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1        Q.   I'm just asking for your knowledge and the logical

2   inference that can be made from a bill that you publicly

3   submitted for consideration in the Texas Legislature.

4              MR. SWEETEN:   But you can't do that by asking her

5   legislatively privileged information.   You're asking her about

6   her mental impressions, opinions about why something was or

7   wasn't included, what can be inferred based upon the inclusion

8   or non-inclusion of certain information.   I think you're asking

9   for privileged information.

10       Q.   To the extent that you lack knowledge of the answer to

11  that question, whether it sometimes has a photo and sometimes

12  does not, that's a fine answer as well.

13       A.   I don't know if there are certificates without photos.

14  I don't know.

15       Q.   Okay.   Why would H.B. 112 solve any problems related

16  to in-person voter fraud in comparison to current Texas law?

17             MR. SWEETEN:   I'm going to object.   I think

18  you're asking her for her mental impressions, opinions about

19  legislation.   I think that falls squarely within the legislative

20  privilege.

21       A.   Privileged.

22       Q.   Did you make any public statements concerning H.B.

23  112?

24       A.   Not that I remember.   Could possibly, but.

25       Q.   You don't recall?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

```
 1          A.   No.
 2          Q.   Do you recall if it was ever mentioned in your
 3     constituent newsletter?
 4          A.   Possibly as the bills that I filed.
 5          Q.   Anything more than just a list of the bills that you
 6     filed?
 7          A.   I don't know.  We do those weekly during session.
 8          Q.   Okay.  Do you keep all of your constituent newsletters
 9     maintained in a file somewhere?
10          A.   I don't.
11          Q.   Do you know if your staff does?
12          A.   I don't know if they do.
13          Q.   Would you like to take a break or can we keep going?
14          A.   Keep going until my --
15               MR. SWEETEN:  She's got that 4:40.
16          Q.   20 minutes.  Sounds good.
17          A.   It's 20 or 30.
18               MR. ROSENBERG:  What happens at 4:40?
19               MR. SWEETEN:  She has a phone call that will take
20     15 minutes.  It's physician related.
21          Q.   What were the basic provisions of S.B. 14?  And if
22     you'd like, I'm happy to give you a copy of U.S. Exhibit 5.
23          A.   Photo ID from prescribed list, including driver's
24     license, ID card, concealed handgun, citizenship paper with a
25     photo on it, U.S. military ID.  It also provided for extensive
```



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1      training or training.  I shouldn't say -- training on the new

2      requirements under S.B. 14.  It provides for a free election ID

3      certificate, voter certificate.  It provides for, off the top of

4      my head, a provisional ballot, that notice be placed outside of

5      the polling place, provision that the names that are similar be

6      accepted, rights to cast provisional ballot, requirements for

7      identification prescribed by Subsection B, that they do not

8      apply to a person who is disabled and presents the voter

9      registration certificate containing the indication described in

10     Section 15.01, and increased penalties for attempting to vote

11     with someone else's ID and actually voting.

12          Q.   Isn't it the case that S.B. 14 limited the use of

13     expired driver's license or personal identification cards to

14     those that are expired up to 60 days as opposed to two years in

15     your bill?

16          A.   I think that's correct in S.B. 14, up to 60 days.

17          Q.   Why the difference?

18               MR. SWEETEN:  I'm going to object.  That calls

19     for legislatively privileged information.

20          A.   It's privileged.

21          Q.   And isn't it correct that S.B. 14 limits the use of

22     passports to those that are expired up to 60 days?

23          A.   That is correct.

24          Q.   And isn't it the case that H.B. 112 put no limitation

25     concerning expiration on U.S. passports?  It's on Page 6 of



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Patricia Harless                                    May 15, 2012

```
 1      Exhibit 4.
 2           A.   Expired or that expired no later than two years before
 3      the date.
 4           Q.   But with regard to passports?
 5           A.   Passports wasn't a new section in the bill.
 6           Q.   But there was no modification to exclude passports
 7      that were expired by more than 60 days, correct?
 8           A.   Right.
 9           Q.   Okay.  Why did S.B. 14 exclude passports that were
10      expired by more than 60 days?
11                MR. SWEETEN:  Don't reveal thoughts, mental
12      impressions or opinions about the legislative process or
13      discussions you've had with legislators, legislation staff,
14      state agencies, TLC or constituents.  Refer to matters of the
15      public record.
16           A.   Privileged.
17           Q.   Okay.  Were you involved in the drafting process for
18      S.B. 14?
19           A.   No.
20                MR. SWEETEN:  I think that's been asked and
21      answered.
22           Q.   Did anyone in the media ask you questions concerning
23      changes between H.B. 112 and S.B. 14?
24           A.   Could possibly.  I don't recall.
25           Q.   Okay.  Why did you shift your support in four months
```



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1    from a bill that allowed individuals to establish their identity

2    via non-photographic ID to a bill that required individuals to

3    present one of a few articulated forms of photo ID?

4              MR. SWEETEN:   I'm going to object based on

5    legislative privilege.  You're asking her to reveal thoughts,

6    mental impressions, opinions about legislation and also

7    communications she's had.  So I'm going to instruct her not to

8    answer based on that.

9         A.   It was privileged.

10        Q.   Are you aware of any records that are maintained of

11   driver's licenses that are expired by more than 60 days but less

12   than than two years?

13        A.   I'm not. You asked that earlier.  I'm not aware.

14        Q.   I'm sorry.

15        A.   It's okay.

16        Q.   Are you aware of what forms of ID are permissible

17   under the Georgia photo ID law?  And I'm happy to put them in

18   front of you if that makes it easier.

19        A.   We talked about it earlier.

20        Q.   This is U.S. Exhibit 6.  Just, if you can look through

21   now that you've just recently looked at S.B. 14 and tell me

22   what's in the Georgia law and not in S.B. 14?

23        A.   And not?  A card issued by the branch, department,

24   agency or identity of the State of Georgia or other state or of

25   the United States authorized by law to issue personal


ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1      identification and provide such identification, a valid U.S.

2      passport, which I assume that means not expired, a valid

3      employee identification card, obtained photograph of elector

4      issued by a branch and department agency or entity of the United

5      States Government, the state or any county, municipal board,

6      authority or other entity of the State.  It says a valid

7      military ID.  So that's not an expired.  And a valid tribal ID

8      card.

9          Q.   And doesn't it also not have an expiration limitation

10     on driver's licenses in Subsection 1?

11         A.   I'm not sure.  I guess you're reading this.  It was my

12     understanding that Georgia's was two -- or not past the last

13     election cycle, but I don't recall.

14         Q.   Just to clarify my question.  Does it say that -- does

15     it limit use of Georgia driver's licenses to those that are

16     unexpired or less than 60 days expired?

17         A.   I don't think it's specific here, unless you see it

18     and I don't.  It says a Georgia driver's license which was

19     properly issued by the appropriate state agency.  The difference

20     between that and the ID card and the passport, it says valid.  I

21     don't know what they're reading into the difference of that is.

22         Q.   Okay.  So would it be fair to say that several of

23     these are different from S.B. 14?  Nearly all of them?

24         A.   I wouldn't use the word different, but they're

25     similar.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1          Q.   Okay.  Well, the driver's license provision doesn't

2     limit the use of expired IDs, correct?

3          A.   It says a Georgia driver's license which was issued,

4     and the difference between the other one says a valid Georgia

5     voter identification card issued or a valid U.S. passport.  I'm

6     not sure what they are meaning by valid.

7          Q.   Okay.

8          A.   Does that mean current?  I don't know.  Why wouldn't

9     they say current?  I just can't answer.

10          Q.   Okay.  But an employee identification card issued by a

11     state --

12          A.   That is different.

13          Q.   It's easier if you don't talk over me.

14          A.   Sorry.

15          Q.   No problem.  And a tribal identification card is not

16     included in S.B. 14, correct?

17          A.   That is different.

18          Q.   Okay.  When Representative Veasey asked you on the

19     floor of the Texas House, "Why should we pass such a stringent

20     bill and stringent law based on rumor and innuendo," isn't it

21     the case what you responded, "S.B. 14 is similar to the case,

22     the legislation that was passed in Indiana, that was upheld by

23     the U.S. Constitution, is similar to the bill that was filed in

24     Georgia that was approved by the Department of Justice"?  Isn't

25     that correct?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

```
1          A.   You're reading it, so I assume that it is.

2          Q.   If you'd like me to -- it's on Page 97 of that

3     transcript right in front of you, which is Exhibit?

4          A.   11.  I don't have it.

5          Q.   It is Exhibit 18.  Look at Page 97, onto Page 98.

6          A.   "Similar to the case, the legislation that was passed

7     in Indiana, upheld by the U.S. Constitution" -- should have been

8     Supreme Court.  "It is similar to the bill that was filed in

9     Georgia that was approved by the Department of Justice."  Yes.

10         Q.   Now, you've testified earlier that these bills had a

11    variety of differences, correct?

12         A.   Was that my word?  I can't remember.

13         Q.   Not verbatim, but you just testified that there were a

14    number of differences in terms of the acceptable ID in Georgia

15    versus S.B. 14, correct?

16         A.   I think you were asking me specifically, and I said --

17    when you read the statement, I said that's different and the

18    tribal ID was different.  The others are similar.

19         Q.   Do you still maintain the position that you

20    articulated on the floor, that the reason for passing the bill

21    was that the legislation is similar to what was passed in

22    Indiana and what was passed in Georgia?

23         A.   My testimony on the floor and during the debate was

24    that it was similar.

25         Q.   And do you still maintain that position today?
```



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Patricia Harless                                    May 15, 2012

```
 1          A.   I still support what I said on the floor.

 2          Q.   How is the legality of S.B. 14 responsive to

 3     Representative Veasey's question concerning the need for the

 4     law?

 5          A.   The legality?

 6          Q.   So Representative Veasey asked -- let me rephrase.

 7               Representative Veasey asked, "Why should we pass such

 8     a stringent bill and stringent law based on rumor and innuendo?"

 9     He is asking what is the need for this bill.  And then you

10     responded, S.B. 14 is similar to the legislation in Indiana and

11     in Georgia, Indiana, having been, you asserted, upheld by the

12     U.S. Constitution and Georgia being approved by the Department

13     of Justice.  So that was talking about how those bills were

14     considered legal.  How was your response that S.B. 14 was legal

15     responsive to Representive Veasey's question about why the

16     legislation was needed?

17          A.   All I can tell you is what I said here.

18          Q.   But why did you respond to a question about the need

19     for the bill with an answer saying that the bill would not

20     violate the U.S. Constitution?

21          A.   I can't remember exactly at what point this was, but I

22     think this was about the debate on an amendment and I was

23     responding to the amendment.

24               MR. FREEMAN: I'm going to object to that as

25     nonresponsive and ask you to review the transcript a little bit
```



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Patricia Harless

1   further back if that provides some context and assistance for

2   you to be able to answer the question.

3       A.   It was in regard to his provision that would gut the

4   bill, is what my testimony is.  And then he continued with his

5   questioning that had nothing to do with his amendment, and I

6   went back to the purpose of his amendment, which the purpose of

7   the bill was that it was similar to Indiana and the U.S.

8   Constitution, and his amendment was trying to gut the provision

9   of the bill.  And I don't know how to answer that any other way.

10          MR. FREEMAN: I'm going to object to that as

11  nonresponsive as well, but we'll move on.

12          THE WITNESS:  Can we take a break?

13          MR. FREEMAN:  Sure.

14          (Recess from 4:36 p.m. to 5:01 p.m.)

15      Q.   Other than modeling bills on Indiana and Georgia, what

16  did you do to ensure that S.B. 14 was constitutional?

17          MR. SWEETEN: I think to some extent that the

18  question is asking her to reveal thoughts, mental impressions,

19  opinions about the legislation or conversations she's had with

20  legislator's staff, state agencies, Leg Council or constituents.

21  So I think that you're asking about the process and how she came

22  up with the bill.  I think that's squarely within the

23  legislative privilege.

24      A.   Privileged.

25      Q.   Did you make any public statements concerning your



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1    efforts to ensure that S.B. 14 was constitutional?

2         A.   I don't know if I made public statements about that or

3    not.

4         Q.   Did you make any public statements or statements on

5    the record concerning your efforts to ensure that S.B. 14 would

6    comply with the Voting Rights Act?

7         A.   I don't know if I made statements on that or not.  I

8    recall making statements that I felt comfortable that it would

9    comply with Section 5 of the Voting Rights Act.

10        Q.   And what was the basis for your comfort?

11        A.   The statements that I said were that we had filed

12   legislation that were similar to Georgia, that had been pre-

13   cleared in Indiana, that had been upheld by the U.S.

14   Constitution, and I think I remember continuing by saying that

15   protected the integrity of the election process, it helped deter

16   and detect in-person voter fraud, and we provided for -- we

17   provided for provisional ballots and free voter certificate

18   card.

19        Q.   And did you take into account the differences between

20   S.B. 14 and the Georgia photo ID bill?

21             MR. SWEETEN:  Are you asking her in her public

22   statements or you're asking her did she take it into account in

23   her process?

24             MR. FREEMAN:  I'm asking with regard to the

25   public statements that she made, did those public statements



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Patricia Harless                                          May 15, 2012

```
 1      take it into account.
 2                 MR. SWEETEN:  Okay.
 3           A.   The public statements were that the legislation was
 4      drafted similar to those states.  I never said on record that it
 5      was identical or the exact same piece of legislation, that it
 6      was similar.
 7           Q.   And that's -- just so I'm clear, was it your belief
 8      that none of these -- strike that.
 9                 Sitting here today, can you identify any purpose for
10      the change from H.B. 112 to HB-14 as to the use of non-photo ID
11      what the purpose for that change was?
12                 MR. SWEETEN:  You're asking her thoughts, mental
13      impressions or opinions about the legislation, the differences
14      between that legislation.  It could also implicate
15      communications she's had.  I believe that's legislatively
16      privileged.
17           A.   It was clearly privileged communications.
18           Q.   What does the term legislative emergency mean within
19      the Texas Legislature?
20           A.   You would have to ask the governor that.  I don't know
21      how to define that.
22           Q.   What does a legislative emergency effectively mean
23      within the legislature?  What is the effect of the declaration
24      of legislative emergency?
25           A.   It's my understand that the governor can call issues
```



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Patricia Harless                                    May 15, 2012

1      that are emergency, that are heard during the first part of the

2      legislative session, a priority.

3          Q.   And if something is not declared a priority, it cannot

4      be heard in the beginning of the legislative session; is that

5      correct?

6          A.   There's certain days that it cannot be heard, until

7      committees are organized.

8          Q.   Are there any substantive constraints on what the

9      governor may declare to be a legislative emergency?

10         A.   Not to my knowledge.  I don't know.

11         Q.   Was photographic voter ID declared to be a legislative

12     emergency?

13         A.   I think the photo voter ID was.

14         Q.   Who was responsible for declaring photographic photo

15     ID to be a legislative emergency?

16         A.   The governor.  It's my understanding that only the

17     governor can call an emergency.

18         Q.   Are you aware of any conversations that occurred with

19     the governor concerning what bills would be declared legislative

20     emergencies?

21              MR. SWEETEN:  I think if you're asking about the

22     fact of the conversation, if you would just -- I think you're

23     asking subject matter.  We talked about this.  We talked about

24     trying to get through this issue together, and I'll work with

25     you.  I think you've put too much substance into the



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1        conversation.  If you want to ask about communications she's

2        aware of, I'm comfortable with that.

3                    MR. FREEMAN:  I'll rephrase.

4            Q.   Are you aware of any conversations concerning the

5        declaration of legislative emergencies for the 2011 legislative

6        session?

7            A.   I am not aware of any conversations prior to them

8        being declared emergency.

9            Q.   So you didn't participate in any of those

10       conversations?

11           A.   I did not.

12           Q.   Okay.  Do you have any documents relating to the

13       declaration of voter ID as a legislative emergency?

14           A.    Not that I'm aware of.  I'm sure that we were sent

15       something from the governor's office, but I can't tell you for

16       sure I saw it or I have it.

17           Q.   Okay.  So nothing outside the actual declaration

18       itself?

19           A.   Right.

20           Q.   Okay.  Was an election set to occur during the first

21       60 days of the legislative session, to your knowledge?

22           A.   An election?

23           Q.   Uh-huh.

24           A.    In the State of Texas?

25           Q.   Uh-huh.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1        A.   I don't know, but I would bet there's some type of

2     municipal or some type of election across Texas.  I don't know

3     though.

4        Q.   Was there a uniform election date -- maybe that's the

5     right term -- set to occur during the first 60 days of the

6     legislative session?

7        A.   If I remember correctly, the uniform election dates

8     are either in May or November, and they're for school board

9     elections or city municipal elections.  So my guess would be no,

10    because May is past 60 days.

11       Q.   Are you aware of any other reason why photographic

12    voter ID was declared to be a legislative emergency?

13       A.   I am not aware.

14       Q.   Okay.  Did you have any role in the development of

15    S.B. 14 before it was submitted for consideration in the Senate?

16       A.   No.

17       Q.   Did your staff?

18       A.   No. Now, you're asking specifically about S.B. 14,

19    correct?

20       Q.   I am.

21       A.   Because I think we filed a bill in the House that was

22    similar to S.B. 14, if not a duplicate.

23       Q.   If I can put in front of you and mark as Government

24    Exhibit, U.S. Exhibit 23.

25                    (Exhibit No. 23 marked)



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

```
 1          Q.    And if you can turn to Page 5.  Now, as you can see on

 2    Page 5, this is an indication from the State of Texas in

 3    response to questions posed by the attorney general.

 4          A.    Uh-huh.

 5          Q.    And the State of Texas has indicated that Mr. Beuck

 6    assisted with the drafting, development and passage of S.B. 14

 7    in the Texas House of Representatives.  Are you aware of any

 8    assistance that Mr. Beuck provided concerning the drafting of

 9    S.B. 14?

10          A.    I have no idea.

11          Q.    Are you aware of any assistance he provided in the

12    development of S.B. 14?

13          A.    I have no idea.

14          Q.    Did you provide him with any instructions as to the

15    substance of what you wished to be included in S.B. 14?

16                MR. SWEETEN:  I think we're getting into

17    communication that she may have had with Mr. Beuck, her

18    legislative assistant.  I think that if you're asking did she

19    talk with Mr. Beuck, I'll let her answer with respect to that.

20    But as far as what she talked to him about or the specific

21    matters, including Senate Bill 14, I think that those would be

22    privileged, the substance of those.

23          A.    I'm sure we've had conversations about drafting a

24    photo voter ID.

25                MR. SWEETEN:  Don't reveal the substance of
```



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Patricia Harless                                            May 15, 2012

```
 1        conversations.  You can reveal the existence of conversations.

 2             A.    I would bet that we had conversations.

 3             Q.    Are you Mr. Beuck's direct supervisor?

 4             A.    Yes.  I can hire and fire him, if that's what you're

 5        asking.

 6             Q.    Does Mr. Beuck take direction from any other

 7        individuals with regard to his work in the Texas Legislature?

 8             A.    Not while employed by me.

 9             Q.    Does he take any direction from Lt. Governor Dewhurst,

10        his former employer?

11             A.    No. I have to answer -- I have to assume he doesn't

12        because if he does then he doesn't have a job with me.

13             Q.    Okay.  And I don't mean to imply that he does.

14             A.    Yeah.  Be careful, because we may be having a talk

15        about this tomorrow.

16             Q.    I'm just trying to understand --

17             A.    I --

18             Q.    -- why Mr. Beuck was listed as having assisted with

19        the development of S.B. 14 if you provided no instruction or

20        gave no input with regard to the bill and you are the person who

21        is his immediate supervisor.  I guess if you could explain, to

22        the extent of your knowledge and inside the confines of any

23        instruction your counsel may give, this statement.

24                  MR. SWEETEN:  One, I think your question would

25        ask for conversations that she had with Mr. Beuck, who is her
```



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1     assistant, and that would be under the umbrella of what we

2     believe is covered by the legislative privilege. Two, I think to

3     some degree your question would ask for thoughts, mental

4     impressions or opinions about legislation or her thoughts about

5     that, and so I think that that's legislatively privileged.

6         A.   You know, we have discussions about legislation I want

7     filed.

8         Q.   Okay.  But you didn't file S.B. 14, correct?

9         A.   I filed -- I am pretty sure I filed a companion bill

10    to S.B. 14.

11        Q.   That was identical in substance to S.B. 14?

12        A.   I think it was.  I can't remember exactly.

13        Q.   And did you provide substantive direction with regard

14    to that companion bill?

15        A.   No.

16        Q.   When was S.B. 14 filed in the Senate; do you know?

17        A.   I don't.

18        Q.   We can refresh your recollection.  This is U.S.

19    Exhibit 8.

20        A.   It says received by the Secretary of State.  That

21    doesn't make sense to me.  Filed 1/12 of 2011.

22        Q.   Does that say the Secretary of the Senate?

23        A.   Yes.  I'm sorry.

24        Q.   So January 12th?

25        A.   Yes.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1          Q.    And when did S.B. 14 pass out of the Senate?

2          A.    Testimony taken, record vote, reported favorably.  So

3     it was reported favorably without amendments.  I'm not exactly

4     sure because their procedures are different than ours.

5          Q.    Was it -- on Page 6 does it note that it was reported

6     engrossed from the Senate on January 26?  Do you see that?  The

7     last one that says S before it starts saying H?

8          A.    Yes.  It says reported engross, January 26.

9          Q.    And when was the bill referred to the Select Committee

10    on Voter Identification and Voter Fraud?

11         A.    2/11.

12         Q.    So February 11th?

13         A.    Yeah.  It was read in the House on the 11th and

14    referred to the committee on the 11th.

15         Q.    How were you chosen as the House sponsor?

16         A.    I don't know.

17         Q.    Did you ever ask Senator Fraser or speak to Senator

18    Fraser about it?

19         A.    I would say that's privileged.

20              MR. FREEMAN: Unless your attorney asserts

21    privilege, I'll ask you to answer.

22              THE WITNESS:  Wake up.

23              MR. SWEETEN:  Actually, with respect to any

24    conversation she had with Senator Fraser, that's legislatively

25    privileged.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Patricia Harless                                    May 15, 2012

1           MR. FREEMAN: You're a good student.

2           MR. SWEETEN:  She's only heard it, what, 200

3   times today?  Sorry.  I was communicating with Matt over here.

4       Q.   Did you ever have a conversation with Speaker Straus

5   on the general subject of House sponsorship of S.B. 14?

6           MR. SWEETEN:  You can answer the question as

7   phrased.

8       A.   Yes.

9       Q.   When did that discussion occur?

10      A.   Probably after he was elected Speaker, before

11  committee assignments came out.

12      Q.   How long did you speak for?

13      A.   Oh, when he and I spoke?  Usually five minutes, two

14  minutes.

15      Q.   Who else was present?

16      A.   I don't think anyone was.

17      Q.   Who initiated the conversation?

18      A.   I did.

19      Q.   Was that the only conversation that you had on that

20  subject?

21      A.   Pertaining to photo voter ID?

22      Q.   And sponsorship in the House.

23      A.   We may have had one more.

24      Q.   Did you ever have any conversations with Chairman

25  Bonnen on the same subject?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1          MR. SWEETEN:  Again, you can answer as to whether

2     a conversation occurred.  Don't reveal any of the contents.

3          A.   No.

4          Q.   Were any of these conversations documented in

5     memoranda or e-mail?

6          A.   No, not that I know of.

7          Q.   Okay.  When did you find out that you would be the

8     House sponsor of S.B. 14?

9          A.   When Chairman Bonnen issued a press release and sent

10    it out through House administration, and I got the press

11    release.

12         Q.   He didn't speak to you first?

13         A.   No.  The dynamics in the House are different.

14              MR. SWEETEN:  Okay.  Just answer his question.

15         Q.   Based on the history of the bill that you have in

16    front of you, how long did the bill take to pass out of the

17    select committee to the floor of the House?

18         A.   It was referred to the select committee on 2/11 and

19    scheduled for a committee hearing on 3/1.  Testimony was taken

20    on 3/1, was left pending on 3/1, and it was voted out with a

21    committee substitute on 3/7 and recorded favorably on 3/7.

22         Q.   So it was only in committee for a week; is that

23    correct?

24         A.   From the date it was referred was 2/11 to 3/7.  So

25    that was a month.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1          Q.   But from the first hearing to the final hearing, it

2     was just a week; is that correct?

3          A.   From the date that it was heard for public comment on

4     3/1 to voted out on 3/7, six days.

5          Q.   Just to loop back real quickly, why did you go to

6     Speaker Straus to talk to him about sponsorship of S.B. 14 in

7     the House?

8               MR. SWEETEN:   I think your question would require

9     her to reveal thoughts, mental impressions, opinions about

10     legislation, legislative process, and would require her to

11     reveal communications with Speaker Straus, and, therefore, I'm

12     going to object as legislatively privileged.

13          A.   Privileged.

14          Q.   Okay.  Did you have any additional conversations with

15     Senator Fraser concerning S.B. 14 on the general subject?

16          A.   Prior to it getting referred to the House in the press

17     release?

18          Q.   Yes.

19          A.   I don't recall if I did.

20          Q.   Did you have any conversations with Senator Fraser on

21     the subject of S.B. 14 after it was referred to the House?

22          A.   I don't think I had any conversations with him prior

23     to Dennis Bonnen doing his press release that I would carry it.

24          Q.   Did you have any conversations with Senator Fraser

25     after Chairman Bonnen's press release?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

```
 1            A.   I could have.  I don't remember specifically.
 2            Q.   So you don't recall any specific conversations with
 3    Senator Fraser even after you were carrying his bill?
 4            A.   Yes.  We -- after we started moving the bill forward.
 5            Q.   Okay.
 6            A.   We had conversations, but not -- I don't recall
 7    anything from the -- from before we had the hearing to the time
 8    it got to the floor.  After we had the hearing, I'm sure we had
 9    conversations.
10            Q.   Okay.  When did those conversations occur?
11            A.   You know, I don't remember.
12            Q.   Do you remember approximately how many there were?
13            A.   I know I went to his office and visited with him once
14    and maybe visited with his staff one other time.
15            Q.   Okay. When you visited with him, was anyone else
16    present?
17            A.   I know my chief of staff and his chief of staff were
18    there.
19            Q.   Is his chief of staff Janice McCoy?
20            A.   Yes.  I think that's her title.
21            Q.   Okay.  And when you met with his staff, who was
22    present?
23            A.   Janice and Colby.
24            Q.   So just the three of you?
25            A.   Yes.
```



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1       Q.   Okay.  Did you ever e-mail with Senator Fraser or his

2   staff?

3       A.   I don't recall e-mailing Senator Fraser at all and I

4   don't recall e-mailing Janice.  May have, but I don't recall it.

5       Q.   Okay.  Did you ever instruct Mr. Beuck to e-mail

6   Janice?

7       A.   I don't recall instructing him to e-mail her.

8       Q.   Uh-huh.

9       A.   But I know that he probably did e-mail her during the

10   course of the legislation moving.

11       Q.   Okay.  Was the period of time between when S.B. 14 was

12   first addressed in a public hearing and when it was passed out

13   of committee shorter than usual for a major bill like this?

14       A.   Actually, I don't think it is.

15       Q.   Okay. What does it mean for a bill to be placed on the

16   emergency calendar?

17            MR. SWEETEN:  I think that's been asked and

18   answered, but go ahead.

19       A.   I don't know what the rules are.

20       Q.   Okay.  You haven't served on the rules committee?

21       A.   Served on Rules and Resolutions, but --

22       Q.   I'm sorry.  Calendars committee?

23       A.   No, I have not.

24       Q.   Okay.  So you're not aware of the distinction between

25   the emergency calendar and any other calendar?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1          A.   I'm not.  I probably should be.  I'm not.

2          Q.   Does the Calendar committee control who puts bills on

3     the emergency calendar?

4          A.   I am not aware.  I'm not advised.

5          Q.   Okay.  Were any changes introduced to S.B. 14 in the

6     conference committee that had not been in the version of the

7     bill passed by either House?

8               MR. SWEETEN:  You mean the House or the Senate?

9          Q.   Either House of the Texas Legislature.

10         A.   Yes.  I know from the floor we had a resolution on the

11    changes in the Conference committee.

12         Q.   And what were those changes?

13         A.   There were several.  We defined the voter certificate

14    election card.  We took out an amendment on the -- we deleted

15    some of the amendments.  I can't remember all of them.  I had an

16    outside-of-the-bounds resolution.

17         Q.   And what does an outside-of-the-bounds resolution

18    mean?

19         A.   It means that when something is different that was in

20    the House version or the Senate version that hadn't been in

21    either, it has -- you have to have a vote on allowing the

22    membership to do that.

23         Q.   How often does that happen?

24         A.   During the last few days of session, when we're doing

25    conference committee reports, it happens more often than



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Patricia Harless                                                   May 15, 2012

1     probably we would like.

2          Q.   And why was the exemption based on religious beliefs

3     added back in in conference?

4               MR. SWEETEN:   Hold on a minute.   You're asking

5     her, I believe, to reveal thoughts, mental impressions or

6     opinions about legislation.   I think the "why" question does

7     that.   It also could require her to reveal communication.   So I

8     think that is within the confines of what is legislatively

9     privileged.   Instruct her accordingly.

10          A.   If I could remember, I would probably say it was

11     privileged.

12          Q.   So you didn't make any public statements regarding

13     that, of which you're aware?

14          A.   Not that I'm aware.   There could have been when we did

15     the outside-of-the-bounds resolution.   I don't know.

16          Q.   And do you recall what changes were included

17     concerning the election identification certificate in the

18     out-of-the-bounds resolution?

19          A.   There was a clarification to make sure the discussion

20     was -- during the debate Representative Anchia raised a concern

21     that the free ID card would draw funds out of the Texas Mobility

22     Fund.   So the out-of-the-bounds resolution and the change was to

23     clarify that it would be election certificate voter card -- I

24     forget the proper name -- and that it would not draw from the

25     Texas Mobility Fund.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

 1          Q.   Are you aware of the date on which the governor signed

 2     S.B. 14?

 3          A.   I bet it's in here.

 4          Q.   Feel free to refresh your recollection.

 5          A.   Signed by the governor on 5/27.

 6          Q.   To your knowledge has the Secretary of State enforced

 7     any part of S.B. 14 concerning photographic voter ID?

 8          A.   To my knowledge, they have not.

 9          Q.   Are you aware of any local election official who has

10     enforced any part of the photographic voter ID requirements of

11     S.B. 14?

12          A.   To my recollection, no.

13          Q.   Okay.  Have you heard of any reports of confusion

14     concerning voter ID requirements leading up to the upcoming

15     primary in a couple weeks?

16          A.   I have seen a press release issued by a senator in

17     Harris County instructing the Secretary of State to make sure

18     that there is not confusion.

19          Q.   Who is that senator?

20          A.   I think it was senator Rodney Ellis from Harris

21     County, I think.

22          Q.   And are you aware of the reason why Senator Ellis

23     issued that press release?

24          A.   No.

25          Q.   Okay. Who were the main opponents of S.B. 14.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1          A.    People?

2          Q.    Individuals.

3               MR. SWEETEN:   I just want to make sure that

4     you're not revealing communication with other legislators,

5     legislation staff, state agencies, Legislative Council,

6     constituents.  And don't reveal thoughts, mental impressions,

7     opinions about the legislation.  To the extent you can answer

8     that question without doing so, you can answer.

9          A.    I think from the committee testimony and the debate on

10    the floor, probably the most vocal in opposition to the

11    legislation, if I remember correctly -- I know Anchia, Rafael

12    Anchia.  I know Mark Veasey.  I remember a number of times with

13    back-and-forth debate with Represent Richard Raymond.  I think

14    there were some -- I know Yvonne Davis offered a couple of

15    amendments, one which I took.  Representative Donna Dukes

16    offered a couple amendments, and I think we adopted one of her

17    amendments, I think.

18         Q.    Are you aware of any outside groups who were opposed

19    to S.B. 14?

20               MR. SWEETEN:   Again, don't reveal communications

21    with other legislators, with legislative staff, state agencies,

22    Texas Leg Council or constituents in answering this question.

23         A.    Other than the people that testified in committee

24    against it, those are the only ones.

25         Q.    And who were those?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1          A.    MALDEF testified.  I think LULAC testified.  I think

2    there were some individuals representing different minority

3    groups that testified.

4          Q.    Were there any minority groups that testified in favor

5    of the bill?

6          A.    There were some minorities that testified in favor of

7    the bill.  I don't know what groups they were associated with.

8          Q.    Can you, sitting here today, identify any minority

9    groups that testified in favor of the bill in committee

10   hearings?

11         A.    I can't recall specifically what groups they were

12   with.

13         Q.    Did it concern you at all that all the major minority

14   groups were opposed to S.B. 14?

15              MR. SWEETEN:  Don't reveal your thoughts, mental

16   impressions or opinions about the legislation or communications

17   with the groups that we've discussed.

18         A.    Okay.  I don't know that I can define all the minority

19   groups, but if I were to, it was probably privileged

20   communication.

21         Q.    I'm not asking for any communication between different

22   legislators.  I'm asking with regard to major groups that you've

23   named.  And based on your inability to name groups that were in

24   favor of the bill representing minority voters, did it concern

25   you that the major groups all lined up against the bill?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1            MR. SWEETEN:  When you're asking about her

2    concern, you're asking her to reveal her thoughts, her mental

3    impressions and her opinions about legislation.  I think that

4    directly asks that.  So I think that's squarely within the

5    legislation privilege.  I'm going to instruct you not to answer.

6            A.    Privileged.

7            Q.    Okay.  Did you at any time learn of any election

8    officials who were opposed to S.B. 14?

9            A.    I can't recall if any testified in committee against

10   it. That's not to say there were or weren't.  I just can't

11   remember.

12           Q.    Okay.  Are you aware of any constituents who testified

13   against S.B. 14?

14           A.    That is possible, but I can't remember.

15           Q.    Did any one of your constituents, without prompting

16   from your office, reach out to your office to offer their

17   opposition to S.B. 14?

18           MR. SWEETEN:  With respect to the substance of

19   conversations between constituents and Representative Harless'

20   office, I believe that would be a matter that is legislatively

21   privileged and would fall within one of the communication areas

22   that I've been objecting to today.  Don't reveal the substance

23   of any communications with constituents.

24                THE WITNESS: I don't understand.  Do I answer the

25   question?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Patricia Harless                                          May 15, 2012

234

1              MR. SWEETEN:  If you can't answer that question

2     without revealing the substance of conversations between you and

3     constituents, then you can't answer the question and tell him

4     so.

5          A.    Okay.  It's privileged.

6          Q.    Okay.  And did you take any steps to address the

7     concerns expressed in the hearings or elsewhere by minority

8     groups?

9          A.    I think the testimony on the floor was that we

10    provided for the approved forms of identification.  If someone

11    did not have one of the approved forms, we would provide them

12    with free identification card in order to vote.  And the bill

13    was drafted with funds set aside for education and an

14    opportunity for, as we have now, ballot by mail if you're a

15    senior or disabled.  We put in all the safeguards.

16             MR. FREEMAN: Going to object to that as

17    nonresponsive, and I guess I'll rearticulate.

18         Q.    Can you identify today any changes that were made to

19    S.B. 14 in response to concerns articulated by minority groups

20    during the hearings held by the Select Committee on Voter

21    Identification and Voter Fraud?

22             Mr. SWEETEN:  Other than matters of public

23    record, including committee hearings or House proceedings, your

24    question is asking her to reveal thoughts, mental impressions,

25    opinions about the legislation or communications between



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Patricia Harless                                    May 15, 2012

235

```
1        constituents, legislators, legislative staff, state agencies or

2        Texas Legislative Council.  I will instruct you to only answer

3        to the extent you are not revealing matters that are subject to

4        the privilege.

5             A.    It's privileged.

6             Q.    Okay.  Were you ever concerned that failing to address

7        the concerns of minority voters and the groups representing

8        minority voters might have an impact on preclearance of S.B. 14

9        under Section 5 of the Voting Rights Act?

10                  MR. SWEETEN: You're asking her to reveal her

11       thoughts, mental impressions or opinions about the legislation,

12       therefore, it's legislatively privileged.

13            A.    My testimony on the floor was that I felt that we had

14       met the constitutional standards laid out in Georgia's

15       legislation with -- providing the ability to deter and detect

16       fraud, providing for a free ID card, a disabled exemption,

17       religious exemption.  We met all the tests.

18            Q.    Okay.

19            A.    To meet Section 5.

20            Q.    Why did you think there was such strong opposition to

21       S.B. 14?

22                  MR. SWEETEN:  I think that question asks her to

23       reveal thoughts, mental impressions, opinions about legislation,

24       Senate Bill 14, and it also could ask her to reveal

25       communications among the groups or individuals that we've
```



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1      listed, and is therefore legislatively privileged.

2           Q.   Is your response that any response would be

3      privileged?

4           A.   Yes.

5           Q.   Okay.  Did you ever make any public statements about

6      the opposition to the bill that you recall?

7                     MR. SWEETEN:  You can answer.

8           A.   Possibly.  There may be.

9           Q.   Do you have your op-ed in front of you?

10          A.   I do, somewhere.

11          Q.   I believe that's it.  Did you ever refer to the claims

12     made by opponents of photo ID as spurious?

13          A.   If it's in here, I guess I did.

14          Q.   It's on the bottom of the first page, last sentence of

15     the first page.  And this is Exhibit No. 19.

16          A.   Yes.  And then I proceeded by quoting Justice Stevens'

17     opinion that includes, "Burdens arising from life's" -- I can't

18     read it.  It's typed over.

19          Q.   Would it be "vagaries"?

20          A.   Yeah --  "however, are neither so serious or frequent

21     as to raise questions about the constitutionality of the photo

22     voter ID."

23          Q.   Are you aware of what the legal test is under

24     Section 5 of the Voting Rights Act?

25          A.   I don't recall it.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Patricia Harless                                              May 15, 2012

1          Q.   Are you aware of whether Crawford V. Marion County

2     Board of Elections was a case under the Voting Rights Act?

3          A.   That's the Georgia?

4          Q.   No.  That's the Indiana.

5          A.   Indiana?  No, that was not subject to preclearance.

6          Q.   And are you aware of whether that case addressed

7     whether the photo ID legislation would have a disparate impact

8     on minority voters, a greater impact on minority voters than on

9     Anglo voters?

10         A.   I don't remember the specifics of the case.  I have

11    read it, but I don't remember.

12         Q.   How would you define spurious?

13         A.   I couldn't define that.  And I'd like to take complete

14    authorship of this, but my staff pretty much wrote a lot of

15    this.  And I'm sorry.

16         Q.   Were all of the arguments made against photo ID

17    requirements just concerning the constitutionality of the photo

18    ID requirement?

19              MR. SWEETEN:  Are you asking about arguments made

20    at the hearing or are you --

21              MR. FREEMAN:  We can start with public.

22         A.   Say that one more time.

23         Q.   Were all of the arguments made against photo ID

24    arguments that photo ID would be unconstitutional?

25              MR. SWEETEN:  He's asking about public, so I'm



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

1      not going to make an instruction.

2          A.    I don't recall.

3          Q.    Did anyone argue that it was simply not necessary?

4                MR. SWEETEN:   This is still as to public?

5                MR. FREEMAN:   In public.

6          A.    I'm sure there were witnesses that said that it wasn't

7      necessary.

8          Q.    And did Crawford V. Marion County Board of Elections

9      address whether photo ID was good policy?

10         A.    I don't recall that in Indiana's testimony.

11         Q.    Does the Supreme Court ordinarily pass on whether a

12     law is good policy?

13         A.    I don't know what the Supreme Court does.

14         Q.    Okay.  Did you ever discuss whether S.B. 14 might

15     impact minority voters more than it impacted Anglo voters with

16     anyone?

17               MR. SWEETEN:   I'm going to object.  I think

18     you're asking for information that relates to mental impressions

19     or communications between legislators, legislative staff, Texas

20     Legislative Council or constituents.  To the extent it does so,

21     I'm going to instruct you not to answer based on legislative

22     privilege.

23         A.    It's privileged.

24         Q.    Did you ever have any discussions of disproportionate

25     impact on the public record?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1      A.   On the public record, I felt like -- I remember

2   testifying that I felt that it would affect all Texans equally.

3      Q.   Were you concerned that S.B. 14 might

4   disproportionately and negatively impact minority voters?

5           MR. SWEETEN:   I think you're asking for her to

6   reveal thoughts, mental impressions, or opinions about

7   legislation,  particularly Senate Bill 14, which is privileged.

8   Don't answer the question.

9      A.   Privileged.

10     Q.   Did you seek any advice on whether S.B. 14 complied

11  with Section 5 of the Voting Rights Act?

12          MR. SWEETEN:   Same objection.

13     A.   That's privileged.

14     Q.   What was your strategy to ensure that S.B. 14 was

15  passed on the House floor?

16          MR. SWEETEN:   Same objection.  Don't answer the

17  question.  It's legislatively privileged.

18     A.   It's privileged.

19     Q.   How did you prevent chubbing?

20          MR. SWEETEN:   Good lord. Chubbing?

21          MR. FREEMAN: Chubbing.

22          MR. SWEETEN: That sounds like it would ask her to

23  reveal mental impressions, opinions about legislation.  So I'm

24  going to object as legislatively privileged.

25     A.   There was never any debate about chubbing on the



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

 1        floor.

 2                        MR. FREEMAN: Mr. Sweeten, after this deposition

 3        we can have a discussion about what chubbing is.  That's fine.

 4                        MR. SWEETEN: I'd like to know what chubbing is.

 5                        THE WITNESS: I know what chubbing is.

 6          Q.   How did you prepare for the floor debate?

 7                        MR. SWEETEN:  To the extent that that question

 8        would require you to reveal communications between legislators,

 9        legislation staff, state agencies, Texas Legislative Council,

10        constituents or would reveal your thoughts, mental impressions

11        or opinions about the legislation, don't answer the question.

12          A.   It would do all of those.

13          Q.   Did you have any discussions with any individuals on

14        the general subject of the floor debate prior to the floor

15        debate?

16                        MR. SWEETEN: I'm going to let you answer to

17        whether or not you had discussions and the names of the

18        individuals.  Do not reveal the substance of the communication.

19          A.   I had discussions with members of the House that were

20        going to help me with the floor debate.  Discussions with my

21        staff.  I'm trying to remember if there were anyone else.

22        Possibly discussions with Janice.  Possibly discussions with an

23        employee with the Lt. Governor's office.

24          Q.   And who was that?

25          A.   Brian Herbert.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1      Q.    And is that H-a-e-b-e-r-t?

2      A.    I think it's H-e-r-b-e-r-t.

3      Q.    Okay.

4      A.    Spelled Herbert but pronounced Abear.

5      Q.    Very fancy.

6      A.    From who knows where.

7      Q.    Anyone else that you can recall?

8      A.    No.

9      Q.    And who were those legislators?

10     A.    Representative Truitt, Represented Todd Smith,

11  Representative Kelly Hancock, Representative Larry Phillips,

12  Representative Bonnen, Representative Geren, Representative

13  Larry Taylor, and maybe Representative Burt Solomons.

14     Q.    Did you approach these individuals prior to the

15  conversation?  Did you initiate these conversations?

16     A.    I did.

17     Q.    With each individual one on one or in a group?

18     A.    It may have been more than one at a time.

19     Q.    Okay.  Did anyone instruct you as to who you should

20  speak to concerning support during floor debate?

21            MR. SWEETEN:  Don't answer that.  It would

22  require you to reveal communications with another legislator,

23  Texas Leg Council, constituents.  If it doesn't do that, you can

24  answer, but otherwise don't answer the question.

25     A.    No.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1          Q.   Were any of these individuals on the select committee

2     with you?

3          A.   Representative Bonnen was.

4          Q.   Anyone else?

5          A.   I can't remember all the committee members, but since

6     you said that, Representative Aliseda was another one I spoke

7     with.

8          Q.   Okay.

9          A.   And he did serve on the select committee.

10         Q.   Okay.  Were any of these individuals on the Elections

11    committee?

12         A.   Representative Larry Taylor serves on Election

13    committee.

14         Q.   Anyone else?

15         A.   I don't know off the top of my head.

16         Q.   Okay.  Did you prepare any documents prior to the

17    floor debate for use during floor debate?

18              MR. SWEETEN:   You can answer as to whether you

19    prepared a document.  I'll let you answer that, but do not go

20    any further and reveal any sort of substance.

21         A.   Yes.

22         Q.   Who prepared that document?

23         A.   Colby and myself.

24         Q.   When did you prepare that document?

25         A.   Maybe two days before, three days before.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Patricia Harless                                            May 15, 2012

1        Q.   Did anyone else provide input concerning that

2   document?

3        A.   Not that I'm aware of.

4        Q.   Did you receive any other instructions from Speaker

5   Straus' office?

6        A.   No.

7             MR. SWEETEN:  Wait a minute.  I'm going to let

8   you ask if she had communications, but I think instructions,

9   you're starting to get into mental impressions and discussions

10  that she may have had and the specifics of those.  So I'll let

11  you ask it, if you would just ask it as to substance.

12       Q.   Happy to scale it back, as comprise.

13       A.   The Speaker's office did not contact me prior to the

14  debate on the floor.

15       Q.   Did Senator Fraser's office contact you prior to the

16  debate on the floor?

17       A.   I don't think they did.  I think we contacted them.

18       Q.   Were there any e-mails passed between your offices

19  prior to the debate on the floor?

20            MR. SWEETEN:  You can answer about the existence

21  of e-mails.

22       A.   Possible.  I don't know.

23       Q.   Any other documents?

24       A.   Possibly.

25       Q.   Okay.  But not to your recollection?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Patricia Harless                                    May 15, 2012

244

1          A.    No.

2          Q.    That's good enough.  Anyone from -- did you have any

3    communications with anyone from Lt. Governor Dewhurst's office

4    prior to the floor debate?

5                MR. SWEETEN:  I'll let you answer as to existence

6    of communications, not to the substance.

7          A.    As I mentioned, Brian Herbert.

8          Q.    Okay.  I'm going to put a document in front of you

9    that has previously been marked Document 9, U.S. Government 9.

10   Sorry to make you relive 11 hours.

11         A.    Is this the same one or a different one?

12         Q.    That is the House journal.  The one I previously gave

13   you a transcript, that is the full transcript as provided by

14   counsel.  This is the official journal.  Just so we can clarify

15   for the record, is it your understanding that the House journal

16   only prints remarks if a member requests that remarks be printed

17   and that some remarks from the day's floor debate are not

18   included in the House journal?

19         A.    To clarify your statement, I know that if a member

20   requests that it be recorded in the House journal, then it is.

21         Q.    Uh-huh.

22         A.    And I know that not everything is recorded in the

23   House journal, but I don't know if they record stuff without

24   members requesting it.

25         Q.    Okay.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1        A.   I think on occasion, when a member has gone to the

2   back mike, if I remember correctly and said, please let the

3   remarks be recorded in the journal, the speaker has said, it's

4   already been done.  So I don't know what the distinction is.

5        Q.   But not everything will automatically show up in the

6   House journal, correct?

7        A.   Yes. That's a true statement.

8        Q.   Good enough.  Can you turn to Amendment 15 on Page 969

9   and take a look at that amendment.

10       A.   Amendment 15?

11       Q.   That's correct. When Amendment 15 was offered -- well,

12   first, can you explain what the purpose of Amendment 15 was, to

13   the extent of your understanding?

14              MR. SWEETEN:  I'm going to let you discuss it to

15   the extent it appears on public record or you can refer to

16   hearings or committees.  He's asking about purpose though

17   potentially invades and requires you to reveal thoughts, mental

18   impressions, opinions about the legislation, including that

19   amendment offered on Senate Bill 14.  Also could implicate

20   communications that you've had.  Therefore, I want you to be --

21   to answer to the extent it does not invade legislative

22   privilege.

23       A.   I'm not sure what this was about.

24       Q.   Well, can you explain the substance, what it would do?

25       A.   It says fees prohibited for certain forms of



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Patricia Harless                                      May 15, 2012

1     identification documents, and it references the election code

2     strikes.  So I'm not sure exactly what this amendment did except

3     for it's saying you can't charge any fees for identification

4     documents.

5         Q.   And isn't it the case that Amendment 15 would have

6     prohibited fees needed -- fees to obtain a document that may be

7     used as proof of identification under S.B. 14?  Isn't that

8     correct?

9         A.   I'm not sure.  The way it reads, it says for certain

10    forms of identification.  I don't know if they're the same forms

11    that are required to get a driver's license or ID or different

12    forms or -- I can't answer it.

13        Q.   Why did you move to table this amendment?

14             MR. SWEETEN:  Don't answer that.  It would

15    require you to reveal your thoughts, mental impressions,

16    opinions about the legislation.

17        A.   It's privileged, unless it's in the record.

18        Q.   During the debate, do you recall saying that the bill

19    was about voter ID, not issuing documents for free ID?  And I

20    can put in front of you what we're going to mark as U.S. Exhibit

21    24.

22             (Exhibit No. 24 marked)

23        Q.   This is Volume II of the full transcript. And if you

24    look to Page 12.  And perhaps if you could take a look at

25    Representative Martinez's statement, you can get a better sense



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1    of the bill as well, the amendment.

2         A.   That's what I said.

3         Q.   And now that you've read Representative Martinez's

4    statement, can you tell me what the amendment would have done?

5         A.   It -- his statement talks about, he doesn't know where

6    his birth certificate is.  It's probably at his mom's house.  If

7    he had to get a certified copy of his birth certificate he would

8    have to go down to the vital statics and pay $22 in order to get

9    that.

10        Q.   And so essentially, isn't it the case that this

11   amendment would make it free to get the documents that you need

12   to get the free ID?  Is that correct?

13        A.   I don't know that the people that would -- this bill

14   was about providing integrity in the election process and

15   protecting the election process.

16             MR. SWEETEN:  You want to confine your answers to

17   the matters of the public record.  I don't want you to go into

18   reveal thoughts, mental impressions or opinions about the

19   legislation.  So there's a line here.  Clearly, you can discuss

20   the public record.  You can discuss his questions to the extent

21   they appear in the House journal, but I don't want you to go

22   into your mental impressions, opinions about the legislature.

23        A.   And I'll stay with my statement that I said on the

24   record that the bill was about photo ID and not issuing

25   documents for free IDs.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1      Q.   But didn't you earlier say that it was important that

2   an election identification certificate be available for free in

3   order for this not to have a negative impact on any Texans,

4   including minority Texans?

5      A.   I don't know if I said it was important.   I said one

6   of the provisions was a free voter certificate card for people

7   that didn't have one of the approved forms of devices --

8   devices?   -- of IDs.

9      Q.   Okay.   And so I guess I'll ask again, if that was one

10   of the elements of S.B. 14 that helped make it legal, that that

11   ID be available for free, for that to be a free ID, doesn't it

12   need to be free to get the documents that you need to get the

13   free ID, as a matter of logic?

14      A.   I think that's privileged.

15           MR. SWEETEN:   Yeah.   Don't reveal your thoughts,

16   mental impressions, opinions about the legislation.   Okay?

17      Q.   Okay.   I'll simply ask for the record one more time,

18   why did you move to table Amendment 15?

19           MR. SWEETEN:   Same objection. Refer to matters of

20   public record, that it's legislatively privileged.

21      A.   I said, "Members, I'd like to move to table this

22   motion.   This bill is about voter ID and not about issuing free

23   IDs, not about issuing documents for free IDs."

24      Q.   If you could please turn to Page 979 and Amendment No.

25   23 and take a look at that amendment real quickly.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1      A.   979?

2      Q.   979 of the House journal, which is again Exhibit No --

3      A.   9.

4      Q.   Yes, 9.

5      A.   Amendment number?

6      Q.   23, offered by Representative Dutton?

7      A.   It's an amendment to allow for student identification

8  cards by public, private high school or institution of

9  education.

10     Q.   Do you recall telling Bloomberg News -- I believe I

11 showed you the article earlier -- that you wanted a form of

12 identification that was easily recognized by poll workers at the

13 election site?

14     A.   I haven't seen the article, but I remember that

15 statement.

16     Q.   You do remember making that statement?

17     A.   I don't know who I made that statement to, but I've

18 made that statement before.

19     Q.   It's Exhibit 10.  I believe you should have it in

20 front of you, if you want to take a look and refresh your

21 recollection.

22     A.   I've got 11, 4, 12, 7, 6. Do you know about where it's

23 at?  Where it says "Election Integrity, Harless, Republican

24 State Rep, said concerns of constituents about 'the integrity of

25 elections' rather than possible partisan advantage explains why



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1        she sponsored the voter ID measure last year.  The law reduces

2        the possibility of fraud, she said.  Lawmakers excluded student

3        IDs because 'we wanted a form of identification that was easily

4        recognized by poll workers at the election site.'"

5            Q.   So that's a correct statement?

6            A.   Yes.  That's what it says there.

7            Q.   Bloomberg does a better job of quoting than the

8        Houston Chronicle?

9            A.   I don't know.  I recognize saying that statement

10       before.

11           Q.   Okay.

12           A.   Whether it was in this record or that.

13           Q.   Okay.  Didn't you previously testify that your polling

14       place is at a school?

15           A.   At my current home?

16           Q.   Uh-huh.

17           A.   Yes.

18           Q.   So isn't it likely that there wouldn't be more than

19       one or two, a few different high school IDs at any given polling

20       place?

21           A.   I couldn't even speculate on that.

22           Q.   Okay.  Are you aware of how many forms of

23       identification are issued by the United States military?

24           A.   I'm not sure what your question is.

25           Q.   Are you aware of how many forms of identification, how



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

```
 1        many different IDs are issued by the United States military?
 2            A.   In the record we talked about the military ID.  And if
 3        I remember correctly, when asked about that, my response was the
 4        military identification is a card issued by one of the branches
 5        of the service.  Other than that, I don't know.
 6            Q.   Are you aware of whether they issue identification
 7        cards to contractors?
 8            A.   I'm not aware of any of that.
 9            Q.   Are you aware of whether they issue identification
10        cards to family members of active military soldiers?
11            A.   I am not aware of any of that.
12            Q.   Are you aware of whether they issue identification
13        cards to veterans?
14            A.   The active branches of the military?
15            Q.   Or the Veterans Administration?
16            A.   I am aware that the Veterans Administration issues
17        IDs.
18            Q.   And are you aware of whether the military issues ID
19        cards to reservists?
20            A.   I don't know.
21            Q.   Did you assess, when you were working on S.B. 14, how
22        many ID cards were issued by the United States military?
23                 MR. SWEETEN:  Don't reveal thoughts, mental
24        impressions, opinions about the legislation.  Don't reveal
25        communications between legislators, legislative staff, state
```



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1      agencies, Leg Council or constituents.

2           A.   That's privileged.

3           Q.   Do you believe that poll workers will be able to

4      easily recognize military IDs?

5           A.   I think that they are a standardized form.

6           Q.   What is the basis for that belief?

7           A.   If it's issued by one of the branches of the military.

8      If they're a Marine, they have a Marine card.

9           Q.   Have you ever seen a military ID?

10          A.   I think I probably have.

11          Q.   Could you tell me what it looks like.

12          A.   I can't off the top of my head.

13          Q.   Why does S.B. 14 allow military identification and not

14     college identification as a permissible form of ID?

15               MR. SWEETEN: Objection, calls for matters of

16     legislative privilege and asks her to reveal thoughts, mental

17     impressions, opinions or communications she's had with the

18     entities or individuals I've previously named.

19          A.   That's privileged.

20               MR. SWEETEN:  Instruct her not to answer.

21          Q.   Are you aware of the demographics of the college

22     population in the State of Texas?

23          A.   I am not.

24          Q.   Are you aware of whether the population in the State

25     of Texas that is currently attending college is a higher



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1      percentage minority than the population of the state as a whole?

2          A.    I'm not.

3          Q.    Okay.  If you can turn to Amendment No. 30, which is

4      on Page 984, onto 985.  And Amendment 30 added a valid

5      identification card that contains the person's photograph and is

6      issued by a tribal organization to the list of acceptable IDs,

7      correct?

8          A.    Yes.

9          Q.    And you didn't oppose this amendment, correct?

10         A.    Um, we had --

11             MR. SWEETEN:  Just reveal it as to matters of

12     public record.  Don't reveal your thoughts or mental impressions

13     or opinions.  So oppose could be -- if it's a public matter, you

14     can discuss it.   If it's a mental impression or opinion about

15     the legislation, do not.

16         A.    We had considerable amount of debate on the floor or

17     dialogue on the floor about this.  Representative Gonzalez

18     offered the amendment, if I remember correctly.  Then she pulled

19     it down, went to seek counsel with other members, came back with

20     the other members, offered the amendment back.  And we discussed

21     that, in her opinion, all tribal cards were issued by an agency

22     of the federal government.

23         Q.    Uh-huh.

24         A.    And we had a discussion -- I don't remember the

25     specifics of it, but it was on the record -- that if she could



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1    provide me with the information that she was quoting from then I

2    would keep this amendment in the legislation.

3         Q.   Uh-huh.

4         A.   But if she could not provide that, we would not keep

5    it.  We would accept it based on her response that she had this

6    information.

7         Q.   And so is it your statement, then, that it came out in

8    the conference committee because she did not provide that

9    information?

10             MR. SWEETEN:  Same instruction.

11        A.   That's privileged conversation.

12        Q.   You told the Texas Tribune that these IDs do not have

13   a single standardized form; is that correct?

14        A.   If that's what it says I did.

15        Q.   And what was the basis for that statement?

16        A.   That would be privileged conversation.

17        Q.   Are you asserting that the --

18        A.   I'm sorry.  I'm not allowed to do that.

19             MR. SWEETEN:  Go ahead.  You can ask your

20   question again.

21        Q.   What was the basis for your statement to the Texas

22   Tribune that tribal ID do not have a single standardized form?

23             MR. SWEETEN:  You can discuss a public statement,

24   but you can't at the same time reveal thoughts, mental

25   impressions or opinions about the legislation.  So I think that



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1    would be legislatively privileged.  Public matter, though, you

2    can answer questions about the statement, but don't reveal the

3    privileged information.

4         A.   The statement was based on privileged information from

5    conversations with colleagues.

6         Q.   Okay.  What about enhanced tribal IDs issued by the

7    federal government?  Aren't these in a single standardized form?

8         A.   If I remember correctly, that was the term that she

9    used during her presentation of the amendment.

10        Q.   Uh-huh.

11        A.   And could not confirm -- or there was never any proof

12   in the record that she knew that those were the types of IDs

13   that were presented in Texas.

14        Q.   Do you know how many state or federally recognized

15   tribes there are in Texas?

16        A.   I know we discussed that on the floor.  I can't

17   remember.  I remember the debate being about 5,000 tribal

18   members in Texas, but I don't know how many select tribes.

19        Q.   If I can just get -- this is U.S. 25.  And if you can

20   just take a look under Texas and see if you can refresh your

21   recollection.

22                   (Exhibit No. 25 marked)

23        A.   I don't recall ever seeing this document at any time

24   during the debate.

25        Q.   Sure.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Patricia Harless                                    May 15, 2012

1      A.    But on this document it says there are three tribes in

2    Texas.

3      Q.    And so there would only be three forms of ID that we

4    are talking about, right?

5      A.    There are three tribes in Texas.  I don't know if they

6    offer different IDs for different members of the tribe.  I don't

7    know.

8      Q.    So, again, why does S.B. 14 permit military ID but not

9    tribal ID?

10          MR. SWEETEN:  Don't reveal thoughts, mental

11   impressions or opinions about the legislation.

12     A.    Privileged.

13     Q.    Okay.  If we can move on to Amendment 34, which is

14   House Journal Page 987.  Take a quick look.

15     A.    Okay.

16     Q.    Have you taken a look?

17     A.    Amendment 34 would have rendered the act unenforceable

18   if it did not comply with Section 5, Sectin 203 or Section

19   4(f)(4) of the Voting Rights Act, correct.

20     A.    Yes.

21     Q.    Now, you earlier stated that the Texas Legislature

22   considered, as part of its process, why -- whether a law

23   complies with federal law and federal Voting Rights Act,

24   correct?

25     A.    Say that one more time.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

```
 1          Q.   You earlier testified that as part of the legislative

 2    process you would consider whether a law complied with federal

 3    law and the federal Voting Rights Act, correct?

 4                MR. SWEETEN:   Objection.   I'm not sure that

 5    accurately characterizes the specific testimony.

 6          A.   And I agree.   I don't remember specifically what I

 7    said.

 8          Q.   Earlier in the deposition you said that during the

 9    drafting process you depended on the Texas Legislative Council

10    to ensure that laws complied with federal law and the federal

11    Voting Rights Act.

12          A.   I agree I said something similar to that, yes.

13          Q.   But -- and on Page 988 near the top, your third

14    statement, you said, "As I said before, this is a federal issue

15    to be decided by the federal courts.   This isn't for us in the

16    Texas Legislature to discuss right now."

17          A.   That was taking a statement out of context from the

18    record.

19          Q.   I'm asking you if you made that statement.   And if

20    you'd like, I can ask you if you'd like to explain that

21    statement in context.

22                MR. SWEETEN:   Let's just answer the question he's

23    asking.   I think he's asking did you make that statement.

24          Q.   Did you make that statement?

25          A.   Yes.
```



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Patricia Harless                                                    May 15, 2012

1       Q.   Would you like to provide context -- could you provide

2   context for that statement?

3              MR. SWEETEN:  I'm going to instruct her not to

4   reveal thoughts, mental impressions or opinions about the

5   legislation.  She can refer to matters of the public record.

6       A.   I think during the debate it was discussed that the

7   legislation is drafted to comply with the Voting Rights Act.

8       Q.   But you stated that this was not an issue for the

9   Texas Legislature, it was an issue for the federal courts,

10  correct?

11      A.   The debate that he wanted to have in the record --

12             MR. SWEETEN: Just answer his question.  Did you

13  state that?

14      A.   Yes, I stated that.

15      Q.   I'll ask you, since your counsel did not object or

16  provide an objection to stop your testimony, I would ask you to

17  complete the statement that you were making.

18      A.   In this debate that we were having, he wanted to

19  debate the need for the Voting Rights Act.  And I told him I

20  don't think this is the place to debate that.

21      Q.   Okay.  Why did you vote against this amendment?

22             MR. SWEETEN:  Don't answer the question.  It

23  would reveal thoughts, mental impressions, opinions about the

24  legislation and is legislatively privileged.

25      A.   Privileged.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Patricia Harless                                                    May 15, 2012

259

1       Q.   If we can turn to Amendment No. 35 is which is on Page

2    991.  And that only states that Section 203 and 14(f)(4), which

3    probably should be 4(f)(4) of the Voting Rights Act should be

4    applied to this section; is that correct?

5       A.   That's what it says.

6       Q.   Are you aware of what Section 203 and Section 4(f)(4)

7    of the Voting Rights Act do?

8       A.   Not off the top of my head.

9       Q.   Can I represent to you that those are the language

10   minority provisions of the Voting Rights Act that require

11   certain documents to be translated into languages spoken by U.S.

12   citizens within the state?

13      A.   Okay.

14      Q.   What was your understanding of the effect of this

15   amendment to apply those two provisions to the bill?

16           MR. SWEETEN:   That would ask her to reveal

17   thoughts, mental impressions, opinions about the legislation.

18   That would be legislatively privileged for her to provide that

19   answer.

20      A.   And it's privileged, and I wasn't involved in that

21   discussion.

22      Q.   Why did you vote against the amendment?

23           MR. SWEETEN:   Don't answer.

24      A.   It's privileged.

25      Q.   Do you believe that materials that must be printed



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1       under S.B. 14 should be printed only in English?

2               MR. SWEETEN:  The question is does she currently

3       believe that or did she believe it at the time of the passage?

4       Q.    Let's say currently.

5       A.    Okay.  I carried a bill last session that said that

6       the Secretary of State must do the translation because now, in

7       Harris County, we translate in English, Spanish, Vietnamese and

8       Mandarin.  And other counties are required, since the census, to

9       print their ballots in additional language.  So I would say that

10      your statement that you're making or asserting that I believe is

11      not true.

12      Q.    It was a question.

13      A.    Yeah.

14      Q.    So the answer is no?

15              MR. SWEETEN:  Dan, I need to go to the bathroom,

16      so I'll be back.  We can take a very short break.

17              MR. FREEMAN:  Yeah.  I'm almost done.

18              (Recess from 7:04 p.m. to 7:06 p.m.)

19      Q.    With regard to the language requirements that you just

20      discussed in Harris County, are you aware that Section 203 of

21      the Federal Voting Rights Act requires Harris County to print

22      those materials in those languages?

23      A.    I think that you said that earlier.

24      Q.    And so, let me just reiterate my question.  Why did

25      you then vote against an amendment that would simply articulate



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

1      that Section 203 applies to S.B. 14?

2                  MR. SWEETEN:  To not reveal thoughts, mental

3      impressions, opinions about legislation, why you voted for

4      something.  Don't reveal communications that you've had.  Those

5      are legislatively privileged.

6            A.    Privileged.

7            Q.    Okay.  Let's move to Amendment 50, Page 1009 on to

8      1010.  If you can take a quick look through it.  Okay.  So

9      Amendment 50 would have simply reimbursed the costs for poor

10     individuals to travel to obtain ID, correct?

11           A.    Yes.

12           Q.    Why did you vote against this amendment?

13                 MR. SWEETEN:  Objection.  It would require her to

14     reveal thoughts, mental impressions, opinions about legislation

15     and would therefore be legislatively privileged.

16           A.    Privileged.

17           Q.    Isn't is the case that the majority of the individuals

18     who live below the poverty line in Texas are members of racial

19     or language minority groups?

20           A.    I don't know that I know that for sure.

21           Q.    Do you know whether members of racial or language

22     minority groups are more likely to live below the federal

23     poverty line in Texas than Anglos?

24                 MR. SWEETEN:  Objection, asked and answered.

25           A.    I don't know that I know what the breakdown is.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Patricia Harless                                                     May 15, 2012

```
 1          Q.   Okay.  Let's move to Amendment 54 on Page 1015.  We

 2    can take a quick look.

 3          A.   I'm sorry.  I didn't know you were waiting on me.

 4          Q.   No worries.  So Amendment 54 would require the

 5    Secretary of State to determine who is prevented from voting and

 6    who filed provisional ballots that were eventually not counted

 7    because the individual did not later show up to provide the

 8    necessary ID and would require the Secretary of State to record

 9    that by demographics, correct?

10          A.   Yes, that's what it says.

11          Q.   Why did you move to table this amendment?

12               MR. SWEETEN:  Objection.  It would ask her to

13    reveal thoughts, mental impressions, opinions about legislation

14    and it is therefore legislatively privileged.

15          A.   It's privileged.

16          Q.   Would it concern you if members of racial or language

17    minority groups were disproportionately likely to show up at the

18    polling place lacking the necessary ID and then later not return

19    to show ID to have their provisional ballot counted and, thus,

20    not have their ballot counted at all?

21               MR. SWEETEN:  Are you asking her would it concern

22    her now?

23               MR. FREEMAN:  Yes.

24          A.   Could you rephrase the question.

25          Q.   Sure.  Would it concern you if members of racial
```



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1      minority groups or language minority groups were

2      disproportionately -- or a larger share of the group of people

3      who voted by provisional ballot, because they didn't have the

4      necessary ID under S.B. 14 and then did not return, for whatever

5      reason, with the necessary ID in the time frame that S.B. 14

6      allows, and, thus, as a result, that that group of people didn't

7      have their ballots counted?

8           A.   You want me to answer a hypothetical.  We have no

9      evidence that that's going to happen.

10          Q.   But if it did happen, would it concern you?

11          A.   I'm --

12               MR. SWEETEN:  Objection, calls for speculation,

13     assuming facts not in evidence.

14          A.   I can't answer a hypothetical.

15          Q.   Okay.  Let's move on to Amendment 55, which is on Page

16     1016.  Take a quick look.

17          A.   1016.  Okay.

18          Q.   Amendment 55.  Under Amendment 55, the Secretary of

19     State is required to determine whether the majority of voters

20     casting provisional ballots because they lacked photo IDs were

21     members of minority groups, and, if so, if that were the case,

22     would then allow the use of voter registration certificates,

23     correct?

24          A.   That's what it says.

25          Q.   Why did you vote against this amendment?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

ESQUIRE
DEPOSITION SOLUTIONS

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1          MR. SWEETEN:  Objection.  It would ask her to

2     reveal her thoughts, mental impressions, opinions about

3     legislation and, therefore, falls under the legislative

4     privilege.

5          A.   Privileged.

6          Q.   Now, you said on the record -- and it's on Page 1018

7     -- in response to arguments in favor of this amendment that in

8     Crawford V. Marion County Board of Elections that The Court

9     ruled that the requirement to produce photo ID imposes only a

10    limited burden on the voter and justifies by the State's

11    interest in restoring confidence in elections and deferring

12    fraud, correct?

13         A.   Where you are reading that?

14         Q.   On Page 1018.  Top of the page.

15         A.   I did.  That's what the record reflects.

16         Q.   And I know we discussed this a little bit earlier, but

17    are you aware of the nature of the legal dispute in Crawford?

18         A.   It was not exactly off the top of my head.  I've

19    reviewed the case.  It was the case on the voter ID for Indiana.

20         Q.   It was constitutionality, correct?

21         A.   I guess.  I can't remember.

22         Q.   But it wasn't discrimination on the basis of race,

23    right?

24         A.   I can't answer that.  I don't know.

25         Q.   If I can represent to you that it was not --



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Patricia Harless                                        May 15, 2012

 1          A.   Okay.

 2          Q.   -- discrimination on the basis of race.

 3          A.   I trust you.

 4          Q.   I appreciate that.  We've spent a lot of time

 5     together.

 6               How was your response concerning Crawford responsive

 7     to concerns about racial discrimination?

 8               MR. SWEETEN:  You're asking her to interpret

 9     matters that were part of the legislative record.  I'll let her

10     refer to the record in answering that question.  But I think to

11     some extent you're asking her to reveal thoughts, mental

12     impressions, opinions about the legislation.  So to the extent

13     you can refer to public documents, feel free to do so.

14     Otherwise, do not reveal those.  They are subject to the

15     legislative privilege.

16          A.   The record is talking about if -- it says in here that

17     I'm not a big fan of talk radio.  I don't listen to it, and I

18     don't believe everything they say.  So that goes to mention what

19     we talked about earlier.  It talks about the decision.  And

20     they're asking me questions, and I'm answering the questions.  I

21     don't recall.

22               MR. FREEMAN:  I'll object to that as

23     nonresponsive.

24          Q.   But I'll assume the remaining answer to my question

25     would be privileged; is that correct?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

 1         A.   Yes, sir.

 2         Q.   Okay.  Last one.  Amendment No. 58 on Page 1021, if

 3    you could take a quick look.

 4         A.   Is this the amendment?

 5         Q.   Amendment 58.  It's on Page 1021.  Strike Section 25

 6    and substitute a new Section 25.  Do you see that?

 7         A.   Okay.  Yes.

 8         Q.   And so Amendment 58 essentially required a study by

 9    county and according to ethnicity of access to photo ID along

10    with a analysis of potential impact on voter turnout, correct?

11         A.   That's what it says.

12         Q.   Why did you move to table that amendment?

13              MR. SWEETEN:  Don't answer.  The question would

14    ask you to reveal thoughts, mental impressions, opinions about

15    legislation.  Therefore, it's subject to the legislative

16    privilege.

17         A.   I would say it's privileged if there's no more record

18    than this.

19         Q.   Do you recall Representative Anchia asserting that

20    such a study should have been conducted prior to consideration

21    of this bill?

22         A.   I don't recall that specifically.  It doesn't mean it

23    didn't happen.

24         Q.   If I can just quickly put this in front of you.  This

25    should be U.S. 26.  If you can turn very quickly to Page 62



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1     through 64.  Just skim through.

2                       (Exhibit No. 26 marked)

3          A.   And this is from the floor or --

4          Q.   This is a transcript of the March 23rd floor debate.

5     This is Volume III.  This is Day 40.

6          A.   How far do you want me to read through?

7          Q.   Until you move to table.

8          A.   Okay.

9          Q.   Which I believe is Page 64.

10                   MR. SWEETEN:  You've gone past it, I think.

11         A.   It goes to Lamar Davis after that.  Do you have Volume

12    II or Volume III?

13                   MR. SWEETEN:   III.

14         A.   And 63 is talking about studies and 64 is taking about

15    statics.  And then it seems that Yvonne Davis and Anchia have a

16    back-and-forth dialogue to 65, 66.

17         Q.   You move to table on Page 69.  Do you see that?

18         A.   Do I need to know what all this is?

19         Q.   If you can just skim through and see -- do you say

20    anything prior to simply moving to table?

21         A.   I'm on 71 and still don't see where I move to table.

22         Q.   It's the top of 69.  Will you accept my representation

23    that --

24                   MR. SWEETEN:  She's found it.

25         Q.   Do you move to table without responding to any of



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Patricia Harless                                          May 15, 2012

1        Representative Anchia's statements?

2            A.    That's what it shows.

3            Q.    Why did you move to table without responding to any of

4        Representative Anchia's statements?

5                  MR. SWEETEN:   I'm going to object.   The question

6        calls for her to reveal thoughts, mental impressions, opinions

7        about the legislation.   She can answer to the extent that the

8        public record reveals information responsive.   Otherwise, I'm

9        going to instruct her not to answer on the basis of legislative

10       privilege.

11           A.    It's privileged.

12           Q.    Okay.   And do you believe that such information was

13       not necessary to support the bill concerning the effect of the

14       bill in terms of possession of ID based on race?

15                 MR. SWEETEN:   Same objection.

16           A.    Privileged.

17           Q.    We are done with amendments.   If you can mark this as

18       U.S. 27.

19                       (Exhibit No. 27 marked)

20           Q.    This is a declaration that you signed with regard to

21       an assertion of privilege in this case.   Can you take a quick

22       look.   Are you familiar with that document?

23           A.    Yes, sir.

24           Q.    Did you meet with the Office of the Texas Attorney

25       General prior to receiving a copy of this document?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Patricia Harless                                      May 15, 2012

269

```
1            A.   No.

2            Q.   Who wrote this document?

3            A.   I received it from my chief of staff.

4            Q.   Did you write this document?

5            A.   I never asked him --

6            Q.   Are you aware of whether he wrote this document?

7            A.   I don't know.  We discussed the issues that should go

8       into the document, but --

9            Q.   Did your chief of staff draft this document?

10           A.   I didn't ask him.

11           Q.   But did you have a conversation about this document

12      with your chief of staff before you received the document?

13           A.   Yes.

14           Q.   And did you have a conversation with the Office of the

15      Texas Attorney General before you received this document?

16           A.   No.

17           Q.   Are you aware of any supporter of the bill who is not

18      asserting attorney/client privilege, legislative privilege, and

19      any other privilege available under state or federal law to

20      protect from disclosures in this case?

21                MR. SWEETEN:  When you're answering that

22      question, don't reveal any communications that you've had with

23      our office or meetings or other discussions.

24           A.   I'm not aware.

25           Q.   Has anything changed since you signed this
```



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Patricia Harless                                              May 15, 2012

1    declaration?  Do you stand by everything in the declaration

2    today?

3                    MR. SWEETEN:  Take your time to the extent you

4    need to answer his question.

5        A.    Yes.

6        Q.    The next two questions I'm going to ask concern

7    conversations that didn't happen on the House floor.  I'm

8    curious about what gets said in members' offices at lunch,

9    fundraisers, etcetera.  Have you ever heard a legislator in

10   those contexts in any other who voted in favor of S.B. 14 state

11   that a photo ID requirement would prevent any registered voter

12   from voting?

13                   MR. SWEETEN:  The question -- the scope of the

14   question is very broad.  I'm not clear as to what -- are you

15   talking at matters prior to the passage of it, or can you be

16   specific as to what you're asking.  It will help me in knowing

17   whether to assert privileges to the question.

18       Q.    I'm asking in any circumstance, private circumstance,

19   so off the floor, have you ever heard any legislator who voted

20   in favor of S.B. 14 state that S.B. 14 would, in effect, prevent

21   any registered voter from voting?

22                   MR. SWEETEN:  I'm going to instruct you not to

23   answer.  He has not limited the question.  To the extent this

24   question could reveal communications with legislators,

25   legislation staff, state agencies, Texas Legislative Council or



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

 1        constituents, that would be legislatively privileged.

 2            A.    That's privileged.

 3            Q.    And have you ever heard a legislator who voted in

 4        favor of S.B. 14 explain that voter ID would prevent any

 5        minority registered voter from voting?

 6                  MR. SWEETEN:   Same instruction.

 7            A.    Privileged.

 8            Q.    Now, distinctly with regard to the purpose of the

 9        bill, do you believe that S.B. 14 has no purpose to reduce the

10        number of Hispanic voters who will be able to vote in elections

11        in Texas?

12                  MR. SWEETEN:   This question has been asked and

13        answered.   I think --  and we've had a discussion at lunch

14        regarding purpose and questions about that.   I will let her

15        discuss what she believes the purpose of the bill is.   We will

16        allow that.   She will not be able to talk about what other

17        people think, what other legislators' opinions are, but I will

18        allow her to testify as to the purpose of the bill.

19            Q.    In the context -- I am asking in the context of all

20        the aspects of the legislative process that led up to passage of

21        the bill, with regard to the purpose of the bill in its

22        complete, all provisions, do you believe that S.B. 14 has no

23        purpose to reduce the number of Hispanic registered voters who

24        will be able to vote in elections in Texas?

25                  MR. SWEETEN:   I think the way you've asked this



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Patricia Harless                                        May 15, 2012

1      question, you're asking her to reveal matters up until the time

2      of the passage of the bill that could include thoughts, mental

3      impressions, discussions, communications with other legislators.

4      I think your question as phrased is directly -- would require

5      her to give information that is legislatively privileged.  So

6      I'm going to instruct her accordingly.

7                   MR. FREEMAN:  Mr. Sweeten, can I ask, based on

8      your understanding of the privilege, as you're asserting this

9      privilege, do you believe there's a way to phrase this question

10     that I can ask with regard to the purpose of the bill and with

11     whether a particular purpose was a purpose of the bill that

12     would ask for purpose but not intent, because you've agreed, I

13     believe, that purpose is a permissible inquiry.

14                  MR. SWEETEN:  We're attempting to accommodate you

15     based upon the letter that we received earlier today and our

16     discussions.  We also are very cognizant of her legislative

17     privilege.  Again, I can allow her to testify about what she

18     believes the purpose -- what the purpose of the bill.  She can

19     testify to that.  We'll let her do that.

20                  MR. FREEMAN:  Okay.

21         A.   As I've answered earlier and as I stated on the floor

22     a number of times and in committee, the purpose of S.B. 14 was

23     to increase and improve the integrity of the election process.

24         Q.   And I'm asking whether there was any secondary

25     subsidiary purpose behind the bill in any aspect that was



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1    motivating the bill, not just on your part, but on the part of

2    the legislators advancing the bill.

3        A.   I can't answer for anyone other than myself.  The

4    purpose of S.B. 14, as I've stated over and over, was to improve

5    the integrity of the election process.

6        Q.   Let's wrap this up then.  Are there any answers you

7    wish to change from what you said earlier?

8        A.   Heck, I can't even remember past the last five

9    questions.  I'm stuck in the amendments.

10       Q.   It's been a long day.  I appreciate your time.  Any

11   information that you didn't recall before that you now recall?

12       A.   No, sir.

13       Q.   Anything you'd like to add so we can understand your

14   questions more clearly?

15           MR. SWEETEN:  Let me take one minute with her.

16               (Brief off-record discussion)

17           THE WITNESS:  The only thing that I might want to

18   add is that I had met with the AG's office and there was

19   discussion about --

20           MR. SWEETEN:  Don't talk about what it was about.

21   You met with the AG's Office.

22           THE WITNESS:  We met with the AG's office prior

23   to signing this affidavit.

24       Q.   Prior to signing?

25       A.   Uh-huh.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1          Q.    But did you meet with the AG's office prior to

2     receiving a copy of the draft?

3          A.    I don't know that I did.

4          Q.    Okay.

5          A.    I can't remember.

6                MR. FREEMAN:  Okay.  I appreciate the correction.

7     Thank you.  And thank you for your testimony.  I want to state

8     that the deposition is left open pending decisions on the, I

9     believe as Mr. Sweeten said, 300 assertions of privilege as well

10    as over various documents and other testimony, and I now pass

11    the witness to Mr. Rosenberg.

12                THE WITNESS:  Thank you.

13                      EXAMINATION

14    BY MR. ROSENBERG:

15         Q.    I'm obviously not going to repeat everything that

16    Mr. Freeman did.  Just a few questions, Representative Harless.

17    And thanks for your patience during the day.  Can we show

18    Representative Harless U.S. 19.  Is that the op-ed piece?  And

19    looking at the first paragraph, the last sentence actually says

20    -- second paragraph -- the first paragraph is one sentence, "Yet

21    as the U.S. Department of Justice reviews the law for

22    preclearance under the Voting Rights Act, a barrage of

23    inaccurate attacks has been levied against our election

24    integrity bill that must be corrected."  Do you see that?

25         A.    Yes, sir.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1          Q.    What did you mean by a barrage of inaccurate attacks?

2                MR. SWEETEN:   You can reference the public

3     statement made.   Don't reference your mental impressions about

4     the passage of Senate Bill 14.

5                MR. ROSENBERG:   Mr. Sweeten, let me respond to

6     that because I respectfully request that you withdraw that

7     objection.   We're dealing with a public statement that

8     Ms. Harless made.   If it happens to have been based on

9     privileged information, then I would submit that she's waived

10    that privileged information.   We have the right to inquire as to

11    the entire basis.

12               MR. SWEETEN:   I'm going to let her discuss

13    matters of the public record, including this statement.   She

14    hasn't waived and she hasn't revealed her thoughts, mental

15    impressions or opinions about the legislation that preceded

16    this.   She's made this statement.   She can answer questions

17    about the statement.   I will allow that to occur.

18         Q.    My question remains, what do you mean by a barrage of

19    inaccurate attacks?

20         A.    As we debated in the record, there were some

21    inaccuracies in information that was being repeated.   And I

22    can't name specifically.

23         Q.    Can you name any one?

24         A.    Not off the top of my head.

25         Q.    Can you name who was making these inaccurate attacks?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1          A.   No.

2          Q.   Turn your attention to the second page, the paragraph

3    that's going to be a little hard to read because it's

4    overwritten, but I'll try to read it and you tell me if I'm

5    accurate.   "While an ID requirement may place a burden on

6    voters;" do you see that?

7          A.   Yes, sir.

8          Q.   And then you go on to quote from Justice Stevens.  Do

9    you see that?

10         A.   Yes, sir.

11         Q.   What do you mean by burden?

12         A.   I honestly can't tell you what emotions I was going

13   through at the time I wrote this.

14         Q.   Well, let me ask you this.

15         A.   And what had prompted up to it.

16         Q.   Do you think it's a burden -- did you think it was a

17   burden on voters who did not have a photo ID to get a photo ID?

18         A.   I think the record that I've talked about over and

19   over a number of times is that we provided for those that do not

20   have one of the approved forms of ID to have an opportunity to

21   get a free ID, and that that's no more cumbersome in the record

22   than the act of voting.

23         Q.   Well, if someone has a photo ID and someone does not

24   have a photo ID, you would admit that there is at least some

25   burden on the fact that the person who does not have a photo ID



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Patricia Harless                                               May 15, 2012

```
 1        to go and get a photo ID; is that correct?

 2                     MR. SWEETEN:  You can answer in the context of

 3        the public statement.  Don't reveal privileged information.

 4                     MR. ROSENBERG:  Again, I disagree with that,

 5        Mr. Sweeten, and would ask you to withdraw that objection in the

 6        context of a statement that Representative Harless made in

 7        public.

 8                     MR. SWEETEN:  If you're asking her about the

 9        public statement, I've again said that she can answer questions

10        about that.

11                     MR. ROSENBERG:  I'm asking her what she meant by

12        something she wrote in public.

13        A.    I can't tell you what every word that I wrote meant at

14        the time that I wrote it, which was November the 14th of 2011.

15        Q.    I understand that.  That's why I'm only asking about

16        one word, burden.

17        A.    I don't know what you want me to answer.  I'm not sure

18        what you're asking.

19        Q.    Let me ask it again.

20        A.    Do you want me to define what burden means?

21        Q.    In the context of how you were using it in this

22        article, yes.

23        A.    Well, I'm not -- I said while an ID requirement may

24        place a burden.  It may.  I don't know that it will.

25        Q.    What kind of burden were you talking about?
```



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Patricia Harless                                           May 15, 2012

278

1          A.    That someone shows a photo ID when they vote.

2          Q.    How about that someone has to go and get a photo ID if

3    they don't already have one?  Would that be a burden?

4          A.    I don't know that that's what I was referring to at

5    the time that I wrote this.

6          Q.    Well, if someone had to go to a motor vehicle facility

7    to get either a driver's license or a voter identification,

8    would that be a burden that someone who already had a driver's

9    license or a voter identification would not have?

10         A.    I don't think that's what I was discussing in this

11   statement.

12         Q.    Would you agree that would be a burden, though?

13         A.    No, I don't.

14         Q.    Well, what if someone had to drive 100 miles to the

15   motor vehicle facility as opposed to someone who already had a

16   driver's license or a photo identification?  Would you agree

17   that that would be more of a burden on the person who had to

18   drive the 100 miles than the person who did not have to drive

19   the 100 miles?

20         A.    I don't think that that's part of the debate or the

21   record and it's -- you know, what one person may think is a

22   burden I may not think is a burden.

23         Q.    Is it your testimony that there was nothing in the

24   public record about the burden on people who had to travel to --

25   long distances to motor vehicle facilities?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Patricia Harless                                                    May 15, 2012

1          A.   That's not what I said.   I think there was members

2     that talked about that people had to travel to motor vehicle

3     divisions, but we don't know if there are actually any of those

4     people that don't already have one of the approved forms of ID

5     or that aren't already eligible to vote by ballot by mail

6     whether they're senior or disabled.   So I can't speculate on if

7     that person actually exists.

8          Q.   Was there also discussion in the public record during

9     the debate in S.B. 14 that people who were minorities were more

10    likely to be further away from motor vehicle facilities than

11    non-minorities?

12         A.   I don't recall that discussion.   It could be possible.

13    But if you don't live close to a DPS station, you don't live

14    close to it whether you're Caucasian or a minority.

15         Q.   Was there any discussion in the public record as to

16    whether or not minorities would be less likely to have

17    transportation to get to motor vehicle facilities than

18    non-minorities?

19         A.   I don't recall the exact testimony.

20         Q.   Would you agree that someone who did not have motor

21    vehicle transportation or public transportation to get to a

22    motor vehicle facility and who did not have a driver's license

23    would have more of a burden on that person than someone who

24    already did have a driver's license?

25              MR. SWEETEN:   Objection, asked and answered, but



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

 1    go ahead.

 2              MR. ROSENBERG:  Not quite, but go ahead.

 3         A.   I don't know that that person doesn't already have one

 4    of the other approved forms of ID.  I don't know that they have

 5    to get the free ID.

 6         Q.   Let's assume that that person has none of the other

 7    IDs.

 8         A.   I'm not going to assume.  I'm not going to assume that

 9    some person may exist out there.

10         Q.   Is it your testimony that there is no one who does not

11    have any of the photo IDs under S.B. 14?

12         A.   I've never said that in testimony.

13         Q.   Was there any analysis or study done to see how many

14    individuals did not have the requisite photo ID during the

15    consideration of S.B. 14?

16              MR. SWEETEN:  Do not reveal thoughts, mental

17    impressions, opinions about legislation or communications that

18    you've had with legislators, legislative staff, state agencies,

19    Texas Leg Council or constituents.  You can refer to the public

20    record.

21         A.   That's privileged.

22         Q.   Do you agree that there are people who do not have a

23    birth certificate in Texas?

24         A.   That's not part of the record.

25         Q.   Do you think that's an important consideration in



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

```
 1      terms of whether or not there are people who might be burdened

 2      by the requirements of S.B. 14?

 3                  MR. SWEETEN:  Objection.  You're calling for

 4      matters that are subject to the legislative privilege, which

 5      includes her thoughts, mental impressions about the bill.  If

 6      you can answer based upon the public record, feel free to do so.

 7           A.   Privileged.

 8           Q.   Would you consider that a burden if someone did not

 9      have a birth certificate, did not have a driver's license, did

10      not have any of the photo identification requirements under S.B.

11      14?

12           A.   I don't recall that being discussed in the record.

13           Q.   Would you consider that a burden?

14           A.   I'm not going to answer that for privilege.

15           Q.   Would you consider that a burden today?

16           A.   Excuse me?

17           Q.   Would you today, sitting here today -- I'm not asking

18      prior to S.B. 14.  Sitting here today, would you consider that a

19      burden?

20           A.   Consider?

21           Q.   Consider a person who does not have any of the photo

22      identifications under S.B. 14 and who did not have a birth

23      certificate in order to get one of the photo identifications

24      under S.B. 14, would you consider that person more burdened than

25      someone who already had a photo ID?
```



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1      A.   I can't answer that because I don't know that the

2   birth certificate is the only form of ID that we discussed that

3   you are required to have to get an ID.  I don't know what the

4   specific identification.

5      Q.   Well, if a person had none of the identification that

6   are listed under S.B. 14 that would allow that person to get a

7   driver's license or voter identification, would you consider

8   that, sitting here today, more of a burden on that person than

9   the person who already has the photo ID?

10      A.   I'm not going to speculate on if some person that

11   meets all that criteria actually exists in Texas.  I'm not going

12   to speculate on it.

13      Q.   Have you looked to see or done any kind of analysis as

14   to whether or not such a person exists in the State of Texas?

15      MR. SWEETEN:  Do not reveal your thoughts, mental

16   impressions, opinions about legislation or efforts, including

17   communications with legislators, legislative staff, state

18   agencies, Texas Leg Council or constituents considering this

19   bill.

20      A.   By answering that, I'd waive privilege, and I can't do

21   that.

22      Q.   Do you know how much it costs to get a birth

23   certificate?

24      A.   I think we talked today about it.  And somewhere in

25   the record somebody made mention of, I think $22, I think.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1          Q.   You think that it would be -- if a person needed to

2     get a birth certificate in order to get the requisite photo

3     identification under S.B. 14, paying $22 would be an additional

4     burden on that person not imposed on people who already have the

5     photo ID?

6               MR. SWEETEN:  You're asking her questions about

7     Senate Bill 14.  You're asking her to reveal mental impressions,

8     opinions about the legislation.  That is squarely within the

9     legislative privilege.  That's what you're asking.  Objection.

10         A.   I can't answer that.

11         Q.   Sitting here today, do you consider that more of a

12    burden, someone who had to pay $22 for a birth certificate in

13    order to meet the requirements of S.B. 14?

14         A.   I can't speculate if that's a burden for that person.

15    I don't know why they need the birth certificate.  I don't know

16    if that's their only form of ID.  I can't speculate on that.

17         Q.   Do you think $22 is an insignificant sum?

18         A.   I guess if I needed a birth certificate to get a job,

19    I would not think it is.  I don't know.

20         Q.   What's a Calendar committee or Calendars committee?

21         A.   It's the committee that bills go to in order to get

22    set on the calendar for the floor.

23         Q.   And how long typically do bills sit in the Calendars

24    committee awaiting placement on the calendar?

25         A.   I don't serve on that committee and I don't know if



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1       there's any specific time frame.

2               Q.    Can you give me a range?

3               A.    I can tell you I've had bills in Calendars for up to

4       two or three months.  I've had bills die in calendars.  I don't

5       know how they operate and what the priority is.

6               Q.    Do you know how long it took S.B. 14 from the time the

7       committee report was received by the Calendars committee to the

8       time it was placed in the calendar the first time?

9               A.    I don't remember.  I saw something, but I don't

10      remember.

11              Q.    If I suggested it was under two hours, would that be

12      right?

13              A.    I couldn't answer that.  I don't know.

14              Q.    Does it sound wrong?

15              A.    I don't know.

16              Q.    Do you recall what happened after S.B. 14 was placed

17      on the calendar the first time?

18              A.    The very first time?

19              Q.    The very first time.

20              A.    When we got to the floor debate?

21              Q.    Right.

22              A.    We started the floor debate, and then there was a

23      point of order called and it was upheld.

24              Q.    And it was because there was a material error in the

25      bill?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1           A.   I don't recall exactly.  I remember what the error

2      was, but I don't know if it was in the bill or in the summary,

3      the bill analysis.  I don't know which one it was.

4           Q.   There's a reference to business days as opposed to

5      calendar days?

6           A.   Exactly.

7           Q.   And what happened as a result of that?  Point of order

8      was sustained.  What does that mean?

9                MR. SWEETEN:  We're talking about the process of

10     Senate Bill 14.  I want to remind her -- I don't want you to

11     discuss mental impressions, opinions about legislation.  You can

12     talk about matters of public record.  If that's what we're

13     doing, you can provide that.

14               MR. ROSENBERG:  And just for the record, Mr.

15     Sweeten, is it your position that testimony as to the regularity

16     or irregularity of the procedure used in S.B. 14 is privileged?

17               MR. SWEETEN:  It depends on the way you ask it.

18     And let's be very clear.  When you asked about the calendar

19     committee or, you know, how common it is, I've let her answer

20     those questions.  Let's not pretend that I've shut that down.

21     That hasn't happened.

22               MR. ROSENBERG:  I haven't pretended anything.

23               MR. SWEETEN:  Okay.  So you can ask her questions

24     about procedure, about how it works generally.  When it comes to

25     Senate Bill 14 and her considerations of that legislation,



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1    that's where I'm asserting privilege.  I'm not -- we'll leave it

2    at that.

3                    MR. ROSENBERG:  Can we have the question read

4    back.

5                    THE REPORTER:  Question: "And what happened as a

6    result of that?  Point of order was sustained.  What does that

7    mean?

8        Q.   We were at the point of order business day, calendar

9    day.

10       A.   They called the point of order from the record.  The

11   parliamentarian ruled on the point of order, that it was -- I

12   don't know the proper term -- a valid point of order, and the

13   bill was -- I think I remember it being re-referred to

14   committee.

15       Q.   Right.  And after it was re-referred to committee went

16   back to the Calendars committee, right?

17       A.   After it goes to committee -- the procedure is after a

18   bill goes to committee, is voted out of committee, then it goes

19   to Calendars to be voted out of Calendar.

20       Q.   And do you recall how long it sat in Calendars

21   committee the second time?

22       A.   I don't.

23       Q.   If I suggested 12 minutes, would that be about right?

24       A.   I have no clue.

25       Q.   Can you -- that's pretty short, though; would you



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

1      agree?

2          A.   I don't know.  I mean, as a member, we don't

3      necessarily know when our bills get to Calendars.  So I don't

4      know what the time frame is.

5          Q.   Would you agree that a total of -- let's assume around

6      80 minutes the first time it sat in the Calendar committee and

7      the second time it sat in the Calendars committee is unusually

8      short for a bill of this importance?

9          A.   I can't answer that.  I don't know.  I don't know.  I

10     don't serve on that committee.  I don't know how long it usually

11     takes them to get the paperwork and if there was a delay in the

12     paperwork and after they get it how long. I don't know the

13     procedures of how that committee operates.

14         Q.   And I assume, then, you can't name any other bill that

15     sat in the committee that short?

16         A.   I can't.  I don't know.

17         Q.   Were you a legislator in 2009?

18         A.   I was.

19         Q.   And this is really for Mr. Sweeten's edification.  Why

20     don't you tell him what chubbing is.

21         A.   Chubbing is when members take a bill to the -- it's

22     filibuster, in essence, in the Texas House.

23         Q.   And do you recall something called a chub-a-thon?

24         A.   I remember I had legislation that died because of

25     chubbing.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Patricia Harless                                         May 15, 2012

288

```
 1           Q.   And when was that?

 2           A.   That was in 2009.

 3           Q.   And that was on H.B. 112?

 4           A.   No.

 5           Q.   What was it?

 6           A.   I think the chubbing, if I remember correctly, wasn't

 7      pertaining to the voter ID legislation.  The chubbing was on our

 8      local and consent calendar.  And local and consent calendar, the

 9      procedures typically are the member lays out the bill and it's a

10      local issue.  It's voted without debate.  And they use the rules

11      to talk each of those local and consent bills to where it bumped

12      the general calendar to the next day.

13           Q.   Are you aware of when the use of the local and consent

14      -- is it local consent calendar -- was used by a minority to

15      block a previous photo ID bill.

16           A.   That was when the chubbing, but I'm not sure -- I

17      don't know.  I'm not exactly sure why the chubbing -- I can't

18      remember exactly.  I don't remember the voter ID bill getting on

19      the calendar.  Was it?  You must know.

20           Q.   I can't answer questions.  I can only ask them.

21      Sorry.

22           A.   Yeah.  I don't remember.  I remember the chubbing on

23      the local calendar.  I knew that it was to stall, to get -- so

24      we wouldn't get to the general calendar.  But I don't know why.

25           Q.   You don't recall if it was specifically used in
```



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Patricia Harless                                    May 15, 2012

1    opposition to a photo ID bill?

2         A.    No.  I don't know.  I seem to vaguely remember

3    conversation about that, but it was conversation.

4         Q.    Do you know what the two-thirds rule is?

5         A.    In the Senate?

6         Q.    Yes.  Are you familiar with that?

7         A.    A little.

8         Q.    And what little?

9         A.    I'm just a little familiar of the debate by Dan

10   Patrick and other members of the Senate about the value of the

11   two-thirds and not.

12        Q.    Was there a change in the two-thirds rule?

13        A.    In the Senate on this?

14        Q.    Yes.

15        A.    It seemed like, if I remember correctly, that the

16   members of the Senate voted to suspend the two-thirds for this

17   one piece of legislation, but I can't say that for sure.

18        Q.    And the one piece of legislation was photo ID bill?

19        A.    I think it was S.B. 14.

20        Q.    Just a couple of tie-up points.  You testified I think

21   that there were conversations that you had with Catherine

22   Engelbrecht?

23        A.    I heard Catherine's name.

24        Q.    Right.  And I think you testified that there were

25   conversations you had with Catherine Engelbrecht concerning the



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Patricia Harless                                              May 15, 2012

1     photo ID bill; is that correct, without going into what the

2     substance was?

3         A.   I think the conversation was after the bill was heard

4     in committee she visited my office.

5         Q.   Right.  I don't think you were asked and just to tie

6     it up, can you tell me what you and she talked about?

7                   MR. SWEETEN:  I'm going to object.  It calls for

8     matters that are legislatively privileged or communication

9     specifically.

10        Q.   And similarly, I think you were asked about

11    conversations with George Hammerline.

12        A.   Yes.

13        Q.   Concerning S.B. 14, correct?

14        A.   After the bill was heard in committee, George stopped

15    by the office.

16                  MR. SWEETEN:  Don't reveal communications or the

17    substance of them.  You can talk about the existence of the

18    communication.

19        Q.   And now I will ask you something that your attorney

20    will tell you you can't talk about.  What were the substance of

21    the conversation or conversations that you had with

22    Mr. Hammerline concerning the photo ID bill?

23                  MR. SWEETEN:  Objection.  That's subject to the

24    legislative privilege.

25        A.   And that's privileged communications with



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1   constituents.

2       Q.   Are you aware of any information contrary to the

3   positions that you took on the floor concerning the impact of

4   S.B. 14 on minorities that has not been made public?

5           MR. SWEETEN:  Do not reveal any thoughts, mental

6   impressions, opinions about the legislation or communication

7   with legislators, legislative staff, state agencies, Texas Leg

8   Council or constituents.

9       A.   My opinions would be privileged.

10          MR. ROSENBERG:  Thank you very much.  Told you

11  I'd be quick.

12          MR. SWEETEN:  Let me make a statement on the

13  record.  We have gone seven hours with Representative Harless

14  and she has sat here and we've answered a tremendous number of

15  questions posed by Mr. Freeman and Mr. Rosenberg.  So the

16  gratuitous remark about objections, yes, but there were many

17  objectionable questions asked of Representative Harless.

18          MR. ROSENBERG:  And just so my record is kept

19  open, I'd like to keep my record open for the same reasons that

20  Mr. Freeman stated.  Thank you very much.

21          (Deposition concluded at 7:11 p.m.)

22

23

24

25



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Patricia Harless

```
 1                        CHANGES AND SIGNATURE

 2

 3        WITNESS NAME_____ DATE OF DEPOSITION_____

 4        PAGE LINE      CHANGE        REASON

 5        _____

 6        _____

 7        _____

 8        _____

 9        _____

10        _____

11        _____

12        _____

13        _____

14        _____

15        _____

16        _____

17        _____

18        _____

19        _____

20        _____

21        _____

22        _____

23        _____

24        _____

25        _____
```



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1        I, REPRESENTATIVE PATRICIA HARLESS, have read the

2    foregoing deposition and hereby affix my signature that same is

3    true and correct, except as noted above.

4

5

6                    _____

                     REPRESENTATIVE PATRICIA HARLESS

7

8

9        THE STATE OF TEXAS   )

10       COUNTY OF TRAVIS     )

11              Before me,_____, on this day personally

12   appeared REPRESENTATIVE PATRICIA HARLESS known to me (or proved

13   to me under oath of through_____) (description of

14   identity card or other document) to be the person whose name is

15   subscribed to the foregoing instrument and acknowledged to me

16   that they executed the same for the purposes and consideration

17   therein expressed.

18              Given under my hand and seal of office this_____

19   day of _____.

20

21

22                    _____

                      NOTARY PUBLIC IN AND FOR

23                    THE STATE OF

24

25



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

```
1                   IN THE UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF COLUMBIA
2
         STATE OF TEXAS,                   )
3                 Plaintiff,               )
                                           )
4        V.                                )
                                           )
5        ERIC H. HOLDER, JR.,              )
         in his official capacity          )
6        as Attorney General of            )
         the United States,                )
7                 Defendant.               )
                                           )
8        ERIC KENNIE, et al.,              )
              Defendant-Intervenors,       )
9                                          )
         TEXAS STATE CONFERENCE            )   CASE NO. 1:12-CV-00128
10       OF NAACP BRANCHES, et al.,        )   (RMC-DST-RLW)
              Defendant-intervenors,       )   Three-Judge Court
11                                         )
         TEXAS LEAGUE OF YOUNG             )
12       VOTERS EDUCATION FUND, et al.,    )
              Defendant-Intervenors,       )
13                                         )
         TEXAS LEGISLATIVE BLACK           )
14       CAUCUS, et al.,                   )
              Defendant-Intervenors,       )
15                                         )
         VICTORIA RODRIGUEZ, et al.,       )
16            Defendant-Intervenors.       )
17                          REPORTER'S CERTIFICATION
                   DEPOSITION OF REPRESENTATIVE PATRICIA HARLESS
18                                MAY 15, 2012
19                I, Amy C. Kofron, Certified Shorthand Reporter in
20       and for the State of Texas, hereby certify to the following:
21                That the witness, REPRESENTATIVE PATRICIA
22       HARLESS, was duly sworn by the officer and that the transcript
23       of the oral deposition is a true record of the testimony given
24       by the witness;
25                          That the deposition transcript was submitted
```



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Patricia Harless                                                    May 15, 2012

1    on_____ to the witness or to the attorney for the

2    witness for examination, signature and return to me

3    by_____;

4              That the amount of time used by each party at the

5    deposition is as follows:

6              Mr. Freeman 06:33

7              Mr. Rosenberg 00:24

8              That pursuant to information given to the

9    deposition officer at the time said testimony was taken the

10   following includes counsel for all parties of record:

11             Mr. Sweeten, Attorney for Plaintiff

               Mr. Freeman, Attorney for Defendant

12             Mr. Rosenberg, Attorney for Defendant-Intervenor

               Mr. Dunn, Attorney for Defendant-Intervenor

13

14             I further certify that I am neither counsel for,

15   related to, nor employed by any of the parties or attorneys in

16   the action in which this proceeding was taken, and further that

17   I am not financially or otherwise interested in the outcome of

18   the action.

19             Certified to by me this_____day of_____, 2012.

20

21   

22             Amy C. Kefron, Texas CSR #6352

23             Expiration Date: 12/31/2013

               Esquire Deposition Solutions

24             100 Congress Avenue, Suite 2020

               Austin, Texas 78701

25

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS