# EXHIBIT 4

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS,                    )
                                   )
          Plaintiff,               )
                                   )
VS.                                )
                                   )
ERIC H. HOLDER, JR. in his         )
official capacity as Attorney      )
General of the United States,      )
                                   )
          Defendant,               )
                                   )
ERIC KENNIE, et al,                )
                                   )
   Defendant-Intervenors,          )
                                   )
TEXAS STATE CONFERENCE OF          )   CASE NO. 1:12-CV-00128
NAACP BRANCHES,                    )   (RMC-DST-RLW)
                                   )   Three-Judge Court
   Defendant-Intervenors,          )
                                   )
TEXAS LEAGUE OF YOUNG VOTERS       )
EDUCATION FUND, et al,             )
                                   )
   Defendant-Intervenors,          )
                                   )
TEXAS LEGISLATIVE BLACK            )
CAUCUS, et al,                     )
                                   )
   Defendant-Intervenors,          )
                                   )
VICTORIA RODRIGUEZ, et al.,        )
                                   )
   Defendant-Intervenors.          )

     *********************************************
                  ORAL DEPOSITION OF
                    JANICE McCOY
                   MAY 16, 2012
     *********************************************



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                                    MAY 16, 2012

2

1           ORAL DEPOSITION OF JANICE McCOY, produced as a

2     witness at the instance of the Defendant, was duly

3     sworn, was taken in the above-styled and numbered cause

4     on the MAY 16, 2012, from 9:39 a.m. to 6:24 p.m., before

5     Chris Carpenter, CSR, in and for the State of Texas,

6     reported by machine shorthand, at the offices of The

7     United States Attorney's Office, 816 Congress Avenue,

8     Suite 1000, Austin, Texas 78701, pursuant to the Federal

9     Rules of Civil Procedure and the provisions stated on

10    the record or attached hereto.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

3

```
 1
 2
 3                    A P P E A R A N C E S
 4      FOR THE PLAINTIFF, STATE OF TEXAS:
 5              Matthew Frederick
                Patrick K. Sweeten
 6              OFFICE OF THE ATTORNEY GENERAL OF TEXAS
                P.O. Box 12548
 7              Austin, TX  78711-2548
 8              209 West 14th Street
                8th Floor
 9              Austin, TX  78701
                (512) 936-1307
10              matthew.frederick@texasattorneygeneral.gov
11
12      FOR THE DEFENDANT, HOLDER, ET AL:
13              Jennifer Maranzano
                Elizabeth S. Westfall
14              U.S. DEPARTMENT OF JUSTICE
                950 Pennsylvania Avenue, NW
15              NWB - Room 7202
                Washington, DC  20530
16              (202) 305-7766
                jennifer.maranzano@usdoj.gov
17              elizabeth.westfall@usdoj.gov
18      FOR THE DEFENDANT-INTERVENOR TEXAS STATE CONFERENCE OF
        NAACP BRANCHES AND THE MEXICAN AMERICAN LEGISLATIVE
19      CAUCUS:
20              Ezra D. Rosenberg
                DECHERT, LLP
21              Suite 500
                902 Carnegie Center
22              Princeton, NJ  08540-6531
                (609) 955-3200
23              ezra.rosenberg@dechert.com
24
25
```



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                        MAY 16, 2012

                                                              4

1       FOR THE KENNIE INTERVENORS:

2               Chad W. Dunn
                BRAZIL & DUNN, LLP
3               4201 Cypress Creek Parkway
                Suite 530
4               Houston, TX  77068
                (281) 580-6310
5               chad@brazilanddunn.com

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1                              INDEX

2    Appearances.....................................3

3    JANICE McCOY

4           Examination by Ms. Maranzano..............7
            Examination by Mr. Dunn.................227

5
     Signature and Changes.........................286

6
     Reporter's Certificate........................288

7
                              EXHIBITS

8
     NO. DESCRIPTION                            PAGE MARKED

9
     28    HB No. 218, Filed 2007                    41

10
     29    SB No. 362                                79

11
     30    Notice of Deposition                      14

12
     31    Press Release From the Office of State    97

13           Senator Troy Fraser

14   32    Senate Rules Adopted by the 81st         119
            Legislature, Jan. 14, 2009

15
     33    Senate Journal, March 18, 2009           132

16
     34    Transcript, March 10, 2009, Committee of 134

17           the Whole Senate

18   36    SB No. 363                               139

19   37    Declaration of Janice McCoy, March 30,   161
            2012

20
     38    Senate Rules Adopted by  82nd Legislature 196

21
     39    Transcript, Jan. 25, 2011, Committee of  204

22           the Whole Senate

23   40    Transcript, Jan. 26, 2011, Committee of  206
            the Whole Senate

24
     41    Transcript  Excerpt: Senate Bill 14, Jan. 208

25           26, 2011



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                                    MAY 16, 2012

6

1        42      Transcript  Excerpt: Senate Bill 14, Jan.      213
                 26, 2011, CD 1, Section II

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                          MAY 16, 2012

7

1                         JANICE McCOY,

2       having been first duly sworn to testify the truth, the

3       whole truth, and nothing but the truth, testified as

4       follows:

5                         EXAMINATION

6       BY MS. MARANZANO:

7            Q.   Good morning.

8            A.   Good morning.

9            Q.   My name is Jennifer Maranzano.  I'm

10      representing the Defendant, Eric Holder, in this matter.

11                    Can you please state your full name for

12      the record?

13           A.   Janice Steffes McCoy.

14                    MS. MARANZANO:  And can we have everybody

15      go around and identify themselves, please?

16                    MR. ROSENBERG:  Ezra Rosenberg from

17      Dechert LLP on behalf of the Texas State Conference of

18      NAACP Branches and MALC.

19                    MR. DUNN:  Chad Dunn on behalf of the

20      Kennie Intervenors.

21                    MR. ROSENBERG:  And let me see if we're

22      having a telephone guest today.

23                    MR. FREDERICK:  Matthew Frederick for the

24      State of Texas.

25                    MS. MARANZANO:  Let's just continue while



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                              MAY 16, 2012

                                                                    8

1    they are doing that.

2         Q.   (By Ms. Maranzano) Ms. McCoy, have you ever

3    been known by any other names?

4         A.   My maiden name is Janice Steffes.

5         Q.   Have you ever been deposed before?

6         A.   No.

7         Q.   Let me go over some ground rules with you.  You

8    have been placed under oath today, so it's important to

9    testify truthfully, accurately, and completely.

10             The court reporter is taking down a

11   transcript of everything that we say, and so it's

12   important to answer my questions verbally, not with

13   shaking your head or nodding.  It's important for you to

14   wait until I finish a question before you answer.  We

15   shouldn't talk over each other, and that way, the record

16   will be clear.  If you wish to stop and take a break at

17   any point, go ahead and let me know, and I will do my

18   best to accommodate you.

19             From time to time, your attorney may make

20   an objection to a question that I ask.  He is doing this

21   for the record, and unless he instructs you not to

22   answer, you can go ahead and answer my question.  If he

23   counsels you to answer only to the extent that

24   information is not privileged, I'd ask you to clarify

25   whether you're not answering based on that ground, so



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                              MAY 16, 2012

                                                                    9
1       that we have a clear record.

2              Do you have any questions based on these

3       instructions?

4       A.   I do not.

5       Q.   Are you on any medication today that would

6       affect your ability to testify?

7       A.   No.

8       Q.   Is there any other reason why you can't testify

9       truthfully, accurately, and completely today?

10      A.   No.

11      Q.   I may use some shorthand today.  If I say "the

12      Senator," I'm referring to Senator Fraser or anyone who

13      is acting on his behalf.  Do you understand that?

14      A.   Yes.

15      Q.   I may use the terms "voter ID" and "photo ID"

16      interchangeably during this deposition.  I'd like you to

17      interpret those words broadly to include any photo

18      identification -- I'm sorry -- any voter identification

19      requirement, whether it had a photo or not, that a voter

20      needs to present in order to vote in person.

21      A.   Okay.

22      Q.   If I use the term "minority voters," I'm

23      referring to voters who are not white, nonAnglo.

24      A.   Okay.

25      Q.   Do you understand all those terms?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

10

1        A.   Yes.

2        Q.   If I ask any questions today that you do not

3    understand, please let me know.

4        A.   I will.

5        Q.   Are you represented by counsel today?

6        A.   I am.

7        Q.   And who is that?

8        A.   Matthew Frederick.

9        Q.   And when did that representation begin?

10       A.   I think when I started working for the

11   state.  I mean, in terms of this case?

12       Q.   In terms of -- you're being represented by

13   Mr. Frederick today in this deposition?

14       A.   Yes.

15       Q.   And when did that representation start, to the

16   best of your knowledge?

17       A.   When the case was brought before the court.

18       Q.   How did you come to be informed that you were

19   being represented by Mr. Frederick?

20       A.   The Attorney General's Office called me.

21       Q.   Have you ever been a party in litigation?

22       A.   No.

23       Q.   Have you ever been involved in a case in which

24   Texas was the -- was a party?

25       A.   No.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                            MAY 16, 2012

                                                                    11

1          Q.   What did you do to prepare for today's
2     deposition?
3          A.   I reviewed the bill, and I looked at some
4     minutes of the Committee of the Whole and the Floor
5     debate.
6          Q.   And when you say "the bill," can you tell me
7     what bill you're referring to?
8          A.   The enrolled version of Senate Bill 14.
9          Q.   And minutes of the Committee of the Whole
10    debate was for Senate Bill 14?
11         A.   Senate Bill 14, yes, ma'am.
12         Q.   Okay.  Did you review anything else?
13         A.   No, ma'am.
14         Q.   Did you meet with your attorneys prior to this
15    deposition?
16         A.   Yes, ma'am.
17         Q.   And who did you meet with?
18         A.   I met with Matt Frederick and Stacey Napier.
19         Q.   And when was that?
20         A.   I met with Matt and Stacey three or four weeks
21    ago.  I don't know the exact date.  And I talked with
22    Matt on the phone last evening.
23         Q.   How long did you meet with Mr. Frederick and
24    Ms. Napier three to four weeks ago?
25         A.   Hour, hour and a half.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

12

1        Q.    And was anybody else present?

2        A.    No, ma'am.

3        Q.    And how long did you talk to Mr. Frederick last

4    night?

5        A.    About an hour.

6        Q.    Did you bring any documents with you today?

7        A.    No, ma'am.

8        Q.    Other than your attorneys, did you speak to

9    anybody about today's deposition?

10       A.    I talked to Colby on Tuesday afternoon about

11   the length of his deposition.

12       Q.    Did you talk to -- and I'm sorry, you're

13   referring to Colby Beuck?

14       A.    Is that how you say his last name?  Yes.  From

15   Representative Harless's Office, yes.

16       Q.    Did you talk to about him anything else from

17   his deposition?

18       A.    No, ma'am.  Just the length.

19       Q.    Did you talk to Senator Fraser about your

20   deposition?

21             MR. FREDERICK:  Let me interject here and

22   say, as I think will not come as a surprise to anybody,

23   the State of Texas will be asserting legislative

24   privilege throughout the deposition.  I will be

25   instructing Ms. McCoy not to answer questions that seek



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

13

1     to discover thoughts or mental impressions of herself or

2     Senator Fraser about pending legislation, or

3     communications about pending legislation with

4     legislators, staffs, state agencies, the Texas

5     Legislative Council, and constituents.

6              So I will instruct you, I think you can

7     answer the question to the extent it asks for whether a

8     conversation occurred, who was party to the conversation

9     and how long it took, when it occurred, but I want to

10    instruct you not to reveal the substance of any

11    conversation that you had with the Senator.  But you may

12    answer her question.

13        A.   The Senator and I did speak about the

14    depositions.

15        Q.   (By Ms. Maranzano) And when was that?

16        A.   We have talked about the deposition when they

17    were trying to get scheduled, and we talked about

18    scheduling and the timing of those depositions.  And

19    then this week, we talked several times Tuesday.  Is

20    today Wednesday?  We talked several times on Tuesday

21    strictly about the length of the depositions that have

22    occurred so far this week, and about the fact that I'm

23    probably going to be out of the office all day today.

24        Q.   Anything else that you discussed with the

25    Senator?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

14

1      A.   I would probably assert legislative privilege

2  at this point.

3      Q.   Was anybody else present during these

4  conversations?

5      A.   No.

6      Q.   Did these conversations take place in person?

7      A.   No.

8      Q.   On the phone?

9      A.   Yes.

10     Q.   Okay.

11     A.   I'm sorry.  Jennifer, we -- the Senator and I

12 also spoke this morning as I was coming over here, so

13 yesterday and this morning.

14     Q.   And did you speak on the phone this morning?

15     A.   Yes, ma'am.

16     Q.   For about how long?

17     A.   Five, ten minutes.

18     Q.   Was that also about the length of time of the

19 deposition?

20     A.   Yes.

21          (Exhibit 30 marked for identification.)

22     Q.   (By Ms. Maranzano) I'm showing you what we've

23 marked as Deposition Exhibit 30.  Can you take a look at

24 it and tell me if you recognize this document?

25     A.   I do.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1       Q.    And what is it?

2       A.    It's the Notice of Deposition for -- for me to

3   appear.

4       Q.    And can I direct your attention to the third

5   page of this document.  Do you see that there's a list

6   of documents there?

7       A.    Yes, ma'am.

8       Q.    Did you undertake a search for these documents?

9       A.    Yes, ma'am.

10      Q.    Can you describe that search to me?

11      A.    I searched -- well, it wasn't very hard,

12  because I had a box marked Voter ID, and everything that

13  I had ever produced was in that box.  And then I did the

14  -- I did a search of my e-mail, and I did a search of my

15  computer files, which also, I had specific files marked

16  as Voter ID in folders, and went through there.

17      Q.    The box that was marked Voter ID, did you

18  say --

19      A.    Uh-huh.

20      Q.    -- can you tell me:  When did you compile

21  documents and put them in that box?

22      A.    I started compiling the box in 2009, when we

23  were debating the legislation then.

24      Q.    Uh-huh.

25      A.    And just continued it through 2011.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

16

1        Q.    And what documents would go in that box?

2        A.    Studies, polls, information from agencies,

3    constituent letters, documents related to the

4    legislative process.

5        Q.    Does that box contain all of your documents

6    about voter ID?

7        A.    That box contains all of my documents about

8    voter ID from 2009 forward.

9        Q.    Did you collect documents prior to 2009?

10       A.    In 2007, Senator Fraser was the Senate sponsor

11   of a House bill related to voter ID, and that particular

12   bill folder has been archived, and those documents were

13   provided to the Attorney General electronically, not in

14   written form.

15       Q.    And when you say that you -- well, let me ask

16   you this:  About how many documents are in that box?

17       A.    Hundreds.

18             (Mr. Patrick Sweeten joins the

19   deposition.)

20       Q.    (By Ms. Maranzano) And then you said you

21   searched your e-mail and computer files?

22       A.    Yes, ma'am.

23       Q.    How did you search your e-mail?

24       A.    The Legislative Council provided a list of

25   terms to search on, and so I searched on those terms.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

17

1      Q.   And how did you search your computer files?

2      A.   Again, all of my voter ID stuff was in the same

3 folders.  I created specific folders for voter ID.  And

4 so other than looking in, potentially, the media folder,

5 I just -- actually just went and grabbed those files and

6 provided them to the Attorney General.

7      Q.   So all the documents you found, you provided to

8 the Office of the Attorney General?

9      A.   Yes, ma'am.

10      Q.   Can I direct your attention particularly to

11 Number 5, Request Number 5?  Can you read that for me,

12 please.

13      A.   "All documents and communications, including

14 but not limited to those among and between staff,

15 members of the Texas Legislature, the Texas Legislative

16 Council, and other Texas State executive offices and

17 agencies relating to any calculations, reports, audits,

18 estimates, projections, assessments, or other analysis

19 of the effect that SB 14 will impose upon minority

20 voters."

21      Q.   Did you search for documents responsive to

22 Request Number 5?

23      A.   I searched for all documents related to voter

24 ID.

25      Q.   Did you have any documents responsive to



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

18

1    Request Number 5?

2         A.    No.

3         Q.    Can I direct your attention to Request

4    Number 8?  Did you search for documents responsive to

5    Request Number 8?

6         A.    Yes.

7         Q.    Did you find any responsive documents?

8         A.    Yes.

9         Q.    Can you tell me how many?

10        A.    No.

11        Q.    Because you don't know?

12        A.    Because I didn't count them.

13        Q.    Can you approximate how many?

14             MR. FREDERICK:  For the record, I'll

15   object to the extent it calls for speculation.  But if

16   you can approximate, you may answer the question.

17        A.    I mean, I'm just trying -- the guess that I

18   would make, if you're talking about things the Senator

19   said publicly that I actually wrote and did a public --

20   a press release on, was probably four or five a session

21   that we would write a public statement.

22        Q.    (By Ms. Maranzano) Okay.  And you mentioned the

23   Senator's involvement in the 2007 legislation.  Was he

24   also involved in the 2005 legislation?

25        A.    No, ma'am.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

19

1      Q.   Can I direct your attention to -- let me ask

2    you this about Request Number 8:  Where were those

3    documents?

4      A.   The public statements that I wrote for the

5    Senator on voter ID were stored on my computer.

6      Q.   Now, when you say the public statements that

7    you wrote, are there public statements that you did not

8    write that the Senator made?

9      A.   Potentially, yes.

10     Q.   And is there a reason you didn't search for

11   those, too?

12          MR. FREDERICK:  Objection to the extent it

13   misstates the testimony.

14     Q.   (By Ms. Maranzano) Did you search for -- I

15   understood you to say that --

16     A.   I did not search newspaper articles for

17   comments that the Senator made.

18     Q.   And -- okay.  Just so I'm understanding you, do

19   you keep newspaper articles --

20     A.   No.

21     Q.   -- in which the Senator makes comments?

22     A.   No.

23          MR. FREDERICK:  Let her finish the

24   question.

25          THE WITNESS:  Oh, okay.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

20

1          Q.   (By Ms. Maranzano) Can I direct your attention
2     to Request Number 11.  Can you take a look at that?  Did
3     you search for documents that were responsive to Request
4     Number 11?
5          A.   Yes.
6          Q.   Did you have any documents that were responsive
7     to Request Number 11?
8          A.   No.
9          Q.   Ms. McCoy, can you tell me a little bit about
10    your educational background?
11         A.   I graduated from a Texas public high school out
12    of Houston and went to Texas A&M University and got a
13    bachelor of science degree awarded in 1991 in political
14    science.
15         Q.   Any other schooling?
16         A.   No, ma'am.
17         Q.   What's your -- what's your job title?
18         A.   Chief of staff.
19         Q.   For?
20         A.   I'm sorry.
21         Q.   For who?
22         A.   Senator Troy Fraser.
23         Q.   What was your job prior to working for Senator
24    Fraser?
25         A.   I worked for the Republican Party of Texas.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

21

1          Q.    How long did you work for the Republican Party
2     of Texas?
3          A.    Twelve and a half, 13 months.
4          Q.    And what was your title with them?
5          A.    Coalitions Director.
6          Q.    And when did you start working for them and
7     when did you complete your time there?
8          A.    I started working for the Republican Party in
9     August of 1997, and it ended in September of 1998.
10         Q.    When did you start working for Senator Fraser?
11         A.    September of 1998.
12         Q.    What does it mean to be a coalitions director?
13         A.    The chairwoman who hired me wanted to try and
14    be more inclusive and bring different types of
15    coalitions to the Republican Party.
16         Q.    What coalitions did she want to bring to the
17    Republican Party?
18         A.    We tried to create a Hispanic Business
19    Council.  Now you're testing my memory.  I don't know if
20    that's the exact title or not.  But there was a couple
21    -- there was another group, but I can't remember.  I'm
22    sorry.
23         Q.    There was another -- another group that you
24    formed with the Republican --
25         A.    Yes.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

22

1        Q.    The Republican Party of Texas?

2        A.    Yes.

3        Q.    How did you get your job with Senator Fraser?

4        A.    The current chief of staff and I had met, and

5    he interviewed me and offered me a position.

6        Q.    Did you start working for Senator Fraser as

7    chief of staff or as something else?

8        A.    Something else.

9        Q.    And what was that position?

10        A.    Legislative assistant.

11        Q.    And what did you do as a legislative assistant?

12        A.    I did policy work, reviewed bills, answered

13    constituent inquiries.

14        Q.    Any areas of legislative specialty as a

15    legislative assistant?

16        A.    No.

17        Q.    And just so I'm clear, I meant, did you have

18    any areas of --

19        A.    Right.  I -- I was assigned to the State

20    Affairs Committee.  Senator Fraser sat on that

21    committee, and I worked that committee.

22        Q.    And what --

23        A.    I think.  I'm sorry.  I don't remember.

24        Q.    Okay.  What issues does the State Affairs

25    Committee deal with?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

23

1          A.    In 1999, they did transportation.  They did

2     elections.  They did tort reform.

3          Q.    Anything else that you can remember?

4          A.    I can't remember.

5          Q.    Are those the same issues that they do now?

6          A.    They do -- State Affairs no longer does

7     transportation.

8          Q.    Okay.  How long were you a legislative

9     assistant for Senator Fraser?

10         A.    I think in 2000, I became legislative

11    director.  In or around the year 2000, I became

12    legislative director, and then I became chief of staff

13    in December of 2004.

14         Q.    What did you do as Senator Fraser's legislative

15    director?

16         A.    Similar things; legislative assistant, policy

17    work, constituent work, bill analysis.  But I also

18    directed the other legislative staff in their work.

19         Q.    Did you have the same legislative areas that

20    you worked on when you were the legislative director as

21    when you were a legislative assistant, or did you change

22    your area of focus?

23         A.    I think in the 2001 session, I worked on

24    business and commerce issues and in the 2003 session.

25    No, that's not right.  It all runs together.  I'm



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

24

1    sorry.  It seems like it should have been yesterday, and

2    it wasn't.  At some point, State Affairs was my focus,

3    and at some point, State Affairs, workers' comp -- no

4    business and commerce became my focus, and I started

5    doing workers' comp issues.  And then in 2003, Senator

6    Fraser became Chair of Business and Commerce.  So in

7    2001, I did Business and Commerce.  2003, I think I went

8    back to State Affairs.

9         Q.   Can you describe for me all of your experience

10   that relates to election law?

11        A.   My experience related to election law is

12   related to when I staffed State Affairs and monitoring

13   and analyzing the legislation that impacted the election

14   code.

15        Q.   And you staffed State Affairs as a legislative

16   assistant, correct?

17        A.   Yes, ma'am.  And then again in 2003, as

18   legislative director.  In 2005 as well, I think.

19        Q.   And do you staff State Affairs as the chief of

20   staff?

21        A.   No, ma'am.

22        Q.   Do you have any experience related to election

23   administration?

24        A.   Yes, ma'am.

25        Q.   What's that experience?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                          MAY 16, 2012

25

1      A.    In 1998, when I worked for the Republican Party

2   of Texas, I was also, in addition to being coalitions

3   director, they asked me to help their primary

4   administrator with some of her job.

5      Q.    And what was that job?

6      A.    To help coordinate the county chairs and get

7   them the information they needed to run their election,

8   the primary election, and then get that information back

9   so it could get certified by the chairman of the

10  Republican Party.

11     Q.    Have you ever worked at a polling place on

12  election day?

13     A.    Yes, ma'am.

14     Q.    In what capacity?

15     A.    Election judge.

16     Q.    And can you describe for me what an election

17  judge does?

18     A.    The election judge helps run the primary in

19  terms of getting the ballots in the ballot box to the

20  polling location, ensuring that the voters are voting in

21  the correct location and that they're eligible to vote

22  at that location, and then when the polls close, getting

23  the ballots back to the county.

24     Q.    Have you ever witnessed any problems at a

25  polling place while you were serving as election judge?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

26

1        A.    No, ma'am.

2              MR. FREDERICK:  Objection, vague.

3              THE WITNESS:  Sorry?

4              MR. FREDERICK:  It's okay.  You can

5        answer.

6        A.    No.

7        Q.    (By Ms. Maranzano) Did you ever witness anyone

8        trying to impersonate another voter while you were

9        serving as election judge at a polling place?

10       A.    No.

11       Q.    Can you describe all of your current

12       responsibilities as chief of staff for Senator Fraser to

13       me, please.

14       A.    I'm responsible for managing the office in

15       terms of just Senate paperwork, time sheets, travel

16       vouchers, general day-to-day business of making sure the

17       Senate office runs.  I'm responsible for overseeing and

18       directing six staff people, in terms of giving them

19       advice about issues that they see or are dealing with in

20       their roles working for the Senator.  I handle the

21       Senator's media relations, and I continue to work policy

22       and legislative issues for the Senator.

23       Q.    Do you assist with drafting legislation?

24       A.    Yes, ma'am.

25       Q.    In what capacity?  What role do you play in



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                      MAY 16, 2012

27

1    drafting legislation?

2        A.    There's several ways you can draft

3    legislation.  Once an idea is -- once it's determined

4    that the Senator wants to carry legislation, we

5    typically make a request to either the Texas Legislative

6    Council or Senate Engrossing and Enrolling and we just

7    send them -- or the Texas Legislative Council with just,

8    you know, general two, three lines, this is what we'd

9    like to see the law do, and then they draft it.  And

10   during session, occasionally we will draft -- I will

11   draft amendments to various legislation, if they're in

12   order to facilitate movement.

13       Q.    If a Senator -- if the Senator has proposed

14   legislation, do you work on trying to ensure that

15   legislation gets passed?

16       A.    Yes.

17       Q.    Can you describe that process for me?

18            MR. FREDERICK:  I'll object, and to the

19   extent that it calls for communications that you might

20   have had with legislators, staff, state agencies, the

21   TLC, or constituents about pending legislation, I'll

22   instruct you not to answer on the basis of privilege.

23   But to the extent you can answer without relying on

24   that, you're free to answer the question.

25       Q.    (By Ms. Maranzano) And I'm asking you right now



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

28

1    in a general sense what your role is in that capacity.

2         A.    In a general sense, once a piece of legislation

3    has been drafted by whomever drafted it, as staff, we

4    get the bill filed with the calendar clerk, and then it

5    goes through a general process that every bill goes

6    through, and once it gets referred to a committee, we

7    make the bill hearing request.  Along with the bill

8    hearing request, we will do a bill analysis, or provide

9    information to the committee so that they can have a

10   bill analysis prepared.  Once the bill is set for a

11   hearing, we will help the Senator with talking points.

12             If the bill makes it out of committee, we

13   will -- in the Senate, we have what's called an intent

14   calendar, so it's my job to -- once when we're ready to

15   move something on the Floor, we will notify the intent

16   calendar, essentially, and we will do talk -- and once

17   we're going to be recognized on the Floor, we'll do

18   talking points for the Floor.  And then if it passes the

19   Senate, we will provide that information to -- the same

20   sort of talking points and data that we have to whoever

21   will pick up the bill in the House.

22        Q.    What is a bill analysis?  I think you mentioned

23   that in regards to the committee portion of the bill.

24        A.    The Senate rules require that every bill have

25   an analysis attached to it.  The committees are



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

29

1     responsible for -- in the Senate, the committees are

2     responsible for putting that bill analysis together.

3     The Senate Research Center helps with that; it's an arm

4     of the Senate, and it basically provides a general

5     description of the bill, and then it will provide a

6     section-by-section analysis.

7         Q.   Do you have -- do you personally have

8     communications with other legislators?

9         A.   Yes.

10        Q.   Regularly about legislation?

11        A.   I mean, regularly is an interesting term.

12    During session?

13        Q.   Uh-huh.

14        A.   Yes.  During the interim, no.

15        Q.   Are your communications with other legislators

16    usually related to bills that Senator Fraser is

17    sponsoring or authoring?

18        A.   Yes.

19        Q.   What else would communications with other

20    legislators be about?

21        A.   Potentially, it could be about that

22    legislator's legislation, if I have a question about it.

23        Q.   Okay.

24        A.   I don't --

25        Q.   About how many times -- during the legislative



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

30

1    session, about how many times in a given week would you

2    talk to another legislator?  Not Senator Fraser, a

3    different legislator.

4         A.   I talk to other legislators pretty much every

5    day during session.

6         Q.   Do you communicate with the Executive Branch

7    about legislation?

8         A.   Yes.

9         Q.   About how frequently during a legislative

10   session do you communicate with the Executive Branch?

11        A.   Infrequently.  It depends on the bill.  I mean,

12   if it's something that is changing the way an agency

13   does business, it could be every day.  If it's a bill

14   that doesn't do that, then maybe never.  I mean...

15        Q.   About how frequently do you communicate with

16   the Governor's Office about legislation?

17        A.   Two, three times a session.

18        Q.   About how frequently do you communicate with

19   the Lieutenant Governor's Office about legislation?

20        A.   Every day.  During session.  I'm sorry.

21        Q.   Yeah.  When we were talking about your

22   responsibilities as chief of staff, did you say

23   communicating with constituents was one of your

24   responsibilities?

25        A.   I might not have said it, but it would be, yes.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1          Q.    Is communicating with interest groups or
2     advocacy groups one of your responsibilities?
3          A.    Yes.
4          Q.    And you said that you had a role in drafting
5     legislation.  Do you have a role in researching issues
6     that might be related to legislation?
7          A.    Yes.
8          Q.    When Senator Fraser is taking a vote on a bill,
9     what's your role in regards to that legislation?  Do you
10    make a recommendation to him?
11         A.    Yes, ma'am.  We do.
12         Q.    You do.  Does that role change if the Senator
13    is the sponsor of a bill?
14         A.    No.
15         Q.    Can you tell me, I think you said the Senator
16    has six staff people?
17         A.    Well, I'm seven.  Yeah.
18         Q.    Can you tell me their names and their titles?
19         A.    We have three people working in the district.
20    They're all called district coordinators.  Mel Ferguson,
21    Blake Woodall, Ralph Gauer, G-a-u-e-r.  And then
22    currently in Austin, in addition to myself, we have
23    three people, and Terri Mathis is scheduler.  Will
24    McAdams, policy analyst.  I think that's his title,
25    legislative analyst, policy analyst, something like



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                          MAY 16, 2012

                                                              32

1      that.  And then Whitney Smith-Nelson, administrative

2      assistant.

3          Q.   Do the staff people in the district office have

4      any role in legislative efforts the Senator makes?

5          A.   No.

6          Q.   Does your office have a records retention

7      policy?

8          A.   No.

9          Q.   None?

10         A.   Our specific office does not have a records

11     retention policy.

12         Q.   When you say "our specific office," you mean

13     Senator Fraser's office?

14         A.   Yes, ma'am.

15         Q.   Do you retain records?

16         A.   No, not --

17         Q.   What prompted you to save certain files from

18     2009 voter ID?

19         A.   I knew that the Senator would want to try again

20     in 2011.

21         Q.   How often do you communicate with Senator

22     Fraser?

23         A.   During the interim?  Two or three times a week.

24         Q.   I'm sorry.  During the interim, can you

25     describe what you mean by that?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

33

1          A.    The Texas legislature is in regular session for

2     140 days in odd-numbered years.  The rest of the time,

3     it's called the interim.  And that's the period we're in

4     right now, and I speak with him two or three times a

5     week during the interim.

6          Q.    And by what means do you communicate with him,

7     usually, during the interim?

8          A.    Phone.

9          Q.    Just phone?

10         A.    (Witness nods head yes.)

11         Q.    And do you speak on the phone, or do you text

12    message each other?

13         A.    Both.

14         Q.    Is that on the Senator's personal phone or an

15    official government phone?

16         A.    Personal phone.

17         Q.    Is that on your personal phone or an official

18    government phone?

19         A.    Both, depending on what time of day it is.

20         Q.    Do you save those messages on your phone?

21         A.    No.

22         Q.    Not at all, or not for any length of time at

23    all?

24         A.    I don't save anything.

25         Q.    Do you delete them, meaning, if they're not on



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

34

1       your phone now, is that because they weren't archived in

2       some manner or --

3            A.   Right.  I delete them.

4            Q.   Okay.  So other than the phone during the

5       interim, do you communicate with the Senator in any

6       other ways?

7            A.   I will, if I'm writing a speech or if he needs

8       some information, I fax things to his home.  But other

9       than that, I do not communicate with him in any other

10      way.

11           Q.   When you're in the legislative session --

12           A.   Yes, ma'am.

13           Q.   -- how often do you communicate with the

14      Senator?

15           A.   Every day.

16           Q.   And how do you usually communicate with him?

17           A.   Verbally.

18           Q.   Do you and the Senator ever exchange e-mails?

19           A.   I have sent him e-mail.  He does not respond.

20           Q.   Do you send e-mail to his personal account or

21      to a government account?

22           A.   Personal.

23           Q.   During the time that you worked for Senator

24      Fraser, how many election-related bills has the Senator

25      authored?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

35

1          A.    I don't know.

2          Q.    Can you give me an estimate?

3          A.    The Senator typically does not author election-

4     related legislation.  He sponsors it.  So typically, I

5     would say, because of his seat on State Affairs, House

6     members will ask him to pick up their election bills,

7     and it could be 10 or 15 a session.  That's not to say

8     that he hasn't authored election related, other than,

9     obviously, voter ID, I just -- I don't -- I don't know.

10         Q.    So as you sit here, you can't think of other

11    election-related bills that Senator Fraser has authored

12    other than voter ID bills?

13         A.    That's correct.

14         Q.    And he has sponsored about 10 to 15 election-

15    related bills in those legislative sessions that you

16    worked in?

17         A.    That's a good guess.

18         Q.    During the time that you've worked for Senator

19    Fraser, how many immigration-related bills has Senator

20    Fraser authored?

21         A.    I don't know.

22         Q.    Can you give me an approximation?

23         A.    My guess would be none.

24         Q.    How about how many immigration-related bills

25    has Senator Fraser sponsored or co-sponsored?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1        A.    Again, my guess would be none, but I don't

2   know.

3        Q.    Are you familiar with Section 5 of the Voting

4   Rights Act?

5        A.    I know what it is.

6        Q.    What's your understanding of the requirements

7   of Section 5?

8        A.    My understanding is that Section 5 of the

9   Voting Rights Act requires the Department of Justice to

10  review election-related legislation for nine specific

11  states and a few other entities, and to ensure that

12  those election changes don't discriminate against

13  minorities.

14       Q.    Did you think it was important to save your

15  voter ID files because of Section 5 of the Voting Rights

16  Act?

17       A.    No.

18       Q.    How does the Legislature ensure that an

19  election-related change complies with Section 5 of the

20  Voting Rights Act?

21            MR. FREDERICK:  Let me interpose an

22  objection.  To the extent that the question seeks

23  information that reflects thoughts or mental impressions

24  about pending legislation or privileged communications,

25  I'll instruct you not to answer.  I think that the



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

37

1    question is more general.  And to the extent it doesn't

2    call for privileged information or communications, you

3    may answer the question.

4        A.   Can you ask the question again?

5        Q.   (By Ms. Maranzano) Yes.  How does the Texas

6    Legislature ensure that an election-related change to

7    the law complies with Section 5 of the Voting Rights

8    Act?

9        A.   I don't know.

10       Q.   Do you believe that compliance with the Voting

11   Rights Act is important?

12            MR. FREDERICK:  Object to relevance.

13       Q.   (By Ms. Maranzano) You can answer.

14       A.   No.

15       Q.   Why not?

16       A.   I don't believe it's fair that nine states --

17   personally don't believe it's fair that nine states are

18   singled out in 2012.

19       Q.   To your knowledge, does Senator Fraser believe

20   that compliance with the Voting Rights Act is important?

21       A.   I don't speak to the Senator's beliefs.

22       Q.   In regards to your files on voter ID, did

23   anybody instruct you not to save those files?

24       A.   No.

25       Q.   Did anybody instruct you to delete your text



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                          MAY 16, 2012

38

1    messages?

2         A.    No.

3         Q.    Can you tell me, describe for me, the current

4    system in Texas by which a voter's identity is verified

5    at the polls?

6         A.    Under current law, the voter who does not show

7    up with a voter registration card -- well, under current

8    law, if a voter shows up with a voter registration card

9    and they're on the rolls, gets to vote.  That's all they

10   need is the card.  If you don't have a card, under

11   current law, you can show several different forms of

12   ID:  Photo, one photo, with several options, or two

13   nonphoto.

14        Q.    Are you aware of any problems with the system?

15             MR. FREDERICK:  Objection, vague, but you

16   may answer.

17        A.    I think that the system works mostly, but it's

18   open to fraud.

19        Q.    (By Ms. Maranzano) Why do you say that?

20        A.    Because the voter registration card doesn't

21   necessarily have to be the person who is standing there

22   with it.

23        Q.    Are you aware of instances of voter fraud?

24        A.    No, ma'am.

25        Q.    Are you aware of any instances of voter fraud?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                          MAY 16, 2012

39

1        A.    I think in -- are we talking about in-person

2    voter fraud or voter fraud?

3        Q.    Well, let's talk generally first.

4        A.    I mean, I think, yes, there are instances of

5    voter fraud in that we know that there is some being

6    prosecuted.  Particularly, mail-in ballots are probably

7    the worst offenders, where we actually have the tools to

8    catch fraud.  In-person voter fraud, I'm not personally

9    aware of any.

10       Q.    When you said earlier that this -- the current

11   system, I think you said, it left -- it left open the

12   possibility of in-person voter fraud?  Is that a correct

13   summary of your testimony?

14       A.    Yes, ma'am.

15       Q.    What would somebody need to do to commit

16   in-person voter fraud under the current system?

17             MR. FREDERICK:  Objection to the extent it

18   calls for speculation, but you may answer, if you can.

19       Q.    (By Ms. Maranzano) What did you mean by it

20   leaves open the possibility?

21       A.    You could register yourself five times, five

22   different names, go vote five times.  You could steal

23   someone's voter registration card and go vote.  You

24   could, you know, borrow.  Like, I don't have time to

25   vote, you go vote for me.  Someone could go vote twice.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                                    MAY 16, 2012

40

1        Q.    Are you familiar with the voter registration
2    application in Texas?
3        A.    Generally.
4        Q.    Does somebody have to make certain attestations
5    on that voter registration application?
6        A.    Yes, ma'am.
7        Q.    And what are those?
8        A.    I think that you are who you say you are, and
9    you live where you say you live, but I don't know for
10   sure.
11       Q.    Does somebody have to swear that they are a
12   citizen on the voter registration application?
13       A.    I think so.
14       Q.    When was SB 14 signed into law?
15       A.    Around the end of May 2011.
16       Q.    Have there been elections since the time that
17   SB 14 was signed into law?
18       A.    Yes, ma'am.
19       Q.    Was SB 14 enforced in those elections?
20       A.    No, ma'am.
21       Q.    Are you aware of any in-person voter fraud that
22   occurred in any of those elections?
23       A.    No, ma'am.
24       Q.    I believe you testified earlier that there was
25   a photo ID bill introduced in 2007; is that correct?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

41

1      A.   Yes, ma'am.

2           MS. MARANZANO:   Can I get that marked?

3  We can do 28.

4           (Exhibit 28 marked for identification.)

5      Q.   (By Ms. Maranzano) Can you take a look at that

6  exhibit that has been marked for the record as

7  Deposition Exhibit 28?

8      A.   (Viewing document.)

9      Q.   Do you recognize this?

10     A.   Yes, ma'am.

11     Q.   What is it?

12     A.   It looks like the filed version of House Bill

13  218 from 2007.

14     Q.   Can you tell me what forms of identification

15  were permitted under House Bill -- is this House Bill

16  218?

17     A.   Yes, ma'am.

18     Q.   Can you tell me what forms of identification

19  this bill would have permitted?

20          MR. FREDERICK:   And take your time.   If

21  you need a minute to review.

22     A.   Oh, no, I just to find it.   Under Section 11 of

23  the bill --

24     Q.   (By Ms. Maranzano) Uh-huh.

25     A.   -- it shows eight different forms of photo ID



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

42

1      that were acceptable:  Driver's license, ID card,

2      military card, employee ID card, citizen's certificate

3      that has a photo, passport, student ID card, concealed

4      handgun license, or a valid ID card issued by a

5      government institution, federal or local.

6              And then if you didn't have photo ID, the

7      bill would allow two forms.  Well, I thought it was two,

8      but I don't see that in here.  The bill would allow for

9      some forms of nonphoto ID, which is also in Section 11:

10     Utility bills, bank statements, official mail, birth

11     certificate, citizenship papers, marriage license,

12     divorce decree, court records.

13     Q.    So under HB 218, am I correct that a voter

14     could show either a form of photo identification or

15     forms of nonphoto identification?

16     A.    Yes, ma'am.

17     Q.    Does nonphoto verification verify a voter's

18     identity?

19     A.    Most of the time, yes.

20     Q.    Is there something about the forms of nonphoto

21     identification in HB 218 that you think verifies an

22     identity in a more secure fashion than a voter

23     registration card?

24              MR. FREDERICK:  Object to the extent that

25     this seeks information of thoughts or mental impressions



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                    MAY 16, 2012

43

1       about pending legislation or requires information that

2       would reflect communications with legislators, staff,

3       state agencies, the Texas Legislative Council,

4       constituents, I'll instruct you not to answer on the

5       basis of privilege.  If you are able to answer without

6       relying on privileged matters, you may do so.

7            A.   Can you ask the question again?

8            Q.   (By Ms. Maranzano) Yeah.  My question is:  Do

9       you think HB 218 would have made an improvement on the

10      current system that you described to me, where a voter

11      shows their voter registration card or other forms of ID

12      when they show up to vote?

13                MR. FREDERICK:  Same objection and

14      objection.  But you may answer if you can.

15           Q.   (By Ms. Maranzano) Do you have an answer to

16      that, ma'am?  Thinking?

17           A.   Yeah.  My personal opinion is no.

18           Q.   What's Senator Fraser's opinion on that?

19                MR. FREDERICK:  Object to the extent it

20      calls for a legislator's thoughts and mental impressions

21      about pending legislation, and I'll instruct you not to

22      answer that question.

23           A.   I choose not to answer.

24           Q.   (By Ms. Maranzano) Would HB 218 prevent a voter

25      from voting multiple times?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                          MAY 16, 2012

44

1              MR. FREDERICK:  I'll make the same

2       objection.  To the extent it calls for privileged

3       information, thoughts or mental impressions or

4       privileged communications.  But to the extent you can

5       answer without relying on privileged matters, you may do

6       so.

7              A.   I have no answer.

8              Q.   (By Ms. Maranzano) Have you no answer because

9       of the instruction?

10             A.   Yes, ma'am.

11             Q.   Okay.  What was the purpose of including two

12      forms of photo identification at HB 1218?

13             MR. FREDERICK:  Objection to the extent it

14      seeks thoughts or mental impressions you or Senator

15      Fraser may have had about pending legislation or

16      communications that are privileged.  To the extent that

17      you can answer without relying on privileged matters,

18      you may answer the question.

19             Q.   (By Ms. Maranzano) And for the record, this is

20      about the legitimate purpose of part of this bill.

21             A.   I think you are better off asking

22      Representative Betty Brown.

23             Q.   Betty Brown.  Did the Senator bring HB 218 to

24      the Senate Floor?

25             A.   He did.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

45

1      Q.   And did you have a role in that?

2      A.   I did.

3      Q.   Do you know what the purpose of including two

4    forms of nonphoto ID in HB 218 was?

5           MR. FREDERICK:  I'll make the same

6    objection.

7           But I think she's just asking just a

8    yes-or-no question, so you may answer whether or not you

9    know.

10     A.   I was not part of how House Bill developed in

11   the House.  My personal belief is that they included two

12   forms of voter ID in order to get the necessary votes to

13   move it out of the House.

14     Q.   Okay.

15          MS. MARANZANO:  And just to clarify the

16   record, it's my understanding that Mr. Sweeten has

17   actually alerted the court that you all are going to

18   allow witnesses to answer questions about legislative

19   purpose.  I missed the e-mail, but that's my

20   understanding of what has happened, so...

21          MR. FREDERICK:  No.  Consistent, I think,

22   with what we have tried to convey yesterday and today,

23   we will permit testimony about legislative purpose to

24   the extent that is available from nonprivileged sources.

25          MS. MARANZANO:  Okay.  This might be



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

46

1     something that we discuss with the court later.

2        Q.    (By Ms. Maranzano) Did Senator Fraser have any

3     role in the development of HB 218?

4        A.    No.

5        Q.    Did the Senator take a public position on HB

6     218?

7        A.    Yes.

8        Q.    What position was that?

9        A.    In favor.

10        Q.    Did you play any role with regard to advising

11     the Senator on that position?

12        A.    Yes.

13        Q.    Did you recommend that he support the bill?

14        A.    Yes.

15        Q.    And what was that recommendation based upon?

16              MR. FREDERICK:   Object to the extent the

17     question calls for thoughts and mental impressions about

18     pending legislation or asks for the substance of

19     communications of legislators' staff, state agencies,

20     TLC and constituents, I will instruct you not to

21     answer.  If you can answer without relying on that

22     material, you may do so.

23        A.    I cannot answer.

24        Q.    (By Ms. Maranzano) Okay.  And just so we have a

25     clear record, you cannot answer because of the privilege



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

47

 1    being asserted?

 2        A.    Yes.

 3        Q.    Did you have any conversations with

 4    constituents about HB 218?

 5        A.    Yes.

 6        Q.    How many?

 7        A.    How many conversations or how many

 8    constituents?  Sorry.

 9        Q.    That's an important distinction.  Let's start

10    with how many constituents.

11        A.    Verbally, I probably spoke to five to ten

12    constituents.

13        Q.    Did you speak to any of these constituents on

14    multiple occasions?

15        A.    Yes.

16        Q.    About how many did you speak to on multiple

17    occasions?

18        A.    How many constituents?

19        Q.    Uh-huh.

20        A.    One.

21        Q.    And was this a conversation on the phone?  In

22    person?  In another means?

23        A.    Most of the time, the conversations with this

24    one constituent were in person.

25        Q.    Have -- I'm sorry.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

48

1        A.   Otherwise, I might have spoken to him once or
2    twice on the phone.
3        Q.   Was anybody else party to the conversations
4    that occurred in person?
5        A.   The Senator may or may not have been part of
6    the conversations.  I don't remember 2007 very well.
7        Q.   Does the Senator meet with any constituent who
8    comes to his office if he's in the office?
9        A.   If the Senator is in the office, in a meeting
10   or on the phone, he will visit with constituents.
11       Q.   Do you recall if he met with anybody, any
12   constituent about HB 218?
13       A.   The same constituents that I met with on
14   several occasions, I think the Senator met with.
15       Q.   Who was this constituent?
16       A.   Skipper Wallace.
17       Q.   Why was he particularly interested in HB 218?
18            MR. FREDERICK:  Object to the extent that
19   calls for the substance of communications with a
20   constituent or a legislator or staff for the thoughts
21   and mental impressions about pending legislation; I
22   instruct you not to answer.
23       A.   I can't answer because of privilege.
24       Q.   (By Ms. Maranzano) Did these conversations all
25   take place in the Senator's office?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                          MAY 16, 2012

49

1        A.   I don't remember, but probably, yes.  By

2    "office," you mean our general office because I have a

3    -- so there's three rooms, so in that space?

4        Q.   In Senator Fraser's office complex --

5        A.   Yes.  Okay.  Right.

6        Q.   -- in the Capitol.

7        A.   Okay.

8        Q.   Okay.  Thank you for clarifying that.

9             Did either you or the Senator ask

10   Mr. Wallace to comment, to speak about HB 218?

11       A.   No.  Are we still talking about 2007?

12       Q.   We're still talking about 2007 right now.

13       A.   Thank you.  No.

14       Q.   We'll get to the other bills at some point.

15            What was the nature of your conversation

16   with Mr. Wallace?

17            MR. FREDERICK:  I'll object and instruct

18   you not to answer to the extent that you would reveal

19   the substance of the conversation.  You may testify as

20   to the general subject matter only, and to the extent

21   you can do that, you may answer.  Otherwise, I instruct

22   you not to answer the question.

23       Q.   (By Ms. Maranzano) And are you going to --

24       A.   I'm going to assert privilege.

25       Q.   All right.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                            MAY 16, 2012

50

1              MS. MARANZANO:  So that I'm clear,

2      Mr. Frederick, is your position that unsolicited

3      conversations with constituents are also covered by

4      privilege?

5              MR. FREDERICK:  Yes.

6      Q.    (By Ms. Maranzano) Did you or Senator Fraser

7      communicate with any members of the Executive Branch

8      about HB 218?

9      A.    I don't remember.  I'm sorry.  I'm probably

10     sure that I talked to Ann McGeehan in the Secretary of

11     State's Office.  Other than that, I don't remember.

12     Q.    What did you talk to Ann McGeehan about?

13             MR. FREDERICK:  I'll object again, and

14     instruct you not to answer to the extent it requires you

15     to disclose the substance of your conversation with

16     Ms. McGeehan about pending or proposed legislation.  To

17     the extent you can answer by giving the general subject

18     matter, you may do so.

19     A.    Generally, I'm sure you've heard Ann.  Ann was

20     responsible for the Elections Division.  Generally, we

21     spoke of how they would implement the bill.

22     Q.    (By Ms. Maranzano) About how many times did you

23     speak with Ms. McGeehan?

24     A.    I don't remember.

25     Q.    Do you remember whether those were



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

51

1    conversations or e-mails or other written

2    communications?

3        A.   I would assume in 2007, most of our

4    conversations were verbal, either on the phone or in

5    person.

6        Q.   Did Senator Fraser have any communications with

7    the Executive Branch about HB 218?

8        A.   I don't know.

9        Q.   Did you communicate with any interest groups or

10   lobbyists about HB 218?

11       A.   I don't remember.

12       Q.   Did you communicate with any election officials

13   about HB 218?

14       A.   Election officials outside of the Secretary of

15   State's Office?

16       Q.   Yes, that's right.   NonExecutive Branch

17   election officials.

18       A.   Yes.

19       Q.   Who did you communicate with?

20       A.   Well, Skipper as County Chair.   I think that I

21   also spoke with the Republican Party of Texas.

22       Q.   How many times did you speak with the

23   Republican Party of Texas?

24       A.   Probably once.

25       Q.   Who from the Republican Party of Texas did you



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

52

1      speak with?

2           A.    I don't know.

3           Q.    Was that an in-person conversation or a

4      conversation by phone, e-mail?

5           A.    Most likely, it was by phone.

6           Q.    And when was that?

7           A.    It was sometime in May, April May of 2009.

8      2007.  I'm sorry.

9           Q.    Anyone else a party to that conversation?

10          A.    No.

11          Q.    Did the Republican Party of Texas also speak to

12     Senator Fraser about HB 218?

13          A.    No.

14          Q.    And how do you know that?

15          A.    Because the Senator doesn't speak to the

16     Republican Party of Texas.  I do.

17          Q.    What was the nature of your conversation with

18     the Republican Party of Texas?

19          A.    I might have been asking about witnesses and

20     testifying and just generally about the bill.

21          Q.    When you say witnesses and testifying, are you

22     talking about for --

23          A.    For the State Affairs Committee.

24          Q.    Did you talk to the Republican Party of Texas

25     about the substance of HB 218?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                            MAY 16, 2012

53

1      A.   I don't remember.  I don't think so, but I
2   don't remember.
3      Q.   Did you have any communications or -- well, let
4   me:  Are there any other election officials that you
5   spoke with about HB 218?
6      A.   Not that I know of.
7      Q.   Did you have any conversations with any groups
8   representing minority voters about HB 218?
9      A.   I don't remember.
10      Q.   Did you have any conversations with the
11   Lieutenant Governor's Office about HB 218?
12      A.   Yes.
13      Q.   How many?
14      A.   I don't remember.  A dozen, two dozen.
15      Q.   Who did you have those conversations with?
16      A.   His executive staff, Julia Rathgeber.  I'm
17   trying to remember if Blaine Brunson was chief of staff
18   then or not.  I can't remember if Blaine was or not.
19   And then whoever staffed State Affairs for Lieutenant
20   Governor, and I don't know who was at the time, either.
21      Q.   Did you say his executive staff?  Is that what
22   you said initially?
23      A.   Yeah.
24      Q.   Does he have --
25      A.   Well -- go ahead.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                          MAY 16, 2012

54

1      Q.   I was going to ask:  Does he have an executive
2   staff that's distinguishable from legislative staff?
3      A.   No.  I said executive staff because there's
4   like three or four people that sit upstairs with him.  I
5   just classified them that way.
6      Q.   Okay.  So you believe that you spoke with Julia
7   Rathgeber potentially?
8      A.   It's Rathgeber.
9      Q.   And you said Blain Brunson possibly?
10      A.   If he was chief of staff in 2007, then, yes.
11      Q.   And potentially whoever was staffing his State
12   Affairs issues?
13      A.   Uh-huh.
14      Q.   And when were these conversations?
15      A.   I would have to look at the record of when the
16   bill made it to the Senate.  April, May time frame of
17   2007.
18      Q.   Were these conversations in person, over the
19   phone, e-mail?  How did you communicate with the
20   Lieutenant Governor's Office?
21      A.   Primarily in person.
22      Q.   Were they in the Capitol offices?
23      A.   Yes.
24      Q.   What was the nature of your conversations with
25   Lieutenant Governor's staff?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

55

1              MR. FREDERICK:  I'll give you the same

2      instruction.  I instruct you not to answer to the extent

3      that it would reveal thoughts and mental impressions

4      about pending legislation or the substance of

5      conversations between you and Senator Fraser or members

6      of the Lieutenant Governor's staff or the Lieutenant

7      Governor.  But to the extent you can identify the

8      subject matter without revealing the substance of the

9      conversations, you may answer the question.

10         Q.    (By Ms. Maranzano) Can you answer?

11         A.    I'm trying to decide if I can.

12         Q.    Okay.

13         A.    We generally spoke about the process of moving

14     the bill in the Senate.

15         Q.    Did you have any discussions with anyone in the

16     Lieutenant Governor's Office about the impact of HB 218

17     on minority voters?

18         A.    No.

19         Q.    Did you have conversations with anybody about

20     the impact of HB 218 on minority voters?

21         A.    I don't remember.

22         Q.    Do you keep any record of meetings that you

23     have?

24         A.    No.

25         Q.    None?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                            MAY 16, 2012

                                                                    56

1          A.    Not from 2007.

2          Q.    How about from 2009?

3          A.    No.

4          Q.    How about from 2011?

5          A.    There might be some stuff on my calendar from

6     2011.

7          Q.    Do you keep any record of meetings or

8     conversations the Senator has?

9          A.    No.

10         Q.    Does the Senator keep such a record?

11         A.    Of meetings that he's had in the past, only to

12    the extent that his calendar is stored electronically,

13    and if that meeting made it to the calendar.

14         Q.    Who keeps that calendar in your office?  Does

15    the Senator keep his own calendar?

16         A.    The scheduler.

17         Q.    Did you turn that calendar over to counsel?

18         A.    No, I didn't.  I'm sorry.

19         Q.    Do you believe that's responsive to the

20    requests that were propounded on your office?

21         A.    I suppose not.

22         Q.    You don't believe that was?

23         A.    Well, I mean, I guess if -- I didn't search the

24    calendar.  So then the answer is no, it was not

25    responsive.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

57

1        Q.    Am I understanding that you didn't turn -- you

2    didn't search it because it was --

3        A.    I forgot to search it.  And so now that you've

4    brought it up, it's not responsive, and I can search for

5    it.

6        Q.    Okay.  Yeah.  I think we're going to ask you to

7    make that search and turn it over to counsel.

8              MR. FREDERICK:  And just for the record,

9    I'll object to the request.

10             MS. MARANZANO:  On what grounds?

11             MR. FREDERICK:  On the grounds that it's

12   privileged and not relevant and not reasonably

13   calculated to lead to discovery of relevant evidence.

14             MS. MARANZANO:  Okay.  But I'm asking her

15   to turn it over to you.  I mean, you can still do a

16   privilege review.

17             MR. FREDERICK:  Fair enough.  Fair enough.

18   That's fine.  I understand.

19             MS. MARANZANO:  Okay.  For the record, our

20   position is who the Senator met with on the dates is not

21   actually privileged.  The substance, we understand

22   you're asserting privilege over.  But we would ask that,

23   at the very least, she'd turn that information over to

24   you.

25             MR. FREDERICK:  And we understand.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

58

1                MS. MARANZANO:  Yeah.

2          Q.   (By Ms. Maranzano) Did Senator -- yes.

3          A.   Just so we can be clear, the Senator meets with

4    people unexpectedly, and it doesn't make to it his

5    calendar.

6          Q.   Okay.

7          A.   So there may have been meetings that have took

8    place that will not reflected on his calendar.

9          Q.   Okay.  And are there any documents that reflect

10   those meetings?

11         A.   Again, the meetings that just took place

12   unexpectedly, no, ma'am.

13         Q.   Okay.  Did you review any studies that would be

14   related to HB 218?

15         A.   No.

16         Q.   Did anyone in your office?

17         A.   No.

18         Q.   Did the Senator -- did you or the Senator make

19   any attempt to determine who among registered voters did

20   not possess one of the forms of identification listed in

21   HB 218?

22         A.   No.

23         Q.   Why not?

24                MR. FREDERICK:  Object to the extent it

25   calls for thoughts, mental impressions, or



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1     communications between you and the Senator or you and

2     the Senator and the legislative staff, state agencies,

3     TLC, and constituents.  If you can answer without

4     revealing privileged matters, you may do so.

5         A.    Generally, when you pick up a bill from the

6     other chamber, you assume most of the work was done in

7     the other chamber.

8         Q.    (By Ms. Maranzano) Did you feel you had any

9     obligation to analyze the bill prior to recommending to

10    your boss that he take a position on it?

11              MR. FREDERICK:   I think I'll make the same

12    instruction:  Don't reveal thoughts, mental impressions,

13    or communications that are privileged.  But if you can

14    answer without doing, so you may answer the question.

15        A.    I did review the bill prior to making a

16    recommendation.

17        Q.    (By Ms. Maranzano) And did you feel that you

18    needed to do anything in addition to reviewing the bill

19    prior to making a recommendation to the Senator?

20        A.    No.

21        Q.    Were you aware that if this bill had been

22    passed, it would have been subject to Section 5 of the

23    Voting Rights Act?

24        A.    Yes.

25        Q.    And did you believe that includes any



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1       obligation to take any additional steps before

2       recommending a position to Senator Fraser?

3              A.    No.

4              Q.    Are you aware of whether the House analyzed the

5       impact of HB 218?

6              A.    I'm not aware.

7              Q.    Do you know whether there was any attempt in

8       the House to analyze whether HB 218 would have a

9       disproportionate impact on minority voters?

10             A.    I'm not aware.

11             Q.    Who would know that information?

12             A.    The House author.

13             Q.    And that was?

14             A.    Representative Betty Brown.

15             Q.    What was the purpose of HB 218?

16                   MR. FREDERICK:   Object on grounds of

17      privilege.   To the extent the question calls for

18      thoughts or mental impressions of you, Senator Fraser,

19      or communications that you or the Senator have had with

20      other legislators, staff, agencies, TLC, or

21      constituents, I instruct you not to answer.   But to the

22      extent that you are able to identify the purpose of the

23      bill without relying on privileged matters, you are free

24      to answer the question.

25             A.    I think the record from the State Affairs



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

61

1    Committee hearing on House Bill 218 will show that the

2    Senator said the intent was to stop in-person voter

3    fraud.

4         Q.   (By Ms. Maranzano) And how does this bill stop

5    in-person voter fraud?

6              MR. FREDERICK:  Object to the extent it

7    calls for speculation and object to the extent it calls

8    for thoughts, mental impressions, or privileged

9    communications.  But to the extent you can answer

10   without relying on privileged matters, you may do so.

11        A.   What was the question?

12        Q.   (By Ms. Maranzano) How does HB 218 solve

13   in-person -- or help with in-person voter fraud?  Is

14   that what -- what did you say the purpose of the bill

15   is?  Why don't you repeat that?

16        A.   If you look at the record from the State

17   Affairs Committee hearing, the Senator said that the

18   intent of a voter ID bill was to stop in-person voter

19   fraud.

20        Q.   And so my question is:  How does this bill do

21   that?

22             MR. FREDERICK:  Same instruction.

23        A.   I'll assert privilege.

24        Q.   (By Ms. Maranzano) Is that the only purpose of

25   HB 218?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

62

1         MR. FREDERICK:  Same objection and

2    instruction.  Don't reveal thoughts, mental impressions

3    or communications with legislative staff, agencies, TLC

4    or constituents.  If you are able to answer without

5    doing so, you may.

6         A.   Again, according to the record, if you look at

7    what Senator Fraser said in the State Affairs Committee

8    hearing, his only intent is to stop in-person voter

9    fraud.

10        Q.   (By Ms. Maranzano) Can you describe to me the

11   procedural history of after HB 218 was introduced, what

12   happened?

13        MR. FREDERICK:  I'll object on grounds of

14   vagueness, but you can answer if you can.

15        A.   I cannot --

16        Q.   (By Ms. Maranzano) I'm looking for a general

17   summary of what happened with the bill.

18        A.   I mean, the House process is the House

19   process.  The bill gets filed, gets sent to committee,

20   gets voted out of committee, it goes to calendars, goes

21   the Floor, gets passed.  In the Senate, it gets -- comes

22   to over to the Senate, then just like every bill,

23   Lieutenant Governor reviews it, refers it to a

24   committee, committee chairman decides to give it a

25   hearing or not, and the bill has a hearing in committee,



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                                MAY 16, 2012

63

1      and the bill gets voted out of committee, and Senator

2      places the bill on the intent calendar.

3           Q.   Can I stop for a second.

4           A.   Uh-huh.

5           Q.   I'm asking you particularly about HB 218, not

6      about a general description.

7           A.   House Bill 218 was voted out of the House, and

8      I can't speak to how it got out of the House.  You need

9      to go back and talk to Betty Brown about that.  House

10     Bill 218 showed up in the Senate, was read, Lieutenant

11     Governor referred it to the Senate State Affairs

12     Committee.  The Senate State Affairs Committee had the

13     bill.  Senator Fraser notified the Senate State Affairs

14     Committee that he wanted to sponsor HB 218 and requested

15     a hearing.  The bill was set for a hearing by the

16     Chairman of Senate State Affairs.  The bill had a

17     hearing.  I don't remember if this bill sat in State

18     Affairs or if it was voted out the same day it was

19     heard.  You'd have to look at the record.  But the bill

20     was voted out of committee.

21                And Senator Fraser decided to move forward

22     with the bill, and so he notified, via the intent

23     calendar notification process, the other senators that

24     he wanted to hear the bill, and we had the bill in

25     Intent for quite a while.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

64

1          This particular bill, we tried to move one

2     day, when we thought we had the necessary votes, and we

3     were not successful, and the bill died.

4          Q.   Okay.  So I'm going to ask you a couple of

5     questions about that process as you've described it.

6          I believe that you testified that the

7     Lieutenant Governor reviews a bill, after it gets voted

8     out of the House, and than refers it to committee?

9          A.   Yes, ma'am.

10         Q.   Does every bill that gets voted out of the

11    House get referred to some Senate committee?

12         A.   Yes, ma'am.

13         Q.   And does the Lieutenant Governor solely -- is

14    that decision of which committee to refer it to solely

15    that of the Lieutenant Governor's?

16         A.   Based on the current Senate rules, yes.

17         Q.   And you mean the 2011 rules?

18         A.   2007, but even now in 2011, yes, ma'am.

19         Q.   Okay.  And you said that the Senator, Senator

20    Fraser notified the committee on State Affairs that he

21    wanted to sponsor this bill?

22         A.   Yes, ma'am.

23         Q.   Why did he do that?

24              MR. FREDERICK:  Well, object to the extent

25    it calls for the Senator's thoughts, mental impressions,



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

65

1    or any communications that you had with him, and I will

2    instruct you not to answer.

3         A.   I'll assert privilege.

4              MR. FREDERICK:  Okay.

5              Jennifer, sometime soon, if we could take

6    a quick break.

7              MS. MARANZANO:  Yeah, just give me a

8    couple of minutes.

9              MR. FREDERICK:  Sure.  Sure.

10        Q.   (By Ms. Maranzano) And you said the committee

11   held hearings on HB 218?  The Committee on State Affairs

12   held hearings on HB 218?

13        A.   Held a hearing.  I don't think they had

14   multiple.  I think they had one.

15        Q.   Who invited the witnesses to testify at that

16   committee hearing?

17             MR. FREDERICK:  I'm going to object to

18   that, and to the extent it calls for communications that

19   any legislator had or that you or Senator Fraser had

20   with legislators, staff, agencies, TLC, constituents, or

21   potential witnesses, I'll instruct you not to answer.

22   To the extent you can answer without revealing the

23   substance of conversations, you can do so.

24        A.    I don't remember that there was an invited

25   panel.  It was just the process of laying out a bill by



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

66

1       the Senator and then the public testifying.

2               I earlier said that I think I talked to

3       the Republican Party of Texas about coming and

4       testifying, so I may have called a few people that I

5       thought would be helpful to the passage of the bill

6       besides the Republican Party of Texas.  I'm not sure.

7       And then the one constituent that we talked to quite a

8       bit about this bill.  Other than that, I don't think

9       there was invited to testimony.

10          Q.   (By Ms. Maranzano) So the one constituent was

11      Skipper Wallace?

12          A.   Yes.

13          Q.   And are you saying that you may have invited

14      him to testify as well?

15          A.   I think I didn't invite him to testify.  I

16      think I was more making sure he knew that the bill had

17      been scheduled for hearing.

18          Q.   Do you remember about how many members of the

19      public testified at that hearing?

20          A.   I do not.

21          Q.   Can you approximate?

22          A.   I cannot.  It's in the record, however.

23          Q.   Okay.  Did anybody raise any concerns about 218

24      during this committee hearing?

25          A.   My recollection is yes.


ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

67

1        Q.    What were those concerns?

2        A.    I cannot -- I cannot speak to what they

3   actually said.

4        Q.    Did anybody raise any concerns about the impact

5   HB 218 might have on minority voters?

6              MR. FREDERICK:  Well, object and instruct

7   you not answer to the extent that the question calls for

8   communications that you had or Senator Fraser had with

9   legislators or legislative staff, agencies, TLC, or

10  constituents.  But to the extent you can answer without

11  revealing.

12       A.    I mean, the record is there.  The hearing was

13  videotaped.  I think that you could watch it.  I don't

14  remember specifically.

15       Q.    (By Ms. Maranzano) Okay.  Did the bill change

16  at all in committee?

17       A.    I don't think so, but -- yeah, I don't think

18  so.  I don't remember.  I mean, we might have made minor

19  tweaks, but I don't think so.

20       Q.    Okay.

21             MS. MARANZANO:  Let's take a five-minute

22  break.

23             (Recess from 11:11 a.m. to 11:32 a.m.)

24       Q.    (By Ms. Maranzano) Ms. McCoy, before the break,

25  we were talking about HB 218.  Who brought HB 218 to the




Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

68

1    Floor of the Senate?

2        A.   Senator Fraser.

3        Q.   Did anyone ask the Senator to bring it to the

4    Floor?

5             MR. FREDERICK:   Object to the extent that

6    calls for communications with other legislative staff in

7    this case the legislators or staff members that's not on

8    the public record, I will instruct you not to answer.

9    If you can answer without revealing that, you may

10   answer.

11       A.   I'll assert privilege.

12       Q.   (By Ms. Maranzano) Why was Senator Fraser

13   playing a leadership role in HB 218?

14            MR. FREDERICK:   I'll object to the extent

15   that calls for thoughts or mental impressions of Senator

16   Fraser about HB 218 or communications with other

17   legislators, staff, or state agencies.  If you can

18   answer without revealing subjective mental impressions

19   or you may do so.

20       A.   I'll assert privilege.

21       Q.   (By Ms. Maranzano) When HB 218 was brought at

22   the time Floor of the Senate, what was your role?

23       A.   My role with House Bill 218 at that point was

24   to help the Senator with his talking points, and that's

25   it.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

                                                                      69

1          Q.    Did you draft his talking points?

2          A.    Yes.

3          Q.    Did you save those talking points?

4          A.    Yes.

5          Q.    Do you still have them?

6          A.    Yes.

7          Q.    Were those turned over to your counsel?

8          A.    Yes.

9          Q.    Did you do any research prior to drafting those

10    talking points?

11         A.    I read the bill book that Representative Brown

12    provided to us.

13         Q.    And what does the bill book include?

14         A.    I don't remember what the bill book included

15    specifically.  Typically, a bill book has copies of the

16    legislation, copies of the bill analysis, copies of the

17    fiscal note, and occasionally, supporting documents.

18    This bill book had all of those things.  I do not

19    remember what those supporting documents were.

20         Q.    Did you do any additional research other than

21    read the bill book?

22         A.    No.

23         Q.    Why not?

24               MR. FREDERICK:  I'll object.  I believe

25    that question calls for your mental impressions about



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

70

1    pending legislation.  I'll instruct not to answer.

2         Q.   (By Ms. Maranzano) Are you going to follow your

3    counsel's instruction not to answer the question?

4         A.   Yes, ma'am.

5         Q.   Okay.  When HB 218 was brought to the Floor of

6    the Senate, did -- or did HB 218 require the support of

7    two-thirds of the senators to bring bill to the Floor

8    for a vote?

9         A.   Yes.

10        Q.   When Senator Fraser brought HB 218 to the

11   Floor, how many senators were present at that time?

12        A.   I don't recall exactly.  Either 29 or 30.

13        Q.   I believe you testified earlier that the

14   Senator brought the bill to the Floor when he -- he

15   tried to move this bill on a day when you thought it

16   would pass?

17        A.   Yes, ma'am.

18        Q.   What did you mean by that?

19        A.   We knew that a particular Senator was absent.

20        Q.   Which Senator was absent?

21        A.   Senator Uresti.

22        Q.   Why was Senator Uresti absent?

23        A.   If you look at the record from that day, I

24   think he was excused because he was sick.

25        Q.   Did you know Senator Uresti's position on HB



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                              MAY 16, 2012

                                                              71
1     218?
2                MR. FREDERICK:  I'll object to the extent
3     it calls for thoughts or mental impressions of any
4     legislators or staff of pending legislation or
5     communications with other legislators of Senator Fraser
6     or staff.  But if you can answer without revealing
7     privileged matters, you may do so.
8          A.   After the bill moved, Senator Uresti voted no.
9          Q.   Can you --
10         A.   So I did not know how he was going to vote
11    prior to the bill moving.  After he voted, he voted
12    no.  After we voted, he voted no.
13         Q.   Well, why did you bring the bill to the Floor
14    when he was absent?
15               MR. FREDERICK:  Object to the extent the
16    question calls for thoughts and mental impressions about
17    pending legislation or communications indications that
18    are privileged.  I instruct you not to answer.  If you
19    can answer without revealing privileged matters, you may
20    do so.
21         A.   I'll assert privilege.
22         Q.   (By Ms. Maranzano) Do you think it's important
23    to give every Senator a chance to weigh in on a bill
24    like HB 218?
25               MR. FREDERICK:  I'll object as



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

JANICE MCCOY                                              MAY 16, 2012

72

1    argumentative, but you may answer if you can.

2         Q.   (By Ms. Maranzano) Are you able to answer that,

3    Ms. McCoy?

4         A.   No.

5         Q.   No, you're not able to answer or --

6         A.   I'm sorry.

7         Q.   -- no, you don't think it's important to --

8         A.   No, I don't think it's important that every

9    Senator vote on every specific piece of legislation,

10   including House Bill 218.

11        Q.   Do you know Senator's Uresti's ethnicity?

12        A.   Yes.

13        Q.   What ethnicity is he?

14        A.   He's Hispanic.

15        Q.   Do you know anything about the district that he

16   represents?

17        A.   Not specifically.

18        Q.   Do you know if he made any comments about

19   HB 218 and the impact it would have on his constituents?

20        A.   I do not know.

21        Q.   Would that impact your thoughts on whether it

22   was important to give him an opportunity to vote on

23   HB 218?

24             MR. FREDERICK:  Objection, calls for

25   speculation.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

73

1          Q.   (By Ms. Maranzano) You can ahead and answer.

2          A.   I'm sorry.  You need to ask the question

3     again.  I don't know what you're asking me.

4          Q.   I'm asking if you thought that Senator Uresti

5     believed that HB 218 would impact his constituents,

6     would you think it was important that he be given an

7     opportunity to take a vote on that bill?

8               MR. FREDERICK:  Same objection.  You can

9     answer.

10         A.   I think, again, generally, every bill impacts

11    every Senators' constituents.  And generally, Senators

12    should on the Floor to vote, but not -- we don't have a

13    31 -- we don't always 31 Senators on the Floor to vote.

14    And so with Senator Uresti, I can't speak to Senator

15    Uresti's constituents what they think is important or

16    not important for him to vote on.

17         Q.   (By Ms. Maranzano) But am I understanding you

18    correctly that your position is, you don't think every

19    Senator needs to vote on every bill, including HB 218?

20         A.   That's correct.

21         Q.   And did you say that the bill -- well, after

22    the first vote was taken on HB 218, was there

23    verification of the vote that was taken?

24         A.   I think that's what it's called, yes.  I think

25    of we -- they voted again.  I don't know if it was a



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

74

1    verification or if they just chose to vote again.  I'm

2    not really sure how that worked.  But there was a second

3    vote.

4         Q.   And did you say Senator Uresti arrived for that

5    vote?

6         A.   He did.

7         Q.   And what happened to HB 218?

8         A.   It failed to suspend the regular order of

9    business rule.

10        Q.   Was that because it did not have a two-thirds

11   majority --

12        A.   That's correct.

13        Q.   Two-thirds majority support?

14        A.   That's correct.

15        Q.   What is the purpose of the two-thirds rule?

16        A.   There is not a rule that's the two-thirds

17   rule.  The rule is the regular order of business rule,

18   and that rule says that as a bill comes out of the

19   calendar, it's placed on the regular order of business,

20   and you're supposed to vote in that order.  So there is

21   no two-thirds rule.

22        Q.   So to vote on a bill out of order, does that

23   require two-thirds majority support?

24        A.   You have to suspend the regular order of

25   business rule, and that requires a two-thirds vote of



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1      the members present.

2          Q.   What do you think the purpose of that

3      requirement is?

4          A.   I can't speak to the purpose.  It's just the

5      way the Senate has done business.

6          Q.   But as somebody who has worked there since

7      1992, do you have any thoughts on what you think the

8      purpose of that is?

9          A.   General consensus on bills.

10         Q.   Are most bills brought to the Floor by getting

11     two-thirds majority support?

12         A.   Yes.

13         Q.   After HB 218 failed to get two-thirds majority

14     support, did anything further happen to that bill?

15         A.   No.

16         Q.   Who were the main supporters of HB 218?

17              MR. FREDERICK:  I'll object to the extent

18     that it calls for communications that you or Senator

19     Fraser might have had with legislators, staff, agencies,

20     or constituents or thoughts and mental impressions.  But

21     if you can answer without that, I think you're free to

22     answer.

23         A.   Well, I think the record will show, if you look

24     at the vote in the Senate, you're talking about who the

25     supporters were in the Senate; Republican Senators



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1    supported it, Democrat Senators did not.

2        Q.    (By Ms. Maranzano) How about, were there any --

3    would you consider anybody from the Executive Branch to

4    be a main supporter of HB 218?

5            MR. FREDERICK:  Same objection.  To the

6    extent it calls for communications between you or

7    Senator Fraser and a member the Executive Branch or

8    their thoughts or mental impressions, I instruct you not

9    to answer.  If you can answer without revealing that,

10   you can answer.

11       A.    I'll assert purchase.

12       Q.    (By Ms. Maranzano) Was there any outside groups

13   or advocacy groups that you would consider to be in the

14   group of the main supporters of HB 218?

15           MR. FREDERICK:  Again, I'll instruct you

16   not to answer and object on privilege, to the extent

17   that it would require you to reveal the substance of any

18   conversation.  But to the extent it's just seeking

19   identity, then you may identify.

20       A.    I honestly don't remember who testified for and

21   against the bill.  Republican Party, I think, was for

22   it.

23       Q.    (By Ms. Maranzano) And did you say -- you said

24   most of the legislators who supported the bill were in

25   the Republican Party?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1          A.    Yes, ma'am.

2          Q.    Do you believe any part of the purpose of

3    HB 218 was partisan?

4                MR. FREDERICK:   I'll object and assert

5    privilege to the extent that the question seeks thoughts

6    or mental impressions about pending legislation or the

7    substance of communications with legislators, staff,

8    agencies, TLC, or constituents.   But, I mean, to the

9    extent that you can identify -- to the extent you're

10   able to identify a purpose without relying on those

11   matters, you're free to answer the question.

12         A.    I think the purpose of the bill, from Senator

13   Fraser and our office's perspective, was to stop

14   in-person voter fraud.   It wasn't partisan.

15         Q.    (By Ms. Maranzano) Who were the main opponents

16   to HB 218?

17         A.    I don't remember.

18         Q.    You don't remember any of them?

19         A.    I don't.

20         Q.    Do you believe that HB 218 would have had a

21   discriminatory impact on minority voters?

22                MR. FREDERICK:   I'll object to the extent

23   it calls for your thoughts and mental impressions about

24   pending legislation and communications, and based on

25   that, I will instruct you not to answer the question.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1          A.    I'll assert privilege.

2          Q.    (By Ms. Maranzano) Are you familiar with

3    Section 2 of the Voting Rights Act?

4          A.    No.

5          Q.    Not at all?

6          A.    Not at all.

7          Q.    Would it surprise you if I told you that

8    Section 2 includes an antidiscrimination provision that

9    applies to all 50 states?

10         A.    I don't know anything about Section 2, so...

11         Q.    So you've never made any effort to ensure that

12   legislation you worked on complied with Section 2 of the

13   Voting Rights Act?

14               MR. FREDERICK:  Objection, argumentative.

15   Objection, assumes facts not in evidence.

16         A.    I don't know anything about Section 2.

17         Q.    (By Ms. Maranzano) Do you think a federal law

18   is required to make sure a piece of legislation doesn't

19   discriminate against minorities?

20         A.    No.

21         Q.    Do you make any attempts to make sure that

22   legislation you work on doesn't discriminate against

23   minorities?

24               MR. FREDERICK:  I object, to the extent it

25   calls for you to reveal thoughts, mental impressions, or



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

79

1      communications relating to specific legislation.  To the

2      extent you can answer without relying on privileged

3      matters, you may do so.

4           A.   I assert privilege.

5           Q.   (By Ms. Maranzano) Was Senator Fraser involved

6      in a photo identification bill in 2009?

7           A.   Yes, ma'am.

8                (Exhibit 29 marked for identification.)

9           Q.   (By Ms. Maranzano) Ms. McCoy, I'm showing you

10     what has been marked as Deposition Exhibit 29.  Do you

11     recognize this?

12          A.   Yes, ma'am.

13          Q.   And what is this?

14          A.   I think it's the filed version of Senate Bill

15     362.

16          Q.   Can you take a look at it and tell me what

17     forms of identification would be allowed in this bill?

18          A.   Section 10 of the bill shows six different

19     forms of photo ID that would be acceptable, including a

20     driver's license or ID card, a military card, a citizen

21     certificate that has a photograph, a passport, a

22     concealed handgun license, and a valid ID card from a

23     federal or local government, or two forms of nonphoto

24     ID, including registration cards, utility bills,

25     official mail, birth certificates, marriage license or



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                           MAY 16, 2012

80

1    divorce decrees, court records.

2        Q.   Is -- I think I didn't ask you this question.

3    Is this the bill that Senator Fraser introduced in 2009?

4        A.   I think I said it was the filed version, yes,

5    ma'am.

6        Q.   Okay.

7        A.   I don't know that to be exact, but based on the

8    title of the bill, it looks like it's the filed version.

9        Q.   Okay.  And this bill would allow for a voter to

10   show one form of photo identification or two forms of

11   nonphoto identification?

12       A.   That's correct.

13       Q.   I believe you testified earlier that two forms

14   of nonphoto identification would verify a voter's

15   identity in both instances?

16       A.   Uh-huh.

17       Q.   What are the instances --

18            MR. DUNN:  Was that a yes?

19            THE WITNESS:  Yes.

20       Q.   (By Ms. Maranzano) What are the instances that

21   a nonphoto ID would not verify a voter's identity?

22            MR. FREDERICK:  Objection to the extent it

23   calls for speculation, but you can answer.

24       A.   Again, if someone is trying to cheat the

25   system, they can -- nonphoto IDs can be reproduced and



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

81

1   manipulated.

2       Q.   (By Ms. Maranzano) Can photo IDs be reproduced

3   and manipulated?

4           MR. FREDERICK:  Objection to the extent it

5   calls for speculation, but you can answer if you know

6       A.   Some can.

7       Q.   (By Ms. Maranzano) Can you tell me what your

8   involvement was in the development of SB 362?

9       A.   Senate Bill 362 as filed was the legislation

10   that the House sent to us from House Bill 218.  So

11   Exhibit 28 is not the bill the Senate was debating,

12   because this is the filed version.  So after the House

13   manipulated it a while, this is the language they sent

14   us.  So we refiled the bill that had passed the House

15   from 2007.  We refiled it in 2009.

16       Q.   Why did Senator Fraser decide to file the bill

17   in the Senate in 2009?

18           MR. FREDERICK:  Object.  That question

19   seeks thoughts or mental impressions of Senator Fraser.

20   I'll instruct you not to answer on the basis of

21   privilege.

22       A.   I'll assert privilege.

23       Q.   (By Ms. Maranzano) So you filed -- I'm sorry.

24   Senator Fraser filed a bill that was -- that had been

25   previously filed in the House; is that correct?  And SB



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

82

1    362 was a version of a previously-filed bill in the

2    House?

3        A.    Senate Bill 362 was the version of House Bill

4    218 that the House sent us, the engrossed version of

5    House Bill 218 from 2007.

6        Q.    Okay.  And you did not make any changes to the

7    bill prior to filing SB 362?

8        A.    I think Senate Bill 362, as filed, was exactly

9    the language that was House Bill 218 as it came out of

10   the Senate committee on State Affairs.

11       Q.    Did you do any -- we've talked a little bit

12   about what you did in relation to House Bill 218.  Did

13   you take any additional steps, in terms of developing or

14   working on SB 362, with regards to any research you did,

15   any studies you looked at?

16       A.    Yes, ma'am.

17       Q.    And what did you do?

18            MR. FREDERICK:  I'll object to the extent

19   this calls for you to reveal thoughts or mental

20   impressions, any communications with legislators, staff,

21   agencies, TLC, or constituents, I instruct you not to

22   reveal the substance of those communications or your

23   thoughts or mental impressions.  If you can answer

24   without revealing those matters, you may do so.

25       A.    I gathered more poll data.  I gathered more



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                              MAY 16, 2012

83

1    research reports, and compiled that information for the
2    Senator.
3        Q.    (By Ms. Maranzano) What poll data did you
4    gather?
5              MR. FREDERICK:  Object.  That calls for
6    you to reveal your thoughts or mental impressions.  I
7    will instruct you not to answer on the basis of
8    privilege.
9        Q.    (By Ms. Maranzano) Are you following your
10   counsel's instruction not to answer that question?
11       A.    Yes, ma'am.
12       Q.    What research reports did you gather?
13             MR. FREDERICK:  Object on the basis that
14   calls for thoughts or mental impressions.  I'm going to
15   instruct you not to answer on the basis of privilege.
16       A.    I'll assert privilege, yes, ma'am.
17       Q.    (By Ms. Maranzano) All right.  Why did you
18   decide to look at poll data when you were doing research
19   on this question?
20             MR. FREDERICK:  I object.  That answer
21   calls for your thoughts or mental impression on pending
22   legislation.  I instruct you not to answer on the basis
23   of privilege.
24       A.    I'll assert privilege.
25       Q.    (By Ms. Maranzano) Did the Senator cite any of


ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

84

1        the poll data or reports that you had gathered on the
2        public record?
3            A.   Yes.
4            Q.   Which polls or reports did he cite?
5            A.   In 2009, he cited Rasmussen Poll on the
6        record.  He cited the Carter-Baker Commission report on
7        the record.  And I don't know that I can recall more
8        than those two on the record.
9            Q.   Were there any polls that you had found in
10       doing your research that the Senator did not cite on the
11       public record?
12               MR. FREDERICK:  I object on the basis that
13       that calls for your thoughts or mental impression,
14       communications.  I instruct you not to answer on the
15       basis of privilege, except to the extent that you can
16       answer yes or no if there are such reports.
17           A.   No.
18           Q.   (By Ms. Maranzano) Were there any studies that
19       you had found or other research you had found that the
20       Senator did not cite on the public record?
21               MR. FREDERICK:  Same objection, same
22       instruction.  You may answer yes or no.
23           A.   Yes.
24           Q.   (By Ms. Maranzano) And what were those?
25               MR. FREDERICK:   I object on the basis that


ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

85

1      seeks thoughts or mental impressions and communications

2      that are privileged.  I instruct you not to answer on

3      the basis of privilege.

4          A.    But I can answer because I don't remember the

5      names of those reports.

6          Q.    (By Ms. Maranzano) Do you remember how many

7      there were?

8          A.    Four or five.  Three, four, five, something

9      like that.

10         Q.    Do you remember what they were about?

11         A.    Voter identification.

12         Q.    Anything more specific than voter

13     identification?

14              MR. FREDERICK:  I'll object.  That seeks

15     thoughts and mental impressions, communications.  I

16     object and instruct you not to answer on the basis of

17     privilege.

18         A.    I'll assert privilege.

19         Q.    (By Ms. Maranzano) When you were working on SB

20     362, did you study any other state's identification

21     requirements?

22              MR. FREDERICK:  I'll object to the extent

23     that calls for your thoughts or mental impressions or

24     communications with legislators, staff, agencies, TLC,

25     or constituents, instruct you not to answer on the basis



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1     of privilege.  However, if you can answer without

2     revealing privileged matters, you may do so.

3          A.   On the record, Senator Fraser said that he had

4     looked at how Indiana was working.

5          Q.   (By Ms. Maranzano) Did you look at any

6     information or study information from any interest

7     groups in relation to SB 362?

8                    MR. FREDERICK:  I'll make the same

9     objection that this question calls for thoughts or

10    mental impressions about pending legislation and your

11    investigative process.  I instruct you not to answer on

12    the basis of privilege, except to the extent you can

13    answer without revealing privileged matters, you may do

14    so.

15         A.   I don't remember.

16         Q.   (By Ms. Maranzano) Did you have any

17    communications about SB 362 with other legislators?

18         A.   Yes.

19         Q.   Which ones?

20                   MR. FREDERICK:  I'll just issue a

21    cautionary instruction.  I don't think that this

22    question is seeking the content of those communications,

23    so I would instruct you not to reveal the content, but

24    you may identify people with whom you spoke.

25         A.   Can we just on the record say that I was four



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

87

```
 1    months pregnant with twins when we were debating Senate
 2    Bill 362, so I don't remember a lot.
 3             I probably spoke to a dozen Senators about
 4    Senate Bill 362.  And as the bill moved through the
 5    Senate, Senator Williams, Senator Ellis, Senator West,
 6    Senator Duncan, Senator Van de Putte, Senator Whitmire.
 7    2009, Senator Huffman, was she in the Senate?  Senator
 8    Harris.  Generally, I mean, a lot of senators I --
 9        Q.   (By Ms. Maranzano) Uh-huh.  So is it fair to
10    say that you spoke to senators who -- those senators who
11    voted for and against SB 362?
12        A.   Yes, ma'am.
13        Q.   Did you speak to the Lieutenant Governor's
14    Office about SB 362?
15        A.   Yes, ma'am.
16        Q.   How many times?
17        A.   I mean, I probably spoke to them every day as
18    the bill was being scheduled for hearing and being
19    heard, and then probably not at all until the House was
20    done with it, and it was moving back over, and then
21    again every day until we voted on it again.
22        Q.   Can you tell me, generally, what those
23    conversations, the nature of those conversations?
24             MR. FREDERICK:  I'll object to the extent
25    it asks you to reveal the substance or content of those
```



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

88

1    conversations, which are subject to privilege.  However,

2    to the extent you're able to identify a general subject

3    matter, you may answer.

4         A.   We generally spoke about the legislative

5    process and we generally spoke about the bill itself.

6         Q.   (By Ms. Maranzano) The legislative process, do

7    you mean how the bill would get passed?

8              MR. FREDERICK:  I'll object to the extent

9    that seeks the content of privileged communications and

10   instruct you not to answer.

11        A.   I'll assert privilege.

12        Q.   (By Ms. Maranzano) Were those conversations by

13   phone or in person?

14        A.   I spoke to Lieutenant Governor's Office.  I

15   generally spoke to them in person.

16        Q.   Is there anybody from the Lieutenant Governor's

17   Office who you spoke to who you haven't already

18   testified about?

19        A.   In 2009?

20        Q.   Uh-huh.

21        A.   I would add Bryan Hebert to the list.

22        Q.   And who is Bryan Hebert?

23        A.   He was Lieutenant Governor's primary staff

24   person for State Affairs in 2009.

25        Q.   Do you know when Bryan Hebert started working



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

89

```
 1    for the Lieutenant Governor?
 2         A.    No, ma'am.
 3         Q.    He was not the Lieutenant Governor's staff
 4    person on voter ID issues in 2007?
 5         A.    I don't remember.  He might have been.
 6         Q.    Was he the Lieutenant Governor's staff person
 7    on voter ID issues in 2011?
 8         A.    Yes, ma'am.
 9         Q.    Did you have communications with officials from
10    other states about SB 362?
11         A.    Yes, ma'am.
12         Q.    And who was that?
13         A.    When I was looking to get witnesses to testify,
14    I spoke to somebody in Indiana.  I don't recall who.  I
15    think from the Secretary of State's Office.  And they
16    were not able to come.  And then I spoke with someone in
17    Georgia.  And I don't remember his name, although it's
18    in the record, because he did come testify.
19         Q.    Did anyone ask you to contact these
20    individuals?
21              MR. FREDERICK:  Object that the question
22    asks you to reveal the substance of communications with
23    legislators, staff or agencies or constituents.  To the
24    extent that you can answer without revealing those
25    privileged conversations, you may do so.
```



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

90

1          A.    Senator Fraser.

2          Q.    (By Ms. Maranzano) Why did you think, or why

3     did the Senator think that individuals from Georgia or

4     Indiana would be helpful in terms of the testimony about

5     SB 362?

6                 MR. FREDERICK:  I object, based that that

7     seeks thoughts or mental impressions of Senator Fraser

8     and communications between Senator Fraser and his

9     staff.  I instruct you not to answer on the basis of

10    privilege.

11         A.    I'll assert privilege.

12         Q.    (By Ms. Maranzano) Do you remember either of

13    these individuals' names who you talked to in Indiana

14    and Georgia?

15         A.    No.

16         Q.    Did anyone from Indiana come and testify during

17    the hearings on SB 362?

18         A.    No.

19         Q.    Did anyone from Georgia come testify?

20         A.    Yes, ma'am.  He was very nice.  I just can't

21    remember his name.

22         Q.    Did you have communications about SB 362 with

23    any interest groups?

24         A.    I don't remember.

25         Q.    Did you have communications about SB 362 with



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

91

1      any groups representing minority voters?

2          A.   I don't remember.

3          Q.   Is there anything that would help you remember

4      whether you had any communications about SB 362 with any

5      interest groups?

6          A.   No.

7          Q.   Did you consider adding any additional forms of

8      identification to SB 362?

9               MR. FREDERICK:   Object.   That question

10     seeks thoughts or mental impressions about pending

11     legislation.   I instruct you not to answer on the basis

12     of legislative privilege.

13         A.   I'll assert privilege.

14         Q.   (By Ms. Maranzano) Can you look at Exhibit 29

15     and Exhibit 28, I believe, HB 218 and SB 362, and look

16     at forms of ID that are allowed in each bill.

17         A.   (Viewing documents.)

18         Q.   What was the purpose of excluding from 362 the

19     student ID as a form of allowable identification even

20     though it was allowed in HB 218?

21              MR. FREDERICK:   I object to the extent

22     this question seeks your thoughts or mental impressions

23     about pending legislation or thoughts of any other

24     legislator, including Senator Fraser or their staff or

25     to the extent it requires communications with



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                              MAY 16, 2012

92

1     legislators, staff, agencies, TLC, and constituents, I

2     instruct you not to answer on the basis of legislative

3     privilege.  To the extent you are able to identify the

4     purpose of any part of the bill without relying on those

5     privileged matters, you may do so.

6          A.   Again, this version of House Bill 218 is not

7     the version that came to the Senate.  I think that the

8     student ID was pulled out by the House, not by the

9     Senate.

10         Q.   (By Ms. Maranzano) I believe that the bill that

11    I have introduced as evidence was actually the bill that

12    was engrossed.  Does that seem correct to you?

13         A.   It does not.

14         Q.   Okay.

15         A.   I'd have --

16         Q.   And you think that the student ID was pulled

17    out of SB 362 in the House?

18              MR. FREDERICK:  I just object to the

19    extent it mischaracterizes the testimony, but you can

20    answer.

21         Q.   (By Ms. Maranzano) Okay.  Can you describe to

22    me what you --

23         A.   My understanding --

24         Q.   Uh-huh.

25         A.   My recollection, Senate Bill 362 should be the



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1    engrossed version of House Bill 218.  So I what I see in

2    front of me with House Bill 218 is not the bill that the

3    Senate debated.  So I don't know what this version is

4    without -- it's saying that it's the engrossed version.

5    I think it's the filed version.

6        Q.   Okay.  Well.  Let me ask you this:  Did SB 362

7    allow, as a form of acceptable identification, student

8    identifications?

9        A.   No, ma'am.

10       Q.   What was the purpose of excluding that from the

11   bill?

12             MR. FREDERICK:  I object to the extent

13   this seeks thoughts or mental impressions from you,

14   Senator Fraser, or other legislators or staff or to the

15   extent it requires you to reveal the substance of

16   communications with legislators, staff, state agencies,

17   TLC, and constituents, I instruct you not to answer on

18   the basis of privilege.  However, to the extent that you

19   are able to identify the purpose of that portion of the

20   bill without relying on those privileged matters, you

21   can do so.

22       A.   I'll assert privilege.

23       Q.   (By Ms. Maranzano) Did you ever look or do any

24   research into who among registered voters would be most

25   likely to have a student identification card?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

94

1            MR. FREDERICK:  Object.  The question

2       calls for your thoughts, mental impressions about

3       pending legislation.  I instruct you not to reveal --

4       not to reveal the substance of your efforts.  However,

5       to the extent that you can answer whether you did or

6       not, you may answer.

7            A.   Ask the question again.

8            MS. MARANZANO:  Can you read back the

9       question.

10           (The requested portion read back by the

11      court reporter.)

12           A.   No.

13           Q.   (By Ms. Maranzano) Why not?

14           MR. FREDERICK:  I'll object on the ground

15      that that calls for your subjective mental impressions

16      and thoughts about pending legislation and instruct you

17      not to answer on the basis of privilege.

18           A.   I'll assert privilege.

19           Q.   (By Ms. Maranzano) Did you have any

20      communications with anyone about the forms of

21      identification, what forms of identification to include

22      in SB 362?

23           A.   No, ma'am.

24           Q.   Did you do any analysis to determine who among

25      registered voters possessed the forms of identification



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                    MAY 16, 2012

95

1      included in SB 362?

2              MR. FREDERICK:  I'll object to the

3      question on the ground that it seeks thoughts and mental

4      impressions and investigative efforts related to pending

5      legislation, and instruct you not to answer to the

6      extent that it would disclose the substance or -- the

7      substance or nature of the process you engaged in.

8      However, you may answer to the extent that you can do so

9      without revealing those matters.

10         A.   I'm sorry.  I'm having some brain fatigue.  You

11     have to read the question again.

12              MS. MARANZANO:  Can you read the question?

13              (The requested portion was read back by

14     the court reporter.)

15         A.   No.

16         Q.   (By Ms. Maranzano) Were you ever instructed not

17     to look at who among registered voters possessed one of

18     the forms of identification included in SB 362?

19              MR. FREDERICK:  I object on the grounds

20     that that seeks communications between legislators,

21     staff, and state agencies.  I instruct you not to answer

22     on the basis of privilege.

23         A.   I'll assert privilege.

24         Q.   (By Ms. Maranzano) If SB 362 had passed the

25     Texas Legislature, would it have been subject to the



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                    MAY 16, 2012

96

```
 1      requirements of Section 5?

 2          A.   Yes.

 3          Q.   Are you familiar with the concept of a Spanish

 4      surname voter registration match?

 5          A.   No.

 6          Q.   Have you ever heard of a Spanish surname

 7      analysis being conducted on a voter registration list?

 8          A.   No.

 9          Q.   Have you ever heard of a Spanish surname list

10      that's put together by the U.S. Census?

11          A.   No.

12          Q.   What's the purpose of SB 362?

13               MR. FREDERICK:  I'll object to the extent

14      that the question calls for thoughts or mental

15      impressions about pending legislation, or to the extent

16      it seeks the substance of communications from

17      legislators, staff, state agencies, TLC, and

18      constituents.  To the extent, however, that you can

19      identify the purpose of the bill without relying on

20      privileged matters, you may do so.

21          A.   Senator Fraser's stated purpose on the record

22      about Senate Bill 362 is to prevent in-person voter

23      fraud.

24          Q.   (By Ms. Maranzano) Any other purposes?

25          A.   No, ma'am.
```



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1       Q.   Did he state on the record any evidence that

2    in-person voter fraud exists?

3       A.   No.

4       Q.   Why was SB 362 a better way to deter in-person

5    voter fraud than through the current system?

6            MR. FREDERICK:  Object to the extent this

7    question seeks thoughts and mental impressions or

8    communications that are privileged about pending

9    legislation.  To the extent that you can answer without

10   relying on those matters, you can do so.

11      A.   I'll assert privilege.

12      Q.   (By Ms. Maranzano) Did anyone ask Senator

13   Fraser to introduce SB 362?

14      A.   No.

15      Q.   And how do you know that?

16           MR. FREDERICK:  I object to the extent it

17   calls for the substance of any privileged

18   communications, and I instruct you not to answer on the

19   basis of privilege.

20      A.   I'll assert privilege.

21           MS. MARANZANO:  Can I have this marked as

22   Exhibit 31?

23           (Exhibit 31 marked for identification.)

24      Q.   (By Ms. Maranzano) Ms. McCoy, I'm showing you

25   what we are marking as Deposition Exhibit 30.  Do you



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

98

1    recognize -- I'm sorry, 31.  Do you recognize this
2    document?
3         A.   Yes, ma'am.
4         Q.   What is this?
5         A.   This is a press release that Senator Fraser
6    issued when he filed Senate Bill 362.
7         Q.   And can I direct your attention to the second
8    to last paragraph there.  Do you see that there is a
9    quote that says -- it's a quote by Fraser, by Senator
10   Fraser.  It says, "In no way am I trying to prevent any
11   legal citizen from voting.  Instead, I want to ensure
12   that illegal aliens, noncitizens, and people otherwise
13   not qualified do not dilute the legitimate votes cast by
14   citizens."  Do you know see which paragraph I'm talking
15   about?
16        A.   You have a different one.
17             MR. FREDERICK:  Okay.  I'm sorry.  Can I
18   stop you real quick?  I think I may have the wrong
19   one.  Oh, okay.  That one is right, December 15th.
20   Thanks.  She wrote -- do you want to mark a different
21   one for the record?
22             (Brief discussion held off the record.)
23             MR. RODRIGUEZ:  That's 30, not 31.
24             (Brief discussion held off the record.)
25             MS. MARANZANO:  We accidentally took this



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

99

```
 1      the other day.  That's an original exhibit.
 2                 MR. FREDERICK:  Just so the record
 3      reflects that we have marked a nonmarked copy of the
 4      exhibit.
 5                 MS. MARANZANO:  Are we -- we're on the
 6      record?
 7                 THE REPORTER:  Yes.
 8                 MS. MARANZANO:  Okay.
 9        Q.   (By Ms. Maranzano) Do you see that paragraph
10      that I just read?
11        A.   Yes, ma'am.
12        Q.   And can you tell me what the Senator meant by,
13      "I want to ensure that illegal aliens, noncitizens, and
14      people otherwise not qualified do not dilute the
15      legitimate votes cast by citizens."  What does that
16      mean?
17                 MR. FREDERICK:  I'll object to the
18      question to the extent it seeks mental impressions of
19      the thought process regarding pending legislation.  But
20      to the extent that -- and I'll also object to the extent
21      it calls for speculation.  To the extent that you think
22      you can answer without relying on privileged matters,
23      you may do so.
24        A.   I'll assert privilege.
25        Q.   (By Ms. Maranzano) Ms. McCoy, did you write
```



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

JANICE MCCOY                                         MAY 16, 2012

                                                              100

1       this press release?

2            A.   Yes, ma'am.

3            Q.   And are you the contact person for any

4       inquiries from --

5            A.   Yes, ma'am.

6            Q.   -- the press release?

7            A.   Yes, ma'am.

8            Q.   And it's your position that you can't testify

9       as to what he meant because it's privileged?  Is that --

10              MS. MARANZANO:  I mean, Mr. Frederick,

11       this is public document.

12              MR. FREDERICK:  Yeah.  Yeah.  Sure.  And

13       let me clarify.  I think we need to be clear on my

14       instruction.  I'm objecting to the extent that it seeks

15       thoughts or mental impressions of Senator Fraser.  To

16       the extent that Ms. McCoy sitting here can -- to the

17       extent that she can tell you in her personal knowledge

18       what she thinks this means sitting here today, then that

19       would not be privileged.  And communications with Fraser

20       would be privileged.  But I mean, the words are on the

21       page, and to the extent that she can tell you what she

22       thinks they mean today, I think that that's fine.

23              MS. MARANZANO:  And just to be clear, she

24       did just testify that she wrote the words, so...

25              MR. FREDERICK:  Right.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

101

1       Q.    (By Ms. Maranzano) Okay.  So to the extent that

2    you --

3       A.    Would you like to ask the question again?

4       Q.    Yes.  I'm interested in what -- the sentence

5    that starts with, "Instead, I want to ensure that

6    illegal aliens, noncitizens, and people otherwise not

7    qualified, do not dilute the legitimate votes cast by

8    citizens, said Fraser."  What does that mean?

9       A.    I think it means that he wants to ensure that

10   the person who shows up at the polls is the person who

11   is supposed to be voting under that name.

12      Q.    Was a part of the purpose of SB 262 related to

13   illegal aliens voting?

14            MR. FREDERICK:  Let me just interpose a

15   objection to the extent that seeks thoughts, mental

16   process, or privileged communications that would be

17   privileged, and I would instruct you not to answer.  But

18   to the extent that you can identify the purpose or

19   whether that's a purpose, you may answer.

20      A.    The purpose of Senate Bill 362 was to stop

21   in-person voter fraud, and that would entail anybody not

22   voting legally, including illegal aliens who are not

23   allowed to vote.

24      Q.    (By Ms. Maranzano) So if a noncitizen votes,

25   you define in-person voter fraud to include a noncitizen



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

102

1      voting as themselves?  Am I understanding you correctly?

2          A.    Because they're committing fraud, yes, ma'am.

3          Q.    Okay.  So when you said the purpose of SB 362

4      was to deter in-person voter fraud, you also are

5      including in that category deterring noncitizens from

6      voting in elections; is that correct?

7                MR. FREDERICK:  I'll just object to the

8      extent it mischaracterized the testimony.  But to the

9      extent we're talking about the purpose of the bill, you

10     may answer the question.

11         A.    The purpose of the bill was to ensure that

12     citizens, registered -- were voting -- were not

13     committing fraud.  There was no in-person voter fraud.

14     So whatever that constitutes, this bill was trying to

15     prevent.

16         Q.    (By Ms. Maranzano) Okay.  So what I'm asking

17     you now is:  What do you believe that that constitutes?

18     As somebody who was the chief of staff for the author of

19     the bill, what do you think that constitutes?

20               MR. FREDERICK:  I will object, based on

21     privilege, the extent that this seeks a subjective

22     motivation, a subjective thought or a mental impression

23     somehow incorporated in the text of the bill.  And I

24     would instruct you not to answer on the basis of

25     privilege.  To the extent that sitting here today, you



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

103

1    can explain your understanding of the terms at issue

2    that would not be privileged, then you may answer.

3         A.    I don't know that I understand your question.

4         Q.    (By Ms. Maranzano) Okay.  What I'm trying to do

5    is, you have testified earlier today that the purpose of

6    both SB 362 and HB 218 was to detect in-person voter

7    impersonation.  And I want to be clear for the record as

8    to how you define that term, the term in-person voter

9    impersonation.

10        A.    Someone who is not authorized to vote by our

11   constitution who is voting in person.  Someone who is

12   cheating the system by voting under a different name.

13   Someone who is cheating the system by voting more than

14   once in an election.

15        Q.    So is part of the purpose of SB 362 to prevent

16   noncitizens from voting?

17             MR. FREDERICK:  Same objection.  But you

18   can answer subject to my previous instruction.

19        A.    Okay.  Can we back up?  Because I just reread

20   this press release.

21        Q.    (By Ms. Maranzano) Uh-huh.

22        A.    Senator Fraser filed two bills in 2008 -- 2008,

23   Senate Bill 362 and Senate Bill 363?

24        Q.    Uh-huh.

25        A.    Senate Bill 363 was talking about -- more about



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

104

1    the illegal immigrant issue.  Senate Bill 362 was about

2    in-person voter fraud.  This quote probably relates more

3    to Senate Bill 363 than it does to Senate Bill 362.  So,

4    I mean, we have to read the whole press release in

5    context.

6        Q.    Uh-huh.

7        A.    I mean, but in-person voter fraud is someone

8    showing up who's not supposed to be there, who is not a

9    citizen of our country, who has someone else's ID, who

10   has falsified voter records and is voting fraudulently,

11   and that's what Senate Bill 362 was trying to do.

12       Q.    Okay.  So how does Senate Bill 362 deter

13   noncitizens from voting?

14             MR. FREDERICK:  I object to the extent it

15   calls for speculation.  You may answer if you can.

16       A.    By requiring someone to show ID, if they're not

17   a legal citizen, they wouldn't have that ID,

18   necessarily, and then they wouldn't be able to vote.

19       Q.    (By Ms. Maranzano) Do you know how many forms

20   of ID listed in SB 362 a noncitizen is able to obtain?

21       A.    I do not.

22       Q.    Did you look into that when you were working on

23   SB 362?

24             MR. FREDERICK:  I object to the extent it

25   calls for mental impressions, thought process,



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                          MAY 16, 2012

105

1      privileged communications.  But subject to that

2      instruction, if you can answer without revealing that,

3      you may answer.

4          A.   No.

5          Q.   (By Ms. Maranzano) No, you didn't look into it?

6          A.   I did not.

7          Q.   Do you think that would be an important issue

8      to look into, if part of the goal of the bill is to

9      prevent noncitizens from voting?

10         A.   The goal of the bill was to prevent in-person

11     voter fraud.

12         Q.   Okay.  I thought you testified earlier that

13     that included anyone who was not legally permitted to

14     vote.  Is that not correct?

15         A.   The goal of Senate Bill 362 was to prevent

16     in-person voter fraud.  Whether it was by legal citizens

17     or illegal citizens, we were trying to create a tool to

18     prevent in-person voter fraud.

19         Q.   Okay.  And to be clear, you did not look into

20     whether noncitizens could obtain the forms of

21     identification required by SB 362?

22         A.   I did not.

23              MR. FREDERICK:  If we can take a break

24     soon.

25              MS. MARANZANO:  Do you want to go like



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                          MAY 16, 2012

106

1      another 15 minutes and break for lunch?  That's fine.

2                  MR. FREDERICK:  Sure.

3                  MR. DUNN:  But then we'll have to do the

4      hearing.

5                  MR. ROSENBERG:  Yeah, that would fit in

6      with the hearing.

7                  MS. MARANZANO:  Okay.

8          Q.   (By Ms. Maranzano) Did the Senator consider any

9      alternative legislative measures that would have

10     accomplished the goal of deterring in-person voter

11     impersonation.

12                 MR. FREDERICK:  Object on the ground that

13     it seeks thoughts, mental impressions, and privileged

14     communications, and I instruct you not to answer the

15     question based on privilege.

16         A.   I'll assert privilege.

17         Q.   (By Ms. Maranzano) Did the Senator make any

18     promises to anyone concerning alternative legislative

19     measures that would have accomplished the goal of

20     deterring in-person voter impersonation?

21                 MR. FREDERICK:  I'll object to the extent

22     that calls for thoughts, mental impressions, or

23     communications with other legislators or legislative

24     staff members, other privileged communications.  To the

25     extent you can answer without revealing privileged



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

107

1       communications, you may do so.

2            A.   I'll assert privilege.

3            Q.   (By Ms. Maranzano) Ms. McCoy, is it your

4       position that promises that the Senator makes about

5       legislation are covered by the privilege, the

6       legislative privilege?

7                 MR. FREDERICK:  Yes, to the extent -- I

8       mean, I guess promises, I'm not entirely clear on what a

9       promise would entail, but I think to the extent that it

10      would include a discussion with another legislator or

11      discussions between legislative staff members about

12      pending legislation.  I mean, I think promise could be

13      construed to include ordinary legislative discussions

14      and, you know, policy discussions and compromises.  I

15      think that kind of thing is an integral part of the

16      legislative process in determining votes to get

17      legislation passed.

18                MS. MARANZANO:  Is it also your position

19      that promises to constituents or groups would be covered

20      by the privilege?

21                MR. FREDERICK:  It's my understanding that

22      a promise to somebody outside the Legislature, I think,

23      would not fall under the privilege.

24                MS. MARANZANO:  That's my understanding,

25      too.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

108

1            MR. FREDERICK:  Yeah.  Yeah.  And I think

2     to the extent it's not an -- to the extent it's a

3     nonconfidential or an external communication, I think

4     that's not what I intend to object to.

5            MS. MARANZANO:  Okay.

6     Q.   (By Ms. Maranzano) Ms. McCoy let me rephrase

7     that question.  Did the Senator make any promises to

8     constituents or outside groups related to SB 362?

9     A.    In what way?

10    Q.    Did the Senator make any promises to bring a

11    bill to the Senate Floor that would require photo

12    identification in 2009?

13    A.    The Senator committed, after the legislation

14    failed in 2007, to constituents that he would try again.

15    Q.    Which constituents did he commit to?

16    A.    Skipper Wallace.

17    Q.    Can you tell me who Skipper Wallace is?

18    A.    He's a constituent from Lampasas.

19    Q.    Why is he so interested in photo identification

20    bills?

21            MR. FREDERICK:  I'll object to the extent

22    that calls for privileged communications between Senator

23    Fraser, Ms. McCoy, and privileged communications between

24    either and Mr. Wallace, and as well as to the extent it

25    calls for thought process, mental impressions.  If you



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1    can answer without revealing thoughts or privileged

2    communications, you can do so.  Otherwise, I instruct

3    you not to answer on the basis of privilege.

4        A.   I mean, Skipper has been a long-time election

5    worker and judge, and I think he just advocates for

6    election law change.

7        Q.   (By Ms. Maranzano) He's an election worker and

8    judge.  What is his profession, if you know?

9        A.   He's a businessman.

10       Q.   So he is a volunteer election judge, and what

11   was the first thing you said?

12       A.   Election worker, election judge.

13       Q.   Does he have any role in the government

14   structure of the county?

15       A.   Skipper, I think, used to be city manager in

16   Lampasas, I think.

17       Q.   Does he have any role with a political party?

18   Any political party?

19       A.   Yes.

20       Q.   Which one?

21       A.   Republican.

22       Q.   And what's his role?

23       A.   He's Chair of the Lampasas Republican Party.

24       Q.   Ms. McCoy, you testified earlier that there was

25   no partisan purpose to SB 362.  So now that you've



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                              MAY 16, 2012

110

1       testified that the Senator made a promise to a person

2       who was affiliated with a political party, the Chair of

3       a political party, do you wish to change your testimony

4       from earlier today?

5            A.   No, ma'am.

6            Q.   Did your office have any communications about

7       the purpose of SB 362?

8                 MR. FREDERICK:  Object as vague, also

9       object on grounds of privilege to the extent it calls

10      for the substance of confidential communications, and

11      instruct you not to answer.  To the extent you can

12      answer without revealing confidential communications,

13      you may.

14           A.   I'm going to assert privilege.

15           Q.   (By Ms. Maranzano) Did your office have any

16      communications in response to a -- did you -- did your

17      office ever get a Texas public records request regarding

18      SB 362?

19           A.   We have received public information requests

20      about voter ID.  I do not recall if they were in post

21      2009 session or post 2011.  Probably both.

22           Q.   Has Senator Fraser had any meetings with

23      constituents where the purpose of 362 was discussed?

24                MR. FREDERICK:  I'll object to the extent

25      it calls for the content of communications, privileged



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

111

1    communications between Senator Fraser and

2    constituents.  To the extent you can answer without

3    revealing the substance of those conversations, you may

4    do so.

5        A.   The Senator has met with constituents about

6    voter ID.

7        Q.   (By Ms. Maranzano) How many times?

8        A.   The Senator mentions voter ID when he speaks

9    and when he gets invited to go speak to different

10   chambers and groups.  Pretty much every time he speaks

11   to a group like that, he'll mention it.  And in office,

12   half dozen.

13       Q.   Would you say that voter ID was one of the

14   Senator's key legislative accomplishments?

15            MR. FREDERICK:  I'll object to the extent

16   to calls for mental impressions or thoughts.  However,

17   to the extent you can answer, based on -- to the extent

18   you can answer without relying on privileged

19   information, you can do so.

20       A.   Yes.

21       Q.   (By Ms. Maranzano) Who besides Senator Fraser

22   were the main proponents of SB 362?

23       A.   Other members?

24       Q.   Well, presumably.  Well, why don't we start

25   with:  Were there any members who voted for the bill who



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

112

1    were strong proponents of it?

2            MR. FREDERICK:  I'll just interpose, I

3    don't think that this question is asking for the

4    substance of communications, so I would admonish you not

5    to reveal the substance of any privileged communications

6    in answering, but I think that you can do that.

7        A.   I mean, I think that all the members that

8    signed on as co-authors would consider themselves strong

9    proponents of the bill.

10       Q.   (By Ms. Maranzano) Were there others in the

11   Texas government who were strong proponents of SB 362?

12           MR. FREDERICK:  Same instruction.

13       A.   I don't think so.  I don't know.

14       Q.   (By Ms. Maranzano) Was 362 a priority for the

15   Governor?

16           MR. FREDERICK:  I'll object on the same

17   grounds.  To the extent it seeks thoughts, mental

18   impressions of the Governor or communications between

19   Senator Fraser's office and the Governor, I will

20   instruct you not to answer.  I mean, if you know.

21       A.   I don't know the Governor's priorities from

22   2009.

23       Q.   (By Ms. Maranzano) Was SB 362 a priority for

24   the Lieutenant Governor?

25           MR. FREDERICK:  The same instruction.  To



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

113

1       the extent it seeks thoughts or mental impressions of

2       the Lieutenant Governor or confidential communications

3       between Senator Fraser's office and the Lieutenant

4       Governor's Office, I would instruct you not to answer.

5       If you're able to answer, you may do so.

6           A.    I don't know -- I don't know the Lieutenant

7       Governor's priorities from 2009.

8           Q.    (By Ms. Maranzano) Was SB 36 a priority for

9       anyone outside of the Texas government?

10              MR. FREDERICK:  I'll object as vague, but

11      you can answer if you know.

12          A.    I don't.  I don't know.

13          Q.    (By Ms. Maranzano) How often did you say that

14      you talked to Lieutenant Governor's Office during the

15      consideration of SB 362?

16          A.    I probably talked to them every day while we

17      were scheduling the bill and during the hearing.

18          Q.    And you have no idea whether it was priority

19      for their office?

20              MR. FREDERICK:  Object, argumentative.

21          Q.    (By Ms. Maranzano) You can answer.

22          A.    That process was about six days long, so to

23      talk to them for six days.  But again, I don't speak for

24      the Lieutenant Governor, so I don't know his priorities.

25          Q.    Were there any groups that represented minority



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

114

1      voters who supported SB 362?

2              MR. FREDERICK:  I'll just object to the

3      extent this calls for the substance of confidential

4      communications between any constituents and Senator

5      Fraser's office, I would instruct you not to answer.

6      But to the extent that you can answer without revealing

7      the substance of any conversation, you can do so.

8      A.    I don't know.

9      Q.    (By Ms. Maranzano) Ms. McCoy, who would know

10     the Lieutenant Governor's priorities?

11              MR. FREDERICK:  Object as vague and calls

12     for speculation.  You can answer if you know.

13     A.    The Lieutenant Governor and his staff.

14     Q.    (By Ms. Maranzano) Who on his staff?

15              MR. FREDERICK:  Same objection.

16     A.    His chief of staff, Blaine Brunson.

17     Q.    (By Ms. Maranzano) Who were the main opponents

18     to SB 362?

19     A.    I don't recall.

20     Q.    Do you recall having communications with

21     constituents who opposed SB 362?

22     A.    No.

23     Q.    Do you recall having -- do you recall having

24     communications with outside groups that opposed SB 362?

25              MR. FREDERICK:  I'll object to the extent



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

115

1        it seeks the substance of any privileged communication

2        between a constituent and Senator Fraser's office, but

3        to the extent it doesn't require you to reveal the

4        substance, you may answer the question.

5            A.    I don't recall.

6            Q.    (By Ms. Maranzano) Do you recall that there was

7        opposition to SB 362?

8            A.    Yes, ma'am.

9            Q.    What was the basis of that opposition?

10               MR. FREDERICK:  I'll object to the extent

11        it calls for speculation.  Also object to the extent it

12        seeks the substance of any privileged communications

13        between other legislators and staff or constituents and

14        Senator Fraser and Ms. McCoy.  To the extent that you

15        know independent of privileged sources or you don't have

16        to reveal any, you may answer.

17            A.    I think if you look at the record, that the

18        people that testified against Senate Bill 362 believed

19        that it would disenfranchise voters.

20            Q.    (By Ms. Maranzano) What do you think about that

21        testimony?

22               MR. FREDERICK:  I'll object to the extent

23        it calls for thoughts or mental impressions about

24        pending legislation.  I also object to relevance.

25            A.    I'll assert privilege.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                            MAY 16, 2012

                                                              116

1              Can I do that?

2              MR. FREDERICK:  Yeah.

3         Q.   (By Ms. Maranzano) Did the Senator take any

4    steps with regard to SB 362 to address any of these

5    concerns that were raised by opponents to SB 362?

6              MR. FREDERICK:  Objection, vague.

7    Objection, seeks thoughts and mental impressions of the

8    Senator.  It also seeks the substance of confidential

9    communications and privileged communications with the

10   Senator.  To the extent that you can answer without

11   revealing the substance of confidential communications

12   or the Senator's thought process or the thought

13   processes of you or any other legislator, you may do so.

14        A.   I don't think we amended the bill, so the

15   answer would be no.

16        Q.   (By Ms. Maranzano) Just to be clear, you don't

17   think you amended the bill at all throughout the entire

18   Senate process?

19        A.   I don't think we did.  Maybe on the margins,

20   but -- so, we did not take any action to make changes

21   either direction.

22        Q.   Is there a reason you didn't take any action to

23   respond to the concern of opponents?

24             MR. FREDERICK:  Objection, it seeks

25   thoughts and mental impressions.  I instruct you not to



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

117

1   answer on the basis of privilege.

2       A.   I'll assert privilege.

3       Q.   (By Ms. Maranzano) Did anybody raise any

4   concerns that SB 362 would disenfranchise minority

5   voters?

6           MR. FREDERICK:  I'll object to the extent

7   it calls for privileged communications between

8   constituents, legislators, staff, and you or Senator

9   Fraser.  To the extent you can answer without relying on

10  privileged communications, you may do so.

11      A.   And on the record, during the debate, several

12  members testified that way, and then we had witnesses

13  that testified in the same manner.

14      Q.   (By Ms. Maranzano) And do you recall what the

15  basis of their testimony was?

16      A.   No, ma'am.

17      Q.   Did you take any steps to determine whether

18  SB 362 would disenfranchise minority voters?

19          MR. FREDERICK:  Object to the extent it

20  seeks thought process -- thought processes and mental

21  impressions and confidential communications with

22  legislators and legislative staff.  I would instruct you

23  not to answer that question on the basis of privilege.

24      A.   I'll assert privilege.

25          MS. MARANZANO:  I think that I'm a point



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

                                                                118

1    where it might make sense to stop for lunch.  And maybe

2    we can start back up after the call to the court?  Does

3    that make sense?

4              MR. SWEETEN:  That's fine.

5              With respect to letting Janice go, I'm

6    going to let her go for a while.  Let's probably have

7    you come back at two o'clock.  I mean, I don't think she

8    needs to be here before 2:00 for any reason.

9              MS. MARANZANO:  Yeah, I think that's

10   right.

11             MR. DUNN:  That's fine.  The only thing

12   I'll add is that I invoked the rule, and under the

13   Federal Rules of Procedure you're not to talk to anybody

14   about your testimony other than your lawyers.

15             THE WITNESS:  That's fine.

16             (Lunch recess from 12:46 p.m. to

17   2:15 p.m.)

18             MS. MARANZANO:  Let's go back on the

19   record.

20        Q.   (By Ms. Maranzano) Before the break, we were

21   talking about SB 362, and I'd like to continue talking

22   about SB 362.

23             Ms. McCoy, what was your role in trying to

24   get SB 362 passed?

25        A.   My role in trying to get 362 passed was to



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                        MAY 16, 2012

119

1    navigate the legislative process for the Senator in

2    terms of the behind-the-scenes staff work that takes

3    place.

4         Q.   And can you describe that to me?

5         A.   Filing the bill.  Filing the bill and

6    requesting hearings, prepping talking points.

7         Q.   Did you have any role in determining how

8    different senators would vote on SB 362?

9         A.   No.

10        Q.   Did Senator Fraser have any idea of how many

11   senators would support SB 362 when he introduced it?

12             MR. FREDERICK:  Object.  The question

13   calls for thought process and mental impressions of

14   Senator Fraser.  It may also call for communications

15   with legislators and staff that are privileged.  I would

16   instruct you not to answer on the basis of privilege.

17        A.   I'll assert privilege.

18             (Exhibit 32 marked for identification.)

19        Q.   (By Ms. Maranzano) Okay.  Can you take a look

20   at what we've marked as Deposition Exhibit 32?  In

21   particular, can you look at Rule 5.11, which is on Page

22   24.  Do you see Provision D under 5.11?

23        A.   Yes.

24        Q.   When was that provision added to the rules?

25        A.   January 14th, 2009.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

120

1          Q.   And how was -- was there a resolution to

2     specifically add Subsection D to Rule 5.11?

3          A.   Yes.

4          Q.   Who introduced that resolution?

5          A.   Senator Williams.

6          Q.   Did Senator Fraser ask Senator Williams to

7     exempt voter ID requirements from the two-thirds Rule?

8               MR. FREDERICK:  I object on the grounds

9     that it seeks confidential communications related to

10    pending legislation, and I'm going to instruct you not

11    to answer on the basis of privilege.

12         A.   I'll assert privilege.

13         Q.   (By Ms. Maranzano) How was the resolution

14    brought up in the Senate to add Subsection D to 5.11?

15         A.   I don't remember.

16         Q.   During the time that you have worked for

17    Senator Fraser, have you ever seen another category of

18    legislation exempted from the two-thirds rule?

19              MR. FREDERICK:  I'll object just on -- to

20    the extent that it mischaracterizes the testimony in the

21    record, but you can answer.

22         A.   I don't recall the Committee of the Whole

23    meeting, except for 2009 and 2011, since I've worked for

24    Senator Fraser.

25         Q.   (By Ms. Maranzano) So am I understanding you



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

121

1    correctly that there has not been, to the best of your

2    recollection, another category of legislation that's

3    been written into the rules as exempted from the

4    two-thirds vote requirement under Rule 5.11?

5                 MR. FREDERICK:   The same objection, but

6    you can answer.

7         A.   Can you repeat the question?

8         Q.   (By Ms. Maranzano) I just want to make sure I

9    understood the answer that you gave, because you

10   mentioned the Committee of the Whole.  But am I

11   understanding you correctly that it's your recollection,

12   as you sit here, that during the time you worked for

13   Senator Fraser, there has not been another category of

14   legislation carved out of Rule 5.11 as voter

15   identification requirements are carved out in

16   Subsection D in the 2009 rules?

17        A.   Yes.

18        Q.   Okay.  What was the purpose of carving out the

19   voter ID identification requirement from the two-thirds

20   rule?

21        A.   I don't know.

22        Q.   Did the Senator have any concerns about

23   exempting SB 362 from the requirement that legislation

24   get two-thirds support in the Senate?

25                MR. FREDERICK:   Object on the grounds that



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1        it seeks the thought process and mental impressions of

2        Senator Fraser about pending legislation, and I instruct

3        you not to answer on the basis of privilege.

4            A.   I'm going to assert privilege.

5            Q.   (By Ms. Maranzano) Did the Senator have any

6        concerns that by exempting legislation from the

7        two-thirds rule requirement, it would appear to be a

8        very partisan-supported piece of legislation?

9                    MR. FREDERICK:   I object on the grounds

10        that it seeks the mental impressions and thought

11        processes of Senator Fraser on pending legislation.  I

12        instruct you not to answer on grounds of privilege.

13            A.   I'll assert privilege.

14            Q.   (By Ms. Maranzano) If SB 362 had not been

15        exempt from the two-thirds rule requirement, would it

16        have passed the Senate?

17                    MR. FREDERICK:   Object to the extent it

18        calls for speculation.

19            A.   I don't know.

20            Q.   (By Ms. Maranzano) Well, SB 362 was voted on,

21        did two-thirds of the members support it?

22            A.   No.

23            Q.   Did you have any communications with Senator

24        Williams about the resolution that led to Subsection D

25        of Rule 5.11 in the 2009 rules?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1          MR. FREDERICK:  I object to the question

2    to the extent it calls for the substance of confidential

3    communications between Ms. McCoy and Senator Williams,

4    so it's subject to legislative privilege.  I'm going to

5    instruct you not to answer on that basis.

6          Q.    (By Ms. Maranzano) Are you following your

7    counsel's instruction not to answer that question?

8          A.    I never spoke to Senator Williams about this

9    resolution.

10         Q.    Did you speak to anybody at Senator Williams's

11   office about this resolution?

12         A.    No.

13         Q.    Did you speak to anybody in the Lieutenant

14   Governor's Office about the resolution that led to the

15   suspension of the two-thirds rule?

16         A.    No.

17         Q.    Did you speak to anybody in the Governor's

18   Office?

19         A.    No.

20         Q.    What was the reaction from senators on the --

21   well, let me ask you this first:  Are you familiar with

22   the testimony that occurred when Senator Williams

23   introduced the resolution to suspend the two-thirds

24   rule?

25         A.    No.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

124

1          Q.    Can you also take a look at Rule 16.07?  It's

2     on Page 106 and 107.

3          A.    Which rule did you want me to look at?

4          Q.    16 -- hold on.

5          A.    07?

6          Q.    16.07.

7          A.    Okay.

8          Q.    Actually, you know what; let's do 16.06 and 07,

9     which relate to matters regarding -- 16.06 is matters

10    requiring a vote of two-thirds of the members present,

11    and 16.07 is Matters of Requiring Vote of Majority

12    Members of the Senate.  Were these rules also impacted

13    by Senator Williams's resolution?

14         A.    I don't know.

15         Q.    Can you look at Section 7, Subsection 7 of Rule

16    16.07, matters -- and 16.07, again, is Matters Requiring

17    Vote of Majority of Members of the Senate.  And

18    Subsection 7 says, "Set voter identification requirement

19    bills for special order."  Does that refresh your

20    recollection as to whether that was something that was

21    impacted by Senator Williams's resolution?

22         A.    I never read Senator Williams's resolution, so

23    I would assume yes, it was in there.

24         Q.    So these changes in the rules directly impacted

25    SB 362, did they not?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                              MAY 16, 2012

125

1        A.    Yes.

2        Q.    So you never read Senator Williams's

3   resolution, but are you familiar with the impact that

4   his resolution on the rules?

5        A.    Yes.

6        Q.    Did Senator Fraser have any concerns about

7   suspending the two-thirds rule for SB 362?

8               MR. FREDERICK:  I object on the grounds

9   that it seeks the mental impressions and thought

10  processes of Senator Fraser as well as privileged

11  communications of the staff, and I instruct you not to

12  answer on the basis of privilege.

13       A.    I'll assert privilege.

14       Q.    (By Ms. Maranzano) Were there any other changes

15  in the rules in 2009 from previous Senate rules that --

16       A.    I don't recall.  I'm sorry.  I thought you were

17  done.  I'm sorry.

18       Q.    No, it was just a pause.

19              That were related only to voter

20  identification requirements?

21       A.    I don't recall.

22       Q.    Was there any consideration of changing any

23  other Senate rules in 2009 to ensure that SB 362 would

24  get passed in the Senate?

25              MR. FREDERICK:  I object to the extent the



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

126

1     question calls for thought process, mental impressions

2     of legislators and for confidential communications,

3     privileged communications among legislators and

4     staff.  I would instruct you not to answer on the basis

5     of privilege, except to the extent there is something

6     nonprivileged you can point to answer.

7          A.   I don't know.

8          Q.   (By Ms. Maranzano) Was SB 362 considered by any

9     Senate committees?

10         A.   Senate committee on the whole.

11         Q.   Is that the only one?

12         A.   Yes, ma'am.

13         Q.   Is it unusual for a bill to go straight to

14    Senate Committee of the Whole?

15         A.   Yes.

16         Q.   Have you seen that happen with other

17    legislation during the time you have worked for Senator

18    Fraser?

19         A.   I don't recall it happening since I've worked

20    for Senator Fraser.

21         Q.   What was your role during the Floor

22    consideration of SB 362?

23         A.   I sat with Senator Fraser as he laid out the

24    bill, and when he asked me to produce documentation, I

25    would give it to him.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

127

1     Q.   What kind of documentation did you have with

2  you?

3          MR. FREDERICK:  I object on the ground

4  that it seeks thought process and mental impressions

5  that may reflect confidential communications.  I would

6  instruct you not to answer on the basis of privilege.

7     A.   I will answer, because I will tell you the same

8  things that we've talked about earlier:  The poll data,

9  the studies, the Carter-Baker Commission report.  Just

10  those two.

11          MS. MARANZANO:  I'm going to ask, if it's

12  possible, Mr. Frederick, can you shorten your objections

13  just so that we can --

14          MR. FREDERICK:  Yeah.

15          MS. MARANZANO:  I mean, you know, since

16  it's the same objection, that will maybe save us some

17  time.

18          MR. FREDERICK:  Absolutely.

19          MS. MARANZANO:  Thank you.

20          MR. FREDERICK:  If y'all are willing to --

21  you know, to stipulate that when I make a shorter

22  objection, it covers all the matters, I am happy to

23  shorten it.

24          MS. MARANZANO:  Great.  Thank you.

25          MR. FREDERICK:  Can I propose "Objection,



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1      legislative privilege"?

2                    MS. MARANZANO:  That's sounds --

3                    MR. FREDERICK:  Is that good enough?

4                    MS. MARANZANO:  That's great.  And you

5      will understand what he means overall.

6                    THE WITNESS:  And then I may not forget

7      your question.

8                    MR. FREDERICK:  Yeah.  Thanks.

9                    MS. MARANZANO:  Okay.  Terrific.

10     Q.   (By Ms. Maranzano) During the Floor debate on

11     SB 362, did anyone raise concerns about the impact that

12     the bill might have on minority voters?

13     A.   Yes.

14     Q.   What concerns were those?

15     A.   I can't speak to specific concerns.

16     Q.   Who raised those concerns?

17     A.   Democrats and the senators.

18     Q.   Were they minority senators?

19     A.   Some of them were.

20     Q.   Do you know if they were senators who

21     represented minority voters?

22     A.   Yes.

23     Q.   What was the Senator's response to these

24     concerns?

25     A.   His response was that he disagreed.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                          MAY 16, 2012

                                                                  129

 1        Q.   What was that disagreement based upon?
 2             MR. FREDERICK:   Object on legislative
 3   privilege, but matters in the public record you may
 4   address.
 5        A.   He referenced election data in both Georgia and
 6   Indiana that showed that their voter ID laws did not
 7   impact minority voters on the record.
 8        Q.   (By Ms. Maranzano) What was that election data?
 9        A.   Data from Indiana and Georgia's elections that
10   were held after they voted -- after they had a voter ID
11   law, that showed that the turnout increased.
12        Q.   So the data you referenced was about turnout?
13        A.   Yes, ma'am.
14        Q.   Was it solely about turnout?
15        A.   Yes, ma'am.
16        Q.   And was it about turnout of minority voters in
17   particular?
18        A.   All voters.
19        Q.   All voters?
20        A.   By I think the data he showed did have
21   minority -- I think the data he referenced in his
22   testimony did show that minority voters increased as
23   well.
24        Q.   And what years were those studies run?
25        A.   I don't remember.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                      MAY 16, 2012

                                                                130

1          Q.   Do you know if he looked into whether other

2     issues might have had any impact on that turnout?

3               MR. FREDERICK:   Objection, legislative

4     privilege.   To the extent there's material on the

5     record, you may answer.

6          A.   I'll assert privilege.

7          Q.   (By Ms. Maranzano) Did any of those studies

8     record any information about voter registration rates in

9     Indiana and Georgia?

10         A.   The data -- I'm sorry.   The data that I

11    mentioned was not a study.   It's actual voter turnout

12    from those states' Secretaries of State.   So I want to

13    be real clear that they're not studies.   We're talking

14    about actual turnout.

15         Q.   Okay.   I got you.   So did the Senator do any

16    research to determine whether voter registration rates

17    changed in those states during the years in which there

18    was an increase in voter turnout?

19              MR. FREDERICK:   Objection, legislative

20    privilege.   Instruct you not to answer.

21         A.   I'll assert privilege.

22         Q.   (By Ms. Maranzano) Did the Senator do any

23    research to determine whether there were any close

24    elections during those years?

25              MR. FREDERICK:   Objection, legislative



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1     privilege.  Instruct you not to answer.

2          A.   Assert privilege.

3          Q.   (By Ms. Maranzano) Did the Senator do any

4     research to determine whether there were any high

5     profile elections during those years?

6               MR. FREDERICK:  Objection, legislative

7     privilege.  Instruct you not to answer.

8          A.   I assert privilege.

9          Q.   (By Ms. Maranzano) Did the Senator do any

10    additional research about turnout and Georgia and

11    Indiana?

12              MR. FREDERICK:  Objection, legislative

13    privilege.  Instruct you not to answer.

14         A.   Assert privilege.

15         Q.   (By Ms. Maranzano) Did SB 362 change at all in

16    response to the concerns that were raised on the Senate

17    Floor?

18              MR. FREDERICK:  Objection, legislative

19    privilege, to the extent it calls for actual thought

20    process, but I think to the extent there's anything on

21    the record, you're free to testify about that.

22         A.   So I went and looked over at the break, while

23    y'all were doing your conference, about the process,

24    because I don't recall, didn't recall, and Senate Bill

25    362, there was a committee substitute in committee.  But



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1       I don't think it changed on the Floor after the Floor

2       debate.

3            Q.   (By Ms. Maranzano) What were the changes that

4       occurred in committee?

5            A.   I didn't -- I don't recall, and I didn't have

6       time to review it.

7            Q.   I just want to go back to finish what you were

8       talking about earlier, and just make sure.  You said the

9       Senator disagreed with the opposition that was brought

10      up on the Floor, and then we talked about turnout.

11           A.   Uh-huh.

12           Q.   Were there any other bases from the Senator's

13      disagreement with the concerns that were raised on the

14      Floor?

15                MR. FREDERICK:  Object on the legislative

16      privilege only to the extent those bases were not

17      disclosed.  But if there's anything else on the record,

18      you're free to address it.

19           A.   I don't remember if he had any other arguments.

20                (Exhibit 33 marked for identification.)

21           Q.   (By Ms. Maranzano) Okay.  Ms. McCoy, I'm

22      showing you what we're marking for the record as

23      Deposition Exhibit 33, and it's Bates labeled U.S.

24      00005599 through U.S. 00005615.  And I'd like to turn

25      your attention to Page 5607 at the bottom and 5608.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

133

1          Do you recognize this, sort of, the

2    overall document?

3          A.   Yes, ma'am.

4          Q.   Is it the Senate Journal from March 18th, 2009?

5          A.   Yes, ma'am.

6          Q.   And do you see on the pages I've directed you

7    to, there's a letter that was submitted by Senator West?

8          A.   The letter was submitted by Senator Van de

9    Putte.  Senator West had comments further down the page.

10         Q.   Gotcha.

11         A.   Is that the letter you're referring to?

12         Q.   Yes, the letter that -- well, I'm referring to

13    the letter the starts out by saying, "Senator West

14    submitted the following statement."

15         A.   Oh, that's not a letter.  That's his statement.

16         Q.   Okay.

17         A.   Uh-huh.

18         Q.   And then on the next page, if you see, it was

19    signed off by Senators West, Ellis, Gallegos, Lucio,

20    Shapleigh, Uresti, Van de Putte, Watson, Whitmire and

21    Zaffirini?

22         A.   Yes, ma'am.

23         Q.   And can you look at Paragraph Number 8, and

24    there's a sentence in there that says, "No Senator who

25    is an ethnic minority has voted in favor of such



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1      legislation," and it's talking about voter ID

2      legislation.  Why do you think these senators felt the

3      need to put in the record the fact that no ethnic

4      minority had voted in favor of voter ID legislation?

5                 MR. FREDERICK:  Objection, legislative

6      privilege to the extent it calls for the thought process

7      of these senators.  If you can answer on a nonprivileged

8      basis, you can.

9           A.   I cannot.

10          Q.   (By Ms. Maranzano) Did Senator Fraser place any

11     significance on the fact that there was such unified

12     opposition from the minority members of the Senate?

13                MR. FREDERICK:  Objection, legislative

14     privilege.  Instruct you not to answer.

15          A.   I'll assert privilege.

16          Q.   (By Ms. Maranzano) Why do you think there was

17     such strong opposition to SB 362?

18                MR. FREDERICK:  Objection, legislative

19     privilege.  Objection, calls for speculation.  I

20     instruct you not to answer.

21          A.   I'll assert privilege.

22                (Exhibit 34 marked for identification.)

23          Q.   (By Ms. Maranzano) Okay.  I'm showing you what

24     we're marking as Deposition Exhibit 34.

25                For the record, it's labeled Texas, Bates



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                         MAY 16, 2012

135

1    range Texas, underscore, 00003857 through 00003920.

2              And I'd like to direct your attention to

3    Page 3911.  It's the second page of this.

4              Do you recognize -- first of all, do you

5    recognize this document?

6         A.   I don't think I've seen the whole document, but

7    I recognize it what it is.

8         Q.   Is it a transcript -- does it appear to be a

9    copy of a transcript from the Committee of the Whole on

10   March 10th, 2009?

11        A.   Yes, ma'am.

12        Q.   Is that when you considered SB -- when the

13   Senate considered SB 362?

14        A.   Yes.

15        Q.   Can you look at the bottom of 3911.  It's a

16   statement from Senator Fraser.  And if you see at the

17   bottom of the page, the statement says, "And I actually

18   came back, and sat down, and I've got probably,

19   interestingly, more research and more reading and debate

20   on this bill maybe than one that I've ever done."

21             Can you tell me what reading and research

22   the Senator is referring to in that?

23             MR. FREDERICK:  Objection, legislative

24   privilege.  Instruct you not to answer.

25        A.   Again, I mean, the same reports and polls that



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                          MAY 16, 2012

                                                                   136

1    I referenced earlier would be what he was referencing

2    there.

3         Q.   (By Ms. Maranzano) Nothing in addition to what

4    you've already testified about?

5         A.   No, ma'am.

6              (Exhibit 35 marked for identification.)

7         Q.   (By Ms. Maranzano) Okay.  We marked this as

8    Deposition Exhibit 35.  It's TX underscore 00 --

9         A.   It's the same one you just gave us.

10        Q.   Oh, okay.  Well, we have two copies.  I'm going

11   to -- all right.  Let's just use the same exhibit, then.

12             I'm going to direct your attention

13   Page 3940.

14        A.   Uh-huh.

15        Q.   And do you see there is a comment from Senator

16   Watson?

17        A.   Oh, maybe it is different.  Uh-huh.  Yes.

18        Q.   Yes.  Okay.  And do you see that he asks a

19   question:  "Are you familiar with any data or study

20   that's been done with regard to some sort of statistical

21   analysis concerning the effect of the new requirements

22   of Senate Bill 362?"  And then on the next page, you see

23   Senator Fraser has an answer, and at the end of that,

24   that paragraph, he says, "I think you're asking a

25   subjective question that we have objective data that is



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

137

1      available that the witnesses are going to lay out.

2      You're asking have I done that?  The answer is no."  Do

3      you see all that?

4           A.   Uh-huh.

5           Q.   Do you recall this testimony?

6           A.   Not specifically, but...

7           Q.   Did Senator Fraser ever do any research on how

8      SB 362 would impact minority voters?

9                MR. FREDERICK:  Objection, legislative

10     privilege.  Instruct you not to answer.

11          Q.   (By Ms. Maranzano) Was there any testimony

12     presented during the debate of SB 362 by Senator Fraser

13     about any analysis related to the impact that the bill

14     would have on minority voters?

15          A.   I think the only testimony that Senator Fraser

16     might have talked about, in terms of voter turnout,

17     minority or not, was the election results from Indiana

18     and Georgia.

19          Q.   Did SB 362 pass the Senate?

20          A.   Yes.

21          Q.   Did Senator Fraser have any role with regard to

22     SB 362 once it was referred to the House?

23          A.   No.

24          Q.   Did you have any role?

25          A.   I met with Representative Todd Smith once.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                                    MAY 16, 2012

                                                                    138

1        Q.    Anybody else?

2        A.    No.

3        Q.    What was your meeting with Representative Smith

4    about?

5              MR. FREDERICK:   Object, legislative

6    privilege to the extent it seeks the substance of the

7    communications, but you are free to describe general

8    subject matter of the meeting, if you can.

9        A.    Senate Bill 14.  I mean, specifically the

10   provisions in Senate Bill 14.

11       Q.    (By Ms. Maranzano) And did Representative Smith

12   carry Senate Bill -- oh, wait.  Did you say Senate Bill

13   14?

14       A.    Oh, I'm sorry.  Senate Bill 362.  I'm sorry.

15       Q.    Did Representative Smith carry Senate Bill 362

16   in the House?

17       A.    Yes.

18       Q.    And did the bill pass the House?

19       A.    No.

20       Q.    Why not?

21       A.    It ran out of time.

22       Q.    Was it essentially filibustered in the House?

23       A.    I don't really remember how that worked, but I

24   think it -- yes.  No.  That's the wrong term.  The

25   calendar was filibustered.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

139

1          Q.   Okay.  All right.  Thank you for the

2     distinction.

3          A.   Yeah.  I don't -- yeah.

4          Q.   You testified earlier about Senate Bill 363.

5     Do you recall that --

6          A.   Yes, ma'am.

7          Q.   -- when we read the news article?

8               Can we have this marked as Exhibit 36?

9               (Exhibit 36 marked for identification.)

10         Q.   (By Ms. Maranzano) Does this appear to be a

11    copy of Senate Bill 363 that you referred to earlier?

12         A.   Yes, ma'am.

13         Q.   What are the general requirements of this

14    legislation in regard to voter registration applicants?

15         A.   Honestly, without reading it again, I can't

16    tell you.

17         Q.   Would it sound correct to you if I said that

18    this requires voter registration applicants to prove

19    citizenship?

20              MR. FREDERICK:  And take your time to read

21    it, if you need to.

22         A.   (Viewing documents.)  Yes.

23         Q.   (By Ms. Maranzano) What was the purpose of

24    Senate Bill 363?

25              MR. FREDERICK:  I object to legislative



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

140

1    privilege to the extent that it seeks mental

2    impressions, thought process, or confidential

3    communications, but to the extent that the question just

4    seeks the purpose of the bill, then you may answer, if

5    you know.

6        A.   I don't remember.

7        Q.   (By Ms. Maranzano) Was this filed at the same

8    time as Senate Bill 362?

9        A.   Yes, ma'am.

10       Q.   Were they filed -- would you say these bills

11   were filed in conjunction with each other?

12       A.   Yes, ma'am.

13       Q.   Why would it be necessary for a voter

14   registration applicant to prove their citizenship?

15            MR. FREDERICK:  Objection, calls for

16   speculation.

17       A.   I don't remember this bill.

18       Q.   (By Ms. Maranzano) Did you work on this bill,

19   Ms. McCoy?

20       A.   Not since it was filed in November of 2008.

21       Q.   Do you recall that press release that we looked

22   at earlier today?

23       A.   Yes, ma'am.

24       Q.   And did it mention Senate Bill 363?

25       A.   Yes, ma'am.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

                                                                    141

1          Q.   And didn't you testify that you had written

2     that press release?

3          A.   Yes, ma'am.

4          Q.   Are you aware of any evidence that noncitizens

5     register to vote?

6               MR. FREDERICK:  I'll object, legislative

7     privilege, to the extent this seeks your thought

8     process, mental impressions or those of Senator Fraser

9     related to this pending legislation.  To the extent you

10    can answer just based on general knowledge, if you can,

11    you're free to do so.

12         A.   I don't know.

13         Q.   (By Ms. Maranzano) You don't know of any

14    evidence?

15         A.   I do not.

16         Q.   Did you look into any such evidence when you

17    were working on Senate Bill 363?

18              MR. FREDERICK:  Objection, legislative

19    privilege.  Instruct you not to answer.

20         A.   I don't recall.

21         Q.   (By Ms. Maranzano) Are you familiar with a

22    federal law called the Help America Vote Act?

23         A.   Yes.

24         Q.   Does HAVA, the Help America Vote Act, implement

25    certain identification requirements for voter



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

142

1      registration applicants?

2          A.   Yes.

3          Q.   Is there any reason to think that those forms

4      of identification wouldn't be sufficient?

5               MR. FREDERICK:  Objection, calls for

6      speculation.  You can answer if you can.

7          A.   Well, my understanding is, HAVA requires your

8      driver's license or your social security card number.

9      Those are the photo -- those are the IDs.

10         Q.   And if a person does not list those forms of

11     identification on their voter registration application,

12     are you familiar with any additional requirements?

13         A.   When they go to vote the first time, they're

14     supposed to show some form of ID.

15         Q.   And do you know what forms of ID are acceptable

16     HAVA?

17         A.   I do not.

18         Q.   Do you know if it's only photo identification?

19         A.   I think it's more than that, but I don't know

20     specifically.

21         Q.   Did you look into the requirements of HAVA when

22     you were working on any voter identification bills?

23              MR. FREDERICK:  Object, legislative

24     privilege.  Instruct you not to answer.

25         A.   I'll assert privilege.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

143

1       Q.   (By Ms. Maranzano) Do you know what ethnic

2   group makes up the largest percentage of the noncitizen

3   population in Texas?

4       A.   The noncitizen --

5       Q.   Uh-huh.

6       A.   -- population in Texas?  No.

7       Q.   How long have you lived in Texas?

8       A.   My whole life.

9       Q.   And you have no idea what ethic group makes up

10  the largest -- percentage of the noncitizen population?

11      A.   Do you want me to guess?

12           MR. FREDERICK:  Objection, argumentative.

13      Q.   (By Ms. Maranzano) You can make an educated

14  guess.

15      A.   Hispanic.

16      Q.   And what's your educated guess based on?  Your

17  time in Texas?

18      A.   We're close to Mexico.

19      Q.   Okay.  Let's talk about Senate Bill 14.  When

20  did Senator Fraser introduce Senate Bill 14?

21      A.   In November of 2010, Senator Fraser filed a

22  piece of legislation -- and I don't recall the bill

23  number -- that was essentially Senate Bill 14.  When

24  session started, we refiled that legislation as Senate

25  Bill 14, so it was right January of 2011.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                              MAY 16, 2012

144

1          Q.    Would it sound correct to you if I say:  Did he
2     introduce a bill that's called Senate Bill 178?
3          A.    That's it.  Yes, ma'am.
4          Q.    And that was the one that was introduced prior
5     to the session beginning?
6          A.    Yes, ma'am.
7          Q.    Was that the same as Senate Bill 14 as it was
8     introduced?
9          A.    No, ma'am.
10         Q.    What were the changes?
11         A.    There was a provision added to Senate Bill 14
12    to exempt certain elderly people from the provisions of
13    voter ID.
14         Q.    And how did that get added?
15               MR. FREDERICK:  Object, legislative
16    privilege.  If you can answer without revealing
17    confidential communications or thought processes, you
18    may.
19         A.    I'll assert privilege.
20         Q.    (By Ms. Maranzano) Did anyone ask Senator
21    Fraser to introduce Senate Bill 14?
22               MR. FREDERICK:  Object, legislative
23    privilege.  Instruct you not to answer.
24         A.    I'll assert privilege.
25         Q.    (By Ms. Maranzano) Did Senator Fraser ever make



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1      any public commitments to introduce Senate Bill 14 after

2      Senate Bill 362 did not get enacted?

3           A.    Probably, but I can't definitively say.

4           Q.    Was Senate Bill 14 given a designation by

5      Governor Perry as emergency legislation?

6           A.    Governor Perry designated photo ID as an

7      emergency.  I don't think that order specifically said

8      that bill number.

9           Q.    What does it mean to be designated emergency

10     legislation?

11          A.    According to the constitution, the Legislature

12     can't do anything substantive for 60 days unless the

13     Governor says it's an emergency.

14          Q.    How did photo ID come to be included in the

15     Governor's designation?

16          A.    I don't know.  I'll just tell you.  I mean...

17          Q.    Did you have any conversations with anyone in

18     the Governor's Office about the emergency designation?

19          A.    No.

20          Q.    Did the Senator?

21          A.    I don't know.

22          Q.    Why would photo ID requirements need to be

23     considered within the first 60 days of the legislative

24     session?

25                MR. FREDERICK:  Objection, calls for



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

146

1        speculation.  You can answer if you know.

2        A.    I don't know.

3        Q.    (By Ms. Maranzano) Were there any elections

4    scheduled within the first 60 days of 2011, of the 2011

5    legislative session?

6        A.    I don't think so, but I can't speak to every

7    election that local governments or...

8        Q.    What other categories of -- what other topics

9    were given emergency designation in 2011?

10       A.    I don't remember.

11       Q.    Does legislation automatically get considered

12   within the first 60 days if it's designated as emergency

13   legislation?

14       A.    No.

15       Q.    Who makes the decision whether or not the

16   legislation will be heard within the first 60 days?

17       A.    My guess is leadership, Lieutenant Governor or

18   the Speaker.  They set the calendars.

19       Q.    Did you have any conversations with anybody in

20   the Lieutenant Governor's Office about SB 14 getting

21   heard within the first 60 days of the 2011 legislative

22   session?

23            MR. FREDERICK:  Object, legislative

24   privilege.

25       A.    Yes.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

147

 1                     MR. FREDERICK:  I think that's calls

 2       for --

 3                     THE WITNESS:  Sorry.

 4                     MR. FREDERICK:  Just let me finish my

 5       objection, please.

 6                     THE WITNESS:  Okay.

 7            Q.   (By Ms. Maranzano) Who in the Lieutenant

 8       Governor's Office did you have a conversation with?

 9            A.   Julia Rathgeber and Blaine Brunson.

10            Q.   How many conversations did you have with them?

11            A.   Probably two on that issue.

12            Q.   How many conversations did you have with the

13       Lieutenant Governor's Office about SB 14?

14            A.   I probably spoke to them once or twice a day

15       during the whole process until voter ID left the Senate.

16            Q.   And is there anybody, other than the people

17       that you've already testified to from the Lieutenant

18       Governor's Office, who you were communicating with?

19            A.   In the Lieutenant Governor's Office?

20            Q.   Uh-huh.

21            A.   No.

22            Q.   So am I correct that it was Julia Rathgeber,

23       Blaine Brunson and Bryan Hebert?

24            A.   Uh-huh.

25                     (Brief discussion held off the record.)


ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

148

1          Q.   (By Ms. Maranzano) Okay.  Ms. McCoy, I'm

2     showing you what we've marked as Deposition Exhibit 5

3     for the record.  Do you recognize what this is?

4          A.   It's the enrolled version of Senate Bill 14.

5          Q.   And can you look at Section 14 of the bill and

6     tell me what forms of identification are permitted under

7     Senate Bill 14?

8          A.   A driver's license, an election ID certificate,

9     an ID card by DPS, a military ID card, a citizens

10    certificate, a passport, and a license to carry a

11    concealed handgun.

12         Q.   What is a military identification card?

13         A.   My understanding is it's a card issued by the

14    Department of Defense.

15         Q.   Is it your understanding that only the

16    Department of Defense issues military IDs that would be

17    acceptable under SB 14?

18         A.   Yes.

19         Q.   And what's that understanding based on?

20              MR. FREDERICK:  We'll object on

21    legislative privilege, only to the extent it would

22    require you to disclose confidential communications or

23    thought process.  If it's based on something outside of

24    that, then you're free to answer.

25         A.   I'll assert privilege.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

149

1       Q.   (By Ms. Maranzano) Have you ever seen a

2   military ID card?

3       A.   No.

4       Q.   Do you know if veterans ID -- a veterans

5   identification is an acceptable form of military

6   identification under SB 14?

7       A.   I don't believe that it is.

8       Q.   And what is that based on?

9       A.   The Department of Veterans Affairs is not a

10  military.  It's an executive branch agency.

11      Q.   Do you know if any Department of Homeland

12  Security identifications would be considered acceptable

13  under SB 14?

14      A.   Again, I would say no.

15      Q.   And what is that based on?

16      A.   That they're not also not military.  They're

17  not under the Department of Defense.

18      Q.   What is a citizenship certificate?

19      A.   My understanding is when someone becomes a

20  citizen of the United States, they are issued a

21  certificate showing that they are now a citizen.

22      Q.   Do you know how much it costs to get a

23  citizenship certificate?

24      A.   No.

25      Q.   Do you know how much is costs to get a United



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

                                                                150

1        States passport?

2             A.    No.

3             Q.    Did you look into the cost of obtaining these

4        IDs when you were working on SB 14?

5             A.    No.

6             Q.    Can you look at Page 11, Section 16 of the

7        bill?  Does SB 14 increase criminal penalties for a

8        person who impersonates a voter?

9             A.    Yes.

10            Q.    Were you involved in the drafting of SB 14?

11            A.    Yes.

12            Q.    What involvement did you have?

13            A.    I presented options to Senator Fraser, and when

14       he determined what he wanted included in the bill, I had

15       it drafted by Senate Engrossing and Enrolling.

16            Q.    Who is Senate Engrossing and Enrolling?

17            A.    It's an administrative arm of the Senate that

18       works on -- it's a group of lawyers that help us with

19       bill drafts and amendments.

20            Q.    What options did you present to Senator Fraser?

21                  MR. FREDERICK:  Objection, legislative

22       privilege.  Instruct you not to answer.

23            A.    I'll assert privilege.

24            Q.    (By Ms. Maranzano) Does Senate Engrossing and

25       Enrolling -- did you say that was a committee?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1        A.   No, ma'am.  It's an administrative arm of the
2    Senate.
3        Q.   Do they provide legal advice about whether a
4    law complies with federal law?
5        A.   No.
6        Q.   Are they connected at all to the Texas
7    Legislative Council?
8        A.   No.
9        Q.   How are those two bodies different?
10       A.   The Texas Legislative Council -- well, Senate
11   Engrossing and Enrolling is strictly a body that's
12   designed to assist the senators, but they do the same
13   essential work.  They work just for the Senate.
14            MS. MARANZANO:  Mr. Frederick, have you
15   produced any documents from the Engrossing and Enrolling
16   branch that Ms. McCoy is testifying about?
17            MR. FREDERICK:  I am not aware at this
18   time whether or not we have.
19            MS. MARANZANO:  Have you reached out to
20   them in terms of the document requests that were
21   propounded on the State of Texas?
22            MR. FREDERICK:  I'm not aware that we
23   have.
24            MS. MARANZANO:  It sounds to me like they
25   might have relevant documents, so I'd request that you



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

152

```
 1    all do that.
 2         Q.   (By Ms. Maranzano) Did you also work with the
 3    TLC, Ms. McCoy, in developing SB 14?
 4         A.   Yes.
 5         Q.   And what was the TLC's role?
 6         A.   I'm trying to remember if we did substitutes or
 7    amendments.  But they assisted me with either a
 8    substitute or potential amendments.  And then at the
 9    end, they also assisted me with the conference committee
10    reports.
11         Q.   When you say -- all right.  So the substitute,
12    can you tell me what the substitute was?
13         A.   I don't remember how we moved this bill through
14    the process.  I don't remember if we had a substitute.
15    I don't remember if we had amendments.  So once we filed
16    the bill with the E & E draft, I used the Legislative
17    Council, as we moved forward, with whatever drafting
18    needs I had.  But I don't remember what those drafting
19    needs are -- were.
20         Q.   So just so I'm clear, what -- how do you
21    distinguish between the drafting E & E does versus the
22    drafting that Texas Legislative Council does?  Is it the
23    process that the bill is in, or is there another
24    distinction?
25         A.   Senate Engrossing and Enrolling moves a lot
```



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

153

1        faster, so when we need quick drafts, we tend to use

2        them.  Legislative Council is a little bit slower, but

3        they review all of the sections of the code to make sure

4        that we're -- if something needs to get changed for

5        compliance -- not -- compliance is not the right word,

6        but settle up reasons, they'll say, "Hey, if you're

7        amending this section of code, you need to address this

8        section, too."  And so sometimes we go through Leg

9        Council, even though we know it's going slower, to make

10       sure that we've hit every part of the code or statute

11       that we need to.

12            Q.    And does Leg Council also look at how

13       legislation interacts with federal law?

14            A.    I don't know.

15            Q.    So did you go through the Engrossing and

16       Enrolling with the initial draft of SB 14 because you

17       were on an expedited -- because you were -- it was

18       because the bill was given emergency designation?

19            A.    No.  We used Engrossing and Enrolling in

20       November because we wanted to get the bill filed as

21       close to the first day of filing as we could.

22            Q.    And why was that?

23            A.    The Senator just wanted to.

24            Q.    Were there multiple drafts of SB 14 prior to it

25       being introduced?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

154

1        A.    Yes.

2        Q.    And would E & E, Engrossing and Enrolling, be

3   the -- would they be the holders of those drafts?

4        A.    No.

5        Q.    Who would?

6        A.    Me.

7        Q.    And did you keep them?

8        A.    Yes.

9        Q.    And did you turn them over to your counsel?

10       A.    Yes.

11       Q.    Did Senate Engrossing and Enrolling draft

12   SB 362 as well?

13       A.    Yes.

14       Q.    Did they draft HB 218 as well?

15       A.    Oh, I'm sorry.   No, no, no.  I'm sorry.  I got

16   confused.  Senate Bill 362 in 2009 was drafted by

17   Legislative Council.

18       Q.    And why was that one drafted by Legislative

19   Council?

20       A.    Because it was -- I think what I filed as

21   Senate Bill 362 was the Senate Committee report of House

22   Bill 218.  So that's all I asked them to do, was, like

23   would you just make this document ready to file, and

24   they did.

25       Q.    Who from -- if I say E & E, can we agree that



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

155

1      that's this Engrossing and Enrolling?

2           A.   Yes, ma'am.  That's how we call them.

3           Q.   Okay.  Who from E & E did you work with on

4      Senate Bill 14?

5           A.   Mardi, M-a-r-d-i, Alexander was my contact.

6           Q.   Anybody else?

7           A.   She was head of E & E.  I think she assigned it

8      to a lawyer, but she's who I dealt with.

9           Q.   How did you communicate with Ms. Alexander?

10          A.   E-mail.

11          Q.   Did you save those e-mails?

12          A.   If I printed out the e-mail, I saved it.  If it

13     was not printed out, then it was not saved.

14          Q.   And would those be in your files if you printed

15     out the e-mails?

16          A.   Yes, ma'am.

17          Q.   And that's the files that we talked about

18     earlier that you kept of SB 362 and SB 14?

19          A.   Yes, ma'am.

20          Q.   Do you know about how many e-mails you

21     exchanged Ms. Alexander?

22          A.   Three or four.

23          Q.   For the whole process of drafting SB 14?

24          A.   Yes, ma'am.

25          Q.   Was there anything you looked at, when you were



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                        MAY 16, 2012

156

1      developing SB 14, that you haven't already testified to,

2      when we were talking about other bills?

3                  MR. FREDERICK:  Object, legislative

4      privilege.  Instruct you not to answer.

5           A.    I'll assert privilege.

6           Q.    (By Ms. Maranzano) Did you have any

7      communications about SB 14 with other legislators?

8           A.    Yes.

9           Q.    Which legislators?

10          A.    Throughout the process?

11          Q.    Uh-huh.

12          A.    I would say probably 90 percent of the

13     senators.  Representative Harless.

14          Q.    Anyone else?

15          A.    I'm trying to think.  That's -- I mean, those

16     are the ones I can remember.  House members.  Other

17     House members potentially, but it was probably more of

18     size than substantive.

19          Q.    Did you have communications with any

20     individuals from the Governor's Office about SB 14?

21          A.    Yes.

22          Q.    And who was that?

23          A.    Michael Scofield.

24          Q.    When was that?

25          A.    Throughout the legislative session.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

157

1      Q.   Were those communications verbal or written?

2      A.   Verbal.

3      Q.   By phone or in person?

4      A.   Both.

5      Q.   Was Senator Fraser involved in those

6   communications?

7      A.   Yes.

8      Q.   In none of them?

9      A.   No.

10      Q.   What was the nature of those communications?

11           MR. FREDERICK:  I'll object, legislative

12   privilege.  Instruct you not to answer.

13      A.   I'll assert.

14      Q.   (By Ms. Maranzano) Did you have communications

15   about SB 14 with any interest groups or lobbyists?

16      A.   Yes.

17      Q.   What groups?

18      A.   I talked to AARP a couple of times.  I'm pretty

19   sure the Disability Coalition, although I'm not sure

20   that's how they're known, came in a time or two, and

21   that group out of Houston, the Patriots or the -- I

22   can't think of what their name is.

23      Q.   Does the King Street Patriots sound correct?

24      A.   Yes, ma'am.  The King Street Patriots.  I think

25   they came in once.  Other than that, I can't think of



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

158

1     any particular interest group that came in.

2          Q.   Did you have any communications with a group by

3     the name of American Legislative Exchange Council, or

4     ALEC, about SB 14?

5          A.   I did not.

6          Q.   Did the Senator?

7          A.   Not to my recollection.

8          Q.   Did you have any communications with an

9     individual by the name of Catherine Engelbrecht about SB

10    14?

11         A.   I did not, but I think she testified.  Did she

12    testify in the Senate?  I can't remember.  I'm sorry.

13         Q.   Did you have any communications with an

14    individual by the name of Paul Bettencourt about SB 14?

15         A.   Yes.

16         Q.   How many?

17         A.   Maybe two.

18         Q.   And do you remember when -- when were those

19    communications?

20         A.   I do not recall.

21         Q.   Were they in person or by phone?

22         A.   By phone.

23         Q.   Were you and he the only parties to those

24    conversations?

25         A.   As far as I know, yes.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                          MAY 16, 2012

159

1        Q.    What was the nature of those conversations?

2              MR. FREDERICK:  Object on legislative

3    privilege and instruct you not to answer.

4        A.    I'll assert.

5        Q.    (By Ms. Maranzano) Can you tell me the general

6    nature of your conversation with Mr. Bettencourt in

7    terms of a --

8        A.    I generally am having a hard -- I think -- I

9    know I talked to him.

10       Q.    Uh-huh.

11       A.    And generally, I'm -- I honestly don't recall

12   that he was helpful to me.  I don't really remember.  We

13   generally talked about Senate Bill 14.

14       Q.    How about the general nature of your

15   conversation with the King Street Patriots?

16             MR. FREDERICK:  To the extent it's a

17   general subject matter, I'll permit you to answer.

18             THE WITNESS:  Right.  Okay.

19       A.    I think generally, they came in to talk about

20   their history of monitoring elections in Harris County.

21       Q.    (By Ms. Maranzano) Did they bring up any

22   in-person voter impersonation?

23             MR. FREDERICK:  Object, legislative

24   privilege and instruct you not to answer.

25       A.    I'll assert.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                        MAY 16, 2012

160

1          Q.   (By Ms. Maranzano) Did you say there was a

2     disability group that came in, disability advocate?

3          A.   I don't -- I think that the disability

4     lobbyists, interest group came in as we were in

5     conference committee to talk to me about the language

6     that was added -- that was amended by the House.

7          Q.   And what was that amendment?

8          A.   It was the Section 1 of the bill.

9          Q.   And were they concerned about that?

10              MR. FREDERICK:   Objection, legislative

11     privilege.   Instruct you not to answer.

12         Q.   (By Ms. Maranzano) Did you have any

13     communications about SB 14 with an individual by the

14     name of Hans von Spakovsky?

15         A.   No.

16         Q.   Did you have any communications with any local

17     election officials about SB 14?

18         A.   I don't recall.

19         Q.   Did you have any communications with the Texas

20     Republican Party about SB 14?

21         A.   I don't think so, but I don't recall.

22         Q.   Did Senator Fraser exchange drafts of SB 14

23     with anyone other than Engrossing and Enrolling or TLC?

24              MR. FREDERICK:   We'll object on

25     legislative privilege to the extent that it seeks the



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1    substance of those drafts, but the fact that drafts were

2    exchanged, you can testify if you remember.

3        A.   No.

4        Q.   (By Ms. Maranzano) Did he discuss drafts of the

5    bill with anybody other than E & E or the Legislative

6    Council?

7              MR. FREDERICK:  Same objection and

8    instruction.  The fact of the communications you can

9    identify.

10       A.   I don't think so.

11             (Discussion held off the record.)

12             (Exhibit 37 marked for identification.)

13       Q.   (By Ms. Maranzano) Can you take a look at --

14   and what exhibit number is -- 23?  Okay.  So I'm showing

15   what we're marking as Deposition Exhibit 37, along with

16   what's been previously marked as Deposition Exhibit 23.

17             And can you look at 37 for a moment and

18   tell me if you recognize that document?

19       A.   I do.

20       Q.   What is that?

21       A.   That's a declaration.

22       Q.   And is that your declaration?

23       A.   Yes, ma'am.

24       Q.   Did you sign that in response to providing

25   information that's contained in Interrogatory Response



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

162

1    Number 1 in Deposition Exhibit 23?

2        A.   Yes, ma'am.

3        Q.   What did you do to compile the list of names

4    that's included in Response Number 1?

5             MR. FREDERICK:  I'm going to object to

6    that on grounds of work product.

7             MS. MARANZANO:  But she's verifying the

8    names.  I'm just asking her what she did to compile the

9    information.  Is that --

10            MR. ROSENBERG:  Whose work product?

11            MR. FREDERICK:  Well, she compiled the

12   information at the direction of an attorney, namely

13   me.  I mean...

14            MS. MARANZANO:  I mean, I'm interested in

15   what she did to come up with the information of who

16   participated in the process of putting SB 14 together.

17   Did she talk to people?  Did she go through records?  Is

18   that, in your mind, work product?

19            MR. FREDERICK:  Hmm.  I mean, if she can

20   answer without waiving the objection.

21            MS. MARANZANO:  What about this:  What did

22   you do to make sure this was a complete list of

23   individuals responsive to Interrogatory Number 1?  Does

24   that alleviate your concerns, Mr. Frederick?  I mean,

25   she did verify in a sworn declaration that she was



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                          MAY 16, 2012

                                                              163

1      supplying this information.

2              MR. FREDERICK:  Okay.  Yeah.  You can

3      answer.

4          A.   Okay.  Well, I worked with the Attorney

5      General's Office and Colby in Representative Harless's

6      office to try and remember who helped in developing and

7      analyzing Senate Bill 14, and amongst three offices,

8      this is the list we produced.

9          Q.   (By Ms. Maranzano) Did you review any documents

10     when you were compiling this list?

11         A.   No.

12         Q.   Did you review any e-mails when you were

13     compiling this list?

14         A.   No.

15         Q.   Did you review anything, or is this solely from

16     your memory and Mr. Beuck's memory?

17         A.   I can't speak for Mr. Beuck in terms of how he

18     developed.

19         Q.   Okay.  Good point.  The names that you provided

20     here, are they solely from your memory?

21         A.   Yes, ma'am.

22         Q.   With regard to Page 3 and 4, do you see there's

23     a list of several legislators:  Representative Pena,

24     Representative Gonzalez, Representative Aliseda, and

25     they are described as co-sponsors and joint sponsors?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1      A.    Uh-huh.

2      Q.    Are there additional joint sponsors and

3  co-sponsors of SB 14?

4      A.    There's additional co-authors.  All of the 18

5  Senate Republicans signed on as co-authors.  I do not

6  know if there were additional co-sponsors in the House.

7      Q.    You know, I'm going to show you what we've

8  marked -- what was this -- this has been previously

9  marked as Deposition Exhibit 8.

10     A.    Uh-huh.

11     Q.    Can you look at that and tell me if it

12  refreshes your recollection as to are there other

13  co-sponsors of SB 14?

14     A.    Like I said, all the other 18 Republicans and

15  apparently, quite a few House members also were

16  co-sponsors.

17     Q.    So why are only these three of the co-sponsors,

18  these three legislators who co-sponsored or joint

19  sponsored the bill, listed in response to Interrogatory

20  Number 1?

21          MR. FREDERICK:  You know, I let you ask

22  her a little bit.  I'm very uncomfortable with this line

23  of questioning, because I think it invades attorney work

24  product that goes to the process of answering discovery,

25  and I object to the question on grounds of work product



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                    MAY 16, 2012

165

1     privilege, the work product immunity.

2              MS. MARANZANO:  Okay.  I mean, our

3     position is she signed a sworn declaration that this is

4     complete and accurate information.

5              MR. FREDERICK:  I would disagree.

6              MS. MARANZANO:  True and correct.

7              MR. FREDERICK:  Yes, that I would agree

8     to.

9              MS. MARANZANO:  And so our position is

10    that we should be able to question her about what she

11    did to make sure it was true and correct and what she

12    meant, you know, by listing these as the individuals who

13    are responsive to the request.  It's about the three.

14             The question remains about the three

15    co-sponsors and joint -- and the -- about Representative

16    Aliseda, Representative Gonzalez, Representative Pena,

17    and why those three individuals are listed in response

18    to Interrogatory Number 1 and why the other co-sponsors

19    are not listed.  So let's just, you know, be clear.  Are

20    you going to instruct her not to answer that question?

21             MR. FREDERICK:  No.  I'll permit her to

22    respond subject to my objection.

23        Q.   (By Ms. Maranzano) So the question is about why

24    Representative Pena, Gonzalez and Aliseda are listed

25    here, and the description provided for them is that they



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1    were co-sponsors and joint sponsors.  But my

2    understanding is that there a number of other co-

3    sponsors and joint sponsors who are not listed here.

4         A.   And those names were provided by Representative

5    Harless's Office as people that were instrumental in

6    specifically drafting, proposing, and developing Senate

7    Bill 14.  My assumption, when I signed this, was that

8    the other members that supported the legislation didn't

9    draft, propose, develop, or analyze the bill.  They

10   supported it, but they didn't do those fours things.

11   And so that's, I think, probably how these members got

12   on the list and not every member.

13        Q.   And was the person who provided these names to

14   you, Mr. Beuck?

15        A.   Yes.

16        Q.   And do you see that on Page 5, Mr. Beuck is,

17   is also listed?

18        A.   Yes, ma'am.

19        Q.   Would it surprise you to learn that

20   Representative Harless testified yesterday that

21   Mr. Beuck was not instrumental in drafting, developing,

22   and passing SB 14?

23             MR. FREDERICK:  Object, mischaracterizes

24   the testimony and assumes facts not in evidence.

25        Q.   (By Ms. Maranzano) Would you like to me to read



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                          MAY 16, 2012

167

1      you testimony from yesterday?

2           A.   Sure.

3           Q.   The question was:  "And the State of Texas has

4      indicated that Mr. Beuck assisted with the drafting,

5      development, and passage of SB 14 in the Texas House of

6      Representatives.  Are you aware of any assistance that

7      Mr. Beuck provided concerning the drafting of SB 14?"

8                     Representative Harless said, "I have no

9      idea."

10                    "Were you aware of any assistance he

11     provided in the development of SB 14?"

12                    Representative Harless said, "I have no

13     idea."

14                    MR. FREDERICK:  Can I get page and line

15     cite for that?

16                    MS. MARANZANO:  Yes.  That is, of the

17     dirty transcript, at Page 201, Line -- I think I started

18     reading -- I read Line 12 through Line 20.  And that's

19     of the transcript that we were sent last night, not the

20     final.

21                    MR. FREDERICK:  Thank you.

22          Q.   (By Ms. Maranzano) Would that surprise you

23     Ms. McCoy?

24          A.   That she didn't remember?

25          Q.   That she has no idea if Mr. Beuck was involved



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                              MAY 16, 2012

                                                                    168

1       in the development, drafting, and passing of SB 14?

2           A.    Yes.

3           Q.    Can you look at -- below Mr. Beuck's name on

4       the interrogatories, Bryan Hebert and Julia Rathgeber?

5           A.    Uh-huh.

6           Q.    Can you tell me what Mr. Hebert's role was in

7       the drafting of SB 14?

8                 MR. FREDERICK:  Object on the grounds of

9       legislative privilege.  To the extent you can answer

10      without revealing -- no, I'm going to object.  I'm going

11      to object to that on legislative privilege and instruct

12      you not to answer.

13          A.    I'll assert privilege.

14          Q.    (By Ms. Maranzano) Can you tell me what

15      Mr. Hebert's role was in analyzing SB 14?

16                MR. FREDERICK:  Object, legislative

17      privilege.  Instruct you not to answer.

18          A.    I'll assert privilege.

19          Q.    (By Ms. Maranzano) Can you tell me what

20      Ms. Rathgeber's role was in assisting with the

21      development of SB 14?

22                MR. FREDERICK:  Objection, legislative

23      privilege.  Instruct you not to answer.

24          A.    I'll assert privilege.

25          Q.    (By Ms. Maranzano) And at the bottom of Page 5,



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1    the top of Page 6, do you see Mr. Battle is listed as
2    somebody who assisted with the analysis of legal
3    questions relating to SB 14.  Can you tell me what legal
4    questions Mr. Battle analyzed?
5            MR. FREDERICK:  Objection, legislative
6    privilege.  Instruct you not to answer.
7        A.   I'll assert privilege.
8            MS. MARANZANO:  And is that even on what
9    issues he was looking at Mr. Frederick, what legal
10   issues he --
11           MR. FREDERICK:  Yeah, that reflects the
12   thought process in mental impressions.
13       Q.   (By Ms. Maranzano) And below Mr. Battle,
14   Mr. Brunson is listed as involved in the development of
15   SB 14.  Can you tell me what his role was in the
16   development of SB 14?
17           MR. FREDERICK:  Objection, legislative
18   privilege.  Instruct you not to answer.
19       A.   I'll assert privilege.
20       Q.   (By Ms. Maranzano) Can you turn to Page 7, and
21   there's two individuals who are listed as staff members
22   for Senator Tommy Williams, both Amanda Montague and
23   Ryan Larue.  Can you tell me why these two staffers are
24   listed here, but Senator Williams is not?
25           MR. FREDERICK:  Again, this whole line of



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

170

1    questioning I object to.  I object to that question on

2    the grounds of work product immunity.

3         Q.   (By Ms. Maranzano) Why don't we do this,

4    Ms. McCoy.  Can you just look through the list and tell

5    me, as you sit here today, if this looks like a true and

6    correct list of individuals involved in the drafting,

7    development -- drafting, proposing, development or

8    analysis of SB 14?

9              MR. FREDERICK:  May I also note for the

10   record that the State -- I mean, as reflected in the

11   exhibit, the State made numerous objections to the

12   request, including overbreadth, undue burden.

13             But you may answer to the extent you can.

14        A.   I think that potentially you could have listed

15   every elected official and every legislator in this

16   document.  But I think this list is pretty complete,

17   given that Senate Bill 14 and how it was developed.

18        Q.   (By Ms. Maranzano) Every -- every legislator in

19   the Texas Senate could be listed as being involved in

20   the drafting, development --

21        A.   Or analysis.

22        Q.   -- or analysis?

23        A.   They all had a thought.  They all had talked

24   about it.  And if you wanted to just...

25        Q.   Did you consider listing every legislator in



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

171

1    response to Interrogatory Number 1?

2        A.   No.

3        Q.   Why not?

4            MR. FREDERICK:   I object.   It's attorney

5    work product.   I instruct you not to answer that

6    question.

7        Q.   (By Ms. Maranzano) Are you following your

8    counsel's advice not to answer?

9        A.   Yes.

10       Q.   In drafting SB 14, did you or the Senator

11   review any studies or reports or analysis that you

12   haven't already testified about today?

13           MR. FREDERICK:   You may testify to the

14   fact of yes or no whether you did.

15       A.   Yes.

16       Q.   (By Ms. Maranzano) What were those?

17           MR. FREDERICK:   Objection, legislative

18   privilege.   Instruct you not to answer.

19       Q.   (By Ms. Maranzano) How many --

20       A.   Well, except that in the record, we referenced

21   more recent polls, more recent public opinion polls.

22   Those types of things weren't -- and they're in the

23   record, so I'll tell you that they were there.

24       Q.   Were there any polls or reports or studies or

25   analysis that you reviewed that are not in the public



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

172

1    record?

2              MR. FREDERICK:  Again, I'll instruct you

3    that you may answer to the question posed, which is a

4    yes-or-no question.

5         A.   Yes.

6         Q.   (By Ms. Maranzano) And for the record, what

7    were those?

8              MR. FREDERICK:  Objection, legislative

9    privilege.  Instruct you not to answer.

10        A.   I'll assert privilege.

11        Q.   (By Ms. Maranzano) How many were there?

12             MR. FREDERICK:  You know what; I'm going

13   to object to that on legislative privilege and instruct

14   you not to answer as well.  That goes to thought

15   processes and mental impressions.

16        A.   I'll assert privilege.

17        Q.   (By Ms. Maranzano) Who were the authors or who

18   conducted these reports or studies?

19             MR. FREDERICK:  Objection, legislative

20   privilege.  Instruct you not to answer except to the

21   extent that the question includes matters that are on

22   the public record.

23        A.   The one in particular that's on the record is

24   the one led by Lighthouse.

25        Q.   (By Ms. Maranzano) Ms. McCoy, did you consider



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1          including any additional forms of identification in
2          SB 14?
3                        MR. FREDERICK:  Objection, legislative
4          privilege.  Instruct you not to answer the question.
5               A.   I'll assert privilege.
6               Q.   (By Ms. Maranzano) Did you consider including
7          identification forms that had expired?
8                        MR. FREDERICK:  Objection, legislative
9          privilege.  Instruct you not to answer.
10              A.   Except that -- the answer is yes, and there's
11         an amendment where we -- the original bill required it
12         to be valid and the amendment allowed expired photo IDs
13         to be used.
14              Q.   (By Ms. Maranzano) And under SB 14, are you
15         allowed to use identification that has expired for a
16         length of time that is greater than 60 days?
17              A.   No.
18              Q.   So you're referring to the amendment that
19         allowed for identification, certain forms of
20         identification in SB 14 to be expired for 60 days --
21              A.   Yes, ma'am.
22              Q.   -- prior to the presentation?  Thank you.
23                        What was the purpose of excluding from
24         SB 14 the option that a voter could present two forms of
25         nonphoto ID?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

174

1          MR. FREDERICK:  Objection, legislative

2    privilege.  Instruct you not to answer.

3          Q.   (By Ms. Maranzano) What changed between 2009

4    and 2011 that would impact what forms of voter -- what

5    forms of identification would verify a voter's identity?

6          MR. FREDERICK:  I object on legislative

7    privilege.  To the extent there are matters in the

8    record that you can identify, you're free to do so, but

9    don't go beyond that.

10         A.   On the record, Senator Fraser said he thought

11   the additional two years from 2009 to 2011 provided us

12   the opportunity to see that the states that had voter ID

13   were not -- that it was working.

14         Q.   (By Ms. Maranzano) What do you mean by that?

15         A.   That people were still voting, that turnout was

16   still fine, that there hadn't been any voter had come

17   forward that had been unable to vote.

18         Q.   And are you referring to anything other than

19   what we already talked about with the Senator having

20   presented the actual turnout rates from Georgia and

21   Indiana?

22         A.   No.

23         Q.   And so I believe we discussed that the Senator

24   didn't do any -- whether the Senator did any additional

25   research other than looking at the turnout rates?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                              MAY 16, 2012

175

1          A.    That's correct.

2          Q.    Okay.  Ms. McCoy, how often does a driver's

3    license photo need to be renewed?

4          A.    I don't know.

5          Q.    Do you know how often a driver's license needs

6    to be renewed?

7          A.    Six years.

8          Q.    Did you think it was an important consideration

9    to look into whether -- how recent a photo would be on

10   one of the forms of identification that you were

11   requiring under SB 14?

12               MR. FREDERICK:  Objection, legislative

13   privilege.  Instruct you not to answer.

14         A.    I'll assert.

15         Q.    (By Ms. Maranzano) Pursuant to SB 14, who will

16   be verifying the voter's identity when they -- well, who

17   looks at the --

18         A.    The election worker.

19         Q.    And how would they do that?

20               MR. FREDERICK:  Objection to the extent it

21   calls for speculation.  If you know, you can answer.

22         A.    I think the legislation is designed for the

23   Secretary of State to write rules to implement that

24   provision.

25         Q.    (By Ms. Maranzano) Do you know if there's going



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1      to be additional training given to poll workers on that

2      topic?

3          A.    I think under Senate Bill 14, the Secretary of

4      State is instructed to provide additional training.

5          Q.    Did you discuss any of these regulations with

6      the Secretary of State's Office?

7                MR. FREDERICK:  I'll object on legislative

8      privilege.  To the extent it calls for communications

9      between you, Senator Fraser, and the Secretary of

10     State's Office about SB 14 or any other pending

11     legislation.

12         A.    I'll assert privilege.

13               MS. MARANZANO:  And just for the record to

14     be clear, are you asserting privilege over the fact of

15     whether or not she had a conversation with the Secretary

16     of State's Office?

17               MR. FREDERICK:  I did not intend to, so if

18     you want to reask the question, I'm not intending to

19     prevent you from discovering that.

20         Q.    (By Ms. Maranzano) Did you have conversations

21     with the Secretary of State's Office about SB 14?

22         A.    Yes.

23         Q.    How many?

24         A.    Five or six.

25         Q.    And when were those?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                              MAY 16, 2012

177

1      A.   After the bill was filed, but prior to it being

2   heard in committee.

3      Q.   Were those conversations in writing or verbal?

4      A.   Verbal.

5      Q.   Was anybody else a party to those

6   conversations?

7      A.   Yes.

8      Q.   And who was that?

9      A.   Bryan Hebert.

10      Q.   Anyone else?

11      A.   I'm trying to think.  It all runs together.

12   Ryan Larue, I think, was in on one of those meetings.

13   Amanda Montague, I think, was in on one of those

14   meetings.

15      Q.   Anyone else?

16      A.   I don't think so.

17      Q.   And were those meetings about how SB 14 would

18   be implemented?

19           MR. FREDERICK:  I want to just caution the

20   witness, the question asked, you may answer, but please

21   don't reveal the substance of any communication.

22           THE WITNESS:  Right.

23      A.   Yes.

24      Q.   (By Ms. Maranzano) And what were the nature of

25   those conversations?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

178

1              MR. FREDERICK:  Object on the basis of

2      legislative privilege.  Instruct you not to answer.

3         A.   I'll assert privilege.

4         Q.   (By Ms. Maranzano) Ms. McCoy, wouldn't it be

5      fair to say that the standards by which a poll worker is

6      going to verifying the identity of a voter is pretty

7      central to the purpose of SB 14?

8              MR. FREDERICK:  Objection.  Objection,

9      calls for speculation.  Objection to the extent it calls

10     for thoughts and mental impressions about SB 14.  I

11     object on the basis of legislative privilege and

12     instruct you not to answer.

13        A.   I'll assert privilege.

14             MS. MARANZANO:  Let's take a break.

15             (Recess from 3:46 p.m. to 3:56 p.m.)

16             MS. MARANZANO:  Back on the record.

17        Q.   (By Ms. Maranzano)  Ms. McCoy, you testified

18     earlier that under SB 362, a voter could show a state or

19     a federal-issued photo ID; is that correct?

20        A.   Yes, ma'am.

21        Q.   What was the purpose of removing that form of

22     photo identification from the required forms of ID

23     allowed under SB 14?

24             MR. FREDERICK:  Objection, legislative

25     privilege.  Instruct you not to answer.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1     Q.   (By Ms. Maranzano)   What was the purpose of
2    removing from SB 14 the option for voters to show a
3    valid employee ID?
4          MR. FREDERICK:   Objection, legislative
5    privilege.   Instruct you not to answer.
6     Q.   (By Ms. Maranzano)   Did any legislators express
7    concern to Senator Fraser that the election
8    identification certificate pursuant to SB 14 would be
9    difficult for their constituents to obtain?
10          MR. FREDERICK:   I'll object on legislative
11    privilege.   However, to the extent any concerns were
12    raised on the Floor in committee, you may testify about
13    that.
14     A.   I don't recall.   Yeah.   That was added by the
15    conference committee, and so I -- the debate on the bill
16    at that point, I don't think anybody raised it on the
17    Floor.
18     Q.   (By Ms. Maranzano)   Prior to the addition of
19    the election identification certificate, was there a
20    provision that allowed for a different sort of
21    pre-identification in SB 14?
22     A.   Yes.
23     Q.   And was that a form of identification that
24    needed to be obtained at driver's license offices?
25     A.   Yes, ma'am.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

180

1        Q.    And does the election identification
2    certificate also need to be obtained at driver's license
3    offices?
4        A.    Yes, ma'am.
5        Q.    Did anybody testify on the Floor about the
6    distance their constituents would need to travel to get
7    to a driver's license office?
8        A.    Yes, ma'am.
9        Q.    Did anybody testify on the Floor about the lack
10   of public transportation options available to driver's
11   license offices?
12       A.    I don't specifically remember that point being
13   raised, but I'm sure it was.
14       Q.    Did anybody testify on the Floor about the wait
15   times at driver's license offices?
16       A.    Yes.
17       Q.    Did anybody testify on the Floor about the cost
18   of obtaining the required underlying documentation to
19   obtain the identification that needed to be issued free
20   of charge under SB 14?
21       A.    I don't specifically recall, but I assume yes.
22       Q.    What was the Senator's response to these
23   concerns that were raised on the Floor?
24              MR. FREDERICK:  I'll just object,
25   legislative privilege, only to the extent the question



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

181

1      could be construed to ask for confidential privileged

2      communications, but anything on the Floor, you may

3      testify about.

4           A.   I don't remember how he responded to those

5      particular complaints on the Floor specifically.

6           Q.   (By Ms. Maranzano)   Did he conduct any

7      analyses, or did you conduct any analysis at his request

8      on any of these issues?

9                MR. FREDERICK:   Objection, legislative

10     privilege.   Instruct you not to answer.

11          A.   I'll assert.

12          Q.   (By Ms. Maranzano)  You'll assert the

13     privilege?

14          A.   Yes, ma'am.

15          Q.   What were the circumstances by which the

16     license to carry a concealed handgun were included in SB

17     14?

18               MR. FREDERICK:   Object on the grounds of

19     legislative privilege, to the extent it seeks thoughts,

20     mental impressions or confidential communications among

21     legislators or staff or agencies.   To the extent you can

22     answer without revealing any of that, you may.

23          A.   It was added as an amendment by Senator

24     Hinojosa.

25          Q.   Do you know the racial composition of license


ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                           MAY 16, 2012

                                                              182

1    to carry license holders?

2         A.   No.

3         Q.   Is it disproportionately white relative to

4    Texas registered voters?

5         A.   I do not know.

6         Q.   Are you aware of whether any staff or

7    legislator investigated the racial composition of

8    license to carry holders?

9              MR. FREDERICK:  I'll object only to the

10   extent that it seeks the substance or nature of the

11   investigations, whether or not you were aware, you may

12   answer.

13        A.   I am not aware.

14        Q.   (By Ms. Maranzano)  Was there any discussion

15   expressing concern that this form of identification

16   might disproportionately favor white voters?

17             MR. FREDERICK:  Object on the grounds of

18   legislative privilege, to the extent there was

19   discussion on the Floor and committee on the record, you

20   may answer.

21        Q.   (By Ms. Maranzano)  Are you asserting

22   privilege?

23        A.   Well, Senator Hinojosa offered the amendment,

24   so I think -- I don't -- I can't speak to his research

25   on the bill or on his amendment.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

183

1      Q.   Was there any discussion expressing concern

2   that this form of ID might disproportionately favor

3   white voters?

4              MR. FREDERICK:   Same objection,

5   legislative privilege, only to the extent it seeks

6   confidential communications, but to the extent that

7   there were.

8      A.   Not that I know of.

9      Q.   (By Ms. Maranzano)  How did the exception for

10  individuals with disabilities come to be included in SB

11  14?

12             MR. FREDERICK:   Object on legislative

13  privilege, only to the extent it seeks confidential

14  communications and thought processing and mental

15  impressions.  To the extent it seeks information about

16  the legislative process or testimony, you may answer.

17     A.   Senator Patrick offered an amendment, and

18  Senator Fraser accepted it.

19     Q.   (By Ms. Maranzano)  What was the purpose of

20  this provision?

21             MR. FREDERICK:   Object to the legislative

22  privilege.  I instruct you not to answer.

23     A.   I think that the record -- Senator Patrick

24  probably on the record said why he wanted to include

25  it.  I don't recall what he said.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1      Q.   (By Ms. Maranzano)  Was this amendment in

2   response to concerns by any particular groups or

3   constituencies?

4           MR. FREDERICK:  Object on the basis of

5   legislative privilege.  To the extent there's -- you

6   have any nonprivileged basis to answer, you may.

7      A.   I think that -- well, again, I don't want to

8   speak for Senator Patrick because I -- I don't want to

9   speak for Senator Patrick.  But there was an individual

10  that testified on the Floor during the Senate committee

11  debate that was fairly moving, and I think Senator

12  Patrick wanted to do something to help him.

13     Q.   (By Ms. Maranzano)  What was the general nature

14  of that testimony?

15     A.   I don't know.  I didn't listen to it.

16     Q.   Was there any testimony on the Floor related to

17  difficulties other individuals might have obtaining

18  identification?

19     A.   I don't know.  I didn't listen to the

20  testimony.

21     Q.   What -- what was your -- your role during the

22  Floor consideration of SB 14?

23          MR. FREDERICK:  I would just caution you

24  not to reveal any confidential communications or mental

25  impressions or thought process, but as to your -- the



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1      process, you may answer.

2           A.   It was the same as what we had testified

3      earlier, I think, on the Senate bill 362, and I sat next

4      to the Senator and helped him with his debate and

5      providing him information that he asked me to provide

6      him during the debate.

7           Q.   (By Ms. Maranzano)  So you were on the Floor

8      with him during the debate?

9           A.   During the Committee of the Whole, yes, ma'am.

10          Q.   And when you say this individual testified with

11     moving testimony that potentially led Senator Patrick to

12     include this exemption, was that during the Committee of

13     the Whole?

14          A.   Yes, ma'am.

15          Q.   How did the exception for individuals with

16     religious objections to being photographed come to be

17     included in SB 14?

18               MR. FREDERICK:  I'll object only to the

19     extent that it seeks confidential communications,

20     thought processes or mental impressions.  But to the

21     extent it seeks the process or public discussion, you

22     may answer.

23          A.   I'll assert privilege.  I don't -- yeah.

24               MR. FREDERICK:  I mean, just -- I want to

25     be clear with you.  I'm not instructing her not to



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

186

1    answer about when it was introduced or how it became

2    part of the bill.  And so I think if you want to probe

3    that further, I'm not objecting to that part.

4              MS. MARANZANO:  Okay.

5         Q.   (By Ms. Maranzano)  Was that provision added in

6    response to any particular concern, Ms. McCoy?

7              MR. FREDERICK:  I'll just -- only to the

8    extent it seeks mental impressions, communications, but

9    if there's testimony, Floor testimony, and if you know,

10   you may answer.

11        A.   There was not Floor testimony on that issue.

12        Q.   (By Ms. Maranzano)  During the drafting of the

13   legislator's consideration of SB 14, was there analysis

14   of the cost that a voter would need to take -- the cost

15   or the steps the voter would need to take to obtain an

16   election identification certificate?

17             MR. FREDERICK:  Objection, legislative

18   privilege.  Instruct you not to answer.

19        A.   I'll assert privilege.

20        Q.   (By Ms. Maranzano)  What documents are needed

21   to obtain an election identification certificate?

22        A.   I don't know.

23        Q.   Was that something that you -- I'm sorry.  You

24   can finish your answer.

25        A.   I used to know, but I don't know now.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                        MAY 16, 2012

187

1      Q.    Was that something that you looked into while
2  developing SB 14?
3      A.    Yes, ma'am.
4      Q.    And were the costs, in particular, something
5  that you looked into while developing SB 14?
6            MR. FREDERICK:   Object on the grounds of
7  legislative privilege.   Instruct you not to answer.
8      A.    I'll assert privilege.
9      Q.    (By Ms. Maranzano)   If there are costs to
10 obtaining underlying documentation for the election
11 identification certificate, is it fair to say the
12 election identification certificate is not actually
13 free?
14           MR. FREDERICK:   Object to the form of the
15 question.   Object, it calls for speculation.   And object
16 to relevance.   If you -- if you have an opinion, you may
17 answer.
18     Q.    (By Ms. Maranzano)   Do you have an opinion?
19     A.    I do not.
20     Q.    You have no opinion on that?
21     A.    I don't know which documents are required to
22 get an ID at this point.   I don't remember.   And so I
23 don't recall why people wouldn't or would not have
24 them.   So my opinion, I mean, I'd have to go back and
25 kind of look.


ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                          MAY 16, 2012

188

1          Q.    If -- if you were to determine that there were
2    costs to obtaining those underlying documentations for
3    an individual who did not have them --
4          A.    Right.
5          Q.    -- would you say it would be fair to
6    characterize the election identification certificate as
7    free?
8                MR. FREDERICK:  Objection to the form of
9    the question.  You can answer if you can.
10         A.    I suppose not.
11         Q.    (By Ms. Maranzano)  Do you know when driver's
12   license offices are open in Texas?
13         A.    I do not.
14         Q.    Does SB 14 require employers to provide paid
15   leave to obtain an ID?
16         A.    No.
17         Q.    Do some individuals in Texas live at least 50
18   miles from a driver's license office?
19         A.    I think there was testimony to that effect,
20   yes.
21         Q.    How much does gas cost in Texas?
22         A.    Texas is a big state.  It varies.  I think in
23   Austin right now it's 3.55 a gallon.
24         Q.    So how much would it cost for somebody to drive
25   a hundred miles round trip?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

189

1           MR. FREDERICK:  Objection, calls for

2      speculation.

3           A.    Depends on their car, how they drive.

4           Q.    (By Ms. Maranzano)  Do you know whether any

5      racial or ethnic group is more likely than not have the

6      necessary ID to obtain the election identification

7      certificate?

8           MR. FREDERICK:  I'll object only to the

9      time extent that this can be construed to seek

10     information related to the development of SB

11     14.   Insofar as you can answer based on your knowledge,

12     sitting here today, you may answer.

13          A.    Can you repeat the question?

14          Q.    (By Ms. Maranzano)  Is there any racial or

15     ethnic group that is more likely to not possess the

16     underlying documentation needed to obtain election

17     identification certificate?

18          A.    I do not know.

19          Q.    Is that something that you ever looked into

20     during the development of SB 14?

21          MR. FREDERICK:  Objection, legislative

22     privilege.  I instruct you not to answer.

23          A.    I'll assert privilege.

24          Q.    (By Ms. Maranzano)  Did you ever look into or

25     analyze who among registered voters would be -- might



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

190

1      not have the forms of identification included in SB 14?

2                MR. FREDERICK:  Objection, legislative

3      privilege.  I instruct you not to answer, except to the

4      extent you can do so based on nonconfidential matters or

5      nonprivileged matters.

6          A.   The specific question again was?

7          Q.   (By Ms. Maranzano)  Did you ever research or

8      analyze who among registered voters in Texas would be

9      more likely or less likely to have the required forms of

10     identification under SB 14?

11         A.   No.

12         Q.   No, you never looked into that?

13         A.   That is correct.

14         Q.   Why not?

15                MR. FREDERICK:  Objection, legislative

16     privilege.  Instruct you not to answer.

17         A.   I'll assert privilege.

18         Q.   (By Ms. Maranzano)  Would you agree that that

19     might be a relevant inquiry pursuant to Section 5?

20                MR. FREDERICK:  Objection, calls for

21     speculation.  Objection, calls for a legal opinion.  You

22     can answer if you can.

23         A.   As I testified earlier, I didn't really

24     consider Section 5 when I was helping the Senator

25     develop this bill.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

191

1      Q.   (By Ms. Maranzano)  Did the Senator seek legal

2  advice from anybody about to ensure that Senate Bill 14

3  would comply with Section 5?

4            MR. FREDERICK:  I'm going to object on the

5  grounds that it seeks information within the attorney-

6  client privilege.  I think the fact that he might have

7  sought some legal would not itself be privileged, but

8  the question -- the question entails the substance of

9  the advice that he may or may not have sought, so I

10  object on that ground.

11            MS. MARANZANO:  And you're instructing

12  Ms. McCoy not to answer?

13            MR. FREDERICK:  Yes.  Yes.

14      Q.   (By Ms. Maranzano)  Are you going to follow

15  your counsel's advice?

16      A.   Yes, ma'am.

17      Q.   Was the passage of SB 14 a priority for Senator

18  Fraser?

19            MR. FREDERICK:  I'll object on legislative

20  privilege and instruct you not to answer as to the

21  extent it calls for confidential communications, but to

22  the extent it's in a public statement or testimony, you

23  can answer.

24      A.    I think the answer is he consistently told his

25  constituents that he thought voter ID needed to be



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

 1    passed.

 2         Q.   (By Ms. Maranzano)  Did his constituents ask

 3    for him to pass some sort of voter ID law?

 4              MR. FREDERICK:  We'll object to the extent

 5    that seeks -- to the extent it seeks the substance of

 6    any particular constituent communication.  If you can

 7    answer based on nonconfidential communications from

 8    constituents, you may answer.

 9         A.   I assert the privilege.

10         Q.   (By Ms. Maranzano)  Was passage of SB 14 a

11    priority for Governor Perry?

12         A.   He declared it an emergency.  I can't speak

13    further than that.

14         Q.   Was passage of the SB 14 a priority for any

15    interest groups that you're aware of?

16         A.   Not that I'm aware of, no.

17         Q.   What was the purpose of SB 14?

18              MR. FREDERICK:  I'm just going to give a

19    cautionary instruction.  You may testify about the

20    purpose of SB 14 to the extent you know.  I would only

21    caution you not to reveal the substance of the

22    confidential communications between yourself and the

23    legislature or any legislative thought process or mental

24    impressions.  But as to the purpose of the bill, you may

25    testify.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

193

1          A.    Senator Fraser consistently said on the record

2     that his purpose was to stop in-person voter fraud.

3          Q.    (By Ms. Maranzano)  Were there any additional

4     purposes to SB 14?

5          A.    Election integrity.

6          Q.    What does that mean?

7          A.    It means -- it means that elections are valid

8     and true and there isn't fraud.

9          Q.    Any other purposes?

10         A.    (Witness shakes head no.)  No.  I'm sorry.

11         Q.    Thank you.  Were there any purposes of SB 14

12    that were not stated on the public record?

13                MR. FREDERICK:  Object, legislative

14    privilege.  Instruct you not to answer.

15         Q.    (By Ms. Maranzano)  Are you following your

16    counsel's advice?

17         A.    I am.

18         Q.    Was any part of the purpose of SB 14 to

19    decrease the number of Hispanic voters?

20                MR. FREDERICK:  Object, legislative

21    privilege.  Instruct you not to answer.

22         A.    I'll assert privilege.

23         Q.    (By Ms. Maranzano)  Was any part of the purpose

24    of SB 14 to decrease the number of any group of minority

25    voters?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

194

1           MR. FREDERICK:  Objection, legislative
2      privilege.  I'll instruct you not to answer.
3           A.   I'll assert.
4           Q.   (By Ms. Maranzano)  Was any part of the purpose
5      of SB 14 to discriminate in any way against any group of
6      minority voters?
7           MR. FREDERICK:  Objection, legislative
8      privilege.  Instruct you not to answer.
9           A.   Assert the privilege.
10          Q.   (By Ms. Maranzano)  Was any part of the purpose
11     of SB 14 for partisan purposes?
12          MR. FREDERICK:  Objection, legislative
13     privilege.  I'll instruct you not to answer.
14          A.   Assert the privilege.
15          Q.   (By Ms. Maranzano)  Did the purpose of photo ID
16     in Texas evolve over time in legislative sessions?
17          MR. FREDERICK:  Object on the basis of
18     legislative privilege.  Instruct you not to answer
19     unless you can do so based on public statements or
20     testimony.
21          A.   Senator Fraser's stated purpose has always been
22     to be prevent in-person voter fraud across the sessions.
23          Q.   (By Ms. Maranzano)  Have you ever heard of a
24     voter who decides not to vote on election day because
25     they're worried their vote will be diluted by a



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

195

1    nonlegitimate voter?

2         A.   No.

3         Q.   Who are the main opponents of SB 14?

4         A.   I think the Senate Democrats, Democrat

5    members.  I think the Texas Democratic party.

6         Q.   Did any minority members of the Senate support

7    SB 14?

8              MR. FREDERICK:  Object on legislative

9    privilege, only to the extent that support or opposition

10   was expressed confidentially by a legislator or staff

11   member to you.

12        A.   No minority senator voted for the bill.

13        Q.   (By Ms. Maranzano)  Did any groups representing

14   minority voters support SB 14?

15             MR. FREDERICK:  Same cautionary

16   instruction.  You may answer to the extent that you know

17   from public statements or the legislative record, but

18   caution you not to reveal any privileged matter

19   communicated to you by a constituent.

20        A.   I don't know.

21        Q.   (By Ms. Maranzano)  Did the Senator consider

22   any alternative legislative measures that would have

23   deterred voter fraud?

24             MR. FREDERICK:  Objection, legislative

25   privilege, and instruct you not to answer.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                        MAY 16, 2012

                                                                196

1          A.    I'll assert.

2          Q.    (By Ms. Maranzano)    What was the Senator's

3     strategy to ensure that Senate Bill 14 was passed?

4                MR. FREDERICK:    Objection, legislative

5     privilege.    Instruct you not to answer.

6          A.    I'll assert.

7                (Exhibit 38 marked for identification.)

8          Q.    (By Ms. Maranzano)    Ms. McCoy, I'm showing you

9     what we marked as Deposition Exhibit 38.    Do you

10    recognize what this -- what this is?

11         A.    Yes.

12         Q.    What is it?

13         A.    It's the Senate Rules Adopted by the 82nd

14    Legislature.

15         Q.    And this, what I've given you is actually the

16    table of contents and some portion of the rules.    It's

17    not the entire set of Senate rules.    Can you look at the

18    table of contents and tell me what procedural rules are

19    implicated by the consideration of SB 14, what

20    procedural rules were applied to SB 14's consideration?

21               MR. FREDERICK:    Objection, vague.    You can

22    answer if you can.

23         A.    I'm not sure.

24         Q.    (By Ms. Maranzano)    Oh, you know what, that

25    looks like it's highlighted.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

197

1        A.   It is highlighted.  Is that the one you want?

2                 MS. MARANZANO:  Why don't we mark a clean

3        one for the record.

4                 MR. FREDERICK:  Here, that one's got a

5        mark on it.  I've got a clean one right here.

6                 MS. MARANZANO:  Thank you.

7                 MR. FREDERICK:  Here's your highlighted

8        one.

9                 (Clean copy Exhibit 38 exchanged for

10       highlighted copy originally marked.)

11       A.   I don't --

12       Q.   (By Ms. Maranzano)  If you look -- let's look

13       at Rule 5.11.

14       A.   Yes, ma'am.

15       Q.   Subsection D of 5.11.  Is that the same

16       provision that we talked about earlier that was included

17       in the 2009 rules that carves out voter identification

18       requirements from the two-thirds rule?

19       A.   Yes, ma'am.

20       Q.   And can you look at Rule 16 for me?

21                 You can scratch looking at Rule 16.

22                 THE REPORTER:  I'm sorry.  I didn't get

23       that.

24                 MS. MARANZANO:  I said she could scratch

25       reviewing Rule 16.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

198

1          Q.   (By Ms. Maranzano)  Can you look at Rule 12.03

2     about conference committees?

3          A.   Yes, ma'am.

4          Q.   And do you see that Section 4 states -- well,

5     can you read Section 4 for me and tell me what your

6     understanding of that subsection of the rule is?

7          A.   "Add text on any matter which is not included

8     in either the House or Senate version of the bill or

9     resolution."

10         Q.   What's your understanding of what this rule

11    does?

12         A.   That rule says that when a bill is in

13    conference committee, they -- the conference committee

14    should not consider including provisions that weren't in

15    either of the House or Senate passed versions.

16         Q.   How many times have you seen that section of

17    the rule disregarded while you've worked for Senator

18    Fraser?

19         A.   Probably happens 20 to 30 times a session.

20         Q.   What type of bills does that happen on?

21         A.   All types.

22         Q.   Was SB 14 considered by any -- you know what,

23    scratch that.  I think we've talked about that already.

24              What did you do to ensure that Senator

25    Fraser was prepared for Floor consideration of SB 14?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

199

1              MR. FREDERICK:  Object based on

2      legislative privilege, to the extent it calls for

3      substance of any communication or your thought process

4      or Senator Fraser's thought process.  However, to the

5      extent you can answer without revealing that, you may

6      describe your preparation.

7          A.    Typically, when we do floor prep for Senate

8      Bill 14 or any bill, we put together a bill book, which

9      includes the bill, the bill analysis, the fiscal notes,

10     any supporting documentation and talking points.  And

11     that's what I did for Senate Bill 14.

12         Q.    (By Ms. Maranzano)  And do you write the

13     talking points?

14         A.    Yes.  Or -- not for every bill.  I did for

15     Senate Bill 14.

16         Q.    And is the bill analysis what we've previously

17     discussed, a section-by-section analysis of the bill?

18         A.    Yes, ma'am.

19         Q.    And do you write that?

20         A.    No, ma'am.

21         Q.    Who does?

22         A.    Those are prepared through the committee

23     process, and I think the Senate Research Center prepares

24     those.

25         Q.    Are you familiar with this Floor testimony on



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                          MAY 16, 2012

                                                              200

1    SB 14?

2         A.    Generally.

3         Q.    And I believe you testified earlier you were

4    with the Senator, correct?

5         A.    For some of it.  I don't -- I think I got up

6    and left for part of it.  Actually, I know I got up and

7    left for part of it.

8         Q.    During the Floor consideration of SB 14, did

9    Senator Fraser answer any questions about SB 14 by

10   saying he was not advised?

11        A.    Can we be clear when we're talking about Floor

12   consideration, Committee of the Whole consideration

13   or Floor?  Specifically when we talk about the Floor,

14   it's when they're actually in session on the Floor.  The

15   Committee of the Whole meets on the senate Floor, just

16   because there's no other place for them to meet.

17             So during the Committee of the Whole

18   debate, there were times that Senator Fraser said "I'm

19   not advised."

20        Q.    What does that mean, "I'm not advised"?

21             MR. FREDERICK:  Object, based on

22   legislative privilege, only to the extent it asks for

23   Senator Fraser's thought process or mental impressions.

24   To the extent you can answer from your own personal

25   knowledge of what "I'm not advised" means, you may.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                           MAY 16, 2012

201

1        A.    Typically, when a senator says that, it means

2     they don't know.

3        Q.    (By Ms. Maranzano)  About how many questions

4     did he answer by saying "I'm not advised"?

5        A.    I don't know.

6        Q.    Can you approximate?

7        A.    No.

8        Q.    Would you say it was hundreds?

9        A.    I don't remember.

10       Q.    Isn't it part of the Senator's role as author

11    of the bill to answer questions about the bill?

12            MR. FREDERICK:  Objection, argumentative.

13    You may answer.

14       A.    The Senator offered his colleagues that he

15    didn't know the answer to some questions and that

16    resource and expert witnesses were going to testify

17    later during the committee, and those questions would be

18    better addressed to those resource expert witnesses.

19       Q.    (By Ms. Maranzano)  Did anyone instruct Senator

20    Fraser not to answer substantive questions about SB 14

21    during the Committee of the Whole?

22            MR. FREDERICK:  Objection, legislative

23    privilege.  Instruct you not to answer.

24       A.    I'll assert privilege.

25       Q.    (By Ms. Maranzano)  During -- during the



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

202

```
 1       Committee of the Whole's consideration of SB 14, did
 2       anyone raise concerns about the impact of SB 14 on
 3       minority voters?
 4            A.   Yes.
 5            Q.   What was the Senator's response?
 6            A.   I don't remember.
 7            Q.   You don't recall how he responded?
 8            A.   (Witness shakes head no.)
 9            Q.   Did numerous senators raise concerns about the
10       impact of SB 14 on minority voters?
11                 MR. FREDERICK:  Objection, legislative
12       privilege, only to the extent it calls for confidential
13       communications.  Anything on the committee or on the
14       Floor, you may testify about.
15            A.   I think that 10 of the 12 Democrat senators
16       testified against the bill during the Committee of the
17       Whole.  May have been 9.  May have been 11.  It wasn't
18       all 12.
19            Q.   (By Ms. Maranzano)  But my question was about
20       testimony related to concerns about the impact of SB 14
21       on minority voters.  It not about --
22            A.   I don't recall what they said.  I know that
23       many senators testified against the bill, but I can't
24       recall what each of them said.  So I cannot answer that
25       question.
```



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

                                                              203

1          Q.   Was that testimony that you would consider to

2     be important?

3                MR. FREDERICK:   Objection, vague.   You may

4     answer.

5          A.   To some people, yes.

6          Q.   (By Ms. Maranzano)  How about to you?

7          A.   No.

8          Q.   Why not?

9          A.   I just work for the Senator.   I don't --

10         Q.   Well, part of your job in working for the

11    Senator is giving him advice on this bill, is it not?

12         A.   Yes.

13         Q.   And so the impact of this bill on minority

14    voters is a relevant consideration, is it not?

15         A.   Yes.

16         Q.   So I'm just wondering why that wasn't an

17    important testimony to you.

18                MR. FREDERICK:   Object to the extent it

19    mischaracterizes the testimony, but you may answer if

20    you can.

21         A.   I think that the position that the Senator had

22    relative to this bill wasn't going to change because of

23    testimony we heard in January of 2011, because we heard

24    the same testimony in January of 2009, and we heard the

25    same testimony in May of '07.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

204

1          So the testimony is important to the
2    people that were giving it, mainly, I think, because
3    they were trying to put it on the record for you guys,
4    but it wasn't going to change my recommendations to the
5    Senator on how to proceed with this legislation.
6          Q.   (By Ms. Maranzano)  Did you take any actions
7    with regard to Senate Bill 14 in response to those
8    concerns?
9               MR. FREDERICK:  Objection, legislative
10   privilege.  Instruct you not to answer.
11         A.   I'll assert privilege.
12              (Exhibit 39 marked for identification.)
13         Q.   (By Ms. Maranzano)  I'm showing you what we've
14   marked for the record as Deposition Exhibit 39.  Can you
15   turn to the label at the bottom, Texas 00000098, and
16   look at the portion of the print?
17              Well, let me ask you first, do you
18   recognize this document, or can you tell me what this
19   document is?
20         A.   I've never seen this document, but it is a
21   transcript of the Committee of the Whole from Tuesday,
22   January 25, 2011.
23         Q.   Can you look at the transcript Page 168.  And
24   do you see that there's a question posed by Senator West
25   as to whether the forms of identification that are



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1        listed in the bill are the least restrictive options in

2        order to achieve the goal of avoiding what you have said

3        is voter identification fraud?

4            A.   Uh-huh.  Yes.

5            Q.   And can you look at Senator Fraser's answer to

6        that?

7            A.   (Witness complies.)

8            Q.   Is that a topic that you looked into prior to

9        introducing Senate Bill 14 of whether this was the least

10       restrictive way to achieve the Senator's goal?

11               MR. FREDERICK:  Objection, legislative

12       privilege.  Instruct you not to answer.

13           A.   I'll assert privilege.

14           Q.   (By Ms. Maranzano)  Can you tell me anything

15       about that topic based on the comments that were made in

16       public during the Committee of the Whole, Ms. McCoy?

17               MR. FREDERICK:  Object to the form, but

18       you may answer.

19           A.   Well, I can speak to what Senator Fraser said.

20       The Secretary of State had provided us information,

21       which he referenced here, showing that people -- 91

22       percent of voters registered with their driver's license

23       under HAVA.

24           Q.   (By Ms. Maranzano)  90 percent of the -- of

25       voter registration applicants registered with their



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                          MAY 16, 2012

206

1    driver's license number?

2        A.    Under the HAVA requirement.

3        Q.    And do you know when HAVA started requiring

4    people to write down their driver's license number?

5        A.    Texas passed its version of HAVA in 2005, so I

6    would assume it took a while to make sure -- it started

7    probably that fall of 2005 or 2006.  Sometimes we start

8    things in January of the next year.

9        Q.    And did anybody ever -- or did you or the

10   Senator ever conduct any analysis of who those 10

11   percent, approximately 10 percent of registered voters

12   without driver's license numbers might be and whether or

13   not they might have any other forms of identification?

14            MR. FREDERICK:  Objection, legislative

15   privilege, and instruct you not to answer.

16       A.    I'll assert privilege.

17       Q.    (By Ms. Maranzano)  Okay.  I'm going to have

18   this marked.

19            (Exhibit 40 marked for identification.)

20       Q.    (By Ms. Maranzano)  I'm showing you what we are

21   marking as Deposition Exhibit 40, which is a transcript

22   of another transcript of the Committee of the Whole from

23   Tuesday, January 26, 2011.

24            Can you look at the second page of this

25   document that's labeled on the transcript as Page 189 at



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

207

1     the top?  Actually, the quote starts -- I'm sorry.  The

2     quote starts on Page 188 from Senator Fraser.  If you

3     can just take a look at that.

4              Does that appear to be saying that there

5     are very small differences between Texas's bill and

6     Indiana and Georgia's bill?

7        A.   That does what it seems to be saying.

8        Q.   Are you familiar with the Indiana and Georgia

9     photo identification requirement?

10       A.   No.

11       Q.   Didn't you testify earlier that you had looked

12    at those two states when you were developing SB 14 362?

13       A.   We looked at voter turnout from those two

14    states.  I never looked at the legislation.

15       Q.   So, Ms. McCoy, you've never looked at either

16    Indiana or Georgia's photo identification requirements?

17       A.   I might have printed out a copy of Indiana's,

18    and I might have seen a table that included the

19    different IDs that allowed under every state's photo ID

20    law, but I've never looked at Indiana or Georgia's

21    legislation in depth, no.

22       Q.   So do you have any position on whether the

23    Indiana and Georgia identification requirements are

24    similar to SB 14?

25       A.   I do not have a position, no.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                              MAY 16, 2012

208

1              (Exhibit 41 marked for identification.)

2      Q.   (By Ms. Maranzano)  Okay.  I'm showing you what

3   we've marked as Deposition Exhibit --

4              MR. FREDERICK:  Do you have one for me?

5              MS. MARANZANO:  Sorry.  I only have one

6   copy.

7              MS. WESTFALL:  Can you look on with the

8   witness?

9              MR. FREDERICK:  Oh, yeah, yeah, I'll look

10   at this one.

11      Q.   (By Ms. Maranzano)  Ms. McCoy, this is a

12   transcript from July 26, 2011.  The Committee of the

13   Whole's consideration of SB 14.  I'm going to direct you

14   to certain pages, but I want to say at the beginning,

15   this transcript has two sets of pagination.  On the

16   left-hand side, it says "CD Number" and "Section

17   Number," and then it also has a page.  So I will give

18   you both of those, because it has -- the pagination

19   restarts with every CD and section number.

20      A.   Okay.  But I want to clarify this isn't from

21   the Committee of the Whole.  This is from when the

22   Senate was actually in session as the Senate.

23      Q.   Okay.  Thank you for that clarification.

24      A.   You're welcome.

25      Q.   Can you turn to Page 34 on CD 1, Section 1?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                          MAY 16, 2012

                                                            209

1          A.   Hold on.  Okay.

2          Q.   Were you on the Floor with the Senator during

3     -- during the Floor consideration on January 26th of SB

4     14?

5          A.   Yes, but --

6          Q.   Yes, but?

7          A.   Can I just clarify?

8          Q.   Yes, please.

9          A.   During the Committee of the Whole, I could

10    actually be inside the rail right next to the Senator.

11    When the Senate was in full session, I had to be outside

12    the rail away from the Senator's desk.

13         Q.   Okay.  Did you communicate with the Senator

14    during that time?

15         A.   As much as you can if they turn around and look

16    at you.

17         Q.   You didn't -- you didn't communicate by a

18    Blackberry or cell phone?

19         A.   No, ma'am.

20         Q.   Okay.  Can you take a look at on Page 34, where

21    it starts with the testimonies by Davis?  Can you just

22    take a look at that?

23         A.   I think I'm on the wrong page.

24              MR. FREDERICK:  I think you're on Section

25    2.  Got Section 1.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

210

1       A.    Okay.

2             MR. FREDERICK:   Yeah.

3       A.    Okay.

4       Q.    (By Ms. Maranzano)  Can you just take look at

5   that amendment which starts with Davis?  And then the

6   action that's taken on that amendment is lower on the

7   page.  Do you recall this amendment being offered?

8             MR. FREDERICK:   Just to clarify, is

9   this -- is it Floor Amendment 12 we're talking about?

10            MS. MARANZANO:   Yes.  I think that's

11  right.

12      A.    I don't recall, because I'm not seeing the text

13  of the amendment.

14      Q.    (By Ms. Maranzano)  Uh-huh.

15      A.    So I don't -- I don't recall.

16      Q.    Do you recall that Senator Davis introduced an

17  amendment to prohibit state agencies from charging fees

18  for the issuance of any acceptable ID under SB 14?

19      A.    Not really, no.

20      Q.    Do you recall that Senator Fraser moved to

21  table that amendment?

22      A.    I mean, I can see that he did.  I don't recall

23  this particular part of the debate.

24      Q.    Did you have any role in recommending to him

25  how to handle amendments to SB 14?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                    MAY 16, 2012

                                                             211

1            MR. FREDERICK:  Well, you may answer the

2       question whether or not you had a role.

3            A.   Yes.

4            Q.   (By Ms. Maranzano)  What was your role?

5            MR. FREDERICK:  I'll object to legislative

6       privilege, to the extent it seeks confidential

7       communications, thought processes or mental

8       impressions.  But to the extent you can describe your

9       role without going into that, then you may answer the

10      question.

11           A.   I provided the Senator with some thoughts on

12      what he could say if certain amendments that we thought

13      were going to be introduced were introduced.

14           Q.   (By Ms. Maranzano)  And did you provide him

15      with a recommendation on how to vote on certain

16      amendments?

17           MR. FREDERICK:  Just caution you, I mean,

18      you can answer the question as phrased, whether or not

19      you offered a recommendation.

20           A.   I did not.

21           Q.   (By Ms. Maranzano)  Why -- well, how would this

22      amendment introduced by Senator Davis have interfered

23      with the Senator's goals of deterring voter fraud?

24           MR. FREDERICK:  Object on legislative

25      privilege.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

212

1          Q.    (By Ms. Maranzano)   Ms. McCoy, as you're

2     sitting here today, are you aware of any ways in which

3     not charging for the acceptable forms of identification

4     under SB 14 would interfere with the goal of deterring

5     in-person voter impersonation?

6          A.    No.

7          Q.    Can you turn to what's labeled as CD-1, Section

8     2, Page 28 through 30?

9          A.    (Witness complies.)

10          Q.    You see that this testimony is related to an

11     amendment proposed by Senator Ellis that would have

12     required the Secretary of State to conduct a study

13     including information about the number of eligible

14     voters who are prevented from voting or have to vote

15     provisionally because they lacked an ID?

16          A.    Yes.

17          Q.    And do you recall that amendment being offered?

18          A.    Yes, ma'am.

19          Q.    Did you provide a recommendation to Senator

20     Fraser as to how to handle that amendment?

21               MR. FREDERICK:   I'll caution.   You can

22     answer the question as phrased, as long as you don't

23     reveal the substance of any confidential communication.

24          A.    No.

25          Q.    (By Ms. Maranzano)   Did Senator Fraser move to



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

213

1      table that amendment?

2           A.   Yes.

3           Q.   And how would conducting a study about who was

4      impacted by SB 14 have interfered with the Senator's

5      goals of deterring in-person voter impersonation?

6                MR. FREDERICK:  Objection, legislative

7      privilege.  Instruct you not to answer.

8           A.   I'll assert privilege.

9           Q.   (By Ms. Maranzano)  Was Senator Fraser

10     concerned that such a study would show that minorities

11     are disproportionately impacted by Senate Bill 14?

12               MR. FREDERICK:  Objection, legislative

13     privilege.  Instruct you not to answer.

14          A.   I'll assert privilege.

15          Q.   (By Ms. Maranzano)  Can I have you turn to --

16     I'm going to actually get out another exhibit.

17               (Exhibit 42 marked for identification.)

18          Q.   (By Ms. Maranzano)  I'm showing you what we're

19     marking as Deposition Exhibit 42.  If you could look at

20     the side of the page that has 28 at the top.  Actually,

21     I'm sorry.  It starts on the bottom of 27.  There's an

22     amendment presented by Senator Gallegos that goes to the

23     top.

24               Do you see that Senator Gallegos offered

25     an amendment that would have required driver's license



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                    MAY 16, 2012

214

1    offices to be open until 7 p.m. on one weekend and

2    during four or more hours on at least two Saturdays per

3    month?

4        A.   Yes.

5        Q.   Did you provide a recommendation to Senator

6    Fraser as to how to vote on this bill -- on this

7    amendment?

8             MR. FREDERICK:  I just caution.  You may

9    answer the question as phrased.  I advise you not to

10   reveal the substance of any communication.

11       A.   No.

12       Q.   (By Ms. Maranzano)  Did Senator Fraser move to

13   table this amendment?

14       A.   Yes.

15       Q.   How would keeping driver's license offices open

16   longer interfere with deterring in-person voter

17   impersonation?

18            MR. FREDERICK:  Objection, legislative

19   privilege.  I instruct you not to answer.

20       A.   I'll assert privilege.

21       Q.   (By Ms. Maranzano)  Did Senator Fraser have any

22   concern that any individuals who work at hourly wage may

23   have a difficult time making it to a driver's license

24   office while it's open?

25            MR. FREDERICK:  Objection, legislative



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                          MAY 16, 2012

215

1    privilege.  I'll instruct you not to answer.

2         A.   I'll assert privilege.

3         Q.   (By Ms. Maranzano)  Did Senator Fraser

4    acknowledge on the Floor that a person needed to work to

5    make sure that a driver's license office was open?

6         A.   Can you repeat that question?

7         Q.   Do you recall the Senator acknowledging on

8    the -- during the consideration of SB 14, that people

9    needed to work to make sure that a driver's license

10   office was open?

11        A.   I do not recall.

12        Q.   Were there any other amendments that you

13   haven't testified about that were offered that would

14   have mitigated the impact of SB 14 on minority voters?

15             MR. FREDERICK:  Objection, assumes facts

16   not in evidence.  Also object on legislative

17   privilege.  Instruct you not to answer.

18        A.   I'll assert privilege.

19        Q.   (By Ms. Maranzano)  Based on the public record,

20   are there any amendments that we haven't discussed that

21   you believe would have mitigated the impact of SB 14 on

22   minority voters?

23             MR. FREDERICK:  Objection, assumes facts

24   not in evidence.  You -- otherwise, you may answer if

25   you can.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

216

1      A.   I don't recall every amendment offered.

2      Q.   (By Ms. Maranzano)  Do you recall any amendment

3   that you believe would have mitigated the impact of SB

4   14 on minority voters?

5           MR. FREDERICK:  Again, object, assumes

6   facts not in evidence.  You may answer.

7      A.   I don't know how to answer, because I don't

8   know that Senator Fraser or I think the bill impacted

9   minority voters negatively.  So the amendment -- I don't

10   know that the -- the answer then is no, because I don't

11   know that they would have added to what we already

12   believe the bill did.

13      Q.   (By Ms. Maranzano)  When did the Senate pass SB

14   14 and refer it to the House?

15      A.   It was either January 26th or 27th when we

16   passed it to engrossment.  I don't recall exactly which

17   day that occurred.

18      Q.   Is it unusual for the Senate to pass

19   legislation within the first two weeks of a session?

20      A.   Yes.

21      Q.   Has that ever happened before during the time

22   that you've worked for Senator Fraser?

23      A.   I don't recall.

24      Q.   Did the Senator have any role with regard to SB

25   14 once it was referred to the House?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1           MR. FREDERICK:  Object only to the extent

2     it seeks privileged matters as to the fact, whether or

3     not he had a role.  You may answer.

4           A.   Yes.

5           Q.   (By Ms. Maranzano)  What role was that?

6           MR. FREDERICK:  And I'll object on the

7     basis of legislative privilege and instruct you not to

8     answer to the extent that your answer would reveal

9     his -- the Senator's or your thought process, mental

10    impressions or disclose the substance of any privileged

11    conversation.  But to the extent you can describe his

12    role without divulging that, you may answer.

13          A.   It was limited in that once Representative

14    Harless was determined to be the House sponsor, we

15    provided her the information that we had that she could

16    move forward.

17          Q.   (By Ms. Maranzano)  Was the Senator concerned

18    about any of the changes to SB 14 that occurred in the

19    House?

20          MR. FREDERICK:  Objection, legislative

21    privilege.  Instruct you not to answer.

22          A.   I'll assert privilege.

23          Q.   (By Ms. Maranzano)  Was the Senator on the

24    conference committee?

25          A.   Yes.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

218

1      Q.   Did the conference committee change the

2   structure of the identification card that was required

3   to be issued free of charge?

4      A.   Yes.

5      Q.   Did they insert a new provision into the bill

6   on that topic?

7      A.   Yes.

8      Q.   Is that unusual?

9           MR. FREDERICK:   Objection, vague.   You may

10   answer.

11      A.   As I testified earlier, the conference

12   committees, 20, 30 times during a session, we'd go

13   outside the bounds.

14      Q.   (By Ms. Maranzano)   What was the purpose of the

15   conference committee removing the provision of SB 14

16   that would have allowed a tribal identification to be

17   used by a voter?

18           MR. FREDERICK:   Objection, legislative

19   privilege.   Instruct you not to answer.

20      A.   I'll assert privilege.

21      Q.   (By Ms. Maranzano)   What was the purpose of the

22   conference committee removing a provision that would

23   require the voter education that was required in SB 14

24   be targeted at low income and minority voters?

25           MR. FREDERICK:   Objection, legislative



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

219

1      privilege.  Instruct you not to answer.

2          A.    I'll assert privilege.

3          Q.    (By Ms. Maranzano)  What was the purpose of the

4      conference committee removing the provision of SB 14

5      that would have exempted from the photo ID requirement

6      individuals whose ID had been stolen and who certified

7      that in an affidavit?

8                MR. FREDERICK:  Objection, legislative

9      privilege.  Instruct you not to answer.

10         A.    I'll assert privilege.

11         Q.    (By Ms. Maranzano)  Did the Senator ever

12     discuss whether SB 14 might disproportionately impact

13     minority voters?

14               MR. FREDERICK:  I'm sorry, Jennifer.  You

15     said did the Senate ever discuss --

16               MS. MARANZANO:  Senator.  I'm sorry.

17         Q.    (By Ms. Maranzano)  Did Senator Fraser ever

18     discuss whether SB 14 might disproportionately impact

19     minorities voters?

20               MR. FREDERICK:  Objection, legislative

21     privilege, and instruct you not to answer, except to the

22     extent that you recall public statements or statements

23     on the Floor in the committee.

24         A.    He had discussions in the Committee of the

25     Whole and on the Floor with other members about their



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

220

1    impressions of the bill that it would impact minority

2    voters.

3         Q.   Did he have discussions about this topic that

4    are not included in the public record?

5              MR. FREDERICK:  I'll object, vague, object

6    to form, and object on the legislative privilege, to the

7    extent that it seeks the substance of any nonpublic

8    conversation.  To the extent you were aware of it, the

9    fact of the conversation, you may testify to.

10        A.   I can't speak to the Senator's private

11   conversations.  I wasn't privy to them.

12        Q.   (By Ms. Maranzano)  Are you aware of any

13   legislators making any statements about illegal alien

14   voting?

15        A.   Yes.

16        Q.   Who was that?

17        A.   I just know it happened.  I don't remember who

18   said it.

19        Q.   What was the statement?

20        A.   I don't know the specifics of it.  I remember

21   reading about it in the newspaper, but I don't remember

22   who said it.

23        Q.   When -- when did you read about the statement?

24        A.   I want to say there was something in 2009, but

25   I'm not -- I don't recall.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

221

1       Q.   What newspaper was that in?

2       A.   I do not recall.

3       Q.   What was the general subject of the statement?

4       A.   I don't recall.  Generally, I remember hearing

5    that somebody said something in a committee hearing on

6    public record, but that's the extent of what I know.

7       Q.   Somebody said something in a committee meeting,

8    that somebody being one of the legislators?

9       A.   Yes.  I'm sorry.

10      Q.   Okay.  Thank you.  Have you ever heard any

11   Texas state legislator who voted in favor of SB 14 say

12   that it would prevent a legitimately registered voter

13   from voting in Texas?

14            MR. FREDERICK:  I object on privilege, to

15   the extent it calls for confidential privileged

16   communications, but other than that, you may answer.

17      A.   That specific statement, no.  That general

18   idea, yes.

19      Q.   (By Ms. Maranzano)  Who said that?

20      A.   The general thought that a legitimate voter

21   might not be able to vote was generally said by the

22   Democrat senators who testified against the bill.

23      Q.   Okay.  I'm sorry.  My question was any

24   legislator who voted in favor of SB 14 saying that?

25      A.   Then the answer is no.  I'm sorry.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

222

1        Q.   Have you ever heard any Texas state legislator

2   who voted in favor of SB 14 say that it would prevent

3   racial or ethnic minorities from voting in Texas?

4        A.   No.

5        Q.   Are you familiar with a public letter from the

6   Lieutenant Governor in 2007 about photo ID requirements?

7        A.   No.

8        Q.   This has been previously marked as -- as

9   Exhibit 3.  This has been previously marked as

10  Deposition Exhibit 3.  Have you seen this before,

11  Ms. McCoy?  I'm sorry.  I'm showing you what has been

12  marked as Deposition Exhibit 3, previously marked.  And

13  if you can tell me if you've seen it before.

14       A.    I don't specifically remember reading this, but

15  I'm sure I did.

16       Q.   Do you see that there's a sentence that 8 to 12

17  million illegal aliens currently living in the U.S. --

18  wait, I'm sorry.  Let me find the exact sentence.

19            Can you look at the second paragraph?  Do

20  you see that -- do you see that that sentence says that

21  "Yesterday, Senator Troy Fraser brought up in the Senate

22  consideration of House Bill 218 by Representative Betty

23  Brown, which simply requires voters to present a

24  driver's license or some other common form of

25  identification at the election polls to prove they are



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

223

1      who they say they are, U.S. citizens"?

2          A.   Yes.

3          Q.   Was that part of the purpose of House Bill 218?

4          A.   No.

5          Q.   Any reason that the Lieutenant Governor would

6      assert that that is the purpose of House Bill 218?

7                   MR. FREDERICK:  Objection, calls for

8      speculation.  You can answer.

9          A.   I can't speak to what Lieutenant Governor wrote

10     in 2007.

11         Q.   (By Ms. Maranzano)  Ms. McCoy, at any time

12     since the passage of Senate Bill 14, have you come to

13     believe that it was passed with any discriminatory

14     purpose?

15                  MR. FREDERICK:  I'll object on the basis

16     of legislative privilege.  I mean, to the extent -- and

17     I'll object to the extent that the question seeks your

18     thought processes, based on information gathered during

19     consideration of SB 14.  And otherwise, you can answer

20     if you won't reveal that.

21                  MS. MARANZANO:  My question is, post

22     enactment, did she come to believe it was passed with

23     discriminatory purpose?

24         A.   No.

25         Q.   (By Ms. Maranzano)  At any time since the



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

224

1    passage of SB 14, have you come to believe that SB 14

2    will have a discriminatory effect on minority voters?

3              MR. FREDERICK:  Same objection, but you

4    can answer.

5         A.   No.

6         Q.   (By Ms. Maranzano)  Ms. McCoy, can you give me

7    about two minutes?  I'm just about done.

8         A.   Sure.

9         Q.   We'll go off the record for about two minutes.

10        A.   Yeah.  Uh-huh.

11             (Recess from 5:03 to 5:11 p.m.)

12        Q.   (By Ms. Maranzano)  Ms. McCoy, do you know what

13   percentage of Senator Fraser's district was made up of

14   Latinos?

15        A.   No.

16        Q.   You testified earlier that minority legislators

17   made statement on the Floor to -- statements on the

18   Floor for the benefit of I believe you said, "of you."

19   Did you mean the Department of Justice?

20        A.   I meant -- yes, yes.

21        Q.   What's the basis of that statement?

22        A.   Personal opinion.

23        Q.   What's your personal opinion based on?

24        A.   Their opposition to the bill and the fact that

25   they thought maybe y'all could help kill it.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

225

1        Q.   Did any of them say anything like that to you?

2             MR. FREDERICK:  Object, based on

3    legislative privilege, to the extent there was any

4    confidential communication between a specific legislator

5    and you or Senator Fraser, I'll instruct you not to

6    answer.  Otherwise, to the extent you can answer, you

7    may.

8        Q.   (By Ms. Maranzano)  Can you answer this

9    question?

10       A.   I cannot.

11       Q.   Ms. McCoy, if you're called to testify at

12   trial, will you testify that SB 14 has no discriminatory

13   purpose?

14       A.   Yes.

15       Q.   If you're called to testify at trial, will you

16   testify that SB 14 has no discriminatory effect?

17       A.   Yes.

18            MS. MARANZANO:  Well, to be clear for

19   Mr. Frederick, it's our position that if she's taking

20   that position, we have a right to explore the basis of

21   that under our motion to compel.

22            MR. FREDERICK:  I'm sorry.  Just so I'm

23   clear, to explore what?

24            MS. MARANZANO:  To explore the -- I mean,

25   there's a number of questions that are related to that,



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

226

1     that y'all have not permitted her to answer.  So we

2     would reserve our right -- we're going to leave this

3     deposition open.  I'd like to say that for the record.

4     And you know, we believe that we have a right to ask her

5     and get answers on a number of questions that you've

6     instructed her not to answer, if she's taking the

7     position that she will offer these opinions if she's

8     called to testify at trial.

9              MR. DUNN:  Intervenors join.

10             MR. FREDERICK:  Okay.  I understand.

11        Q.   (By Ms. Maranzano)  Ms. McCoy, are there any

12    answers that you've provided today that you now wish to

13    change?

14        A.   Yes.

15        Q.   What's that?

16        A.   When we took our break.

17        Q.   Uh-huh.

18        A.   I went back and tried to look at the record of

19    when things passed or didn't pass.

20        Q.   Uh-huh.

21        A.   And I didn't have a lot of time, because there

22    was someone in my office on an unrelated issue for most

23    of the hour.  But you -- the Senate did remove the

24    provision on student ID's, not the House.  I think I had

25    testified that the House removed it, but we ended up



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                    MAY 16, 2012

227

1    taking it out at some point.  I don't recall really when

2    that came out just because I was kind of hurriedly

3    looking through the versions.  And I think the House did

4    send it to us with it in and we had taken out.

5        Q.   Thank you for that clarification.

6        A.   You're welcome.

7        Q.   Anything else?

8        A.   That's -- that's it.

9        Q.   Any -- I'm sorry.

10       A.   So that was the only thing that I wasn't sure

11   about when I answered earlier.

12       Q.   Is there any information that you didn't recall

13   earlier that you now recall?

14       A.   No.

15            MS. MARANZANO:  Well, as I said, we're

16   leaving this deposition open, and I will now hand it

17   over to Chad.

18                      EXAMINATION

19   BY MR. DUNN:

20       Q.   Good afternoon.

21       A.   Hi.

22       Q.   Hi.  My name is Chad Dunn.  I don't think we've

23   ever met before, have we?

24       A.   I don't think so.

25       Q.   All right.  Well, I know you've been here for



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

228

 1    quite a while today, so I'm not going to, you know, try

 2    to waste your time.  I've got a few issues that I want

 3    to ask you about.  And I'm going to jump around a little

 4    bit, all right?  I'm going to do my best to not ask you

 5    anything that's already been asked.

 6         A.   Okay.

 7         Q.   But in order to get done with you as soon as I

 8    can, I may end up having to overlap just a little bit,

 9    and for that I apologize.  All right.

10              I'm going to start a little bit with some

11    of your earlier testimony.  As I understand it, you used

12    to be an election judge; is that true?

13         A.   One election I served as election judge.

14         Q.   Which election was that?

15         A.   Maybe 2000.  I don't really recall.  It's been

16    a while.

17         Q.   Was that in Travis County?

18         A.   Yes, sir.

19         Q.   And were you appointed as the actual election

20    judge, or you served as a volunteer?

21         A.   I was not precinct chair.

22         Q.   Okay.

23         A.   I -- they called and asked me, it was a

24    November election, the local party called and said we

25    need a Republican, because they had -- they wanted a



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

229

1    Democrat and a Republican.  And I lived in the precinct,

2    and they asked me to do it, and I said yes.  I don't

3    know if they had to actually turn my name in or not.

4        Q.   Okay.  And I'm not trying to quarrel with you,

5    but it sounds more like you were an election observer or

6    a poll watcher than an election judge.

7        A.   No, sir.  I was an election -- or the assistant

8    election -- I don't think I was the election judge.  I

9    was the assistant election judge.  I mean, I actually

10   had the title.

11       Q.   Okay.  And what were you responsibilities there

12   at the polling location?

13       A.   I was -- what was it?  I was -- I -- served as

14   the election judge, assistant election judge.  So I

15   monitored the election.  If there were any issues that

16   came up, I was there to resolve them.  There were not.

17   And then at the end of the night, I do remember taking

18   the box.  They used -- they used to take the boxes to --

19       Q.   Central tabulation?

20       A.   Yeah.  Well, you know where Palmer Event

21   Center -- there used to be a building next to Palmer

22   Event Center, but they tore it down.  Whatever that

23   building was, I took the box there and had to turn it in

24   official.  And then by election code, you have to keep

25   the documents for two years.  And so I was the custodian



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1      of the documents for that precinct for two years.

2          Q.   All right.  Were you actually assigned the

3      responsibility of enrolling voters as they came in?

4          A.   I did not sit there and check the voters.

5      That, the election workers did that.

6          Q.   And did you do that during early vote or

7      election day or both?

8          A.   It was only on election day.

9          Q.   Do you remember the precinct?

10         A.   No.  The precinct number, no, sir.

11         Q.   Do you remember the actual location?

12         A.   There was a church just at 45th and Medical

13     Parkway.

14         Q.   While there, did you observe any activity that

15     you were concerned might be election fraud?

16         A.   No.

17         Q.   Have you served in an election judge or

18     election official capacity any other time than we just

19     spoke about?

20         A.   No.

21         Q.   Now, you said somebody called you and asked you

22     to do this.  Do you remember who that was?

23         A.   No, sir.

24         Q.   Was it a party official or a county official?

25         A.   I think it was a party official.  Travis County



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

231

1        Republican party official.
2             Q.   Was it the chairman?
3             A.   I don't recall.
4             Q.   I assume that you vote in most elections?
5             A.   Yes, sir.
6             Q.   Do you vote in both nonpartisan and partisan
7        elections?
8             A.   Yes, sir.
9             Q.   And you're going to hate me for asking this,
10       but it's important for several questions, what year were
11       you born?
12            A.   1969.
13            Q.   All right.  I tried to do it as gingerly as I
14       could.
15            A.   I'm not embarrassed.
16            Q.   So I assume since you turned 18 and since then,
17       you have more or less consistently voted?
18            A.   Yes, sir.
19            Q.   Whenever you have voted in Texas, have you ever
20       observed activity that made you concerned it would be
21       voter fraud?
22            A.   No, sir.
23            Q.   Have you ever voted in an election and observed
24       discriminatory behavior by an election clerk?
25            A.   No, sir.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                    MAY 16, 2012

232

1        Q.   I think you also testified that you've lived in
2    Texas your whole life; is that true?
3        A.   Yes, sir.
4        Q.   Have you, during that time, ever witnessed an
5    act of discrimination against a minority citizen in
6    Texas?
7              MR. FREDERICK:  Object as vague.  Object
8    to relevance.  But you can answer.
9        A.   Yeah.  I don't -- I don't know that I can
10   answer that question because it's vague.  I mean --
11       Q.   (By Mr. Dunn)  Well, I'll do -- I'll see if I
12   can do better.  All right?
13       A.   Okay.
14       Q.   Have you ever seen a government official deny a
15   benefit or service to a minority citizen?
16       A.   No, sir.
17       Q.   Have you ever seen another citizen in Texas
18   treat a minority citizen with some degree of disrespect?
19       A.   Another citizen?
20       Q.   Yes, ma'am.
21       A.   So one citizen treating somebody else with
22   disrespect?  Yes, sir.
23       Q.   And was that an Anglo to an African-American or
24   an Anglo to a Latino or something different?
25       A.   I think in all instances I have seen people



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

233

1       treat people poorly, whether it's minority on minority

2       or Anglo on minority or minority on Anglo, I've seen it

3       all.  And I've lived 43 years, you see a lot of

4       disrespect.

5           Q.   So, in your opinion, there's not a higher

6       degree of discrimination amongst the citizenry between

7       Anglos and minority population in Texas anyway?

8           A.   In my opinion, that's correct.

9           Q.   Have you always lived in Austin?

10          A.   No, sir.

11          Q.   Where else have you lived in the state?

12          A.   Houston, in College Station, Bryan/College

13      Station when I was at A&M.

14          Q.   You went to school at A&M?

15          A.   Yes, sir.

16          Q.   Where did you grow up?

17          A.   Houston.

18          Q.   So is it fair to say that you've more or less

19      split your life in-between Houston and Travis County?

20          A.   Yes, sir.

21          Q.   Now, I'm going to move to a different topic, so

22      I'm trying not to lose you here.  But you were asked a

23      number of questions about the various photo voter ID

24      bills over the last several sessions about documents

25      prepared as part of the legislative process.  Okay.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1    That's where I'm going now.

2        A.   Yes, sir.

3        Q.   And you were asked some questions about bill

4    analysis that were prepared.  And I want to focus on SB

5    14 for a minute.  The bill analysis prepared for SB 14

6    was created by whom?

7        A.   The bill analysis that was created by Senate

8    Bill 14 as it came out of Senate, as it was filed, as it

9    came out of Senate committee as it was grossed,

10   engrossed, was prepared by Senate Research Center,

11   essentially, via the Senate administrative process.

12            The House, when it made it over there,

13   their processes developed their own bill analysis for

14   use.  I don't really recall -- I don't know who does

15   theirs.

16       Q.   All right.

17       A.   They probably base it on ours, but they do

18   their own.

19       Q.   And I want to focus on the Senate report

20   first.  The Senate report was prepared by Senate

21   Research, if I understood your answer right.

22       A.   That's -- yes.

23       Q.   Okay.  And I want to make sure we're being very

24   specific about that.

25       A.   Right.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1      Q.   Was it completely created by and put out by

2   Senate Research, or did it include language provided by

3   you or somebody in your office?

4      A.   Senator Fraser, through me, provides language

5   to the committee chair and their staff, and in this

6   case, Senator Duncan chaired Senate State Affairs.  They

7   then take that information and submit it to Senate

8   Research Center.  I don't know for sure if they used my

9   language verbatim.  Sometimes they do.  Sometimes they

10   don't.  And on this instance, I do not recall if they

11   used any of my language verbatim.

12      Q.   And so just to be clear in our record, do you

13   recall whether or not the language your office submitted

14   to Senator Duncan's staff was changed at all when it was

15   submitted by Senator Duncan's staff to Senate research?

16      A.   I do not recall.

17      Q.   Who was it with Senator Duncan's staff you

18   would have coordinated on the research analysis?

19      A.   Jennifer Fagan.

20      Q.   Was any convincing or cajoling necessary to

21   convince Senator Duncan's staff to support this bill?

22           MR. FREDERICK:  Object, legislative

23   privilege.  Instruct you not to answer.

24      A.   I'll assert privilege.

25      Q.   (By Mr. Dunn)  With respect to the -- in



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

236

1    addition to the bill analysis, a fiscal note was also

2    prepared; is that true?

3         A.   Yes, sir.

4         Q.   And was that prepared by the Legislative Budget

5    Board?

6         A.   Yes, sir.

7         Q.   Can you recall if, and I'm not asking for the

8    numbers, but from the various sessions you've been asked

9    about photo ID bills today, can you recall if there were

10   any changes to the fiscal note of the bill in its

11   various iterations?

12        A.   I don't recall what the fiscal note was in

13   2007.  I think in 2009 the number stayed somewhere in

14   the 2 to 4 million dollar range.

15        Q.   Do you remember who the analyst at LBB was on

16   these bills?

17        A.   I did not know the analyst at LBB.

18        Q.   Did you ever communicate with the analyst at

19   LBB?

20        A.   No, sir.

21        Q.   Did you ever provide LBB any estimates as to

22   your belief as to the fiscal impact of the bill?

23        A.   No, sir.

24        Q.   Did you ever do or conduct any research as to

25   what the fiscal impact of the bill would be?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

237

1          MR. FREDERICK:  Object, based on

2    legislative privilege.  Instruct you not to answer to

3    the extent it reveals the substance of any research.  I

4    instruct you not to answer.

5          A.    I'll assert privilege.

6          Q.    (By Mr. Dunn)  Stepping way from this bill for

7    a minute, is it generally important that a bill in the

8    legislature not have a fiscal impact or have a minimal

9    fiscal impact in order to pass?

10         MR. FREDERICK:  Object, vagueness, but you

11   can answer.

12         MR. DUNN:  I'll strike the question and

13   rephrase.  How about that?

14         Q.    (By Mr. Dunn)  Is it -- bills with a large

15   fiscal impact, do they typically get defeated or fail?

16         A.    They take longer to pass.

17         Q.    And they -- and because the bill involves a

18   larger fiscal impact, that means the state has to divert

19   financial resources to the bill's tenants; is that true,

20   if it were to pass?

21         A.    No.

22         Q.    Well, I assume that in all these years that

23   you've worked for Senator Fraser and perhaps others, you

24   have prepared a lot of bills and received a lot of

25   fiscal impacts on bills; is that true?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

238

1        A.   Yes, sir.

2        Q.   Is it not typically bad news when you received

3   a fiscal impact statement from LBB that puts money on

4   the cost of a bill?

5             MR. FREDERICK:  Object to vagueness.  You

6   can answer.

7        A.   Well, I think I need you to ask the question

8   better.  I don't -- can you ask the question again?

9        Q.   (By Mr. Dunn)  Uh-huh.  Is it more difficult to

10  pass a piece of legislation when it has a fiscal impact

11  statement from LBB that it costs a considerable amount

12  of money?

13       A.   Not always, but the majority of the time, yes,

14  you'd rather have a zero fiscal note than not.  Or have

15  a low fiscal note than not.

16       Q.   And just so our court, which may not understand

17  the process here in Texas, our budget here in the state

18  is prepared either by the House Appropriations Committee

19  or the Senate Finance Committee in alternating sessions;

20  is that true?

21       A.   That's true.

22       Q.   And so if a member wants to pass a bill that

23  has a fiscal impact, they typically have to go to either

24  the Appropriations or Finance Committee and work out an

25  arrangement to pay for the bill; is that also true?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                    MAY 16, 2012

239

 1        A.    Yes.

 2        Q.    All right.  What efforts were made -- is it

 3   true then that Senate Bill 14 had a fiscal impact

 4   according to the LBB?

 5        A.    Yes.

 6        Q.    What steps were taken to make sure the funding

 7   would be available for the bill?

 8        A.    In 2007, no, I'm sorry.  I get my years -- in

 9   2009 -- well, let's back up.

10             So when a bill has a fiscal impact, you

11   need a Finance Committee member to propose an amendment

12   to the budget or a rider or some sort of mechanism to

13   get that included, a contingency rider, sometimes.  In

14   2007, I want to say that -- I can't remember if I did

15   one of those or not.  In 2009, I'm sorry.  Sorry.

16   2009.  In 2007, I don't -- I didn't do anything with the

17   budget of the bill.  I don't remember that.

18             In 2009, I think we prepared a contingency

19   rider, and I think we asked another senator who was on

20   the committee to move that forward, who was a supporter

21   of the bill.

22             In 2011, I don't recall that I did any

23   work on trying to -- on behalf of Senator Fraser in

24   trying to get money in the budget.

25        Q.    Is the short answer with respect to Senate Bill



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                            MAY 16, 2012

240

1    14, in 2011, you can't recall what, if anything, you did
2    to get the bill funded?
3         A.   I don't recall that I did anything to get the
4    bill funded --
5         Q.   All right.
6         A.   -- on behalf of Senator Fraser.
7         Q.   Senator Fraser has served on the Finance
8    Committee before, has he not?
9         A.   Yes, he has.
10        Q.   When did that service stop?
11        A.   I don't recall.  2005 or 2007.
12        Q.   Do you recall the senator you approached in
13   2009 to hold the contingency rider on the committee?
14        A.   I do not.
15        Q.   Do you know who carried it in 2011?
16        A.   I do not.
17        Q.   Just for our record, which -- was the
18   appropriation bill in '11 out of the house or out of the
19   Senate?  Or do you remember?
20        A.   I don't remember.
21        Q.   I don't either so I was hoping you did.
22        A.   I try to forget.
23        Q.   All right.  As part of the fiscal analysis for
24   the bill, did you participate in trying to determine
25   what it would cost to fully fund antifraud technologies



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

241

1     in voting locations?

2               MR. FREDERICK:  I'm going to object on the

3     basis of privilege, to the extent it calls for the

4     substance of any communications or your thought process,

5     mental impressions, but the question as phrased, you may

6     answer it as long as you don't reveal those matters.

7         A.   Senator Fraser and I didn't do any work on

8     developing what the fiscal note looked like or what the

9     agency said it would cost them or not cost them.  So we

10    did nothing on the fiscal impact.

11        Q.   (By Mr. Dunn)  All right.  Fair enough.  So

12    I'll ask this question:  Did you, though, in working on

13    the bill, in any session, come to learn of various

14    technologies that have been developed or being developed

15    that can be used in polling locations to stop voter

16    fraud?

17              MR. FREDERICK:  Object to legislative

18    privilege.  Instruct you not to answer.

19        A.   I'll assert privilege.

20        Q.   (By Mr. Dunn)  With respect to Senate Bill 14,

21    do you know which legislator or which legislator's staff

22    was the point person for the fiscal impact of the bill,

23    if it wasn't you?

24        A.   I mean --

25              MR. FREDERICK:  If you know.


ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                    MAY 16, 2012

                                                          242

1          A.   When a bill moves to the legislative process,

2     the committee staff in the committee is responsible for

3     asking LBB for a fiscal note.  LBB then asks the

4     different agencies that are impacted how much it will

5     cost.  That comes back, gets attached to the bill, and

6     we move forward.

7               I mean, I don't -- I mean, I think -- I

8     mean, I don't know that I can be responsive to your

9     question, because I don't know that any legislative

10    staff directed anybody to provide that type -- those

11    numbers.  It's just that's what happened.  That's what

12    we got back from legislative budget board.

13         Q.   (By Mr. Dunn)  Let me try a different way of

14    phrasing the question.  Do you know and can you name for

15    us any staffer that was involved in formulating the

16    fiscal impact of this bill or coordinating with LBB?

17         A.   No.

18         Q.   Okay.  As I understand your description earlier

19    of your job responsibilities, you principally handle the

20    Capitol office for Senator Fraser and his legislative

21    priorities; is that true?

22         A.   Yes.

23         Q.   Do you have any district office

24    responsibilities?

25         A.   Only insomuch as I oversee the same



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

243

1    administrative functions for those three employees, and

2    they call me and bounce things off me about meetings or

3    issues or case work that they're working on.

4        Q.   Do you go out into the district?

5        A.   I have.  I haven't done it in the last couple

6    of years.

7        Q.   Senator Fraser's district is, gross

8    generalization, but more or less northwest of the Austin

9    area; is that true?

10       A.   He would categorize it as the Hill Country from

11   Kerr County to Abilene, from Belton to Menard.

12       Q.   All right.

13       A.   Junction.

14       Q.   Where are his district offices?

15       A.   Abilene, Belton and Marble Falls.

16       Q.   Is there an area in the district that has a

17   high degree of African-American, Latino or Asian

18   population?

19       A.   I would assume Bell County probably has our

20   largest minority population because it's our largest

21   county.

22       Q.   How would you describe that minority?  I mean,

23   is it Latino, African-American mixed?

24       A.   African-American.

25       Q.   I think you were asked earlier if you knew the



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

244

1      percentage of Latinos you have in your district.  I
2      think you said you didn't know; is that true?
3              A.    That's true.
4              Q.    Do you have an estimate?
5              A.    No, sir.
6              Q.    Do you have an estimate for the number of
7      African-Americans in your district?
8              A.    No, sir.
9              Q.    Do you have an estimate for the number of
10     Asians in your district?
11             A.    No, sir.
12             Q.    You've been with Senator Fraser for 10 years.
13     Did I hear that right?
14             A.    Since 1998.
15             Q.    '98.  All right.  So about 14 years?
16             A.    Yes, sir.
17             Q.    In the 14 years, what activities have you taken
18     or Senator Fraser taken to support the minority
19     community in his district?  Any bills, business,
20     meetings, or legislative business undertaken for those
21     groups?
22                   MR. FREDERICK:  I'll object on legislative
23     privilege, only to the extent that your answer would
24     require you to reveal thought process, mental
25     impressions or confidential communications related to


ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

245

1      pending legislation.  To the extent you can answer

2      without revealing that, you may answer.

3          A.   Senator Fraser votes and promotes and works

4      with every constituent equally.

5          Q.   (By Mr. Dunn)  And I appreciate that.  I'm just

6      trying to find out, can you name for us some bills or

7      meetings or sort of administrative lobbying he's done on

8      of behalf of the minority constituents in his district?

9          A.   No.

10         Q.   Now, with regard to your district

11     responsibilities, do you ever go out and take the place

12     of the Senator at an event or speak to group because

13     he's unavailable?

14         A.   I have in the past.  I have not done it in

15     about three years.

16         Q.   What sort of events would you go speak to?

17         A.   They weren't necessarily speaking events where

18     it was a public forum.  They typically would just be

19     meetings with various constituency groups that wanted to

20     express concerns or opinions to our office.

21         Q.   Are there -- if I understand the testimony

22     earlier, there's sort of a schedule kept by your office

23     of where the Senator goes and does.  It doesn't have

24     everything, but it has some things; is that right?

25         A.   Yes, sir.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                          MAY 16, 2012

246

1          Q.    Would it also include the events that you
2     attended or another staff attended on his behalf?
3          A.    No, sir.
4          Q.    Those would be kept on the staffer's private
5     calendar?
6          A.    That's correct.
7          Q.    Can you recall ever have gone to an event in
8     place of Senator Fraser and speaking with a group of
9     African-Americans or Latinos?
10         A.    I've gone to events where African-Americans and
11    Latinos were present but nothing specific to those
12    groups.
13         Q.    Not a group or event where they made up the
14    predominant population in the attendees?
15         A.    That's correct.  I have not.
16         Q.    Have you attended any public meetings in
17    Senator Fraser's district as it relates to photo ID?
18         A.    I've attended meetings with the Senator where
19    he has -- speaking to a group where he brings up the
20    topic of photo ID in terms of the legislation that he
21    passed or didn't pass, given whatever year it was, but
22    nothing specific for the meeting specifically about
23    voter ID.
24         Q.    In other words, you didn't go to any rallies or
25    events put together by certain political groups who were



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                          MAY 16, 2012

247

1    pushing photo ID?

2         A.   No, sir.

3         Q.   It would just come up as a part of more general

4    political discussion?

5         A.   Yes, sir.

6         Q.   My question earlier was limited to events in

7    the district.  Now I'm going to ask you about anywhere.

8    Have you been to such events?

9         A.   No, sir.

10         Q.   When is it that photo ID became something you

11    started working on in your office?

12         A.   The spring of 2007.

13         Q.   What caused that project to develop?

14              MR. FREDERICK:  Object, based on

15    legislative privilege.  To the extent you can answer

16    without revealing communications with the Senator,

17    legislators, constituents, or thoughts or mental

18    impression, you can answer.

19         A.   When the Senator agreed to be the House sponsor

20    to House Bill 218.

21         Q.   (By Mr. Dunn)  Prior to agreeing to be the

22    sponsor of House Bill 218, you hadn't researched,

23    drafted bill language or otherwise worked on the photo

24    ID issue?

25              MR. FREDERICK:  Objection, legislative



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

248

1     privilege.  Instruct you not to answer.

2          A.    I'll assert privilege.

3          Q.    (By Mr. Dunn)  The impetus to your office

4     beginning to deal with photo ID, did it have anything to

5     do with a specific event or events actually involving

6     voter impersonation?

7               MR. FREDERICK:  Object on the basis of

8     legislative privilege.  Instruct you not to answer.

9          A.    I'll assert privilege.

10         Q.    (By Mr. Dunn)  Why is it that Senator Fraser,

11    after having been asked in 2007 to carry House Bill 218,

12    why is it that he continued to hold the issue and push

13    it in future sessions?

14              MR. FREDERICK:  Object on the basis of

15    legislative privilege.  To the extent that it -- that

16    the question calls for subjective mental impressions,

17    thought process or confidential communications, I

18    instruct you not to answer.  If you can answer based on

19    nonprivileged matters including public statements or

20    core testimony, you can do so.

21         A.    I think I can say that Senator Fraser has said

22    consistently, public record or public meetings, that he

23    believes that the issue of in-person voter fraud and

24    protecting the integrity of our elections was important,

25    and he wanted to continue to fight.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                                    MAY 16, 2012

                                                                        249

1          Q.   (By Mr. Dunn)  And he came to that conclusion

2     sometime in or around the spring of 2007 when he was

3     asked to support House Bill 218?

4                MR. FREDERICK:  Objection to the extent it

5     mischaracterizes the prior testimony.  Also object on

6     legislative privilege.  I instruct you not to answer.

7          A.   I'll assert privilege.

8          Q.   (By Mr. Dunn)  Is it true that Senator Fraser's

9     issue in the photo ID matter -- strike that.

10               Senator Fraser's interest in the photo ID

11    matter did not develop until he was approached by a

12    member of the House?

13               MR. FREDERICK:  Objection, legislative

14    privilege.  Instruct you not to answer.

15         A.   I'll assert privilege.

16         Q.   (By Mr. Dunn)  You were asked some testimony

17    about Section 5 of the Voting Rights Act.  I'm just

18    telling you that to sort of get you to where I'm going

19    now.

20         A.   Yes, sir.

21         Q.   All right.  And you mentioned something that

22    nine states and some territories are subject to Section

23    5.  Did I hear you correctly?

24         A.   That was my comment.  Yes, sir.

25         Q.   Do you know how it is that those nine states



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

250

1  and territories were made subject to Section 5?

2       A.   My understanding is that it was part of -- back

3  when LBJ was president, but that's as much I could speak

4  to.

5       Q.   In other words, you don't know if there was a

6  formula or some kind of basis used to select the areas

7  subject to Section 5, you're not familiar with it?

8       A.   That's correct.

9       Q.   Are you aware that Section 5 was applied to

10  certain areas because of the history of discrimination?

11      A.   It's my understanding that that was the

12  intent.  Yes, sir.

13      Q.   And do you deny that there's a history of

14  discrimination in Texas?

15      A.   No, sir.

16      Q.   When is it that you think, if you do, that the

17  discrimination in Texas stopped?

18      A.   I don't recall that there being discrimination

19  in my life -- well, in my adult lifetime.

20      Q.   So sometime in your adolescence is when that

21  problem was solved in your view?

22           MR. FREDERICK:  Objection, to the extent

23  misstates the testimony.  You can answer.

24           MR. DUNN:  I'll rephrase.

25      Q.   (By Mr. Dunn)  When in your view was racial



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

251

1          discrimination in Texas resolved?

2              A.   I don't know.

3              Q.   Okay.  But in any event, in your opinion, we're

4          at the point now where federal laws are not required to

5          protect minority citizens in Texas?

6                   MR. FREDERICK:  You may answer to the

7          extent that --

8              A.   My personal opinion is federal law is not

9          necessary to protect minority voters in Texas.

10             Q.   (By Mr. Dunn)  But you believe that minority

11         citizens have an equal opportunity to vote as Anglos or

12         anyone else?

13             A.   That they do?

14             Q.   Yes, ma'am.

15             A.   Yes, sir.

16             Q.   Okay.  That is -- that sort of belief, the

17         belief that everybody that's an American citizen has an

18         equal vote is also part of the law in the constitution,

19         the federal constitution; is that true?

20             A.   Yes, sir.

21             Q.   All right.  So when you draft legislation,

22         whether it's on elections or anything else for the

23         Senator, do you keep that concern in mind to make sure

24         you're complying with that provision of the

25         constitution?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                              MAY 16, 2012

252

```
 1        A.   I --
 2             MR. FREDERICK:  Object on the basis of
 3    legislative privilege, and instruct you not to answer.
 4        A.   I'll assert privilege.
 5        Q.   (By Mr. Dunn)  Do you believe that -- this
 6    is -- I'm going to make sure I'm clear about this.  If
 7    you're confused, ask me.  But do you believe that
 8    government, whether it's state or federal, is capable of
 9    disenfranchising a citizen?  I beg your pardon?
10        A.   I'm sorry.  I'm just thinking in my head.
11        Q.   Oh.
12        A.   What do you mean by "disenfranchising"?
13        Q.   Well, let's say the federal government passed a
14    law that said that people with blue eyes can't vote any
15    longer.
16        A.   So we're specifically talking about elections?
17        Q.   Yes.  Uh-huh.  Such a law would disenfranchise
18    voters.  Would you agree?
19        A.   If you had blue eyes, yes, sir.
20        Q.   All right.  You and I share that trait.  That's
21    why I picked that one.
22        A.   Maybe we shouldn't be voting.
23        Q.   Well, we probably -- well, I won't even say.
24             All right.  With respect to -- there have
25    been laws over the years that have caused voters to be
```



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                          MAY 16, 2012

                                                                    253

1    disenfranchised; would you agree?

2         A.    Previous, yes.

3         Q.    For example, requiring a voter to pay a poll

4    tax.  Would you agree that resulted in disenfranchise?

5         A.    Yes.

6         Q.    Laws that require voters to take a literacy

7    test.  Would you agree that was disenfranchising?

8         A.    Yes.

9         Q.    Do you believe that government can make voting

10   so onerous that it becomes a disenfranchisement?

11              MR. FREDERICK:  Object as vague, but if

12   you have an opinion, you can answer it.

13        A.    I don't believe the government would do that.

14        Q.    Fine.  But if it did, it could become

15   disenfranchising?

16        A.    I think the government could do a lot of things

17   that are bad and does.

18        Q.    So is it your opinion that Senate Bill 14 as

19   passed has no effect on the difficulty in voting in

20   Texas?

21              MR. FREDERICK:  I'll object only to the

22   extent that the question seeks your mental impressions,

23   thought processes related to the development of SB 14

24   and any confidential communications.  As you sit here

25   today, you may answer based on personal knowledge or



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

254

1    opinion.

2        A.    I do not believe Senate Bill 14 disenfranchises

3    voters.

4        Q.    (By Mr. Dunn)  All right.  And that's fair

5    enough, but that's a slightly different answer to a

6    different question.

7              I'm asking:  Do you believe that Senate

8    Bill 14 puts some burden on voting that wasn't there

9    before?

10             MR. FREDERICK:  Same objection and

11   instruction.

12       A.    I'll assert privilege.

13             THE WITNESS:  Can I?  Is that what --

14             MR. FREDERICK:  No.  Let me repeat it just

15   so I'm clear to you.

16             THE WITNESS:  Okay.

17             MR. FREDERICK:  I object based on

18   legislative privilege, only to the extent the question

19   seeks your thoughts or Senator Fraser's thoughts or

20   mental impressions about SB 14 during the process of

21   development and passage or any confidential

22   communications --

23       A.    Okay.

24             MR. FREDERICK:  -- related to it.  To the

25   extent that you have a personal opinion or personal



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

255

1    knowledge, as you sit here today, not based on that, you
2    may answer.
3          A.   So the question is?
4          Q.   (By Mr. Dunn)  The question is, what is your
5    opinion as to whether or not Senate Bill 14 places some
6    burden on voting?
7          A.   I don't believe it imposes an additional burden
8    on voting that makes it hard for anybody to vote.
9          Q.   And so I just want to make sure I understand.
10   You don't think that there's any burden, or you think
11   that the burden is insignificant?
12         A.   I think the burden is insignificant.
13         Q.   All right.  And so whereas a burden that would
14   come from a poll tax or a literacy test is some degree
15   higher -- well, let me just strike that.
16              Where do you draw the line between the
17   burden of a poll tax, for example, and the burden
18   created by the photo ID requirement?
19              MR. FREDERICK:  Object as vague.
20         A.   I don't know that I personally believe that the
21   burden of having a photo ID is a burden or having a
22   photo ID is a burden.
23         Q.   (By Mr. Dunn)  I see.  All right.  Well, have
24   you worked on -- you staffed State Affairs for some
25   period of time I think you said, right?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                          MAY 16, 2012

256

1       A.   Yes, sir.

2       Q.   And State Affairs in the Senate is where most

3   election bills go through unless --

4       A.   Yes.

5       Q.   -- there's a special rule set up?

6       A.   Yes, sir.

7       Q.   All right.  In this case, Senate Bill 14 didn't

8   go through State Affairs because the Committee of the

9   Whole was created; is that true?

10      A.   That's true.

11      Q.   But typically, the committee with senators who

12  have the background and knowledge about election matters

13  are in State Affairs?

14      A.   Yes, sir.

15      Q.   There have been a number of bills that have

16  been passed by the state legislature in the last several

17  sessions that relate to election laws; is that true?

18      A.   Yes, sir.

19      Q.   There have also been a number that relate to

20  voter registration; is that true?

21      A.   Yes, sir.

22      Q.   Are you familiar with bills that have created

23  new requirements for deputy voter registrars in Texas?

24      A.   Not specifically, no.

25      Q.   All right.  Are you familiar with any bills



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

257

1     that create additional burdens in order to become

2     registered to vote in Texas?

3         A.   I don't recall that we passed anything about

4     registering to vote since HAVA or that doesn't comply

5     with HAVA.

6         Q.   So if things have been passed since then, you

7     just don't recall it?

8         A.   That's correct.

9         Q.   Now, could you see a scenario where the -- and

10    I'm using your language, the insignificant burden of SB

11    14 added on to a burden of voter registration, added on

12    to a burden of deputy registrars, could add up to

13    disenfranchisement in time?

14             MR. FREDERICK:  Objection, calls for

15    speculation.  You can answer if you can.

16        A.   I don't know what the changes were to voter

17    registration and deputies, so I cannot answer the

18    question.

19        Q.   (By Mr. Dunn)  But you would agree that if we

20    take stacks of hairs and we continue to stack the hairs,

21    sooner or later we'll get to the thickness of a quarter?

22             MR. FREDERICK:  Objection, vague.  You can

23    answer if you can.

24        A.   I don't believe that Senate Bill 14 was passed

25    in a vacuum, and I think we recognized what the rest of



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

258

1     the election code did when we passed it.

2          Q.   (By Mr. Dunn)  So it's your testimony then that

3     whatever burden, if there is one on Senate Bill 14, does

4     not add into other burdens if there are in state law to

5     the right to vote?

6               MR. FREDERICK:  Object to the extent it

7     mischaracterizes prior testimony, but you can answer.

8          A.   I don't know that I said there were other

9     burdens.  So, I mean.

10         Q.   All right.  What burdens are there, if any, to

11    the voting in Texas?

12         A.   I don't believe there are any burdens currently

13    to voting in Texas.

14         Q.   Are you familiar with new regulations adopted

15    by the Department of Public Safety relating to documents

16    required to be presented in order to get an ID or

17    driver's license?

18         A.   I have recently read news clips saying they did

19    that.  Yes, sir.

20         Q.   These are new regulations that came out May the

21    1st; is that true?

22         A.   I don't know the date, but recent, yes, sir.

23         Q.   Very recently?

24         A.   Yes, sir.

25         Q.   DPS also adopted some new regulations shortly



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

259

1    in advance of the last legislative session, did they

2    not, with respect to information that had to be provided

3    to get a driver's license or ID?

4         A.   I think that's correct.  Yes.

5         Q.   So is it your opinion that as DPS continues to

6    add requirements to getting a driver's license or an ID,

7    that doesn't create a burden, even ever so slight, to

8    voting?

9         A.   Well, Senate Bill 14 provides with other forms

10   of ID, so you could use one of those forms, those five

11   other forms, four other forms, to vote if you didn't

12   want to get a driver's license.

13        Q.   So if the state, whether it be through the

14   legislature, the agency makes it extremely difficult to

15   get a driver's license, that's not a burden, in your

16   view, because there are other IDs that can be obtained.

17   Do I have that right?

18             MR. FREDERICK:  Object to the extent it

19   misstates prior testimony.  You can answer.

20        A.   I don't -- can you say that, can you repeat

21   your question?

22             MR. DUNN:  Sure.  Would you mind reading

23   that one?

24             (Requested portion read back by the court

25   reporter.)



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                    MAY 16, 2012

                                                            260

1               MR. FREDERICK:  Object, again, as

2       vague.  Object to the extent it mischaracterizes the

3       prior testimony.  And object, it calls for speculation.

4       But you can answer.

5               (Cell phone buzzes.)

6       Q.   (By Mr. Dunn)  Do you need to deal with that?

7       A.   I need to just turn it off.

8       Q.   I know you have twins.  If you need to get it.

9       A.   No. My husband has them.

10              I don't know that what we -- what DPS has

11      done is created a burden in terms of getting a driver's

12      license.  And I believe that Senate Bill 14 provided

13      with other mechanisms if you didn't want to use a

14      driver's license as a photo ID to vote.

15      Q.   All right.  Well, did you or anybody in your

16      office have any coordination with DPS and its adoption

17      of regulations relating to obtaining a driver's license

18      or ID?

19      A.   No.

20      Q.   Are you aware of any impediments to DPS through

21      its rule-making authority to create other requirements

22      for folks to bring in order to obtain one of these state

23      IDs?

24      A.   No.

25      Q.   So then it would be true that even under the



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

261

1    current sort of situation and regulation in which we're

2    judging Senate Bill 14, that could easily change should

3    DPS decide to alter its regulations?

4              MR. FREDERICK:   Objection, calls for

5    speculation, but you can answer.

6         A.   I don't think I can answer the question.   I

7    can't speculate what DPS will or won't do.

8         Q.   (By Mr. Dunn)   I don't think I was asking you

9    to speculate.

10         A.   Okay.

11         Q.   I guess all I was asking is since DPS

12    regulations are as fluid as DPS wants to create rules,

13    you would agree with me the effect of Senate Bill 14

14    will change as those requirements change?

15         A.   I disagree because DPS has to operate within

16    statute, and if statute is clear, then DPS rules can't

17    go beyond that.

18         Q.   Was there anything in Senate Bill 14 that

19    authorized DPS to require documentation of 30-day

20    residency in order to get a voter ID or a driver's

21    license?

22         A.   No, sir.

23         Q.   So do you know what their statutory authority

24    was for doing that?

25         A.   No, sir.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                           MAY 16, 2012

                                                                  262

 1        Q.   If there was statutory authority, it would have
 2   had to come from someplace other than Senate Bill 14?
 3        A.   That's correct.
 4        Q.   All right.  Now, I'd like to ask you a little
 5   bit about the 21-vote rule.  And I understand that you
 6   say it's not a rule, so I'm not trying to put the word
 7   "rule."  How do you want to refer to it, the 21-vote
 8   tradition?
 9        A.   We can call it a rule if you'd prefer, if that
10   makes it easier for you.
11        Q.   All right.  A bill or measure in the Senate in
12   order to pass out of the body under typical rules and
13   traditions requires 21 votes, if all 31 senators are
14   present?
15        A.   It requires -- yes, sir, if all 31 senators are
16   present.  Yes, sir.
17        Q.   All right.  And if there's some number below 31
18   senators, then two-thirds of the number who are present
19   is required, so long as there's a quorum; is that true?
20        A.   Yes, sir.
21        Q.   What measures can you recall in your 14 or so
22   years of experience have been passed out of the Senate
23   without complying with the two-thirds tradition?
24        A.   Besides photo ID, I don't know of any.
25        Q.   Now, you gave some testimony earlier -- well,



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

263

1    strike that.

2              The 31 senators who are in the Senate are

3    the only people eligible to vote in the Senate.  Seems

4    like a silly question, but that's true; is that right?

5         A.   That's true.

6         Q.   All right.  So you either have to convince the

7    requisite number of those senators to support your

8    measure or you have to somehow change the electorate; is

9    that true?

10        A.   Change the electorate.  I don't understand.

11        Q.   These 31 senators.  You either got to convince

12   --

13        A.   Right.

14        Q.   -- two-thirds or a majority, whatever you

15   need --

16        A.   Right.

17        Q.   -- or you got to beat a senator or two in an

18   election?

19        A.   That's correct.

20        Q.   As I understand earlier forms of photo ID,

21   because there wasn't the two-thirds vote in the Senate,

22   the maneuver then was to have the vote when one senator

23   who opposed the bill was missing; is that true?

24        A.   Yes.

25        Q.   And that happened on at least one occasion when



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

264

1      Senator Uresti was not around?

2          A.    In terms of voter ID, yes.

3          Q.    And it was senators, I'm not asking you to

4      identify whom, but it was senators who came up with this

5      maneuver of trying to get a bill through when there

6      wasn't two-thirds of the -- when you didn't have a

7      senator present.

8                MR. FREDERICK:  I'll object on legislative

9      privilege.  Instruct you not to answer it.

10               MR. DUNN:  Okay.  And I'm not talking

11     about Senate Bill 14.  I'm talking about process in

12     general in the Senate.  So is it your -- is it your

13     instruction to her, she can't talk about the two-thirds

14     rule in general?

15               MR. FREDERICK:  No.  That's not my

16     instruction to her.

17               MR. DUNN:  Oh, okay.  All right.  I just

18     didn't want to keep asking the same question.

19               MR. FREDERICK:  No, no, I hear you.

20         Q.    (By Mr. Dunn)  All right.  So -- let me just

21     start over.

22               Your experience there in the Senate is

23     that senators occasionally will wait for an opponent

24     senator to not be in the chamber in order to push a

25     bill?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                          MAY 16, 2012

265

```
 1          A.   Yes, sir.
 2          Q.   All right.  And the hope then is to get the
 3     bill passed and get two-thirds while this other senator
 4     is out of the room?
 5          A.   Yes, sir.
 6          Q.   And sometimes it might take a couple of
 7     senators out of the room; is that true?
 8          A.   Yes.
 9          Q.   There's a tradition in the Senate, though, on
10     big and large and hot button measures that senators ask
11     the chair that a bill not come up when they have to be
12     away from the Senate; is that true?
13               MR. FREDERICK:  Objection, vague.  You may
14     answer.
15          A.   It has been done, to my knowledge, yes.
16          Q.   (By Mr. Dunn)  And now here's where I'll get
17     his objection.  All right.
18               Do you know if Senator Uresti asked
19     whoever was in the Lieutenant Governor's chair, don't
20     bring up this bill while I'm out of the chamber?
21               MR. FREDERICK:  I'll object on legislative
22     privilege, to the extent it calls for a confidential
23     communication from a legislator or staff, or -- yeah,
24     but to the extent it's in the public record or the
25     Senate, you may answer.
```



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

266

1       A.   I don't know Senator Uresti's discussions with

2   Governor Dewhurst's office.

3       Q.   (By Mr. Dunn)  Now, senators who have it in

4   their intent when they pass a bill, to try to get the

5   bill passed without another member present, that senator

6   could also have the intent to conduct elections in Texas

7   where certain members can't participate?

8            MR. FREDERICK:  Objection, calls for

9   speculation.

10      A.   I disagree.

11      Q.   (By Mr. Dunn)  Have you ever done any research

12  or been presented any data as to whether or not there's

13  racially polarized voting in Texas?

14           MR. FREDERICK:  I'll object, legislative

15  privilege, to the extent that you have performed any

16  such research in connection with pending legislation.

17  I'm instructing you not to answer on the basis of

18  legislative privilege.

19      A.   I'll assert privilege.

20           MR. DUNN:  So even sitting -- not talking

21  about Senate Bill 14, just in general, are you familiar

22  with whether or not there's racially polarized voting in

23  Texas, you're instructing her not to answer on that?

24           MR. FREDERICK:  No.

25           MR. DUNN:  Okay.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

267

1          MR. FREDERICK:  If you're asking her, in

2    general, is she aware of whether or not there's racially

3    polarized voting, that's different.  If you're asking

4    her whether she's performed research in her role as the

5    senate staffer, that I would object to.

6          MR. DUNN:  I see.

7     Q.    (By Mr. Dunn)  Are you aware of whether or not

8    there's racially polarized voting in Texas?

9     A.    I am not aware.

10    Q.    Do you know what racially polarized voting is?

11    A.    Not necessarily.

12    Q.    Have you ever worked on campaign staff?

13    A.    No.  I'm sorry.  When I first got out of

14   college, I worked for a political consultant, but we had

15   several campaigns, and I never actually staffed a

16   campaign.

17    Q.    Do you play any role in Senator Fraser's

18   reelection campaign?

19    A.    I do Senator Fraser's campaign books.  Senator

20   Fraser hasn't had a campaign for several years.  So I

21   have helped him develop press releases saying he's

22   running for reelection, but that's the extent of it.

23    Q.    All right.  When you say his books, are you

24   talking about the Ethics Commission reports?

25    A.    Yes, sir.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

268

```
 1        Q.   All right.  But you don't actually direct
 2   political strategy for him?
 3        A.   No, sir.
 4        Q.   Do you do that for any other candidate?
 5        A.   No, sir.
 6        Q.   Did you have any involvement in redistricting
 7   this last election cycle?
 8        A.   No, sir.
 9        Q.   Did you make any recommendations to
10   redistricting members or their staff as it related to
11   the makeup or the shape of Senator Fraser's district?
12             MR. FREDERICK:  I'll object on privilege,
13   only to the extent that your answer would reveal
14   confidential communications or thought processes, the
15   fact of whether or not you did.  You may answer.
16        A.   Yes.
17        Q.   (By Mr. Dunn)  Who was it that you spoke with
18   about Senator Fraser's district?
19        A.   Senator Seliger.
20        Q.   He was the chairman of the redistricting effort
21   in the Senate; is that true?
22        A.   Yes, sir.
23        Q.   Anyone else?
24        A.   His asides, probably other staff, legislative
25   staff, other senators, members, staffs.
```



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

269

1       Q.   What was the characteristic of the changes

2   Senator Fraser wanted to his district?

3              MR. FREDERICK:  Objection, legislative

4   privilege.  I'm instructing you not to answer.

5       A.   I'll assert privilege.

6       Q.   (By Mr. Dunn)  All right.  Earlier we asked, I

7   asked you about discrimination in Texas.  Are you aware

8   of any courts in Texas finding that legislative acts

9   have a discriminatory effect or purpose?

10      A.   Not specifically, no.

11      Q.   Are you aware that in this most recent

12  redistricting cycle, a panel of judges in San Antonio

13  unanimously found that parts of the redistricting plan

14  in Texas either had a discriminatory effect or purpose?

15             MR. FREDERICK:  Object to the extent it

16  assumes facts not in evidence.

17      A.   I didn't follow.

18      Q.   (By Mr. Dunn)  You didn't follow?

19      A.   No, sir.

20      Q.   Did you follow the United States Supreme Court

21  opinion in 2003 where a majority of that court found

22  that Texas legislature had been racially discriminatory

23  in redistricting?

24      A.   No, sir.

25      Q.   At least with respect to the legislators that



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

270

1    passed Senate Bill 14, the vast majority of them were

2    the same ones that passed the legislative redistricting

3    in both 2003 and the most recent set; is that true?

4        A.   I'm sorry.  I don't know the votes of

5    redistricting in 2003.  The votes of the redistricting

6    bill in 2011, I think only two senators voted against

7    it, and those two senators also voted against voter ID.

8             MR. DUNN:  All right.  So I object to the

9    responsiveness.

10       Q.   (By Mr. Dunn)  I guess all I'm asking, though,

11   is that the senators that voted in support of

12   redistricting in 2011 were the same body of senators

13   that voted on Senate Bill 14?

14            MR. FREDERICK:  Object to the extent it

15   assumes facts not evidence, but you can answer if you

16   know.

17       A.   Yes.

18       Q.   Is it also true that the champions, so to

19   speak, the people who were pushing the redistricting

20   effort in the Senate, were also the same senators that

21   were pushing Senate Bill 14?

22            MR. FREDERICK:  Objection, assumes facts

23   not in evidence.  Object, vague.  You can answer if you

24   can.

25       A.   I really honestly didn't work on redistricting.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

271

1      Q.   (By Mr. Dunn)  All right.  I'm going to move to

2   a new topic.  You spoke with Ann McGeehan about Senate

3   Bill 14, if I recall?

4      A.   Yes, sir.

5      Q.   And she was -- she left the Secretary of

6   State's office, what, in January of this year; is that

7   true?

8      A.   She left sometime this -- in the last couple of

9   months.  I don't know exactly when.

10      Q.   Have you had -- and the person that replaced

11   her is a gentleman named Ingram; is that right?

12      A.   Keith Ingram.  Yes, sir.

13      Q.   Keith Ingram.  Have you spoken with him at all

14   about Senate Bill 14's implementation?

15      A.   About Senate Bill 14's implementation.  I

16   talked -- I don't recall.  I know I think I've talked to

17   him.  I don't know if it's specifically about Senate

18   Bill 14.

19      Q.   Turning back to Ms. McGeehan, did she testify

20   in either the House or the Senate committee as a whole

21   on Senate Bill 14?

22      A.   She testified on Senate Bill 14, yes, in the

23   Senate.  Yes, sir.

24      Q.   Did she testify in favor or opposition to it?

25      A.   She testified on as a resource witness.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                          MAY 16, 2012

272

1       Q.   In other words, she didn't express an opinion

2   on behalf of the Secretary of State as to whether or not

3   Senate Bill 14 was a good idea?

4       A.   Not that I recall.

5       Q.   Was there any effort by you to encourage

6   Ms. McGeehan to get behind the bill in her testimony?

7            MR. FREDERICK:  Objection, legislative

8   privilege.  I would instruct you not to answer.

9       A.   I'll assert privilege.

10      Q.   (By Mr. Dunn)  In your -- I'm going to do

11  several questions.  He's going to object, and you're

12  going to answer, but I just want to get these out here.

13           In your conversations with Ms. McGeehan,

14  did you ask her to provide you data on election returns

15  and how they might be impacted by the photo ID

16  requirement?

17           MR. FREDERICK:  Objection, legislative

18  privilege.  I'll instruct you not to answer.

19      A.   I'll assert.

20      Q.   (By Mr. Dunn)  Did you provide Ms. McGeehan any

21  data or research that you had performed on the effect of

22  the photo ID requirement on turnout?

23           MR. FREDERICK:  Objection, legislative

24  privilege.  I'll instruct you not to answer.

25      A.   I'll assert.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

273

1      Q.   (By Mr. Dunn)  Did you request at any time that
2   the Secretary of State's office prepare research or
3   analysis on whether or not the photo ID requirement
4   would have a disparate impact on minority citizens?
5            MR. FREDERICK:  Objection, legislative
6   privilege.  Instruct you not to answer.
7      A.   I'll assert.
8      Q.   (By Mr. Dunn)  Are you aware -- this one ought
9   to get past the bully here.
10           Are you aware that the Secretary of
11  State's office has data and computer staff that might be
12  capable of performing an analysis about the impact of a
13  particular legislation on minority citizens?
14     A.   I've seen the data that they prepared for the
15  Department of Justice, so yes, I know that now.
16     Q.   You know that they are capable of doing that?
17     A.   Yes, sir.
18     Q.   The data, though, that's been prepared for the
19  Department of Justice, all that came about after Senate
20  Bill 14 had been passed by legislature and signed by the
21  Governor, true?
22     A.   True.
23     Q.   Other than the resource of the Secretary of
24  State's office, are you familiar with any other
25  organization that you had sort of access to that could



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                    MAY 16, 2012

274

1    have performed an analysis, what I would call an

2    analytical analysis of whether or not Senate Bill 14

3    would have disparate impact on minorities?

4              MR. FREDERICK:  I'll object on the basis

5    of legislative privilege, only to the extent that it

6    seeks thought process or mental impressions during the

7    development and passage of SB 14, to the extent it --

8    he's asking you as you sit here today, are you aware.

9         Q.    Let me fix the question.

10             What resources other than Secretary of

11   State did you have to consult about doing data type

12   analysis on the effect of SB 14 on minorities?

13             MR. FREDERICK:  I'm sorry.  Could you

14   read -- read the question back, sir?

15             (Requested portion read back by the court

16   reporter.)

17             MR. FREDERICK:  I'm going to object on

18   legislative privilege.  I think that gets into thoughts

19   and mental impressions.  I'll instruct you not to

20   answer.

21        A.    I'll assert.

22             MR. DUNN:  All right.  And I just want to

23   make sure.  So she's not allowed to tell me what

24   agencies or groups could have performed this analysis

25   that she's aware of?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

275

```
 1                  MR. FREDERICK:  To the extent you're
 2      asking her during -- during the development and passage
 3      of SB 14, what she thought at the time was available to
 4      her to perform specific subject matter, subject matter
 5      specific analysis, yes, I believe that's a thought,
 6      mental impression, that's protected by legislative
 7      privilege.
 8          Q.   (By Mr. Dunn)  Is it your opinion that this
 9      bill will not have the effect of discouraging even one
10      voter?
11                  MR. FREDERICK:  That's -- cautionary
12      instruction, I mean, I think as phrased, to the extent
13      the question seeks your opinion, as you sit here, you
14      may answer.
15          A.   My opinion is that it will not impact one voter
16      negatively.
17          Q.   (By Mr. Dunn)  All right.  If you could go with
18      me to US-31.  Right here on the top.
19          A.   Oh, yes.
20          Q.   I'd like to go with you to the last paragraph,
21      and if I remember your testimony from earlier, you at
22      least prepared the initial draft of 31; is that true?
23          A.   Yes, sir.
24          Q.   All right.  The first sentence of --
25          A.   The first phrase.
```



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

276

1        Q.    And I told you the last paragraph.  I really
2    meant the next to the last one that begins with "voting
3    is"?
4        A.    Okay.
5        Q.    The sentence reads:  "Voting is one of our most
6    important rights as Americans, but it is also a
7    responsibility."  Do you see that?
8        A.    Yes, sir.
9        Q.    In my reading, I don't understand, and I don't
10    think it's defined in the writing here what it was meant
11    be responsibility.  Is there a sentence that informs
12    what that phrase, "but it is also a responsibility," in
13    this document?
14        A.    No, sir.
15        Q.    All right.  So what is it that you meant, at
16    least when you drafted this, about voting is a
17    responsibility?  I mean, why was that in here?
18              MR. FREDERICK:  I object on the basis of
19    legislative privilege, to the extent that it seeks a
20    thought or mental impression about pending legislation
21    that goes -- that -- underlying a public statement.  So
22    I -- as phrased, I would instruct you not to answer the
23    question.
24        A.    I'll assert.
25        Q.    (By Mr. Dunn)  Do you believe that members who



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                         MAY 16, 2012

277

1      don't have a significant population of minority citizens

2      in their district still have to take care to make sure

3      the minority citizens elsewhere in the state are

4      protected under the law?

5          A.   Yes.

6          Q.   In other words, if there's a member that -- and

7      I know this doesn't happen, but if there's a member that

8      just represented 100 percent African-Americans, would it

9      be fair for that member to just ignore the needs of

10     Anglos and Latinos?

11         A.   No.

12         Q.   So when you prepare legislation or help Senator

13     Fraser with legislation, do you consider it one of your

14     responsibilities to make certain that that legislation

15     doesn't have a disparate impact on minority citizens or

16     majority citizens?

17             MR. FREDERICK:  Objection, legislative

18     process.  Instruct you not to answer.

19         A.   I'll assert.

20         Q.   (By Mr. Dunn)  Is there any -- have there ever

21     been situations where you've been working on bills where

22     you believe there was a conflict in your duties under

23     the state constitution and the federal constitution?

24             MR. FREDERICK:  Objection, legislative

25     process privilege.  Legislative privilege.  Instruct you



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1    not to answer.

2         A.   I'll assert.

3         Q.   (By Mr. Dunn)  Do you believe that federal law

4    is supreme to state law?

5              MR. FREDERICK:  Objection, relevance.

6    Objection, vague.  I would also object on the basis of

7    legislative privilege, to the extent it's asking for

8    what she believes in her role as a role in the Senate.

9    If he's asking for your opinion or belief as you sit

10   here today, not based on confidential matters, you can

11   answer if you can.

12        A.   I do -- I believe that the state -- that the

13   federal government is not superior to the states.

14        Q.   (By Mr. Dunn)  All right.  And that's not what

15   I thought my question was.

16        A.   Okay.

17        Q.   So, but I may have done a bad job of wording

18   it.

19             Really what I'm asking is, to the degree

20   there's conflict between federal law and state law,

21   which one controls, if one does?

22             MR. FREDERICK:  Objection, asks for legal

23   opinion.

24        A.   I don't think I can answer that question.

25        Q.   (By Mr. Dunn)  Well, as you helped Senator



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

1     Fraser prepare legislation, do you have to consider how

2     that legislation will interact with federal law?

3          A.   In some cases, yes.

4          Q.   And do you think the state is authorized to

5     pass statutes that conflict with the federal law?

6               MR. FREDERICK:  Objection, relevance.

7     Objection, legislative privilege, to the extent it seeks

8     her opinion with respect to specific legislation.  To

9     the extent it just asks for your opinion, you can answer

10    if you can.

11         A.   I don't think I have an opinion.

12         Q.   (By Mr. Dunn)  All right.  I'm going to switch

13    gears on you now and go to the ID requirements

14    themselves.  You were asked some questions about

15    nonphoto IDs?

16         A.   Yes, sir.

17         Q.   And as I understand your testimony, without

18    going through it all, but under current state law, a

19    voter can arrive at the polling location without a photo

20    ID and rely on some nonphoto IDs; is that right?

21         A.   That's my understanding, yes.

22         Q.   And some of those things are like utility

23    bills, for example?

24         A.   Yes.

25         Q.   Do you have an opinion as to whether or not a



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

280

1    nonphoto ID is as effective as a photo ID in

2    discouraging voter fraud?

3              MR. FREDERICK:  Just caution to the extent

4    it asks for your opinion as you sit here today, based on

5    nonprivileged matters, you can answer if you have an

6    opinion.

7         A.   My opinion is the photo ID is a better

8    mechanism to prevent fraud.

9         Q.   (By Mr. Dunn)  Now, do you believe that photo

10   identification can be sort of manufactured?

11             MR. FREDERICK:  Objection, vague.  I'll

12   caution you to the extent you can answer based on

13   personal opinion, not based on privileged information,

14   you may answer if you have an opinion.

15        Q.   (By Mr. Dunn)  Have you ever heard of a fake

16   ID?

17        A.   When I was in college, yes, sir.

18        Q.   All right.  People had fake driver's license?

19        A.   A lot of people had fake driver's licenses,

20   yes, sir.

21        Q.   And they would use them to go into bars and

22   convince the bartender they were 21 and get an alcoholic

23   beverage; is that right?

24        A.   Yes, sir.  Back when we are younger, yes, sir.

25        Q.   You don't think people fake IDs any longer?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                              MAY 16, 2012

                                                                    281

1        A.    I think it's a lot harder to fake IDs these

2    days.

3        Q.    What do you think makes it harder about faking

4    IDs today?

5        A.    I think that the provisions of real ID -- the

6    federal provisions of real IDs that Texas has enacted to

7    make driver's licenses harder to fake make it harder.

8        Q.    Like, for example, a driver's license now have

9    like a black light insignia; is that right?

10       A.    Yes, sir.

11       Q.    And there's other things that when you put the

12   ID in a certain type of viewing device, you can see

13   whether it's genuine; is that true?

14       A.    That's my understanding.  Yes, sir.

15       Q.    And you see these devices at the airport, you

16   know, occasionally at the bank; is that right?

17       A.    I haven't seen them at a bank but --

18       Q.    You've seen them at the airport?

19       A.    I don't know that I've seen them at an

20   airport.  I haven't flown in over three years.

21       Q.    With twins?

22       A.    Yes, sir.

23       Q.    All right.  Well, was there ever any discussion

24   about funding technology of polling locations that would

25   allow the staff to determine whether or not a particular


ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

282

1      photo ID was genuine?

2                    MR. FREDERICK:   Objection, legislative

3      privilege.   To the extent you can answer based on

4      discussions on the Floor or any public statements or

5      testimony, you may do so.

6           A.    I don't recall any public discussions about

7      that --

8           Q.    (By Mr. Dunn)   Was there any --

9           A.    -- issue.

10          Q.    Do you recall any private discussions without

11     giving me the details?

12                    MR. FREDERICK:   Objection, legislative

13     privilege.   Instruct you not to answer that.

14                    MR. DUNN:   She doesn't even have to admit

15     whether the discussion happened.

16                    MR. FREDERICK:   I think with the lead up,

17     I believe that the question implies the substance of a

18     conversation.   I'm not trying to prevent you from asking

19     if a conversation ever took place, generally, but I

20     think the subject matter was drawn too specifically to

21     lead up.

22          Q.    (By Mr. Dunn)   Are you aware of any

23     conversations in the consideration of Senate Bill 14

24     relating to technology at the polling location to

25     determine the genuineness of a photo ID?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

283

1       A.    No.

2       Q.    Do you know why not?

3       A.    Why people didn't have discussions about that

4    issue?  No, sir.

5       Q.    Now, would you agree that nonphoto ID, if you

6    required a number of them, might be accurate to confirm

7    the identity of a voter?

8              MR. FREDERICK:  Objection, calls for

9    speculation.  Objection, vague.  But you may answer.

10      A.    Nonphoto ID, a number of nonphoto ID could

11   confirm the identity of someone, yes.

12      Q.    (By Mr. Dunn)  Do you know why that wasn't

13   included in the bill?

14             MR. FREDERICK:  Objection, legislative

15   privilege.  Instruct you not to answer.

16      A.    I'll assert privilege.

17      Q.    (By Mr. Dunn)  Did you have any senators come

18   to you and tell you or in your presence that they were

19   voting against this bill but they really supported it?

20             MR. FREDERICK:  Objection, legislative

21   privilege.  To the extent that calls for communication

22   between a senator and you, that would be privileged, and

23   I instruct you not to reveal it.

24      A.    I'll assert.

25      Q.    (By Mr. Dunn)  When was the last time you



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                        MAY 16, 2012

284

1     renewed your driver's license?  Ballpark.  You don't
2     need to look it up.
3          A.   I don't know.
4          Q.   Oh, okay.  Has it been a while?
5          A.   It's been -- yeah.  I think I'm due next year.
6          Q.   All right.
7          A.   So five or six years.
8          Q.   Do you use the private DPS office here
9     available to Capitol staff members?
10         A.   I think I do it online.
11         Q.   Okay.  Each time you do it, you do it online?
12         A.   The last time I renewed online.  I think I
13    renewed when I got married in 2006, or I went in 2006,
14    because I had to actually show my marriage -- my new
15    Social Security card.  And since then, I've done it
16    online if I had to do it.  I guess, probably, I haven't
17    had to do it since 2006.
18         Q.   Are you aware of there being a DPS office
19    available for Capitol employees and state employees?
20         A.   If you're speaking of the office at 15th and
21    Congress, I thought that was open to the public.
22         Q.   All right.  Are you aware of an office that is
23    open to the public but is not advertised to the public
24    for DPS driver's license?
25         A.   I didn't know that it wasn't advertised.


ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                            MAY 16, 2012

285

1      Q.   Did you ever go to a DPS office for a driver's
2   license in the Clement's building?
3      A.   No.
4      Q.   So if there's an office that is available to
5   the public but isn't otherwise made known to the public
6   for obtaining a driver's license, you wouldn't know
7   about it?
8      A.   That's correct.
9           (Recess from 6:20 to 6:23 p.m.)
10          MR. DUNN:  I'm going to say the thing
11   today that you're going be the most happy to hear:
12   There are no more questions for you.
13               THE WITNESS:  Woo-hoo.
14          MR. DUNN:  However -- there's my however
15   -- however, we join in the United States' position we're
16   leaving the deposition open, after the court rules on
17   some issues, and we may have to ask you more questions
18   later on.
19               THE WITNESS:  Yes, sir.
20          MR. DUNN:  Thank you for your time.
21          (Deposition concludes at 6:24 p.m.)
22
23
24
25



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE McCOY                                    MAY 16, 2012

286

```
 1    CHANGES AND SIGNATURE

 2           RE: TEXAS VS. HOLDER, ET AL

 3    PAGE   LINE   CHANGE              REASON

 4    _____

 5    _____

 6    _____

 7    _____

 8    _____

 9    _____

10    _____

11    _____

12    _____

13    _____

14    _____

15    _____

16    _____

17    _____

18    _____

19    _____

20        I, JANICE McCOY, have read the foregoing deposition

21    and hereby affix my signature that same is true and

22    correct, except as noted above.

23

24                        _____

25                             JANICE McCOY
```



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                              MAY 16, 2012

287

1    THE STATE OF _____)

2    COUNTY OF_____)

3

4          Before me,_____, on this day

5    personally appeared JANICE McCOY, known to me (or proved

6    to me under oath or through_____

7    (description of identity card or other document) to be

8    the person whose name is subscribed to the foregoing

9    instrument and acknowledged to me that they executed the

10   same for the purposes and consideration therein

11   expressed.

12         Given under my hand and seal of office

13   this_____day of _____, 2012.

14

15

16         _____

           NOTARY PUBLIC IN AND FOR
17         THE STATE OF _____

18

19

20

21

22

23

24

25



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

288

```
1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA
2
     STATE OF TEXAS,                )
3                                   )
                 Plaintiff,         )
4                                   )
     VS.                            )
5                                   )
     ERIC H. HOLDER, JR. in his     )
6    official capacity as Attorney  )
     General of the United States,  )
7                                   )
                 Defendant,         )
8                                   )
     ERIC KENNIE, et al,            )
9                                   )
         Defendant-Intervenors,     )
10                                  )
     TEXAS STATE CONFERENCE OF      )  CASE NO. 1:12-CV-00128
11   NAACP BRANCHES,                )  (RMC-DST-RLW)
                                    )  Three-Judge Court
12       Defendant-Intervenors,     )
                                    )
13   TEXAS LEAGUE OF YOUNG VOTERS   )
     EDUCATION FUND, et al,         )
14                                  )
         Defendant-Intervenors,     )
15                                  )
     TEXAS LEGISLATIVE BLACK        )
16   CAUCUS, et al,                 )
                                    )
17       Defendant-Intervenors,     )
                                    )
18   VICTORIA RODRIGUEZ, et al.,    )
                                    )
19       Defendant-Intervenors.     )
20               REPORTER'S CERTIFICATION
                DEPOSITION OF JANICE McCOY
21                    MAY 16, 2012
22       I, Chris Carpenter, Certified Shorthand Reporter in
23   and for the State of Texas, hereby certify to the
24   following:
25       That the witness, JANICE McCOY, was duly sworn by
```



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

289

1     the officer and that the transcript of the oral

2     deposition is a true record of the testimony given by

3     the witness;

4         That the deposition transcript was submitted on the

5     _____day of _____, 2012, to the witness or to the

6     attorney for the witness for examination, signature and

7     return to_____, by

8     _____, 2012; and if returned, the original

9     transcript will forwarded to Jennifer Maranzano, the

10    custodial attorney;

11        That the amount of time used by each party at the

12    deposition is as follows:

13        Ms. Maranzano: 5 hours, 28 minutes

14        Mr. Rosenberg:  1 hour, 6 minutes

15        I further certify that I am neither counsel for,

16    related to, nor employed by any of the parties or

17    attorneys in the action in which this proceeding was

18    taken, and further that I am not financially or

19    otherwise interested in the outcome of the action.

20        Certified to by me this 18th day of May, 2012.

21

22                            _____



23                            Chris Carpenter, Texas CSR 1151
                              Expiration Date:  12/31/2012
                              100 Congress Avenue, Suite 2000

24                            Austin, TX  78701
                              (512)328-5557

25                            Firm Registration No. 283

ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com