# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STATE OF TEXAS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| ERIC H. HOLDER, JR., in his official capacity as Attorney General of the United States, | ) Civil Action No. 12-128 (RMC) |
| | ) |
| Defendant, and | ) |
| | ) |
| ERIC KENNIE, *et al.*, | ) |
| | ) |
| Defendant-Intervenors. | ) |

## OPINION

In 2012, the U.S. Attorney General and thirty-one Defendant-Intervenors challenged Texas's proposed voter identification law and momentarily prevailed before a three-judge panel. Defendant-Intervenors now seek an award of attorneys' fees, expenses, and costs, despite the subsequent vacatur of the three-judge panel's opinion by the Supreme Court. This Court previously decided a similar case, *Texas v. United States*, which awarded attorneys' fees to Defendant-Intervenors who successfully challenged Texas's redistricting maps in Voting Rights Act litigation before a three-judge panel, even though the Supreme Court later vacated the three-judge panel's opinion as moot. But the Court arrives at a different result here. While the redistricting dispute eventually became moot, in this case, Texas simply kept appealing until the Supreme Court vacated the three-judge panel's opinion. Because the voter identification law is now in effect and because Texas maintained its position throughout this litigation, the Court will

1

deny the requested fees and costs.

## I. FACTS

The parties in this litigation disputed whether Texas's photo identification law could be implemented consistent with the Fifteenth Amendment to the U.S. Constitution, *see* U.S. Const. amend. XV, § 1, and the Voting Rights Act of 1965 (VRA), 42 U.S.C. §§ 1973 *et seq*. On May 27, 2011, Governor Rick Perry signed into law Senate Bill 14 (SB 14), which required registered Texas voters to identify themselves at the polls with one of the following forms of government-issued photo identification: (1) a driver's license or personal identification card issued by the Texas Department of Public Safety (DPS); (2) a license to carry a concealed handgun issued by DPS; (3) a U.S. military identification card; (4) a U.S. citizenship certificate with photograph; or (5) a U.S. passport. Tex. Elec. Code § 63.0101 (Jan. 1, 2012).

SB 14 represented a striking departure from then-existing Texas law. Unlike preceding enactments, SB 14 required voters to present photo identification at the polls, prohibited the use of identification that had expired more than sixty days before the date of voting, and banned the use of pictureless voter registration certificates commonly issued by Texas county registrars. *See id.* Voters who lacked a government-issued photo identification could obtain an election identification certificate from DPS free of charge. *See* SB 14, § 20. The voter identification law preserved an exemption for voters with documented disabilities and voters over the age of sixty-five, as well as disabled voters, to vote by mail without obtaining or presenting photo identification when voting.

Because Texas was a jurisdiction covered by Section 5 of the VRA, 28 C.F.R. pt. 51 App., it could not implement SB 14 without obtaining "preclearance" from either the U.S. Attorney General or a three-judge panel of this Court. 42 U.S.C. § 1973c(a). To secure

preclearance, Texas was required to demonstrate that SB 14 "neither ha[d] the purpose nor [would] have the effect of denying or abridging the right to vote on account of race[,] color," or "member[ship] [in] a language minority group." *Id.* §§ 1973c(a).[1] Therefore, on July 25, 2011, Texas submitted SB 14 to the U.S. Department of Justice (DOJ) for preclearance. Compl. ¶ 12; *id.*, Ex. 2 (Jul. 25, 2011 McGeehan Letter) [Dkt. 1-3].

Under the VRA, the Attorney General was required to "interpose[] an objection within sixty days" of the State's request for preclearance. 42 U.S.C. § 1973c(a). Texas, wanting to implement the photo-ID bill before the 2012 presidential election, requested expedited consideration of its submission, with a proposed decision date of August 20, 2011. *See* Jul. 25, 2011 McGeehan Letter at 1 (citing 28 C.F.R. § 51.34). The Attorney General did not accede to this timeline. Instead, on September 23, 2011, DOJ informed the Texas Director of Elections that the information provided in the State's preclearance submission was "insufficient to enable [it] to determine that the proposed changes have neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group, as required under Section 5" of the VRA. Compl., Ex. 3 (Sept. 23, 2011 Herren Letter) [Dkt. 1-4] at 1. Accordingly, DOJ requested additional information concerning the number of registered Texas voters who might be required to secure additional forms of voter identification under SB 14.[2] *Id.* Texas responded to DOJ's requests on October 4, 2011, *see*

---

[1] In 1975, Congress extended the VRA to cover members of language minority groups. *See* 42 U.S.C. § 1973b(f)(2); *see also id.* § 1973*l*(c)(3) (defining the terms "language minorities" and "language minority groups").

[2] Specifically, DOJ requested information related to:

> a. The number of registered voters in Texas, by race and Spanish surname within county of residence, who currently possess a Texas driver's license or other form of photo identification issued by DPS that is current or has expired within sixty days.

3

Compl. ¶ 14, the Attorney General requested further supplementation, *see id.* ¶ 15, and the preclearance record was completed on January 12, 2012, *see id.* ¶ 16.

In the meantime, while the Attorney General was considering SB 14, DOJ denied preclearance to a newly-enacted voter identification law in South Carolina. *Id.* ¶ 17. DOJ concluded that the South Carolina law—which was, in many respects, identical to SB 14—would have a differential impact on non-white registered voters. In other words, DOJ concluded that South Carolina had "failed to meet its burden of demonstrating that [the photo identification law] [would] not have a retrogressive effect." Compl., Ex. 6 (DOJ Letter to South Carolina) [Dkt. 1-7] at 4–5. Texas filed a Complaint against the Attorney General in this Court on January 24, 2012,[3] on the assumption that DOJ would apply the same reasoning to deny Texas's application. *See* Compl. ¶¶ 21–22.

On March 12, 2012, the Attorney General denied preclearance to SB 14, finding that the State had failed to show that SB 14 would not have "the effect of denying or abridging the right to vote on account of race." Am. Compl. [Dkt. 25], Ex. 7 (Mar. 12, 2012 DOJ Letter) [Dkt. 25-7] at 1–2 (citing *Georgia v. United States*, 411 U.S. 526 (1973); 28 C.F.R. § 51.52). In

---

> . . .
>
> b. For the 605,576 registered voters who the State has advised do not have a Texas driver's license or personal identification card, . . . the number of such persons by Spanish surname, as well as an estimated number by race, within county of residence; and
>
> c. Describe any and all efforts . . . to provide notice to these individuals of the requirements of S.B. 14 and the availability of a free DPS-issued identification.

Sept. 23, 2011 Herron Letter at 2–3.

[3] The case was assigned to a three-judge Court, which included Circuit Judge David S. Tatel and District Judges Rosemary M. Collyer and Robert L. Wilkins.

his decision, the Attorney General concluded that the data submitted by Texas showed that registered Hispanic voters were more than twice as likely as registered non-Hispanic voters to lack an approved form of photo identification. *Id.* at 2. The Attorney General also expressed concern that the free Election Identification Certificate (EIC) would not mitigate the financial burden of SB 14 on Hispanic voters. *Id.* at 3. Thereafter, Texas filed an Amended Complaint in this Court, which included a claim that Section 5 of the VRA, as reauthorized in 2006, "exceed[ed] the enumerated powers of Congress and conflict[ed] with Article IV of the Constitution and the Tenth Amendment." Am. Compl. at 1–2.

The three-judge Court received several motions to intervene on behalf of individual voters, elected representatives, and civil rights advocacy groups. The first such motion was filed by Eric Kennie, Anna Burns, Michael Montez, Penny Pope, Marc Veasy, Jane Hamilton, David De La Fuente, Lorraine Birabil, Daniel Clayton, and Sergio Deleon (collectively, the Kennie Intervenors),[4] and the Court granted their motion to intervene on March 15, 2012. *See* Mar. 15, 2012 Order [Dkt. 17] at 2. Defendant-Intervenors were directed to "avoid duplication of efforts" and to consolidate their briefing and argument. *See* Apr. 13, 2012 Minute Order. The Court also imposed an expedited schedule, as this litigation represented Texas's only chance of implementing SB 14 before the November 2012 elections.

---

[4] The Court also received and granted four motions to intervene on behalf of the following Defendant-Intervenors: (1) the Texas State Conference of NAACP Branches and the Mexican American Legislative Caucus, *see* Mar. 12, 2012 Mot. to Intervene [Dkt. 15]; (2) the Texas Legislative Black Caucus, the League of Women Voters of Texas, the Justice Seekers, Reverend Peter Johnson, Reverend Ronald Wright, and Donald Wright, *see* Mar. 22, 2012 Mot. to Intervene [Dkt. 38]; (3) Victoria Rodriguez, Nicole Rodriguez, Southwest Voter Registration Education Project, and Mi Familia Vota Education Fund, *see* Mar. 23, 2012 Mot. to Intervene [Dkt. 42]; and (4) the Southwest Workers Union and La Union Del Pueblo Entero, *see* Apr. 4, 2012 Mot. to Intervene [Dkt. 64]. *See* Mar. 15, 2012 Order [Dkt. 17] at 2; Apr. 13, 2012 Minute Order. These Defendant-Intervenors have not submitted motions for attorneys' fees. As such, this Opinion focuses solely on the Kennie Intervenors.

5

After expedited discovery, the three-judge Court held a one-week bench trial that commenced on July 9, 2012. DOJ and Defendant-Intervenors presented evidence at trial and argued against preclearance. *Texas v. Holder*, 888 F. Supp. 2d 113 (D.D.C. 2012). Specifically, Defendant-Intervenors relied on data from Texas voter registration forms to argue that Hispanic voters were disproportionately likely to lack photo identification. *Id.* at 137–38. The Kennie Intervenors also called four witnesses at trial: Texas State Senator Wendy Davis, Texas State Senator Rodney Ellis, expert witness Dr. Allan Lichtman, and election law expert Randall Buck Wood. *See* Mot. for Fees [Dkt. 383] at 5–10. These witnesses testified as to various efforts to mitigate the burden of SB 14 on indigent persons, the hidden costs of SB 14 for indigent persons lacking qualifying voter identification, and the empirical flaws in Texas's expert testimony regarding the impact of SB 14 on voter turnout.

From this record, the Court found that Texas had offered faulty data and unreliable testimony concerning whether minorities disproportionately lacked the necessary identification under SB 14. *Texas*, 888 F. Supp. 2d at 127. Because Texas submitted nothing more, the Court concluded that "the state [] failed to meet its burden of demonstrating that SB 14 lacks retrogressive effect." *Id.* The Court also considered the undisputed record evidence and found that "racial minorities in Texas [were] disproportionately likely to live in poverty and, because SB 14 will weigh more heavily on the poor, the law will likely have retrogressive effect." *Id.* Accordingly, the Court denied Claim One, *i.e.*, Texas's request to pre-clear SB 14 under Section 5 of the VRA, and stayed Claim Two, *i.e.*, Texas's claim that Section 5 of the VRA is unconstitutional, pending the parties' submission of a joint proposed briefing schedule. Texas appealed this Court's decision on Claim One to the Supreme Court.

Before the Supreme Court ruled on Texas's appeal, however, it decided *Shelby*

*County v. Holder*, 133 S. Ct. 2612 (2013). *Shelby County* involved a constitutional challenge to, *inter alia*, Section 4 of the VRA. The Supreme Court held that because the coverage formula in Section 4(b) was based on stale data, it distinguished among the States in an unconstitutional manner, and it could "no longer be used as a basis for subjecting jurisdictions to preclearance." *Id.* at 2631. Thereafter, on June 27, 2013, the Supreme Court vacated and remanded the three-judge panel's decision denying preclearance to Texas for SB 14.

After the Supreme Court issued judgment on Texas's appeal, *see* July 29, 2013 S. Ct. Judgment [Dkt. 377], the three-judge panel dismissed all claims based on the Supreme Court's ruling in *Shelby County*. Defendant-Intervenors requested that the Court retain jurisdiction to hear any motions for attorneys' fees and costs, and expressed their intention to file motions for attorneys' fees within fourteen days of the three-judge panel's entry of judgment. Defendant-Intervenors' Response to Mot. to Dismiss at 2 (citing Fed. R. Civ. P. 54(d)(2)).

The Kennie Intervenors now move for attorneys' fees and costs.[5] They contend that they are prevailing parties and are entitled to fees and costs under the VRA, seeking a total reimbursement of $353,150.97. Mot. for Fees [Dkt. 383] at 27.

Texas has not filed a brief in opposition to the pending motion. Instead, Texas filed a three-page "Advisory" that begins and ends with *Shelby County*. *See* Advisory [Dkt. 384]. Texas writes that the *Shelby County* decision means that the State was wrongly subjected to preclearance in the first place. Thus, Texas contends, the participation of Defendant-Intervenors in this VRA litigation only served to "impose[] significant

---

[5] The Kennie Intervenors have timely filed their motion pursuant to Federal Rules of Civil Procedure 54(d), which provides that a motion for attorneys' fees and costs must be filed "no later than 14 days after the entry of judgment." Fed. R. Civ. P. 54(d)(2)(B)(i). The three-judge Court's December 21, 2012 Minute Order did not alter the deadlines set by the Federal Rules, as the Court's Order merely held in abeyance Defendant-Intervenors' motions for attorneys' fees pending appeal without imposing alternate deadlines. *See* Dec. 21, 2012 Minute Order.

7

unconstitutional burdens on the State, including that for more than a year, Texas was unable to implement an election-integrity measure that numerous States continue to enact and implement . . . ." *Id.* at 2. Texas adds that "the only basis upon which the Kennie Intervenors could have conceivably claimed prevailing-party status" was the three-judge Court's denial of preclearance, which the Supreme Court vacated on appeal. *Id.*

## II. ANALYSIS

This case was tried on the merits to a three-judge Court under the VRA, and that Court fulfilled its mandate when it entered its judgment. Section 5 of the VRA requires matters to be "heard and determined by a court of three judges" only to the extent required by 28 U.S.C. § 2284, *see* 42 U.S.C. § 1973c(a). Section 2284, in turn, permits "[a] single judge . . . [to] conduct all proceedings except the trial, and enter all orders permitted by the rules of civil procedure except as [otherwise] provided . . . ." 28 U.S.C. § 2284(b)(3). Here, the three-judge panel fulfilled its statutory purpose. The question of fees and costs is an ancillary matter and is properly resolved by the district court judge to whom the case was assigned initially. *See, e.g.*, *Pub. Serv. Comm'n of Mo. v. Brashear Freight Lines, Inc.*, 312 U.S. 621, 625 (1941) (noting that a single district judge, rather than a three-judge panel, should have resolved a motion for damages that was filed after the three-judge panel had ruled on an injunction application for which the three-judge panel had been convened); *Hamilton v. Nakai*, 453 F.2d 152, 161 (9th Cir. 1971) (holding that a single judge could decide an ancillary issue because the three-judge court had issued its judgment and therefore "had fulfilled the statutory purpose for which the two additional judges had been called"); *Allen v. Cnty. Sch. Bd. of Prince Edward Cnty., Va.*, 249 F.2d 462, 464 (4th Cir. 1957) (finding post-judgment motion requesting deadline for compliance with three-judge court's desegregation order was properly resolved by single district court

judge).

At the outset, the Court notes that parties in the United States ordinarily bear their own attorneys' fees regardless of the outcome of the litigation. *Fresh Kist Produce, LLC v. Choi Corp.*, 362 F. Supp. 2d 118, 125 (D.D.C. 2005) (citing *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 602–03 (2001), *superseded in part by statute*, Open Government Act of 2007, Pub. L. No. 110-175, 121 Stat. 2524 (codified at 5 U.S.C. § 552(a)(4)(E) (2009))). There are exceptions, however, to this so-called "American Rule." For instance, the American Rule does not apply where there is an explicit statutory basis for awarding fees. *Id.* (citing *Alyeska Pipeline Serv. Co. v. The Wilderness Soc'y*, 421 U.S. 240, 257 (1975), *superseded by statute on other grounds*, Civil Rights Attorney's Fees Awards Act of 1976, Pub. L. No. 106-274, § 4(d), 114 Stat. 803, 804 (codified at 42 U.S.C. § 1988(b) (2000))).

If a party establishes that it is entitled to attorneys' fees, then the question becomes whether the fees sought are reasonable. *See Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983), *abrogated on other grounds by Gisbrecht v. Barnhart*, 535 U.S. 789, 795–805 (2002). The standard metric for determining the reasonableness of a fee request is the "lodestar method."[6] Such a calculation "produces an award that *roughly* approximates the fee that the prevailing attorney would have received if he or she had been representing a paying client who was billed by the hour in a comparable case." *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 551 (2010).

**A. Kennie Intervenors' Request for Fees and Costs**

The Kennie Intervenors contend that statutory fee shifting provisions apply here.

---

[6] The "lodestar" approach to fee awards was established by the Supreme Court in *Hensley*, and is the approach followed by the federal courts in most fee award disputes. *See Gisbrecht*, 535 U.S. at 802.

Specifically, they seek attorneys' fees under § 1973*l*(e) of the VRA, 42 U.S.C. § 1973*l*(e), and subsection (b) of 42 U.S.C. § 1988. Both provisions contain similar language and identical legislative purposes. *See Donnell v. United States*, 682 F.2d 240, 245 n.7 (D.C. Cir. 1982). The former states that "[i]n any action or proceeding to enforce the voting guarantees of the fourteenth or fifteenth amendment, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee, reasonable expert fees, and other reasonable litigation expenses as part of the costs," 42 U.S.C. § 1973*l*(e), while the latter permits a court, "in its discretion, . . . [to] allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs," 42 U.S.C. § 1988(b). Both provisions are designed to "encourag[e] private litigants to act as 'private attorneys general' in seeking to vindicate the civil rights laws." *Donnell*, 682 F.2d at 245. As a result, the two provisions are construed consistently. *Id.* at 245 n.7 (citing *Riddell v. Nat'l Democratic Party*, 624 F.2d 539, 543 (5th Cir. 1980)); *see also Buckhannon*, 532 U.S. at 603 n.4 (recognizing that § 1973*l*(e) and § 1988(b) have been interpreted in a consistent manner).

Requests for attorneys' fees pursuant to § 1973*l*(e) and § 1988(b) generally implicate two questions of law. The first is whether the party seeking recovery of attorneys' fees is a prevailing party. If so, then a fee award ordinarily should be granted. *See, e.g.*, *Blanchard v. Bergeron*, 489 U.S. 87, 89 n.1 (1989) (observing that a party that prevails in § 1988 litigation "ordinarily" is entitled to attorneys' fees (internal quotations and citation omitted)); *Donnell*, 682 F.2d at 245 ("[T]he legislative history [of § 1973*l*(e)] makes clear that a prevailing party usually should recover fees."). The second is whether a court should exercise its discretion *not* to award attorneys' fees because there are "special circumstances [that] would render such an award unjust." *Newman v. Piggie Park Enters.*, 390 U.S. 400, 402 (1968).

## 1. Prevailing Party Precedent

The phrase "prevailing party" is a legal term of art, *Buckhannon*, 532 U.S. at 603, which has been addressed by the Supreme Court in multiple decisions. *See, e.g.*, *Tex. State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 791 (1989) ("A prevailing party must be one who has succeeded on any significant claim affording it some of the relief sought, either *pendent lite* or at the conclusion of the litigation."); *Hewitt v. Helms*, 482 U.S. 755, 760 (1987) ("[P]laintiff [must] receive at least some relief on the merits of his claim before he can be said to prevail."). The Supreme Court most recently addressed the concept in *Buckhannon*. Interpreting the fee-shifting provisions of the Fair Housing Amendments Act of 1988, 42 U.S.C. § 3613(c)(2), and the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. § 12205,[7] the Supreme Court required a "prevailing party" to be "one who has been awarded some relief by the court," *Buckhannon*, 532 U.S. at 603, resulting in a "judicially sanctioned change in the legal relationship of the parties," *id.* at 605.

*Buckhannon* excluded from its definition instances in which the objective of a lawsuit is achieved because a defendant voluntarily changes its conduct. Thus, the "catalyst theory" of fee recovery, *id.* at 601, which is dependent on voluntary action, is not connected to the clear meaning of "prevailing party," *id.* at 605. Neither the legislative history of similar fee-shifting provisions, such as the Civil Rights Attorney's Fee Awards Act, *id.* at 607, nor the Court's precedents supported a "holding that the term 'prevailing party' authorizes an award of attorney's fees *without* a corresponding alteration in the legal relationship of the parties," *id.* at

---

[7] The fee-shifting provisions of both statutes are similar to 42 U.S.C. § 1973*l*(e) and 42 U.S.C. § 1988(b), under which Defendant-Intervenors seek fees. The Fair Housing Amendments Act provides that "the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee and costs," 42 U.S.C. § 3613(c)(2), while the ADA states that "the court . . . , in its discretion, may allow the prevailing party . . . a reasonable attorney's fee, including litigation expenses and costs," 42 U.S.C. § 12205.

11

605. The Supreme Court also was troubled because the catalyst theory permits litigants to recover attorneys' fees for "nonfrivolous but nonetheless potentially meritless lawsuit[s]." *Id.* at 606. Not only are such recoveries without "the necessary judicial *imprimatur*," *id.* at 605, but they discourage voluntary changes in conduct, *id.* at 608. Accordingly, the Supreme Court held that voluntary changes in conduct disassociated from judicial action are similar to a "reversal of a directed verdict," a finding of constitutional infirmity "unaccompanied by judicial relief," and other nonjudicial modifications of actual conditions, none of which permits recovery of attorneys' fees.[8] *Id.* at 605–06 (internal quotations and citations omitted).

Since *Buckhannon*, the D.C. Circuit has adopted a three-part test for adjudicating prevailing-party status; that test requires "(1) . . . a court-ordered change in the legal relationship of the parties; (2) [a] judgment . . . in favor of the party seeking the fees; and (3) [a] judicial pronouncement . . . accompanied by judicial relief." *Green Aviation Mgmt. Co. v. FAA*, 676 F.3d 200, 203 (D.C. Cir. 2012) (internal quotation marks and citation omitted). Notably, only the latter two prongs are relevant when a defendant is the party seeking attorneys' fees.[9] *Id.* at 204.

---

[8] Through the Open Government Act of 2007, Congress superseded *Buckhannon* and reinstated the catalyst theory of attorney fee recovery only for fee awards under the Freedom of Information Act, 5 U.S.C. § 552. *See Brayton v. Office of the U.S. Trade Representative*, 641 F.3d 521, 525 (D.C. Cir. 2011).

[9] In *Oil, Chemical, & Atomic Workers International Union v. Department of Energy*, 288 F.3d 452 (D.C. Cir. 2002), *superseded by statute on other grounds*, Open Government Act of 2007, Pub. L. No. 110-175, 121 Stat. 2524, *as recognized in Summers v. Department of Justice*, 569 F.3d 500, 503 (D.C. Cir. 2009), the D.C. Circuit ruled that when interpreting a fee-shifting provision courts should give the phrase "prevailing party" the same construction as it does in other fee-shifting provisions "unless there is some good reason for doing otherwise," *id.* at 455. Overcoming this presumption is difficult. *Green Aviation*, 676 F.3d at 202 (explaining that this Circuit "has joined other circuits in acknowledging that the burden of establishing good reason not to apply *Buckhannon* is not easily met" (internal alterations, citation, and quotations omitted)). Neither Texas nor the Kennie Intervenors argue that *Buckhannon* should not control the meaning of "prevailing party" in 42 U.S.C. § 1973*l*(e) or 42 U.S.C. § 1988(b).

*Buckhannon* expressly recognized only two appropriate bases for awarding attorneys' fees—judgments on the merits and settlements enforced through consent decrees. *Buckhannon*, 532 U.S. at 605 ("We have only awarded attorney's fees where the plaintiff has received a judgment on the merits, or obtained a court-ordered consent decree." (internal citations omitted)). Prevailing-party status in this jurisdiction, however, is not so limited. Under the D.C. Circuit's construction of *Buckhannon*, a litigant in this jurisdiction need only establish that he or she received "some form of judicial relief, not necessarily a court-ordered consent decree or a judgment on the merits." *Turner v. Nat'l Transp. Safety Bd.*, 608 F.3d 12, 15 (D.C. Cir. 2010). The D.C. Circuit has recognized that, under certain circumstances, prevailing-party status may result from a favorable jurisdictional ruling, a grant of preliminary injunction, or even a judicially-sanctioned stipulation. *Id.* (citing with approval *District of Columbia v. Jeppsen ex rel. Jeppsen*, 514 F.3d 1287, 1290 (D.C. Cir. 2008); *Select Milk Producers, Inc. v. Johanns*, 400 F.3d 939, 945 (D.C. Cir. 2005); *see also Carbonell v. INS*, 429 F.3d 894, 895–96, 899 (9th Cir. 2005)).

### 2. Kennie Intervenors' Arguments

The Kennie Intervenors state that they joined the litigation to oppose preclearance of SB 14. The Attorney General first denied preclearance to Texas on March 12, 2012, with the result that Texas was, for at least a time, prevented from implementing its voter identification law. Following a trial before the three-judge panel of this Court at which all parties presented demonstrative evidence, expert reports, and testimony, the panel found that SB 14 violated the VRA. Therefore, it, too, denied preclearance. The Kennie Intervenors argue that this Court's judgment provided a substantial benefit, as it prevented Texas from applying the voter identification law during the November 2012 elections. Moreover, the Kennie Intervenors

emphasize that this case had a real-world impact because, absent the Court's judgment, certain Kennie Intervenors would have been denied the right to vote based on SB 14's requirements.[10]

Texas responds only with its Advisory, which posits that the three-judge Court's denial of preclearance is "the only basis upon which the Kennie Intervenors could [] conceivably . . . claim[] prevailing-party status," Advisory at 2, but that the decision does not support a fee award because it "was vacated on appeal," *id.* Texas asserts that *Shelby County* must be given full retroactive effect and that this Court has no choice but to deny the Kennie Intervenors' motion for fees and costs. *Id.* at 2–3 (citations omitted).

### 3. Are Kennie Intervenors Prevailing Parties?

In its Advisory, Texas's main contention is that the Supreme Court, as a matter of fact and law, erased the three-judge Court's opinion, and, consequently, the Kennie Intervenors' successes before that Court.[11] Texas believes that *Shelby County* establishes that the entirety of the preclearance process, including this Court's denial of preclearance, was a constitutional nullity. Texas does not address the Kennie Intervenors' argument that they achieved the relief they sought because Texas was prohibited from implementing SB 14 before the November 2012 elections.

---

[10] The Kennie Intervenors also rely on *Commissioners Court of Medina County, Texas v. United States*, 683 F.2d 435 (D.C. Cir. 1982), in arguing their prevailing-party status. The Kennie Intervenors contend that a judgment denying preclearance gives rise to a presumption that any defendants who intervened are prevailing parties. *Medina County*, however, is a "catalyst theory" fee award case that predates *Buckhannon*. *See Medina Cnty.*, 683 F.2d at 440 (describing the applicable test for prevailing party status as whether "the party . . . substantially received the relief sought, and . . . [whether] the lawsuit . . . [was] a *catalytic, necessary, or substantial factor in attaining the relief*" (emphasis added)). Although neither the Supreme Court nor the D.C. Circuit has overruled *Medina County* explicitly, its continuing validity in light of *Buckhannon* is uncertain, and here, immaterial to the Court's determination of the Kennie Intervenors' prevailing-party status.

[11] Texas mentions that SB 14 is currently in effect to contest Defendant-Intervenors' prevailing party status. This contention is further discussed below, *see infra*.

14

In *Texas v. United States*, 2014 WL 2758597 (D.D.C. June 18, 2014), this Court found that the State of Texas had effectively conceded those Defendant-Intervenors' arguments by filing a nearly-identical two-page Advisory and refusing to challenge specific arguments in Defendant-Intervenors' motions for attorneys' fees. *Id.* at *7 (citing D.D.C. Local Civil Rule 7(b)). Of relevance here, the Court found that Texas had not disputed that Defendant-Intervenors were prevailing parties prior to the Supreme Court's issuance of *Shelby County* and its subsequent vacatur of the three-judge Court's opinion as moot. *Id.*

So, too, here. Texas does not dispute that the Kennie Intervenors were prevailing parties prior to the Supreme Court's issuance of *Shelby County* and subsequent vacatur of this Court's opinion denying preclearance to SB 14. Thus, the Court finds that Texas has waived any argument as to the prevailing party status of the Kennie Intervenors prior to *Shelby County*. *See Hopkins v. Women's Div., Gen. Bd. of Global Ministries*, 238 F. Supp. 2d 174, 178 (D.D.C. 2002) ("It is well understood in this Circuit that when a [non-movant] files an opposition to a motion . . . addressing only certain arguments raised by the [movant], a court may treat those arguments that the [non-movant] failed to address as conceded." (citing *FDIC v. Bender*, 127 F.3d 58, 67–68 (D.C. Cir. 1997))); *CSX Transp., Inc. v. Commercial Union Ins., Co.*, 82 F.3d 478, 482–83 (D.C. Cir. 1996); *see also Twelve John Does v. District of Columbia*, 117 F.3d 571, 577 (D.C. Cir. 1997) (explaining that the Circuit "honors . . . [a district court's] enforcement of the rule" that "absence of a response [is] . . . a basis for treating the motion as conceded").

But while Texas concedes that the Kennie Intervenors were prevailing parties prior to *Shelby County*, it argues against an award of fees and costs on the ground that *Shelby County* effectively stripped the Kennie Intervenors of their victory. In *Texas v. United States*, this Court considered and rejected the same argument based on *National Black Police*

*Association v. District of Columbia Board of Elections & Ethics*, 168 F.3d 525 (D.C. Cir. 1999) and *Grano v. Barry*, 783 F.2d 1104 (D.C. Cir. 1986). *See Texas v. United States*, 2014 WL 2758597, at *8. Therefore, as it did in *Texas v. United States*, the Court considers the impact of those cases on the matter at hand.

In *National Black Police Association*, various plaintiffs sought an injunction against campaign contribution limits for certain local elections. 168 F.3d at 526–27. The district court enjoined the initiative as violative of the First Amendment, and fifty-two days later, the D.C. City Council repealed the challenged contribution limits. *Id.* at 527. On appeal, the D.C. Circuit deemed the matter moot in light of the Council's repeal and vacated the district court's judgment. The district court then awarded attorneys' fees to plaintiffs, holding that "despite the eventual mootness of the case . . . . the injunction changed the legal relationship of the parties, and contributors were able to make substantial contributions that otherwise would not have been legal." *Id.* The D.C. Circuit agreed. "The fact that the case was moot by the time of the appeal [did] not alter the fact that the injunction altered the legal relationship between the parties when it was issued . . . ." *Id.* at 528. It was of no moment to the D.C. Circuit that the plaintiffs would have realized their goal fifty-two days later when the Council repealed the initiative. "The plaintiffs secured a real-world vindication of their First Amendment rights" regardless of subsequent events. *Id.* Accordingly, the "district court properly found that the plaintiffs were prevailing parties because at the time judgment was entered, the injunction altered the legal relationship between the parties." *Id.* at 529.

Similarly, in *Grano*, plaintiffs obtained an injunction that delayed the demolition of an historical site pending a public referendum. 783 F.2d at 1107–08. The D.C. Circuit affirmed the district court's finding that the plaintiffs were prevailing parties despite the fact that

16

the vote to preserve the site was invalidated. *Id.* at 1109. The Circuit reasoned that the public referendum would have had no chance to preserve the building at all if the building were razed before the election. In other words, the *Grano* plaintiffs "faced two hurdles[:] [t]hey successfully surmounted the first by holding off the demolition until the election . . . . [and] [a]lthough their goal of ensuring that the result of the election would have legal effect was subsequently blocked in another court, they nonetheless succeeded in the aspect of their claims that brought them into federal court . . . ." *Id.* Significantly, the D.C. Circuit subsequently has observed that "[t]he injunction [in *Grano*] produced a lasting change in the parties' legal circumstances and gave the plaintiffs the precise relief that they had sought." *Thomas v. Nat'l Sci. Found.*, 330 F.3d 486, 493 (D.C. Cir. 2003).

In *Texas v. United States*, the Fee Applicants challenged three proposed redistricting maps before a three-judge panel. The panel denied preclearance for the redistricting maps, and Texas appealed that decision to the Supreme Court. While the three-judge Court's opinion and *Shelby County* remained pending before the Supreme Court, the Texas Legislature passed three statutes that redrew the State's voting districts and abandoned the proposed redistricting maps that had been challenged before the three-judge panel. Thereafter, the Supreme Court issued *Shelby County*, vacated the three-judge panel's decision to deny preclearance to Texas for the proposed redistricting maps, and directed the panel to consider whether the controversy had been mooted by Texas's legislative action. On remand, the three-judge panel found that "both *Shelby County* and Texas's enactment of superseding redistricting plans mooted the controversy." 2014 WL 2758597, at *3. Upon consideration of the motions for attorneys' fees, this Court explained that "[a]lthough the Supreme Court ultimately vacated [the three-judge panel's] opinion, neither *Shelby County* nor the vacatur erased the real-world

17

vindication that Defendant-Intervenors had achieved," *i.e.*, the judicial bar to implementation of Texas's proposed redistricting maps. *Id.* at *8. Therefore, "[i]n line with this Circuit's precedents and those in other courts of appeals," the Court found that "Defendant-Intervenors did not lose prevailing-party status *due to subsequent mootness*." *Id.* (emphasis added) (citations omitted).

The procedural posture of this fee application presents a different question. Unlike *Texas v. United States*, the legal controversy surrounding SB 14 was not rendered moot by action of the Texas legislature. Texas did not withdraw its voter identification law after a loss in VRA litigation. To the contrary, Texas maintained its position that it was entitled to implement SB 14 as a reasonable measure to protect against voter fraud.

Admittedly, the prevailing-party precedent includes language that is capacious enough to find prevailing-party status even where the initial decision is vacated on appeal. *See, e.g., Nat'l Black Police Ass'n*, 168 F.3d at 528 ("'In short, a plaintiff 'prevails' when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the [prevailing party].'" (quoting *Farrar v. Hobby*, 506 U.S. 103, 111–12 (1992))); *id.* at 529 ("[T]he district court properly found that the plaintiffs were prevailing parties because at the time the judgment was entered, the injunction altered the legal relationship between the parties."); *Turner*, 608 F.3d at 15 (noting that a prevailing party "need receive only some form of judicial relief, not necessarily a court-ordered consent decree or a judgment on the merits"); *Grano*, 783 F.2d at 1109 ("While partial versus complete success is a consideration in assessing the amount of fees, the critical question in evaluating the availability of fees is whether fee claimants have received any benefit at all." (internal quotation marks and citation omitted)).

It cannot be denied that the Kennie Intervenors received *some* benefit from the three-judge panel's ruling. As they explain:

> [i]f imposed in 2012, the photo ID law would have resulted in some of the Kennie Intervenors being denied the right to vote. For example, as Intervenor Kennie explained in his deposition testimony, he lacks a valid photo ID that would permit him to cast a ballot under SB 14. Kennie, who is indigent, [also] cannot obtain a photo ID from any Texas DPS office . . . . Since he lacks photo ID, this Court's decision provided Defendant Intervenor Kennie with a substantial benefit: he remained eligible to vote in the 2012 election.

Mot. for Fees at 12. Thus, while certain Kennie Intervenors may be required to present voter identification at the polls today, the delayed imposition of SB 14 and the ability to cast ballots during the November 2012 elections were meaningful events that, at least for a time, altered the legal relationship between the parties.

Nonetheless, while the prevailing-party precedents include language that could cover the instant matter, none extends beyond the procedural posture of subsequent mootness on appeal. *See, e.g., Grano*, 783 F.2d at 1109 ("The mootness of the subsequent appeal . . . emphasizes, rather than detracts from, the practical substance of [the plaintiffs'] victory."). Put differently, no court has held that a litigant maintains its prevailing party status after vacatur on appeal.

There is a sound basis for enforcing this procedural distinction. For instance, in *Texas v. United States*, the prevailing-party status of Defendant-Intervenors comported with a commonsense determination of what it means to "prevail": Defendant-Intervenors challenged Texas's proposed redistricting maps and, both immediately after the three-judge Court's decision and today, those redistricting maps are not in force. By contrast, this case did not become moot and Texas never changed its endorsement of SB 14. The State of Texas simply appealed until it

19

won and the three-judge panel decision barring SB 14 was vacated. The Court concludes that the Kennie Intervenors' prevailing-party status did not survive the Supreme Court's vacatur of the three-judge panel's decision denying preclearance.

### III. CONCLUSION

While the Court recognizes the apparent similarities between *Texas v. United States* and *Texas v. Holder*, the different postures of these cases compel different results. Even with Texas's threadbare Advisory, on view of the whole record, the Court finds that the Kennie Intervenors are not entitled to the requested attorneys' fees and costs for want of prevailing-party status. The Court will deny the Kennie Intervenors' request for $353,150.97 in fees and costs. A memorializing Order accompanies this Opinion.

Date: August 11, 2014

/s/
ROSEMARY M. COLLYER
United States District Judge